IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-882 (LPS) |
| | ) | (CONSOLIDATED) |
| ROXANE LABORATORIES, INC. et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

OF COUNSEL:

Aaron Stiefel
Daniel P. Di Napoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC  20005-2327
(202) 683-3500

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real
Suite 400
Palo Alto, CA 94306
(6500 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY  10502
(914) 326-5825

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*

September 30, 2016

**CONTENTS**

I.     Parties and Background ............................................................................................ 1

       A.     Plaintiffs .......................................................................................................... 1

       B.     Defendants ....................................................................................................... 1

       C.     Multiple Sclerosis ........................................................................................... 2

       D.     4-Aminopyridine.............................................................................................. 5

       E.     Ampyra ............................................................................................................ 6

II.    Patents-in-Suit.......................................................................................................... 8

       A.     United States Patent No. 5,540,938 (the "'938 Patent")........................................ 8

       B.     The Acorda Patents .......................................................................................... 9

III.   Claim Construction ................................................................................................. 11

IV.    Defendants Have Stipulated To Infringement .............................................................. 11

V.     The Parties' Experts ............................................................................................... 12

       A.     Plaintiffs' Experts .......................................................................................... 12

       B.     Defendants' Experts ....................................................................................... 13

VI.    The Definition of a Person of Ordinary Skill in the Art .................................................. 13

VII.   Defendants Have Failed to Demonstrate By Clear and Convincing Evidence That the
       '938 Patent is Invalid as Having Been Obvious ........................................................... 14

       A.     The Asserted Claims of the '938 Patent Would  Not Have Been Obvious to a
              POSA as of 1990-91 ....................................................................................... 14

       B.     The Commercial Success of Ampyra Is Further Proof of Nonobviousness ......... 19

VIII.  The Invention of the Acorda Patents and Development of Ampyra................................. 19

IX.    Defendants Have Failed to Demonstrate By Clear and Convincing Evidence That the
       Asserted Claims of the Acorda Patents Are Invalid as Having Been Obvious ............... 23

       A.     The Scope and Content of the Prior Art............................................................ 23

       B.     The Prior Art Did Not Provide A Motivation with a Reasonable Expectation of
              Efficacy to Improve Walking or Increase Walking Speed ................................ 40

       C.     The Acorda Patent Claims Covering Administration Without Dose Titration Were
              Nonobvious ................................................................................................... 42

       D.     The Acorda Patent Claims Covering Administration of 10 mg Sustained Release
              4-AP BID for at Least Two Weeks to Improve Walking in MS Patients Were Nonobvious
              44

       E.     The Acorda Patent Claims Requiring Specific Blood Levels and Pharmacokinetic
              Parameters Were Nonobvious.......................................................................... 45

F.      Secondary Considerations Support the Conclusion That the Acorda Patents Were Nonobvious at the Time of Invention ............................................................................. 46

     i.      The Patented Treatment Is a Commercial Success ...................................46

     ii.     There Existed a Long-Felt but Unsolved Need for the Claimed Treatment.....................................................................................49

     iii.    Others Had Failed to Develop Effective Treatments  to Improve Walking in Multiple Sclerosis Patients .......................................49

     iv.     The Patented Treatment Produced Unexpected Results ...........................51

## I.   PARTIES AND BACKGROUND

### A.  Plaintiffs

1.      Acorda Therapeutics, Inc. ("Acorda") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 420 Saw Mill River Road, Ardsley, New York 10502.  (D.I. 252, Ex. 1 at ¶ 1 ("Uncontested Facts")).

2.      Alkermes Pharma Ireland Limited ("Alkermes," and, together with Acorda, "Plaintiffs") is an Irish corporation (company number 448848) having a principal place of business at Connaught House, 1 Burlington Road, Dublin 4, Ireland.  (Uncontested Facts at ¶ 2).

3.      The parties have stipulated that Plaintiffs have standing with respect to each of Plaintiffs' claims asserted in this action against Defendants.  (D.I. 254 at ¶ 9).

### B.  Defendants

4.      Apotex Corp. is a corporation organized and existing under the laws of the state of Delaware, having a principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.  (Uncontested Facts at ¶ 3).

5.      Apotex Inc. (together with Apotex Corp., "Apotex") is a corporation organized and existing under the laws of Canada, having its principal place of business at 150 Signet Drive, Toronto, Ontario M9L 1T9, Canada.  (Uncontested Facts at ¶ 4).

6.      Mylan Pharmaceuticals Inc. ("Mylan") is a corporation organized and existing under the laws of the State of West Virginia, having a principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  (Uncontested Facts at ¶ 5).

7.      Roxane Laboratories, Inc. ("Roxane") is a corporation organized and existing under the laws of the State of Nevada, having a principal place of business at 1809 Wilson Road, Columbus, Ohio 43228.  (Uncontested Facts at ¶ 6).

8.     Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.  (Uncontested Facts at ¶ 7).

### C. Multiple Sclerosis

9.     Multiple Sclerosis ("MS") is a complex disease involving interplay between the central nervous and immune systems.  (Tr.[1], Goodman, 427:2-11, 430:5-17).   MS is a degenerative and inflammatory neurological disease which causes demyelination of nerve fibers resulting in short-circuiting of nerve impulses and a slowing or blocking of transmission along the nerve fibers, with associated disabling symptoms.  (Tr., Lublin, 392:12-393:10, 397:20-399:2, 409:6-14).

10.     Myelin is a fatty material that insulates axons (part of a nerve cell), allowing signals to travel along the axon rapidly and efficiently.  In MS, the patient's immune system damages or destroys the protective myelin sheath around axons.  This demyelination exposes potassium channels in the axonal cell membrane, which leak potassium current into the extracellular space.  The loss of potassium current in turn weakens or blocks further conduction of electrical impulses, or action potentials.  (Tr., Lublin, 392:12-25, 393:3-8, 397:25-399:2).

11.     Demyelination slows or blocks the movement of nerve impulses along the nerve. The result is diminished coordination of nervous system signals which can be manifested in a wide variety of symptoms affecting a range of body parts and systems.   These symptoms include, for example, walking impairment, visual difficulty, fatigue, spasticity, bladder dysfunction, tingling or pain, sexual dysfunction, balance problems, and cognitive changes. (Tr., Lublin, 392:12-25; Goodman, 432:15-433:22).

---

[1]     Citations to "Tr." refer to the trial transcript in this case.

12.     MS also causes brain scarring, which leads to permanent symptoms and makes MS patients susceptible to seizures or convulsions.  (Tr., Goodman, 430:5-7, 430:19-431:4, 441:23-442:7).

13.     The complexity of designing clinical trials of MS treatments and interpreting the results is heightened by the wide variety of MS symptoms which make it difficult to select clinical endpoints and lead to mixed results.  (Tr., Goodman, 436:11-437:1).

14.     There is substantial variability in how MS is manifested in a single patient and between patients.  (Tr., Goodman, 431:20-432:1, 432:11-14, 434:1-436:8; Peroutka, 121:18-22).  MS is not a static disease; it is a moving target.  (Tr., Goodman, 435:13-21).  There can be substantial variability of symptoms on a day-to-day – or even hour to hour – basis.  (Tr., Goodman, 435:22-436:8, 437:2-24; Peroutka, 121:23-122:4).

15.     The high degree of variability leads to challenges in conducting clinical trials and drawing conclusions from those trials, as changes in symptoms may reflect natural fluctuations in the disease course or the day-to-day variability of the disease, making it difficult to determine which of the symptomatic changes observed in a clinical trial represent actual clinical benefits of the treatment being tested.  (Tr., Goodman, 436:9-438:1).

16.     As there is no cure for MS, it is standard practice, when treating MS, to deconstruct the patient's symptoms and treat the symptoms individually.  Physicians also seek to modify the course of the illness with medications.  The ultimate goal is to improve the patient's quality of life.  (Tr., Lublin, 393:11-394:13).

17.     Difficulty walking is one of the more common and challenging difficulties faced by patients with MS.  (Tr., Goodman, 432:6-10).

18.     There are a number of methods for assessing disease state in patients with MS. Some measures use numerical scales designed to interpret patients' subjective, self-reported interpretation of particular symptoms, such as fatigue or walking in general, or the patient's overall global impression of their condition.  (Tr., Goodman, 455:7-11, 481:4-8, 12-13, 518:5-6, 518:20-519:5).   Other methods are more objective in nature, such as timed walking measures, including the timed 25-foot walk (T25FW).  (Tr., Lublin, 394:14-20).

19.     While many tests, such as walking tests, measure clinically manifested symptoms, other tests more directly assess the slowing of nerve impulse transmission caused by demyelination.  For example, researchers and clinicians can measure subclinical visually evoked potentials ("VEP") to detect the slowing of nerve transmission in MS patients.  (JTX-0065 (Halliday); Tr., Lublin, 394:21-396:9).   In the 1970s, researchers established that VEP could serve as a "valuable test in the early diagnosis of multiple sclerosis," as changes in the latency can be directly measured even where measures of clinically manifested symptoms do not show a change.  (JTX-0065 (Halliday); Tr., Lublin, 395:15-396:9, 397:2-8).

20.     By the late 1980s and early 1990s, VEP was also being used in conjunction with clinical metrics as a measure of efficacy in clinical trials.   (JTX-0025 (Bever I); JTX-0043 (Davis); JTX-0113 (Stefoski II); Tr., Lublin, 400:13-401:7, 402:17-403:11, 404:8-25; *see also* JTX-0028 (Bever III)).

21.     VEP is an especially useful tool as it is not susceptible to the placebo effect, which is a particular problem in MS trials (Tr., Lublin, 401:20-402:10, 403:12-404:7, 405:1-17) in which test subjects who did not receive active drug often show improvement.  (JTX-0080A (Goodman Poster) (*e.g.*, greater improvement on fatigue on placebo than 4-AP); JTX-0104 (Schwid) (referring to failed 161 patient study where placebo improved Expanded Disability

Status Scale ("EDSS") same as 4-AP); Tr., Lublin, 412:17-22; Goodman, 468:25-469:17, 486:7-19, 489:9-490:2, 495:20-496:17).

### D. 4-Aminopyridine

22.     4-aminopyridine (4-AP), also known as dalfampridine, is the active ingredient in Acorda's Ampyra® product.  4-AP is a potassium channel blocker.  By blocking potassium leakage from demyelinated nerves, 4-AP improves nerve conduction.  (Tr. Lublin, 397:16-399:7, 399:14-400:6; Goodman, 438:5-16; *see also* PTX-599 (Bostock)).

23.     4-AP has potential serious adverse effects, including seizures or convulsions. Other side effects include tremors, paresthesias, dysesthesias (painful tingling), dizziness, and insomnia.  Adverse effects such as seizures are related to 4-AP's potassium channel blocking mechanism of action.  (Tr., Goodman, 438:17-439:11).

24.     4-AP has a long history, having been marketed as a bird poison.  (Tr., Fassihi, 361:18-362:2).  4-AP was also used to generate seizures in animal models for use in the testing of anti-seizure medications.  (*Id.*).

25.     The toxicity of 4-AP has long been recognized to limit its application.  (JTX-0025 at 421 (Bever I) (suggesting use of 3,4-diaminopyridine instead of 4-AP due to "[s]eizure induction by 4-AP and a high toxic to therapeutic ratio . . . limiting its clinical use" and recognizing that "seizures have occurred in patients taking as little as 80 mg/day [4-AP], a dose that did not lead to improvement in patients with MS who have chronic stable deficits"); JTX-0089 at 270 (Murray); Tr., Goodman, 441:18-442:7; Peroutka, 123:21-124:4).  4-AP poses risks of serious adverse effects, including seizures, in MS patients.  (JTX-0028 at 1056 (Bever III); JTX-0080A at Abstract (Goodman Poster); JTX-0089 at 270 (Murray); JTX-0095 at 294-95 (Polman I) (observing seizures in two patients, one after only taking two 5 mg capsules of instant release 4-AP and one after taking a total of 20 mg 4-AP per day of instant release 4-AP);

Tr., Goodman, 438:17-439:11, 441:23-442:16, 456:21-457:8, 460:14-25, 481:24-482:16, 495:11-496:17; Peroutka, 123:21-124:4, 126:14-127:14; *see also* PTX-0416 at 6 (Solari) ("A conclusion on the safety of these preparations is even more problematic due to the limited power of the current systematic review to reliably detect major adverse events, and to the low external validity of the results (narrow entry criteria).")).   The concern about seizures is heightened in MS patients because "one of the hallmarks of MS is brain scarring, predisposing [MS patients] to an increased risk of seizures."  (Tr., Goodman, 441:23-442:16).   A POSA would have been particularly concerned about 4-AP's seizure risk because it was linked to the same mechanism of action through which 4-AP provides therapeutic benefit.  (Tr., Goodman, 438:17-439:11, 482:9-16, 495:11-496:17; *see also* Tr., Peroutka, 122:5-13).   Seizure risk continued to be a significant concern as of April 2004.  (Tr., Goodman, 495:11-496:17).

### E.  Ampyra

26.   Acorda holds an FDA-approved New Drug Application ("NDA"), No. 022250, for the use of 10 mg dalfampridine extended release tablets to improve walking in patients with multiple sclerosis (MS), which Acorda sells under the registered name Ampyra.  (D.I. 1 at ¶ 30; Uncontested Facts at ¶ 8).

27.   Ampyra was approved by the FDA on January 22, 2010.  (Uncontested Facts at ¶ 67).

28.   Ampyra was the first FDA-approved use of 4-AP.  (Uncontested Facts at ¶ 68; Tr., Goodman, 512:15-17; Peroutka, 142:2-7).

29.   Improving walking in MS patients is the only FDA-approved use of Ampyra (dalfampridine).  (Uncontested Facts at ¶ 9; Tr., Peroutka, 142:8-13).

30.   Acorda has been marketing and selling Ampyra in the United States since March 2010.  (Uncontested Facts at ¶ 69).

31.     The drug label for Ampyra states, under the heading "INDICATIONS AND USAGE," that "AMPYRA (dalfampridine) is indicated as a treatment to improve walking in patients with multiple sclerosis (MS).  This was demonstrated by an increase in walking speed . . . ." (JTX-0076 at AMPDEL0170808; Uncontested Facts at ¶ 73).

32.     Under the heading "DOSAGE AND ADMINISTRATION," the Ampyra drug label states:

> The maximum recommended dose of AMPYRA is one 10 mg tablet twice daily, taken with or without food, and should not be exceeded.  Doses should be taken approximately 12 hours apart.  Tablets should only be taken whole; do not divide, crush, chew, or dissolve. Patients should not take double or extra doses if a dose is missed.
>
> * * *
>
> No additional benefit was demonstrated at doses greater than 10mg twice daily and adverse reactions and discontinuations because of adverse reactions were more frequent at higher doses [see FDA Approved Patient Information for complete "Instructions for Use"].

(JTX-0076 at AMPDEL0170808; Uncontested Facts at ¶ 74).

33.     Under the heading "DESCRIPTION," the Ampyra label states that "AMPYRA (dalfampridine) is a potassium channel blocker, available in a 10 mg tablet strength.  Each tablet contains 10 mg dalfampridine, formulated as an extended release tablet for twice-daily oral administration."  (JTX-0076 at AMPDEL0170811; Uncontested Facts at ¶ 75).

## II.    PATENTS-IN-SUIT[2]

### A.    United States Patent No. 5,540,938 (the "'938 Patent")

34.    The '938 Patent, entitled "Formulations and Their Use in the Treatment of Neurological Diseases," issued on July 30, 1996.  (JTX-0001 (the '938 Patent); Uncontested Facts at ¶ 10).

35.    The '938 Patent is a divisional of U.S. Application No. 73,651, filed June 7, 1993, which issued as U.S. Patent No. 5,370,879 on December 6, 1994. Application No. 73,651 was a continuation of U.S. Application No. 786,400, filed November 1, 1991, which was subsequently abandoned by the applicant.  (JTX-0001 (the '938 Patent); Uncontested Facts at ¶ 11).  The '938 Patent also claims priority to an Irish patent application filed November 2, 1990.  (*Id.*)  The patent expires on July 30, 2018.  (Uncontested Facts at ¶ 11).

36.    The FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" ("Orange Book"), lists the '938 Patent with respect to Ampyra.  (C.A. No. 14-00932 (LPS), D.I. 1 at ¶¶ 32-33; Uncontested Facts at ¶ 12).

37.    Joseph G. Masterson and Michael Myers are the named inventors of the '938 Patent.  (JTX-0001 (the '938 Patent); Uncontested Facts at ¶ 13).

38.    Alkermes is the assignee of the '938 Patent.  (Uncontested Facts at ¶ 14).

39.    Acorda holds an exclusive license to the '938 Patent.  (Uncontested Facts at ¶ 15).

40.    Plaintiffs have asserted that Defendants infringe claims 3 and 8 of the '938 Patent. (D.I. 252, Pretrial Order at ¶ 4).

---

[2]    The "Asserted Claims" refers to: the '938 Patent claims: 3, 8; the '826 Patent claims: 1, 7, 38, 39; the '437 Patent claims: 1, 2, 5, 22, 32, 36, 37; the '703 Patent claims: 36, 38, 45; and the '685 Patent claims: 3, 5.  The '826 Patent, the '437 Patent, the '703 Patent, and the '685 Patent are collectively referred to as the "Acorda Patents."  The '938 Patent and the Acorda Patents are collectively referred to as the "Ampyra Patents."

### B.  The Acorda Patents

41.     United States Patent No. 8,007,826 (the "'826 Patent"), entitled "Sustained Release Aminopyridine Composition," issued on August 30, 2011.  (JTX-0002 (the '826 Patent); Uncontested Facts at ¶ 18).

42.     The '826 Patent issued from U.S. Patent Application No. 11/010,828 (the "'828 application"), which was filed on December 13, 2004, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004.  (JTX-0002 (the '826 Patent); Uncontested Facts at ¶ 19).  The patent expires on May 26, 2027.  (Uncontested Facts at ¶ 19).

43.     Plaintiffs have asserted that Defendants infringe claims 1, 7, 38, and 39 of the '826 Patent.  (D.I. 252, Pretrial Order at ¶ 4).

44.     United States Patent No. 8,354,437 (the "'437 Patent"), entitled "Method of Using Sustained Release Aminopyridine Compositions," issued on January 15, 2013.  (JTX-0003 (the '437 Patent); Uncontested Facts at ¶ 24).

45.     The '437 Patent issued from U.S. Patent Application No. 11/102,559 (the "'559 application"), which was filed on April 8, 2005, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004.  (JTX-0003 (the '437 Patent); Uncontested Facts at ¶ 25).  The patent expires on December 22, 2016.  (Uncontested Facts at ¶ 25).

46.     Plaintiffs have asserted that Defendants infringe claims 1, 2, 5, 22, 32, 36, and 37 of the '437 Patent.  (D.I. 252, Pretrial Order at ¶ 4).

47.     United States Patent No. 8,400,703 (the "'703 Patent"), entitled "Methods of Using Sustained Release Aminopyridine Compositions," issued on May 14, 2013.  (JTX-0004 (the '703 Patent); Uncontested Facts at ¶ 30).

48.     The '703 Patent issued from U.S. Patent Application No. 13/299,969 (the "'969 application").  The '969 application was a continuation of U.S. Patent Application No.

11/102,559, which was filed on April 8, 2005, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004. (JTX-0004 (the '703 Patent); Uncontested Facts at ¶ 31). The patent expires on April 8, 2025. (Uncontested Facts at ¶ 31).

49.     Plaintiffs have asserted that Defendants infringe claims 36, 38, and 45 of the '703 Patent. (D.I. 252, Pretrial Order at ¶ 4).

50.     United States Patent No. 8,663,685 (the "'685 Patent"), entitled "Sustained Release Aminopyridine Composition," issued on March 4, 2014. (JTX-0005 (the '685 Patent); Uncontested Facts at ¶ 36).

51.     The '685 Patent issued from U.S. Patent Application No. 13/187,158 (the "'158 application"). The '158 application was a continuation of U.S. Patent Application No. 11/010,828 (the "'828 application"), which was filed on December 13, 2004, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004. (JTX-0005 (the '685 Patent); Uncontested Facts at ¶ 37). The patent expires on January 18, 2025. (Uncontested Facts at ¶ 37).

52.     Plaintiffs have asserted that Defendants infringe claims 3 and 5 of the '685 Patent. (D.I. 252, Pretrial Order at ¶ 4).

53.     The FDA's Orange Book lists each of the Acorda Patents with respect to Ampyra. (Uncontested Facts at ¶¶ 20, 26, 32, 38).

54.     Andrew R. Blight and Ron Cohen are the named inventors on each of the Acorda Patents. (JTX-0002 ('826 Patent); JTX-0003 ('437 Patent); JTX-0004 ('703 Patent); JTX-0005 ('685 patent); Tr., Cohen, 274:4-6; Uncontested Facts at ¶¶ 21, 27, 33, 39).

55.     Acorda is the assignee of each of the Acorda Patents.  (JTX-0002 ('826 Patent);

JTX-0003 ('437 Patent); JTX-0004 ('703 Patent); JTX-0005 ('685 patent); Uncontested Facts at

¶¶ 22, 28, 34, 40).

## III.     CLAIM CONSTRUCTION

56.     This Court endorsed stipulated constructions for certain claim terms in the

Ampyra Patents.  (D.I. 187; D.I. 193; Uncontested Facts at ¶ 42).

57.     The Court held a claim construction hearing on March 7, 2016.  On March 16,

2016, the Court issued a claim construction order and opinion on claim construction.  (D.I. 195;

D.I. 196; Uncontested Facts at ¶ 43).

## IV.     DEFENDANTS HAVE STIPULATED TO INFRINGEMENT

58.     Each Defendant filed an ANDA, pursuant to the FDCA, seeking approval to

engage in the commercial manufacture, use, or sale of dalfampridine (10 mg) oral extended

release tablets before the Ampyra Patents expire.  (Uncontested Facts at ¶¶ 78, 98, 111, 131).

59.     In connection with the filing of its respective ANDA, each Defendant submitted a

Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that each of the

Ampyra Patents is invalid, unenforceable, or will not be infringed by the commercial

manufacture, use, or sale of that defendant's generic dalfampridine tablet.  (Uncontested Facts

at ¶¶ 79, 99, 112, 132).

60.     Each Defendant has stipulated that the filing of its ANDA with the FDA seeking

approval to market its generic dalfampridine tablets prior to the expiration of the Ampyra

Patents infringed the Asserted Claims of the Ampyra Patents under 35 U.S.C. § 271(e)(2)(A), to

the extent those claims are found to be valid and enforceable.  (D.I. 254 at ¶ 1).

61.     Each Defendant has stipulated that the Asserted Claims of the Ampyra Patents would be infringed by use of the proposed products that are the subject of its ANDA, to the extent those claims are valid and enforceable.  (D.I. 254 at ¶ 2).

## V.     THE PARTIES' EXPERTS

### A.  Plaintiffs' Experts

62.     Plaintiffs' expert Dr. Reza Fassihi, holds a Ph.D. in pharmaceutics from Brighton University (U.K.) and is a professor of pharmacy at Temple University.  (JTX-0040; Tr. Fassihi, 315:7-9).  He is a widely published researcher who has devoted the bulk of his career to the development of sustained release pharmaceutical formulations.  (JTX-040; Tr., Fassihi, 318:13-320:17).

63.     Drs. Fred Lublin and Andrew Goodman are board certified neurologists who have specialized in treating MS patients and conducting MS clinical trials for decades.  (JTX-0034; Tr., Lublin 386:1-11, 388:7-389:12, 390:7-21; Goodman, 422:20-423:12, 424:21-427:19).  Both have treated thousands of MS patients, (Tr., Lublin, 389:13-20; Goodman, 424:21-425:3, 425:11-15, 425:21-426:8), have published widely regarding MS, (JTX-0034; Tr., Lublin, 388:7-21; Goodman, 423:24-424:9), and teach and train doctors regarding the care of MS patients. (JTX-0034; Tr., Lublin, 387:22-388:3, 389:5-12, 389:24-390:6; Goodman, 424:21-425:15, 425:16-20).

64.     Dr. Gregory Bell holds both an M.B.A. and a Ph.D. in business economics from Harvard University.  (Tr., Bell, 573:13-24).  He is currently a Group Vice President at Charles River Associates, a global economics and management consulting firm, where he is the global head of the life sciences practice, and works on, among other things,  new drug strategy, product launches, pricing, and marketing strategy.  (Tr., Bell, 573:4-12, 573:25-574:14).

### B.  Defendants' Experts

65.     Dr. Stephen Peroutka is an M.D. and a Ph.D in pharmacology and experimental therapeutics.  (Tr., Peroutka, 44:25-45:7).  Dr. Peroutka treated roughly 100 MS patients during the 1980s, but otherwise has not treated MS patients or conducted MS research.  (Tr., Peroutka, 45:22-25, 119:9-18, 119:24-121:16).  Dr. Peroutka has not published any articles relating to MS.  (Tr., Peroutka, 120:19-121:13).

66.     Dr. Arthur Kibbe holds a Ph.D. in pharmacokinetics and biopharmaceutics and is a professor emeritus at Wilkes University.  (DTX-129; Tr., Kibbe, 173:19-174:13).  Dr. Kibbe has not conducted research or published on sustained release pharmaceutical formulations.  (Tr., Kibbe, 229:5-231:3).

67.     Dr. DeForest McDuff received a Ph.D. in Economics from Princeton University in 2009.  (Tr., McDuff, 626:13-18, 655:5-6).  Dr. McDuff has testified on behalf of generic drug companies that various FDA-approved branded pharmaceuticals were not commercial successes.  (Tr., McDuff, 655:19-657:22).

## VI.    THE DEFINITION OF A PERSON OF ORDINARY SKILL IN THE ART

68.     The Plaintiffs have put forth the following definition of a person of ordinary skill in the art (a "POSA") with regard to the Ampyra Patents:

> A person of ordinary skill in the art during the relevant time period would have the knowledge of someone with an M.D. with experience treating MS patients and a Ph.D. in pharmaceutics, or pharmacology, and at least five years of experience in clinical research and drug development, including researching, designing and testing drug formulations, particularly for the treatment of multiple sclerosis.

69.     All of Plaintiffs' and Defendants' experts testified that their opinions regarding obviousness would be the same regardless of whether the Court adopts Plaintiffs' definition or

Defendants' definition.   (Tr., Fassihi, 322:18-24; Lublin, 406:6-18; Goodman, 429:14-430:4;

Peroutka, 72:14-17; Kibbe, 183:16-184:5).

## VII.   DEFENDANTS HAVE FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT THE '938 PATENT IS INVALID AS HAVING BEEN OBVIOUS

### A.   The Asserted Claims of the '938 Patent Would Not Have Been Obvious to a POSA as of 1990-91

70.    Claims 3 and 8 of the '938 Patent would not have been obvious to a POSA as of

1990-91.  Given what was then known (and not known) about 4-AP and given the nascent state

of the art of developing sustained release formulations, a POSA would not have had a reasonable

expectation of success in developing a claimed sustained release 4-AP formulation that would

achieve therapeutically effective blood levels over 12-24 hours when administered once-or

twice-daily.  (Tr., Fassihi, 328:9-329:3, 329:23-330:4, 343:15-344:10).

71.    In 1990-91, although the chemical compound 4-AP had long been known, it was

not an FDA-approved drug for any purpose in any form.  (Tr., Fassihi, 338:7-9; Kibbe, 233:21-

23).  4-AP was known as a bird toxin and as an agent used to induce seizures in animals.  (Tr.,

Fassihi, 361:18-362:2).  The clinical efficacy and safety of 4-AP as a treatment for multiple

sclerosis was undetermined.  (Tr., Fassihi, 352:16-357:25; Goodman, 444:16-447:19).  The two

prior art studies cited by Defendants, Stefoski (1987, JTX-0112) and Davis (1990, JTX-0043),

plainly were quite limited in that they were very small, did not use a randomized treatment

design, were not double-blinded, had only short-term use, and relied on outcome measures that

were not widely accepted.   (JTX-0027 at S-119 (Goodman I); Tr., Fassihi, 355:11-356:12,

360:14-18; Lublin, 402:11-16, 403:12-404:17, 405:1-14; Goodman, 444:16-446:3, 446:13-

447:19).[3]  The Stefoski and Davis papers did little more than suggest the need for further studies.  (JTX-0112 at 76 (Stefoski I); JTX-0043 at 90 (Davis); Tr., Fassihi, 352:16-355:10, 379:14-380:4).  Given the sparse evidence of any clinical usefulness for 4-AP in MS patients, a POSA would not have been motivated to make a sustained release formulation of 4-AP in 1990-91.  (Tr., Fassihi, 344:11-18).  It was the inventors, not the prior art, that identified "a need for an improved dosage form" of 4-AP.  (JTX-0001 at 2:12-13).

72.    A POSA who undertook in 1990-91 to attempt to develop a sustained release formulation of 4-AP would not have had an expectation of success.  In 1990-91, developing a sustained release formulation of 4-AP would not have been routine experimentation.  (Tr., Fassihi, 328:9-329:3, 329:21-330:4).  Sustained release technology was at a nascent stage.  (Tr., Myers, 151:11-18; Fassihi, 327:19-328:4).  The knowledge and experience of formulators and the number of excipients and technology available to formulators was limited.  (Tr., Fassihi, 327:19-328:4).

73.    In 1990, Dr. Joseph Robinson—who defendants' expert Dr. Kibbe described as "a real authority on sustained release" (Tr., Kibbe, 236:17-237:1)—wrote that "[d]esign of a sustained-release product is normally a very difficult task."  (PTX-0095 at 201).  Dr. Robinson explained that "[s]uccessful fabrication of sustained-release products . . . involves consideration of the physical-chemical properties of the drug, pharmacokinetic behavior of the drug, route of administration, disease state to be treated and, most importantly, placement of the drug in a dosage form that will provide the desired temporal and spatial delivery pattern for the drug." (PTX-0095 at 199; *see also* Tr., Fassihi, 326:16-327:14, 329:23-330:4).

---

[3]     The '938 Patent itself cites "clinical trials carried out by Davis, F. A. and Stefoski, D. of The Rush Multiple Sclerosis Centre, U.S.A.," in which 4-AP was "administered orally in multiple daily doses over 2-5 days to MS patients."  (JTX-001 at 1:56-59).

74.     In 1990-91, Elan Corporation–the predecessor of plaintiff Alkermes and the company that employed inventors Masterson and Myers–was at the forefront of the development of sustained release formulations.   (Tr., Fogarty, 159:24-160:3; Myers, 151:11-18; Fassihi, 324:20-325:15).

75.     In 1990-91, the FDA was still in the process of developing guidelines to aid pharmaceutical companies in developing formulations.   (Fassihi, 338:17-340:2; *see also* JTX-108).

76.     The drugs that were then available in sustained release dosage forms, including all those identified in Remington's (1990) (JTX-0109), were drugs that had previously been approved by the FDA in immediate release form.  (Tr., Fassihi, 335:19-336:13, 366:9-19).  Once a product has been widely consumed in immediate release form, information becomes available about the safety, efficacy, and pharmacokinetics of the drug.  (*Id*. at 336:10-338:6).  Developing a sustained release formulation without that information would have been very difficult.  (*Id*. at 336:15-18).

77.     In 1990-91, because 4-AP had not been approved by the FDA, there was very limited information available about 4-AP.  (Tr., Myers, 150:16-151:7; Fassihi, 361:18-362:2).  A POSA would not have known what *in vitro* dissolution profile would be needed in order to achieve sustained blood levels of 4-AP that would be therapeutic, yet safe, over time.  (Tr., Kibbe, 240:21-241:24).

78.     Each active pharmaceutical ingredient ("API") is unique, with its own physical-chemical properties and pharmacokinetics.  (Tr., Fassihi, 340:3-12).  There was (and is) no universal sustained release formulation that would work for all drugs.  (*Id.*).

79.     Pharmacokinetic information is important to developing sustained release formulations because the pharmacokinetics of the drug define how the drug is released, distributed, metabolized, and eliminated.  (Tr., Fassihi, 337:14-338:6, 340:13-341:4).  Unlike immediate release formulations, sustained release formulations do not dissolve immediately.  (*Id.* at 326:16-327:14).  Rather, they travel throughout the gastrointestinal tract, which subjects the drug to various environments.  (*Id.*).

80.     No meaningful pharmacokinetic information was available regarding 4-AP in 1990-91.  (*Id.* at 345:4-7, 348:18-349:8, 349:16-352:15).  Uges (1982) (JTX-0137) was the only publication containing any 4-AP pharmacokinetic information and reflected data from only nine healthy subjects.  (JTX-0137 (Uges); Tr., Kibbe, 247:6-12).  Uges does not concern sustained-release 4-AP.  (JTX-0137 (Uges); Tr., Fassihi, 346:9-22).  The information in Uges demonstrates significant variability in the pharmacokinetics of 4-AP and a lack of predictability.  (Tr., Fassihi, 348:18-349:8, 349:16-352:15).  Uges suggests that the pharmacokinetics of 4-AP are complicated, such that more information was needed to develop a sustained release formulation. (*Id.* at 350:20-25).  Accordingly, a formulator would not have relied on Uges in making sustained release 4-AP.  (*Id.* at 348:18-349:8, 349:16-352:15).

81.     Development of a sustained release formulation is complicated by the fact that sustained release formulations introduce larger total amounts of drug, as compared with individual immediate release dosage forms, with the expectation that the drug will be released more slowly, over a longer period of time.  (*Id.* at 325:25-326:15).  As a result, sustained formulations pose a risk of "dose dumping," *i.e.*, releasing too much drug too soon.  (*Id.*).  That was an issue with respect to 4-AP, which was known to be toxic.  (*Id.* at 328:9-19).

82.     The high solubility of 4-AP made the task of formulating a sustained release version of 4-AP particularly challenging because the more soluble the active ingredient, the more difficult it is to slow the release of the drug.  (Tr., Myers, 153:22-154:1; Fassihi, 342:19-343:8; *see also* JTX-0081 at 1679 (Remington's 1990)).  The potency and low dose of 4-AP further complicated designing a sustained-release formulation because of concerns of dose dumping (toxicity) and the need for uniform distribution of the API throughout the dosage form.  (Tr., Myers, 157:17-23; Tr., Fassihi, 341:9-343:12).  The observation of seizures in past trials of immediate release 4-AP suggested that the therapeutic window of 4-AP was narrow.  (Tr., Fassihi, 343:9-12).

83.     The 1985 and 1990 Remington's treatises, the only prior art references asserted by Defendants with respect to sustained release platforms, merely demonstrate that by 1990-91 (1) certain platforms had been used to produce sustained release formulations; and (2) certain drugs that were already FDA-approved in immediate release form had also been produced in sustained release formulations.  (JTX-0081 (Remington's 1990); JTX-0082 (Remington's 1985); Tr., Fassihi, 335:19-336:13, 358:3-21).  Remington's does not speak to whether and how one of ordinary skill in the art of formulation development would have developed a sustained release formulation of 4-AP, particularly in light of the fact that much was unknown about 4-AP and that 4-AP had not been approved by the FDA even in an immediate release formulation.  (Tr., Fassihi, 358:3-21).

84.     Thus, the formulator – as of the 1990-91 timeframe – did not know whether it was possible to develop, without undue experimentation, a pharmaceutically acceptable formulation that would release 4-AP at the rate necessary to achieve therapeutically effective blood levels. (*Id*. at 328:9-329:3, 343:15-344:10).

85.     The '938 Patent was novel in that the inventors (1) prepared for the first time a sustained release formulation of 4-AP; (2) disclosed release rates with the specifics at every hour of how much of the drug should be released; (3) described multiple examples of sustained release formulations of 4-AP; and (4) taught how to reach therapeutic levels.  (*Id*. at 377:17-378:19).

86.     A POSA would not have been motivated to develop a sustained release formulation of 4-AP with a reasonable expectation of success.  (Tr., Fassihi, 328:9-329:3, 329:23-330:4, 343:15-344:18).

## B.  The Commercial Success of Ampyra Is Further Proof of Nonobviousness

87.     The nonobviousness of the '938 Patent is further supported by the commercial success of Ampyra, as described *infra* in Section IX(F)(i).  (Tr., Bell, 577:18-578:13).  From its launch in 2010 through the end of 2015, net sales of Ampyra totaled $1.7 billion, and Acorda realized net income from U.S. sales alone of $998.7 million.  (PTX-0795; Tr., Bell, 577:21-579:13, 580:13-581:19).  Ampyra is a sustained release 4-AP formulation, and no immediate release version of 4-AP was approved by the FDA.  (Uncontested Facts at ¶ 67).  Some of the commercial success of Ampyra is attributable to the invention of the '938 Patent.  (Tr., Bell, 584:2-585:8).

## VIII.    THE INVENTION OF THE ACORDA PATENTS AND DEVELOPMENT OF AMPYRA

88.     Dr. Ron Cohen founded Acorda in 1993.  (Tr., Cohen, 277:6-7).  Dr. Cohen initially planned to focus on finding therapies to restore function to people with spinal cord injuries ("SCI") and thereafter to branch into other areas of neurology, such as MS.  (*Id*. at 277:6-14).  Dr. Cohen learned of 4-AP through Dr. Andrew Blight, one of Acorda's first employees, who had previously done some initial exploratory work with 4-AP and spinal cord

injury. (*Id*. at 277:15-279:9). After obtaining a patent application license from a Canadian foundation, Acorda initially used an immediate release 4-AP formulation; in 1997, Acorda licensed the sustained release formulation developed by Elan. (*Id*. at 279:3-280:21). Acorda ultimately conducted Phase I, Phase II and two large Phase III trials in SCI patients, all of which failed. (*Id*. at 280:22-281:10).

89.     In 1998, Acorda began researching the use of sustained release 4-AP to treat MS, which Elan was no longer interested in pursuing after its own large MS trial failed. (*Id*. at 281:11-24). Elan's study had been a double-blinded, randomized, placebo-controlled, 161 patient study of safety and efficacy of twice daily sustained-release 4-AP in MS patients. (*Id*. at 283:8-284:9; *see also* PTX-0360 (Elan Report)). The primary endpoint of the Elan study was the Expanded Disability Status Scale (EDSS), a composite measure of function, including assessment of ambulation, served as the primary outcome variable. (JTX-0104 at 817 (Schwid); PTX-0360 at 1 (Elan Report); Tr., Goodman, 467:18-25). The EDSS had been used in previous studies and was widely accepted by the MS community. (PTX-0360 at 104; Tr., Goodman, 284:10-20). The patients in the 4-AP group initially received 12.5 mg BID, and the dose was increased by 5 mg every two weeks until the patients either experienced intolerable side effects or a maximum dose of 22.5 mg BID was achieved. (PTX-0360 at 8-9 (Elan Report); Tr., Cohen, 284:21-285:3). The dose was increased gradually because 4-AP was known to have potentially toxic effects, including seizures, particularly as the doses increase. It was understood in the field that 4-AP should be administered starting at a low dose to be increased over time so the patient could acclimate and then receive higher dose without adverse events. (Tr., Cohen, 285:4-14). The only outcome measure with a statistically significant difference was a secondary outcome measure of lower extremity muscle strength; all other primary and

secondary outcomes measures failed.   (PTX-0360 at 101-102 (Elan Report); Tr., Cohen, 285:15-22).

90.     Although Elan's MS trial had failed, given that Acorda was a small start-up entirely dependent on investor money, Dr. Cohen felt that Acorda had to take bigger risks than other companies, and he decided to continue development of sustained release 4-AP to treat MS. (Tr., Cohen, 281:25-282:9).

91.     Acorda's first MS study concerned eye muscle movement in MS patients in 1990-2000.   (PTX-0413A at 225 (MS-F200 Report); Tr., Cohen, 286:1-287:12).   None of the outcome measures worked, and the study failed.  (PTX-0413A at 227; Tr., Cohen, 287:10-12).

92.     Acorda subsequently conducted the 36 patient MS-F201 study in 2000-2001.[4] (PTX-0466A (MS-F201 Report); Tr., Cohen, 287:13-288:14).   The study was designed primarily to explore safety and tolerability.  Consistent with previous practice in administering 4-AP, the 25 patients in the 4-AP group received doses that escalated weekly in five mg increments, beginning with 10 mg BID and reaching 40 mg BID in the seventh week.  (Tr., Cohen, 288:9-21).  The low starting dose of 10 mg BID was chosen due to 4-AP's toxicity, allowing patients to  be titrated up to receive maximum effect.  (*Id.*, at 288:22-289:4).  The maximum dose of 40 mg BID was chosen based on severe adverse events that occurred above that dose.  (*Id.*, at 289:5-11).  The outcome measures included fatigue, lower extremity manual muscle test ("LEMMT"), the multiple sclerosis functional composite, and subjective measures.  (*Id.*, at 289:12-22).  The study failed as to all of the prospectively identified endpoints except for LEMMT.  (*Id.*, at 289:23-290:2).  The results of the timed 25 foot walk, which was a component of the MS functional composite, were not statistically significant.  (PTX-0466A at

---

[4]     Acorda's MS-F201 study is the study discussed in the Goodman References.

63 (MS-F201 Report); Tr., Cohen, 290:3-5, 290:18-292:1).  With respect to the timed 25 foot walk, the placebo group showed greater improvement than the 4-AP group in multiple weeks. (PTX-0466A at 63 (MS-F201 Report); Tr., Cohen, 290:18-292:1).  In three of the seven visits, the placebo group demonstrated greater improvement than the 10 mg BID visit.  (PTX-0466A at 63 (MS-F201 Report); Tr., Cohen, 291:20-292:1).  Acorda then conducted a post-hoc analysis of the data analyzing walking speed (as opposed to walking time) and found a statistically significant difference on this measure between the 4-AP and placebo groups when the 4-AP results were aggregated across all of the various doses combined together.  (Tr. Cohen, 292:2-10; Goodman, 478:23-479:4).  The inventors were quite discouraged after analysis of the MS-F201 study, knowing that post-hoc analyses were fraught with risk and the study was small. (Tr., Cohen, 292:19-25).

93.    Thereafter, Acorda conducted the MS-F202 study, a 206 patient Phase II study which prospectively used walking speed as an outcome measure.  (PTX-0168A (MS-F202 Report); Tr., Cohen, 292:11-293:15).  To limit adverse events and the size of the study, the MS-F202 study explored sustained release 4-AP doses of 10 mg, 15 mg, and 20 mg BID.  (Tr., Cohen, 293:23-294:16).  After a run-in period, there was a two-week up-titration period, followed by a twelve-week stable dosing period.  (Tr., Cohen, at 295:7-13).  The titration period was used to limit side effects.  (Id., at 295:14-18).  When the pre-planned analysis was conducted the study failed; none of the 4-AP groups showed a statistical difference versus placebo.  (Id., at 295:25-296:3).

94.    In the face of that apparent failure, Acorda decided to conduct a blinded post-hoc analysis, identifying the individual patients who appeared to have a significant change in walking speed.  (Id., at 296:9-298:20).  This analysis evolved into a "responder analysis."  (Id.).

Acorda found that the responders were, overwhelmingly, from the 4-AP group, with a p-value of less than .0001. (*Id.*, at 298:8-20).

95.     Looking at the post-hoc results, Acorda discovered, surprisingly, that there was no meaningful difference in efficacy among the 10 mg, 15 mg, and 20 mg groups. (*Id.*, at 298:21-299:9).  Having found that the 10 mg dose was as effective as 15 mg or 20 mg, Acorda determined that there was no need to titrate the patients up from 10 mg. (*Id.*, at 299:10-17).

96.     Acorda then conducted two Phase III studies, with only a 10 mg BID dosing versus placebo using the responder analysis as the prospectively-defined primary outcome measure. (*Id.*, at 299:18-300:5).  Both studies were successful, with p-values of less than .0001. (*Id.*, at 300:6-8).

97.     Acorda then submitted a New Drug Application, which received FDA priority review. (*Id.*, at 300:9-17).  The priority review indicated that the FDA considered Ampyra a potentially important therapy for an important condition. (Tr., Goodman, 512:6-14).  The FDA approved Ampyra in January 2010. (Tr., Cohen, 300:18-19).  The launch of Ampyra was very well received, greatly exceeding Acorda's expectations. (*Id.*, at 300:20-301:9).

## IX.     DEFENDANTS HAVE FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS OF THE ACORDA PATENTS ARE INVALID AS HAVING BEEN OBVIOUS

### A.  The Scope and Content of the Prior Art

98.     Before the invention of the claimed therapeutic regimen, no adequately controlled clinical trial had shown that administration of sustained release 4-AP at any dose, much less the 10 mg BID stable dose that is the subject of all of the Asserted Claims of the Acorda Patents, was safe and effective to improve walking or any other clinical deficit in patients with multiple sclerosis. (Tr., Goodman, 495:11-496:17).  As late as 2003, a systematic review of the relevant literature by Solari et al., including a meta-analysis of the few randomized clinical trials

("RCTs") of 4-AP that had been conducted in MS patients, concluded that the "available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms" and that "no confident estimate of effectiveness of aminopyridines in the management of MS symptoms is possible."   (PTX-0416 at 1 (Solari); *see also* Tr., Goodman, 488:16-489:3).   Solari points out that "Potassium blocking drugs ([4-AP, and 3,4 DAP]) may be able to improve nerve function in nerves without enough myelin.   However, the review of trials found there is not enough evidence about the safety of these drugs or whether [symptomatic] benefits are certain."  (PTX-0416 at 15 (Solari)).

99.   Solari also states that "publication bias remains a pervasive problem in this area," and notes the lack of "common end points" available across trials and the "distinct possibility of false positive findings" in trials that do not specify a primary endpoint."   (PTX-0416 at 1, 5 (Solari); Tr., Goodman, 488:16-489:3, 491:3-24).   This pervasive publication bias is confirmed by unpublished failures which contradicted results disclosed in earlier published studies.   (*See, e.g.,* PTX-0413A at 225, 227 (MS-F200 Report) (unpublished clinical trial report failing to show the efficacy of 4-AP in treating MS patients with internuclear ophalmoplegia); *compare* PTX-0413A at 225, 227 (MS-F200 Report) *with* PTX-0330 at 202 (Van Diemen II)[5] (earlier published study finding "smooth pursuit [eye movement] gain improve[d] . . . after . . . orally administered 4-AP")).

100.   Elan's study in 161 MS patients, the largest RCT of 4-AP prior to the effective filing date of the Acorda Patents, had failed.   (JTX-0104 at 817 (Schwid)[6]; PTX-0360 at 2 (Elan Report); Tr., Goodman, 467:4-13).   The study was designed to determine efficacy; it had 80%

---

[5]      Van Diemen II is cited on the face of the '826, '437, '703, and '685 Patents.

[6]      Schwid is cited on the face of the '826, '437, '703, and '685 Patents.

power to detect the difference between an improvement rate of 5% in the placebo group and 20% in the sustained-release 4-AP group.  (JTX-0104 at 817 (Schwid); Tr., Goodman, 468:1-10).  As measured using the EDSS, 22% of the patients treated with 4-AP improved, but the same percentage improved in the placebo group – *i.e.*, 4-AP showed no improvement in EDSS relative to placebo.  (JTX-0104 at 817 (Schwid); Tr., Goodman, 468:25-469:4; Peroutka, 118:2-7).  Thus, Elan's multi-center clinical trial was "unable to establish clinical efficacy."  (JTX-0104 at 817 (Schwid)).  The failure of the largest study at the time evaluating the use of 4-AP in MS patients cast serious doubt on the reports of clinical effects that had been observed in small exploratory studies conducted earlier.  (Tr. Goodman, 469:5-17).

101.   JTX-0089 (Murray)[7] did not teach or suggest the use of 4-AP for treatment in MS. It reports on a study evaluating 4-AP as an immediate release oral preparation in four patients with Eaton-Lambert syndrome, four with congenital myasthenia, and one with myasthenia gravis.  (JTX-0089 at 265 (Murray); Tr., Goodman, 440:2-9).  Unlike MS, the diseases studied by Murray are diseases of the peripheral nervous system and neuromuscular junction.  (Tr., Goodman, 440:10-16, 442:17-443:3).  Murray discloses an upward titration dosing scheme: the starting dose was 10 mg daily, which was gradually increased, depending on response, to a maximum of 200 mg daily in one patient.  (JTX-0089 at 266 (Murray); Tr., Goodman, 440:17-441:10).  Further, of the nine subjects in the Murray study, "[o]ne patient had an acute confusional episode, and three patients had seizures . . . ."  (*See* JTX-0089 at 270 (Murray); *see also* Tr., Goodman, 441:11-17).  Murray notes these adverse effects in its conclusion, stating "[t]he central effects of 4-AP, especially seizures, limit its use."  (JTX-0089 at 270 (Murray); Tr., Goodman, 441:18-22; Peroutka, 123:21-124:4).  Due to its focus on peripheral nervous

---

[7]    Murray is cited on the face of the '826, '437, '703, and '685 Patents.

system diseases, Murray does not teach anything regarding the safety or efficacy of 4-AP in MS patients.  (Tr., Goodman, 441:23-443:3, 506:7-10).   The study included no assessment of walking speed.  (*Id.* at 506:11-12).

102.   JTX-0112 (Stefoski I)[8] reports on a small, exploratory study in which 4-AP was administered intravenously to twelve temperature-sensitive male patients with MS and five normal men.  (*See* JTX-0112 at 72; *see also* Tr., Goodman, 443:16-21).   The Stefoski I study was not double-blinded or randomized.  (Tr., Goodman, 443:22-444:1, 444:16-18).   The patients in the study were evaluated using various tests, not all variables were tested in all patients, and the study does not identify a prospectively defined efficacy endpoint.  (*See* JTX-0112 at 72-73; Tr., Goodman, 444:19-20).   A POSA would have viewed Stefoski I as an exploratory study.  (Tr., Goodman 444:22-445:6).   Further, Stefoski I does not evaluate walking speed or improvement in walking.  (*Id.*, at 445:7-9).   Stefoski I reports that "[s]tudies are currently in progress to determine the clinical usefulness of oral 4-AP as a symptomatic treatment" and suggests that "a search for new agents that can increase the conduction safety factor and testing for their efficacy in MS are warranted."  (*See* JTX-0112 at 75-76).   Due to the unblinded, exploratory nature of the study, a POSA reading Stefoski I would not have drawn any meaningful inferences about symptomatic improvement in MS patients from the reported results.  (Tr., Goodman, 445:22-446:3, 562:2-564:13).

103.   JTX-0043 (Davis)[9] reports the results of a small, exploratory study in which "[t]wenty temperature-sensitive male MS patients were given either 10 to 25 mg of 4-AP or identically appearing lactose placebo capsules."  (JTX-0043 at 186 (Davis); Tr., Goodman,

---

[8]     Stefoski I is cited on the face of the '826, '437, '703, and '685 Patents.

[9]     Davis is cited on the face of the '826, '437, '703, and '685 Patents.

446:13-23).   Fifteen patients received immediate release capsules containing 4-AP and five received placebo.  (JTX-0043 at 186 (Davis); Tr., Goodman, 446:19-23).  The Davis study was not fully blinded.   (*See* JTX-0043 at 191 (Davis); *see also* Tr., Goodman, 446:24-447:8). Patients in the Davis study were evaluated using various tests, not all variables were tested in all patients, and the study does not identify a prospectively defined efficacy endpoint.  (*See* JTX-0043 at 187-88 (Davis); Tr., Goodman, 447:9-11).   The Davis study did not evaluate walking speed.  (Tr., Goodman, 447:12-14).  Due to its exploratory nature, the study was not designed as an efficacy study and would not permit a POSA to infer that 4-AP improves walking.  (*Id*. at 447:15-19; 499:15-17, 562:2-564:13).

104.   JTX-0113 (Stefoski II)[10] reports on another small, exploratory study designed to determine whether the findings in the previous single intravenous and oral dose studies with 4-AP could be observed using multiple doses.  (JTX-0113 at 1344 (Stefoski II); Tr., Goodman, 448:12-18).  In Stefoski II, seventeen patients received immediate release 4-AP doses for one to five days.  (JTX-0113 at 1344 (Stefoski II); Tr., Goodman, 448:19-25).  The doses were titrated on an individual basis based on patient response; the study refers to this dosing scheme as an "optimal-dose-finding approach."  (JTX-0113 at 1344 (Stefoski II); Tr., Goodman, 449:1-10). The study may have been unblinded, as "[p]atients were informed of possible 4-AP side effects, including paresthesias and dizziness."  (JTX-0113 at 1344 (Stefoski II); Tr., Goodman, 449:15-19).  The Stefoski II study did not identify a prospectively defined efficacy endpoint or assess walking speed.  (JTX-0113 at 1344-45 (Stefoski II); Tr., Goodman, 449:20-24).  Due to its exploratory nature, blinding concerns, and short duration, a POSA would not have understood

---

[10]      Stefoski II is cited on the face of the 826, '437, '703, and '685 Patents.

Stefoski II to support a conclusion regarding the safety or efficacy of prolonged administration of 4-AP to MS patients.  (Tr., Goodman, 449:25-450:11, 562:2-564:13).

105.   The Stefoski I, Davis, and Stefoski II studies were all experimental in nature. They explored whether or not the types of physiologic effects seen in experiments with 4-AP in animals could show a translatable effect into clinical symptoms.  Such small, experimental studies do not constitute treatment of MS.  (Tr., Goodman, 450:12-24, 562:2-564:13).

106.   Commentary in the field criticized the studies reported in Stefoski I and Davis as "limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively defined neurological deficits or adjust significance levels to compensate for multiple comparisons."   (JTX-0028 (Bever III)[11] at 1059; Tr., Goodman, 450:25-451:23; Peroutka, 129:4-130:1).

107.   PTX-0330 (Van Diemen II) reported the "relationship between dosage, serum level, efficacy, and safety" of 4-AP in a seventy-patient study in MS.  (See PTX-0330 at 196 (Van Diemen II); Tr., Goodman, 451:24-452:1, 452:11-17).  Van Diemen II studied intravenous and immediate release oral administration of 4-AP using a crossover design.  (See PTX-0330 at 196 (Van Diemen II); Tr., Goodman, 452:18-21, 453:2-3).  For the oral doses, the study uses an individualized titration scheme based on tolerability up to a maximum based on weight.  (PTX-0330 at 196-97 (Van Diemen II); Tr., Goodman, 452:22-453:1).  Van Diemen II did not assess walking speed or use EDSS as a measure of efficacy; instead it assessed efficacy by "registering horizontal smooth pursuit eye movements," a measure of how normally the eyes move from side to side.  (See PTX-0330 at 197 (Van Diemen II); Tr., Peroutka, 125:14-19; Goodman, 453:4-15).  Van Diemen II concludes that "higher dosages and serum levels are likely to

_____

[11]     Bever III is cited on the face of the '826, '437, '703, and '685 Patents.

produce greater improvement in those MS patients who are capable of favorably responding to 4-AP." (*See* PTX-0330 at 203 (Van Diemen II); Tr., Goodman, 453:16-22). This conclusion suggests to a POSA that, because the study used an upward titration dosing scheme, one would either use an upward titration scheme on an individual basis or target higher dose or serum levels in order to achieve greater effects. (Tr., Goodman, 453:23-454:3).

108. JTX-0095 (Polman I)[12], disclosed an open-label, unblinded study with twenty-three MS patients who received immediate release oral 4-AP and placebo. (*See* JTX-0095 at 292, 295 (Polman I); Tr., Goodman, 454:13-17, 454:21-22). Polman I employed the same type of upward titration dosing scheme used in Van Diemen II based on tolerability up to a maximum based on weight. (JTX-0095 at 293 (Polman I); Tr., Goodman, 454:23-455:3). Polman I used no pre-specified outcome measure to assess efficacy and did not assess walking speed. Rather, the study analyzed efficacy based on subjective information from the patients obtained during regular clinic visits. (JTX-0095 at 293 (Polman I); Tr., Goodman, 455:4-14). The study reported that "[i]mprovements in fatigue and ambulation were mentioned quite often by the patients as being responsible for the favorable overall effect (Table 1)," but noted that "[i]t is important to emphasize the fact that only a small minority of the favorable effects reported by the patients resulted in significant changes in the EDSS." (*See* JTX-0095 at 295 (Polman I); Tr., Goodman, 455:15-456:5). Two patients in the Polman I study had to discontinue 4-AP treatment due to seizures. (*See* JTX-0095 at 294-95 (Polman I); Tr., Goodman, 456:21-25). One patient, who had taken only two 5 mg capsules of 4-AP suffered a period of speech arrest followed by a generalized tonic-clonic epileptic seizure on the second day of treatment. (*See* JTX-0095 at 294 (Polman I); Tr., Goodman, 456:25-457:5; Peroutka,

---

[12]      Polman I is cited on the face of the '826, '437, '703, and '685 Patents.

126:14-127:2).   In another patient, "a generalized tonic-clonic convulsion occurred after 18 months of 4-aminopyridine therapy (20 mg/d)."   (*See* JTX-0095 at 295 (Polman I); Tr., Goodman, 457:5-8; Peroutka, 127:3-14).   Polman I concluded: "More studies are needed for further elaboration of the exact value of 4-aminopyridine in the long-term treatment of patients with MS."   (*See* JTX-0095 at 296 (Polman I); Tr., Goodman, 457:9-13).   Due to its unblinded and non-randomized nature and lack of pre-specified outcome measures, the Polman I study did not allow a POSA to reasonably infer that 4-AP improves fatigue or ambulation in MS patients. (Tr., Goodman, 457:14-20, 562:2-564:13).   A POSA would not draw any efficacy conclusion from the unblinded self-reporting Polman I study.  (*Id*. at 499:18-500:9).

109.   JTX-0028 (Bever III) described an eight patient study using immediate release 4-AP that was designed to compare the safety of two target peak serum concentrations (low: 30-59 ng/ml and high: 60-100 ng/ml).  (JTX-0028 at 1055; Tr., Goodman, 457:21-458:4, 459:9-12).   Bever III was a methodological study designed to test a dosing technique known as "concentration control" used to minimize the potential toxicity of 4-AP.  (Tr., Goodman, 458:5-459:8).   The dosing scheme was based on individual titration to specific blood concentrations for which the study designers controlled.   (JTX-0028 at 1055 (Bever III); Tr., Goodman, 459:13-17).   Bever III used dose titration in order to avoid a "difficult dilemma" in 4-AP trial design:   "[t]o avoid serious side effects in the patients having the highest serum drug levels, doses must be kept as low as possible, but this means that patients with the lowest drug levels may have levels inadequate to produce any therapeutic effect."  (JTX-0028 at 1055 (Bever III)). The study in Bever III did not establish a predetermined primary endpoint to measure efficacy. (Tr., Goodman, 459:18-20).   Rather, the authors identified various methods used to evaluate efficacy, including the EDSS and the ambulation index (AI).  (JTX-0028 at 1055-56 (Bever III);

Tr., Goodman, 459:21-460:2).  AI is a clinical tool which uses a timed walk test to measure ambulation.  (Tr., Goodman, 460:3-9; Peroutka, 128:1-3).  The study reported no benefit in EDSS or AI.  (JTX-0028 at 1057 (Bever III); Tr., Goodman, 460:10-13; Peroutka, 128:20-24).  Bever III also reported a number of adverse effects.  One patient experienced an episode of encephalopathy when 4-AP serum levels peaked at 114 ng/ml and another patient had a grand mal tonic-clonic seizure, the most serious type of grand mal seizure, when 4-AP serum levels peaked at 104 ng/ml.  (See JTX-0028 at 1056 (Bever III); Tr., Goodman, 460:14-25).  Bever III itself noted the study's design limitations: "[t]he present study was limited by a small sample size and short treatment duration."  (See JTX-0028 at 1058 (Bever III); Tr., Goodman, 461:1-6).

110.   JTX-0001 (the '938 Patent)[13], a product of Elan's innovative effort to develop a sustained release 4-AP formulation is directed, in relevant part, to improving nerve conduction in MS patients as measured by electrophysiological tests (Tr., Lublin, 410:18-411:7) and does not teach treatment of symptoms of MS with 4-AP.  (Tr., Goodman, 462:13-15; see also Tr., Lublin, 407:18-408:12).  The '938 Patent does not teach or suggest administering 4-AP to improve walking in MS patients.  (Tr., Goodman, at 462:16-18).  The '938 Patent specification discloses no new clinical data; it refers only to the work of Davis and Stefoski with respect to potential therapeutic use of 4-AP in treatment of MS patients.  (JTX-0001 at 1:52-61 (the '938 Patent); Tr., Goodman, 462:1-12; Lublin, 409:15-24).  Also, the '938 Patent teaches the use of upward dose titration with respect to 4-AP administration.  (JTX-0001 at 13:65-14:9 (the '938 Patent); Tr., Lublin, 409:25-410:17; Tr., Goodman, 462:19-463:10).  In summary, a POSA would have understood that the '938 Patent did not teach or suggest the use of a stable dosing

---

[13]      The '938 Patent is cited on the face of the '826, '437, '703, and '685 Patents.

regimen at a particular dose of sustained-release 4-AP for improvement of walking in MS patients. (Tr., Goodman, 507:21-508:9).

111.   JTX-0069 ("Hayes III")[14] described two open-label, single-center studies sponsored by Acorda and designed to examine the pharmacokinetics and safety profile of sustained release 4-AP in patients with chronic spinal cord injury (SCI). (JTX-00069 at 186 (Hayes III); Tr., Goodman, 463:11-23). The first study evaluates single oral doses of sustained release 4-AP (10 mg, 15 mg, 20 mg, and 25 mg) taken once a week for four weeks in fourteen patients with SCI. The second study examined the effect of multiple oral doses of sustained release 4-AP (10 mg, 15 mg, 20 mg, and 25 mg, each given twice daily for six days and once on the seventh day for one week) in sixteen patients with SCI. (*See* JTX-00069 at 186 (Hayes III); Tr., Goodman, 463:24-464:5). No patient in either of the studies received a twice daily dose of 4-AP for more than one week. (Tr., Goodman, 463:24-464:5). As a study in SCI patients, Hayes III contained no disclosure regarding the efficacy of sustained release 4-AP at any blood level for treating patients with MS. (Tr., Goodman, 464:9-15; Peroutka, 133:10-20). Nor does Hayes III address safety concerns specific to MS patients, such as brain related toxicities, encephalopathy and confusion, and seizures. (Tr., Goodman, 464:16-465:2).

112.   JTX-0068 ("Hayes I")[15], an abstract, appears to disclose the same open-label study conducted to investigate the pharmacokinetics and safety of multiple oral doses of sustained-release 4-AP in SCI patients disclosed in Hayes III. (JTX-0068 at S62 (Hayes I); Tr., Goodman, 465:3-14). Hayes I provided no teaching or suggestion with respect to the use of 4-AP for treatment of MS. Hayes I included no disclosure as to the efficacy of any dose of 4-AP

---

[14]     Hayes III is cited on the face of the '826, '437, '703, and '685 Patents.

[15]     Hayes I is cited on the face of the 826, '437, '703, and '685 Patents.

to treat MS.  (Tr., Goodman, 465:15-18; Peroutka, 133:10-20).  While Hayes I disclosed pharmacokinetic parameters for sustained release 4-AP evaluated in the study, the study provided no teaching or suggestion as to therapeutic efficacy corresponding to any blood level or release profile for 4-AP.  (Tr., Peroutka, 133:10-20).  Additionally, Hayes I did not address the safety issues most important to MS patients.  (Tr., Goodman, 465:18-20).

113.   JTX-0140 (Schwid), was the first published study using Elan's sustained release formulation of 4-AP in MS.   Schwid reported a small methodological study testing the usefulness of a variety of quantitative functional measures to determine whether the tests were sensitive and might have value in understanding whether or not any efficacy signal could be gleaned at the dose and timeframe studied.  (Tr., Goodman, 469:18-470:3, 499:4-14).  The study was a randomized, placebo-controlled, crossover design in ten MS patients designed as to test different outcome measures.  (*See* JTX-0104 at 818 (Schwid); Tr., Goodman, 469:18-470:3). The ten patients received 17.5 mg sustained release 4-AP or placebo twice daily for seven days. After an intervening washout period of seven days, the patients that had received placebo were given 4-AP, and vice versa, for an additional seven days.  (JTX-0104 at 818 (Schwid); Tr., Goodman, 470:4-24).  No patient received 4-AP for more than one week and the design would not have permitted a POSA to reach any conclusion about administering 4-AP for more than one week.  (Tr., Goodman, 470:24-471:6).

114.   Schwid did not disclose any prospectively defined efficacy outcome measure, and instead, assessed a variety of quantitative measures in the methodologic study, including: maximum voluntary isometric contraction testing (MVICT), manual muscle testing (MMT), grip strength, time to ambulate 8 meters, time to climb four stairs, EDSS score, and global impression score.  (JTX-0104 at 817 (Schwid); Tr., Goodman, 471:7-23).  The one outcome

measure in Schwid reported to have statistical significance, "9 out of 10 patients walked more quickly on 4AP SR (p=0.02)," was not adjusted for multiple measures assessed in the study. (JTX-0104 at 820 (Schwid); Tr., Goodman, 472:15-473:2). A POSA would have understood that the p=0.02 value reported in Schwid for patients that walked more quickly on 4-AP, when adjusted for the number of measures assessed in the study (7), results in a p=0.14 value (14%), which may be due to entirely to chance. (Tr., Goodman, 562:2-563:11). Studies like Schwid where multiple efficacy measures are evaluated would not be considered by a POSA as showing evidence of efficacy without statistical correction for the use of multiple efficacy measures. (Tr., Goodman, 471:24-472:14, 562:2-564:13; *see also* PTX-0416 at 5 (Solari) ("[I]n such a many-outcome situation, this raises the distinct possibility of false positive findings.")). Schwid does not provide a POSA with evidence of efficacy of 4-AP on any of the measures assessed in the study; it was a test of test to see which test might be more sensitive and might be useful in future trials. (Tr., Goodman, 473:3-9, 562:2-534:13).

115. Schwid reported that the mean serum 4-AP level during treatment was "65±25 ng/ml (range, 34-99)" (JTX-0104 at 819 (Schwid)) and that "[t]reatment appeared particularly efficacious in subjects who achieved serum 4AP levels above 60 ng/mL." (*See id.* at 820; Tr., Goodman, 473:19-25; Peroutka, 131:13-19, 132:7-13). Schwid also stated that "[n]one of the patients with a serum level less than 60 ng/mL felt better (according to their global impressions) on 4-AP SR than placebo." (*See* JTX-0104 at 819 (Schwid); Tr., Goodman, 473:10-18). Thus, if anything, Schwid suggested that serum 4-AP levels higher than 60 ng/mL must be targeted to detect efficacy. (Tr., Goodman, 474:1-7).

116. Schwid called for further studies to establish efficacy of 4-AP: "In addition to establishing efficacy in larger trials, future studies of 4AP SR will need to examine long-term

efficacy and tolerability as well as further refine dosing regimens to optimize delivery despite a relatively narrow therapeutic window." (JTX-0104 at 820 (Schwid); Tr., Goodman, 473:8-14).

117.   Schwid also disclosed the prior failed Elan study conducted in 1994 and made clear that the study was adequately designed to assess EDSS. (JTX-0104 at 817 (Schwid); Tr., Goodman, 467:1-468:24).

118.   Subsequent to Schwid's report of the 1994 failed large-scale EDSS study, the only reported study of 4-AP in MS patients prior to the filing of the Acorda Patents was in JTX-0062 (Goodman I), JTX 0061 (Goodman II), and JTX 0080 (Goodman Poster) (collectively the "Goodman References") which disclosed some of the results of Acorda's MS-F201 study. (Tr., Goodman, 498: 19-22) MS-F201 was a small study designed as a methodological exploration of the sensitivity and usefulness of the outcome measures studies. It was not intended to be an efficacy study, and none of the Goodman references contained any dose-specific information versus placebo with regard to any of the outcome measures used. (Tr., Goodman, 498:19-499:3).

119.   Goodman I[16] was an abstract that disclosed the multicenter, randomized, double-blind, placebo-controlled, dose-ranging study funded by Acorda to further explore the safety of escalating doses of sustained-release 4-AP in MS patients. (JTX-0062 at S116 (Goodman I); Tr., Goodman, 474:15-475:5). "Thirty-six patients at 4 centers were randomized to active (25) and placebo (11) treatment cohorts." (JTX-0062 at S116-17 (Goodman I); Tr., Goodman, 465:18, 476:3-4). Five subjects withdrew due to adverse effects: two because of seizure, one because of tremors, one because of dizziness and nausea, and one because of leg pain. (JTX-0062 at S117 (Goodman I); Tr., Goodman, 476:5-9).

---

[16]      Goodman I is cited on the face of the '826, '437, '703, and '685 Patents.

120.    The abstract described a parallel group, dose escalation protocol which started with placebo run-in for the first week, 20 mg/day (10 mg po BID) the second week, and then increased in weekly increments of 10 mg/d up to 80 mg/d during week eight.  (JTX-0062 at S117 (Goodman I); Tr., Goodman, 476:10-11, 476:15-19).  This type of dosing protocol does not provide any information as to the efficacy of a single dose of 4-AP administered as a stable dose.  (Tr., Goodman, 476:20-477:3).

121.    Goodman I reported: "The primary aim of this trial was to determine the safety and tolerability of escalating doses of a sustained-release (SR) formulation," with a secondary aim "to explore efficacy over a broad range using measures of fatigue and motor functions." (JTX-0062 at S116 (Goodman I); Tr., Goodman, 475:6-13).  Thus, a POSA would have understood Goodman I to describe an exploratory study of multiple outcome measures.  (Tr., Goodman, 475:14-17).

122.    Goodman I stated that the aggregated "fampridine-SR group showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01)."  (JTX-0062 at S117 (Goodman I); Tr., Goodman, 477:4-12, 478:23-479:4). Goodman I also reported that "[n]o other measures showed significant treatment effects." (JTX-0062 at S117 (Goodman I)).  A POSA would not draw any efficacy conclusion from Goodman I because it reports that multiple efficacy measures were used in the exploratory study and a POSA would have recognized that without correction for the use of multiple efficacy measures, any report of improvement could be due to chance alone and/or placebo effect.  (Tr., Goodman, 501:12-502:6, 562:2-564:13; *see also* PTX-0416 at 5 (Solari) ("[I]n such a many-outcome situation, this raises the distinct possibility of false positive findings.")).

123.   Goodman I also observed that "[d]ose response curves showed increasing benefit in both measures in the 20 to 50 mg/day range."   (JTX-0062 at S117 (Goodman I); Tr., Goodman, 477:16-478:6).  This referred to the relative relationship as the dose increased rather than to any particular dose.  (Tr., Goodman, 477:21-478:22).  At most, a POSA would infer from Goodman I to try future studies with 4-AP titrated upward or targeting higher doses.  (Tr., Goodman, 478:13-22).

124.   The content of Goodman II[17] was identical to Goodman I.  (JTX-0061 (Goodman II); Tr., Goodman, 479:6-12).  A POSA would be unable to draw any inferences as to efficacy of 4-AP from Goodman II for the same reasons as POSA would be unable to reach conclusions as to efficacy from Goodman I.  (Tr., Goodman, 479:13-15).

125.   The Goodman Poster[18] provided substantially the same information reported in Goodman I and Goodman II as well as further detail regarding the objective and.  (JTX-0080A (Goodman Poster); Tr., Goodman, 479:16-481:20).  The Goodman Poster stated that the study was "designed as a preliminary, dose ranging study to assess safety and to explore potential outcome measures for use in later trials," conveying that it was a methodological study assessing outcome measures to explore their potential value if there were to be another trial, not an efficacy study.   (JTX-0080A at Methods (Goodman Poster); Tr., Goodman, 480:8-11, 480:18-481:3; Peroutka, 133:21-134:7).   The Goodman Poster identified multiple efficacy endpoints including Timed 25 Foot Walk, manual muscle testing, and patient self-reports using subjective fatigue scales.  (JTX-0080A at Methods (Goodman Poster); Tr., Goodman, 481:4-13).  Each of these tests is distinct, and an MS patient could improve on one and not the others.

---

[17]     Goodman II is cited on the face of the '826, '437, '703, and '685 Patents.

[18]     The Goodman Poster is cited on the face of the '437 and '703 Patents.

(Tr., Goodman, 481:14-20).   A POSA would not draw any efficacy conclusion from the Goodman Poster (or any of the Goodman References) because a POSA would have recognized that without correction for the use of multiple efficacy measures any report of improvement could be due to chance alone and/or placebo effect.  (Tr., Goodman, 562:2-564:13).

126.   The Goodman Poster disclosed adverse events in the 4-AP treated group "consistent with the findings of previous studies" including two cases of seizure, dizziness, insomnia, paresthesia, nausea, asthenia, headache, and tremor.   (JTX-0080A at Abstract (Goodman Poster); Tr., Goodman, 481:24-482:8).   The Poster noted seizure risk requiring further study in the disclosed dose range.  (JTX-0080A at Abstract (Goodman Poster); Tr., Goodman, 482:9-16).

127.   The Goodman Poster reported statistically significant improvements in walking speed ($p=0.04$) as measured by the Timed 25 Foot Walk.  (JTX-0080A at Results Summary (Goodman Poster)).   However, this p-value was for the aggregated treatment group as a whole; the statistical significance did not apply to any individual dosage.  (Tr., Goodman, 482:17-484:1; Peroutka, 137:25-138:7).   The value was obtained by use of the statistical test called repeated measures analysis of variance (rANOVA) over weeks 1-7 and did not disclose successful treatment at 10 mg BID or at any one specific dose.   Rather, the reported p-value revealed that the group of MS patients treated with the eight week dose escalation regimen showed improvement as a group over the course of the entire drug study in the 20-80 mg/day dose range.  (Tr., Goodman, 482:17-484:1).   The study was not designed or intended to provide determinations of therapeutic efficacy of individual doses.  (Tr., Goodman, 482:17-483:22).

128.   The Goodman Poster also reported statistically significant improvement in the drug group for LEMMT, but, as with the results for walking speed, the report of statistically

significant improvement in LEMMT reflected the response of the aggregated treatment group rather than improvement at any particular dosage and also is not corrected for the use of multiple efficacy measures in the reported study.  (JTX-0080A at Results Summary (Goodman Poster); Tr., Goodman, 485:20-486:6, 562:2-564:13).  A POSA would not have drawn any conclusion as to efficacy from the Goodman Poster because a POSA would have recognized that without correction for use of multiple efficacy measures, any report of improvement could be due to chance alone and/or placebo effect.  (Tr., Goodman, 501:12-502:6, 561:25-564:13).

129.   Additionally, the Goodman Poster would not have allowed a POSA to infer that the 10 mg BID (20 mg/day) dose improved walking, due, at a minimum, to the lack of placebo comparison in the graph entitled "Dose Response 25 Ft. Walk."  (Tr., Goodman, 484:2-18, 485:16-19; Tr., Peroutka, 135:8-136:10, 136:17-23; 708:22-711:2).  To the extent a POSA disregarded the lack of placebo group data and nonetheless sought to reach a conclusion relating to efficacy, the Goodman Poster suggested an "increasing benefit" at higher doses, implying that a POSA would either try to titrate upward or target the higher doses.  (JTX-0080A at Abstract (Goodman Poster); Tr., Goodman, 477:16-478:22).  The graph showed an increased benefit in walking speed for 20 mg BID as compared to 10 mg BID.  (*Id.*; *see also* Tr., Peroutka, 136:24-137:7).

130.   Reflecting the strong placebo effect in MS studies, the Goodman Poster also reported a greater improvement in fatigue in the placebo-treated group as compared to the 4-AP treated group.  (JTX-0080A at Results Summary (Goodman Poster); Tr., Goodman, 486:7-19; Peroutka, 134:8-18).

131.   The inventors' own clinical work in Study MS-F202 reported in the Acorda Patents further demonstrated the unpredictability of MS studies and the inherent difficulty of

interpreting their results.  When analyzed in terms of its primary outcome variable (percent change in average walking speed compared to baseline), the study reported in the Acorda Patents shows a positive trend for all three treatment groups (10, 15 and 20 mg), but did not show a statistically significant improvement in walking speed compared to placebo.  (Tr., Cohen, 295:19-296:8; Goodman, 515: 6-14).  A post-hoc re-analysis of the data, which focused on the consistency of response in single patients, rather than the average magnitude of response in the treated patient groups, was required to reveal a statistically significant increase in response rate relative to placebo for all three treatment groups.  (Tr., Cohen, 298:8-20).  That analysis also surprisingly revealed that there was no significant difference among the 10, 15, and 20 mg BID groups with respect to improving walking in subjects who responded to 4-AP.  (Tr., Cohen, 298:21-299:9; Tr., Goodman, 515:6-25).

**B.  The Prior Art Did Not Provide A Motivation with a Reasonable Expectation of Efficacy to Improve Walking or Increase Walking Speed**

132.   The small exploratory and/or methodological studies conducted with 4-AP were not designed to show efficacy and were difficult to interpret in view of the variability among patients, placebo effects, and the multiple end points pointing in a variety of directions.  As a result, a POSA would not have had an expectation of efficacy based on those studies.  (Tr., Goodman, 495:11-496:17).

133.   Solari stated that "available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms."  (PTX-0416 at 1 (Solari); *see also* Tr., Goodman, 488:16-489:3).

134.   To the extent the prior art suggested the use of sustained release 4-AP in MS patients, there was much uncertainty as to whether any clinical endpoint would demonstrate

efficacy and greater uncertainty as to whether 4-AP could improve walking ability or increase walking speed.  (Tr., Goodman, 497:9-498:18, 500:10-501:2, 503:12-16).

135.   Walking ability is a continuum, and to be clinically beneficial, maximum effect is desired.  (Tr., Cohen, 294:17-295:6; Goodman, 520:5-521:3).

136.   A POSA would have known that the risk of seizure was linked to the same mechanism of action through which 4-AP provided therapeutic benefit.  (Tr., Goodman, 438:17-439:11; *see also* Tr., Peroutka, 122:5-13).   Seizures had been observed in patients taking low doses (two 5 mg capsules and 20 mg daily) who had previously appeared to tolerate 4-AP well.  (JTX-0095 at 295 (Polman I); Tr., Goodman, 456:21-457:8; Peroutka, 126:25-127:2).

137.   A POSA would have recognized that the prior art studies that showed benefits for walking were conducted in a small number of patients, decreasing the likelihood that those benefits would be reproducible when studied on a scale sufficient to demonstrate efficacy.  (Tr., Goodman, 443:4-21, 461:3-6, 495:11-496:17).   The POSA's perspective would be strongly influenced by the fact that the then-largest study of 4-AP in MS patients to date had failed to show efficacy on EDSS.[19]  (JTX-0104 at 817 (Schwid); Tr., Goodman, 467:4-469:17, 496:7-13).

138.   Further, when Acorda performed a 206 MS patient, randomized, placebo controlled clinical trial using walking speed as the predetermined clinical endpoint, it failed to

---

[19]   DTX-584, used by Defendants during the cross examination of Dr. Cohen, appears to be dated December 3, 2003, less than one year before the Acorda Patents' priority date.  The exhibit was not identified as prior art in the Pretrial Order (*cf.* D.I. 252, Pretrial Order ¶¶ 44-65) and merely states that "[p]articipants in MS studies demonstrated improved walking ability and lower leg strength."  There is no statement as to the significance of those improvements.  The exhibit is therefore irrelevant to the obviousness of the Acorda Patents.

show that 4-AP improved walking speed versus placebo as measured by its predetermined endpoint.  (PTX-0168A at 4, 133 (MS-F202 Report); Tr., Cohen, 295:19-296:8).

139.   A POSA would also have accounted for the risk of false positives in trials involving multiple endpoints where those trials fail to account for the "many outcome situation": an increased risk that a particular, statistically significant result in a multiple-outcome study was in fact due to random chance or variability due to the testing of multiple endpoints.   (Tr., Goodman, 471:24-472:14, 491:25-492:9, 495:11-496:17, 501:12-502:10, 562:2-563:13).

140.   A POSA would have been skeptical that the method of treatment claimed in the Acorda Patents would be successful because of the strong placebo effect in measures of clinical improvements observed in MS patients.   (Tr., Goodman, 489:9-490:2, 495:11-496:17).   A POSA would recognize that placebo had performed as well as 4-AP in the largest clinical trial to date.  (JTX-0104 at 817 (Schwid); Tr., Goodman, 467:4-469:417, 496:7-13).

141.   The prior art would not in any combination provide a person of skill in the art a reasonable expectation of achieving the claimed inventions, all of which are directed at improving walking or increasing walking speed using a stable dosing regimen of 10 mg sustained-release 4-AP twice daily.  (Tr., Goodman, 495:11-496:17, 510:14-511:3).

### C.   The Acorda Patent Claims Covering Administration Without Dose Titration Were Nonobvious

142.   The prior art did not provide any evidence to a POSA that 10 mg sustained release 4-AP administered BID without dose titration would improve walking in MS patients.   (Tr., Goodman, 506:24-508:22).   To the extent a POSA would have inferred anything regarding efficacy from the prior art, it suggested, in view of 4-AP's narrow therapeutic window, titrating

doses in order to gain maximum efficacy while seeing to avoid adverse effects.  (Tr., Goodman 520:5-521:3; Cohen 285:4-14, 288:22-289:4).

143.   The '938 Patent specification disclosed that "at the commencement of treatment the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached" and "[s]uitably when said tolerable state is reached, the dose administered is increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached."  (JTX-0001 at 14:4-9 ('938 Patent)).  A POSA in April 2004 would have understood the '938 Patent to be teaching a dosing scheme of individual upward titration for initial tolerability and then titration for effect of administration, not a stable dose regimen.  (Tr., Goodman, 462:19-463:10, 507:25-508:6).

144.   In the small study reported in Schwid, patients were given a 17.5 mg dose sustained-release 4-AP or placebo rather than a 10 mg dose.  (Tr., Goodman, 470:6-8, 508:10-11).  Further, Schwid taught a POSA to target 4-AP serum levels of at least 60 ng/mL, which suggested using a method of titration to reach that level.  (JTX-0104 at 819-20 (Schwid); Tr., Goodman, 473:10-474:7, 508:12-16).  Schwid combined with Hayes I and Hayes III (together the "Hayes References") would have pointed a POSA to a dose of over 25 mg sustained release BID in order to achieve the serum levels found particularly effective by Schwid.  (JTX-0068 (Hayes I); JTX-0069 (Hayes III); JTX-0104 (Schwid); Tr., Goodman, 508:10-16; Peroutka, 130:21-133:9).

145.   The Goodman References describe a study with a dose escalation protocol which started with placebo run-in for the first week, 20 mg/day (10 mg po BID) the second week, and then increased dosing in weekly increments of 10 mg/d up to 80 mg/d during week eight.  (JTX-0062 at S116-17 (Goodman I); Tr., Goodman, 476:10-11, 476:15-19).  This type of dosing

protocol did not provide a POSA with any information as to the efficacy of any dose of 4-AP administered as a stable dosing regimen.  (Tr., Goodman, 476:20-477:3).

146.   The prior art did not demonstrate that 10 mg sustained-release 4-AP administered BID without dose titration improved walking in MS patients.  (Tr., Goodman, 506:24-508:22).

**D.   The Acorda Patent Claims Covering Administration of 10 mg Sustained Release 4-AP BID for at Least Two Weeks to Improve Walking in MS Patients Were Nonobvious**

147.   A POSA would not have had a reasonable expectation of success with respect to a method of administering a stable dose regimen of 10 mg sustained-release 4-AP twice-daily for a period of at least two weeks or at least twelve weeks to improve walking or increase walking speed in MS patients.  (Tr., Goodman, 504:15-506:23).

148.   The '938 Patent did not teach administration of 4-AP for any period of time. (JTX-0001 at 14:4-9 (the '938 Patent); *see also* Tr., Goodman, 462:19-463:10, 505:20-22).

149.   Polman I reported seizures in one patient after two 5 mg capsules and in another patient at 20 mg/day.   (Tr., Goodman, 456:21-457:8, 505:25-6; Peroutka, 126:14-127:14). Accordingly, based on Polman I, a POSA in April 2004 would not have a reasonable expectation of success in administering a 10 mg sustained-release 4-AP BID for at least two weeks to improve walking in MS patients.  (Tr., Goodman, 506:18-23).

150.   Murray did not involve patients with MS, and the most critical safety concerns related to brain scarring and seizures were not addressed.   (Tr., Goodman, 440:2-9, 441:23-442:16, 506:7-10).

151.   In the 10 patient study reported in Schwid, no patient received 4-AP for more than one week, and the design would not permit a POSA to draw any conclusion about administering 4-AP for more than one week.  (Tr., Goodman, 470:10-471:6).

152.   The Goodman References disclosed a study with a dose escalation protocol which started with placebo run-in for the first week, 20 mg/day (10 mg po BID) the second week, and then increased in weekly increments of 10 mg/d up to 80 mg/d during week eight.  (JTX-0062 at S116 (Goodman I); JTX-0061 at A167 (Goodman II); JTX-0080A at Abstract (Goodman Poster); Tr., Goodman, 476:10-11, 476:15-19).  This type of dosing protocol did not provide any information as to the efficacy of a single dose of 4-AP administered as a stable dose.  (Tr., Goodman, 476:20-477:3).

### E.   The Acorda Patent Claims Requiring Specific Blood Levels and Pharmacokinetic Parameters Were Nonobvious

153.   Through hindsight, a POSA could determine the effective blood levels and pharmacokinetic (PK) parameters achieved through the stable dosing regimen claimed in the Acorda Patents: 10 mg sustained-release 4-AP administered twice daily to improve walking in MS patients.  There is nothing in the prior art identifying a specific therapeutic blood level or specific PK parameter with respect to any dose regimen for 4-AP that would improve walking in MS patients.  (Tr., Goodman, 508:23-509:17, 509:23-510:21).  There is nothing in the prior art identifying a specific $C_{maxSS}$:$C_{minSS}$ ratio and $C_{avSS}$ range, or a particular $T_{max}$ range, with respect to efficacy of 10 mg sustained release 4-AP administered twice daily to improve walking in MS patients.  (*Id.*).

154.   The Hayes References disclose PK information on administration of sustained-release 4-AP in SCI patients, but contain no teaching or suggestion with respect to the efficacy of any stable dosing regimen of sustained-release 4-AP in improving walking in MS patients.  (Tr., Goodman, 463:11-464:15, 465:3-18, 509:23-510:13; Peroutka, 133:10-20).  Nor do the Hayes References address safety concerns specific to MS patients, such as brain related

toxicities, encephalopathy and confusion, and seizures.  (Tr., Goodman, 464:16-465:2, 465:18-20).

155.   There was nothing in the prior art that provided a POSA with a reasonable expectation of success that any dose regimen for sustained-release 4-AP would improve walking in MS patients, let alone any identification of specific therapeutic blood levels or PK parameters to achieve doing so.  (Tr., Goodman, 508:23-509:17, 509:23-510:21).

### F.  Secondary Considerations Support the Conclusion That the Acorda Patents Were Nonobvious at the Time of Invention

156.   Plaintiffs' evidence of secondary considerations further supports the conclusion that the Acorda Patents are nonobvious.  (Tr., Goodman, 511:4-521:3; Bell, 573:3-597:15).

### i.  The Patented Treatment Is a Commercial Success

157.   Ampyra is a commercially successful product.   (Tr., Bell, 577:18-578:13; Peroutka, 713:18-23).  Annual net sales of Ampyra in the U.S. were $133.1 million in 2010, the year of launch, reaching $436.9 million in 2015, and totaling $1.7 billion through 2015.  (PTX-0795; Tr., Bell, 578:17-579:13, 580:13-25).  Net income from those sales was $998.7 million. (PTX-0795; Tr., Bell, 581:1-19).  Acorda's sales have grown from 8 million tablets in 2010 to 16.6 million tablets in 2015, despite a significant increase in price per tablet, from $17 to $26, over that period.   (Tr., Bell, 578:17-579:8, 592:1-9; *see also* PTX-0794; PTX-0795; PTX-0528A).  From 2011, the first full year of sales, through 2015, net sales of Ampyra grew at an average rate of 20 percent per year, and unit sales of Ampyra grew at 8 percent per year from 2011 through 2015.  (PTX-0528A; PTX-0794; PTX-0795; PTX-0796; Tr., Bell, 578:17-579:13, 580:13-25).  These figures exclude sales of dalfampridine outside the U.S., which Acorda licenses to Biogen for milestone and royalty payments.  (PTX-0733 at 25-26; Tr., Bell, 577:18-578:13, 581:20-583:1).  Payments to date from Biogen have totaled approximately $135

million, and Acorda may receive up to an additional $380 million.  (PTX-0733 at 25-26; Tr., Bell, 577:18-578:13, 581:20-583:1).

158.   Ampyra's commercial success has not been due to aggressive marketing.  (Tr., Bell, 590:8-591:18).   Acorda's marketing expenditures for Ampyra have decreased while Ampyra revenue has increased.  (PTX-0795; Tr., Bell, 590:8-24).   In addition, unit sales of Ampyra increased even as the price of Ampyra increased.  (PTX-0528A; PTX-0794; PTX-0795; Tr., Bell, 591:25-592-13).   This indicates that market demand has driven sales, not low prices.  (Tr., Bell, 591:25-592-13).

159.   The commercial success of Ampyra may be attributed jointly to the inventions of the Asserted Claims of the '938 Patent and the Acorda Patents.  (Tr., Bell, 577:18-578:13, 583:11-584:9).   Ampyra's sustained release formulation and unique indication of treating walking difficulties in MS patients are directly related to the product's commercial success. (Tr., Bell, 584:2-585:8).   The 10 mg sustained release 4-AP formulation was used to generate walking improvements in the clinical trials based on twice-daily administration.  (JTX-0076 at AMPDEL0170813-14).   These clinical trials led to Ampyra's approval by the FDA.  (*Id.*). Further, Ampyra is an embodiment of the invention covered by the Asserted Claims of the Acorda Patents because each of the Asserted Claims of the Acorda Patents is directed to a method of administering 10 mg sustained release 4-AP twice-daily to improve walking, or increase walking speed, in MS patients.  (Tr., Bell, 583:11-585:8).

160.   Surveys found that 87% of prescribers and 83% to 87% of patients were moderately to highly satisfied with Ampyra.  (PTX-0556 at 7; PTX-0547 at 4; PTX-0549 at 4; Tr., Bell, 585:9-586:23).   Persistent (continuing) patients on therapy accounted for 78 and 76 percent of revenue for Ampyra in 2012 and 2013.  (Tr., Bell, 585:9-586:23; *see also* PTX-0579

at 2; PTX-0604 at 3).   This demonstrates that Ampyra's success is due to its efficacy at improving walking in patients with MS.   (Tr., Bell, 585:9-586:23).   Multiple insurance companies have required patients to demonstrate improved walking before Ampyra prescriptions could be renewed.  (Tr., Bell, 587:2-588:6; *see also* PTX-543 at 2; PTX-0603 at AMPDEL0214836; PTX-0664 at 5).   These prior authorization requirements reflect that patients' continued use of Ampyra and insurers' continued willingness to pay for Ampyra are tied to product benefits claimed by the Ampyra Patents.  (Tr., Bell, 587:2-588:6).

161.   Ampyra is promoted to physicians and patients only as a treatment to improve walking in patients with MS.  (JTX-0099 at 16; PTX-0111 at 20; PTX-0115; PTX-0116; PTX-0119; PTX-0121; PTX-0556 at 8, 10; PTX-0566 at 3; PTX-0586 at 25; Tr., Bell, 588:10-590:4). Acorda's key Ampyra messages to physicians and patients are based on clinically meaningful improvement in walking speed.  (JTX-0099 at 16; PTX-0111 at 20; PTX-0115; PTX-0116; PTX-0119; PTX-0121; PTX-0556 at 8, 10; PTX-0566 at 3; PTX-0586 at 25; Tr., Bell, 588:10-590:4).  Thus, the promotion of Ampyra is tied to inventions of the Ampyra Patents.  (Tr., Bell, 588:10-590:4).

162.   The sales comparisons cited by defendants' expert Dr. McDuff are irrelevant to the commercial success analysis of Ampyra.  (Tr., Bell, 592:22-594:5, 612:5-17).   It is not the comparative level of sales that is relevant for commercial success, but rather, whether the product presents a commercial opportunity.  (*Id.*).  Further, Dr. McDuff's profitability analysis incorrectly multiplied the average out-of-pocket cost of developing any pharmaceutical product by a factor based on the failure rate experienced on average by pharmaceutical companies in developing products.  (Tr., Bell, 594:6-597:15; McDuff, 672:6-14).  Dr. McDuff also includes the full cost of preclinical research and development, which is improper given that 4-AP was

known for decades before the inventions claimed in the Ampyra Patents.  (Tr., Bell, 594:6-597:15).  Correcting Dr. McDuff's profitability analysis demonstrates that Ampyra is profitable.  (Tr., Bell, 594:6-597:15; McDuff, 681:10-682:14).

163.  Prior to the '938 Patent issuing in 1996, it is undisputed that there was no blocking patent to the Acorda Patents.  (Tr., McDuff, 683:7-684:1).

### ii.  There Existed a Long-Felt but Unsolved Need for the Claimed Treatment

164.  The FDA granted priority review to Acorda with respect to its New Drug Application for Ampyra, which indicated that the FDA viewed the application as a particularly important therapy for MS.  (Tr., Goodman, 512:6-14).

165.  Difficulty walking is one of the most common difficulties faced by MS patients.  (Tr., Goodman, 432:15-433:5, 511:22-512:5).  The symptoms of MS that affect mobility have a significant impact on independence, quality of life, safety, and financial and emotional health, and walking impairment is frequently cited by patients as one of the most devastating symptoms of their disease.  (Tr., Goodman, 431:20-532:10, 511:22-512:5).

166.  Ampyra is a unique treatment that significantly increases walking speed in approximately one third of individuals with MS, which can help improve independence, employment opportunity, and ultimately quality of life.  (Tr., Goodman, 511:15-512:5).

167.  Ampyra is the first and only FDA-approved drug indicated for improving walking in patients with MS.  (Tr., Goodman, 512:18-513:1; Peroutka, 142:8-13).

### iii.  Others Had Failed to Develop Effective Treatments to Improve Walking in Multiple Sclerosis Patients

168.  Elan itself failed to demonstrate effectiveness in improving EDSS scores in the then-largest study of 4-AP in MS, which cast "a huge amount of skepticism and doubt" on the

seemingly promising results from the exploratory studies found in the prior art.  (Tr., Goodman, 513:2-514:24).

169.   Nerispiridine is another example of a failure by others to develop a drug to improve walking in MS patients.   (Tr., Goodman, 513:2-11; Lublin, 411:13-412:16).  Nerispirdine is a potassium channel blocker that had been shown to increase nerve conduction in animal models of demyelinated nerves.  (Tr., Lublin, 412:2-7).  Based on this information, Sanofi-Aventis undertook clinical trials to determine whether nerispirdine, like 4-AP, is effective at improving walking in patients with MS.  (Tr., Lublin, 412:8-16).

170.   Between July 2009 and July 2010, Sanofi-Aventis conducted a large scale trial (DRI10566), involving 405 participants, assessing the efficacy of nerispirdine in improving the ability to walk, defined as a consistent improvement in walking speed as measured by the Timed 25-Foot Walk (T25-FW), in patients with MS.  (PTX-0569 (Nerispirdine Report); *see also* Tr., Lublin, 411:18-412:7).

171.   The DRI10566 trial included a responder analysis, like the analysis used to show efficacy of Ampyra.  (PTX-0569 (Nerispirdine Report); Tr., Lublin, 412:8-16).   Nevertheless, the study found "no evidence of efficacy," and, based on the negative results, Sanofi-Aventis ended development of nerispirdine for MS.   (PTX-0569 (Nerispirdine Report); Tr., Lublin, 412:18-413:10).

172.   The failure of nerispirdine is indicative of the challenges and unpredictability faced in developing treatments for MS.  Both nerispirdine and 4-AP have the same mechanism of action and were shown to improve nerve transmission, but when assessed using the same techniques, 4-AP was demonstrated to have a clinical benefit and nerispirdine was not.  Even

after the invention of the Acorda Patents, it has been very difficult to develop therapies that reliably increase walking in patients with MS.  (Tr., Lublin, 413:1-10).

### iv.   The Patented Treatment Produced Unexpected Results

173.   It was surprising and unexpected that 10 mg sustained-release 4-AP administered BID improves walking, or increases walking speed, in MS patients.  Dr. Goodman did not believe the 10 mg dose would be effective.  (Tr., Goodman, 515:6-25).  Acorda's MS-F202 study, which tested walking speed as its primary endpoint, failed to show meaningful improvement over placebo in the aggregate.  (Tr., Cohen, 295:12-296:8).  The after the fact, post-hoc responder analysis was necessary to determine that a subgroup of study participants were shown to have meaningfully improved their walking speed.  (Tr., Goodman, 515:6-25; Cohen, 297:1-298:20).

174.   It was even more surprising that there was no meaningful difference in efficacy between the 10 mg, 15 mg, and 20 mg BID doses, and that the preferred dose of 10 mg BID provided maximum efficacy while avoiding adverse effects seen at the higher doses.  (Tr., Cohen, 298:21-299:17, Goodman, 518:5-521:3).  "[W]hat was surprising is . . . that [it] could be done with a single dose without having to do what was described . . . in the prior art of titrating or individuating or maximizing doses in order to gain efficacy with the peril of coming close to the toxic range.  Here we have a sweet spot at 10 milligrams with no or minimal at least serious adverse effects but still having equivalent efficacy compared to these other doses.  So this was an unexpected, surprising and happy discovery."  (Tr., Goodman, 520:18-521:3).

OF COUNSEL:

Aaron Stiefel
Daniel P. Di Napoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC  20005-2327
(202) 683-3500

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real
Suite 400
Palo Alto, CA 94306
(6500 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY  10502
(914) 326-5825

September 30, 2016

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*