## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-882 (LPS) |
| | ) | (CONSOLIDATED) |
| ROXANE LABORATORIES, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## **DEFENDANTS' PROPOSED FINDINGS OF FACT**

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgmhlaw.com
mch@pgmhlaw.com

*and*

Charles B. Klein
Samuel S. Park
Bryce A. Cooper
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendants Apotex Corp.,
Apotex Inc., Teva Pharmaceuticals USA Inc.,
and Roxane Laboratories, Inc.*

Dated:  September 30, 2016

MORRIS JAMES LLP

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*and*

Robert L. Florence
Karen L. Carroll
Michael L. Binns
PARKER POE ADAMS & BERNSTEIN LLP
3355 Lenox Road, Suite 750
Atlanta, GA 30326

*Attorneys for Defendant Mylan
Pharmaceuticals Inc.*

# TABLE OF CONTENTS

Page

I.      Patents-in-Suit ...................................................................................................1

        A.      The Elan Patent ....................................................................................1

        B.      The Acorda Patents ...............................................................................3

                1.      The '826 Patent .........................................................................3

                2.      The '685 Patent .........................................................................5

                3.      The '437 Patent .........................................................................6

                4.      The '703 Patent .........................................................................8

II.     Background ........................................................................................................9

        A.      Multiple Sclerosis .................................................................................9

        B.      History of 4-AP before Elan's exclusive license to Acorda .................10

        C.      Ampyra® ..............................................................................................12

III.    Witnesses ..........................................................................................................12

        A.      Plaintiffs' Fact Witnesses ...................................................................12

        B.      Plaintiffs' Expert Witnesses ................................................................12

        C.      Defendants' Expert Witnesses .............................................................13

        D.      Witnesses Appearing by Deposition .....................................................15

IV.     Claim Construction ...........................................................................................15

V.      The Patents-in-Suit are Obvious Over the Prior Art .........................................15

        A.      Person of Ordinary Skill in the Art ......................................................15

        B.      The Asserted Claims of the Elan Patent are Prima Facie Obvious Because
                They Claim a Known Drug For a Known Use With a Known Formulation
                Type ....................................................................................................16

                1.      4-AP was known in the art ........................................................16

                2.      4-AP was known in the art to be useful in treating multiple
                        sclerosis ...................................................................................17

                        a.      Stefoski I ......................................................................17

                        b.      Davis ............................................................................18

                        c.      Knowledge of a POSA ..................................................19

                3.      Sustained release was known in the art ......................................20

                4.      A POSA would know sustained release formulations have
                        significant advantages over immediate release formulations for
                        treating chronic conditions ........................................................22

| | | | |
|---|---|---|---|
| | 5. | A POSA would know how to determine if a drug was suitable for a sustained release formulation | 23 |
| | 6. | A POSA would have known that 4-AP satisfies the criteria for being an attractive sustained release drug | 24 |
| | 7. | A POSA would have known how to make a sustained release formulation of 4-AP | 27 |
| C. | | The Asserted Claims of the Acorda Patents are Obvious Over the Prior Art Because They Simply Narrow the Elan Patent to Treat a Known Symptom of MS Using a Known Dose for an Obvious Period of Time Resulting in Known Pharmacokinetic Parameters | 29 |
| | 1. | The Elan patent discloses a known sustained release 4-AP formulation to treat MS | 29 |
| | 2. | Additional prior art confirms that a sustained release formulation of 4-AP was known | 31 |
| | 3. | The prior art taught that 10 mg of sustained release 4-AP was an obvious choice | 34 |
| | 4. | The prior art taught that 4-AP was useful in improving walking and/or walking speed | 36 |
| | 5. | The prior art specifically disclosed the pharmacokinetic ("PK") parameters claimed in the Acorda Patents, which also are inherent to dosing with a 10 mg dose twice daily | 38 |
| | 6. | Extending a stable dosing regimen to two weeks and beyond was obvious | 40 |
| VI. | | Evidence of Secondary Considerations Cannot Rebut the Prima Facie Obviousness of the patents-in-suit | 43 |
| A. | | No Evidence of Unexpected Properties/Benefits | 44 |
| B. | | No Evidence That Amprya Satisfied a Long-Felt Need | 46 |
| C. | | No Evidence of Failure of Others | 47 |
| D. | | Amyyra® is Not a Commercial Success | 48 |
| | 1. | Ampyra® Had a Limited Commercial Opportunity | 50 |
| | 2. | Given the limited opportunity, the opportunity costs, and risks, Ampyra® was not economically profitable | 51 |
| | 3. | The Elan patent has served as a blocking patent, limiting the relevance of any success for the Acorda patents | 54 |
| | 4. | At best, the claimed nexus of Ampyra® to the patents-in-suit is weak | 55 |

**<u>TABLE OF ABBREVIATIONS AND KEY TECHNICAL TERMS</u>**

| | |
|---|---|
| Elan Patent | United States Patent No. 5,540,938 |
| Acorda Patents | United States Patent No. 8,007,826<br>United States Patent No. 8,354,437<br>United States Patent No. 8,440,703<br>United States Patent No. 8,663,685 |
| Patents-in-Suit | Elan Patent and Acorda Patents, collectively |
| Asserted Claims | Claims of the patents-in-suit that Plaintiffs allege Defendants have infringed |
| Plaintiffs | Acorda Therapeutics, Inc.<br>Alkermes Pharma Ireland Ltd. |
| Defendants | Roxane Laboratories, Inc., Teva Pharmaceuticals USA, Inc., Apotex Corp. and Apotex Inc., and Mylan Pharmaceuticals Inc. |
| Elan | Elan Corporation, plc |
| Acorda | Acorda Therapeutics, Inc. |
| USPTO | United States Patent and Trademark Office |
| POSA | A Person of Ordinary Skill in the Art |
| $C_{min}$ | Minimum plasma concentration of the drug or active agent |
| $C_{max}$ | Maximum plasma concentration of the drug or active agent |
| $T_{max}$ | Time to maximum plasma concentration |
| $C_{maxSS}$ | Maximum plasma concentration of the drug or active agent at steady state |
| $C_{minSS}$ | Minimum plasma concentration of the drug or active agent at steady state |
| $C_{maxSS}:C_{minss}$ ratio | Ratio of the maximum plasma concentration of the drug or active agent at steady state to the minimum plasma concentration of the drug or active agent at steady state |
| $C_{avSS}$ | Average maximum plasma concentration of the drug or active agent at steady state |
| Ng/ml | Nanogram/milliliter |
| b.i.d. | Twice a day |
| 4-AP | 4-aminopyridine (a mono-aminopyridine), dalfampridine, fampridine |
| Immediate Release | A class of drug delivery in which the release of the drug from the delivery system is rapid, making the drug available for immediate absorption into the blood stream |
| Sustained Release | ("SR") A type of formulation within the controlled release drug delivery class which is designed to release the drug slowly over a longer period of time than immediate release formulations. For purposes of this case, "controlled release" means the same thing as "sustained release." |
| MS | Multiple Sclerosis ("MS") is a chronic disease of the neuroimmunological system |
| EDSS | Expanded Disability Status Scale |

Defendants Apotex Corp., Apotex Inc. (together with Apotex Corp., "Apotex"), Mylan Pharmaceuticals Inc. ("Mylan"), Roxane Laboratories, Inc. ("Roxane"), and Teva Pharmaceuticals USA, Inc. ("Teva") (collectively, "Defendants"), respectfully submit proposed Findings of Fact below.

## I.    PATENTS-IN-SUIT

1.    There are five patents-in-suit: United States Patent No. 5,540,938 ("the '938 patent" or the "Elan patent") and United States Patent Nos. 8,007,826 ("the '826 patent"), 8,354,437 ("the '437 patent"), 8,440,703 ("the '703 patent"), and 8,663,685 ("the '685 patent"). (D.I. 252, Ex. 1, ¶¶ 10-41.)  The '826 patent, '437 patent, '703 patent, and '685 patent are sometimes referred to collectively as the "Acorda patents."  The patents-in-suit are listed in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" ("Orange Book") with respect to Ampyra®.  (Tr. (Peroutka) 51:2-13.)

### A.    The Elan Patent

2.    The United States Patent and Trademark Office ("USPTO") issued the Elan patent, entitled "Formulations and Their Use in the Treatment of Neurological Diseases," on July 30, 1996.  (JTX-001; D.I. 252, Ex. 1 at ¶ 11.)  The inventors listed on the face of the Elan patent are Joseph G. Masterson and Michael Myers.  (*Id*., Ex. 1 at ¶ 13; Tr. (Peroutka) 64:12-17.)

3.    Elan Corporation, plc ("Elan"), is named as the assignee on the face of the Elan patent.  (JTX-001.)  Acorda has an exclusive license to the Elan patent from Elan. ((Tr. (Goodman) 535:17-22; Tr. (Cohen) 303:17-304:2.)  Elan was acquired by Alkermes Pharma Ireland Limited ("Alkermes"), which is the successor in interest to the Elan patent (Tr. (Goodman) 535:20-22.)

4.    The Elan patent lists November 2, 1990, as its foreign application priority date, but Plaintiffs are asserting an actual priority date to U.S. Application No. 786,400, filed

November 1, 1991.  (D.I. 252, Ex. 1 at ¶ 11; JTX-001 at 1:5-7.)  Plaintiffs' expert testified that

the priority date is November 1, 1991.  (Tr. (Fassihi) 324:5-7.)  The patent expires on July 30,

2018. (D.I. 252, Ex. 1 at ¶ 11.)

  5. The Elan patent is directed to methods of treating a neurological disease

characterized by a slowing of nerve impulse transmission, such as multiple sclerosis ("MS") by

administering a sustained release formulation of a mono- or di-aminopyridine, such as 4-

aminopyridine (also known as "dalfampridine" and "4-AP") or 3,4 diaminopyridiene, where the

sustained release formulation allows controlled absorption resulting in therapeutically effective

blood levels over a 12- to 24-hour period when administered once or twice daily.  (JTX-001 at

2:30-41; Tr. (Peroutka) 64:22-55:4.)

  6. Plaintiffs asserted claims 3 and 8 of the Elan patent against Defendants.  (D.I.

252, Ex. 1 at ¶ 16.)

  7. Claims 3 and 8 depend from claim 1.  Claim 1 recites:

> A method for the treatment of a neurological disease where the disease is
> characterised by a slowing of nerve impulse transmission, which comprises
> administering to a patient in need thereof a medicament containing a mono- or di-
> aminopyridine active agent, said medicament being effective to permit sustained
> release of said mono- or di-aminopyridine active agent at a rate allowing
> controlled absorption thereof which achieves therapeutically effective blood
> levels over a 12-24 hour period when administered on a once- or twice-daily
> basis.

(JTX-001 at 22:16-25.)

  8. Claim 3 also depends from claim 2.  Claim 2 recites:  "[a] method according to

claim 1, wherein the neurological disease is characterized by demyelination of the central

nervous system."  (*Id*. at 22:26-28.)  Claim 3 recites:  "[a] method according to claim 1 or 2,

wherein the neurological disease is multiple sclerosis."  (*Id*. at 22:29-30.)

  9. Claim 8 recites: "[a] method according to claim 1, wherein the active agent is 4-

aminopyridine." (*Id.* at 22:50-51.)

10. The asserted claims of the Elan patent are not limited to a specific sustained release formulation. Nor are the asserted claims limited to a specific technology (or platform) to create a sustained release formulation, a dissolution profile, or any specific pharmacokinetic parameters. (JTX-001; Tr. (Peroutka) 65:5-7.)

11. The asserted claims of the Elan patent do not specify a duration of time for the treatment regimen. (Tr. (Peroutka) 65:10-11.) The specification states, however, that it is an "object of the present invention to provide preparations suitable for the long-term administration" of 4-AP. (JTX-001 at 2:22-25.)

12. The asserted claims of the Elan patent are silent as to dose and do not require any dose titration. (Tr. (Peroutka) 65:18-19; Tr. (Lublin) 415:16-416:10.) The dose, though, must result in "therapeutically effective blood levels over a 12-24 hour period" when given once a day or twice daily. (*Id.* at 22:22-25.) In contrast, claims 5, 6, and 7 mention dose titration, where a dose is increased "at selected intervals of time until a therapeutic dose is achieved." (*Id.* at 22:29-51.)

## B.    The Acorda Patents

13. The inventors listed on the face of the Acorda patents are Andrew R. Blight and Ron Cohen. (D.I. 252, Ex. 1 at ¶¶ 21, 27, 33, 39; Tr. (Peroutka) 66:9-10.) Acorda Therapeutics, Inc. ("Acorda") is listed as the assignee of the Acorda patents. (D.I. 252, Ex. 1 at ¶¶ 22, 28, 34, 39.)

### 1.    The '826 Patent

14. The USPTO issued the '826 patent entitled "Sustained Release Aminopyridine Composition" on August 30, 2011. (D.I. 252, Ex. 1 at ¶ 18.) The earliest application date for the '826 patent was December 11, 2003, but Plaintiffs claim the priority date as April 9, 2004. (*Id.*

at ¶ 19.)  The patent expires on May 26, 2027.  (*Id.*)

15.     The '826 patent is directed to a method of improving walking in a human multiple sclerosis patient by orally administering a 10 mg sustained release formulation of 4-aminopyridine twice daily ("b.i.d.") for at least two weeks, wherein the administration results in specific pharmacokinetic parameters, including a $C_{maxSS}:C_{minSS}$ ratio of 1.0 to 3.5, a $C_{avSS}$ of 15 ng/ml to 35 ng/ml, and/or $T_{max}$ of about 2 hours to about 5.2 hours.  (JTX-002 at 29:1-30:33.)

16.     Plaintiffs assert claims 1, 7, 38, and 39 of the '826 patent against Defendants. (D.I. 252, Ex. 1 at ¶ 23.)

17.     Claim 1 recites:

A method for maintaining a therapeutically effective concentration of 4-aminopyridine in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:

orally administering to the human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day; and

thereafter, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, whereby an in vivo 4-aminopyridine $C_{maxSS}:C_{minSS}$ of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

(JTX-002 at 27:17-30.)

18.     Claim 7 depends from claim 6.  Claim 6 recites:

A dosing regimen method for providing a 4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:

initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily;

without a subsequent period of 4-aminopyridine titration, whereby an in vivo

$C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

(*Id*. at 27:41-57.)

19.     Claim 7 recites:  "[t]he method of claim 6, whereby an increase in walking speed is obtained in said human."  (*Id*. at 27:58-59.)

20.     Claim 38 depends from claim 37.  Claim 37 recites:

A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of greater than two weeks, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

(*Id*. at 30:14-21.)

21.     Claim 38 recites:  "[t]he method of claim 37 wherein the sustained release composition elicits a $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 when administered b.i.d. or administered at 12-hour intervals to a human."  (*Id*. at 30:22-25.)

22.     Claim 39 also depends from claim 7 and recites:  "[t]he method of claim 37 wherein said time period is twelve weeks." (*Id*. at 30:26-27.)

23.     The parties have stipulated that if the two week limitations are obvious, then the 12 week limitations are also obvious.  (D.I. 254; Tr. (Peroutka) 68:16-19.)

24.     In the prosecution history for the '826 patent, the patentees discuss a 1997 paper titled "Quantitative Assessment of Sustained Release 4-AP for the Symptomatic Treatment of Multiple Sclerosis," by Schwid et al. ("Schwid").  (JTX-104;  JTX-007; Tr. (Peroutka) 95:3-15.) The patentees argued in a statement to the USPTO that Schwid disclosed stable dosing of 4-AP. (Tr. (Peroutka) 95:3-15; JTX-007 at AMPFH002449.)

## 2.     The '685 Patent

25.     The USPTO issued the '685 patent, entitled "Sustained Release Aminopyridine

Composition" on March 4, 2014.  (D.I. 252, Ex. 1 at ¶ 36.)  The '685 patent is a continuation of the '826 patent, the earliest application date of which was December 11, 2003, but Plaintiffs claim the priority date as April 9, 2004.   (JTX-005 at 1:6-10; D.I. 252, Ex. 1 at ¶ 37.)  The '685 patent expires on January 18, 2025.  (*Id*.)

26.     Plaintiffs asserted claims 3 and 5 of the '685 patent against Defendants.  (D.I. 252, Ex. 1 ¶ 41.)

27.     Claim 3 depends from claim 2, which depends from claim 1.  Claim 1 recites:

A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein the sustained release composition further comprises one or more pharmaceutically acceptable excipients.

(JTX-005 at 27:22-28.)

28.     Claim 2 recites: "[t]he method of claim 1 wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient."  (*Id.* at 28:1-4.)

29.     Claim 3 recites: "[t]he method of claim 2 wherein the sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours."  (*Id*. at 28:5-8.)

30.     Claim 5 depends from claim 1 and recites: "[t]he method of claim 1 wherein the sustained release composition provides an average plasma concentration at steady state in humans in the range of about 15 ng/ml to about 35 ng/ml."  (*Id*. at 13-16.)

### 3.     The '437 Patent

31.     The USPTO issued the '437 patent, entitled "Method of Using Sustained Release Aminopyridine Compositions," on January 15, 2013.  (D.I. 252, Ex. 1 at ¶ 24.)  The priority date of the '437 patent is April 9, 2004.  (*Id*., Ex. 1 at ¶ 25; JTX-003 at 1:6-7.)  The patent expires on

December 22, 2016.  (D.I. 252, Ex. 1 at ¶ 25.)

32.     The '437 patent is directed to a method of increasing walking speed or improving walking in a human multiple sclerosis patient by orally administering a 10 mg sustained release formulation of 4-AP twice daily (b.i.d.) for at least two weeks, wherein the 10 mg sustained release formulation of 4-AP is the only dose and where the administration results in specific pharmacokinetic parameters, including a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml.  (JTX-003 at 27:55-30:26.)

33.     Plaintiffs asserted claims 1, 2, 5, 22, 32, 36, and 37 of the '437 patent against Defendants.  (D.I. 252, Ex. 1 at ¶ 29.)

34.     Claim 1 recites:

A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

(JTX-003 at 27:55-61.)

35.     Claim 2 recites:

A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

(*Id*. at 27:62-68.)

36.     Claim 5 depends from claim 1 and recites:  "[t]he method of claim 1 wherein said time period comprises twelve weeks."  (*Id*. at 28:16-17.)

37.     Claim 22 depends from claim 18, which depends from claim 1.  Claim 18 recites: "[t]he method of claim 1 wherein said sustained release composition is a tablet."  (*Id*. at 28:48-

49.)

38.     Claim 22 recites:  "[t]he method of claim 18 wherein said tablet exhibits a release profile to obtain a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml." (*Id*. at 28:55-57.)

39.     Claim 32 recites:

A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

(*Id*. at 29:10-17.)

40.     Claim 36 depends from claim 32 and recites: "[t]he method of claim 32 wherein said time period comprises twelve weeks."  (*Id*. at 30:11-12.)

41.     Claim 37 depends from claim 33.  Claim 33 recites:

A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

(*Id*. at 29:18-24.)

42.     Claim 37 recites:  "[t]he method of claim 33 wherein said time period comprises twelve weeks."  (*Id*. at 30:13-14.)

### 4.     The '703 Patent

43.     The USPTO issued the '703 patent, entitled "Methods of Using Sustained Release Aminopyridine Compositions," on May 14, 2013.  (D.I. 252, Ex. 1 at ¶ 30.)  The '703 patent is a continuation of the '437 patent and has a priority date of April 9, 2004.  (JTX-004 at 1:6-9.)  The patent expires on April 8, 2025.  (D.I. 252, Ex. 1 at ¶ 31.)

44.     Plaintiffs asserted claims 36, 38, and 45 of the '703 patent against Defendants.

(D.I. 252, Ex. 1 at ¶ 35.)

45.    Claim 36 depends from claim 2.  Claim 2 recites:

A method of improving lower extremity function in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks.

(JTX-004 at 29:63-67.)

46.    Claim 36 recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said sustained release composition provides a release profile to obtain a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml." (*Id*. at 31:28-31.)

47.    Claim 38 depends from claim 2 and recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient." (*Id*. at 31:36-40.)

48.    Claim 45 depends from claim 2 and recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said time period is more than two weeks." (*Id*. at 32:20-22.)

## II.    BACKGROUND

### A.    Multiple Sclerosis

49.    MS is a chronic disease of the neuro-immunological system first identified in the 1800s.  (Tr. (Peroutka) 52:10-53:15.)  Currently, there is neither a known cause of, nor a known cure for, MS. (Tr. (Peroutka) 53:21-54:1.)

50.    MS causes a loss of myelin, the fatty insulating material around many nerves in the central nervous system.  (*Id*.; *see also* Tr. (Lublin) 392:12-392:25.)  This is called demyelinization and can cause a disruption in the nerve flow anywhere in the nervous system.

(Tr. (Peroutka) 52:13-53:10.)  Symptoms of MS can include impairment of almost any bodily function controlled by the nervous system.  (Tr. (Peroutka) 54:9-55:5.)

51.     Weakness in the legs and/or alterations in walking are one of the most common symptoms of MS.  (Tr. (Peroutka) 55:9-56:4; Tr. (Goodman) 432:21-23.)  Roughly 50 to 75 percent of MS patients will experience difficulty walking.  (*Id.*)  It was well-known and accepted in 1990—prior to the priority dates of any of the patents-in-suit—that difficulty with walking was a symptom of MS. (Tr. (Peroutka) 55:9-56:4.)

52.     Treatments for MS currently fall into two categories: (1) the use of disease-modifying agents which alter the course of the disease and lessen the chance that the patient gets worse; and (2) therapies that attempt to alleviate the symptoms of MS to improve the patient's quality of life.  (Tr. (Lublin) 393:11-20.)

**B.     History of 4-AP before Elan's exclusive license to Acorda**

53.     4-AP, the active ingredient in Ampyra®, also known as 4-aminopyridine, fampridine, or dalfampridine, was first identified in a German paper in 1902.  (Tr. (Peroutka) 73:1-5.)  4-AP improves nerve conduction by blocking potassium channels, and is sometimes referred to as a "potassium channel blocker."  (Tr. (Peroutka) 122:5-10.)

54.     4-AP was first used in humans in studies conducted in the 1970s, when a Swedish group tested 4-AP in connection with neurological diseases myasthenic syndrome and myasthenia gravis, which are characterized by an impasse in nerve transmission between the muscles, resulting in weakness.  (Tr. (Peroutka) 73:9-18.)  These studies taught a person of ordinary skill in the art ("POSA") about the safety profile of 4-AP and that muscle strength could be increased with 4-AP.  (Tr. (Peroutka) 73:19-24.)

55.     The first study of 4-AP in animal models for MS was a British study in 1980 that looked at a rat model of demyelination. (Tr. (Peroutka) 73:25-74:6.) That study indicated 4-AP

would reverse and improve the deficit caused by demyelination in animals.  (*Id.*)

56.     In 1981, Drs. Murray and Newsom-Davis conducted a study that established the safety of long-term use of 4-AP in humans.  (Tr. (Peroutka) 74:7-75:12; JTX-089.)  The paper discussing this study, Murray et al., "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," *Neurology*, 31:265-71 (1981) ("Murray") (JTX-089) is a printed publication published in the United States and available to persons of ordinary skill in the art in 1981.  (D.I. 252, Ex. 1 at ¶ 56.)  Murray describes a dosing scheme in which the starting dose of 4-AP was 10 mg twice daily, which was gradually increased, depending on the response, to a maximum of 200 mg daily in one patient.  (Tr. (Goodman) 439:24-441:3.)  The results of the Murray study show that 4-AP given orally for 10 months can improve neuromuscular transmission.  (Tr. (Peroutka) 74:9-23; JTX-089.)  While three of the patients in the Murray study suffered seizures, Dr. Murray observed that the seizures only occurred at daily doses of 80 mg or more.  (Tr. (Peroutka) 74:24-75:4.)

57.     4-AP was first tested in MS patients in 1983 in a study in England.  (Tr. (Peroutka) 75:12-75:15)  Stefoski and Davis of the Rush Medical School also began to develop immediate release formulations of 4-AP to treat MS in the 1980s.  (JTX-112; JTX-043.)  By 1990, Elan entered into a formal agreement with Rush that allowed Elan to use Rush's research on 4-AP to develop pharmaceutical formulations of 4-AP.  (Tr. (Fogarty) 158:24-159:15.)

58.     After the Elan patent issued on July 30, 1996, Elan granted a license to the Elan patent to Acorda in 1997, allowing Acorda to use the sustained release 4-AP formulations Elan developed for clinical trials in spinal cord injury patients, *i.e.*, for treatment of a chronic condition.  (Tr. (Cohen) 280:16-281:3; JTX-020.)  In 1998, Elan expanded the license to Acorda, granting it exclusive rights over 4-AP, including for use in treatment of MS—another chronic

condition for which sustained release would be necessary.  (Tr. (Cohen) 281:11-19; 303:17-304:2; Tr. (Peroutka) 65:12-17, 77:20-78:8; JTX-021.)

       **C.**    **Ampyra®**

59.    Acorda holds an FDA-approved New Drug Application ("NDA"), No. 022250, for the use of 10 mg dalfampridine extended release tablets to improve walking in patients with MS, which Acorda sells under the registered trademark Ampyra®.  (D.I. 252, Ex. 1 ¶ 66.) Ampyra® was approved in January 2010.  (Tr. (Cohen) 300:18-19.)

60.    The package insert or product label of Ampyra® shows that it is approved to improve walking in patients with MS.  (Tr. (Peroutka) 51:22-25; JTX-076.)  The label provides a recommended maximum dose of 10 mg twice daily approximately 12 hours apart with or without food but does not specify the duration of treatment.  (*Id*. at 52:1-7.)

**III.**    **WITNESSES**

       **A.**    **Plaintiffs' Fact Witnesses**

61.    Plaintiffs called Dr. Ron Cohen as their only live fact witness at trial.  Dr. Cohen, a medical doctor, is a named inventor on the Acorda patents.  (Tr. (Cohen) 274:4-6.)  He is the President and CEO of Acorda, which he founded in 1993.  (*Id*. at 273:25-274:3, 277:8-14.)

       **B.**    **Plaintiffs' Expert Witnesses**

62.    Plaintiffs called four expert witnesses at trial on their own behalf:  Dr. Reza Fassihi, Dr. Andrew Goodman, Dr. Fred Lublin, and Dr. Gregory Bell.

63.    Dr. Reza Fassihi is a Professor of Pharmacy at Temple University, School of Pharmacy.  (Tr. (Fassihi) 315:7-9.)  Plaintiffs offered and this Court accepted Dr. Fassihi as an expert in pharmaceutics and, in particular, sustained release formulations.  (*Id*. at 320:24-321:5.)

64.    Dr. Andrew Goodman is a Professor of Neurology at the University of Rochester. (Tr. (Goodman) 424:10-20.)  He directs the Immunology and Multiple Sclerosis Division within

the Department of Neurology.  (*Id.* at 424:21-25.)  Plaintiffs offered and this Court accepted Dr.

Goodman as an expert in neurology, particularly MS, the treatment of MS, and clinical trials in

MS.  (*Id.* at 428:10-16.)  Dr. Goodman has advised and consulted with Elan for years, starting in

1994.  (*Id.* at 535:23-536:6.)  Dr. Goodman was also a paid consultant for Acorda since the late

1990s or early 2000 and worked with Acorda in connection with its drug development of

Ampyra®.  (*Id.* at 535:23-536:22.)  During the course of the studies supporting the development

of Ampyra®, Dr. Goodman worked side-by-side with the inventors of the Acorda patents.  (*Id.* at

537:9-12.)  Dr. Goodman also receives compensation from Acorda for work performed on its

MS advisory committee.  (*Id.* at 537:17-24.)  Dr. Goodman also noted in passing that he had

been asked to be an investigator on another study, but had to decline due to a potential conflict

with his role at Acorda.  (Tr. (Goodman) 513:4-16.)

65.     Dr. Fred Lublin is a medical doctor specializing in neurology.  (Tr. (Lublin)

386:1-5.)  He is also a Professor of Neurology at the Icahn School of Medicine at Mount Sinai.

(*Id.*)  Plaintiffs offered and this Court accepted Dr. Lublin as an expert in neurology with specific

expertise in the care and research of MS.  (*Id.* at 392:5-10.)

66.     Dr. Gregory Bell is a Group Vice President at Charles River Associates, a global

economics and management consulting firm.  (Tr. (Bell) 573:3-9.)  He has worked at Charles

River Associates since 1992.  (*Id.* at 573:10-12.)  Plaintiffs offered and this Court accepted Dr.

Bell as an expert in the economics of the pharmaceutical industry.  (*Id.* at 576:5-10.)

### C.     Defendants' Expert Witnesses

67.     Defendants called three expert witnesses live at the trial:  Dr. Stephen Peroutka,

Dr. Arthur Kibbe, and Dr. DeForest McDuff.

68.     Dr. Stephen Peroutka is an M.D./Ph.D. specializing in neurology and

pharmacology.  (Tr. (Peroutka) 43:23-24; 44:25-45:7.)  After actively treating patients, including

MS patients, and serving as an Assistant Professor of Neurology at Stanford University, Dr. Peroutka worked in the pharmaceutical industry in the fields of neuroscience, including with respect to MS research.  (*Id*. at 46:6-47:10.) Dr. Peroutka is currently the Vice-President of Neuroscience and Global Therapeutic Head of inVentiv Health Clinical, a company that focuses on neurosciences, and he routinely reviews MS protocols.  (*Id*.).  Defendants offered and this Court accepted Dr. Peroutka as an expert in neurology, pharmacology, and drug development. (*Id*. at 49:7-12.)

69.     Dr. Arthur Kibbe, Ph.D., is an Emeritus Professor of Pharmacy at Wilkes University.  (Tr. (Kibbe) 176:24-177:2; 177:15-18.)  Dr. Kibbe has almost 50 years of experience in the development and formulation of pharmaceutical dosage forms, specifically including the development of dosage forms to be used for the first time in patients, and the development and review of pharmacokinetic studies.  (*Id*. at 175:4-176:5; 178:14-21.)  He has routinely trained students on how to make and test formulations, including sustained release formulations, first at the University of Mississippi, and then later at Wilkes University, starting in 1994.  (*Id*. at 174:14-175:1; 178:14-21.)  Dr. Kibbe has also served as an advisor to Congress and the FDA in the development of drug approval standards.  (*Id*. at 176:9-18.)  Since 1989, Dr. Kibbe has served on the Steering Committee, as Editor-in-Chief, and is author of 20-25 monographs for the Handbook of Pharmaceutical Excipients, an internationally recognized reference text disclosing information on excipients, including those used to achieve sustained release.  (*Id*. at 176:6-177:2; 178:8-13.)   Defendants offered and this Court accepted Dr. Kibbe as an expert in the development and evaluation of pharmaceutical dosage form formulations, including both immediate and sustained release formulations, and also as an expert in pharmacokinetics.  (*Id*. at 179:25-180:7.)

70.     Dr. DeForest McDuff is a Vice President at Intensity Corporation, a consulting firm with expertise in economics, finance, computer science, and data science.  (Tr. (McDuff) 626:19-627:3.)   Dr. McDuff is an economic consultant with a Ph.D. in economics from Princeton.  (*Id*. at 627:1-3.)   He has substantial experience in the pharmaceuticals industry, including more than 20 cases considering commercial success.  (*Id*. at 627:7-9.)   Defendants offered and this Court accepted Dr. McDuff as an expert on economics and commercial success as it relates to patentability.  (*Id*. at 627:13-17.)

### D.      Witnesses Appearing by Deposition

71.     Defendants called three fact witnesses by deposition.  Michael Myers is a named inventor of the Elan patent and was designated as Alkermes's Rule 30(b)(6) witness on numerous topics.  (Tr. 148:4-7.)   Mairead Fogarty was a Rule 30(b)(6) witness designated on numerous topics by Alkermes.  (Tr. 158:4-9.)   Andrew Blight is a named inventor of the Acorda patents and was designated as Acorda's Rule 30(b)(6) witness on numerous topics.  (Tr. 161:20-25.)

## IV.    CLAIM CONSTRUCTION

72.     The parties stipulated to constructions for certain claim terms contained in the patents-in-suit.  (D.I. 193; D.I. 187; D.I. 252, Ex. 1 at ¶ 42).   On March 16, 2016, the Court issued a claim construction order and opinion adopting constructions for the remaining disputed claim terms. (D.I. 195; D.I. 196; D.I. 252, Ex. 1 at ¶ 43.)

## V.     THE PATENTS-IN-SUIT ARE OBVIOUS OVER THE PRIOR ART

### A.      Person of Ordinary Skill in the Art

73.     The parties have offered different definitions of a person of ordinary skill in the art ("POSA"), but these differences are not material.  (D.I. 252, Ex. 2 at ¶¶ 20, Ex. 3 at ¶¶ 22-24.) The experts have agreed that their opinions would not change if either parties' definition of a

POSA was adopted.  (Tr. (Peroutka) 72:8-17; Tr. (Kibbe) 183:16-184:5; Tr. (Fassihi) 322:14-24; Tr. (Lublin) 406:9-18; Tr. (Goodman) 429:19-430:4.)

    **B.**    **The Asserted Claims of the Elan Patent are Prima Facie Obvious Because They Claim a Known Drug For a Known Use With a Known Formulation Type**

    74. The asserted claims of the Elan patent—claims 3 and 8—relate to (1) a method of treatment of a neurological disease; (2) using a mono- or di-aminopyridine active agent; and (3) with a sustained release allowing controlled absorption which achieves therapeutically effective blood levels over a 12-24 hour period when administered once or twice a day.  (JTX-001.) Claim 3 specifically requires MS as the disease to be treated, and claim 8 requires 4-AP as the active ingredient.  (*Id.*)

    75. As explained in detail below, the prior art demonstrates that 4-AP was a drug well-known to a POSA.  4-AP was further known to be useful in the treatment of patients with MS, and more specifically for treatment of the symptoms of MS.  And, since MS is a chronic condition with no known cure, a POSA would have known to apply well-known formulation techniques to create a sustained-release dosage form that would be necessary to facilitate such a course of treatment.

        **1.**    **4-AP was known in the art**

    76. 4-AP is not a new compound and was first identified in a German paper in 1902. (Tr. (Peroutka) 73:1-5.)  4-AP was first used in humans in studies conducted in the 1970s, and was then used in animal studies in the UK in 1980.  (Tr. (Peroutka) 73:19-74:6.)  In 1981 studies by Drs. Murray and Newsom-Davis disclosed the use of 4-AP in pharmaceutical preparations to evaluate the safety and efficacy of the drug.  (Tr. (Peroutka) 74:7-11; JTX-089.)  These studies continued in both the UK and the US throughout the 1980s.  (Tr. (Peroutka) 75:12-15; JTX-112; JTX-043.) Accordingly, there is no dispute that 4-AP was a drug known to a POSA before the

Elan patent.

### 2.      4-AP was known in the art to be useful in treating multiple sclerosis

77.     The asserted claims of the Elan patent require that the claimed sustained release formulation of 4-AP is capable of resulting in "therapeutically effective blood levels over a 12 to 24 hour period when administered on a once or twice daily basis."  (JTX-001.)  This Court construed the term "therapeutically effective blood levels" as "blood levels sufficient to produce a therapeutic effect."  (D.I. 195; D.I. 196; D.I. 252 at ¶ 43.)  There is no requirement in the Elan patent that the administration of the drug ameliorate a symptom.  (Tr. (Lublin) 408:10-12.)  In order for 4-AP to be therapeutically effective, it ameliorates a neurological disease with no requirement that 4-AP benefit the afflicted patient in any particular way.  (Tr. (Lublin) 408:13-409:2.).

### a.      Stefoski I

78.     In 1987, Stefoski and Davis, researchers at the Rush Medical School, conducted a study and published a paper titled "4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis, *Ann. Neurol.* Vo. 21, 71-77 (1987) ("Stefoski I").  (Tr. (Goodman) 443:4-12; Tr. (Peroutka) 75:16-23; JTX-112.)  Stefoski I is a printed publication published in the United States and available to persons of ordinary skill in the art in 1987.  (D.I. 252, Ex. 1 at ¶ 62.)

79.     Stefoski I studied motor function, defined by the researchers as power, coordination, and gait (*i.e.*, walking), as well as ocular motor function, by monitoring 12 MS patients and five normal men before, during, and after IV injection of seven to 35 mg of 4-AP.  (JTX-112 at 1; Tr. (Peroutka ) 76:2-77:14.)  As a result of this study, Stefoski I concluded that 10 of the 12 patients showed mild to marked improvement, vision improved in seven patients, oculomotor function improved in five, and motor function (defined as power, coordination, and gait) improved in five. (JTX 112 at 1; Tr. (Peroutka) 76:3-77:14.)   These improvements

gradually developed within minutes with doses as low as two mg. (Tr. (Peroutka) 76:3-77:14.)

80.     In addition, Stefoski I reported that five of the patients receiving 4-AP had a differential effect in visual evoked potential ("VEP") versus the two individuals on placebo. (JTX-112.)  VEP, also known as visual evoked response ("VER"), is a test to detect subclinical lesions in MS patients.  (Tr. (Lublin) 394:21-396:9.)  VEP is designed to pick up changes in the optic nerve that were not appreciated clinically to aid in the diagnosis of MS.   (*Id*.) Improvements in VEP latency suggest a central effect because there is no placebo effect on the test.  (*Id*. at 402:7-8.)  Therefore, VEP can reveal a nerve conduction response and a therapeutic effect.  (*Id*. at 417:24-418:14.)  VEP is a proven method of showing improving nerve conduction. (Tr. (Lublin) 418:4-6.)  Thus, the differential effect observed provided strong support of the true pharmacologic effect of 4-AP.  (Tr. (Lublin) 404:18-405:14.)  Stefoski I concluded that their data suggested a clinical usefulness for 4-AP in treating MS patients. (Tr. (Peroutka) 77:15-19.)

### b.     Davis

81.     In February 1990, the same group of investigators at Rush Medical School published a paper on a follow-up study in the Annals of Neurology titled "Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," *Ann. Neurol.*, 27(1):186-192 (1990) ("Davis") (Tr. (Peroutka) 77:15-82:16; JTX-043.)   Davis is a printed publication published in the United States and available to persons of ordinary skill in the art in 1990.  (D.I. 252, Ex. 1 at ¶ 47.)  Davis looked at 15 MS patients who were given 4-AP starting at 10 mg going up to 25 mg or placebo. (*Id*.)  Davis found that all of the MS patients given 4-AP had mild to marked improvements.   (*Id*.)   Motor function (defined as power, coordination, and gait) improved in nine of 13 involved subjects.  (*Id*.)  Davis found that 10 mg doses were efficacious. (*Id*.)

82.     Davis concluded that orally administered 4-AP produces clinically important

improvements in multiple chronic deficits in MS. (Tr. (Peroutka) 79:6-80:10; JTX-043.)  Davis also reported that in spite of patients becoming unblinded, several had reversible improvements in VEP testing that could not be explained by placebo effect.  (Tr. (Lublin) 402:11-404:7; JTX-043).  Therefore, by showing that there was some improvement in VEP, Davis showed that 4-AP can be therapeutically effective.  (Tr. (Lublin) 418:7-14.)  Davis further found that no serious adverse events, *e.g.*, seizures, occurred in doses at 10–25 mg.  (Tr. (Peroutka) 79:14-80:10.)

83.     Noting prior incidences of seizure in MS patients, the authors of the Davis study noted that their results suggested a "safe and effective therapeutic window for orally administered 4-AP for visual and motor defects in selected MS patients." (Tr. (Kibbe) 206:14-207:12.)

### c.     Knowledge of a POSA

84.     An article published in 1994 in the Annals of Neurology by Bever discussed the Davis and Stefoski studies, commenting that they were "limited."  (JTX-027 at AMPFH0021791.)  However, there is no such thing as a perfect study.  (Tr. (Peroutka) at 142:24-143:10.)  All studies are subject to limitations, including investigator bias, number of subjects, statistical analyses, and statistical issues.  (*Id*.)  It has become common for authors of journal articles to comment on the limitations they feel exist in studies they discuss.  (*Id*.) POSAs would consider these limitations in view of the reported study results and the teachings of the prior art.  (Tr. (Peroutka) 143:11-22.)

85.     The specification of the Elan Patent admits that the Stefoski I and Davis references describe improvement in conduction of nerve impulses caused by 4-AP and show that 4-AP was found to improve specific neurological deficits of VEP in MS patients.  (JTX-001 at 1:52-66; Tr. (Lublin) 409:15-24, 416:19-417:9; Tr. (Goodman)  462:8-462:12.)

### 3.      Sustained release was known in the art

86.      Sustained release formulations release the drug continuously over a long period of time, meaning absorption of the drug is slower and it reaches peak later before dissipating slower than an immediate release formulation.  (Tr. (Kibbe) 186:4-11.).  This gives the drug a longer duration of effect compared to immediate release formulations.  (*Id*. at 186:20-25.)

87.      The earliest work in the area of sustained release dosage forms can be traced to a 1938 patent, which involved using coated pellets for prolonged release of a drug.  (Tr. (Fassihi) 367:1-14.)  This work was a forerunner to the development of the coated particle approach to sustained release delivery that was introduced in the early 1950s.  (*Id*.)  In the 40 years following the 1938 patent, there were a number of strategies developed from research in sustained release. (*Id*. at 367:18-25.)

88.      A POSA would have known about sustained release technology and sustained release formulations from reference texts such as Remington's and Robinson & Lee, which have had chapters devoted to sustained release technology since at least 1990.  (JTX-082; JTX-79; Tr. (Kibbe) 188:6-189:1.)

89.      The 1985 edition of Remington's – a "Bible of pharmaceuticals sciences" – highlights that, prior to 1990, numerous sustained release drugs were on the market.  (JTX-082 at AMP-DEF-0000150; Tr. (Peroutka) 81:11-19.)   In addition, Remington's 1990 edition includes Tables II-VI, which disclose lists of 39 FDA-approved commercially available sustained release products for each of five known platforms: reservoir diffusion, matrix diffusion, matrix dissolution, encapsulated dissolution, and ion exchange.  (JTX-081 at AMP-DEF-0000177-180; Tr. (Kibbe) 208:24-209:2; Tr. (Fassihi) 368:17-21.)   These FDA-approved drugs were manufactured by 14 different companies (Tr. (Fassihi) 369:11-372:10.)  Many of the listed FDA-approved drugs in Remington's have been available since the 1950s or 1960s.  (Tr. (Kibbe)

209:12-17; Tr. (Fassihi) 366:3-25.)  Therefore, the technology to make many different sustained

release products was available by 1991.  (Tr. (Fassihi) 366:20-25.)

90.     Remington's also explains how to make a sustained release drug using each of the

disclosed platforms and the excipients appropriate for each dosage form.  (Tr. (Kibbe) 209:7-11.)

For example, in a matrix tablet, a POSA would blend the active ingredient with a matrix

polymer, the most common being hydroxypropylmethylcellulose.  (Tr. (Kibbe) 209:24-210:2.)

A POSA would know to perform compatibility tests to determine if the drug has any chemical

reactions with the excipients.  (Tr. (Kibbe) 210:12-211:9.)  A POSA would then blend the active

ingredient at the desired dose with various ratios of excipients to make several different potential

formulations.  (*Id*.)  This process takes about a day to a day-and-a-half.  (*Id*.)  Once a uniformed

blend is obtained, the formulation can be tableted, which takes about 15-20 minutes.  (Tr.

(Kibbe) 210:2-3; 210:12-211:9.)  Once the tablet is obtained, a POSA would perform dissolution

testing to confirm that, when administered, the drug will have the desired release profile.  (*Id*.)

Most formulators can complete this process in about four months.  (Tr. (Kibbe) 212:2-3.)

91.     Additionally, a POSA would have known about sustained release formulations

that were already known and on the market before 1990.  (Tr. (Peroutka) 81:11-13.)  Numerous

pharmaceutical companies were making sustained release products before 1990. (Tr. (Fassihi)

366:3-373:5.)

92.     Indeed, Dr. Myers, one of the inventors listed on the Elan patent, explained that

he learned about controlled release prior to the date of the invention from courses and

conferences sponsored by the Controlled Release Society, and by reading available materials on

new polymers and new equipment that were being used to create sustained release formulations,

visiting equipment manufacturers, and reviewing patents on sustained release dosage forms.  (Tr.

(Myers) 151:19-153:10.)

**4.     A POSA would know sustained release formulations have significant advantages over immediate release formulations for treating chronic conditions**

93.     A POSA would have known that sustained release medications are especially useful for treating chronic diseases.  (Tr. (Kibbe) at 184:20-23.)

94.     There is no disagreement that advantages of sustained release formulations were known to a POSA.  (Tr. (Fassihi) 325:19-24.)  For example, Remington's 1985 edition includes a table setting forth various known advantages of sustained release.  (JTX-082; Tr. (Kibbe) 188:9-21.)

95.     One such recognized advantage of sustained release products is improved patient compliance—*i.e.*, that a patient is much more likely to be able to comply with a treatment that requires taking a drug only once or twice a day.  (JTX-082; Tr. (Kibbe) 189:16-190:12.)

96.     A POSA would know that because the formulation releases the drug more slowly and over a longer period of time, less total drug is employed.  (Tr. (Kibbe) 190:20-24.)  As a result, peak concentrations may not reach the toxic or side effect level, which reduces the incidence of side effects.  (*Id*. at 191:2-18.)  Maintaining levels of the drug between the minimum effective concentration and the toxic concentration further results in improved efficiency in treatment.  (*Id*. at 191:19-22.)

97.     Sustained release was also known by a POSA to improve bioavailability  (*i.e.*, the amount of a drug that is absorbed and enters the circulation) by spreading the release of the drug over a longer section of intestine, allowing it more opportunity to be absorbed.  (*Id*. at 192:1-7.)

98.     A POSA would recognize that standard testing is done in any dosage form development, including compatibility, dissolution, and stability testing.  (*Id*. at 194:9-13.)  With sustained release formulations, a POSA would also consider, for example, dose dumping, patient

misuse, establishing an in vitro/in vivo correlation when formulating a sustained release formulation, and first pass effect, which occurs when a drug that is taken orally is highly metabolized by the liver before going into systematic circulation, reducing the bioavailability of the drug.  (Tr. (Kibbe) at 194:5-198:3.)   However, these are common considerations that a formulator addresses, and thus a part of the routine optimization process used to formulate a sustained release drug product.  (*Id*. at 198:4-11.)   Such routine experimentation would not prevent a POSA from considering making a sustained release formulation.  (*Id*.)   Nor would a POSA be dissuaded simply because a sustained release formulation may be more difficult to prepare relative to an immediate release formulation or because an immediate release product had not already been FDA-approved.  (Tr. (Kibbe) 232:11-233:2.)  To those skilled in the art, the sustained release formulation process is still "straightforward."  (Tr. (Kibbe) 264:12-20.)   As long as the drug has the characteristics that make it a potential candidate, a POSA would be motivated to try to make a sustained release formulation.  (*Id*. at 198:4-11.)

### 5.      A POSA would know how to determine if a drug was suitable for a sustained release formulation

99.     A POSA would understand in light of Remington's 1985 edition that if a drug has four distinct characteristics, it is a good candidate for a sustained release formulation.  (JTX-082 at AMP-DEF-0000153-156; Tr. (Kibbe) 198:12-200:14.)

100.    First, a drug with a relatively short half-life must be dosed more frequently than a drug with a long half-life, because the drug is eliminated from the patient's system more quickly.  (JTX-082 at 4-5 (AMP-DEF-0000150-51); Tr. (Kibbe) 198:19-22; Tr. (Peroutka) 61:4-8.)  Thus, a POSA would understand that if a drug has a half-life of 3-4 hours, another dose is required after 3-4 hours to maintain the level of drug in the blood.  (Tr. (Peroutka) 61:12-21.)  A sustained release formulation, by delivering drug to the body over an extended period of time, can provide

a longer duration of action for drugs with a short half-life by gradually releasing drug over time to maintain concentration levels.  (Tr. (Peroutka) 61:22-62:5.)

101.    Second, a good candidate drug for sustained release would have a relatively efficient absorption to allow it to be absorbed relatively efficiently and uniformly along the gastrointestinal tract.  (Tr. (Kibbe) 198:23-199:4.)

102.    Third, a relatively small dose is required for a candidate for sustained release dosing so that the resulting dosage form is convenient to swallow.  (*Id*. at 199:5-17.)

103.    Finally, because sustained release formulations are often used to treat chronic conditions, drugs used to treat a chronic condition serve as good candidates for such a formulation.  (*Id*. at 199:18-200:1.)   If a drug satisfies these criteria, a POSA would have expected to use a number of different known sustained release platforms with a reasonable expectation of success.  (*Id*. at 234:2-11.)

6.     **A POSA would have known that 4-AP satisfies the criteria for being an attractive sustained release drug**

104.    Prior to 1990, a POSA would have known the advantages of a sustained release formulation and would have recognized that 4-AP satisfied all of the characteristics of a candidate for sustained release.

105.    In 1982, Uges et al. published a paper titled "4-Aminopyridine Kinetics," *Clin. Pharmacol. Ther.* 31(5):587-593 (1982) ("Uges"), which is a printed publication published in the United States and available to persons of ordinary skill in the art in 1982, before the priority date of all of the patents-in-suit. (JTX-137.)  Uges examined nine healthy subjects who received three different administrations of 20 mg of 4-AP, an IV and uncoated tablet (both immediate release), and an enteric dose (delayed release).  (Tr. (Kibbe) 201:4-23; JTX-137.)  Uges disclosed that the half-life of 4-AP was approximately four hours.  (*Id*.)

106.    Drugs like 4-AP with a four-hour half-life are good candidates for sustained release because an immediate release dosage form would have to be administered four to six times per day.  (Tr. (Peroutka) 61:4-62:5.)  Thus, a POSA would be motivated to develop a sustained release formulation so that the drug can be absorbed over a longer period of time and need only be taken once or twice a day.  (Tr. (Kibbe) 201:4-23.)

107.    A POSA would also have known that 4-AP is a good candidate for sustained release because Uges taught that the bioavailability of the enteric-coated tablets was 95 plus or minus 29 percent, which means that almost 100 percent of the drug was absorbed even when its absorption had been delayed.  (Tr. (Kibbe) 201:25-202:5.)  This means that the drug is absorbed efficiently over time, making it a good candidate to create a sustained release product.  (*Id*. at 203:20-204:7.)

108.    Uges also disclosed that almost 100 percent of the drug, regardless of how it was administered, was excreted unchanged in the urine.  (*Id*. at 202:6-12.)  This means that biotransformation is unlikely, and there is not likely to be any risk of the first pass effect in the administration of 4-AP.  (*Id*.)

109.    All of these characteristics of 4-AP reported in Uges taught a person of ordinary skill in the art at the time the study was published that 4-AP was an excellent candidate for sustained release and would give such a person motivation to go forward.  Since a POSA also would have known that MS is a chronic disease—therefore requiring treatment for a prolonged period of time—a POSA would have a strong motivation to create a sustained release dosage form of 4-AP based on the disclosures in the prior art, such as Uges and Remington's.  (Tr. (Kibbe) 226:2-24.)

110.    A POSA would not have dismissed the results of Uges because of the small

- 25 -

sample size, because a POSA would recognize it as appropriate for a preliminary study and would provide information that motivates the formulator to move forward.  (*Id.* at 203:6-19.)

111.    Because the half-life and bioavailability data reported in Uges are consistent, a POSA would have a basis for moving forward with developing a sustained release formulation prior to 1990.  (*Id.*)  Indeed, Stefoski I found that 4-AP's duration of action was consistent with that found by Uges—a half-life of about four hours.  (Tr. (Peroutka) 77:20-78:8.)

112.    In view of 4-AP's short half-life as described in Stefoski I and the description of the therapeutic window described in Davis, a person of ordinary skill in the art would have concluded that it would be advantageous to use a sustained release formulation to administer 4-AP to humans. (Tr. (Peroutka) 81:5-10.)  Specifically, when considering a treatment for MS, a neurologist or pharmacologist would have known that without a sustained release formulation, a patient would have to be dosed every three to four hours in order to obtain an "all-day" treatment.  (JTX-112; Tr. (Peroutka) 77:20-78:8.)

113.    It is not surprising, therefore, that Elan moved to developing a sustained release formulation of 4-AP due to issues of potential side effects and patient compliance.  (Tr. (Myers) 155:20-156:2; 157:1-16; Tr. (Fogarty) 161:10-18.)   While Elan was developing multiple immediate release formulations of 4-AP, (Tr. (Fogarty) 160:18-161:9), Dr. Blight, one of the two listed inventors on the Acorda patents, testified that it was "not unusual" or "particularly mysterious" "to be interested in sustained release for a drug which has a short half life, which [4-AP] does."  (Tr. (Blight) 164:10-15.)

114.    The specification of the Elan patent admits that it was desirable to make a sustained release formulation of 4-AP.  (Tr. (Fassihi) 373:19-23.)  The "Background and Prior Art" section of the Elan patent itself states that "[f]urther, in view of the nature of neurological

diseases, it can be appreciated that there is a need for an improved dosage form." (JTX-001 at 2:10-13.) The Elan patent further explains that "such a formulation must result in a controlled release of drug to the system circulation and therapeutically effective blood levels throughout a given treatment period." (*Id*. at 2:13-16.) A POSA would have had a reasonable expectation of making a sustained release formulation of 4-AP using the known sustained release platforms.

### 7.    A POSA would have known how to make a sustained release formulation of 4-AP

115.    Prior to 1990, a POSA would have known how to make a sustained release formulation of 4-AP that could provide a therapeutically effective blood level for a period of 12-24 hours when given once or twice daily.

116.    The asserted claims of the Elan patent do not require a particular sustained release formulation of 4-AP. (Tr. (Kibbe) 219:7-12; Tr. (Fassihi) 374:6-13.) Therefore, a POSA would understand that any known sustained release platform could potentially be used to develop a sustained release formulation of 4-AP.

117.    There were "lots of different platforms that [could] be used to make a sustained release" formulation of 4-AP that were known in the art in 1990. (Tr. (Kibbe) 208:21-209:2.) Remington's 1990 edition discloses lists of 39 FDA-approved commercially available sustained release products from 14 different companies for each of five known sustained release platforms: reservoir diffusion, matrix diffusion, matrix dissolution, encapsulated dissolution, and ion exchange. (JTX-081 at AMP-DEF-0000177-180; Tr. (Kibbe) 208:24-209:2; Tr. (Fassihi) 368:17-21.) Further, Remington's 1990 edition does not simply inform readers that the platforms exist, but "actually lay[s] out how you can make [the platforms] and what excipients are appropriate for these dosage forms." (Tr. (Kibbe) 209:8-11.)

118.    As just one specific example, the Elan patent includes one embodiment using a

sustained release platform that was disclosed in Remington's 1990 edition and was well-known in the art.   The Elan patent teaches making a matrix core or membrane using hydroxypropylmethylcellulose as the water soluble polymer.  (JTX-001 at 4:41-46; Tr. (Kibbe) 219:7-220:11.)  The pellets or granules are then compressed into tablets.  (Tr. (Kibbe) 219:7-220:11.)  A POSA could also make any number of other sustained release platforms in which 4-AP would work, including the system used for Contac®, in which 4-AP would work "quite nicely."  (Tr. (Kibbe) 208:18-210:7.)

119.   A POSA would have ensured that the sustained release formulation would last over a course of a longer period by choosing a platform and excipients and then dissolution testing to determine which combination, "when it's administered, [] will release the drug, at least over six hours or more to get you to a sustained release product."  (Tr. (Kibbe) 210:8-211:9.) This process is "really straightforward."  *Id.*

120.   Dr. Myers, an inventor of the Elan patent, confirmed that it took him only three or four weeks to put about three or four formulations on paper, and about a day to actually physically make the sustained release formulation of 4-AP.  (Tr. (Myers) 154:2-155:6.)

121.   Dr. Myers had experience with a sustained release platform and simply "added this active ingredient instead of a different one and adjusted the platforms with routine testing until [Elan] got the dissolution pattern and therefore the blood level that they wanted."  (*Id.* at 211:18-23.)

122.   A POSA also would not have required there to be an immediate release formulation approved by the FDA before having motivation to make a sustained release formulation.   Because FDA submissions are confidential, the fact that a product is approved by the FDA does not mean that there is a substantial amount of information about that product in the

literature.   (Tr. (Kibbe) 232:2-233:2.)   As long as there is enough information known in literature, a POSA would be motivated to move forward.  (*Id*.)  For example, although not FDA-approved, an immediate release version of 4-AP was known and studied in the prior art by at least Stefoski I, Davis, Uges, and Elan themselves. (JTX-112, JTX-043, JTX-137, Tr. (Fogarty) 160:18-161:9.)

        **C.**    **The Asserted Claims of the Acorda Patents are Obvious Over the Prior Art Because They Simply Narrow the Elan Patent to Treat a Known Symptom of MS Using a Known Dose for an Obvious Period of Time Resulting in Known Pharmacokinetic Parameters**

     123.    Although the Plaintiffs assert 16 claims from the Acorda patents, the limitations of these claims fall into five specific "core" categories: a method of treatment where (1) a sustained release formulation of 4-AP is administered to treat MS patients; (2) the dose is 10 mg given twice-a-day (b.i.d.); (3) in order to improve walking (*i.e.* to increase walking speed); (4) where certain pharmacokinetic ranges result; and (5) the dose is administered for at least two weeks without titration.   (Tr. (Peroutka) 66:21-67:12.)   Dr. Cohen testified that his claimed invention is the 10 mg b.i.d. dose.  (Tr. (Cohen) 305:25-306:5.)

     124.    As will be explained below, the Acorda patents claim a subset of what is covered by the Elan patent, and the claim limitations were obvious in light of the prior art, which includes the Elan patent.  (Tr. (Peroutka) 89:1-9.)  Indeed, Plaintiffs concede that the scope of the Acorda patents is not broader than the scope of the Elan patent.  (Tr. (Closing) 794:4-795:11.)

        **1.**    **The Elan patent discloses a known sustained release 4-AP formulation to treat MS**

     125.    The Elan patent is listed in the Orange Book for Ampyra®. (Tr. (Peroutka) 50:24-51:13; DTX-204.)  As discussed above, the Elan patent describes a method for the treatment of MS using a sustained release formulation of 4-AP. (Tr. (Peroutka) 64:9-66:2; Tr. (Kibbe) 184:6-9; JTX-001.)   The Elan patent teaches a person of ordinary skill in the art about how to

manufacture a sustained release formulation of 4-AP.  (Tr. (Kibbe) 219:7-220:11.)

126.    The Elan patent was published in 1996, years before the priority dates of the Acorda patents, and constitutes prior art for the Acorda patents.  (Tr. (Kibbe) 218:20-25.)  The patentees of the Acorda patents referred to and relied on data found in the Elan patent in the prosecution history of the Acorda patents.  (Tr. (Peroutka) 87:17-20; JTX-007.)  Thus, a POSA would have known from the Elan patent that a sustained release formulation of 4-AP could be used to treat MS, and have a reasonable expectation of success that such a formulation would result in the therapeutic efficacy claimed in the Elan patent.  (Tr. (Peroutka) 82:22-83:9.)

127.    Acorda has admitted that these limitations of the asserted claims would have been obvious to a POSA.  (Tr. (Cohen) 273:25-274:6; 302:2-22 (admitting that the use of 4-AP to treat MS had been proposed and tested before Acorda came along).)  Dr. Cohen, one of the listed inventors on the Acorda patents and the President and CEO of Acorda, admitted that he and Dr. Blight, a listed co-inventor on the Acorda patents, did not invent the concept of using 4-AP in a sustained release formulation to treat MS patients.  (Tr. (Cohen) 302:23-303:1.)  Instead, Acorda took an exclusive license from Elan to use the Elan patent for the treatment of MS, (Tr. (Cohen) 303:17-304:2), and even obtained from Elan the 10 mg 4-AP sustained release product it used in clinical studies.  (Tr. (Cohen) 304:3-8; Tr. (Blight) 166:12-14.)  According to Cohen, "Elan invented the sustained release formulation that [Acorda] used and [is currently] using."  (Tr. (Cohen) 302:23-303:4.)  Neither of the named inventors for the Acorda Patents are formulation scientists.  (Tr. (Blight) 165:8-13.)  Indeed, prior to 2004, Acorda did not do any development or formulation work on any sustained release formulation for 4-AP and never modified any sustained release formulation for 4-AP.  (Tr. (Cohen) 304:9-21; Tr. (Blight) 163:14-20.)

### 2. Additional prior art confirms that a sustained release formulation of 4-AP was known

128.　Sustained release formulations of 4-AP were also known to a POSA from, *e.g.* Schwid.  Schwid is a printed publication published in the United States and available to persons of ordinary skill in the art in 1997.  (Tr. (Peroutka) 91:12-92:4; JTX-104; D.I. 252, Ex. 1 at ¶ 61.)

129.　A POSA would have known that the problem of peak serum levels can be alleviated by a sustained release formulation where the $C_{max}$—the highest concentration of drug measured in a pharmacokinetic study—is typically lower than in immediate release formulations of the same drug.  (Tr. (Peroutka) 58:10-59:21.)  Because the drug is delivered to the body over time, rather than at once, a sustained release formulation can circumvent potential toxicity problems.  (*Id.*)

130.　Dr. Blight, one of the named inventors of the Acorda patents, admitted that Acorda looked at sustained release formulations for 4-AP for this very reason.  (Tr. (Blight) 164:10-25.)  According to Dr. Blight, sustained release formulations are a fairly standard approach to drug development for a drug with a short half-life, such as 4-AP.  (*Id.*)

131.　Schwid also provides a brief introductory description of an unpublished study done by Elan in 1994 in which Elan's sustained release 4-AP formulation was administered to 161 people with MS for six weeks.  (Tr. (Goodman) 465:21-467:13.)  According to Schwid, the 1994 Elan study used a sustained release preparation of 4-AP because pharmacokinetics had shown that seizures and bad toxicity occurred when serum 4-AP levels peaked in patients. (Tr. (Peroutka) 91:12-92:4; JTX-104.)  But the clinical endpoint measured by the 1994 Elan study was the Expanded Disability Status Scale ("EDSS").  (Tr. (Peroutka) 93:8-13.)  The Schwid publication itself reported that the EDSS may have been an inadequate outcome variable for this test.  (*Id.* at 93:16-18.)  In fact, in assessing the 1994 Elan Study, Dr. Goodman advised Acorda

that the EDSS was not an effective outcome variable for measuring improvements in walking. (Tr. (Goodman) 542:19-543:1.)  Since the Schwid study, no other study has used EDSS as the sole outcome variable in testing 4-AP.  (Tr. (Goodman) 546:1-4.)

132.    Schwid reported in detail on a subsequent study using 4-AP in MS patients.  (Tr. (Goodman) 469:18-470:9; JTX-104.)  This study also used Elan's sustained release formulation. (Tr. (Goodman) 471:11-23; Tr. (Cohen) 305:3-24.)  The data reported in Schwid showed that timed gait improved in nine out of 10 patients administered a dose of 17.5 mg b.i.d. compared to the placebo group.  (Tr. (Peroutka) 91:17-92:12.)  The authors, which included Dr. Goodman, concluded that sustained release 4-AP administered twice daily improved motor function in MS patients.  (*Id*. at 92:5-15.)

133.    From the teachings of Schwid, a POSA would have known to use and had a reasonable expectation of success in using a sustained release formulation of 4-AP.  While Dr. Goodman claimed that the unpublished study mentioned in Schwid would have discouraged a POSA from further attempts to treat MS with a sustained release 4-AP formulation, Dr. Peroutka explained why that is not the case.  (Tr. (Peroutka) 93:8-13.)  Dr. Peroutka testified that Schwid found the EDSS to be "imprecise due to substantial intrarater and interrater variability."  (Tr. (Peroutka) 93:8-95:15.)  Further, Dr. Peroutka testified that Schwid used a fix dose of 17.5 milligrams b.i.d. and found "an improvement in motor function, and that there were quantitative measures that could be used that was [sic] more sensitive than the EDSS score."  *Id*.

134.    A POSA would also have known about the efficacy of 4-AP sustained release formulations from Goodman et al., "Placebo-Controlled Double-Blinded Dose Ranging Study of Fampridine-SR in Multiple Sclerosis," *Multiple Sclerosis*, vol. 8, Suppl. July 2002, S 11 6-S 117 (P308) ("Goodman I") (JTX-062), which is a printed publication published in the United States

and available to a person of ordinary skill in the art in 2002.  (D.I. 252, Ex. 1 at ¶ 49.)  Dr. Goodman—Plaintiffs' expert witness and long-time consultant for Elan and Acorda—was the lead author of Goodman I.  (Goodman, 474:15-21; 475:6-13.)

135.    Dr. Goodman publicly displayed the results of the data reported in Goodman I at the seventh annual meeting of the America's Committee for Treatment and Research in Multiple Sclerosis ("ACTRIMS-ECTRIMS") (the "Goodman Poster" or "Goodman Presentation") (JTX-080; JTX-080A) in Baltimore, Maryland, in September 2002.  The Goodman Presentation was publicly presented in the United States and available to a person of ordinary skill in the art in September 2002.

136.    In 2003, Goodman again disclosed the results of Acorda's test of Elan's 10 mg 4-AP sustained release product.  (Tr. (Cohen) 306:6-307:7; JTX-061, Goodman et al., "Placebo-Controlled Double-blinded Dose Ranging Study of Fampridine-SR in Multiple Sclerosis," *Neurology*, vol. 60 (5 Supp. 1), A167 (March 2003) ("Goodman II").).   Dr. Goodman characterized  the disclosure in Goodman II (JTX-061) as being formatted differently from Goodman I, but having exactly the same content. (Tr. (Goodman) 479:9-12.)  Goodman II is a printed publication which was published in the United States in March 2003 and available to a person of ordinary skill in the art prior to the Acorda patents.  (*Id*.)

137.    The Goodman Poster reports the same study disclosed in Goodman I, but shows more data than that provided by the abstract.  (Tr. (Goodman) 479:16-480:2.)    Dr. Goodman again presented the results of  Acorda's Phase II MS-F201 study (the "201 Study") at the America Academy of Neurology before December 2003. (Tr. (Goodman) 523:23-14.)  There is no question that the Goodman Poster was displayed and presented by Dr. Goodman in the public domain before December 2003.  (Tr. (Goodman) 524:11-14.)

138.    The objective of the study reported in Goodman I, Goodman II, and the Goodman Poster (collectively, "the Goodman References") were twofold:  To "[d]etermine the safety of multiple doses of [sustained release 4-AP] (one week each of 20 mg/day, 30 mg/day, 40 mg/day, 50 mg/day, 60 mg/day, 70 mg/day and 80 mg/day;" and to "[o]btain evidence of efficacy and dose-response using several outcome measures…"  (JTX-080A.)

139.    The study reported in Goodman I used Elan's sustained release formulation. (Tr. (Cohen) 306:6-8.)

### 3.    The prior art taught that 10 mg of sustained release 4-AP was an obvious choice

140.    Based on the teachings of the references known in the art prior to the date of the Acorda patents, a POSA would have known that 10 mg given twice a day (*i.e.*, 20 mg/day) was an appropriate dose to deliver in a sustained release formulation of 4-AP.

141.    The 1987 Stefoski I study tested a range of 7.5 to 52.5 mg of 4-AP, measured in a single day and administered by an injection of 7 to 35 mg of 4-AP total for the day, given in 1- to 5 mg doses every 10 to 60 minutes.  The authors found this range to be safe and effective. (Tr. (Peroutka) 107:21-108:15.)

142.    Similarly, the 1990 Davis study teaches that 10 mg doses were efficacious in a study where 15 MS patients were given 4-AP.  (Tr. (Peroutka) 77:15-82:16; JTX-043.)  Indeed, the Davis study doses from 10-25 mg, administered as a single dose in one day, with individual doses of 25, 20, 15, 12.5, and 10 mg.  The study then compared the doses from the 10-25 mg 4-AP group against a placebo group and found mild to marked improvements as a result of the treatment with 4-AP.  (*Id*.)  Davis also found that at these doses, no serious adverse events, *e.g.*, seizures, occurred.  (*Id*.)

143.    In 2002, Goodman I disclosed results from his tests of the efficacy of 4-AP

- 34 -

sustained release formulations in doses in the range of 20 to 80 mg b.i.d.

144.     Goodman I, Goodman II, and the Goodman Poster all practice the Elan patent with the Elan formulation and report on Acorda's 201 Study that supported FDA approval of Ampyra®.  (Tr. (Cohen 306:14-307:7.)  That study began with a placebo in the first week and then went to 20 mg/day (*i.e.*, 10 mg of 4-AP sustained release twice a day) for the second week. Doses increased weekly in increments of 10 mg per day up to a total of 80 mg per day during the eighth week. (Tr. (Goodman) 476:15-19.)  The study reported "[e]vidence of dose-response in 20-40 mg/day range," *i.e.*, 10 to 20 mg taken twice daily. (JTX-080A; Tr. (Goodman) 528:11-17.)

145.     The Goodman Poster also concluded that the safety profile was "consistent with previous experience" and that there was "[l]ittle added benefit, and increased [adverse events] at doses above 50 mg/day."  (JTX-080A.)  The Goodman Poster teaches that the dose range for further testing would be the 20 to 40 mg per day range because, in the results summary of the poster, Dr. Goodman was teaching away from using 4-AP at doses above 40 mg a day to treat MS patients.  (Tr. Goodman 534:17-535:4; JTX-080A.)

146.     By 2003, Hayes et al. published "Pharmacokinetic studies of single and multiple oral doses of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," *Clin. Neuropharmacol*. 26(4):185-192 (2003) ("Hayes III") (JTX-069).  This study is a printed publication published in the United States and available to persons of ordinary skill in the art in 2003.  (JTX-069.)  Hayes III discloses a dosing regimen of 10, 15, 20, or 25 mg of 4-AP given twice daily for six days, then once on the seventh day.   (Tr. (Goodman) 464:1-5.)

147.     Based upon the teachings of these and other prior art references, a POSA would have been motivated to use a dose of 10 mg of 4-AP in a sustained release dosage form

administered twice a day.  (JTX-080.)  A POSA would know that the prior art taught that oral doses of 4-AP were safe and effective at 7.5-52.5 mg/day (Stefoski II (JTX-113)), 10-25 mg/day (Davis (JTX-043)), 20-50 mg/day (Hayes III (JTX-069)), 35 mg/day (Schwid (JTX-104)), and 20-40 mg/day (Goodman I, II, Poster (JTX-061; JTX-062; JTX-080; JTX-080A)).   (Tr. (Peroutka) 107:9-108:20.)   Thus, a 20 mg/day dose would be considered by a POSA to be amongst the lowest dose that is both safe and effective.  (Tr. (Peroutka) 104:7-105:3; 107:21-108:15; JTX-080.)

148.   Dr. Blight admitted that there were prior studies that had used 10 mg of 4-AP twice a day in patients as the initial dose, and that Acorda considered those studies, taking into account "all previous work," in determining to start with 10 mg twice a day in the design of its own studies.  (Tr. (Blight) 166:20-167:5.)

149.   A skilled artisan reading the Goodman references in 2004 could not expect any dose in the 20 to 50 mg per day range to be more effective than any of the other doses in that same range.  (Tr. (Goodman) 533:1-535:4.)

### 4. The prior art taught that 4-AP was useful in improving walking and/or walking speed

150.   Weakness in the legs and/or impaired walking is one of the most common symptoms of MS, with approximately 50 to 75 percent of MS patients experiencing difficulty walking.   (Tr. (Peroutka) 55:9-56:4; Tr. (Goodman) 432:21-23.)   It was well-known and accepted prior to the priority dates of any of the patents-in-suit that difficulty with walking was a common symptom of MS.  (Tr. (Peroutka) 55:9-56:4.)

151.   Davis found that 10 mg doses of 4-AP going up to 25 mg showed mild to marked improvements in power coordination and gait in nine of 13 involved subjects.  (Tr. (Peroutka) 77:15-82:16; JTX-43.)

152.    Schwid reported that "timed gait was improved on 4-AP SR [sustained release]" compared to the placebo in nine out of 10 subjects  (Tr. (Peroutka) 91:15-19; Tr. (Goodman) 472:15-16; *see also* JTX-104.)  Schwid disclosed that treatment with 4-AP appeared particularly efficacious in subjects who achieved serum levels above 60 ng/l, with everyone improving in timed gait testing and grip strength and subjective impression.  (Tr. (Goodman) 473:20-25; *see also* JTX-104.)

153.    Goodman I and Goodman II reported that the 4-AP Sustained Release group showed statistically significant improvement from baseline compared to placebo in functional measure of mobility (timed 25 walking speed, P=0.04) and lower extremity strength (manual muscle testing, P=0.01).  (Tr. (Goodman) 477:4-12; Tr. (Cohen) 307:14-17; JTX-061.)

154.    The Goodman Poster reported that the study showed a "significant benefit on timed walking."  (Tr. (Goodman) 532:14-17.)

155.    Prior to 2004, Acorda announced on its publicly accessible website, under the heading "Clinical Trials" that:

> Approximately 550 people have been treated with Fampridine-SR in 14 clinical trials, including . . . six clinical trials for MS. Participants in MS studies demonstrated improved walking ability and lower leg strength.

(Tr. (Cohen) 307:14-17; DTX-584.)

156.    Solari et al., "Aminopyridines for symptomatic treatment in multiple sclerosis," Cochrane Review, in *The Cochrane Library,* issue 2 (2003) ("Solari") (PTX-416) is a printed publication published in the United States and available to persons of ordinary skill in the art in 2003, which is before the priority date of the Acorda patents.  Solari did not conduct any original clinical studies and did not consider many of the available studies and information in the prior art, including the Elan patent and the Hayes and Goodman studies. (Tr. (Peroutka) 104:25-

105:18.)  Looking at some of the studies in the prior art, Dr. Solari found that 54% of patients experienced improved motor functions when being administered 4-AP versus 7% during placebo. (Tr. (Peroutka) 106:8-107:5.)  Because there was a one in 1,000 chance that this finding was random, a person of ordinary skill in the art would have significant motivation to further explore using 4-AP to improve motor function in MS patients.  (Tr. (Peroutka) 106:8-107:5.)  Dr. Peroutka testified that a POSA would have had "significant motivation" from Solari to explore motor function, even if it did not provide motivation for other symptoms.  (Tr. (Peroutka) 106:8-107:5.)

### 5. The prior art specifically disclosed the pharmacokinetic ("PK") parameters claimed in the Acorda Patents, which also are inherent to dosing with a 10 mg dose twice daily

157.   Pharmacokinetics is the science of measuring what happens to the drug after it is ingested.   (Tr. (Peroutka) 57:17-22.)   As. Dr. Kibbe explained, this process is known as "LADMER"—liberation, absorption, distribution, metabolism, excretion, and response.  (Tr. (Kibbe) 179:3-18.)

158.   Obtaining pharmacokinetic ("PK") data is a standard part of drug development. (Tr. (Peroutka) 58:25-2.)  PK data is expressed using terms of art like $C_{max}$, the concentration of drug in the blood at the highest concentration observed in the pharmacokinetics study.  (Tr. (Peroutka) 58:10-12.)

159.   The PK parameters of a drug that is administered multiple times is different from a single dose.  (Tr. (Peroutka) 62:6-63:17.)  When a single dose is administered, the PK profile rises quickly, reaches $C_{max}$, and then falls relatively quickly.  (*See* DDX 2-15).

160.   When an additional dose is administered before the plasma concentration returns to zero, the newly administered drug will cause the plasma concentration to rise again.  (Tr. (Peroutka 62:10-63:17.)  Over multiple doses, the PK will eventually reach an equilibrium or

steady state where the $C_{min}$ will be at a certain level and the $C_{max}$ will be a certain level (*Id.*; *see also* DDX 2-17).

161.    The PK values in the Acorda patents are inherent, known and disclosed in the prior art in connection with the sustained release formulation of 4-AP and dosing regimen of 10 mg twice a day.  (Tr. (Kibbe) 218:8-219:9; 226:10-13.)

162.    PK values are a function of the amount of drug absorbed into the plasma over time.  Accordingly, the PK parameters in the Acorda patents are a natural result of the administration of 10 mg b.i.d. of 4-AP sustained release product. (Tr. (Kibbe) 226:10-226:13.) Because the administration of 10 mg b.i.d. of 4-AP SR was already disclosed in the art, a POSA would have known that the PK profiles that result from the administration of such a dosage form are inherent within a specific mode of administration.   (Tr. (Kibbe) 218:3-19.)  Thus, a prior art reference which discloses the b.i.d. administration of the 10mg 4-AP SR formulation inherently discloses the PK values that can be measured during the b.i.d. administration period.  (*Id.*)

163.    Moreover, the prior art contains teachings that a POSA could use to calculate the PK values from a 4-AP SR formulation.  Indeed, a POSA would be able to calculate PK values from the teaching in Uges.  (Tr. (Kibbe) 218:8-219:9.)

164.    In 2001, Hayes published the results of a study on the plasma concentration of 4-AP sustained release.    Hayes, "Open-Label, Multiple-dose Study to Determine the Pharmacokinetics and Safety of Fampridine-SR in Patients with Chronic Spinal Cord Injury," *Annals of Neurology*, 50 (31); S62(201) (2001) ("Hayes I") (JTX-068).  This study, which is prior art to the Acorda patents, was eventually published in the '826 patent (one of the Acorda patents).  (Tr. (Blight) 166:9-17.)

165.    Hayes III later reported the PK data from the actual Ampyra® clinical trial

studies. (Tr. (Peroutka) 87:25-88:2; JTX-069 at AMP-DEF-0000501; JTX-002 at 25:1-28.) These studies included (a) a study to determine the PK and safety profile of an oral sustained release formulation of 4-AP, administered as a single dose; and (2) a study to determine the PK and safety profile of an oral sustained release formulation of 4-AP twice daily for one week in patients with chronic spinal cord injuries. (Tr. (Peroutka) 95:23-96:24; JTX-069.)

166.    Hayes III reported: (a) that the sustained release 4-AP formulation was absorbed slowly; (b) the peak plasma concentration shortly after doses (2.6 to 3.7 hours); (c) the plasma half-life (5.6 to 6.7 hours); and (d) that it reached steady state after four days of twice daily administration. (Tr. (Peroutka) 95:23-96:24; JTX-069.)

167.    The $T_{max}$, the $C_{avg}$ at steady state and the ratio of $C_{max}$ to $C_{min}$ at steady state values reported in Hayes III, in connection with the dosage of 10 mg b.i.d., are all within the claimed pharmacokinetic limitations of the Acorda patents. (Tr. (Peroutka) 96:25-97:5; JTX 69.)

168.    The fact that the Hayes III study was done on spinal cord patients rather than MS patients would have no impact on the PK values disclosed in the study, because there would be no difference in the pharmacokinetics of an MS patient and those of a spinal cord patient. (Tr. (Kibbe) 224:20-22.)

169.    Dr. Blight and Dr. Cohen referred to and relied upon the PK data in Hayes III in the '826 patent. (Tr. (Kibbe) 223:25-224:15.) In fact, a table disclosing PK data in the '826 patent is identical to the table disclosed in Hayes III. (*Id.*)

### 6.    Extending a stable dosing regimen to two weeks and beyond was obvious

170.    MS is a chronic disease, and the disability that an MS patient has once it is established and stable will remain for the rest of that patient's life. (Tr. (Peroutka) 52:8-12.) Consequently, MS needs to be treated chronically, meaning indefinitely. (*Id.*; Tr. (Peroutka)

49:17-50:9; Tr. (Kibbe) 199:22-200:1; 218:3-19.)  Thus, a POSA would have been motivated to treat MS patients for at least two weeks.  (Tr. (Kibbe) 226:14-17.)

171.    The Elan patent does not discuss duration but does discuss the treatment of a symptom of a chronic disease.  (JTX-001.)

172.    The prior art in 2004 contained data concerning treatment using 4-AP for 32 months in Polman I and three months in Van Diemen II. (Tr. (Peroutka) 109:6-22; JTX-095; DTX-572.)[1]

173.    Likewise, Murray taught a person of ordinary skill in the art that doses of 4-AP under 80 mg could be used to treat humans chronically without any serious seizure effects, up to 10 months.  (Tr. (Peroutka) 75:5-11.)

174.    The Goodman Poster contains no suggestion that 4-AP would be less effective in treating MS, a chronic disease, over time.   (Tr. (Peroutka) 104:17-24.)   Based on the data reported in the Goodman Poster, a POSA would have a reasonable expectation that a dose of 10 mg of 4-AP sustained release administered twice a day would work for longer than two weeks. (Tr. (Peroutka) 104:7-105:3.)

175.    Based on the literature and data in the prior art, a POSA in 2004 would expect that the 10 mg twice a day sustained release formulation of 4-AP would work for more than two weeks.   (Tr. (Peroutka) 104:7-105:3.)   Indeed, these references do not mention any loss of

---

[1] Van Diemen, et al., "4-Aminopyridine in patients with multiple sclerosis: dosage and serum level related to efficacy and safety," *Clin. Neuropharmacol.*, Vol. 16(3), 195-204 (1993) ("van Diemen II") (AMP-DEF-0000660), is a printed publication published in the United States and available to persons of ordinary skill in the art in 1993, which is before the earliest priority date of the Acorda Patents.  (Joint Pretrial Order, Ex. 1 at ¶ 65.)  Polman et al., "4-Aminopyridine in the Treatment of Patients with Mulitple Sclerosis," *Arch. Neurol.*, Vol. 51, 292-96 (March 1994) ("Polman I") (AMP-DEF-0000565), is a printed publication published in the United States and available to persons of ordinary skill in the art in 1994, which is before the earliest priority date of the Acorda Patents.  (Joint Pretrial Order, Ex. 1 at ¶ 57.)

efficacy in treatment over time, any reason that 4-AP cannot be administered indefinitely, or provide any other teaching that would discourage a POSA from administering a sustained release formulation of 4-AP for at least two weeks as required by the asserted claims (*Id.*)  There is no evidence in the prior art suggesting that 4-AP could not be used chronically. (Tr. (Peroutka) 104:7-105:3.)

176.    A POSA in 2004 would have been motivated to choose 10 mg as a dose and would have treated MS patients for at least two weeks because it is a chronic condition. (Tr. (Kibbe) 226:14-17.)

177.    Once an efficacious dose is found, the general goal of drug development is to provide a stable dosing regimen.  (Tr. (Peroutka) 99:9-11.)  This is because it is desirable for a patient to be prescribed a dose on a regular basis.  (Tr. (Goodman) 553:1-20.)  The patentees discussed Schwid in the prosecution history of the '826 patents, arguing in a statement to the USPTO that Schwid disclosed "fixed" or stable dosing of 4-AP.  (Tr. (Peroutka) 95:3-15; JTX-007 at AMPFH0002449.)   A POSA would have, therefore, also been motivated to administer a stable dose of 10 mg 4-AP to treat MS.

178.    Claims 1, 3, and 8 of the Elan patent are silent on titration.  (Tr. (Peroutka) 65:18-19; Tr. (Lublin) 414:25-416:10; JTX-001.)  Claim 5 of the Elan patent, though, is dependent on claim 1 and requires a dose titration.  (JTX-001; Tr. (Lublin) 416:4-10.)  Claim 1's silence on titration therefore demonstrates that it allows for a stable dose.

179.    The Acorda patents are obvious because they narrow a known dose (10 mg twice daily) disclosed in the prior art, with a known use (treating symptoms of MS patients), with an obvious stable dosing regimen for an obvious duration (*i.e.*, chronically, because MS is a chronic disease and, of course, anything that is chronic needs to be treated chronically). (Tr. (Peroutka)

50:3-9.)

### 7.    The remaining limitations are also obvious over the prior art

180.    There are other extraneous limitations of the Acorda Patents that the "core" (Tr. (Peroutka) 69:24-70:8) limitations discussed above do not cover.  (JTX-003 at 28:48-49 and 29:17-24; JTX-005 at 27:22-28 and 28:5-8.)

181.    Based on the teachings of the references in the prior art, a POSA would have known to use a tablet for the sustained release composition.  (JTX-003 at 28:48-49.)  The "Elan [P]atent, among others, specifically disclose[d] a sustained release formulation that is a tablet." (Tr. (Peroutka) 111:6-8.)

182.    A POSA would have also known to administer dalfampridine without other doses of dalfampridine.  (JTX-003 at 29:17-24.)  The Goodman references, among others, "teach using dalfampridine without other doses of dalfampridine."  (Tr. (Peroutka) 111:10-13.)

183.    Further, a POSA would have known to include one or more pharmaceutically acceptable excipients in the composition.  (JTX-005 at 27:22-28.)  The Elan patent, among others, "teach[es] a sustained release composition with one or more pharmaceutically acceptable excipients."  (Tr. (Peroutka) 111:16-19.)

184.    Finally, a POSA would have known to create a sustained release profile that extends over at least six hours.  (JTX-005 at 28:5-8.)  The Elan patent "teach[es] a sustained release profile that extends over six hours."  (Tr. (Peroutka) 111:20-23.)

## VI.    EVIDENCE OF SECONDARY CONSIDERATIONS CANNOT REBUT THE PRIMA FACIE OBVIOUSNESS OF THE PATENTS-IN-SUIT

185.    Plaintiffs presented no evidence of secondary considerations with regard to the Elan patent.  Plaintiffs contend that the following secondary considerations are evidence of non-obviousness with regard to the Acorda patents: unexpected results; long-felt but unmet need;

failure of others; and commercial success.  (D.I. 252, Ex. 2 at ¶¶ 36-51.)[2]  However, Plaintiffs have not set forth sufficient evidence to demonstrate that such secondary considerations were present for Ampyra®.

### A. No Evidence of Unexpected Properties/Benefits

186.    Plaintiffs' expert, Dr. Goodman, testified that the invention claimed by the Acorda patents yielded unexpected results because "the 10 mg twice daily sustained release as the, in essence, preferred dosage, was surprising given the prior art suggesting a need to go to higher, higher doses and higher blood levels."  (Tr. (Goodman) 515:8-11.)  According to Dr. Goodman, the preference for 10mg was surprising because:  (a) Dr. Goodman was personally surprised that the 10 mg dose would work because he did not think it would be effective  (Tr. (Goodman) 517:11-25); and (b) Dr. Goodman and Dr. Cohen suggested that they were surprised to see no meaningful difference between doses of 10, 15, and 20 mg.  (Tr. (Cohen) 298:25-299:3; Tr. (Goodman) 517:11-25.) Contrary to Plaintiffs' claim, it was not unexpected that a 10 mg dose twice daily would be effective, let alone as effective as 15 mg and 20 mg SR b.i.d.

187.    First, Dr. Goodman actually disclosed the results of clinical trials delivering multiple doses of fampridine SR twice a day in doses ranging from 10-80 mg per day and teaching that the dose range for further testing would be 20 to 40 mg per day.  (Tr. (Goodman) 476:15-476:19; 534:17-535:4; Goodman I; Goodman II; Goodman Poster.)

188.    The Goodman Poster, which outlined the results reported in Goodman I and Goodman II, reported evidence related to efficacy in walking from a Phase II study.  (Tr. (Peroutka) 693:19-25; *see* JTX 80A.)  The Goodman Poster shows efficacy at 10 mg twice daily for walking.  (Tr. (Peroutka) 694:1-9.)  The study shows "that at the lowest dose that they use, 20

---

[2] In the pretrial order, Plaintiffs offered a theory of teaching away.  (Joint Pretrial Order, Ex. 2 at ¶ 79; Ex. 4 at ¶76.  At trial, however, Plaintiffs pursued no such theory.

mg, that is 10 mg twice a day, there is a decrease of about three seconds," to walk 25 feet.  (*Id.*) Specifically, the Goodman Poster states that "the average improvement in walking speed during the low dose period, that is defined as 20 to 50 mg per day, including a greater than 20 percent increase for nine of the 25 subjects," or 36 percent of patients.  (Tr. (Peroutka) 694:13-24; JTX-80; JTX-80A.)

189.    The efficacy taught in the Goodman Poster was also provided in Ampyra's® label.  (Tr. (Peroutka) 695:9-22; *see* JTX-76.)  The Ampyra® Label provides two figures from two different trials.  The figures show 32%-36% of patients improve walking speed, which is almost identical to the results of the Goodman Poster.  (Tr. (Peroutka) 695:9-695:2; JTX-76.)

190.    Thus, Dr. Goodman's own poster demonstrates that a 10 mg 4-AP SR dose b.i.d. would be effective.

191.    The Solari paper, also referred to as the Cochrane review, further demonstrates that efficacy using 10 mg was not unexpected.  In the Solari paper, the reviewers looked at outcome measures, with the main focus on: (a) safety and (b) efficacy or changes in disability or impairment scales assessing (A) motor function, (B) visual acuity, (C) cognition, and (D) fatigue.  (Tr. (Peroutka) 105:7-20.)  The Solari paper also looked at quality of life, which is an efficacy measure, and patients' subjective responses.  (*Id.*)  Although Solari could draw no conclusions regarding the efficacy of 4-AP across all of the symptoms of MS, when looking at endpoints relating to walking, the Solari review found efficacy for motor function and ambulation.  (Tr. (Peroutka) 697:21-698:6; JTX-76 at 4-5.)  Specifically, the Solari paper assessed ambulation in three studies: (a) 54 patients assessed the efficacy of aminopyridine and ambulation on the ambulation index in the two Bever papers; and (b) timed gait using the Schwid paper, wherein nine out of ten patients improved in ambulation during the study treatment versus none during

treatment with placebo.  (Tr. (Peroutka) 698:7-17; JTX-76 at 4-5.)   Thus, the Solari paper confirmed that 4-AP showed efficacy in ambulation and motor strength.  (Tr. (Peroutka) 699:16-20; JTX-76 at 4-5.)

192.     Given the teachings in the Goodman Poster and Solari review, a POSA would not have expected safety issues as of 2003 with 10 mg of sustained release 4-AP twice daily.  (Tr. (Peroutka) 700:7-14.)   In fact, going back to the 1980's, there were multiple doses used and found to be safe in the 10-40 mg range, as reported by Dr. Goodman.  (*Id.*)  Therefore, it was not surprising or unexpected that 10 mg of 4-AP twice a day was efficacious to treat walking with lower adverse effects than higher doses.  (Tr. (Peroutka) 700:20-24.)

193.     Second, Dr. Goodman's opinion that a POSA in 2004 would have been surprised to find that there is no statistically significant change in efficacy between the administration of 20mg/day and 50 mg/day is similarly unsupported.  At trial, Dr. Goodman admitted that the dose response curve in Goodman I did not detect any significant differences among doses within the range of 20-50 mg/day.  (Tr. (Goodman) 533:1-4.)  Indeed, Dr. Goodman disclosed that a skilled artisan reading the Goodman references in 2004 could not expect any dose in the 20 to 50 mg per day range to be more effective than any of the other doses in that same range. (Tr. (Goodman) 533:1-535:4.) In turn, based on the Goodman Poster, it was not unexpected that 10 mg twice a day would be as efficacious as the higher dose.  (Tr. (Peroutka) 696:3-20.)

### B.     No Evidence That Amprya Satisfied a Long-Felt Need

194.     Dr. Goodman opined that Ampyra® satisfied a long-felt unmet need to improve the quality of life of MS patients.  (Tr. (Goodman) 511:15-512:5.)  According to Dr. Goodman, this long-felt unmet need is shown by the fact that FDA granted Acorda a priority review for Ampyra® even though 4-AP had never been previously approved by FDA for pharmaceutical use.  (*Id*. at 512:6-17.)

195.     Dr. Goodman provided no testimony regarding when this unmet need was recognized in the art.  Nor did he provide any testimony regarding the duration of time this unmet need existed in the art without a solution.

196.     Dr. Goodman admitted that only 15%-20% of his patients who suffer from walking difficulties due to MS are prescribed Ampyra®.  (Tr. (Goodman) 539:24-540:2.)  This low percentage of patients who are prescribed Ampyra® is direct evidence that Ampyra does not satisfy a long-felt but unmet need.  Ampyra® only addresses a subset need and a subset of patients with that need, but does not address the need completely.  (Tr. (Peroutka) 702:1-6.) Simply put, Ampyra® only partially treats one symptom in a third of the subjects who might need it and does not reverse the symptom to normal.  (Tr. (Peroutka) 702:7-11.)

### C.       No Evidence of Failure of Others

197.     Plaintiffs claim that the patents-in-suit are not obvious because others failed to develop a therapy like Ampyra®.  (Tr. (Goodman) 513:2-11.)  First, Dr. Goodman contends that the 1994 Elan study failed because it did not show therapeutic efficacy under the EDSS test. (*Id*.)  In other words, Dr. Goodman describes this study as a failure because it failed to prove efficacy in a certain way—*i.e.* confirm the hypothesis it set out to confirm.   (*Id*.)

198.     To the contrary, the Schwid study found that EDSS was not an effective testing variable for measuring improvements in walking, and more sensitive measures needed to be created.  (Tr. (Goodman) 542:19-543:1; Tr. (Peroutka) 703:22-704:19.)  Indeed, Schwid explains that the EDSS is "relatively insensitive to change due to its ordinal nature:"

> For example, a patient who needed a cane to walk 100 meters would need to improve enough to walk without the cane before the EDSS score would change.  Lesser improvements in gait would not be reflected by the EDSS, and notable changes in strength or other deficits could also be overlooked.

(JTX-0104 at AMPDEL0166739.)

199.     Since the Schwid study, no other study has used EDSS as the sole outcome variable in testing 4-AP.  (Tr. (Goodman) 546:1-4.)  Dr. Goodman agreed, advising Acorda that the EDSS was not an effective outcome variable for measuring improvements in walking.  (Tr. (Goodman) 542:19-543:1.)

200.     Plaintiffs have advanced no evidence showing that the administration of 4-AP in the 1994 Elan study failed to provide the therapeutic benefits of Ampyra®, namely improved walking as demonstrated by increased walking speed. (JTX-076.)  Likewise, Plaintiffs have also advanced no evidence that Ampyra® succeeded where this 1994 Elan study allegedly failed, namely by demonstrating an improvement in EDSS score.  In other words, Plaintiffs have not shown that Ampyra® succeeded where others had failed.

201.     Dr. Goodman also contends that Sanofi-Aventis failed to create a therapy like Ampyra®.  According to Dr. Lublin, the failure of nerispirdine is evidence that it was very difficult to develop an agent that would reliably improve walking in MS patients.  (Tr. (Lublin) 413:4-10.)  Nerispirdine and 4-AP, however, are not the same drug.  (Tr. (Lublin) 419:7-24; Tr. (Peroutka) 704:21-705:2.)   In addition, while both drugs are potassium channel blockers, nerispirdine is also a sodium channel blocker.  (Tr. (Lublin) 419:25-420:8; Tr. (Peroutka) 705:6-20; JTX-076 at 4-5.)  The formulation of nerispirdine that failed was also an immediate release and not a sustained release formulation.  (*Id*. at 420:9-12.)   And the claimed invention here relates to the 4-AP dosing regimen, not the compound itself.  Sanofi-Aventis did not fail to improve walking speed in MS patients using a sustained release 10 mg b.i.d. formulation of 4-AP and, therefore, its project as to nerispirdine is not relevant to this case.

## D.     Amyyra® is Not a Commercial Success

202.     Plaintiffs' expert, Dr. Bell, testified that Ampyra® has been a commercial success because it has generated over $1.7 billion in sales in the U.S., resulting in approximately $1

billion in accounting profits for Acorda.  (Tr. (Bell) 578:1-6.)  Dr. Bell further relied on the growth rate in sales since 2010, which show a growth of 8% per year in tablets sold and a 20% per year growth in sales revenue.  (*Id*. at 579:2-8.)  Dr. Bell also contends that Acorda's license to Biogen to commercialize a 4-AP product outside the U.S. shows that Ampyra® is a commercial success.  (*Id*. at 581:22-583:1.)

203.    Although he has done so in previous cases where he analyzed commercial success, Dr. Bell did not compare the sales, price, or market share of Ampyra® to any other drug.  (Tr. (Bell) 611:8-612:20.)  Dr. Bell's commercial success analysis does not provide context for Ampyra® sales.  (Tr. (McDuff) 635:2-20.)

204.    Dr. McDuff explained that commercial success may be considered in the context of obviousness because "[t]he idea is that if an invention is obvious and it's a commercial success, the market . . . would have brought that product to market sooner."  (Tr. (McDuff) 628:16-20.)  Thus, the question on commercial success is whether, with sales now known, how strong would the incentive for development have been, if any?  (DDX 8-5.)  As Dr. McDuff explained, the incentive for development cannot be measuring only by the sales of the drug once it is on the market, but rather should include the costs that would be incurred to bring that product to market—the commercialization costs.  (*Id*. at 630:3-10.)

205.    All aspects of the pharmaceutical development process of a product, including research and development, clinical development, clinical trials, FDA approval, and sales and profits, are relevant to an analysis of commercial success.  (Tr. (McDuff) 628:24-629:11.)  These factors should be evaluated in order to determine whether the sales and profits of a pharmaceutical product are large enough to make an inference about the commercial opportunity or the economic incentives, back at the time of the alleged invention.  (Tr. (McDuff) 629:7-11.)

206.    Unlike Dr. Bell's analysis, Dr. McDuff's analysis of the commercial success of the product accounted for comparisons with pharmaceutical industry benchmarks, comparisons to other drugs, and an evaluation of Ampyra's® economic profitability.  Together, these factors demonstrate that Ampyra's® sales and profits do not indicate commercial success and are not sufficient to have generated economic incentives to bring the product to market sooner.  (Tr. (McDuff) 647:20-25.)

### 1.    Ampyra® Had a Limited Commercial Opportunity

207.    The sales and profits of Ampyra® are not large enough to have made the market interested in the product.  (Tr. (McDuff) 629:1-4.)   Ampyra® has a limited commercial opportunity due to "[its] limited label, [its] limited efficacy, and [its] limited patient population." (Tr. (McDuff) 630:17-19.)

208.    Originally, Acorda sought to have Ampyra® approved for a broader indication: to treat spinal cord injuries as well as MS, generally.  (*Id.* at 630:20-25.)  Acorda was not able to obtain those broader indications, and was instead only approved for the limited purpose of improving walking in patients with MS.  (*Id.*)  With this limited indication, Ampyra® is an orphan drug with a limited patient population.  (Tr. (McDuff) 631:4-8.)  Even within the MS patient population, only 25 to 30 percent of the patients are eligible for Ampyra®.  (*Id.*; *see also* JTX-76; DTX-419; DTX-57.)

209.    When compared to pharmaceutical industry benchmarks, sales of Ampyra® are not impressive.  For example, Ampyra's® sales are just a fraction of the top two decile drugs. (Tr. (McDuff) 632:16-633:8.)   At best, Ampyra's® sales are average, which it puts it at or around the break-even point, economically.  (Tr. (McDuff) 633:9-13.)

210.    When compared to other MS drugs, Ampyra® is just a fraction of top-selling MS drugs and just two to three percent of the top ten MS drugs in terms of revenue.  (Tr. (McDuff)

633:22-634:2.)

211.    Dr. McDuff also evaluated Ampyra's® commercial opportunity by comparing it to other orphan drugs, finding that some orphan drugs (including other MS drugs) are able to achieve a very high revenue per patient.  (Tr. (McDuff) 634:7-14.)  Ampyra®, by contrast, has a low revenue per patient, again suggesting that the commercial opportunity was limited.  (Tr. (McDuff) 634:7-17.)

### 2.    Given the limited opportunity, the opportunity costs, and risks, Ampyra® was not economically profitable

212.    According to the published literature on the subject, the economic costs of developing a pharmaceutical product include: (a) out-of-pocket costs or direct expenditure dollars; (b) success rates; (c) development time; and (d) costs of capital.  (Tr. (McDuff) 642:12-18; 688:5-14; *see also* JTX 88; JTX 44.)  Considering all of these costs, the leading literature from DiMasi et al. estimates that the total cost of commercializing a new chemical entity receiving FDA approval between 2005-2013 with clinical testing initiated between 1995-2007 is $2.588 billion per approved drug.  (Tr. (McDuff) 649:8-20.)

213.    Dr. McDuff considered the characteristics of the drugs included in the DiMasi paper and concluded that Ampyra® "fits squarely in the type of drug that's analyzed in that [DiMasi] research."  (Tr. (McDuff) 639:21-640:4.)

214.    Dr. McDuff used the DiMasi estimate as a starting point, then tailored his analysis to make it specific to Ampyra®, including adjustments for the lower clinical costs of orphan drugs, the higher costs for drugs related to the central nervous system, and an adjustment based on the specific timing of Ampyra's® launch.  (Tr. McDuff) 640:5-17.)  These adjustments were based on other peer reviewed literature on the commercialization costs of drugs.  (*id.* at 640:18-20.)

215.    Dr. McDuff concluded that the appropriate economic cost estimate for Ampyra®
is $2.564 billion, which represents the value of the costs at the time of FDA approval.  (Tr.
(McDuff) at 640:22-641:2, 641:20-642:2.)

216.    Dr. McDuff then compared Ampyra's® economic costs to its profits using a
discount rate of 15%, a common rate used to evaluate risk in the pharmaceutical industry.  (Tr.
(McDuff) 641:20-642:18.)  Dr. McDuff found that the value of Ampyra's® profits represent only
$1.48 billion, resulting in "a negative present value to relative to the total economic cost of 1.08
billion of loss."  (Tr. (McDuff) 642:14-18.)  Even with sales projected until 2027—the latest
expiration date of any of the patents-in-suit—Ampyra® will not achieve economic profit.  (Tr.
(McDuff) 638:19-21.)  These sales and profits are not large enough to generate a worthwhile
commercial opportunity for Ampyra®.  (Tr. (McDuff) 643:9-12.)

217.    Plaintiffs' expert, Dr. Bell, offers two critiques to Dr. McDuff's analysis, namely
that Ampyra® (a) should have a higher success rate than the average drug, and (b) has lower
preclinical costs because the compound already existed.  (Tr. (Bell) 643:17-645:6.)  Both of
these critique are unsupported and do not change the resulting commercial success conclusion, in
any event.

218.    First, Plaintiffs have failed to provide evidence to show Ampyra's® actual
commercialization costs.  (Tr. (McDuff) 638:17-19.)  Plaintiffs have also failed to provide
evidence to show Ampyra's® actual preclinical costs.  (Tr. (McDuff) 645:19-21.)

219.    Dr. McDuff considered Dr. Bell's critiques, and found that the higher success rate
of orphan drugs relied upon by Dr. Bell is the result of factors that are inapplicable to Ampyra®.
(Tr. (McDuff) 644:2-7.)  For example, Dr. McDuff noted that orphan drugs may have a higher
success rates if they are genetic modifications of a drug, genetic mutations of a drug, or a

treatment relating to a specific protein.  *Id*.  Ampyra® does not fall into these categories.

220.    Nevertheless, Dr. McDuff considered Dr. Bell's claim that the success rate should be 22%, and found that the adjustment would result in $431 million less in costs, still resulting in an economic profit of negative $650 million when sales are projected to 2027.  (DDX 8-19.)

221.    Dr. Bell also claimed that the success rate for Ampyra® should have been 100% and the pre-clinical costs should be $0 if the asserted claims of the patent-in-suit were obvious. (Tr. (McDuff) 644:16-20.)  But, Dr. Bell admitted that even if an invention is obvious, there is still an economic cost associated with opportunity costs, such as the cost of capital and the time value of money.  (Tr. (Bell.) at 609:20-611:7; Tr. (McDuff) 644:16-645:2.)  Thus, Dr. McDuff concluded that using any plausible estimate for commercialization costs, and projecting sales until 2027, Ampyra® would not turn an economic profit.  (Tr. (McDuff) 646:14-20; DDX 8-19; DDX 8-20.)

222.    Plaintiffs suggest that the $150 million in licensing fees earned by Acorda on sales of dalfampridine outside the US will add to the commercial success of Ampyra®. Even if these sales were added to the analysis, however, the revenue would still largely fall below the commercialization cost.  (Tr. (McDuff) 646:25-647:8.)  In addition, the fact that Acorda's marketing spend and sales force decreased after launch is irrelevant, because those trends are typical, not unusual, in the pharmaceutical industry.  (Tr. (McDuff) 647:9-19.)

223.    Lastly, the presence of ANDA filers does not, in and of itself, indicate commercial success.  (Tr. (McDuff) 629:25-630:10.)  Sales may be large enough to warrant economic interest from generic suppliers, but branded companies incur substantial costs in the research, regulatory, and approval processes that are not incurred by generic suppliers.  (*Id.*)

224.    Accordingly, when put in the proper context, Ampyra® sales and profits do not

demonstrate a commercial success. (Tr. (McDuff) at 634:18-24.)

### 3. The Elan patent has served as a blocking patent, limiting the relevance of any success for the Acorda patents

225.    Even if there were evidence of commercial success, Dr. McDuff found that the Elan patent would have served as a blocking patent that limited the economic relevance of commercial success, if any, relating to the Acorda patents. (Tr. (McDuff) 648:1-16.)

226.    The Elan patent is listed in the FDA's orange book for Ampyra® and issued in 1996. (Tr. (McDuff) 648:17-20.) This listing is effectively a notice to others that the Elan patent covers the Ampyra® product. (Tr. (McDuff) 648:21-25.)

227.    In 1997, Elan provided Acorda with an exclusive license for spinal cord injury. (Tr. (McDuff) 650:8-15.) In April 1998, Elan provided Acorda with an exclusive license for MS. (*Id*.) Thus, there was only a very narrow window of time (*e.g.*, less than two years) between issuance of the Elan patent in 1996 and the exclusive license in January 1997 and 1998. (Tr. (McDuff) 652:1-9.)

228.    Elan's exclusive license with Acorda meant that Acorda was the only entity that could get access to the Elan patent. (Tr. (McDuff) 650:19-651:1; JTX-001, 002, 003, 004, 005, 006, 020, and 021.) Elan was subsequently granted a patent term extension by the Patent Office, meaning that the patent does not expire until 2018. (Tr. (McDuff) 649:23-650:3.) The Elan patent serves as a blocking patent to this day, and will until its expiration in 2018. (Tr. (McDuff) 649:14-18.) This significantly limits material economic incentives for other companies to develop a 4-AP product, because the Elan patent broadly claims any sustained release form of 4-AP used to treat MS. (Tr. (McDuff) 648:1-13.)

229.    Plaintiffs put forth no evidence that Elan was willing to license or did license the Elan patent to anyone else besides Acorda. (Tr. (McDuff) 651:10-17.) Plaintiffs put forth no

evidence that Elan even attempted to license the Elan patent to anyone else besides Acorda.  (Id. at 651:18-21.)  Nor did Plaintiffs offer evidence about the terms of any proposed license for the Elan patent between Elan and anyone besides Acorda.  (Id. at 651:22-25.)

### 4.      At best, the claimed nexus of Ampyra® to the patents-in-suit is weak

230.    Any connection or nexus between any commercial success of Ampyra® and the claims of the patents-in-suit is weak.  The 4-AP compound, which has existed for many years, is the primary basis for the clinical efficacy of the drug Ampyra®.  (Tr. (McDuff) 653:3-10; Tr. (Peroutka) 707:1-8.)  Neither the Elan patent's claimed sustained release nor the Acorda patents' optimal dose of 10 mg b.i.d. dosing is the primary driver of Ampyra's® sales.  (Tr. (McDuff) 653:11-15; Tr. (Peroutka) 707:1-8.)  The 15 mg or a 20 mg product would be just as clinically effective as a 10 mg product.  (Tr. (McDuff) 653:19-25; Tr. (Peroutka) 707:9-20.)  From a or commercial success perspective, sales would essentially be unchanged if Acorda sold a 15 mg or 20 mg product.  (*Id.*)

231.    There is no evidence linking the use of Ampyra® with the claimed innovations of the patents-in-suit.  Nor was any evidence put forth by Plaintiffs that 10 mg was "the optimal dosing or the sustained release being the driver of sales."  (Tr. (McDuff) 654:5-10; Tr. (Peroutka) 707:9-20.)

Dated:  September 30, 2016

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgmhlaw.com
mch@pgmhlaw.com

*Attorneys for Defendants Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA Inc., Roxane Laboratories, Inc.*

*Of Counsel:*

Charles B. Klein
Samuel S. Park
Bryce A. Cooper
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendants Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA Inc., and Roxane Laboratories, Inc.*

MORRIS JAMES LLP

*/s/ Mary B. Matterer*
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*Of Counsel:*

Robert L. Florence
Karen L. Carroll
Michael L. Binns
PARKER POE ADAMS & BERNSTEIN LLP
3355 Lenox Road, Suite 750
Atlanta, GA 30326

*Attorneys for Defendant Mylan Pharmaceuticals Inc.*