```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -
     ACORDA THERAPEUTICS, INC.,          :
4                                        :    CIVIL ACTION
              Plaintiff,                 :
5    v                                   :
                                         :    (Consolidated)
6    ALKEM LABORATORIES LTD.,            :
                                         :    NO. 14-882-LPS
7             Defendant.                 :
                                         - - -
8
                        Wilmington, Delaware
9                    Monday, September 19, 2016
                     Bench Trial - Volume A
10
                           - - -
11
     BEFORE:          HONORABLE LEONARD P. STARK, Chief Judge
12
     APPEARANCES:                  - - -
13

14           MORRIS NICHOLS ARSHT & TUNNELL, LLP
             BY:  MARYELLEN NORIEKA, ESQ.
15
                 and
16
             KAYE SCHOLER, LLP
17           BY:  AARON STIEFEL, ESQ.,
                  DANIEL DiNAPOLI, ESQ., and
18                SOUMITRA DEKA, ESQ.
                 (New York, New York)
19
                 and
20
             KAYE SCHOLER, LLP
21           BY:  SYLVIA M. BECKER, ESQ.
                 (Washington, District of Columbia)
22
                        Counsel for Plaintiffs Acorda
23                      Therapeutics, Inc., and Alkermes
                        Pharma Ireland Limited
24

25   Dale Hawkins                        Brian P. Gaffigan
     Registered Merit Reporter           Registered Merit Reporter
```

1

2    APPEARANCES:   (Continued)

3

4                   PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
                    BY:  JOHN C. PHILLIPS, JR., ESQ.

5                        and

6                   WINSTON & STRAWN, LLP
                    BY:  CHARLES B. KLEIN, ESQ.
7                        (Washington, District of Columbia)

8                        and

9                   WINSTON & STRAWN, LLP
                    BY:  SAMUEL S. PARK, ESQ.,
10                       REID F. SMITH, ESQ., and
                         BRYCE A. COOPER, ESQ.
11                       (Chicago, Illinois)

12                       Counsel for Roxane Laboratories, Inc.,
                         Teva Pharmaceuticals USA, Inc., Apotex
13                       Corp. and Apotex, Inc.

14

15                  MORRIS JAMES LLP
                    BY:  MARY B. MATTERER, ESQ.

16                       and

17                  PARKER POE ADAMS & BERNSTEIN, LLP
                    BY:  ROBERT L. FLORENCE, ESQ,
18                       MICHEAL L. BINNS, ESQ., and
                         KAREN L. CARROLL, ESQ.
19                       (Atlanta, Georgia)

20                       and

21                  PARKER POE ADAMS & BERNSTEIN, LLP
                    BY:  CHRISTOPHER M. THOMAS, ESQ.
22                       (Raleigh, North Carolina)

23                       Counsel for Mylan Pharmaceuticals Inc.

24

25

1                              - oOo -

2                     P R O C E E D I N G S

3                  (REPORTER'S NOTE:  The following bench trial was

4     held in open court, beginning at 8:32 a.m.)

5                  THE COURT:  Good morning, everyone.

6                  (The attorneys respond, "Good morning, Your Honor.")

7                  THE COURT:  Just this first morning, let me have

8     you start by putting your appearances on the record for me,

9     please.

10                 MS. NOREIKA:  Good morning, Your Honor.

11                 THE COURT:  Good morning.

12                 MS. NOREIKA:  Maryellen Noreika for the

13    plaintiffs.  And with me at counsel table are Daniel

14    DiNapoli and Aaron Stiefel from Kay Scholer.

15                 MR. DiNAPOLI:  Good morning, Your Honor.

16                 THE COURT:  Good morning.

17                 MR. STIEFEL:  Good morning, Your Honor.

18                 MS. NOREIKA:  In the row behind are Sylvia

19    Becker and Sam Deka, also from Kaye Scholer.

20                 And then sitting in the front row, is Jane

21    Wasman who is the general counsel of Acorda.

22                 THE COURT:  Okay.  Good morning.  Welcome.

23                 MS. MATTERER:  Good morning, Your Honor.

24                 THE COURT:  Good morning.

25                 MS. MATTERER:  On behalf of Mylan, defendants

```
 1    Mary Matterer from Morris James.  I have with me Robert

 2    Florence at counsel table.

 3              MR. FLORENCE:  Good morning, Your Honor.

 4              MS. MATTERER:  Karen Carroll.

 5              MS. CARROLL:  Good morning, Your Honor.

 6              MS. MATTERER:  And Michael Binns.

 7              MR. BINNS:  Good morning, Your Honor.

 8              THE COURT:  Good morning.

 9              Thank you.

10              MR. PHILLIPS:  Good morning, Your Honor.

11              THE COURT:  Good morning.

12              MR. PHILLIPS:  Jack Phillips on behalf of

13    Apotex, Teva, and Roxane.  And with me in the courtroom are

14    Charles Klein.

15              MR. KLEIN:  Good morning.

16              MR. PHILLIPS:  Sam Park.

17              MR. PARK:  Good morning.

18              MR. PHILLIPS:  Bryce Cooper.

19              MR. COOPER:  Good morning.

20              MR. PHILLIPS:  And Reid Smith, all of Winston &

21    Strawn.

22              MR. SMITH:  Good morning.

23              THE COURT:  Good morning to all of you.  Thank

24    you.

25              Is that everybody?  All right.  Well, welcome
```

1      again.  We're here for trial.

2                  Before we begin with presumably opening

3      statements, are there any issues or objections from the

4      plaintiffs this morning?

5                  MR. DiNAPOLI:  No, Your Honor, although there is

6      one issue as to the order of presentation of the opening.

7                  THE COURT:  Okay.  That sounds like an issue.

8      So why don't we start the clock, and why don't you come

9      address that then.

10                 MR. DiNAPOLI:  Very well.  I mean it's -- and we

11     are the plaintiffs in the case, and I understand that it's

12     customary practice for plaintiffs to go first.

13                 I understand that the defendants do bear the

14     burden since the only issue in the case is invalidity.  But

15     nonetheless, as plaintiffs, we would like the opportunity to

16     present our invention first.

17                 THE COURT:  My recollection is it was undisputed

18     at least the order of proof was going to be defendants

19     first; is that correct?

20                 MR. DiNAPOLI:  Yes.

21                 THE COURT:  But you would nonetheless like to be

22     heard first on opening?

23                 MR. DiNAPOLI:  Correct.

24                 THE COURT:  All right.  Thank you.  We'll hear

25     from defendants on this, and then we'll see if you have

1    separate issues.

2              MR. KLEIN:  Your Honor, I believe this is the

3    only issue, but because we have the burden of proof, we

4    would like to present our opening statement first, and we

5    believe that is customary.

6              THE COURT:  Okay.  Thank you.

7              Well, I'm going to stick to the burden of proof

8    being the order that I hear argument in.  I think you could

9    go either way, and I don't think it will be unfair to either

10   side, but I certainly had in my mind that we are going to

11   here from the defendants first since that was the undisputed

12   order of proof.  So we'll do that with respect to the

13   openings as well.

14             And just for the record, no other issues that

15   defendants wanted to raise?

16             MR. KLEIN:  That is correct, Your Honor.

17             THE COURT:  And how many openings should I

18   expect on the defendants' side?

19             MR. KLEIN:  Just one.

20             THE COURT:  Okay.  All the better.

21             Well, you may begin when you are ready.

22             MR. KLEIN:  Thank you, Your Honor.  I will be

23   presenting the opening statement on behalf of all of the

24   defendants.

25             I would like to begin by giving Your Honor a

1    high level overview of our theories and themes in the case,

2    and the case is going to focus on issues of obviousness.

3              There are five asserted patents and 18 asserted

4    patent claims.  And it sounds like a lot, and it sounds

5    complicated but it really isn't because all of the asserted

6    claims fall within two categories.

7              The first category is, includes two asserted

8    claims from the earliest patent which is the '938 patent,

9    and this patent was assigned to Elan Corporation, so for

10   convenience we're going to refer to it as the Elan patent.

11             Elan is now Alkermes so that is how Alkermes

12   fits into the picture.

13             And there are two asserted claims from this

14   patent, and the evidence will show that these claims are

15   obvious because they merely cover a known drug called 4-AP,

16   for a known use, treating multiple sclerosis or MS with a

17   known formulation type.

18             It is a sustained release formulation.

19             The second category includes all the remaining

20   patents.  There are four patents that are assigned to

21   Acorda, so we're going to call those the Acorda patents.

22   And those asserted claims are obvious as well because they

23   simply narrow the scope of the Elan patent.

24             Now, the Elan patent issued in 1996.  The

25   priority date for the Acorda patents is eight years later,

1    so that the Elan patent is actually prior art to the Acorda

2    pant, and all the Acorda patents do is narrow the scope of

3    the Elan patent down to a dose, a known dose in the art,

4    10 milligrams twice daily for a known MS treatment, to

5    improve walking.

6           The evidence will show that all claims of all

7    asserted patents are invalid as obvious.

8           I'll note we also do have a 112 defense that is

9    pleaded in the alternative that is directed solely to the

10   Elan patent and depending on the positions that plaintiffs

11   take, if appropriate, we'll address those in closing

12   argument and post-trial briefing, but the trial will focus

13   on issues of obviousness.

14          I'd like to give Your Honor a little bit of

15   background on multiple sclerosis or MS.  You don't need to

16   know too much about the disease to understand the issues of

17   the case, so I'm just going to give you a high level

18   overview.  MS, it's obviously a terrible disease.  It

19   attacks the cover for the nerve fibers and that is called

20   the myelin sheath.

21          So what the disease does is degrades this myelin

22   sheath, and that in turn slows the nerve impulses from the

23   brain to the body, and that is called demyelinization.

24          So when the brain is not communicating with the

25   with the body, it causes all kinds of problems and most

1    relevant here it impairs the ability to walk.  There are

2    other systems as well but the Acorda patents focus on MS

3    patients' ability to walk.

4              The disease, as Your Honor probably knows, is a

5    chronic disease and unfortunately there is no cure.

6              The drug at issue in this case is called Ampyra.

7    And it's the embodiment of all patents in suit, all the

8    patents are listed in the FDA Orange Book for Ampyra, and

9    the defendants, of course, have filed applications with the

10   FDA to market generic versions of this drug.

11             And this drug contains the active ingredient

12   4-aminopyridine, or 4-AP.  It goes by other names like

13   dalfampridine and fampridine, but the vast majority of the

14   time we will refer to it as simply 4-AP.  And Ampyra has a

15   specific dose.  It is 10 milligrams.  And you will see it is

16   an extended release tablet.

17             Throughout the trial, you will hear terms like

18   extended release, controlled release, sustained release, and

19   there are some nuances among these terms, but for purposes

20   of this case, they all mean the same thing.  It's the

21   release of the drug into the body over a period of time as

22   opposed to immediately.

23             According to the label, the drug should be taken

24   twice daily, or BID.  So you will see bid.  Sometimes it's

25   all caps, sometimes it's all lower case.  All that means is

1    twice a day.  And it's indicated to improve walking in MS

2    patients.

3              So turning to the drug itself, you are not going

4    to hear plaintiffs come in and say they invented 4-AP.  4-AP

5    is a very old drug.  It's been known for more than a

6    century.

7              In addition, it was known in the art that 4-AP

8    could be used to treat MS.  That was a known use.

9              On this screen is the Davis reference, and as

10   you can see from the very title of the reference, it is

11   entitled:  orally administered 4-aminopyridine improves

12   clinical science in multiple sclerosis.

13             And what Davis taught was the results

14   demonstrate, the results of the clinical trial, demonstrate

15   that orally administered 4-AP acutely improves both motor

16   and visual abnormalities in MS patients.

17             So the use of 4-AP to treat MS was known in the

18   art.  This was a known drug for a known use.

19             All of the patents that are asserted in this

20   case have a common denominator.  They all claim variations

21   of this known use for a known drug, and we'll talk about

22   that.

23             But I want to focus first on the earliest

24   patent, the Elan patent, it is of the '938 patent.  And

25   although it is small, on the left, in the snapshot, it was

1    issued in 1996.  It's got a priority date of November 1990.

2    So that is the date we're focused on for prior art.  It

3    expires in July 2018.  There was a patent term extension

4    that was applied to this patent, and there are two asserted

5    claims, claims 3 and 8.

6            Looking at the claims, 3 and 8 are both

7    depending on claim 1.  And for convenience, I'll look at

8    them together.  And when you look at them together, they

9    claim a method of treatment of a neurological disease -- and

10   if you go to claim 3, that is MS -- which comprises

11   administering to a patient in need thereof a medicament

12   containing -- and then you go to claim 8 -- 4-AP.

13           So at this point, the patent is claiming 4-AP

14   to treat MS that was known in the art.  So the key term in

15   this patent is sustained release.  That is the focus of this

16   patent, and that is why I highlighted it.

17           And the patent does not claim a particular

18   formulation or recipe that achieves a sustained release.

19   It covers any sustained release formulation that achieves

20   therapeutically effective blood levels over 12 to 24 hour

21   period when administered on a once or twice daily basis.

22           So this is the key question for the Elan patent:

23   Was it obvious to formulate a known drug (4-AP ) for a known

24   use (to treat MS) in a sustained release dosage form?

25           And the evidence will show that the answer is

 1   yes.

 2              For example, going back to the Davis reference,

 3   and here I inserted the month because to make it clear, it

 4   is before the priority date, the Davis reference is prior

 5   art.  And, again, it taught that 4-AP could be used to treat

 6   MS.  And, in particular, Davis taught that there was an

 7   effective therapeutic window for orally administered MS, but

 8   it also taught that there were severe side effects if you

 9   gave too much of the drug.  The patients could have seizures

10   if you gave too much of the drug.

11              Combined with the fact that 4-AP has a short

12   half-life, what this means and what was known in the art is

13   that patients taking 4-AP to treat MS would have to take

14   many pills a day, up to say, for example, four pills a day.

15   And MS is a chronic disease.  So that, if you are taking

16   four pills a day for a week, that might be okay, but for a

17   chronic disease, it is not only inconvenient for patients,

18   it causes very significant concerns as to patient

19   compliance.

20              And this was known in the art and, in fact, the

21   patent itself, the Elan, the '938 patent, conceives what the

22   prior art taught.  In the heading, background and prior art,

23   the patent itself says there is a need for an improved

24   dosage form for 4-AP, and that improvement must result in a

25   controlled release of the drug.

1          So the patent, itself confirms motivation in the

2     art to modify the known use, the known drug for the known

3     use, 4-AP to treat MS, by making the 4-AP a controlled

4     release dosage form.

5          The PhamaStem case from the Federal Circuit

6     makes it clear that admissions in the specification

7     regarding the prior art are binding on the patentee for

8     purposes of a later inquiry into obviousness.

9          So motivation is conceded in the patent itself.

10    And so all that is left for this patent is whether a skilled

11    artisan would have had a reasonable expectation of success

12    in taking the 4-AP, following what the prior art suggests

13    and formulated in a sustained release dosage form.

14          And that was obvious.  There was a reasonable

15    expectation of success.  Controlled release sustained

16    release dosage forms have been known for a long time.

17          Again, the priority date is 1990.  And if you

18    look at the Lee reference, that is going back more than a

19    decade, to '78.  And that reference has been known over the

20    years.  There have been available a variety of drug

21    modifications and dosage forms to control the release of

22    the drug, including sustained release:  Remington's, a very

23    well known treatise five years before the priority date.

24    Numerous products on the market that claim sustained or

25    controlled drug delivery.

1              So what happened here is Elan simply applied a

2       routine research method to follow the prior art, take the

3       4-AP which was known to treat MS and formulate it in a known

4       formulation.  That analogous circumstance the federal

5       circuit in PharmaStem held that the inventors merely used

6       routine research methods to prove what was already believed

7       to be the case.  Scientific confirmation of what was already

8       believed to be true may be a valuable contribution, but it

9       does not give rise to a patentable invention.

10             And that's all that happened here, the prior

11      art, already believed that a proved dosage form was

12      warranted for 4-AP when used to treat MS and that it should

13      control the release of the drugs and all the inventors did

14      here was use routine research methods to come up with a

15      formulation that worked and that does not give rise to a

16      patentable invention.

17             So the evidence will show that the Elan patent

18      both claims, both asserted claims of the Elan patent are

19      invalid as obvious.

20             Turning now to the Acorda patents, again, the

21      Elan patent is prior art to Acorda.  And that's because the

22      Elan patent issued in 1996 and the priority date for these

23      four patents is eight years later, 2004.  In the meantime

24      Acorda took an exclusive license to from Elan and used the

25      Elan sustained release formulation to run some clinical

1    study.

2              There are sixteen asserted claims from these

3    four patents and again that sounds like a lot, like a lot,

4    sounds complicated.  It's not at all.  These claims overlap

5    and there are common limitations.  And at the bottom all

6    these patents do is limit the scope of the Elan patent to a

7    known dose or a known MS treatment.

8              I'm not going to walk through all sixteen

9    claims.  I chose a representative claim, claim 1 from the

10   '826 claim.  I'm going to walk through the key limitations

11   of this claim that apply through the four.  The first

12   limitation requires a sustained release 4-AP to treat MS

13   patients.

14             The second limitation, and this is really the

15   heart of the patent, requires a specific dose, 10 milligrams

16   BID, again BID, all that means is twice a day.  The patent

17   further narrows down the type of MS therapy that's involved.

18   The patents are directed to improving walking or increasing

19   walking speed in patients with MS.  And then you'll see a

20   number of limitations that have pharmacokinetic ranges,

21   we'll call these the pK limitations and I'll address these

22   later.  They're really not important to this case.

23             And then finally, the treatment has to last for

24   at least two weeks without titration.  These are the five

25   key limitations that cut across the asserted claims of the

1   Acorda patents.

2            Now to take these one at a time, if you look at

3   the first limitation, sustained release 4-AP to treat MS

4   patients, the Acorda plaintiffs can't come in and claim that

5   they invented this because that is precisely what is claimed

6   in the Elan patent that is prior art.  So all they did was

7   build upon that and narrow the scope of the Elan patent.

8            In fact, after the Elan patent issued in 1996,

9   Schwid reported on a study with the Elan formulation and

10  found that a 17.5 milligram dose of sustained release 4-AP,

11  BID, twice daily, improves motor function in MS patients.

12  The conclusion of the article says 4-AP SR improved motor

13  function in MS patients and there is a promise to be useful

14  in future trials.  So sustained release 4-AP to treat MS,

15  clearly well established in the prior art.

16           Turning to the dose, and as I said before, this

17  is really the heart of the patent, and it's -- it also goes

18  to the biggest problem that plaintiffs have, and that is

19  there is a phase two, the results of a phase two clinical

20  trial that supported FDA approval of Ampyra are reported in

21  the prior art, and the reported three times in three

22  references that are related and we will refer to them as the

23  Goodman I and Goodman II references.

24           Goodman I is from 2002 and Goodman II is from

25  2003.  They're essentially the same thing, but they are

1    abstracts that summarize the results of this phase two

2    clinical trial and then there is a Goodman poster, which is

3    the poster that Dr. Goodman presented in connection with

4    those two abstracts.  Collectively we'll refer to these as

5    the Goodman references.

6            And as you can imagine, given that this was a

7    successful phase two trial, it discloses the specific dose

8    that's claimed in the patent which is the dose that's used

9    in the FDA approved Ampyra label, 10 milligrams, BID, twice

10   daily, or 20 milligrams a day.  And I'll note that

11   Dr. Goodman, the author of these references, he was a

12   consultant for Elan and Acorda for many years and he's also

13   plaintiff's expert in this case who you will actually hear

14   from Dr. Goodman in this case.

15           Dr. Goodman not only identified the specific

16   dose that's claimed in the patent, the 10 milligram BID

17   dose, but he identified it as only one of three preferred

18   doses.

19           In the Goodman poster, Dr. Goodman reports there

20   was evidence of a dose response in the 20 to 40 milligram

21   per day range.  20 to 40 milligrams per day translates to

22   three doses, 10, 15, and 20 milligrams bid or twice daily.

23   One of those three doses is the dose claimed in the Acorda

24   patent.

25           So turning to the next limitation, improved

1   walking and increased walking speed.  Well, this limitation

2   is disclosed in the Goodman references as well.  And I

3   should note that the Goodman references also used sustained

4   release 4-AP to treat MS patients, so they also address the

5   first limitation.

6          So in the Goodman I and Goodman II references,

7   Dr. Goodman references to the fampridine SR, that's

8   sustained release 4-AP showed statistically significant

9   improvement from baseline compared to placebo in functional

10  measures of mobility, a timed 25 walking, 25 foot walking

11  speed test with a P value of, that's statistically

12  significant, and in the poster, Dr. Goodman got the point,

13  said there was a statistically significant benefit on timed

14  walking.

15         So the Goodman references disclose this

16  limitation as well.

17         Now, turning to these pK limitations, there are

18  a number of pK limitations in the asserted claims and you'll

19  go through them and they look intimidating, they have ranges

20  and they say max.  These limitations are practically

21  irrelevant to the case.  That's because the pK release

22  profiles that are claimed in the patent are satisfied with

23  the 10 milligram bid dose, they are inherent with that dose,

24  and we know that from the Hayes III reference from 2003,

25  which tested Elan's 10 milligram bid dose and discloses all

1       the pK results and they're all within the claimed ranges.

2               In fact, Acorda did not modify the Elan

3       formulation at all.  So they can't claim to have invented

4       any type of pharmacokinetic invention.  And regardless, all

5       they did, Your Honor, is the patients who were taking a 10

6       milligram dose, they just took blood samples and reported

7       the pK results.

8               And the Federal Circuit has addressed that type

9       of situation and held that an obvious formulation cannot be

10      nonobvious simply by administering it to a patient and

11      claiming the resulting serum concentrations.  To hold

12      otherwise would allow any formulation no matter how obvious

13      to become patentable merely by testing and claiming an

14      inherent property.  This is the Santarus case.  That makes

15      sense if a 10 milligram dose is obvious, you can't get a

16      patent just by taking blood samples and reporting the serum

17      concentrations.

18              So I'll pause at this point for a moment, Your

19      Honor, because you might be thinking we've gone through four

20      of the limitations, these are all disclosed in each of the

21      Goodman references, so you might be wondering why are we

22      talking obviousness and not anticipation.  And the truth is

23      but for this last limitation, we wouldn't be here, at least

24      for the Acorda patents, because there would be no question,

25      the Acorda patents would be anticipated by the Goodman

1    references.

2              The only reason, the only reason the Acorda

3    patent claims are not anticipated is because the patents

4    also require that the dose be used for at least two weeks

5    without titration.  I have an asterisk in the slide because

6    some of the asserted claims require 12 weeks, but there is a

7    stipulation in the docket, 254, that if the two-week

8    limitation is obvious, the twelve-week limitation is

9    obvious, so the two-week limitation controls this issue.

10             And the reason both a two-week and a

11   twelve-limitation would be obvious is because we're talking

12   about a chronic disease.  It's multiple sclerosis.  And the

13   reason that Goodman references don't anticipate is because

14   the study, the phase two study reported in the Goodman

15   references tested 10 milligrams BID for one week and then

16   they increased the dose for the next week and they kept

17   increasing the doses in subsequent weeks.

18             The test, they didn't simply test the 10

19   milligrams for more than one week, it's obviously safe

20   because they increased the dose and they still got good

21   results, but they didn't actually practice that final

22   limitation of keeping it, keeping the dose at two weeks

23   without titration.  This is a chronic disease.  We're

24   talking about drug development.  We're talking about a

25   stable dose that's going to be given to patients for at

1   least two weeks.

2           So this leads to the key question for the Acorda

3   patents, was it obvious to use a known and preferred dose,

4   10 milligrams BID 4-AP, for a known MS treatment to improve

5   walking for at least two weeks?  Was it obvious to take what

6   was known to work for one week and use it for at least

7   another week?  That is the question for the Acorda patents.

8   The evidence will show the answer is yes.

9           In fact, plaintiff's own expert, Dr. Goodman,

10  conceded that there was motivation to conduct further

11  testing of the 10 milligram dose for more than two weeks.

12  The study, the clinical study that's discussed in the

13  Goodman references is called the 201 study, and you will

14  hear that throughout the trial.

15          Because that trial was a success, there was

16  another trial called a 202 study.  It was a second phase two

17  study.  It's not in the prior art, but that study tested the

18  10 milligram and the other two preferred doses for two

19  weeks, and the results of that study supported the Acorda

20  patents.

21          So I asked Dr. Goodman in his deposition, would

22  a person of ordinary skill in the art in December 2003 be

23  motivated based on the 201 study, which is in the prior art,

24  to design a study along the lines of what became the 202

25  study which supported the patent?  And the witness says

1   well, I mean, the historical truth is that we did so, yes.

2   It was clearly motivation to take what worked for one week

3   and test it for more than one week, and more than two weeks.

4          So the evidence in this case fits neatly within

5   the KSR framework.  I know Your Honor has seen this

6   paragraph many times, but here we submit it applies.  When

7   there is a design need or market pressure to solve a problem

8   to help MS patients, and there are a finite number of

9   identified predictable solutions, the prior art taught that

10  there were three preferred doses for further testing.  A

11  person of ordinary skill in the art has good reason to

12  pursue the known options within his or her technical grasp.

13  We are talking about routine drug development.  If this

14  leads to the anticipated success, which it can, it is likely

15  the product is not of innovation, but of ordinary skill and

16  common sense.

17         Ordinary skill and common sense is all it takes

18  to go from a treatment that helped MS patients when used for

19  one week, and use it for more than two weeks.  That's

20  ordinary skill and common sense.  And we submit that's what

21  this case is about.

22         So how do plaintiffs respond?  They say the

23  Goodman reference did not demonstrate efficacy.  It didn't

24  prove efficacy, because additional testing was required.

25  There was a small sample, it was a preliminary study, so it

1    didn't demonstrate efficacy.  That's a theme you're going to

2    hear from the plaintiffs.

3           The problem with that theme is time and again

4    the Federal Circuit has rejected its holding that conclusive

5    proof of efficacy is not necessary to show obviousness.  All

6    that is required is a reasonable expectation of success,

7    that's the Hoffmann-LaRoche case.

8           And, Your Honor, you will hear testimony about

9    reasonable expectation of success and there will be a

10   dispute about that at the trial, but at the end of the day,

11   that dispute is academic and it's academic because as a

12   matter of law, the Acorda patent claims are prima facie

13   obvious.  Federal Circuit has held where there is a range

14   disclosed in the prior art and the claimed invention falls

15   within that range, the burden of production falls upon the

16   patentee.  The plaintiffs must come forward and produce

17   evidence of teaching away or secondary considerations of

18   nonobviousness.

19          That is exactly what we have here.  The Elan,

20   the '938 patent taught, disclosed, patented therapeutic

21   doses of sustained release 4-AP to treat MS.  The Goodman

22   references narrow that down to three preferred doses and the

23   specific type of treatment that we're talking about here to

24   improve walking in MS patients, all the Acorda patents did

25   is take one of the preferred doses from the prior art.  The

1     patent claims are prima facie obvious as a matter of law and

2     so plaintiffs have, have to produce evidence of teaching

3     away or secondary considerations of nonobviousness.

4                So let's take a look at what they produced.

5                They are arguing, teaching away.  And their

6     argument is that the Goodman references we just talked

7     about, the references that disclose a successful Phase II

8     clinical study that supported FDA approval for Ampyra

9     actually teach away from Ampyra and teach away from the

10    patents that cover Ampyra.

11               This is exactly what they're saying.  It is in

12    their statement of issues of fact, paragraph 79.  Goodman 2

13    and the Goodman poster teach away from a stable dose regimen

14    of 10 milligrams sustained release 4-AP twice daily.

15               This is the precise dose that Dr. Goodman

16    said he found evidence of a dose response for, and a

17    statistically significant benefit on timed walking.

18               Under no stretch of the imagination does the

19    Goodman poster or the Goodman references teach away from

20    using the claimed invention.  They teach the claimed

21    invention except for that two-week limitation.

22               So to the extent plaintiffs proceed with this

23    teaching away theory, we submit it is not credible.

24               Turning now to the evidence of unexpected

25    results that we expect them to present.

1               So, again, in their statement of issues of fact,

2       paragraphs 132 and 133, they offer two arguments for

3       unexpected results.

4               The first argument they say is that it was

5       surprising that the 10 milligram dose improves walking or

6       increases walking speed in MS patients.

7               Your Honor, that wasn't surprising.  That is

8       exactly, exactly what the Goodman references teach, so that

9       was not surprising at all.

10              Second, they argue it was surprising that the

11      10 milligram dose was as effective as the 20 milligram dose.

12      Remember there are three preferred doses:  10, 15 and 20.

13      And they're arguing, well, it was surprising that the 10 and

14      20 had the same effect.

15              Well, the Phase II study report, reported by

16      Dr. Goodman was not designed to test whether there are

17      statistical differences between the 10, 15 and 20 milligram

18      doses.  So you can't tell, one way or the other, whether

19      they're going to be just as effective or not.

20              So it's not surprising, but let's accept for

21      the sake of argument, for the sake of argument, that it

22      was surprising that 10 milligrams was more effective than

23      expected.

24              That doesn't get the plaintiffs anywhere.  It

25      still leads to a dead end as a matter of law.

1          Unexpected results that are probative of

2    nonobviousness are those that are different in kind and not

3    merely in degree from the results of the prior art.  Results

4    which differ by percentages are differences in degree rather

5    than kind.

6          So to say the 10 milligram dose had as a

7    percentage better efficacy than expected is not an

8    unexpected result.  Even if it were surprising, it is not an

9    unexpected result for purposes of obviousness.

10          We expect plaintiffs to offer evidence of

11    commercial success.  And if they offer that evidence, we

12    will talk about the economics.  But at the end of the day,

13    their entire theory of commercial success turns on the

14    notion that there was a financial motive for pharmaceutical

15    companies to develop a formulation of 4-AP to improve

16    walking in accordance with the claims in the Acorda patents.

17          There is a significant legal problem with that

18    theory.  The Acorda patents, the priority date is 2004.  The

19    last two decades, the Elan patent has blocked anyone from

20    practicing the invention that is claimed in the Acorda

21    patents.  There is a blocking patent, and that patent was

22    exclusively licensed to Acorda.  Others were not going to

23    be able to take a license.  It was blocking others from

24    practicing the invention.  And so even if there were a

25    financial motive, there was a huge disincentive under the

1    patent laws for anyone else to practice the Acorda patents.

2                And the courts have recognized this:  Where

3    market entry by others was precluded due to blocking

4    patents, the inference of nonobviousness of the asserted

5    claims from evidence of commercial success is weak.

6                So, once again, they hit another dead end,

7    teaching away unexpected results, commercial success.

8    They're either not credible or they fail as a matter of law.

9                Now, I expect them to offer evidence of some

10   other secondary considerations, such as long felt and unmet

11   need; and the evidence will show that Ampyra doesn't meet a

12   long felt and unmet need but, regardless, the same problem

13   that plaintiffs have with commercial success, they also have

14   with long felt and unmet need because the theory of long

15   felt unmet need is that if there was a need in the art to

16   practice this, and it was so obvious, how come no one did

17   it?

18               Well, the answer was there was a patent dating

19   back to 1996 that prevented anyone from doing it.  So they

20   have the same problem with long felt and unmet need.

21               They may offer evidence of failure of others,

22   but I want Your Honor to pay careful attention to the dates

23   of the alleged failures that they talk about.  They're old

24   failures, long before the Goodman references that we're

25   talking about.

1           And we expect them to discuss a review, a

2    literature review article by a gentleman named Solari.  And

3    they'll rely on that reference, but that reference does not

4    discuss any of the Goodman references as well as other prior

5    art that we're relying on.  So as a practical matter,

6    whatever that review article has to say isn't probative of

7    obviousness in this case.

8           So hopefully from my presentation, Your Honor,

9    we'll see that although there are lots of asserted claims,

10   the issues are really straightforward, they're simple.  Our

11   themes are simple and straightforward.  And we will proceed

12   efficiently.  We obviously only have ten hours to do so.

13          We only have two live witnesses in our case in

14   chief -- we'll have a couple videos -- two live witnesses.

15   Our first witness will be Dr. Stephen Peroutka.  He is an MD

16   and a Ph.D., an expert in neurology, pharmacology, and drug

17   development.  And he will explain our theories of

18   obviousness in much more depth than I have.

19          Next, you will hear from Dr. Arthur Kibbe who

20   is a Ph.D.  He is an expert in formulation and

21   pharmacokinetics.  So he will talk about in more depth about

22   sustained release formulation and the PK limitations we

23   talked about for the Acorda patents.  And,

24          Finally, if the plaintiffs offer evidence of

25   commercial success, in our rebuttal case, we will call

1    Dr. Deforest McDuff who is an economist.

2              So to wrap up, all the asserted claims fall

3    within two categories.

4              The first category, two asserted claims from the

5    Elan patent, they're both obvious.  They just cover a known

6    drug (4-AP) for a known use (treating multiple sclerosis)

7    with a known formulation type (sustained release).

8              The prior art is conceded by the patent itself.

9    Motivated skilled artisans could use sustained release of

10   4-AP to treat MS.

11             And the prior art also provided skilled artisans

12   with a reasonable expectation of success that they can take

13   this active ingredient and through routine experimentation

14   come up with a sustained release formulation.

15             The remaining claims are also obvious.  They

16   merely narrow the prior art Elan patent to a known dose for

17   a known MS treatment and, thus, are prima facie obvious.

18             Acorda's teaching away and secondary

19   considerations theories fail both factually and legally.

20             Thank you, Your Honor.

21             THE COURT:  Thank you very much.  We'll hear

22   from plaintiffs.

23             MR. KLEIN:  Before that, do you want copies,

24   Your Honor?

25             THE COURT:  Sure.  That would be helpful.  Thank

1   you.

2                    (Binders passed forward.)

3                    THE COURT:  You may proceed.

4                    MR. DiNAPOLI:  Thank you, Your Honor.  I am

5   privileged to present the opening on behalf of plaintiffs

6   Acorda Therapeutics and Alkermes in their assertion of the

7   patents covering Acorda's flagship product, Ampyra.

8                    Your Honor recently signed a stipulation whereby

9   defendants admitted that their proposed generic products

10  infringe all of the patents in this case.

11                   So the only issue in this case is whether the

12  defendants can meet their high burden of proof to show by

13  clear and convincing evidence that the patents are invalid.

14                   The defendants will try to do so by using

15  hindsight to ignore failed studies and other evidence

16  showing lack of clinical effect.

17                   The defendants will also rely on small clinical

18  studies designed solely for the purpose of exploring

19  potential endpoints for use in future trials and then recast

20  those as clinical studies showing efficacy.

21                   But the evidence will show that the defendants

22  cannot come anywhere close to meeting their high burden.

23                   Ampyra is an extended or sustained release

24  formulation of dalfampridine.  Dalfampridine is also called

25  4-AP or 4-aminopyridine.

1                    4-AP is, in fact, a very old compound.  It is

2       over 100 years old.  Nonetheless, Ampyra is the first and

3       only FDA approved use of 4-AP in that 100 years.

4                    Ampyra is also the first and only approved use

5       treatment approved by the FDA to improve walking in MS

6       patients.

7                    Plaintiffs are asserting five patents in this

8       case, and collectively we will be referring to those as the

9       Ampyra patents.

10                   The patents are from two different periods.  The

11      earliest of the Ampyra patents is the Masterson patent, or

12      the '938 patent.  And that patent dates back to 1991.

13                   The '938 patent describes the same release

14      formulation invented by Elan which is now plaintiff

15      Alkermes.

16                   Plaintiffs are asserted two claims from the '938

17      patent; and shown here is one of those claims, claim 8 which

18      depends from claim 1.

19                   Claim 8 is directed not to the sustained release

20      formulation itself but rather to what the sustained release

21      provides to the patient and, namely, a therapeutically

22      effective blood level of 4-AP over a 12 to 24 hour period.

23                   The later of the Ampyra patents are the four

24      Acorda patents, and they date back to 2004.

25                   The inventors on the Acorda patents are Drs. Ron

1    Cohen and Andrew Blight.  And you will hear from Dr. Cohen

2    who is also the founder and CEO of Acorda during this trial.

3            The Ampyra patents describe, among other things,

4    what was then the largest clinical study with 4-AP in MS

5    patients.  It was a 206 patient study.

6            And plaintiffs are asserting 16 claims from the

7    Acorda patents.  As shown here is a representative claim

8    from Acorda's '437 patent that contains several of the core

9    claim elements that you will hear about.  And, as shown, the

10   claim recites a method of increasing walking speed by

11   administering 10 milligrams of 4-AP -- of a sustained

12   release 4-AP twice a day.

13           I plan to address briefly four topics -- three

14   topics actually.

15           I will provide general background information on

16   the science of MS and 4-aminopyridine.

17           I will describe some key events along the path

18   that Elan and Acorda followed in making the inventions

19   claimed in the Ampyra patents.

20           And third I will discuss the references which

21   demonstrates that the defendants cannot meet their high

22   clear and convincing evidence burden.

23           Multiple sclerosis, MS, is an unpredictable,

24   debilitating disease of the central nervous system.

25           The cause of MS remains unknown.  In people with

1    MS, the immune system attacks and damages the nerves of the

2    central nervous system.  This damage interrupts, disrupts

3    the conduction of information in the central nervous system.

4            The symptoms of MS vary widely and depend both

5    on which of the body's nerves are damaged and the extent of

6    the damage, and there is no cure for MS.

7            These are a few of the most common symptoms of

8    MS that you will hear about during this trial.

9            Walking impairment is one of the most prevalent

10   and disabling symptoms of MS.

11           Muscle weakness is another frequent symptom of

12   MS, and it can occur in any part of the body including the

13   arms and legs.

14           There are a variety of visual disorders are also

15   common in MS.

16           One visual disorder that you will hear about

17   involves a weakness of the pair of muscles that control the

18   coordination of the eyes.  And in MS patients, when they

19   have that weakness, they will get double vision.

20           And fatigue is yet another symptom of MS.

21           The nature of MS presents formidable challenges

22   for those trying to develop treatments.

23           The central nervous system and the immune system

24   are among the most complex systems in the body, and MS

25   involves both.

1          MS symptoms vary significantly from patient to

2     patient, leaving researchers with the task of identifying

3     which symptoms to target.

4          One of the principal difficulties facing

5     researchers is the variability within a single patient.  The

6     symptoms can vary day to day, and patients can have good

7     days and bad days.  That makes it very difficult for

8     clinical studies to distinguish the effect of a drug from

9     the normal fluctuations of the symptoms in the patient.  And,

10          Finally, MS research is complicated by a strong

11     placebo effect in clinical trials involving MS.

12          And you will hear about each of these challenges

13     reflected in the clinical studies discussed during this trial.

14          I want to now briefly describe how 4-AP improves

15     nerve conduction in MS patients.

16          Shown here is a healthy nerve.  The nerve fiber

17     appears in blue.

18          Myelin surrounds the nerve fiber in orange, and

19     the myelin acts as an electrical insulator.

20          The yellow depicts how information in the form

21     of electrical signal travels down the nerve.  The electrical

22     signal, in essence, hops along gaps in the myelin.

23          This slide shows a nerve damaged by MS.  The

24     MS has demyelinated part of the nerve, creating that bigger

25     gap.  And the electrical signal, as a result, travels more

1    slowly over that gap and may sometimes get blocked

2    completely from proceeding down the nerve.

3              And a key reason the signal is slow or blocked

4    along that gap is that the demyelinization exposes potassium

5    channels, allowing potassium to leak out of the nerve cell.

6              4-AP is a potassium channel blocker, and 4-AP

7    blocks the exposed potassium channels, thereby reducing the

8    amount of potassium that leaks out of the nerve.  This in

9    turn enhances the conduction of the electrical signal along

10   the nerve.

11             I want to turn now to how Elan and Acorda made

12   the inventions claimed in the Ampyra patents.

13             The hundred year history of 4-AP, includes use

14   as a bird toxin.  And before 4-AP was tested in MS patients,

15   it was tested clinically in other patients such as -- or

16   other disorders such as myasthenia gravis.  In those tests,

17   4-AP sometimes caused seizures.

18             The experimental work with 4-AP and MS began

19   with some animal tests and would show that 4-AP could in

20   fact improve nerve conduction in demyelinated nerves in

21   those animals.  And since MS was known as a demyelinating

22   disease, that kicked off, those animal tests kicked off

23   experiments of 4-AP in people with MS.

24             Now, as I mentioned, potassium channel blocking

25   is the mechanism by which 4-AP improves nerve conduction.

1              Potassium channel blocking is also the mechanism

2    that causes seizure in some people.  Thus, from the outset,

3    researchers recognized there was a risk, a major risk of

4    using 4-AP in people.

5              This created the dilemma for researchers.  Too

6    much 4-AP had serious adverse events such as seizures.  Too

7    little was thought to have no effect.  That left an open

8    question:  Would 4-AP have any question in MS patients

9    without also causing serious adverse events such as

10   seizures, and, if so, what dose would be safe and effective?

11             The risk of seizures also led researchers to

12   adopt a dose titration regimen for 4-AP.  They felt that

13   they needed to start with a very low dose of 4-AP such that

14   the patient could tolerate it and then gradually raise that

15   dose in the hope of seeing some benefit in the patient.

16             Now, the early history of 4-AP in some of the

17   early clinical studies were in the late '70s and to the

18   early '90s by researchers at Rush University.  And you will

19   hear that those clinical studies were limited as far as the

20   way that they were conducted so therefore the conclusions

21   that could have been drawn from them were questionable.

22             Elan began working with 4-AP about over a decade

23   later.  And at that time, Elan was a Pioneer in the

24   development of sustained release technology, and Elan

25   succeeded in making the first sustained release formulation

1    of 4-AP.  And Elan conducted clinical trials with this same

2    release formulation, including a large clinical trial using

3    as an endpoint the expanded disability status scale, or

4    EDSS.  And clinicians frequently used the EDSS to assess the

5    severity of symptoms in MS.  And that EDSS scale includes a

6    walking component.  And Elan used that standard assessment

7    method in its primary endpoint in its clinical trial.

8    However, that trial failed.

9              In 1998, Acorda took over the development of

10   4-AP for MS.  And you will hear from Dr. Cohen that because

11   Acorda was a small biotech company, he felt he needed to

12   take outsized risk with the few opportunities to develop

13   drugs that came along.

14             The first clinical trial that Acorda did was

15   testing whether 4-AP improved the coordination of muscles

16   that controlled the eyes.  But that study failed.  After

17   that, Acorda conducted a small clinical trial to test the

18   safety and tolerability of 4-AP in MS, and in that study

19   Acorda also explored several potential outcome measures for

20   possible use in future trials.

21             And then in 2003, Acorda conducted what was at

22   that time the largest clinical trial of 4-AP in MS patients

23   and, again, that was a 206 patient trial.  That study is

24   what is described in the Acorda patents and it shows that 10

25   milligrams of sustained release 4-AP improved walking in MS

1   patients.  That study also showed that 10 milligrams was as

2   effective as the 15 and 20 milligram dose, but that the 10

3   milligram dose had fewer side effects and this was a big

4   improvement, because as I said earlier, many years ago,

5   scientists recognized or thought that they needed to start

6   low dose and then titrate up and now that Acorda showed that

7   the 10 milligram dose was as effective as 15 and 20, you no

8   longer needed to titrate the dose, you could start with the

9   10 milligram dose and stay with the 10 milligram dose.

10          Later Acorda performed confirmatory studies,

11   they filed their NDA.  And then Ampyra was approved in 2010.

12   I want to turn now to some of the evidence that you will

13   hear about showing why defendants can't meet their clear and

14   convincing evidence burden to show that the claims would

15   have been obvious.

16          In 2003, Dr. Solari published a review article

17   and what she intended to do was determine the efficacy and

18   safety of 4-AP in neurological deficits and MS patients.

19   And what she undertook was a systematic review of the

20   literature reporting on the clinical studies of 4-AP in MS

21   patients and what she concluded was that the currently

22   available information allows no unbiased statement about

23   safety and efficacy of 4-AP in treating MS symptoms, no

24   evidence of efficacy.

25          Now the defendants are going to rely on a 1994

1    article by Dr. Bever which reports on a small eight patient

2    study in MS.  And Dr. Bever in that same article commented

3    on some of those earlier clinical studies that I had

4    mentioned performed by Rush and others.  And what he

5    concluded about those studies, he says these studies, that's

6    what he's referring to, was that conclusions from those

7    studies were limited by the questionable nature as to how

8    the studies were performed.

9             Now, Dr. Bever also in 1994 commented about his

10   own eight patient study and the fact that conclusions from

11   those studies were limited because it was only an eight

12   patient study.

13            Turning now to the '938 patent or the Masterson

14   patent that is a patent that both Acorda has asserted and

15   that the defendants are relying on as a reference against

16   the Acorda patents, you will hear from Dr. Fassihi, that

17   Elan was the one who first succeeded in making a sustained

18   release formulation of 4-AP.  And that was after well over a

19   decade of clinical testing of 4-AP, in MS and other

20   diseases.  You will also hear from Dr. Fassihi that at the

21   time that the Masterson patent was filed in 1991, sustained

22   release technology was an emerging technology and that Elan

23   was a Pioneer in that field and that what Elan did was not

24   obvious.

25            With respect to the defendants use of the

1    Masterson patent as a reference against the later Acorda

2    patents, the Masterson patent, again, isn't about the

3    sustained release formulation itself, but also about what it

4    is that it provides to the body, and namely that's a

5    therapeutically effective drug level of 4-AP.  And you'll

6    hear what that meant at the time was that it improved nerve

7    conduction and that scientists were still trying to

8    determine whether improving nerve conduction would

9    ultimately translate into some other benefit in MS patients.

10   So in effect the Acorda patents didn't narrow the Masterson

11   patent, quite the opposite, it expanded it greatly, the

12   Acorda patents showed for the first time that improving

13   nerve conduction in fact provided a clinical benefit to MS

14   patients.

15              1997 was an important event in the history of

16   4-AP in MS because that's when Dr. Schwid reported on the

17   failed Elan study in EDSS.  And in his article, he commented

18   that it was a 161 patient study, that was by far the largest

19   clinical study in MS with 4-AP.  And it was a multicenter

20   double-blind placebo-controlled parallel group study.  It

21   had a primary outcome variable which was the EDSS and 22

22   percent of the patients in the 4-AP group improved on the

23   EDSS, but the same percentage improved on the placebo group.

24   That's a common theme that one hears about in MS treatment,

25   a very high placebo group and here it led to the failure of

1   the EDSS.

2           Now, the Schwid article also reports on a small

3   ten patient study in which they explored seven possible

4   outcomes for potential use in later trials.  Now, go back to

5   the slide before.

6           There, the defendants also rely on a 2002 poster

7   by Dr. Goodman, and that was the poster which reports on a

8   small 20 to 36 patient which, again, it was a preliminary

9   study designed to assess safety and tolerability and explore

10  potential outcome measures for use in later trials.  It was

11  not designed to answer the question does 4-AP have efficacy,

12  it was designed to see what do we do next.

13          And Your Honor will also hear some evidence from

14  Acorda on secondary indicia of nonobviousness, such as the

15  fact that Ampyra did in fact solve a very long-felt need by

16  the patient and it helps improve walking which is one of the

17  most debilitating symptoms of MS.

18          So the state of the art at the time that the

19  Acorda patents were filed, and again, this is the art that a

20  person of skill in the art would be using to judge whether

21  or not there was a reasonable expectation of success of the

22  claimed invention.

23          At that time it was recognized that MS involved

24  both the central nervous system and the immune system and

25  both of those were exceptionally complicated systems in the

1    body and lead to tremendous uncertainty as to what 4-AP or

2    any drug would do in the treatment of MS.  And there is

3    tremendous challenges in developing treatment, for example

4    this inter patient variability, the good days and bad days

5    that mask drug effects from natural fluctuations in the

6    course of the disease.  And they would still know about in

7    2004, the largest study, the 161 patient study that failed,

8    and instead all they would have was a couple of small

9    exploratory studies to see what to do next in light of that

10   large 161 patient study.

11          And finally, there was an independent literature

12   review done by Dr. Solari, and again, she concluded that

13   there was no evidence of efficacy.  And that contrasts

14   sharply with what we see in the Acorda patents, because the

15   Acorda patents, describe, what was then the largest phase

16   two study, a 206 patient study, double blind placebo

17   controlled parallel group, the primary efficacy endpoint was

18   increase in walking speed, and again that study showed that

19   10 milligrams BID improved walking, that 10 milligrams was

20   as good as the 15 and 20 in efficacy with fewer side effects

21   so that you no longer had to titrate.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.  The defendants may call

24   their first witness.

25          MR. PARK:  Your Honor, Samuel Park on behalf of

Peroutka - direct

1    the defendants.  Defendants call Dr. Stephen J. Peroutka.

2                THE CLERK:  Please spell your full name for the

3    record.

4                THE WITNESS:  Stephen J. Peroutka.

5    S-T-E-P-H-E-N, Peroutka, P-E-R-O-U-T-K-A.

6

7                    STEPHEN J. PEROUTKA, M.D., PH.D.,

8                     the witness herein, having first

9                      been duly sworn on oath, was

10                     examined and testified as follows:

11

12               THE COURT:  Good morning, Dr. Peroutka.  Welcome.

13               MR. PARK:  Your Honor, may I approach with the

14   binders?

15               THE COURT:  You may approach.

16                    DIRECT EXAMINATION

17   BY MR. PARK:

18   Q.    Dr. Peroutka, what is your full name?

19   A.    Stephen Joseph Peroutka.

20   Q.    Have defendants retained you to testify as an expert

21   in the case?

22   A.    Yes.

23   Q.    What is your area of expertise?

24   A.    I'm a neurologist and a pharmacologist.

25   Q.    You also have an expertise in drug development?

Peroutka - direct

1    A.    Yes.

2    Q.    What is neurology?

3    A.    Neurology broadly is the study of the brain and

4    nervous system, the nervous systems, the brain, spinal cord

5    and the nerves ending in the spinal cord.

6    Q.    You also mentioned pharmacology.  What is that?

7    A.    Pharmacology is the study of drugs, how they work,

8    mechanism of action and their effects.

9    Q.    What is your expertise with drug development?

10   A.    With drug development since the 1980's I have been

11   involved with starting as an investigator moving toward

12   designing and doing the studies in academics as well as in

13   industry setting.  And then more recently as a therapeutic

14   expert as a current position and former position where

15   we act as advisors on drug development to small, medium

16   large size companies on strategy endpoints, patients, et

17   cetera.

18   Q.    Let's go to DTX 139.  Dr. Peroutka, is this an

19   accurate copy of your CV?

20   A.    Yes, from last December.

21   Q.    Did you prepare a slide presentation to summarize

22   your qualification to give an opinion in this case as an

23   expert?

24   A.    Yes, I did.

25   Q.    Dr. Peroutka, would you summarize for the Court your

Peroutka - direct

1    education and training?

2    A.    Yes.  So I received a bachelor's degree from Cornell

3    University in 1975.  I then went to medical school at Johns

4    Hopkins, initially as a straight M.D. student, but

5    eventually I entered the M.D./Ph.D. program, receiving my

6    M.D. in '79 and my Ph.D. in pharmacology and experimental

7    therapeutics in 1980.

8              I was then a medical intern at Stanford

9    University in 1980 to '81, went back to Baltimore as a

10   resident and fellow in the development of neurology at Johns

11   Hopkins, then back to Stanford as an assistant professor in

12   the development of neurology.

13   Q.    Dr. Peroutka, are you a licensed doctor?

14   A.    Yes, in California.

15   Q.    And you still are?

16   A.    Yes.

17   Q.    After residency, did you also work as a practicing

18   physician?

19   A.    Yes.

20   Q.    And during that time did you treat any MS patients?

21   A.    Yes.

22   Q.    Approximately how many MS patients have you treated

23   over the course of your career?

24   A.    Through the 1980's, it's hard to know the exact

25   number, but I would estimate roughly 100, range.

Peroutka - direct

1   Q.    At some point did you leave Stanford to move into

2   industry?

3   A.    Yes.

4   Q.    And when was that?

5   A.    1990.

6   Q.    Would you briefly describe for the Court your work

7   history after leaving Stanford?

8   A.    Sure.  The next slide, please.  So after Stanford I

9   went to Genentech.  I was the first director of the

10   department of neuroscience working in drug development for a

11   couple of agents, TPA for stroke.  I then left and started a

12   small migraine company, continued with migraine in terms of

13   therapeutic agents at a company called Synergia.

14         I then became the development leader for pain at

15   Johnson & Johnson.  I went back to California to do a couple

16   chief medical officer jobs.

17         And then what's most relevant is the work at

18   PRA.  PRA Health Sciences, I was the vice-president of

19   neurosciences.  In 2008 to 2011, PRA Health Sciences was the

20   leading clinical research organization working in multiple

21   sclerosis and over that three year period I estimate I

22   looked at approximately 30 multiple sclerosis proposals, so

23   as a CRO we got RFPs, it's called request for proposal, we

24   look at the study plans, we provide advice as to whether the

25   study is designed properly, whether there is any issues that

Peroutka - direct

1    should be considered in the protocol and then if they were

2    to win, we didn't win, but at the time MS research was about

3    20,000 people that we needed to be in trials and we were

4    roughly doing about a third of that, about 8,000 of the

5    25,000 were getting actively recruited by PRA Health Sciences.

6          After that chief medical officer, a couple of

7    jobs, and then currently vice-president neuroscience and

8    global therapeutic head inVentiv Health where we focus on

9    neurosciences, we look at MS protocols routinely and other

10   disorders.

11   Q.    In what ways did your training as a neurologist and a

12   pharmacologist help you in your work in developing drugs?

13   A.    Well, I'm biased, but I think it's important but in

14   terms of the neuroscience to understand the diseases, to

15   treat the patients with the disease, to understand the

16   clinical implications.  The end points we'll talk about in

17   this case, it's important to understand what's to be

18   measured, how you measure it, what's clinically significant,

19   the pharmacology, understanding drug actions at the same

20   time is important, being able to understand the significance

21   of pharmacokinetics, pharmacology, mechanisms of action, et

22   cetera, I think is a benefit when you compile all that

23   information to drug development.

24   Q.    Over the course of your career, have you served on

25   any editorial boards or peer reviewed journals?

Peroutka - direct

1    A.      Yes.  Next slide, please.  So I have been a peer

2    reviewer of a number of journals.  It's in my CV, but

3    roughly 30.  Four of them were important journals if you

4    will, or famous journals, the Journal of Science and

5    Neurology.  And Lancet.  I have been on the editorial board

6    of roughly ten to fifteen journals.  The potential relevance

7    here would be Clinical Neuropharmacology and Drugs.

8    Q.      Is it considered to be an honor to be a peer reviewer

9    for a prestigious journal?

10   A.      I would say in general yes, because that means you're

11   a peer of a group that's submitting work for the journal, so

12   the work is qualified for the New England Journal of

13   Medicine.

14   Q.      Would you summarize for the Court your other

15   qualifications to testify as an expert today?

16   A.      Sure.  The next slide.  So I published primary

17   articles, roughly 200 plus, around 225, 60 plus book

18   chapters in my career.  I have been involved in clinical

19   trials, 50 plus.  I would sale five as an investigator, five

20   to 15 as the primary investigator, and a larger study trial,

21   and the rest as an advisor.  Invited speeches, over 40

22   globally, and then companies consulted with, it lists nine

23   on my CV but it's actually significantly more.

24   Q.      Have you served as an expert in a patent case in the

25   past?

Peroutka - direct

1   A.      Yes.

2   Q.      Approximately how many?

3   A.      In court like this, about three.

4   Q.      Now in any of those cases, has a judge ever refused

5   to qualify you as an expert?

6   A.      No.

7           MR. PARK:  Your Honor, at this time, defendants

8   tender Dr. Peroutka as an expert in neurology, pharmacology

9   and drug development.

10          THE COURT:  Any objection?

11          MR. DiNAPOLI:  No objection.

12          THE COURT:  He is so recognized.

13  BY MR. PARK:

14  Q.      Dr. Peroutka, do you have a slide presentation to

15  assist the Court with your testimony today?

16  A.      Yes.

17  Q.      Now, would you summarize for the Court the opinions

18  you intend on giving today?

19  A.      Yes.  Next slide, please.

20          So in summary, my conclusion based on my review

21  of all of the relevant information is that all of the

22  asserted patents are obvious.  And the reasons are starting

23  with the '938 Elan patent, it describes a known drug,

24  dalfampridine or 4-AP, 4-aminopyridine for a known use, at a

25  priority date to treat MS patients using a known formulation

Peroutka - direct

1   type at the priority date that is sustained release.

2           In terms of the asserted claims of the four

3   related Acorda parents, I believe they're obvious because

4   all they really do is narrow the known dose, they take a

5   range of the prior art and then just simply narrow or

6   restrict it down to what falls well within the known prior

7   art, with a known use, treating symptoms of MS patients for

8   an obvious duration.  MS is a chronic disease and of course

9   anything that's chronic needs to be treated chronically.

10  Q.    What are the topics you intend to address during your

11  direct examination today?

12  A.    Can I have the next slide, please.

13          So this is just a little overview of the

14  testimony which will be.

15          First, background information.

16          Two, the asserted claims of the Elan and Acorda

17  patents.

18          Three, the invalidity opinions for the Elan

19  patent.  And,

20          Four, invalidity opinions for the Acorda

21  patents.

22  Q.    Let's start with the background.

23  A.    Okay.

24  Q.    Dr. Peroutka, do you understand that this case

25  involves patents related to a drug called Ampyra?

Peroutka - direct

1    A.     Yes.

2    Q.     What is DTX-204?

3    A.     So this slide shows the Orange Book, which is a

4    listing of the approved drug products with therapeutic

5    equivalence for dalfampridine, which is also called Ampyra,

6    which is also 4-AP, or 4-aminopyridine, and what it shows is

7    that there are five patents related to this product.

8           Shown in the top line, No. 5540938, that is the

9    Elan patent, and then the other four are the Acorda patents

10   in question.

11   Q.     Are these the five patents that are asserted in this

12   case?

13   A.     Yes.

14   Q.     And, in general, what do these patents cover?

15   A.     They all cover the use of a known 4-AP to treat

16   symptoms of MS for various periods of time.

17   Q.     Okay.

18   A.     For the sustained release formulation.

19   Q.     Now, Dr. Peroutka, have you reviewed JTX-76, the

20   prescription information for Ampyra?

21   A.     Yes.  Next slide, please.

22          So this is taken from the package insert or the

23   product label that the FDA has approved.  And it shows that

24   the indication for Ampyra, dalfampridine, is to improve

25   walking in patients with multiple sclerosis.

Peroutka - direct

1    Q.      Now, what is the dosage regimen of Ampyra?

2    A.      As stated here -- oops, sorry -- product label, the

3    maximum recommended dose is 10 milligrams twice daily,

4    approximately 12 hours apart with or without food.

5    Q.      Now, does the dosage and administration section of

6    Ampyra say how long it should be taken?

7    A.      No.

8    Q.      And how long do you expect that Ampyra should be

9    taken by patients?

10   A.      Well, MS is a chronic disease.  The disability that

11   you have once it is established and stable, for the rest of

12   your life.  So chronically, meaning indefinitely.

13   Q.      Okay.  Now, we saw that Ampyra is indicated for

14   improving walking in MS patients.  Would you describe for

15   the Court what MS is?

16   A.      Sure.  Next slide, please.

17          So we have seen various versions of this, but

18   basically multiple sclerosis is a disease of the nervous

19   system, really the neuroimmunological system.  The immune

20   system attacks the myelin that we already heard about, so in

21   a normal nerve, which is in the middle.  I'll see if I can

22   get my pointer to work here.

23          So the normal nerve is insulated, if you will,

24   by a substance called myelin.  In MS, the immune system

25   attacks that myelin and destroys it, demyelinates it such

Peroutka - direct

1    that there is patches of demyelinization causing a

2    disruption in the nerve flow that we have already heard

3    about.

4              There is a wide variety of symptoms that can

5    occur because this demyelinization can occurring anywhere in

6    the nervous system.  It can be in the spinal cord.  It can

7    be in the optic nerve.  It can be in the back of the brain

8    causing other problems; in the frontal lobe having very

9    different symptoms.  The next slide sort of summarizes

10   that.

11   Q.    Okay.  Before we get to our next slide, let me ask

12   you a few questions about that.

13   A.    Sure.

14   Q.    When was MS first identified as a disease?

15   A.    In the 1800s.

16   Q.    And how drugs are currently on the market to treat

17   MS?

18   A.    To treat the exacerbation, I think it's in the 8 to

19   12 range, and there is a number of drugs that are potential

20   to treat symptoms like spasticity.

21   Q.    Is there currently a known cure for MS?

22   A.    No.

23   Q.    Okay.  And do you know what causes MS in patients?

24   A.    No.  There is many, many theories having to do mostly

25   with the immune system, but to date I don't believe there is

Peroutka - direct

1    a true 100 percent known cause.

2    Q.      Okay.  And how does dalfampridine help patients with

3    MS?

4    A.      Well, I think we saw a good schematic in the video

5    where the potassium channels are exposed in the demyelinated

6    nerves.  By blocking them, you improve the transmission, so

7    instead of it being slowed or altered, you are able to go

8    and restore it to a more normal rate of transmission.

9    Q.      Now let's get to the symptoms.

10           So when a patient has, MS what are the symptoms

11   that that patient can experience?

12   A.      Well, as shown on the next slide, honestly, it can be

13   almost anything.

14           So multiple sclerosis, by the original

15   definition, is multiple lesions in space and time.  And what

16   that means is that, so if a person comes in and they're

17   blind in one eye, a condition called optic neuritis, that

18   is probably MS.  But because it's the first event, we

19   were taught in the past you couldn't yet give the diagnosis

20   even though it was probably multiple sclerosis.  You had to

21   wait until there was a second lesion in the nervous system

22   in a different part of the nervous system to be given

23   multiple.  That is where the name multiple comes from.

24           Now, with MRI, when someone comes in with optic

25   neuritis and you see a plaque in the brain, it is probably

Peroutka - direct

1    MS, and it is now considered and should be treated as MS.

2             Because these lesions can occur anywhere in the

3    nervous system, myelin is pretty much ubiquitous, the

4    symptoms can be almost anything controlled by the nervous

5    system.

6             Cognitive issues.  There can be a frontal lobe

7    lesion causing behavioral changes, vision, depression,

8    fatigue, pain, bladder incontinence, et cetera.

9             Because the legs are basically -- the ability

10   to walk is a complicated issue.  It's not just the

11   strength in your legs, it's your balance system.  It is

12   also your sensory system where you put your foot and all

13   the coordination of the motors, abilities of muscles,

14   coordination centers.  Weakness of the legs and/or

15   alterations in walking are one of the more common symptoms

16   in MS.

17            In fact, it has been estimated roughly 50 to

18   75 percent of patients will have trouble walking with MS.

19   Q.    That was actually my next question.  Is difficulty in

20   walking one of the more common symptoms in MS?

21   A.    Yes.  Again, the reason is because walking is not --

22   you know, in vision, it is basically your optic nerve,

23   whereas walking could be the motor nerves to the muscles, it

24   could be the sensory nerves in your feet, it could be in the

25   cerebellum, your coordination center.  It could be in your

Peroutka - direct

1    vestibular system.

2    Q.      Now, is walking, difficulty in walking as a symptom

3    of MS, was that known in 1990?

4    A.      Yes, it was well known and accepted.

5    Q.      Doctor, what type of drug formulation is Ampyra?

6    A.      Sustained release.

7    Q.      Let's go to the next slide.

8            Is extended release another term for sustained

9    release?

10   A.      Yes.  I think I would consider them essentially

11   synonymous.

12   Q.      How is a sustained release different than an

13   immediate release?

14   A.      So a sustained release -- and I believe it is in

15   the Court's construction, and I agree with it, is that a

16   formulation designed to release a therapeutically effective

17   amount of drug or other active agent such as polypeptide

18   or synthetic compound over an extended period of time.

19           That is different than immediate release,

20   because immediate release is a formulation that releases it

21   upon administration, so there is no attempt to slow it.

22   It's sort of, if you will, the natural state of the tablet

23   as it goes into the stomach and it's released.  There is no

24   attempt to modulate that.

25   Q.      Okay.  So let's pause here and talk about what

1    happens to the formulation after it enters the body.

2    A.    Okay.

3    Q.    Now, after a patient takes the drug tablet, what

4    happens to it?

5    A.    It's, in general, they're dissolved in the stomach.

6    Sometimes it can pass into the small intestine, but in

7    general, it dissolves, meaning it goes into solution and

8    into the acid of the stomach and then it is absorbed through

9    the gastric wall into gastric system.

10    Q.    Now, is there a relationship between the rate of

11    release of the drug and the absorption of the drug into the

12    body?

13    A.    Yes, it is directly related, because the longer the

14    pill stays as a solid, it can't be absorbed obviously.  It

15    has got to be dissolved and then released into the stomach

16    acid, which is then absorbed into the circulation.

17    Q.    And how do scientists measure what happens to the

18    drug after it enters the circulation?

19    A.    So the science, the pharmacokinetics.  So there are

20    various ways of measuring the concentration of the drug at

21    different parts of the body, most commonly in the plasma of

22    the blood.

23    Q.    Did you prepare a slide on the basic concepts of

24    pharmacokinetics?

25    A.    Yes.  Next slide, please.

Peroutka - direct

1          So this is an example of the pharmacokinetics of

2     an immediate release versus a sustained release.  And it is

3     actually data taken from the patent '826, Figure 1, and

4     specifically in this case, although this is meant to be a

5     representative, 12 and-a-half milligrams of 4-AP.

6          So in this case, the red or orangey-looking

7     thing -- the gentleman's head is right in the way.  Sorry.

8          (Gentleman's head moves out of way.)

9     BY THE WITNESS:

10    Q.    This one, the Cmax.  So what is Cmax?  Cmax is the

11    concentration at the highest concentration that is measured

12    in the pharmacokinetics study.

13         So in PK studies, pharmacokinetics studies, they

14    look at different time points after administration.  So at

15    time zero, subject swallows the pill.  And then they draw

16    blood at one, three, five, whatever time periods they choose.

17         Immediate release you can see goes up quickly,

18    within an hour roughly, and hits a level of about 68 here,

19    nanograms per mil.

20         The blue is the sustained release, where the

21    Cmax is much lower, only 28.  Same amount of drug.

22         And then they both decay or are eliminated from

23    the body, through the metabolic pathways, or through the

24    kidney.

25    Q.    Now, for most drugs, is obtaining its pharmacokinetic

Peroutka - direct

1    value a standard part of drug development?

2    A.    Yes, it is very common.

3    Q.    And was that true of 2003?

4    A.    Yes.

5    Q.    Does this comparison of an IR, immediate release

6    drug formulation PK level and sustained release or SR

7    formulation PK levels, does that tell you anything about

8    the advantages of a sustained release versus an immediate

9    release?

10   A.    Yes.  There are two main advantages that you can see

11   here, depending on what you want in your drug.  So there are

12   drugs where you might need the high level, but if it's a

13   drug where you don't want an extremely high level, the

14   advantage of the sustained release is that the same amount

15   of drug does not go above 30 whereas this one is up around

16   68.

17            So a sustained release, number one, potential

18   advantage, and again it is different for every drug, some

19   drugs you want this AP, but for a drug where there is

20   toxicity at certain levels, you want to stay below that,

21   but given a dose, then the lower Cmax is advantageous.

22            The second way is in the duration of action.  So

23   if you can extend the release, if you can slow it down, you

24   also extend the time it is in the body.

25            So if we look at the red or orange, it goes

Peroutka - direct

1    above 10 essentially at time zero, and then it drops below

2    the minimal.  Let's just theoretically say 10 nanograms is

3    what you would like to keep above.  So it's about eight

4    hours before it drops below ten, whereas in the blue, it

5    goes above ten in roughly an hour and it stays above ten for

6    about 12-13 hours.  So you can lower the max and extend the

7    duration in the therapeutic window.

8    Q.    I think you just touched on this, but what is a

9    therapeutic window of a drug?

10   A.    The next slide shows it better.

11            So what it shows is that for most drugs, for

12   many drugs, there is a level of the drug in the blood that

13   is not tolerated.  What that means is that -- and it can

14   mean various things.  It can mean seizures.  It can mean

15   inducement of headache, lowering of blood pressure.  It

16   doesn't matter what it is.  But the patient finds it not

17   tolerable.  And that would be the level you do not want to

18   have above.

19            There is also clearly a level near zero, for

20   example, where it is not effective.  So there is a level

21   where you have to get to a threshold of efficacy.  So that

22   is what is defined as the therapeutic window which is a

23   concentration of drug above which you see the clinical

24   benefit but above this top part would be where you see lack

25   of tolerability.

Peroutka - direct

1            So this is your effective dose therapeutic

2    range.  It's both safe, it's tolerated, and it's effective

3    in this example.

4    Q.    Now, using this graph, would you also explain to the

5    Court the concept of a half-life of a drug?

6    A.    The half-life of a drug is the time that it takes to

7    eliminate half of a specific dose from the body or half of

8    the molecules from the body.

9            So as an example in this case, you see it peaks

10   at about 68.  So when do you drop in the body from 68 to 34?

11   And it's roughly about two to three hours.

12   Q.    Okay.  What does the half-life of a drug tells you

13   about a drug's duration of action in a body?

14   A.    Well, in general, the half-life correlates with the

15   duration of action.  What that means for drugs that have a

16   three to four hour half-life, you have to dose every three

17   to four hours.  With a drug with a 12 hours, you have to

18   dose it every 12 hours.

19            And it is actually a pretty good correlation.

20   If the drug's half-life is 24 hours, that is a once a day

21   dose.

22   Q.    Now, for a drug that has a short half-life, how can a

23   sustained release drug formulation help?

24   A.    The way it can help is that it can extend the time

25   that it is in the body.  So even though it is the same dose,

Peroutka - direct

```
 1    even though the half-life technically of each molecule is

 2    the same, the release of the drug is extended.  So that it's

 3    essentially like a reservoir, if you will, that allows for

 4    the drug to maintain to be absorbed at a rate to extend its

 5    therapeutic concentration.

 6    Q.    Okay.  Now, the examples that we have seen are the

 7    pharmacokinetic parameters of a drug after a single dose.

 8    What happens to the pharmacokinetics of a drug after

 9    multiple doses?

10    A.    Go to the next slide, please.

11          So multiple dosing, the goal of multiple dosing

12    where there is a therapeutic range that you would like to

13    achieve is to reach what is called a steady state.  So what

14    is a steady state?  So it turns out that after five doses at

15    the half-life, as an example shown here, you reach a state

16    of steady concentrations.

17          So what it shows here is the first dose, of

18    course, you are at zero.  You have no drug in your body.

19    And it goes up, but then it starts to drop down because of

20    metabolism.

21          If you then dose at time number one a second

22    pill, obviously you are starting not at zero you are

23    starting higher and you go up, and you can see it rachets

24    up-up-up.

25          But after about five half-life doses, you reach
```

Peroutka - direct

1    a state where -- let me get away from here.  Once you get

2    up -- sorry -- you get to the point where the lowest use is,

3    the lowest concentration, so we're going to call that the

4    Cmin steady state.

5            At steady state, the lowest concentration is

6    just before you take the next pill.

7            After you do that, you go up to a Cmax, a high

8    concentration, which we're going to call here the Cmax at

9    steady state.  And then it drops down.

10           But this is the key point of steady state.  This

11   value should be the same as this, and the same as this.

12   Because once you reach the equilibrium or steady state, the

13   Cmin will be a certain level, your Cmax will be a certain

14   level.  And there is obviously an average, the average

15   concentration at steady state.  In other words, this green

16   portion is going around the same value as opposed to once

17   you build the levels up in your blood.

18   Q.     Okay.  Now, Dr. Peroutka, the background science that

19   you have described to the Court so far, were these concepts

20   that were known by 1990?

21   A.     Yes, well known.

22   Q.     Thank you, Dr. Peroutka, for that scientific

23   background.  Let's now switch gears and lay out for the

24   Court the asserted claims of the Elan and the Acorda

25   patents.

Peroutka - direct

1    A.    Okay.

2    Q.    Now, you understand that Acorda is asserting --

3    Acorda and Alkermes are asserting 18 claims against the

4    defendants from the five Orange Book patents that we saw

5    earlier?

6    A.    Yes.

7    Q.    Let's walk through all of them.

8    A.    Okay.

9    Q.    Now, first of all, would you identify JTX-1?

10   A.    Right.  This is a photograph of the first page of the

11   '938 Elan patent.

12   Q.    Okay.  Would you explain to the Court the background

13   information for the '938 patent, the Elan patent?

14   A.    Yes.  The inventors are Drs. Masterson and Myers, and

15   the priority date is November 2nd, 1990.  I understand there

16   is some variation, but the earliest possibility would be

17   November 2nd.  That is what I based my opinion on.

18   Q.    Now, what are the asserted claims of the Elan patent?

19   A.    Can we go to the next slide, please.

20         So the Elan patent claims, the key ones are 3

21   and 8.

22   Q.    And what do claims 3 and 8 cover?

23   A.    They're talking about the treatment of a neurological

24   disease, and then claim 3 limits that to multiple sclerosis.

25         And to using a mono- and a di-aminopyridine

Peroutka - direct

1    activation sustained release, achieving a therapeutically

2    effective blood level over a 12 to 24 hour period when

3    administered on a once or twice daily basis.

4                    Claim 8 limits that to 4-AP.

5    Q.    Okay.  Now, do the Elan patent claims state what type

6    of a sustained release formulation is necessary?

7    A.    No.

8    Q.    So can it be tablet or a capsule or some other form?

9    A.    Presumably, yes.

10   Q.    Okay.  Do the claims limit the duration of treatment?

11   A.    No.

12   Q.    And what would you expect that a treatment for a MS

13   patient will last?

14   A.    Well, again, it's a chronic disease, with

15   stabilization, it's a lifelong disability.  So for as long

16   as the disability lasts, which in general, the MS is the

17   rest of your life.

18   Q.    Did the claims say anything about titration?

19   A.    No.

20   Q.    Now, did you prepare a slide on the Elan patent

21   claims' core limitations?

22   A.    Yes.  Next slide, please.

23               So in reviewing it, it seems like there are

24   three main core limitations.

25               That is, to treat multiple sclerosis with 4-AP,

1    using a sustained release formulation dose, that results in

2    the therapeutic blood level when given once or twice a day.

3    Q.    Let's now move on to the asserted claims of the

4    Acorda patents.  Did you prepare a summary slide of the

5    Acorda patents?

6    A.    Yes.  Next slide, please.  So these are the four

7    patents shown visually on the left.  They were related

8    patents.  All of them are directed to methods of using

9    dalfampridine SR, 4-AP.  Dr. Blight and Dr. Cohen are the

10   inventors.  Priority date is April of 2004, there are

11   sixteen asserted claims.

12   Q.    Now, Dr. Peroutka, do you understand that the

13   plaintiffs are asserting an earlier priority date of the

14   Acorda patents?

15   A.    I know there has been discussion of that, but my

16   current understanding is 2004.

17   Q.    If the priority date were deemed to be earlier, for

18   example December 2003, would that change your opinion?

19   A.    No, because I based my analysis on the December 2003

20   priority date.

21   Q.    Did you prepare a slide -- there is lots of claims,

22   sixteen of them.  Did you prepare a slide on the

23   representative claim?

24   A.    I did.  Next slide, please.

25   Q.    What are the limitations of claim 1, the

1  representative claim?

2  A.     So we're going to go through a listing here.  So if

3  we could go to the first one.  It's the patent limitation is

4  sustained release 4-aminopyridine to treat multiple

5  sclerosis patients.

6             Next is using a very specific dose, 10

7  milligrams, BID, meaning twice a day.  Next is to improve

8  walking in a human with a specific pK parameters as shown in

9  the group for at least two weeks.

10  Q.     Now are these the core limitations that are present

11  in all of the Acorda patents?

12  A.     Yes.

13  Q.     Now, let's go to claim 7 of the '826 patent, JTX 2.

14  What does claim 7 cover that's different than claim 1?

15  A.     So basically claim 7 then limits it to an increase in

16  walking speed as opposed to just walking.

17  Q.     You see that claim 7 also incorporates the

18  limitations of claim 6?

19  A.     Yes.

20  Q.     And what does claim 6 state that's different than

21  claim 1?

22  A.     They talk about in the yellow highlights without a

23  prior period 4-aminopyridine titration and then maintaining

24  administration without a subsequent period of titration.

25  Q.     What is titration?

Peroutka - direct

1    A.      Titration is a process where you start at whatever

2    dose and go either up or down as needed based on patient

3    response.  So if the patient has toxicity, you would drop

4    down.  If the patient has no effect, you would go up, but

5    it's safe, you could go up.

6    Q.      We're still on the '826 patent.  What does claims 38

7    and 39 cover that are different than claims 1 and 7?

8    A.      So here as you can see 38 talks about the method of

9    claim 37 where specific pK parameters are listed.  Claim 37,

10   it refers to now has the T max, we haven't discussed T max.

11   T max is the time it takes to reach C max.  So if the

12   maximal concentration is at one hour, the T max, the time to

13   reach that maximum is one hour.  The claim 39 refers back to

14   37, but then it says the time period is twelve weeks as

15   opposed to previously I believe it was two weeks.

16   Q.      Dr. Peroutka, do you understand that the parties have

17   stipulated that if the two week limitations are obvious,

18   then the 12 week limitations are also obvious?

19   A.      Yes.

20   Q.      Let's move on to the '437 patent, JTX 3.  How are

21   claims 1, 2, 5, and 22 of the asserted claims of the '437

22   patent different from the claims that we have seen up to

23   this point?

24   A.      So now they're saying claim 1 here says 10 milligrams

25   of 4-AP twice daily are the only doses of 4-AP administered

Peroutka - direct

1    to said patient during said time period.

2    Q.     Now, we're still on the '437 patent.  How are claims

3    32, 36, 37, of the asserted claims of the '437 patent

4    different than the claims that we have seen up to this

5    point?

6    A.     Well, now, you will see 36, 37 to go the twelve weeks

7    as opposed to the previous two weeks.  I think that's the

8    main difference, the two weeks to the twelve weeks.

9    Q.     Now, let's move to the '703 patent, JTX 4.  How are

10   claims 36, 38 and 45 of the asserted claims different than

11   the claims that we have seen up to this point?

12   A.     36 talks about lower extremity walking, slightly

13   different wording, but again showing the same pK parameters.

14   38 now extends the T max, so earlier it was at two hours to

15   5.2 hours, now it says two hours to about six hours.

16   Q.     Let's move on to the final Acorda patent, the '685

17   patent.  How are claims 3 and 5 different than the claims we

18   have seen up to this point?

19   A.     Claim 1 adds in you could also have one or more

20   pharmaceutically acceptable excipients in the formulation

21   which would be common practice.  And number three it says

22   that the release profile of 4-AP should extend over six

23   hours.

24   Q.     Dr. Peroutka, we have now gone over every single

25   Acorda claim that's been asserted against defendants.  Would

Peroutka - direct

1    you summarize for the Court, again, the core limitations of

2    all of the claims of the Acorda patents?

3    A.      Sure.  On this slide, you can see again, I have

4    already mentioned all the patents here discuss a sustained

5    release 4-AP to treat multiple sclerosis patients using 10

6    milligrams twice a day doses to improve walking or increased

7    walking speed or lower extremity strength with specific pK

8    ranges for a period of at least two weeks without titration.

9    Q.      Now, to recap, let's go over the core limitations of

10   the Elan patent in comparison to the core limitations of the

11   Acorda patents?

12   A.      Sure.  Next slide, please.

13           So if you look at it this way, I summarize it,

14   the Elan patent in red talks about the treatment of multiple

15   sclerosis patients with 4-AP sustained release.  The Acorda

16   patent restricts that as treatment of MS patients for

17   walking with 4-AP.  The Elan patent says once or twice a day

18   dosing is needed.  Acorda says 10 milligrams twice a day is

19   needed to achieve a therapeutic effect.  The Elan patent

20   discusses that the dosing and the dosing regimen should

21   result in therapeutically effective blood levels.  The

22   Acorda patent specifies more specifically the values of

23   those therapeutically effective levels.  The Elan patent

24   doesn't say anything about duration, but it says the

25   treatment of MS, whereas the Acorda patent says at least two

                        Peroutka - direct

1    weeks without titration.

2    Q.     Dr. Peroutka thank you for that overview.  Let's now

3    go through your opinions in this case, starting with the

4    Elan patent first.

5    A.     Sure.

6    Q.     Dr. Peroutka, what is the legal standard you applied

7    in your obviousness analysis?

8    A.     So, the standard is shown here that a patent claim is

9    obvious if the differences between the claims and the prior

10   art are such that the claims as a whole would have been

11   obvious to a person of ordinary skill in the art.

12   Q.     And are these the four steps that are listed here,

13   the steps that you followed in your obviousness analysis?

14   A.     Yes.  So they are first, I tried to resolve a level

15   of ordinary skill in the pertinent art.  Second to determine

16   the scope and content of the prior art.  Three to ascertain

17   the differences between the claimed invention and the prior

18   art.  And then four, to address any secondary considerations

19   if any that might exist.

20   Q.     First, who is a person of ordinary skill in the art

21   or a POSA for the Elan patent?

22   A.     Next slide, please.  So I think for this case, I

23   would say there are two main people who are of ordinary

24   skill.  One would be for the treatment aspects and that

25   person would need a masters, a Ph.D., or an M.D. in the

Peroutka - direct

1    fields of pharmacology, neurology or medicine with

2    experience in researching and treating neurological disease.

3    And also a pharmaceutical requires somebody with a masters

4    or Ph.D. in the field of pharmaceutics.  And a POSA in this

5    specific case would be one or the other, but have an

6    understanding and appreciation for the other aspects and the

7    ability to collaborate with one another.

8    Q.    Now, is your definition of a POSA different than

9    plaintiffs'?

10   A.    Very subtly show from my reading, basically we're in

11   an agreement, they put an M.D. and a Ph.D. in on their POSA

12   requirements.  I don't think you need both.  I think it's

13   fine if you're both, but you need one or the other.

14   Q.    If the Court were to adopt plaintiffs' definition of

15   a POSA, would your opinion about the Elan patent change in

16   any way?

17   A.    No.

18   Q.    Second step, did you also search for and review the

19   relevant prior art?

20   A.    Yes.

21   Q.    What are the key prior art references that you intend

22   to rely on for the Elan patent obviousness analysis?

23   A.    So, I would say that the three key papers, and there

24   is many more, but the three key papers were Stefoski, Davis

25   and then Remington.

Peroutka - direct

1    Q.    Do you have a timeline to place this, place these key

2    pieces of prior art into context?

3    A.    Yes, we'll discuss these in more detail shortly.  As

4    we already heard, dalfampridine or 4-AP was first identified

5    in 1902 in a German paper.

6    Q.    Now, was dalfampridine being used in humans at this

7    point?

8    A.    1902, not to my knowledge.

9    Q.    When was dalfampridine first used in humans?

10   A.    Next slide, please.

11            So there were studies in the 1970's, a Swedish

12   group used 4-AP to use on myasthenic syndrome, the first

13   paper in 1977 looked at one person, in 1979 the same group

14   of investigators looking at a group of six.

15   Q.    What is myasthenic syndrome and myasthenia gravis?

16   A.    They are neurological disease where the immune system

17   has an impasse in transmission between the muscles so that

18   people that have less strength, they get very weak.

19   Q.    What do studies on these disorders teach a person of

20   ordinary skill in the art looking to develop a treatment

21   option for MS patients?

22   A.    Well, first off, they show the safety profile of

23   4-AP, and then it also suggests that strength could be

24   increased with 4-AP.

25   Q.    When was the first study of dalfampridine in animal

Peroutka - direct

1    models of MS?

2    A.      Next slide.  So 1980 there was a British study

3    looking at a rat model of demyelination, a model in a rat if

4    you will of multiple sclerosis and then they showed that

5    4-AP would reverse and improve the deficit caused by the

6    demyelination in animals.

7    Q.      Was there a study that established the safety of a

8    long-term use of 4-AP in humans?

9    A.      Next slide, please.

10          Shortly after this, 1981, Dr. Murray and

11   Newsom-Davis used oral 4-aminopyridine in the disorder of

12   neuromuscular transmission, and they treated people for as

13   long as ten months.

14   Q.      Now, would you describe for the Court the Murray

15   study, JTX 89?

16   A.      So they used a dose of, starting dose of 10 milligrams

17   twice a day, so this is back in 1980, probably, the paper was

18   published in '81, a long time ago, then they went up depending

19   on the response as I mentioned that the patient either had no

20   effect, they would go higher to a maximum of 200 milligrams

21   a day, and the results showed that 4-AP given orally from

22   anywhere from two days, the shortest that they used it, to

23   ten months could improve neuromuscular transmission.

24   Q.      Did Dr. Murray make any conclusions about

25   dalfampridine's serious adverse effects in humans?

Peroutka - direct

1  A.     What they found was three of their patients had

2  seizures, and all of these were receiving 80 milligrams or

3  more of 4-AP a day, the doses were 80 milligrams a day, 120

4  and 200.

5  Q.     What did Murray teach to a person of ordinary skill

6  in the art with respect to the long-term use of

7  dalfampridine in humans?

8  A.     Well, as shown there that you could use it, there was

9  a dose, meaning under 80 milligrams per day that you could

10  treat chronically without any serious seizure effects, up to

11  ten months.

12  Q.     Moving on in the timeline, when was dalfampridine

13  first tested in MS patients?

14  A.     1983.  A study by Dr. Jones and colleagues in England

15  were the first ones to try it in MS patients.

16  Q.     After that was there another study looking at the use

17  of dalfampridine in MS patients?

18  A.     Yes.  Next slide, please.  So this is the study I

19  highlighted as one of our top three which is the

20  Dr. Stefoski paper.  This is a study done in Chicago at Rush

21  Medical School using 4-AP.  As you can see in the title,

22  4-aminopyridine improves clinical signs in multiple

23  sclerosis.

24  Q.     Did you rely on Stefoski to form your opinion in this

25  case?

Peroutka - direct

1   A.      Yes.

2   Q.      Would you describe for the Court the Stefoski study?

3   A.      Stefoski and colleagues, they looked at 12

4   temperature sensitive male patients.  Let me explain that

5   because that's an odd statement.  Before MRIs in the 1980's

6   and earlier, we would put people in hot bathtubs, and the

7   reason is that our nerves conduct essentially electrical

8   signals, but when your core temperature goes up, the

9   transmission should speed up and that would actually expose,

10  if you will, symptoms of MS.  People would get worse

11  transiently, put them in a hot tub and their weakness would

12  get worse.

13          The reason they did this in this study is

14  because it's considered, it was considered in the 1980's a

15  gold standard of diagnosis, so if you were a patient who had

16  what symptoms, numbness, tingling, weakness and you got

17  worse after a hot bath, you had MS.  Today, of course, we

18  use MRI scans.  And this test may be done for academic

19  reasons, but it's not standard neurology anymore, but these

20  were MS patients.

21          And then they looked at five normal men and they

22  monitored the men before, during and after the IV injection

23  of seven to 35 milligrams of 4-AP starting at one milligram,

24  they would start it at one, and they went up every ten to

25  sixteen minutes up to a maximum of 35.

Peroutka - direct

1    Q.    Now, what did Dr. Stefoski conclude as a result of

2    this study?

3    A.    You can see in the second yellow, if you go back one.

4    Ten of the twelve patients showed mild to marked

5    improvement.  They were looking here at vision.  Vision

6    improved in seven patients.  They looked at occular motor

7    function, meaning movement of the eyes and they looked at

8    motor function as they defined as power, coordination and

9    gait in five.  Improvements was seen in five subjects.

10   Improvements gradually developed within minutes with doses

11   as low as two milligrams.

12               I think that's an important point.  Doses as low

13   as two milligrams would help a patient and gradually reverse

14   two to four hours after peak drug effect.

15   Q.    What did Dr. Stefoski suggest about the clinical

16   usefulness of dalfampridine in MS patients?

17   A.    So Stefoski and colleagues said that their data

18   suggest a clinical usefulness for this agent, meaning 4-AP

19   in MS patients.

20   Q.    Now, did Dr. Stefoski also make an observation about

21   4-AP's duration of action?

22   A.    Yes.  And this I believe I can say was stimulated by

23   the fact that they saw the symptom improvement reverse in

24   two to four hours, clearly a disease that's chronic, a life

25   long disability, if you have an agent that only works for

Peroutka - direct

1   two to four hours after every pill it becomes impractical.

2             Based on the half life here, here they note in I

3   think 1981 that half life meaning the plasma half life of

4   4-AP in humans was 3.6 hours, so the clinical improvement

5   was consistent with the half life reported by Dr. Uges and

6   what that meant clinically to a neurologist, pharmacologist

7   was that it would be a treatment for MS that worked all day

8   long, they would have to be dosed every three to four hours.

9   Q.     That dosing regimen that you described, three to four

10  times a day for a MS patient, would that be a convenient

11  dosing regimen?

12  A.     Three to four hours which comes out to six times a

13  day.  And the answer is no, it was well-known back in the

14  '80's and before that patient compliance with a regimen was

15  a very critical factor in determining if your drug is going

16  to have benefit.  Drugs that are given once a day it's

17  well-known are the best in the sense of most likely to be

18  taken every day, it's easy to get up and remember to take a

19  pill.  Twice a day dosing is pretty good, it's easy to

20  remember to wake up and take it and then when you go to

21  sleep.

22            Once you take it above two times a day, just

23  from a practical viewpoint, you have to remember I have to

24  take a tablet at ten o'clock is difficult at two o'clock or

25  whatever, so once a day dosing I would say is ideal, twice a

Peroutka - direct

1    day is acceptable, you lose compliance, it's been studied

2    with medications that are more than twice a day dosing.

3    Q.    Was there a follow-up study to the Stefoski

4    publication by the same group of researchers at Rush

5    University?

6    A.    Yes.  Next slide, Dr. Davis.  This is a paper now

7    from 1990 that states that orally administered 4-AP improves

8    clinical signs in multiple sclerosis.  So Dr. Stefoski is

9    actually the middle author on this paper, but this is the

10   same group from Rush Medical School.

11   Q.    Did you rely on the Davis publication, JTX 43, to

12   form your opinion in this case?

13   A.    Yes.

14   Q.    Would you describe the Davis study to the Court?

15   A.    Yes.  Next slide, please.  So, in this case, Dr.

16   Davis and Stefoski and colleagues at Rush looked now at 20

17   temperature sensitive male MS patients and they were given

18   now orally, whereas the first study was IV, this is now

19   oral.  Also starting at 10 milligrams going up to 25

20   milligrams or placebo, so a placebo controlled study.

21          And what they found was all of the 15 MS

22   patients given 4-AP had mild to marked improvements.  And

23   then, motor function, which they define as power

24   coordination and gait, gait being a synonym for walking

25   improved in nine of 13 involved subjects.  Again, they saw

Peroutka - direct

1    improvements that developed gradually at doses as well as

2    low, they say that 10 milligram was efficacious, began

3    within 16 minutes and lasted about four to seven hours, and

4    also importantly here they found that no serious adverse

5    events occurred, meaning no seizures in particular because

6    that was the big concern about this product since seizure

7    had been seen at 80, 120 and 200.

8            And they concluded that orally administered 4-AP

9    produces clinically important improvements in multiple

10   chronic deficits in MS.

11   Q.    And just to be clear, that "no serious adverse

12   events," that is at 10 to 25 milligrams?

13   A.    Correct.

14   Q.    What did the Davis publication -- did the Davis

15   publication also make an observation about the therapeutic

16   window of dalfampridine?

17   A.    Yes.  And highlighting on the next slide is showing

18   it in yellow.

19           So I'll read the whole sentence.

20           Since MS patients have an increased incidence of

21   seizure, they might be expected to be at higher risk for

22   seizures on exposure to 4-AP.

23           Again, it was already observed by Murray and

24   Newsom-Davis in 1981 that seizures could be induced with

25   this drug.

1          So it says that, although it is important to

2      recognize the potential, it is obviously very important,

3      that their results suggest that they could define a safe and

4      effective therapeutic dosage window.

5      Q.     Now, in view of 4-AP's short half-life as described

6      in Stefoski and the description of the therapeutic window by

7      Davis, what would a person of ordinary skill in the art have

8      concluded about using dalfampridine in humans?

9      A.     That it would be good to have a sustained release

10     formulation.

11     Q.     Okay.  And was sustained release formulations known

12     before 1990?

13     A.     Yes.  Next slide, please.

14          So this is just an example from Remington's

15     Chapter on Sustained Release Drug Delivery Systems from

16     1985.  So this is like the Bible of pharmaceutical sciences

17     where they talk about different formulations, et cetera.

18          I'm using this as an example, but it states, it

19     highlights the point, numerous products were on the market.

20          So in 1990, so I was part of the drug industry

21     when I joined officially, but I was well aware, for example,

22     I was a neurologist, that numerous drugs were needed for

23     sustained release.

24          Morphine is another three or four half-life.

25     That MS Contin was the name of the product.

1              Mestinon for myasthenia gravis, a short-acting

2     cholinergic agent, was used.

3              Sinemet, which is a Parkinson's drug, using

4     Carbidopa and Levodopa, was called Sinemet CR, Sinemet

5     Controlled Release.

6              And there were numerous companies.  We already

7     heard one company had expertise, a company called Calta

8     (phonetic).  So there were small companies that were working

9     on formulation technologies.

10              There were marketed products already by 1990

11     that attacked this exact problem which is short-acting drugs

12     for chronic conditions, that they would benefit from the

13     sustained release formulation.

14     Q.     Dr. Peroutka, did you rely on Remington's chapter on

15     sustained release, JTX-82, to form your opinion?

16     A.     Yes.

17     Q.     Okay.  Now did you understand that defendants'

18     pharmaceutical expert, Dr. Kibbe, is going to talk more

19     about sustained release dalfampridine formulations during

20     his testimony?

21     A.     Yes, he is the expert in pharmaceutics.

22     Q.     Now, relying on Dr. Kibbe's testimony, would a

23     person of ordinary skill in the art have had a reasonable

24     expectation of success that a pharmaceutical formulator

25     would have been able to make a sustained release formulation

Peroutka - direct

1   of dalfampridine?

2   A.      Yes.  And so putting myself back at the priority

3   date, when I was there, since I knew about all these other

4   drugs that had similar challenges in terms of the dosing

5   regimen, I would have assumed -- and actually I did find

6   that a related article by Uges did an enteric coating, so

7   people had tried to manipulate the product before.  So I

8   would have expected a reasonable expectation of knowledge

9   given the state of the knowledge and the priority date.

10  Q.      And you are also relying on Dr. Kibbe's opinion?

11  A.      Yes, of course.

12  Q.      Now, did you have an opportunity to review Elan's

13  patent specification?

14  A.      Yes.  Next slide, please.

15  Q.      And what did the Elan patent say about the existing

16  motivation to make the sustained release formulation?

17  A.      Well, in the patent itself, they say that, further,

18  in view of the nature of neurological disorders, it can be

19  appreciated that there is a need for an improved dosage

20  form.

21          I think that would be considered correct by all

22  POSAs at that time.

23          However, such a formulation must result in a

24  controlled release of the drug to the systemic circulation

25  and therapeutically effective blood levels throughout a

84

Peroutka - direct

1    given treatment period.

2    Q.    Okay.  Now, wrapping up your obviousness analysis for

3    the Elan patent, would you summarize for the Court your

4    takeaways from the primary prior art that you discussed so

5    far?

6    A.    So the next slide puts what was known based on my

7    review at the time of the priority date.

8              So use of 4-AP to treat MS.  So there were

9    multiple papers showing that 4-AP treats MS systems, visual

10   systems, motor function, gait.

11             We relied on Stefoski and Davis.

12             I mentioned other papers, multiple other papers

13   that looked at this issue.

14             The total daily oral doses of 10 to

15   25 milligrams per day provided a safe and effective

16   therapeutic window.  That was discussed in Davis.  So we had

17   a range of doses that were both safe and effective.

18             The 4-AP efficacy was maintained with no

19   evidence of loss and effect with treatment periods of two

20   weeks through ten months.  That is Murray and use of the

21   Davis paper.

22             So that was all that we knew in terms of using

23   4-AP to treat MS.

24             To make and use a 4-AP sustained release once-

25   or twice-a-day formulation, we knew that 4-AP efficacy in MS

1    was transient, lasting only a few hours after IV, four to

2    seven hours after oral, and that was consistent with the

3    half-life.  So that was factual information.  Sustained

4    release formulations were well known and were suggested for

5    drugs with short half life.

6            Uges paper, Stefoski, Remington's, POSA

7    knowledge.  Dr. Kibbe will address in much greater detail

8    the technology part, but the fact that sustained release

9    formulations would be beneficial to short half-life drugs

10   that were used to treat chronic diseases was well known at

11   the time.

12           And my opinion is that it was reasonable to

13   expect that a POSA, a pharmaceutics POSA could make an SR

14   that achieves therapeutic blood levels for 12 to 24 hours

15   when given once or twice a day.

16   Q.    Based on your review of the prior art, did you come

17   to a conclusion regarding the validity of the Elan patent?

18   A.    Yes.  Next slide, please.

19           So my opinion would be it is invalid because of

20   the following facts.

21           It covers a known drug at the time, 4-AP, for a

22   known use, treating MS, literature data extending back seven

23   years, with a known formulation type, sustained release that

24   were commonly known and used at the time.

25           The prior art suggested and motivated a POSA to

Peroutka - direct

1    make and use a 4-AP sustained release formulation because of

2    the fact that's a short half-life and short therapeutic

3    effect when given orally or IV.

4            And there would be a reasonable expectation that

5    such POSA would be successful in making the 4-AP

6    formulation.  And Dr. Kibbe will expand upon that.

7    Q.    Dr. Peroutka, are you aware of any secondary

8    considerations of nonobviousness related to the Elan patent?

9    A.    Not at this time.

10   Q.    Now, if plaintiffs do present such evidence, do you

11   intend to address them during your rebuttal testimony?

12   A.    Yes.

13   Q.    Now, let's turn to your opinions about the validity

14   of the Acorda patents.

15   A.    Okay.

16   Q.    Now, first, would you please remind the Court the

17   core limitations of the Acorda patents?

18   A.    Sure.  You have seen these before.  But basically the

19   core limitations of the Acorda patents are, again, sustained

20   release 4-AP to treat MS patients at a dose of 10 milligrams

21   BID to improve walking and walking speed with specific PK

22   ranges for a period of at least two weeks without titration.

23   Q.    Now, did you apply the same obviousness analysis for

24   the Acorda patents that you did for the Elan patent?

25   A.    Yes.

Peroutka - direct

1    Q.      And are the Acorda patents directed to the same POSA

2    as the Elan patent?

3    A.      Yes.

4    Q.      Okay.  And do you consider yourself to be a POSA for

5    the Acorda patents?

6    A.      Yes, in therapeutics.

7    Q.      And you also consider yourself to be a POSA for the

8    Elan patent as well?

9    A.      Yes.

10   Q.      Did you have an opportunity to review the relevant

11   prior art references related to the Acorda patents?

12   A.      Yes.

13   Q.      Now, first of all, all of the references that you

14   discussed in connection with the Elan patent, are those also

15   prior art for the Acorda patents?

16   A.      Yes, of course.  They all predate the priority date.

17   Q.      What are the key prior art references that you intend

18   to rely on for the analysis for the Acorda patents?

19   A.      Okay.  So in addition to the previous ones now, we

20   have the Elan patent itself which was published in 1996.

21          We have Dr. Goodman's publications from

22   2002-2003 time frame.

23          We have the Hayes and colleagues publications in

24   the 2001 and 2003.

25   Q.      Do any of these references report the results from

Peroutka - direct

1    the actual Ampyra clinical trial studies?

2    A.    Yes.  The Hayes is the phase I PK data, I believe,

3    and the Goodman is a Phase II study.

4    Q.    Let's pick up on the timeline where we left off in

5    1990 with the priority date of the Elan patent.

6          What claim limitations of the Acorda patents are

7    disclosed in the Elan patent?

8    A.    Let me go to the next slide.

9          So this is again a schematic showing that the

10   Elan patent, the Acorda patent both discuss a sustained

11   release of form 4-AP.

12         The Elan patent uses the term "therapeutic dose

13   once or twice a day."  Acorda specifies ten milligrams twice

14   it a day.

15         Elan patent is to treat multiple sclerosis

16   whereas the Acorda patent treats multiple sclerosis patients

17   to improve walking and/or speed.

18         Elan talks about a dose that results in a

19   therapeutic blood level whereas the Acorda patents give a

20   numerical values to the PK levels.

21         Elan's patent doesn't discuss duration in any

22   specific form other than to the treatment of a chronic

23   disease, doesn't discuss titration in the claims in dispute

24   whereas Acorda talks about for at least two weeks without

25   titration.

Peroutka - direct

1    Q.      Now, in terms of their relationship, do the Acorda

2    patents claim a subset of the broader limitations of the

3    Elan patent?

4    A.      Yes.  And the next slide shows it similar to what was

5    already shown earlier today.  But the Elan patent, if you

6    will, is the big circle of all therapeutic doses that can be

7    given once or twice a day.  And at the time of the priority

8    date, a number of studies have been done which essentially

9    describe that therapeutic dose.

10          The Acorda patents limit it to a subset of

11    specifically 10 milligrams BID, which is a therapeutic dose.

12    Q.      Did the Acorda patents use the pharmacokinetic

13    parameters that were achieved using the Elan formulation?

14    A.      Yes.

15    Q.      Now, did you have an opportunity to review the

16    deposition testimonies of the inventors in this case?

17    A.      Yes.

18    Q.      And what did Dr. Blight, the inventor of the Acorda

19    patent, say about that subject?

20    A.      So the next slide just shows Dr. Blight's testimony.

21    He was asked:

22          "Question:  Did Acorda alter the sustained

23    release formulation that Elan provided in any manner?"

24          And his answer was:

25          "Answer:  We did not do any formulation work,

Peroutka - direct

1   no."

2   Q.    And does the Elan patent teach a dosing regimen that

3   lasts at least two weeks?

4   A.    Well, again, it goes to the treatment of a chronic

5   disease.  So it doesn't specifically say two weeks but it

6   talks about administering it in a patient in need thereof.

7   It says MS deficits are stable and chronic.  That is

8   implicitly lifelong.

9   Q.    Now, claim 1, upon which asserted claims 3 and 8

10  depend, of the Elan patent, does it require a dosing regimen

11  that has titration?

12  A.    No.

13  Q.    So let's go back to the timeline.  Did you find a

14  continuing interest in research for using dalfampridine in

15  MS patients in the 1990s?

16  A.    Yes.

17  Q.    Now, Dr. Peroutka, did you rely on Stefoski II and

18  van Diemen II for your opinion in this case?

19  A.    Yes.  Throughout the 1990s, as we will see, a number

20  of the investigator groups, ones in the Netherlands,

21  Chicago, Baltimore, at the University of Maryland, Dr.

22  Rudmann at Rochester, and other investigators globally were

23  researching 4-AP in patients.

24          MR. PARK:  And for the record, that is JTX-113

25  and DTX-572.

Peroutka - direct

```
 1   BY MR. PARK:

 2   Q.     Let's go to 1994.  Did you rely on Bever III and

 3   Polman I, JTX-28 and 95 for your opinion?

 4   A.     Yes, these are all papers.

 5   Q.     And what did they teach?

 6   A.     In general, as you can see, it says:  4-AP in the

 7   treatment of payments with multiple sclerosis, a review

 8   article of Dr. Bever in 1994 showing the different ways of

 9   giving the drug orally.  Some had sustained release

10   formulations as early as I think '95-96 could help improve

11   symptoms of MS.

12   Q.     Did you review the Schwid paper JTX-104 for your

13   opinion?

14   A.     Yes.

15   Q.     Now, would you describe for the Court the Schwid

16   study?

17   A.     So the Schwid paper was 1997.  Dr. Goodman, I should

18   point out, is the senior author, he was involved in the

19   study, and probably the primary author was Schwid, which was

20   a quantitative assessment of sustained release 4-AP for the

21   symptomatic treatment of multiple sclerosis.

22          And what they did was shown in highlighted in

23   the top right.  Pharmacokinetics have shown that these

24   episodes, meaning seizures and bad toxicity, occur when

25   serum 4-AP levels peak.  So they used a sustained release
```

Peroutka - direct

1    preparation, 4-AP SR.  Fampridine EL 970 was therefore

2    formulated.  So based on my review of what EL 970 was, I

3    have good reason to think that that is actually Ampyra, the

4    drug under discussion today.  The same formulation.

5    Q.     Now, what did the Schwid paper conclude?

6    A.     Well, first off, what they did was they measured the

7    time to walk eight meters, it was about 25 feet, the time to

8    climb four stairs, and various other things.  So what

9    they're doing, you notice they said quantitative assessment.

10            So what they found was that timed gait was

11   improved over 4-AP SR compared to placebo in nine out of ten

12   subjects which was significant, peak value 0.2.

13            Their conclusion was 4-AP sustained release, a

14   dose of 17 and-a-half milligrams twice a day, improved motor

15   function in MS patients.

16            The quantitative outcomes used in the study

17   permit more sensitive evaluation of the therapeutic effect

18   and promise to be useful in future trials of the symptomatic

19   treatments for MS.

20            MR. PARK:  Okay.  Now, Jeremy, would you pull up

21   JTX-104.

22   BY MR. PARK:

23   Q.     During plaintiffs' opening, you heard that there was

24   a mention of a failed study in the Schwid paper?

25   A.     Correct.

Peroutka - direct

1   Q.      Now, what was Schwid's ultimate conclusion with

2   respect to that study in his paper?

3   A.      Yes.  Can we go to -- so, first off, it is probably

4   worth it if I'm able to explain more about this failed

5   study, how it shows up here.  Can we highlight, I think it's

6   the right column, right, in 19, starting at the bottom, the

7   second row.

8           So in this paper, they talked about a 1994 study

9   of 161 subjects which we heard about in a multicenter study

10  where they looked at something called the EDSS scale.  So

11  EDSS is Expanded Disability Status Scale.  It is a broad

12  range of looking at the overall function of a patient with

13  multiple sclerosis.

14          What Dr. Schwid notes -- if you can go to the

15  next paragraph is I think a key point.  Yes.

16          So what they said was that the EDSS, this

17  ability scale, however, may have been an inadequate outcome

18  variable for this trial.

19          And it again is a very interesting and relevant

20  I think example.  It says that the EDSS example is imprecise

21  due to substantial intrarater and interrater variability.

22          That means if I were to assess a patient plus

23  another neurologist, we might come up with different numbers

24  for EDSS.  If I were to do it in the same patient every day

25  for a week, I may come up with different numbers.

Peroutka - direct

1              So it's relative and it's relatively insensitive

2       to change.

3              So, for example -- this is the key part.  For

4       example, a patient who needed a cane to walk 100 meters

5       would need to improve enough to walk without the cane for

6       100 meters -- that is a football field -- before their EDSS

7       score would change.

8              So having a drug that took you from needing a

9       cane to not needing a cane, that is a pretty big jump in

10      ability, and a pretty big improvement.

11             So that Schwid points out lesser improvements in

12      gait, i.e., walking, would not be reflected in this case and

13      notable changes in strength or other deficits could also be

14      overlooked.

15             So this study of Schwid was meant look at,

16      quote, "more sensitive measures."

17             So walking 100 meters or 25 feet, whatever the

18      distance is, how quickly you could get there without a cane

19      or even with a cane would be more sensitive whether or not

20      you needed a cane.

21      Q.    Now, let's go back to DDX-63.

22             What was Dr. Schwid's ultimate conclusion and

23      suggestion to a POSA about dalfampridine SR?

24      A.    Well, the conclusion was that there was an

25      improvement in motor function, and that there were

Peroutka - direct

1   quantitative measures that could be used that was more

2   sensitive than the EDSS score.

3   Q.      Okay.  Dr. Peroutka, did the Schwid study suggest

4   that dalfampridine SR should only be used for one week,

5   which was the study life of the study?

6   A.      No, it was just the length of the specific trial.

7   Q.      Did the Schwid study titrate the dalfampridine dosing?

8   A.      No, they used a fix dose of 17.5 milligrams twice a

9   day.

10  Q.      Did you also review the prosecution history from the

11  Acorda patents, JTX-7?

12  A.      Yes.

13  Q.      Did the patentee say anything about the Schwid study

14  during the prosecution of the patents?

15  A.      Yes.

16              Next slide, please.

17              So you can see here in the highlighted statement

18  made that fixed dosages were also used, see, for example

19  Schwid, the paper we just discussed.

20  Q.      Subsequent to Schwid, was there another study

21  involving Elan's SR formulation?

22  A.      Yes.  Go to the next slide.

23  Q.      Now, did you rely on Hayes 1, JTX 68 and Hayes 3, JTX

24  69, to form your opinion in this case?

25  A.      Yes.

Peroutka - direct

1   Q.      Would you describe for the Court the Hayes 1 and 3

2   studies?

3   A.      Sure.  Next slide, please.  The Hayes study is

4   essentially a phase one pharmacokinetic study on the

5   formulation of dalfampridine.  What they did was based on

6   the pharmacokinetics of orally administered dalfampridine,

7   multiple daily doses would have been needed as we discussed.

8   So they did two studies to determine the pharmacokinetic and

9   safety profile of an oral sustained release formulation

10  which again is 4-AP, administered as a single dose in one

11  part of the study and then twice daily for one week in

12  patients with chronic spinal cord injuries.

13          What they found was that the sustained release

14  was absorbed slowly, the peak plasma concentration shortly

15  after doses, 2.6 to 3.7 hours, and the plasma half life as

16  you see from 5.6 to 6.7 and it reached steady state after

17  four days of twice daily administration.  They found it was

18  well tolerated and only mild to moderate adverse events were

19  reported and no serious adverse events.

20  Q.      What were the four pharmacokinetic parameters that

21  were published in the Hayes study?

22  A.      As you can see, three highlights at the 10 milligram

23  BID dose, they measured Cmax in nanograms per mil, the

24  Caverage for steady state and the Tmax.

25  Q.      The Tmax, the Caverage at steady state and the ratio

Peroutka - direct

1    of Cmax to Cmin at steady state, are these values that

2    reported in Hayes study all within the claim limitation, the

3    pharmacokinetic limitation of the Acorda patents?

4    A.    Yes.

5    Q.    Now, this is from the Hayes three study, JTX 69.  If

6    you were to look at the Hayes one study, did Hayes 1 also

7    report identical pharmacokinetic primaries?

8    A.    Yes.

9    Q.    Now, Hayes 1 was from 2001.  Was there another study

10   involving Ampyra formulation in 2002?

11   A.    Yes.

12   Q.    Now, Dr. Peroutka, did you rely the Goodman

13   references, JTX 80 and JTX 62 to form your opinion in this

14   case?

15   A.    Yes.

16   Q.    What -- was this a dose ranging study?

17   A.    Yes, the title is placebo controlled double blinded

18   dose range study of dalfampridine SR in multiple sclerosis.

19   Q.    What does it mean to be a dose ranging study?

20   A.    Well, dose ranging studies are where you start at a

21   given dose, usually the lowest dose that you're going to use

22   in your trial and then you look at safety and tolerability

23   and efficacy and if you have acceptable tolerability and

24   whatever level of efficacy you then go up a dose level, and

25   then study that for tolerability and efficacy.

Peroutka - direct

1  Q.     Were the Goodman, the Goodman abstract and the

2  Goodman poster presented at the same conference in 2002?

3  A.     Yes.

4  Q.     Now, did you also review an abstract from 2003, the

5  JTX 61, which reported results from the same study?

6  A.     Yes.

7  Q.     Let's first talk about the abstract.  Would you

8  describe for the Court the Goodman study as reported in its

9  abstract?

10  A.     Yes.  Next slide, please.

11         So I already read the title but basically what

12  they did here was looked at a sustained release formulation

13  given orally to patients with MS and they started at a dose

14  of 10 milligrams twice a day, which is a total of 20

15  milligrams a day.  And patients got either 10 milligrams of

16  4-AP or placebo, or, ten got placebo for seven days and they

17  did various measurements in that time frame.  After seven

18  days, they did testing, and then if it was tolerable to the

19  subjects, they increased the active study drug group by 10

20  milligrams per week.

21         So, for example, they went 20 milligrams a day

22  to 30.  They then went a week on that dose and if that was

23  acceptable and tolerable, they increased to 40 to 50 to 60

24  to 70 to 80, if tolerable.

25  Q.     What did the Goodman abstract conclude?

Peroutka - direct

1    A.      They said that dose response curves showed an

2    increasing benefit in both measures in the 20 to 50

3    milligram a day range, meaning timed walking or lower

4    extremity strength.

5    Q.      Was the purpose of the Goodman study to find the most

6    efficacious dose without adverse events?

7    A.      Yes.  I mean, that's the goal of almost all those

8    ranging studies.

9    Q.      So once an efficacious dose is found, is the general

10   goal of drug development to provide a stable dosing regimen?

11   A.      Yes.

12   Q.      And at what dosages did the Goodman abstract conclude

13   efficacy without a substantial increase in adverse events?

14   A.      Below 50 milligrams a day, as it says doses above 50

15   had little benefit and increased in adverse effects, I

16   believe they had seizures in the patients on 60 and 80

17   doses.

18   Q.      Going back to the 2002 conference where this abstract

19   was presented, did you also find a poster presentation that

20   was associated with the Goodman abstract?

21   A.      Yes.

22   Q.      Before we talk about the actual substance of that, I

23   want to talk about poster presentations in general.  In your

24   decades in experience in attending scientific conferences,

25   what is the purpose of the poster presentation?

Peroutka - direct

1   A.      Posters are one way to communicate new knowledge.

2   The other way is a platform presentation or a lecture where

3   someone gets on the podium, shows slides and talks to the

4   audience, and usually fifteen minutes.  The other way is the

5   more common way would be a big lecture hall, much bigger

6   than this with hundreds of posters side-by-side under

7   certain themes.  So this row might be new treatments for

8   multiple sclerosis.  Normally during the conference the

9   author or authors would be assigned a time when they were to

10  stand by their poster in order to answer any questions.

11  Throughout the conference, you can go by, look at the

12  poster, read it, think about it but then speak to the author

13  who is involved or authors, you would know when to talk to

14  them.

15  Q.      Are poster presentations generally meant to be review

16  by the participants at the conference?

17  A.      Yes, that's the whole point of the conference,

18  assimilation of information.

19  Q.      Can attendees generally take notes?

20  A.      Yes.

21  Q.      Is there any indication in the Goodman poster that

22  this was supposed to be confidential?

23  A.      No.

24  Q.      And is there any indication on the Goodman poster

25  that observers were not supposed to take notes?

Peroutka - direct

1    A.    No.

2    Q.    So is there any reason for you to believe that

3    the Goodman poster was not publicly available as of

4    2002?

5    A.    No.

6    Q.    Now, did the Goodman poster provide a POSA with more

7    detailed data than the abstract?

8    A.    Yes.

9    Q.    Let's start with the chart that's on the left here.

10   What is the 25 foot walk change in speed show?

11   A.    It's showing that at doses 20 to 50 milligrams a day,

12   that you can see who got better and who got worse, and in

13   that dose range, you can clearly see it's weighted toward

14   the right side that it's getting better.

15   Q.    This was compared to a placebo?

16   A.    Right, down below placebo where you can see not quite

17   as dramatic improvement.

18   Q.    What is the dose response 25 foot walk here show?

19   A.    My interpretation is as follows, what they did here

20   is they had the screening values, so they had somebody come

21   in and they had them walk 25 feet, and it took about 15, 16

22   seconds for the patients.  They then call it phase one, two

23   and three and run in, but all these are before the study

24   gets going.  Everybody as I said gets placebo for seven

25   days, as you came in the study they measure your walking and

Peroutka - direct

1    measure it along first days of the week, and at the end of

2    the run in right before you got your first drug.

3              You can see patients, this is common, they

4    haven't done the walk, they don't really know what they're

5    being asked to do, they got a little better, but it's pretty

6    consistent, about 16 seconds to walk 25 feet.  They were

7    given for the first week, 10 milligrams, and it dropped down

8    to just under 14 seconds at the end of a week of 10

9    milligrams twice a day, or 20 milligrams total.  Then after

10   a week of 30 milligrams a day, it slightly got worse, but

11   essentially the same.  But next increase it dropped down a

12   bit, next one went up a bit, next one down a bit, next one

13   up a bit, what it says to me in this range here, they're all

14   the same, a dose response showing improvement in a range

15   would go down continually.  They got the 10 milligrams to

16   work at this level and that level of efficacy was maintained

17   through the dosage ranges.

18   Q.    In your testimony now just now when you're saying

19   this level to that level, you're referring to the 20

20   milligrams to 80 milligrams a day?

21   A.    Over the range of 20 to 80 milligrams a day, the

22   change in speed, the time it takes to walk was reduced to

23   roughly the same amount, 13 to 14 seconds from roughly 16 to

24   17 at the baseline.

25   Q.    What did the Goodman poster conclude?

Peroutka - direct

1    A.     Dr. Goodman concluded that the safety profile was

2    consistent with previous experience, I agree with that, that

3    in the ten and specifically less than 50 milligrams a day,

4    all the prior art has shown that when a patient is taking

5    less than 50, 50 milligrams I should point out is the lowest

6    daily dose that anyone has ever had a seizure on 4-AP, below

7    50 is safe.

8           Secondly they concluded significant benefit on

9    timed walking that's shown on the right side, dose response

10   25, significant benefit on lower extremity strength, also

11   consistent with the prior literature, and then he states

12   evidence of dose response in the 20 to 40 milligram range.

13   I'm not quite sure how he made that conclusion, because

14   although -- whenever 20 is, there are 13 something goes up a

15   little bit at 30 and then drops down, so there is only three

16   points, one is up and one is down, so I'm not sure that is

17   evidence of a dose response, but it's certain stable

18   clinical effect at 20 to 40.

19   Q.     And when Dr. Goodman is talking about 20 to 40

20   milligrams a day range, he's talking about 10 milligrams

21   twice a day, 15 milligrams a day and 20 milligrams twice a

22   day?

23   A.     Yes.

24   Q.     Would you have had a reasonable expectation of

25   success that 10 milligrams of dalfampridine twice a day

Peroutka - direct

1    would improve walking in MS patients?

2    A.    Yes, in the totality of the prior art, it shows ten

3    milligrams would, there is data, 25 people, and then on top

4    of that you have got all the prior art, so yes.

5    Q.    You heard this was described as a phase two study?

6    A.    Correct.

7    Q.    Based on the results of this study would you have

8    included, for example, the 10 milligrams twice a day

9    dalfampridine sustained release dose in a phase three study?

10   A.    Yes, there are dose related increases, very serious

11   ones above 50 you would take the lowest effective dose that

12   was safe.

13   Q.    And that's 10 milligrams twice a day?

14   A.    In this study, right, they didn't do anything lower.

15   It's possible it could go even lower, but based on the data,

16   10 is the lowest effective dose.

17   Q.    Based on this data would you expect that the 10

18   milligram twice a day sustained release formulation of

19   dalfampridine would work for more than two weeks?

20   A.    Yes, the literature going back, I think some

21   sustained release was used as long as 18 months, 10 months

22   for a nonsustained release, so there is no evidence that I

23   could find in the prior art that ever suggested that you

24   couldn't use this drug chronically.

25   Q.    We're going to wrap up in just a minute for the

Peroutka - direct

1    Acorda patents, but before we get there, you heard

2    plaintiffs mention the Solari reference in their opening.

3    So let's pull that up.  PTX 416.

4             Now, is this a reference that you considered in

5    your opinion?

6    A.    Yes.

7    Q.    Did the Solari publication conduct any original

8    studies of its own?

9    A.    No.

10   Q.    Did Solari publication consider the Elan patent in

11   its review?

12   A.    No.

13   Q.    Did the Solari publication consider the Hayes

14   publication that you discussed in its review?

15   A.    No.

16   Q.    Did the Solari publication consider the Goodman

17   publications that you discussed in its review?

18   A.    No.

19   Q.    So what does the Solari publication actually suggest

20   to a person of ordinary skill in the art about dalfampridine

21   efficacy to improve motor function in MS patients?

22   A.    Right.  So when they did this review, they looked at

23   a number of things.  Can we go there first?  They looked at

24   five different aspects based on seven studies that they

25   pulled from the literature.  First off they didn't do the

Peroutka - direct

1    entire literature, they only did randomized control clinical

2    trials, which if you have to have high level efficacy, you

3    would tend to do, but it's unfair to eliminate all the other

4    literature.  But that was what they did.  If we look at five

5    things -- that's not it.  Go up a little higher, I think.

6    That's not it, either.  But they talk about fatigue, visual

7    symptoms, and motor function is one of them.

8    Q.    Let's go to page four, motor functions?

9    A.    Motor functions.  When they looked at everything,

10   fatigue, visual symptoms, they do make a conclusion that

11   there is no definitive evidence of efficacy, but very

12   interestingly if you read the paper in detail, when they

13   just looked at motor function which we have been discussing

14   here, they found three randomized control trials involving

15   54 patients that considered motor function testing as a

16   study outcome, Bever, 1996, and Schwid that we discussed.

17   They did manual muscle testing in all the studies, 29

18   patients improved, 54 percent improved when 4-AP, versus

19   four, seven percent during placebo.  That's 14.5.  To a

20   statistician that's a huge number.  You can see in this P

21   value.  If you go to the last thing, P equals less than

22   .001.  Dr. Solari didn't do the study, but what she did do

23   was look at just the motor function of these studies, and

24   she did observe.

25                As a POSA, I look at that, P OO1, one in a

Peroutka - direct

1   thousand chance that this is random, that would have been

2   significant motivation to me to explore if not fatigue, not

3   the other things that they measured in this study, but

4   specifically motor function which is I think where the prior

5   art leads you.

6   Q.    Now, wrapping up, would you summarize for the Court

7   the relationship of the Elan patent, the Schwid and the

8   Goodman publications and the Acorda patents?

9   A.    Next slide, please.  So going back to these sort of

10   diagrams, we have the Elan patent in the blue talking about

11   a therapeutic dose of a sustained release 4-AP given once or

12   twice a day to treat MS.

13          We have got the Goodman poster doing a range of

14   study 10 to 20 milligrams twice a day.  We have Schwid

15   saying 17-and-a-half twice a day, 35 milligrams, so Goodman

16   and Schwid now limit the therapeutic dose down to 10 to 20

17   milligrams a day.  And Acorda patent further restricts that

18   within the Elan patent, within the prior art of Goodman and

19   Schwid to 10 milligrams twice a day.

20   Q.    Dr. Peroutka, this is an important point.  Did you

21   prepare another demonstrative to show the Court what the

22   prior art showed to be a safe and effective dose for 4-AP?

23   A.    Yes.  Next slide.  So this shows the way I like to

24   think of therapeutic dosing.  So the Elan patent on the top,

25   it's just a therapeutic level so it's some range of doses.

Peroutka - direct

1     It's highly unlikely that there is only one dose of the drug

2     and only one dose that works.

3            So if you look at it this way, broad therapeutic

4     level line, Stefoski 91 did a range of seven-and-a-half to

5     52.5 that they said was safe and effective.  Davis said 10

6     to 25 milligrams was safe and effective.  Hayes 20 to 50.

7     Schwid used just 35.

8            My point of this, Your Honor, is it's right in

9     the middle of all the other ranges.  In other words, it's

10    not breaking any new grounds.  They're not building upon a

11    new dose.  It's simply selecting within the range that's

12    well established.  Goodman says 20 to 40 a day is safe and

13    effective, and the Acorda patents put a stake down at 20

14    which is again dead center of all the other publications

15    talking about ranges of safe and effective doses.

16    Q.    Let's now compare the claim limitations of the Acorda

17    patents with the prior art references that you discussed.

18    Does the prior art teach the use of 10 milligrams

19    dalfampridine sustained release twice day daily?

20    A.    Yes, next slide.  So we have Goodman 2002, that

21    specifically has a data point of 10 milligrams twice a day,

22    we have those publications that discuss efficacy at 10

23    milligrams.

24    Q.    Does the prior art teach the use of 10 milligrams

25    dalfampridine sustained twice daily to improve walking and

Peroutka - direct

1    increase walking speed?

2    A.    Yes.  Goodman said that the sustained release groups

3    statistically showed statistically significant improvement

4    from baseline compared to placebo and functional measures of

5    mobility timed 25 walking speed at a P value of .04.

6    Q.    Dr. Peroutka, did you prepare a demonstrative on what

7    the prior art teaches about the duration of action,

8    treatment for dalfampridine?

9    A.    Yes.  Next slide, please.

10   Q.    So, again, using that same format where the Elan

11   patent really doesn't discuss duration, but it discusses the

12   treatment of a symptom and the chronic disease, chronic

13   stable.  We have got 32 months Polman I, ten months Murray,

14   three months van Diemen, there is numerous publications that

15   talk about longer than two week treatment, none of those

16   mention any loss of efficacy or any reason that it can't be

17   given indefinitely.  So?

18   A.    So Acorda just limits it down to two plus a week.

19   Q.    So does the prior art in your view suggest the use of

20   10 milligrams twice daily without titration for more than

21   two weeks?

22   A.    Yes.

23   Q.    Now, for most drugs in general, once a

24   therapeutically effective dose is found, during the clinical

25   study or dose ranging study, are those doses titrated from

Peroutka - direct

1    week to week?

2    A.    In general, no.  The vast majority of drugs, the dose

3    is decided, you are give a prescription with that dose and

4    you treat yourself.

5    Q.    And is there a practical benefit to that?

6    A.    Yes.  I mean the extreme example would be insulin

7    for diabetics where people have to monitor their blood and

8    constantly adjust the dose in order to fine tune a

9    treatment.  That is titration.

10          Obviously, it's a lot easier simply to take one

11   pill, the same pill twice a day than to have to figure out,

12   well, this morning I need this much, that much.  But with

13   pills, it is almost impossible to titrate easily.

14   Q.    So does the prior art teach the specific

15   pharmacokinetics of 10 milligrams of dalfampridine twice a

16   day?

17   A.    Yes.  Hayes has exactly the data that is in the

18   patent.  Basically, it is showing that at 10 milligrams

19   twice a day, you achieve a value that is right in the range

20   claimed in the patent.

21   Q.    Did the Hayes reference disclose all of the claimed

22   pharmacokinetics in the Acorda patents?

23   A.    Yes, either directly or indirectly.

24   Q.    So we just addressed the core limitations of the

25   Acorda patents.  Are there any remaining claim limitations

Peroutka - direct

1    of the Acorda patents that we have not specifically

2    discussed?

3    A.      There is a few.  If you go to the next slide.

4            For example, in the '437, they talk about that

5    the composition should be a tablet.

6    Q.      Okay.  Does the Elan patent, among others,

7    specifically disclose a sustained release formulation that

8    is a tablet?

9    A.      Yes.

10   Q.      Okay.  And does the Goodman study, among others,

11   teach using dalfampridine without other doses of

12   dalfampridine?

13   A.      Yes.

14   Q.      And that is in claim 1 of the '685 patent; right?

15   A.      (Nodding yes.)

16   Q.      Does the Elan patent, among others, teach a sustained

17   release composition with one or more pharmaceutically

18   acceptable excipients?

19   A.      Yes.

20   Q.      Does the Elan patent teach a sustained release

21   profile that extends over six hours?

22   A.      Yes.  It says therapeutically effective for once- or

23   twice-a-day dosing, so it implies it, yes.

24   Q.      Now, in view of the totality of the prior art

25   references that you have discussed and the claimed

Peroutka - direct

1    invention, including prosecution history, what is your

2    conclusion as to the validity of the Acorda patents?

3    A.     Next slide, please.

4           So my opinion is that indeed they're all invalid

5    because, as I have shown, they simply narrowed the Elan

6    patent to a known dose for a known use for a period of two

7    weeks or more.  All, I should say, within the range that has

8    already been demonstrated in the prior art.

9           The prior art found that the claimed dose,

10   10 milligrams BID was effective for that precise treatment

11   and improvement.  The slide is shown there.  And I circled

12   the 10 milligram dose.

13          I mean those data, that one graph, to me, leads

14   to the extremely reasonable expectation of success when you

15   put it in the context of the totality of all the prior art.

16   Knowing the dose ranges, knowing the safety profile, knowing

17   the measures that are being used here, 25 subjects showing a

18   20 percent decrease in the time it takes them to walk would

19   lead me to think that would be replicated in future studies.

20   Q.     Thank you, Dr. Peroutka.  Are you aware of secondary

21   indicia of nonobviousness relating to the Acorda patents?

22   A.     Not at this point.

23   Q.     In your review of the prior art, did you find any

24   unexpected or surprising results about the claimed

25   invention?

Peroutka - direct

1    A.    No.

2    Q.    Did you find any evidence of long-felt need but

3    failure of others?

4    A.    No.

5    Q.    Did you find any evidence of skepticism of others?

6    A.    No.

7    Q.    Now, if the patentees present such evidence, do you

8    intend on addressing them during your rebuttal testimony?

9    A.    Yes.

10   Q.    Now, circling back to all of the asserted claims of

11   the Ampyra patents, the Orange Book patents, what is your

12   opinion with respect to the Elan and the Acorda patents?

13   A.    So in my final slide, my conclusion is that all the

14   asserted claims of all five patents are obvious.  That a

15   person of ordinary skill of the art at the priority date

16   1990-91 would have had a very reasonable expectation of

17   success based on the totality of the prior art, that a

18   sustained release formulation could be created and could be

19   used to treat systems of MS once or twice a day.

20          MR. PARK:  Your Honor, at this time defendants

21   move to entered into evidence all JTX and DTX relied upon by

22   Dr. Peroutka for his opinion, including DTX-139, 204, 572,

23   and JTX-1, 2, 3, 4, 5, 7, 28, 43, 61, 62, 68, 69, 76, 80,

24   80A, as if the alphabet A, 82, 89, 95, 104, 112, and 113.

25          THE COURT:  Is there any objection?

Peroutka - cross

1              MR. DiNAPOLI:  No objection, Your Honor.

2              THE COURT:  Okay.  Those that were specifically

3      listed by number are admitted.

4              (Above-listed exhibits are admitted into

5      evidence.)

6              MR. PARK:  Defendants reserve the right to have

7      redirect and rebuttal testimony from Dr. Peroutka, but we

8      don't have any further questions at this time.

9              THE COURT:  Okay.  Well, at this time, we will

10     take a recess of about 15 minutes and then we'll have

11     cross-examination.

12             (Brief recess taken.)

13                 *      *      *

14             (Proceedings reconvened after recess.)

15             THE COURT:  We're ready for cross-examination.

16             MR. DiNAPOLI:  Yes, Your Honor.  May I approach?

17             THE COURT:  You may.

18             (Binders passed forward.)

19             THE COURT:  You may proceed when you are ready.

20             MR. DiNAPOLI:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22     BY MR. DiNAPOLI:

23     Q.      Dr. Peroutka, you would agree with me before the

24     Acorda patents, the largest clinical study testing 4-AP in

25     MS patients had failed; is that correct?

Peroutka - cross

1    A.    No, I would not.

2    Q.    Why don't we take a look at JTX-104.

3              If we go down to -- well, strike that.

4              You are familiar with this article, correct?

5    A.    Yes.

6    Q.    And it's the Schwid article that you testified about

7    on direct?

8    A.    Yes.

9    Q.    And it is published in the Journal of Neurology?

10   A.    Yes.

11   Q.    All right.  And that is one of the very well

12   respected journals in the field of neurology?

13   A.    Yes.

14   Q.    And it's peer reviewed?

15   A.    Yes.

16   Q.    And if you look at the bottom, it's a column on the

17   left.  It starts:  In 1994, 161 subjects with stable

18   deficits from MS participated in a multicenter double-blind

19   placebo-controlled parallel group study, taking 4-AP SR over

20   placebo for six weeks.

21              Do you see that?

22   A.    Yes.

23   Q.    Was that, the 161 patient study, the largest study of

24   4-AP in MS patients at that time?

25   A.    161 was the largest, yes.

Peroutka - cross

1    Q.      And if you go up to the conclusions -- strike that.

2    If you go up to, in the abstract, under background, the

3    second sentence.  I'm sorry.  Second sentence.  A previous

4    multicenter ...

5               A previous multicenter trial of 4-AP SR using

6    the Expanded Disability Status Scale as the primary outcome

7    was unable to establish clinical efficacy.

8    A.      Yes.

9    Q.      Do you agree with that statement?

10   A.      Using the EDSS scale.  But the problem with this

11   whole line here is that I have never seen this study.  I

12   haven't seen the data.  I haven't seen a reference to it.

13   There is no citation.  It is just the word of the first

14   author.  To assess the study, you have to look at the data,

15   what were the patients that got into it, how long were they

16   treated, what dose did they use.

17              So this is like saying, you know, something is

18   not good, but it doesn't tell you what the "something" is.

19   Q.      I'm a little confused.  You relied on some Goodman

20   abstracts, didn't you?

21   A.      That has data.

22   Q.      That has all the data that you just read off?

23   A.      Yes.  It has dose.  It has the measures they did.  It

24   has statistics.  It has the number of subjects.

25   Q.      Okay.  Let's look at what the Schwid article has.  It

Peroutka - cross

1   does identify it as 161 subjects; correct?

2   A.      Correct.

3   Q.      And that it was a multicenter study; correct?

4   A.      Correct.

5   Q.      And that it was double blind study?

6   A.      Correct.

7   Q.      And it was a placebo control?

8   A.      Right.

9   Q.      And it was a parallel group study?

10  A.      Correct.

11  Q.      And people were on 4-AP for six weeks; correct?

12  A.      What dose does it say?

13  Q.      Sir, I'm asking the questions.

14  A.      I'm sorry.

15  Q.      The subjects were on 4-AP for six weeks; correct?

16  A.      That's what it says.

17  Q.      And they used EDSS as the primary outcome measure?

18  A.      Yes.

19  Q.      So they identified the primary outcome measure;

20  correct?

21  A.      Yes.

22  Q.      And it says that the study was powered; right?

23  80 percent detect a difference between the improvement rate

24  of five percent in the placebo group and 20 percent in the

25  4-AP SR group; is that correct?

Peroutka - cross

1    A.      That is what it says.

2    Q.      And they also give results.  22 percent of patients

3    in the 4-AP SR group improved on the EDSS; correct?

4    A.      Yes.

5    Q.      And that it also says that the same percentage

6    improved in the placebo group; correct?

7    A.      Yes.

8    Q.      And that was are information presented in this well

9    respect peer-reviewed neurology journal in 1997?

10   A.      Yes.  It was information, not data.

11   Q.      Now, the EDSS include a walking component, doesn't

12   it?

13   A.      One subset, yes.

14   Q.      Now, it was also one of the most widely utilized

15   assessment instruments in MS; is that correct?

16   A.      Yes.

17   Q.      And it's been used, the EDSS has been used in a lot

18   of clinical trials; right?

19   A.      Yes.

20   Q.      At the time that the Schwid article was published,

21   reporting on the 161 patients study, you weren't conducting

22   MS research; is that correct?

23   A.      Correct.

24   Q.      And you weren't treating MS patients?

25   A.      Correct.

Peroutka - cross

1   Q.      And you weren't working or doing research with 4-AP;

2   right?

3   A.      Correct.

4   Q.      And why don't we take a look at JTX-001.  Go to the

5   next page.

6           It's the Masterson patent which I believe you

7   testified about.

8   A.      Right.

9   Q.      And if you look at the related U.S. application date,

10  right there, No. 62, you can see that it's the division of

11  an application filed on November 1st, 1991.

12  A.      Correct.

13  Q.      And on November 1st, 1991, you were not conducting MS

14  research; isn't that correct?

15  A.      Correct.

16  Q.      And you weren't treating MS patients at that time,

17  either?

18  A.      Correct.

19  Q.      And you weren't working with 4-AP?

20  A.      Correct.

21  Q.      And you weren't conducting research with sustained

22  release formulations at that time either; correct?

23  A.      It's possible but not specifically.

24  Q.      Why don't we look at JTX-002.

25          And you are familiar with this patent?

Peroutka - cross

1    A.    Yes.

2    Q.    And you can see under the provisional application

3    number there is a 2003 date and then there is also on the

4    very last line, an April 9th, 2004 date.  Do you see that?

5    A.    Correct.

6    Q.    In April of 2004, at that time, you were not

7    conducting MS research; isn't that true?

8    A.    Yes.

9    Q.    And you weren't treating MS patients at that time?

10   A.    Correct.

11   Q.    And you weren't conducting experiments with 4-AP;

12   correct?

13   A.    Correct.

14   Q.    And you haven't treated MS patients since 1990?

15   A.    Correct.

16   Q.    And from 1990 through at least around 2007, you

17   weren't involved in MS research?

18   A.    Correct.

19   Q.    I think you identified, and you had a slide of about

20   200-plus articles that you published?

21   A.    Correct.

22   Q.    And none of those relate to MS; isn't that correct?

23   A.    Correct.

24   Q.    And none of those relate to 4-AP; correct?

25   A.    Correct.

Peroutka - cross

1    Q.    And I believe you identified over 60 book chapters;

2    correct?

3    A.    Correct.

4    Q.    And none of those relate to MS?

5    A.    Correct.

6    Q.    And none of those relate to 4-AP?

7    A.    Correct.

8    Q.    And your CV identifies 137 abstracts; correct?

9    A.    Correct.

10   Q.    And none of those relate to MS; right?

11   A.    I don't believe so.

12   Q.    And none of them relate to 4-AP?

13   A.    Correct.

14   Q.    You have never prescribed 4-AP; is that correct?

15   A.    Correct.

16   Q.    And you have never prescribed Ampyra?

17   A.    Correct.

18   Q.    I believe you talked about and had a picture diagram

19   of the many different symptoms that MS can cause in

20   patients.  Those symptoms can vary over time, can't they,

21   within a single patient?

22   A.    Yes.

23   Q.    And that would include day-to-day variability; isn't

24   that correct?

25   A.    Sometimes, yes.

Peroutka - cross

1  Q.      And walking can vary day to day; correct?

2  A.      Sometimes, yes.

3  Q.      Walking speed can vary day to day?

4  A.      Sometimes, yes.

5  Q.      And I believe you had mentioned that 4-AP was a

6  potassium channel blocker?

7  A.      Correct.

8  Q.      And that 4-AP improves nerve conduction by blocking

9  potassium channels?

10  A.      Correct.

11  Q.      4-AP also causes seizures by blocking potassium

12  channels, doesn't it?

13  A.      In high doses, yes.

14  Q.      And that is the same mechanism of action that one was

15  hoping to use 4-AP in order to improve MS; correct?

16  A.      Possibly.  It's not clear at high doses if you are

17  getting other channel involvement or just one.  So it is

18  possible that it is in other sites at higher doses.

19  Q.      Can you take a look at JTX-89?  And this is an

20  article that you testified about which is, relates to the

21  use of 4-AP in some small patient studies with myasthenia

22  gravis; is that correct?

23  A.      Yes.  Yes.

24  Q.      Do you have the article?

25  A.      Yes.

Peroutka - cross

1    Q.      And this is one of the articles that you testified

2    about, the Murray article?

3    A.      Yes.

4    Q.      And myasthenia gravis, that is a form of muscular

5    disease; correct?

6    A.      Yes.

7    Q.      And MS is a central nervous disease?

8    A.      It's a neuroimmunological disease, I would call it.

9    Q.      But it is within the central nervous system, it is

10   not at the neuromuscular junction.

11   A.      Well, it effects the peripheral nervous system, too.

12   Q.      Has there been any 4-AP approved by the FDA for

13   treating myasthenia gravis?

14   A.      No.

15   Q.      And I believe you had testified that Murray had

16   established the long term safety of 4-AP?

17   A.      Well, he looked at patients out to ten months.

18   Q.      And if you look at the very last page, page 270, in

19   the conclusions.

20   A.      Okay.

21   Q.      At the very bottom, it says:  The central effects of

22   4-AP, especially seizures, limit its use.

23           Do you see that?

24   A.      Yes.

25   Q.      So Murray agreed that seizures limited the use of

1    4-AP?

2    A.    Yes, at certain doses.

3    Q.    And he wrote that?

4    A.    Correct.

5    Q.    If you turn to PDX-330.

6    A.    I'm sorry.  What number?

7    Q.    I'm sorry.  PTX-D-330?

8    A.    I have a different number system.

9    Q.    Just PTX-330.  Sorry.

10            THE COURT:  It's in the binder he handed you.

11            THE WITNESS:  The first one?

12            THE COURT:  No, the one that plaintiffs handed

13   you.

14            THE WITNESS:  I have got JTX numbers and I got

15   DTX, but I have 204 and 572.

16            MR. DiNAPOLI:  It's the second-to-last article,

17   I believe.

18            THE COURT:  It's about three or four tabs in the

19   back in my copy.

20            MR. DiNAPOLI:  Three tabs.  Excuse me.

21            THE WITNESS:  330?

22            MR. DiNAPOLI:  Are you looking at the cross

23   binder?  I'm sorry.  The binder that I handed you.

24            THE WITNESS:  I thought so.

25            MR. DiNAPOLI:  It should say Peroutka cross on

Peroutka - cross

1     the front cover.

2                  THE COURT:  Do you want to help him out?

3                  MR. DiNAPOLI:  May I approach, Your Honor?

4                  THE COURT:  You may.

5                  MR. DiNAPOLI:  I may have handed you the wrong

6     binder.

7                  THE COURT:  PTX 330.

8                  THE WITNESS:  I got it now.  Sorry about that.

9     I had the wrong number.

10    BY MR. DiNAPOLI:

11    Q.    And is this one of the articles that you had

12    reviewed?

13    A.    Yes.

14    Q.    And this is an article that relates to the use of

15    4-AP in improving smooth muscle, the gain of the eyes,

16    smooth muscle pursuit of the eyes?

17    A.    I believe so, yes.

18    Q.    So it doesn't relate to walking; isn't that correct?

19    A.    I believe so, yes.

20    Q.    Do you want to go to the Polman article which is JTX

21    95.

22    A.    Okay.

23    Q.    This is one of the articles that you had testified

24    about?

25    A.    Yes.

Peroutka - cross

1   Q.      If you look at the conclusion that Dr. Polman reached

2   on the front cover it says although a substantial portion of

3   patients with multiple sclerosis seemed to benefit from

4   long-term administration of 4-aminopyridine, additional

5   studies are needed to clarify the exact value of the drug.

6   Do you see that?

7   A.      Yes.

8   Q.      Dr. Polman was recognizing that there was a need for

9   some additional studies?

10  A.      In order to clarify the exact value of the drug, yes.

11  Q.      I believe you had testified about doses at which the

12  art had seen seizures in people with MS?

13  A.      Yes.

14  Q.      Why don't you take a look at page 294.  If you look

15  under side effects.  And in particular, the first paragraph,

16  it says in one patient, a 54 year old woman who was treated

17  with 4-aminopyridine for the first time, a period of speech

18  arrest was followed by a generalized tonic-clonic epileptic

19  seizure on the second day of the 4-aminopyridine treatment.

20  Do you see that?

21  A.      Yes.

22  Q.      At that moment she had taken only two five milligram

23  capsules of 54 a-aminopyridine?

24  A.      Yes.

25  Q.      Here is a report of a woman after taking two five

Peroutka - cross

1    milligram capsules of 4-AP had a seizure?

2    A.    Yes.

3    Q.    And then if we turned to the page 295, on the third

4    patient, it says in a third patient, a 51 year old man who

5    had tolerated 4-AP well for three months during a previous

6    trial, a generalized tonic-clonic convulsion occurred after

7    18 months of 4-aminopyridine and 20 milligrams per day, do

8    you see that?

9    A.    Yes.

10   Q.    So 10 milligrams per day, but BID would be 20

11   milligrams a day; correct?

12   A.    Yes.

13   Q.    And here this 51 year old man had a seizure; correct?

14   A.    Correct.

15   Q.    If you turn to JTX 0028.

16   A.    Okay.

17   Q.    This is an article by Dr. Bever, I believe you

18   testified about?

19   A.    Yes.

20   Q.    And this article, there were eight patients tested in

21   this study; isn't that correct?

22   A.    Yes.

23   Q.    And Dr. Bever attempted to measure changes in

24   ambulation index; isn't that correct?

25   A.    I believe so, amongst other things.

Peroutka - cross

1    Q.      And ambulation index includes the timed 25-foot walk?

2    A.      I believe so.  I should double-check, but I believe

3    so.

4    Q.      And Dr. Bever saw no changes in the ambulation index;

5    is that correct?

6    A.      In the eight patient study, can we know the results

7    so I can refresh my mind?

8    Q.      If you turn to page, it has the lower 453 on the

9    lower right, and just above discussion.  It says no changes

10   were seen in AI or EDSS scores.  Data not given.

11   A.      I would like to see the data.  What did they use to

12   generate the data.  This is another example where a

13   statement can be made but I don't feel comfortable

14   concurring with it until I see the data.

15   Q.      Dr. Bever said he was going to test for it in the

16   ambulation index?

17   A.      Did he use .001 milligrams or a thousand milligrams?

18   Did he do it once a day or twice a day?  There is not enough

19   data to assess the statement.

20   Q.      Dr. Bever assessed his own results and reported there

21   were no changes seen in AI; right?

22   A.      That's correct.

23   Q.      That's his conclusion of his own data; right?

24   A.      Right.

25   Q.      And then if you turn to the last page of the

Peroutka - cross

1    document, 454, and in the upper left, there is a reference

2    to these studies suggest, do you see that?

3    A.       Not yet, but just a second.  Yes.

4    Q.       And if you look in the previous part of that

5    paragraph, you can see that these studies referring to the

6    Stefoski and Davis articles and the Jones article that you

7    had referred to; is that correct?

8    A.       Yes.

9    Q.       And what Dr. Bever concluded about the Stefoski,

10   Davis and Jones articles was that while the studies suggest

11   that 4-AP may induce improvements in specific neurological

12   deficits in MS, the studies were limited by questions about

13   blinding, failure to randomize treatment and failure to

14   either use prospectively defined neurological deficits or

15   adjust significance levels to compensate for multiple

16   comparisons, do you see that?

17   A.       Yes.

18   Q.       Those are criticisms that Dr. Bever had with the way

19   the Stefoski and Davis studies were run?

20   A.       I wouldn't use the word criticism, I would note that

21   they were limitations.

22   Q.       He commented on them?

23   A.       Yes.

24   Q.       And that's something that a person of skill in the

25   art would have been aware of?

Peroutka - cross

1    A.    Yes.

2    Q.    And I believe you had testified about table three and

3    how table three provides the pK data, pharmacokinetic data

4    for the 10 milligrams BID dose?

5    A.    Correct.

6    Q.    That is the information that appears in the patent

7    specification?

8    A.    It falls in the range of the patent specification.

9    Q.    So if I can understand this correctly, there is a

10   Caverage, steady state that says 20.8 for the 10 milligram

11   dose, Caverage steady state, the 10 milligram dose provided

12   an average of 20.8 plus or minus 5.7; is that correct?

13   A.    Correct.

14   Q.    If one wanted to give a higher average concentration

15   to the blood, for example, if one wanted a 31 nanogram per

16   milliliter average concentration in the blood, you would

17   need to give the 15 milligram dose; correct?

18   A.    Correct.

19   Q.    That's what's shown here in the next column?

20   A.    Correct.

21   Q.    And similarly if one wanted to give a 60 nanogram per

22   milliliter average per concentration, one would need to give

23   something bigger than 25 milligrams per dose; correct?

24   A.    Yes.

25   Q.    And that's what's shown in the right column?

Peroutka - cross

1    A.     No, it shows that at 25 you get 53.

2    Q.     53.

3           Let's go back to the Schwid article, which was

4    JTX 139.  If you go back to page 820 in the discussion

5    section.

6           THE COURT:  Is it not PTX 139?

7           MR. DiNAPOLI:  JTX 104.

8           THE COURT:  JTX 104.  Thank you.

9    BY MR. DiNAPOLI:

10   Q.     And if you go to the last page of the article under

11   discussion.

12   A.     Okay.

13   Q.     In the very bottom it says treatment appeared

14   particularly efficacious in subjects who achieved serum 4-AP

15   levels above 16 nanograms per milliliter with everyone

16   improving in time and gait testing, grip strength and five

17   of six improving by MVICT and their own subjective

18   assessment, do you see that?

19   A.     Yes.

20   Q.     If someone wanted to have a plasma concentration that

21   averaged 60 nanograms per milliliter, the Hayes article

22   would tell you you needed something bigger than 25

23   milligrams a day?

24   A.     We are going to have to spend more time on that if

25   you would like me to answer that.  Let me refresh myself.

Peroutka - cross

1  This is Schwid 97.  Can we go to the table to find where the

2  blood levels are in this.  Are they referring in this study

3  to blood levels that were drawn?  I'm trying to find the

4  actual data.

5  Q.     In which?

6  A.     Where does the 60 nanogram come from?

7  Q.     I want to know about the statement.  If your counsel

8  wants you to analyze the data, that's something they can do,

9  I'm on the clock.  I just want to ask you about the

10 statement that's in the discussion session which says it was

11 above 60 nanograms per milliliter that they appeared

12 particularly efficacious?

13 A.     It says that.

14 Q.     That's what it says.  As we already went through on

15 your analysis of the Hayes article, if you wanted to have an

16 average steady state concentration of greater -- of 60

17 nanograms per milliliter you would need 25 milligrams

18 tablets BID; right?

19 A.     No, because this paper used 17-and-a-half BID.  So in

20 this paper, 17-and-a-half gave them these levels.

21 Q.     Well, it doesn't necessarily say it gave those

22 levels, it said that it was particularly efficacious in

23 subjects who achieved those levels?

24 A.     Right, but they were using 17-and-a-half twice a day.

25 Q.     And some subjects could achieve above 60 and some

1   subjects would have achieved below 60; isn't that correct?

2   A.    Yes.

3   Q.    Not everybody gets the same level; right?

4   A.    It depends on the time you measure it, whether it's

5   at peak dose, there is variations.

6   Q.    If someone wanted to maintain an average state

7   concentration above 60, the Hayes article told you you

8   needed something above 25 milligrams?

9   A.    Correct.

10  Q.    Now, the Hayes articles that you had referred to,

11  they were two pK articles?

12  A.    Uh-huh.

13  Q.    Neither of those were testing MS patients; isn't that

14  correct?

15  A.    Correct, spinal cord injury, I think it was.

16  Q.    And they were not efficacy studies; is that correct?

17  A.    Not to my knowledge.

18  Q.    They were pharmacokinetic studies in spinal cord

19  injury patients?

20  A.    Correct.

21  Q.    Let's go to JTX 80A.  And if you look at the method

22  section.

23  A.    Okay.

24  Q.    Which I think on the second page is a little easier

25  to see.  On the first line it says the study was designed as

Peroutka - cross

1    a preliminary dose ranging study to assess safety and to

2    explore potential outcome measures for use in later trials.

3    Do you see that?

4    A.    Yes.

5    Q.    So the purpose of this study, one purpose was to

6    explore potential outcome measures for use in later trials?

7    A.    Correct.

8    Q.    If you look at the result summary down at the bottom.

9    Under fatigue, it says substantial improvements in fatigue

10   were seen in both dalfampridine and placebo treated groups,

11   it says overall there was a trend toward greater improvement

12   in the placebo treated group, do you see that?

13   A.    Correct.

14   Q.    What's that's saying is for AP, improved fatigue in

15   patients but that placebo in fact improved it better?

16   A.    A trend.

17   Q.    Greater improvement in placebo than on 4-AP?

18   A.    Yes.  Trend.

19   Q.    Now this study, the study reported on in the poster,

20   you understand that was a study conducted by Acorda?

21   A.    Well, in collaboration with academics.

22   Q.    Do you know that all of the data that Acorda

23   collected appears in this report?

24   A.    No.

25   Q.    I would assume that it doesn't appear in all the

Peroutka - cross

1    abstracts, all the data that Acorda collected; correct?

2              MR. PARK:  Objection, Your Honor.  Calls for

3    speculation.

4              THE COURT:  There is an objection.  Do you have

5    a response?

6              MR. DiNAPOLI:  I will ask a different question.

7    BY MR. DiNAPOLI:

8    Q.    You have 36 patients in this study; isn't that

9    correct?

10   A.    Yes.

11   Q.    And there were 25 patients on active, 4-AP, and there

12   were 11 patients on placebo; is that correct?

13   A.    Yes.

14   Q.    If we look at the dose response 25 foot walk, let me

15   pull it up on your -- why don't we stick with JTX 80A.  Pull

16   up the dose response, 25 foot walk.  You see what's reported

17   here along the left-hand side column is time in seconds.

18   And then along the bottom are visit periods, doses; is that

19   correct?  And then there is two lines recorded; correct?

20   A.    Correct.

21   Q.    One says all subjects and equals 25; correct?

22   A.    Correct.

23   Q.    And the other says completers and equals 20; isn't

24   that correct?

25   A.    Correct.

Peroutka - cross

1    Q.     And what's missing there are the 11 people who were

2    on placebo; is that correct?

3    A.     Correct.

4    Q.     And somebody looking at this chart wouldn't know how

5    the people on placebo responded to them?

6    A.     No.

7    Q.     In fact, we had already seen that in some instances,

8    placebo can respond better than the active ingredient

9    itself; correct?

10   A.     Correct.

11   Q.     The missing data could be that the placebo responded

12   better than what's depicted on this graph?

13            MR. PARK:  Same objection.

14            THE COURT:  Do you have a response?

15            MR. DiNAPOLI:  I'll withdraw the question.

16   BY MR. DiNAPOLI:

17   Q.     Without the placebo data you couldn't draw any

18   conclusions as to whether, in fact, the placebo responded

19   better than 4-AP in this dose response 25 foot walk;

20   correct?

21   A.     There is no placebo data to assess here.

22   Q.     It's absent?

23   A.     It's absent.

24   Q.     Sticking with that figure, if you look at the 20

25   milligram dose, I think you said roughly a little bit below

Peroutka - cross

1    14.  But if you look at the 40 milligram dose, it's closer

2    to 12, between 12 and 13; isn't that correct?

3    A.     Yes.

4    Q.     So it had, the 20 milligram dose was, in fact, to the

5    extent we could tell anything from this picture, showing a

6    bigger improvement; isn't that correct?

7    A.     Correct.

8    Q.     And there was also some conclusions that 20 to 40 was

9    safe, and that was one of the endpoints here, there was

10   safety and tolerability, and 20 and 40 were both considered

11   safe and tolerable in this study; is that correct?

12   A.     Correct.

13   Q.     So this study, this graph, if it was going to lead

14   you anywhere, was going to lead you to the 20 milligram

15   dose, correct?  Not the 10 milligram?

16   A.     No, because we know that side effects are dose

17   related, and I think they observe the seizure at 60 in this

18   study as well as 80.  So what is missing on this graph are

19   the error bars.  There is no mention of statistical

20   significance.  If 40 was truly significantly better than 20

21   a day, there is no mention of that.  And since the numbers

22   are bouncing around, it's not a consistent dose response by

23   any means.  This is the flat part of the dose response

24   curve.  So I would take the lowest effective dose.

25   Q.     And you mentioned that there is no evidence that 20

Peroutka - cross

1    is statistically significant better than 10; is that what

2    you are saying?

3    A.      Correct.

4    Q.      There is no evidence that any of these doses is

5    statistically significantly; isn't that correct?

6    A.      Their analysis was based on my understanding on a

7    composite of all the treated groups versus the baselines.

8    Q.      And was that analysis done on walking speed or on

9    timed 25 foot walk?

10   A.      Well, they're derivative values, meaning if you know

11   the time, you know the distance.  You can calculate the

12   speed.

13           So they measured the time.  They knew 25 feet.

14   Speed equals distance divided by time, right?  Miles per

15   hour.  So feet per second is speed, but the actual values

16   that calculate speed are shown in the graph.  So the graph

17   doesn't say speed but it's a calculable value from the data.

18   Q.      Is it hypothetically possible that there could have

19   been statistical significance on speed, but not on time?

20           MR. PARK:  Objection, Your Honor.  Speculation.

21           THE COURT:  Do you want to respond?

22           MR. DiNAPOLI:  I'm asking an expert a

23   hypothetical.

24           THE COURT:  I'll allow the answer.  The

25   objection is overruled.  Go ahead.

Peroutka - cross

1   BY THE WITNESS:

2   A.     I would have to answer as a biostatistician.  It

3   would seem not because you are dividing by a variable.  It

4   depends on the standard deviations of the statistical test

5   you would use perhaps.

6   Q.     So you would be surprised by that result, right?

7   A.     Again, I'd have to look at all the data and see what

8   the data are.

9   Q.     Why don't you take a look at JTX-001, which is the

10  Masterson patent that you testified about.

11  A.     Okay.

12  Q.     And if we look at column 13, down at the very bottom.

13  It says "in one embodiment."  There you go.

14         In one embodiment, the medicament is

15  administered to a subject at a dose and for a period

16  sufficient to allow said subject to tolerate said dose

17  without showing any adverse effects and thereafter

18  increasing the dose of said active agent at selected

19  intervals of time until a therapeutic dose is reached.

20         Do you see that?

21  A.     Yes.

22  Q.     And that is talking about a dose titration that we

23  had mentioned before; is that correct?

24  A.     Yes.

25  Q.     And some drugs are, in fact, titrated; isn't that

Peroutka - cross

1    true?

2    A.      Correct.

3    Q.      Some pain medications that I think have you worked on

4    have been titrated; is that correct?

5    A.      Correct.

6    Q.      And those are commercially available drugs?

7    A.      Correct.

8    Q.      Why don't you go to PTX-0003.

9    A.      (Witness complies.)

10   Q.      And, in particular, column 17, which shows Example 5.

11   And just for the record, JTX-0003 is the '437 patent that

12   you testified about.

13   A.      Okay.

14   Q.      And if you look at Example 5, it says that, this

15   example provides an embodiment of a method of treating

16   subjects with a substantial -- a sustained release

17   fampridine formulation and a responder analysis of the

18   present invention.

19           And then it describes the study, doesn't it?

20   A.      It describes a study we haven't discussed.

21   Q.      Correct.  And it describes that study as a Phase II

22   double-blind placebo-controlled parallel group 20 week

23   study; is that correct?

24   A.      Correct.

25   Q.      It was in 206 subjects?

Peroutka - cross

1   A.      That's what it says.

2   Q.      And in April of 2004, that would have been the

3   largest clinical study of 4-AP in MS patients; isn't that

4   true?

5   A.      I believe so.

6   Q.      And if you continue reading, it says that the study

7   was designed to investigate the safety and efficacy of three

8   dose levels of fampridine, 10 milligrams BID, 15 milligrams

9   BID and 20 milligrams BID.

10          Do you see that?

11  A.      Yes.

12  Q.      So this study was specifically designed to

13  investigate the efficacy of 10 milligrams BID; isn't that

14  correct?  And other doses?

15  A.      And other doses, yes.

16  Q.      It also defines the primary endpoint that was tested,

17  doesn't it?

18  A.      Correct.

19  Q.      And that the primary efficacy endpoint was an

20  increase relative to baseline in walking speed on the timed

21  25 foot walk.  So the primary efficacy endpoint was

22  expressly designed in this study.

23  A.      Correct.

24  Q.      I think you said that 4-AP is a molecule that has

25  been around for over 100 years.

Peroutka - redirect

1    A.       Correct.

2    Q.       But you would agree with me Ampyra is the first FDA

3    approved use of 4-AP; isn't that correct?

4    A.       Correct.

5    Q.       And it's the only approved use by the FDA of 4-AP,

6    correct?

7    A.       Correct.

8    Q.       And Ampyra is also the first and only FDA approved

9    drug to improve walking in people with MS; isn't that

10   correct?

11   A.       For that specific indication.  You could say

12   anti-spasticity helps people, too, but that isn't specific

13   to walking.

14              MR. DiNAPOLI:  I have nothing further, Your

15   Honor.

16              THE COURT:  Is there any redirect?

17                    REDIRECT EXAMINATION

18   BY MR. PARK:

19   Q.       Dr. Peroutka, you were shown the specification of

20   certain Ampyra patents.  In your understanding, do the

21   claims control the scope of the patent or certain

22   embodiments in the specification?

23   A.       The claims.

24   Q.       Now, you were also shown a number of studies.  And

25   there were some comments or I believe opposing counsel said

Peroutka - redirect

1    criticisms of those studies.  Now, in your view, are there

2    limits on all studies?

3    A.    Yes.  I mean I don't like the term "criticisms"

4    because in a sense, there is no such thing as a perfect

5    study.  You know, studies are all subject to investigator

6    bias, number of subjects, statistical analyses, statistical

7    issues.  And as time has gone on, it has become common in

8    the paper to always quote what you feel as the author as the

9    limitation.  So it has become sort of a common practice in

10   journal articles.

11   Q.    And just because there are certain limitations within

12   the study, does that limit the teachings or suggestions that

13   a POSA could take away from the reference?

14   A.    No, it is taken into consideration.  And depending

15   on what you want, in terms of clinical medicine, there is a

16   concept called class A evidence of, this is considered a

17   randomized controlled study.  It has been replicated twice,

18   similar to FDA approval requirements.

19          And yet there is additional evidence:  Single

20   case reports can teach you things, uncontrolled studies,

21   non-blinded studies.  So you can learn from all studies.

22   It's just a question of relative value.

23   Q.    Now, you were asked a few questions about an

24   unpublished study from 1994 that was referenced in the

25   Schwid paper.

Peroutka - redirect

1    A.      Yes.

2    Q.      Now, was that a study that Schwid was reporting on

3    primarily on his paper?

4    A.      Well, first off, you said reference.  I would change

5    the word, it wasn't reference.  There was no actual

6    reference in the reference section to it.

7              I have to tell you my experience, 30 some years,

8    I have never seen anything like it.  I don't know who did

9    this study.  He doesn't even make clear who were the authors

10   of this study, where was this study done.  It was just

11   something in the introduction.  It was sort of an

12   introductory comment.  And, quite honestly, I'm surprised it

13   got in there because most reviewers would not have allowed

14   that.

15             But as I mentioned to Mr. DiNapoli, I don't know

16   the dose that was used.  I don't know the severity of the

17   patients.  Were these bed-ridden severe MS patients that

18   they were trying to dramatically improve, or were these very

19   mild cases?  Were these people that had MS for the last

20   3 months, or was it 20 years of symptoms?

21             So I really can't assess it.  So it is an

22   outlier, quite frankly.  That reference in that paper, I

23   have never seen anything like that before.  And I can't

24   assess it given the fact that there is not enough

25   information to assess.

Peroutka - redirect

1    Q.    Now, that, quote-unquote, "published study," that was

2    from 1994; right?

3    A.    That's what it says.  We can't confirm that.

4    Q.    From 1994 to 2004, were there other studies that you

5    relied on to make your conclusion about the Acorda patents?

6    A.    Yes, multiple.

7            MR. PARK:  Now, Jeremy, let's pull up JTX-62.

8    The Goodman study.

9            THE WITNESS:  That's not it.

10           MR. PARK:  The lower right-hand corner.

11           THE WITNESS:  Lower right.

12           MR. PARK:  Then going on to the next page.

13           Okay.  Let's go to the next page.

14   BY MR. PARK:

15   Q.    Okay.  Dr. Peroutka, you were asked a few questions

16   about the placebo effect of the Goodman study; correct?

17   A.    Yes.

18   Q.    Okay.  Now, did the Goodman abstract say anything

19   about the statistical significance of the actual results

20   that they saw compared to the placebo effect?

21   A.    Yes.  They had the P values in there.  If we can blow

22   up and highlight that?  That is sort of the middle.

23           The fampridine SR group showed statistically

24   significant improvement from baseline compared to placebo in

25   functional measures of mobility, timed 25 walking speed, and

Peroutka - redirect

1    lower extremity strength.

2    Q.    And the Goodman poster that counsel asked you about,

3    that was the poster that was associated with this abstract;

4    correct?

5    A.    Yes, right.

6    Q.    So did you evaluate the data from the abstract and

7    poster in making your conclusion?

8    A.    Yes.

9    Q.    Lastly, I believe you were asked about the Hayes

10   study, the pharmacokinetic values?

11   A.    Yes.

12   Q.    So that was a study done on spinal cord injury

13   patients; correct?

14   A.    Correct.

15   Q.    If they had been done on multiple sclerosis patients,

16   would you have expected that the pharmacokinetic values

17   would change?

18   A.    Yes.  There is no reason to suspect that spinal cord

19   injury would alter drug pharmacokinetics.

20   Q.    Did you mean to say, no, that it wouldn't change the

21   values?

22   A.    Yes, and there is no reason to expect a difference.

23   Q.    And --

24   A.    I'm sorry.  I may have answered your question but

25   there should not be a difference between patient subgroups

1    because as far as we know, spinal cord injury and MS would

2    not effect, having those diseases should not affect

3    pharmacokinetic parameters.

4                MR. PARK:  Thank you, Your Honor.

5                Thank you.

6                THE COURT:  Thank you.

7                Doctor, you may step down.  Thank you very much.

8                THE WITNESS:  Thank you.

9                THE COURT:  Defendants may call their next

10   witness.

11               MR. KLEIN:  Before we do anything else, what

12   does Your Honor want to do about --

13               THE COURT:  I'm sorry.

14               MR. KLEIN:  What does Your Honor want to do

15   about lunch?

16               THE COURT:  I would intend to go about another

17   hour and take a lunch break.

18               MR. SMITH:  Good afternoon, Your Honor.

19               THE COURT:  Good afternoon.

20               MR. SMITH:  My name is Reid Smith.  I'm from

21   Winston & Strawn representing Apotex, Roxane and Teva.  And

22   on behalf all defendants, we'd like to introduce testimony

23   by deposition designation at this time.

24               The parties have agreed, pursuant to the

25   provisions of the pretrial order, on designations and

1    counterdesignations which we will show by video.

2              The first video is in the deposition of

3    Dr. Michael Myers which took place on December 9th, 2015.

4              Michael Myers, as you may have seen today, was

5    one of the two listed inventors on the Elan patent.  He was

6    also designated as Alkermes's 30(b)(6) witness on numerous

7    topics.

8              The total time will be 11 minutes, eight seconds

9    with eight minutes, 16 seconds allocated to defendants and

10   two minutes, 52 seconds allocated to plaintiffs.

11             For the convenience of the court and the

12   parties, I will note that Myers Deposition Exhibit 3

13   corresponds to Exhibit JTX-001, which has already been

14   introduced, and is mentioned in the designated portion of

15   Mr. Meyers's deposition designation.

16             For the Court's convenience, we have binders

17   with the designated testimony.  May I approach?

18             THE COURT:  You may.  And do you have one for

19   the court reporter as well?

20             You do.

21             (Binders passed forward.)

22             THE COURT:  All right.

23             MR. SMITH:  We have one for the clerk, too.

24             THE COURT:  Great.  Thank you.

25             And when you are ready, you may start the video.

Myers - designations

1            (Michael Myers designations placed in record.)

2            "Question:  What's your full name?

3            "Answer:  Michael Myers.

4            "Question:  Okay.  Let's take them one at a

5       time.  So you were at Elan Pharmaceuticals from '87 to '95?

6            "Answer:  Yes.

7            "Question:  Let's take a look at the '938

8       patent.

9            "I trust you're familiar with this document?

10           "Answer:  Yes.

11           "Question:  Okay.  You are one of the listed

12      inventors; is that right?

13           "Answer:  Yes, I am.

14           "Question:  So, generally speaking, can you

15      explain your role in connection with this patent?

16           "Answer:  Yes.  So I developed the formulations

17      using Elan's technologies.  The idea was to come up with a

18      long-acting dosage form for 4-aminopyridine.

19           "Question:  And Dr. Masterson, what was his role

20      generally?

21           "Answer:  Well, he dealt with the medical

22      aspects primarily, the rationale for using the drug in that

23      clinical setting, et cetera.

24           "Question:  And what do you recall about first

25      getting involved in this project?

Myers - designations

1            "Answer:  I recall being told by my boss that we

2    had a new project and that we were to work to develop

3    twice-a-day formulation of this, of this drug.

4            "Question:  Who was your boss?

5            "Answer:  At that time when it came in, I

6    believe it was John Devane.

7            "Question:  And to the best of your

8    recollection, what were you asked to do?

9            "Answer:  I was asked to develop twice-daily

10   formulation of 4-aminopyridine that will give the

11   flexibility to tailor the dose to individual patients in

12   each case.

13           "Question:  Did you have any prior experience

14   with 4-AP?

15           "Answer:  No.

16           "Question:  And so what did you do to

17   familiarize yourself with 4-AP?

18           "Answer:  Well, I studied the drug's physical

19   chemical properties, familiarized myself with the extent of

20   the challenge.

21           "Question:  Did you look at the literature?

22           "Answer:  I looked at some, some literature.

23   There wasn't much available that was relevant to what I was

24   attempting to do.

25           "Question:  Roughly what time period is this?

1          "Answer:  This was sometime in 1991, I believe.

2          "Question:  Were you given any materials about

3     4-AP?

4          "Answer:  There was some basic information but

5     not that much.

6          "Question:  Like the chemical information?

7          "Answer:  Yes.

8          "Question:  Okay.  Did you study controlled

9     release in school?

10         "Answer:  No.

11         "Question:  So it's an on-the-job training type

12    of thing?

13         "Answer:  Yes.  Controlled release at that point

14    in time was very much in its infancy.  It was a very new

15    concept, and there were just a couple of companies working

16    in that space at the time.  And I happened to be one of

17    them.  So there wasn't any database established that I could

18    study.

19         "Question:  Did you take any courses in -- after

20    your Ph.D. in controlled release to get familiar with the

21    technology?

22         "Answer:  Elan sent me to a number of courses

23    and conferences, yes.

24         "Question:  What types of courses and

25    conferences?

Myers - designations

1      "Answer:  It was mainly on the new materials

2    being developed to help facilitate the development of

3    controlled release products, new polymer systems, new

4    equipment that was being developed.  It was a period of very

5    rapid innovation.

6      "Question:  Was there an organization that

7    sponsored these courses and conferences?

8      "Answer:  There was an organization called

9    Controlled Release Society.

10      "Question:  Did you review any publications to

11    get familiar with the technology?

12      "Well, I'm talking about, just to clarify,

13    before you started getting involved with 4-AP?

14      "Answer:  Yes.

15      "Question:  Okay.  Do you recall anything else

16    you did to get familiar with the controlled release

17    technology before getting involved with the 4-AP project?

18      "Answer:  Yeah.  I spent a lot of time

19    familiarizing myself with the materials that were being

20    developed and new polymer systems and also new equipment.  I

21    visited a lot of equipment manufacturers to see if there

22    were more efficient ways of developing the formulations and

23    coming up with faster methodology, et cetera.

24      "Question:  Did you look at any patents,

25    controlled release patents?

Myers - designations

1          "Answer:  Yes.  There were a number of patents

2    that I reviewed.

3          "Question:  Okay.  So basically when you learned

4    on the job, there wasn't someone who was teaching you how to

5    do it?  You were learning it through outside sources; is

6    that fair?

7          "Answer:  Well, through my own resources and

8    throughout outside sources.  As I said, this was all very

9    new, and it was changing very rapidly.  So I was trying to

10   stay ahead of it.

11         "Question:  Okay.  So Dr. Devane came to you

12   about the 4-AP project, and how did you start the project?

13   What did you did?

14         "Answer:  So as I said, I looked at the drug's

15   physical chemical properties, how soluble it was, were there

16   any other issues that I needed to take into consideration.

17   Decided on the technology approach.  Elan had a number of

18   drug-delivery technology platforms.  I decided on the one

19   that I felt was most appropriate for that drug and the

20   targets that we were trying achieve and initiated the

21   formulation activities.

22         "Question:  All right.  And did you -- you said

23   you looked for issues with the properties.  Were there any

24   issues?

25         "Answer:  Well, the drug was very soluble, which

Myers - designations

1   increases the extent of the challenge for the formulator.

2           "Question:  So did you then test it, test the

3   formulation?

4           "Answer:  Yes.  So the process was we would

5   develop a number of formulations, test them in the

6   laboratory, assess the results.  Based on the results, make

7   some decisions about changing the ratio of the polymers or

8   the type of polymer or whatever under the changes I felt

9   would benefit the product.

10          "Question:  Can you give me a ballpark?

11          "Answer:  25, 30.

12          "Question:  I got you.  Initially, before you

13  tested anything, how many formulations did you study?

14          "Answer:  Three or four.

15          "Question:  And how long did it come -- did it

16  take to come up with the ingredients for the formulation,

17  you know, come up with the paper formulation, if you will?

18          "Answer:  I guess that took me a few weeks

19  initially.

20          "Question:  For the three or four or for each

21  one?

22          "Answer:  No.  Combined.

23          "Question:  So it took about three or four weeks

24  to put on paper about three or four formulations, and then

25  about a day to actually physically make it; is that right?

Myers - designations

1               "Answer:  Yes.

2               "Question:  And then the next step is to test

3       them?

4               "Answer:  So it went to the lab for primarily

5       for dissolution testing where we would assess the release

6       characteristics of the formulations.

7               "Question:  Now, initially why is it that Elan

8       was interested in a sustained release product for the 4-AP

9       project?

10              "Answer:  I don't know.

11              "Question:  So you were just asked to come up

12      with a sustained -- twice-daily sustained release, you don't

13      know why?

14              "Answer:  I don't know why Elan was initially

15      interested in it.  I don't know what the target was but --

16      yeah.

17              "Question:  So -- and I'm blanking.  Did

18      Dr. Devane, that was your boss?

19              "Answer:  Uh-huh.

20              "Question:  Did he ever explain to you why Elan

21      was looking into twice-a -- twice-daily tablet for capsule,

22      tablet?

23              "Answer:  He explained that the four times a day

24      formulation or the immediate release formulation caused some

25      side effects for patients; and that if we developed

Myers - designations

1    controlled release formulation, that we could potentially

2    reduce or eliminate some of those side effects.

3              "Question:  Okay.  You certainly didn't invent

4    4-AP; right?

5              "Answer:  The molecule itself?

6              "Question:  Correct.

7              "Answer:  No.

8          And you did not invent the use of 4-AP to treat

9    neurological diseases; is that fair?

10             "Answer:  I did not.

11             "Question:  Okay.  And Dr. Masterson didn't

12   invent that either; correct?

13             "Answer:  I don't know for sure.  I suspect not,

14   but I don't know for sure.

15             "Question:  Let me ask you, so if you take a

16   look at the first page of Exhibit 3, this is the '938

17   patent.

18             "Answer:  Yes.

19             "Question:  So if you go to column two, line

20   eight, so you see there are line numbers going down the

21   columns?

22             "Answer:  Uh-huh.

23             "Question:  Okay.  Here there's a paragraph that

24   says, "In the use of."  Do you see that?

25             "Answer:  I do.

Myers - designations

1        "Question:  So the patent here says, "In the use

2    of a drug for long-term therapy, it is desirable that the

3    drug be formulated so that it is suitable for once or twice

4    daily administration to aid patient compliance."

5        "Was that your understanding when you began

6    working on the 4-AP project?

7        "Answer:  That was the general understanding

8    that we had in Elan that we could improve patient compliance

9    by reducing the frequency of medications that have to be

10   taken from four times a day, three times a day, to once or

11   twice a day.  It wasn't specific to 4-AP.

12       "Question:  Okay.  And how does that aid patient

13   compliance?

14       "Answer:  Well, the belief is that by reducing

15   the number of doses, you reduce the chance of a patient is

16   going to skip a dose.

17       "Question:  And with regard to the 4-AP project,

18   you mentioned issues with regard to solubility and

19   stability.  Were there any other issues that you recall

20   addressing during that project?

21       "Answer:  Well, the does was quite low; and that

22   also did increase the challenge, particularly from a tablet

23   standpoint.

24       "Question:  What does did you use?

25       "Answer:  We tested a number of doses.  We made

Fogarty - designations

1   7.5, 10, 12-and-a-half.  We tested a whole range of

2   different doses.

3                    (End of designations. )

4                    MR. SMITH:  Your Honor, the next deposition clip

5   we will show is from the deposition of Mairead Fogarty.

6   Ms. Fogarty was designated by Alkermes.  The total time was

7   five minutes and 26 seconds of which five minutes and 12

8   seconds will be allocated to defendants and the remaining 13

9   seconds will be allocated to plaintiffs.

10                   I will note that Exhibit JTX 0054 is mentioned

11  in the designated portion of Ms. Fogarty's deposition and is

12  provided in the binders.

13                   THE COURT:  Okay.  Thank you.

14                   (Videotape designations of Mairead Fogarty.)

15                   "Question:  May I ask you to please say and

16  spell your name for the record?

17                   "Answer:  Mairead Fogarty, M-a-i-r-e-a-d,

18  F-o-g-a-r-t-y.

19                   "Question:  Okay.  And you are currently

20  employed by Alkermes; is that correct?

21                   "Answer:  That's correct.

22                   "Question:  You reside in Ireland?

23                   "Answer:  In Ireland, yes.

24                   "Question:  So the question I really want to

25  know is, do you recall what the date of the Rush Elan

Fogarty - designations

1    agreement was?  And I'm not talking about the specific date,

2    but just a year.  Was it 1990?

3                "Answer:  I believe so.

4                "Question:  And was part of the reason that Elan

5    entered into this agreement with Rush Presbyterian for the

6    development of drug formulations with 4-aminopyridine as the

7    active pharmaceutical ingredient?

8                "Answer:  It's my understanding that there was a

9    molecule that had shown promise and that Rush Pharmaceutical

10   hadn't done anything in terms of formulating, and there were

11   some issues that perhaps could be resolved by some of the

12   formulation expertise that Elan brought to the table.  I'm

13   assuming here, but I'm assuming it was both the compound and

14   its uses and the fact that we could bring the formulation

15   expertise to make a better product or product.

16               "Question:  And in terms of the expertise that

17   Elan was bringing, that was the experience as you've

18   discussed with formulating sustained release versions of

19   several different drugs; right?

20               "Answer:  Yes.  Sustained release or, you know,

21   various types of dosage forms or whatever technology the

22   product needed in terms of giving the required performance

23   in people.

24               "Question:  By 1990, Elan was one of the leading

25   companies in terms of sustained release formulations; is

1   that correct?

2            "Answer:  It was up there in terms of sustained

3   release formulations, yes.

4            "Question:  Let me ask you now -- you can set

5   the prescribing information aside.  And please take a look

6   at the document that's been marked as Exhibit 16, which is a

7   document apparently entitled, "formulation development", and

8   it bears the Bates raining ALK_00033057 through 33078.

9            Is this a document that you've seen before?

10           "Answer:  Yes, I've seen the content before.

11           "Question:  And so just to summarize, this

12   document provides a summary of the history of the

13   development of fampridine or 4-aminopyridine at Elan and

14   Alkermes; right?

15           "Answer:  It's a summary of information.  I'm

16   not sure if it's a complete summary, but it is -- it is a

17   summary of.

18           "Question:  So just going through some sections

19   of the formulation development summary 2.1, on the front

20   page, it indicates that there were two variations of an

21   immediate release IR capsule formulation in the second

22   paragraph.

23           "Do you see that?

24           "Answer:  Yes.

25           "Question:  Do you recall what those two

Fogarty - designations

1    variations of an IR formulation -- capsule formulation for

2    4-aminopyridine were?

3             "Answer:  This is based on my own recollection,

4    and I think it was powder in a capsule, you know, mostly

5    drug, maybe some other excipients, but powder in a capsule.

6    And I think the second formulation was IR beads in a

7    capsule.

8             "Question:  Okay.

9             "Answer:  That's the recollection I have.

10            "Question:  Yes.  And the second sentence in

11   that second paragraph states, "Due to the potential for

12   plasma peek related adverse events associated with

13   fampridine, Elan subsequently embarked upon developing a

14   sustained release (SR)formulation."

15            "Does that kind of summarize the reason why Elan

16   decided to develop a sustained release formulation of

17   4-aminopyridine?

18            "Answer:  Yes.

19            (End of designations.)

20            MR. SMITH:  Your Honor, the next deposition clip

21   we will show is from a deposition of Dr. Andrew Blight which

22   took place on December 3rd and 4th of 2015.  Dr. Blight as

23   you may have seen today was one of the two listed inventors

24   on the Acorda patent.  He was also designated as Acorda's

25   30(b)(6) witness on numerous topics.

Blight - designations

1    The total time is 10 minutes and 46 seconds with

2    8 minutes and 23 seconds allocated to the defendants, and

3    the remaining 2 minutes, 23 seconds allocated to plaintiffs.

4    I will note that two exhibits are mentioned in

5    the designated testimony, JTX 002 which has already been

6    admitted and DTX 020.

7    THE COURT:  Thank you.

8    (Videotape designations of Andrew Blight.)

9    "Question:  Good morning, Dr. Blight.  Could you

10   please state your name for the record?

11   "Answer:  Andrew Blight.

12   "Question:  Why did -- why did Acorda start

13   focusing on MS as well as spinal cord injury?

14   "Answer:  We studied spinal cord injury

15   originally.  We eventually took on the development in MS

16   that Elan had been pursuing, and we investigated both of

17   those in parallel; and it wasn't really until 2004, that the

18   spinal cord injury trials were not successful and the MS

19   studies appeared more promising that that really our focus

20   then was primarily on MS.  And it had been on spinal cord

21   injury up to that point because that was really the founding

22   interest of the company.

23   "Question:  So let's go back to the 1998 time

24   frame.  At what point did Acorda decide to look at the

25   sustained release formulation for 4-aminopyridine?

Blight - designations

1              "Answer:  I don't recall what time that was.

2              "Question:  Do you know if they had decided to

3      do a sustained release prior to 1998?

4              "Answer:  The interactions with Elan were before

5      1998.

6              "Question:  And at that time, was it your

7      understanding that Elan had been working on a sustained

8      release formulation?

9              "Answer:  Yes.

10             "Question:  Did Acorda do any separate work on

11     the sustained release formulations separate from the work

12     that Elan was doing?

13             "Answer:  No.

14             "Question:  Did Acorda do any work on the

15     sustained release formulation?

16             "Answer:  I'm not clear what you mean by "work."

17             "Question:  Did Acorda alter the sustained lease

18     formulation that Elan provided in any manner?

19             "Answer:  We did not do any formulation work;

20     no.

21             "Question:  So Acorda's work was focused on the

22     in vivo and in vitro in clinical trials?

23             "Answer:  Yes.

24             "Question:  Did Acorda have any -- any input

25     with respect to the development of the dalfampridine product

Blight - designations

1    at Elan?

2              "Answer:  Ultimately, yes.  We worked with their

3    team on the final qualification of the drug for approval.

4              "Question:  Did Acorda ask for a specific

5    dalfampridine product from Elan, or did they just take what

6    Elan had?

7              "Answer:  That's, again, very difficult to

8    answer in the sense that there was interaction back and

9    forth between the two companies on the formulation.

10             "Question:  Was there a reason Acorda looked at

11   sustained release formulations for dalfampridine?

12             "Answer:  It was -- it's not unusual to be

13   interested in sustained release for a drug which has a short

14   half life, which dalfampridine does.  It wasn't particularly

15   mysterious.

16             "Question:  I'm sorry, could you repeat that

17   last, it wasn't particularly...

18   A.    Mysterious.  It's a fairly standard approach to drug

19   development to have a sustained release form.  When you have

20   a short half life, there's a need for.

21             "Question:  And in the, in the 1990s, was this a

22   common approach for drugs that had a short half life?

23             "Answer:  I don't know.

24             "Question:  But you had heard of it?

25             "Answer:  Yes.

Blight - designations

1            "Question:  Stepping back from claim 1, with

2     respect to work done on 4-aminopyridine in MS patients, what

3     work did Dr. Cohen do in that development?

4            "Answer:  We worked together on the program from

5     the beginning.  So we worked as a team on this.

6            "Question:  Did either of you have any --

7     Withdraw that.

8            "Did either of you do any work on the sustained

9     release composition?

10           "Answer:  Do you mean formulation?

11           "Question:  Yes.

12           "Answer:  We are not formulation scientists.

13     No, we haven't.

14           "Question:  So the formulation of the sustained

15     release composition had already been done by someone else?

16           "Answer:  The formulation work was done outside,

17     yes.

18           "Question:  None of the formulators are named as

19     inventors on this patent; correct?

20           "Answer:  Correct.

21           "Question:  In deciding to go to the sustained

22     release formulation, did you ever consider how many doses

23     would be needed for an immediate release formulation as

24     opposed to a sustained release formulation?

25           "Answer:  It's not -- no.

1                "Question:  And why not?

2                "Answer:  It's not something we considered.

3                "Question:  You didn't consider an immediate

4      release formulation?

5                "Answer:  Not that I recall.

6                "Question:  Are you aware of any reasons to go

7      with an immediate release formulation?

8                "Answer:  There are advantages that I know of.

9                "Question:  Before the break, we were looking

10     at, I believe, the '826 patent.

11               "Answer:  Yes.

12               "Question:  And the sustained release

13     formulation, that was obtained from Elan; correct?

14               "Answer:  Yes.

15               "Question:  And the studies related to the

16     plasma concentration in MS patients, that study was

17     performed by Elan?

18               "Answer:  The ones that are in these examples,

19     yes.

20               "Question:  Was there prior studies that had

21     used 10 milligrams twice a day in patients as the initial

22     dose?

23               "Answer:  Yes.

24               "Question:  And did you consider those studies

25     in determining to start with 10 milligrams twice a day?

Blight - designations

1      "Answer:  At the time that these studies were

2   designed, all previous work would have been taken into

3   account, yes.

4         "Question:  And were you --

5         "Answer:  By Acorda.  By Acorda.

6         "Question:  And were you the person responsible

7   at Acorda for taking into consideration previous studies?

8         "Answer:  I would have been involved in that

9   decision, yes.

10        "Question:  And who else would have been

11  involved in consideration of those prior studies?

12        "Answer:  Primarily Ron.

13        "Question:  And when you say 'prior studies,'

14  are you referring to prior studies done by Acorda or prior

15  studies known in the field?

16        "Answer:  Both essentially.

17        "Question:  And underneath that with the dates

18  1987 to 1991, it refers to a series of studies in MS by

19  Stefoski and Davis relating to the effects of motor

20  function?

21        "Answer:  Yes.

22        "Question:  Were you aware of those studies?

23        "Answer:  Yes.

24        "Question:  And in your work with SCI in the

25  late 1980s and early 1990s, did you consider the work done

Blight - designations

1    by Stefoski and Davis?

2              "Answer:  Yes.

3              "Question:  And did you consider the work done

4    by them in your work on dalfampridine with respect to

5    multiple sclerosis after you joined Acorda?

6              "Answer:  Yes.  They were part of the history of

7    examining this molecule and demyelinating conditions.

8              "Question:  3273, yes.  This relates to a 1996

9    Schwid study.

10             "Are you aware of that study?

11             "Answer:  Yes.

12             "Question:  At the time you were working at

13   Acorda, were you aware of that study?

14             "Answer:  Yes.

15             "Question:  And that study included a

16   17.5 milligram twice-a-day dose?

17             "Answer:  That's the dose they used, yes.

18             "Question:  And in designing the clinical

19   studies at Acorda for dalfampridine in MS patients, did you

20   consider the Schwid 1996 reference?

21             "Answer:  The reference was useful in the sense

22   that it's sort of qualified that the timed walk as a way

23   to potentially measure very quantitatively the effects of

24   treatment on walking ability.  So it was useful in that

25   regard.

Blight - designations

1          "In the meantime, the 25-foot walk had already

2     been introduced and had superseded the methodology they

3     used, which I think was the 8 meter.  I'm not entirely sure.

4     Yes, 8 meter is what they had used.  But the principle of

5     methods are similar, so it was a useful guide to methodology

6     that could be used in a larger study.

7          "Question:  Did you -- have you ever attended

8     the ANA or the American Neurological Association

9     conferences?

10          "Answer:  Yes, frequently.  So I may have been

11     there, but I don't actually recall it.

12          "Question:  Are those conferences that are held

13     yearly?

14          "Answer:  Yes.

15          "Question:  And who goes to those conferences?

16          "Answer:  Neurologists.  So neurologists

17     throughout the country.  They have two major meetings a

18     year, the AN academy and the association, and many of them

19     go to both, but it's very well attended by neurologists.

20          "Question:  When you refer to neurologists, does

21     that include clinicians?

22          "Answer:  That is clinicians, yes.  It's

23     primarily a clinicians meeting.

24          "Question:  Would researchers specializing in

25     neurology go to this as well?

Blight - designations

1          "Answer:  Yes.

2          "Question:  Is the poster just on a wall, or is

3    there a specific time where people will present their

4    poster?

5          "Answer:  In scientific meetings, generally,

6    posters are displayed on boards.  They're out in the hall

7    somewhere.  And there's usually a set time at which posters

8    are available.

9          "Question:  And are they generally -- you said

10   that they are displayed on the wall.  Are they displayed on

11   the wall throughout the meeting?

12         "Answer:  Generally speaking, in scientific

13   meetings, posters are only displayed for part of a meeting

14   and there may be sequences that display different things.

15         "Question:  What is the purpose for displaying

16   them on a wall, to your understanding?

17         "Answer:  Posters are open for reading,

18   obviously.  They have to be somewhere.

19         "Question:  So they are available for the

20   neurologists to read them?

21         "Answer:  I mean, posters, generally speaking,

22   are available to be read.  There's no guarantee that anyone

23   will look at them.

24         "Question:  Were there any limitations on taking

25   notes at these type of conferences in your experience?

1          "Answer:  It's highly unlikely that anyone would

2     be prevented from taking notes at that scientific meeting.

3               (Designations end.)

4               MR. SMITH:  Your Honor, at this time, defendants

5     would like to enter into evidence the following exhibits

6     that were referenced in the designated testimony.

7               JTX-001, JTX-002, JTX-054, and DTX-020, all of

8     which are contained in your binder.

9               THE COURT:  Are there any objections?

10              MR. STIEFEL:  No objection, Your Honor.

11              THE COURT:  Those are all admitted.

12              (Above-listed exhibits are admitted into

13    evidence.)

14              MR. SMITH:  Thank you, Your Honor.

15              THE COURT:  Thank you.  You may call your next

16    witness.

17              MR. FLORENCE:  Good afternoon, Your Honor,

18    Robert Florence with the law firm of Parker Poe Adams

19    Bernstein.  I represent the Mylan defendant, Mylan

20    Pharmaceuticals Inc. in this case, and I will be handling

21    the direct examination of our next witness.

22              If I may, Your Honor, I expect our next witness

23    will be Dr. Arthur Kibbe.  I expect that his direct

24    examination will go somewhere north of an hour at least and

25    we need to do a counsel change here at the table.  I don't

```
 1    know if Your Honor wants to break for lunch now rather than

 2    truncate part of his direct, but we'll do whatever Your

 3    Honor wants.

 4              THE COURT:  Sure.  Let's do about a half hour of

 5    it, and then I will interrupt you and we'll take it a lunch

 6    break.

 7              ... ARTHUR HAMILTON KIBBE, having been first

 8    duly sworn, was examined and testified as follows ...

 9              THE COURT:  Good afternoon.  Welcome, Dr. Kibbe.

10              THE WITNESS:  Good afternoon.  How are you?

11              THE COURT:  Good.  Thank you.

12              You may approach with binders, if you have them,

13    when ready.

14              MR. FLORENCE:  Thank you, Your Honor.

15              (Pause.)

16              MR. FLORENCE:  I apologize, Your Honor.  Bear

17    with us.

18              THE COURT:  It's your time.  That's fine.

19              MR. FLORENCE:  I have copies for the Court.

20              THE COURT:  Yes.  Thank you.

21              MR. FLORENCE:  What is the best side for me?

22              (Binders passed forward.)

23              (Witness hits microphone.)

24              THE WITNESS:  I hate this thing.

25              THE COURT:  Are you okay?
```

Kibbe - direct

1            THE WITNESS:  Yes I'm fine.

2            THE COURT:  We can proceed whenever you are

3    ready.

4                    DIRECT EXAMINATION

5    BY MR. FLORENCE:

6    Q.    Dr. Kibbe, will you please state your full name for

7    the record.

8    A.    Yes.  My name is Arthur Hamilton Kibbe.  K-i-b-b-e.

9    Q.    And, Dr. Kibbe, you have been handed some witness

10   binders that we may refer to from time to time.  If you can

11   please turn to DTX-129 in your witness binder.

12   A.    Yes, I have it.

13   Q.    And what do you understand that document to be?

14   A.    It's my CV.

15   Q.    And have you prepared some demonstrative slides for

16   the Court today that pertain to information contained on

17   your CV?

18   A.    Yes, I have.

19   Q.    And, Dr. Kibbe, please explain for the Court what

20   degrees you hold?

21   A.    Yes.  I have a Bachelor's Degree in Pharmacy from

22   Columbia University which I obtained in 1966.

23            While I was matriculating there, I took elective

24   courses in pharmaceutical manufacturing because that was an

25   area of interest.

Kibbe - direct

1           I then went to the University of Florida and I

2    received a Master's Degree in Pharmaceutics, focusing on a

3    formulation development and pharmacokinetics having studied

4    with Ed Garrett about pharmacokinetics and with a gentlemen

5    named Reed Blythe who invented the spansules which is the

6    first sustained release product in 1955.

7           I got a small sabbatical.  The Government

8    thought I could be of service during Vietnam.

9           And I came back and finished up my

10   pharmacokinetics and pharmaceutics studies at the University

11   of Florida in 1973.  We worked on different dosage forms and

12   the science behind those dosage forms and pharmacokinetics

13   evaluation of dosing forms.

14          Then I went on and took my first position at the

15   University of Mississippi, Ol' Miss in Oxford, Mississippi.

16          There, there we go.  There, I was responsible

17   for training both undergraduate pharmacy students and

18   graduate students in pharmaceutics who all went on to become

19   formulators in industry, some of them rising to positions of

20   quite importance within the industry.  One of them owns a

21   pharmaceutical company that he started right outside of

22   Baltimore.

23          We trained them by teaching them how to do

24   formulation work, making either an immediate release or

25   controlled or delayed release formulation and then doing

Kibbe - direct

1    pharmacokinetics testing of those dosage forms.

2              I went from there -- and we're going to skip to

3    the next slide so we can keep it relatively chronological.

4              I was asked to take over the Development

5    Services at the National Institutes of Health.  We provided

6    services for all 13 institutes that were doing intramural

7    studies at the Bethesda facility.

8              And so we would develop dosage forms that

9    would be used for the first time in men or first time in

10   patients that they were testing.  So we did a lot of mostly

11   immediate release dosage forms, tablets and injectables but

12   occasionally we had to mimic sustained release dosage forms

13   for comparisons.

14             I went from there to a bioresearch laboratory.

15   Now, this is a contract research organization.  As such, it

16   did research for the entire pharmaceutical industry, both

17   United States, Canada, and Europe.  And we did work for

18   innovative companies, and we also did bioequivalency testing

19   for generic companies.

20             We did first time in man, which is what is

21   sometimes called ascending dose tolerance studies.  We give

22   another dose and another dose and another dose, and you look

23   at the side effect profiles.

24             At one point, we were doing ten human studies

25   a month.  And my responsibility was, indirect with our

Kibbe - direct

1    clients, to determine what protocols would best fit their

2    needs, establish the timeline for the studies, and then

3    review the results of those protocols.

4              Occasionally, I was able to give them advice

5    with dosage forms that they were developing.

6              I then took a position as Senior Director of

7    Professional and Scientific Affairs at the American

8    Pharmaceutical Association.

9              While there, I was introduced to a staff member

10   for Congressman Dingle who asked me to help the congressman.

11   They were investigating the FDA and its process for

12   approving drugs, and I served as a consultant to Congressman

13   Dingle while he was doing that investigation.

14             And then the Commissioner of the FDA asked me to

15   head up a three-man team to evaluate how they went about

16   their approval process.  And I did that and ended up with a

17   report that became called "the Kibbe report" for lack of a

18   better name.

19             I also went and taught at, I took a position

20   with another contract research organization after that.

21   While I was at ApHA, I got deeply involved with the Handbook

22   of Pharmaceutical Excipients.  That is a joint publication

23   of the ApHA and the Royal Society of Great Britain.

24             And I was on staff and part of the steering

25   committee for the second edition.  And when I left ApHA and

Kibbe - direct

1    took my current position at Wilkes, they asked me to do the

2    third edition, and I was Editor of Chief in that.

3              It's an internationally recognized reference

4    text, and it has information about excipients which are the

5    ingredients you use to make a dosage form other than the

6    active ingredient.

7              You could go to that and look at a monograph of

8    any one excipient, and it would tell you what it is

9    generally used for, how much of it is generally in a given

10   dosage form.  So it really represents a robust reference

11   text.

12             I have had a chance to be on editorial review

13   boards and peer review boards and I have been honored as a

14   fellow of the Academy of Pharmaceutical Research and

15   Science.  I currently am an emeritus professor which means I

16   got promoted to be retired, but I managed to keep an office

17   at Wilkes where I worked and I still teach pharmacokinetics

18   in the fall.

19             While I was at Wilkes I was the founding

20   faculty.  We started a pharmacy program there and it gave me

21   a chance to teach undergraduate pharmacy students.  And we

22   started a program on teaching BS and formulation and those

23   individuals ended up then working for the pharmaceutical

24   industry.

25             That gives you a thumbnail sketch of who I am.

Kibbe - direct

1    Q.    Dr. Kibbe, when did you start having involvement with

2    the Handbook of Pharmaceutical Excipients?

3    A.    The second year that I was at APHA, we started to

4    develop the second edition.  The first edition had been

5    published before I came there.

6    Q.    Do you recall what year that was?

7    A.    I can give you an estimate.  So that was '89.

8    Q.    And I apologize, Dr. Kibbe, if I missed it, but do

9    you still have involvement with the Handbook of

10   Pharmaceutical Excipients?

11   A.    Yes, I have been fortunate enough to keep current.  I

12   am on the steering committee and I authored 20 to 25

13   monographs within the book.

14   Q.    Dr. Kibbe, collectively how long have you been

15   involved with the development and formulation with

16   pharmaceutical dosage forms?

17   A.    I began my training on that almost 50 years ago, and

18   I have been using it as a teaching tool and involved in

19   doing exemplary sustained release products to teach people

20   how to do it and those people go off and work in industry

21   doing that, so 50 years.

22   Q.    How long have you been involved in the

23   pharmacokinetic evaluation of dosage forms?

24   A.    Those go hand in hand.  If you make a dosage form and

25   test it, you have to test it in vitro, most commonly at the

Kibbe - direct

1    dissolution study.  You also have to verify that it will

2    work as you expect it to work in your patient population.

3    You have to understand the pharmacokinetics, which describes

4    what happens when you administer the drug.

5              It's a system we call LADMER that covers what

6    happens to a dosage form when you administer it, the first

7    being the L, liberation, the drug comes out of the dosage

8    form.  Then it can be absorbed.  A drug stuck in a dosage

9    form can't be absorbed into the body, so it gets liberated

10   from the dosage form.

11             Then it gets absorbed across the membrane or

12   from the site of administration.  Then it gets into the

13   blood supply and gets distributed throughout the body, so

14   liberation, absorption, distribution, of the body acts on

15   drugs and sometimes it's metabolizing them, hence M,

16   sometimes it excretes them, E, but we also are expecting it

17   to have a response and that's R, and that's where LADMER

18   describes that whole process.

19             And we, my formulators in pharmacokinetic don't

20   care what the response is, we care about all the other

21   aspects.  And we care about them because we can control the

22   speed with which they happen.  And that's what our role is

23   in the process.

24   Q.    Thank you, Dr. Kibbe.

25             MR. FLORENCE:  At this time, the defendants

Kibbe - direct

1    tender Dr. Kibbe to the Court as an expert in the

2    development and evaluation of pharmaceutical dosage form

3    formulations including both immediate and sustained release

4    formulations and also an expert in pharmacokinetics.

5              THE COURT:  Any objection?

6              MR. STIEFEL:  No objection, Your Honor.

7              THE COURT:  So recognized.

8    BY MR. FLORENCE:

9    Q.    Dr. Kibbe, do you have an understanding of why you're

10   here today?

11   A.    I'm here to give my professional opinion about the

12   patents at issue in this case.

13   Q.    Do you have an understanding of which parents are at

14   issue?

15   A.    I have a demonstrative that lays out all the patients

16   at issue plus the claims that are asserted in this case.  So

17   they're all listed on this one chart.  The first patent, the

18   '938 patent happened well in advance of the others, and

19   we'll look at it independently.  But then we'll lump

20   together the other patents under the general Acorda patent

21   name because they have such similar essential

22   pharmacokinetic elements that we can deal with them all more

23   or less at the same time.

24   Q.    And Dr. Kibbe, were you present today earlier when

25   Dr. Peroutka testified?

Kibbe - direct

1    A.      Yes, I was.

2    Q.      And do you recall Dr. Peroutka referring to the '938

3    patent as the Elan patent?

4    A.      Yes.

5    Q.      So do you have an understanding that they're the same

6    thing?

7    A.      That is exactly the same patent that he was talking

8    about.

9    Q.      And Dr. Kibbe, you stated that you're here to opine

10   regarding the claims that have been asserted from the

11   patents in this case.  Do you have a demonstrative regarding

12   which claims of the '938 patent are at issue and your

13   understanding of those claims?

14   A.      Yes.  It's fairly similar to the one that

15   Dr. Peroutka used earlier.  So these are the claims of the

16   '938 that are asserted.  And that is claims 3 and 8, and

17   they both are dependent claims which means that to

18   understand what they really contain you have to understand

19   the independent claim from which they are asserted.

20           And so if you look at the statements, it's very

21   clear that claim 1 is a method for treating a neurological

22   disease.  And claim 3, which depends from 1, reduces the

23   breath of neurological diseases to multiple sclerosis.  That

24   is a dependent claim.

25           Then we also see that they are giving, a mono or

Kibbe - direct

1    di-aminopyridine as an active agent.  There, right in here,

2    it says.  Which claim 4, again, deduces the total number of

3    compounds that would fit in that to one, 4-aminopyridine, or

4    4-AP, and that's what we have been talking about all

5    morning, 4-AP.

6              Then it says to be administered as a sustained

7    release, to permit sustained release of said, there is no

8    restriction on what kind of sustained release and there are

9    lots of different platforms or ways of forming a sustained

10   release.  And that it can be therapeutically effective blood

11   levels over a 12 to 24 hour period.  Those are the elements

12   that we see in claim 1.  And claim 2, 3, and 8 as dependent

13   claims, and that's the asserted claims.

14   Q.    Dr. Kibbe, do you have an understanding that claim 8

15   where it says wherein the active agent is 4-aminopyridine,

16   that's also known as 4-AP?

17   A.    Yes.

18   Q.    Dr. Kibbe, have you provided an expert opinion in

19   this case related to the claims of the '938 patent that have

20   been asserted?

21   A.    Yes.  I believe they're obvious and based on the

22   literature and the prior art.

23   Q.    And do you have a chart to demonstrate that?

24   A.    Yes, I do.  So basically the '938 patent is obvious

25   to a person of skill in the art over the prior art because

Kibbe - direct

1    4-AP was an obvious drug to make and use as a sustained

2    release dosage form.  We're going to talk about references

3    that talk about the nature of 4-AP and the nature of the

4    condition you're treating and why it would be obvious to

5    someone to think that the best dosage form for that would be

6    sustained dose release dosage form.

7    Q.    And your opinion refers to a person of ordinary skill

8    in the art.  Have you provided an opinion as to the

9    qualifications as to who that individual would be?

10   A.    Yes, I have.  I put one in my declaration.  Basically

11   from my perspective as a formulator, you have to have

12   training in formulation and years of experience doing

13   formulation especially sustained release formulation, and an

14   understanding and appreciation of how to do pharmacokinetic

15   evaluations.

16   Q.    And Dr. Kibbe, are you aware of whether or not

17   plaintiff's experts in this case have also offered a

18   definition or qualification that they believe are

19   appropriate for a person of ordinary skill in the art?

20   A.    Yes, Dr. Fassihi has done that in his declaration.  I

21   disagree with Dr. Fassihi because he tried to incorporate

22   what I think are two distinct individuals, one a physician

23   who understands the therapeutic effectiveness of the active

24   pharmaceutical ingredient and a formulator who knows how to

25   take any active pharmaceutical ingredient and turning it

Kibbe - direct

1    into an effective dosage form or delivery system.

2    Q.    But Dr. Kibbe, would your opinions change if the

3    Court were to adopt plaintiff's?

4    A.    No, I agree with Dr. Peroutka that those two are

5    compatible with our understanding of what's going on.

6    Q.    Dr. Kibbe, you mentioned that the claims of the '938

7    patent are directed to methods of treatment with a sustained

8    release formulation of 4-AP; correct?

9    A.    That's correct.

10   Q.    What exactly -- we have heard a little bit about it

11   from Dr. Peroutka.  What do you understand a sustained

12   release formulation to be?

13   A.    Okay.  The oral solid dosage forms can be categorized

14   into three general types.  Immediate release which means

15   once it's ingested it releases the drug as rapid as possible

16   so you get an immediate absorption of drugs and an immediate

17   effect.  It's really important for drugs that are treating

18   an acute condition.  You have a migraine headache, you don't

19   want to wait around for results, you want quick results.

20         There is sustained release, which releases the

21   drug continuously over a long period of time to give you

22   have a more -- a broader level of drug over a longer period

23   of time.  This is especially useful for chronic medication.

24   We try to do this whenever possible when we're treating

25   chronic medication because we know they're going to be

Kibbe - direct

1    taking the drug multiple times and we don't want the effect

2    of the drug to wear off before they take the next dose.

3              The third type is a delayed release, and this

4    applies to drugs that are either irritating to the stomach

5    or acted on negatively by stomach acid.  What we do is we

6    use a coating, an enteric coating.  We have been making

7    enteric coated products since the 1800s and its job is to

8    get the drug to migrate throughout the stomach without being

9    released and then release the drug immediately.

10             The sustained release product, true sustained

11   release started to be developed in the '50s with Rudy Blythe

12   and his spansule which some of you, if you're old enough to

13   remember Contac, it was the first product on the market like

14   that.

15   Q.    Dr. Kibbe, have you prepared some demonstrative

16   slides that discuss sustained and immediate release

17   formulations?

18   A.    Yes, because Dr. Peroutka did this, we'll go through

19   it as quickly as possible.  It's a reinforcement.  If there

20   are questions that the Court has, we can answer them.  This

21   is just a stylized idea of what happens with an immediate

22   release.  You'll notice the upscale there are two doses on

23   this slide, the upscale is relatively fast, very vertical,

24   it reaches a maximum concentration in a very short period of

25   time.  This is really good if you have got a pain, you got a

Kibbe - direct

1    headache, you want relief.  But because it gets that high,

2    it starts to dissipate sooner, and it will drop down

3    rapidly.

4          Now, the next slide shows you what might look

5    like a sustained release.  Because the dosage form itself

6    now controls the first step in the LADMER system which is

7    the liberation of the drug from the dosage form, the drug is

8    being released from the dosage form gradually over a longer

9    period of time.  Hence the absorption is slower, it reaches

10   peek later, and then it dissipates slower.  And if we look

11   at the two together, you can see the dramatic difference.

12         Now, why is all this important?  Because we know

13   that practically every drug has a minimum effective

14   concentration and a level at which it might cause side

15   effects.  And if you'll note that the minimum concentration

16   here, with the immediate release, you would get onset quite

17   soon, but the duration of effect would not be long, and

18   because it only goes to where the levels drop, so this is

19   where it drops, and that would be the duration of effect.

20         With a sustained release, it starts off and

21   maybe it doesn't hit effective levels quite as quickly, but

22   because it's a sustained release, it has a much longer

23   duration of effect.  That makes it more convenient for the

24   patient to be able to take the drug twice a day and maintain

25   effectiveness, not having to take one sooner.

Kibbe - direct

1          The side effect profile can sometimes get into

2     the levels of drug after an immediate or rapid release.  So

3     we have drawn here, it says toxic, but it could be something

4     as simple as making you drowsy.  And we try to avoid side

5     effects if we can.  And there is a distinct advantage to

6     sustained release that it avoids side effects.  And we're

7     going to talk about the advantages and issues associated

8     with making sustained release in a second.

9     Q.    I have a couple of quick questions for you,

10    Dr. Kibbe.  Does the difference between the minimum

11    effective concentration and the toxic or side effect level

12    of a drug, does that vary by drug?

13    A.     Absolutely.  There are drugs which are almost

14    universally safe, in which case the toxic level would never

15    been reached.  And there are drugs that have toxicities that

16    are mild and those that have severe toxicity.  So for

17    instance, blood thinners, you have to dose very, very

18    carefully, because too low and you're not controlling the

19    clotting time; too high and you cause spontaneous bleeding.

20    That would be called a narrow therapeutic index drug.

21          Any drugs where the levels, the ratio of the

22    minimum effective concentration and the onset of side

23    effects of toxicity is close is a narrow therapeutic index

24    drug and we have to be more careful about how we dose those.

25    Q.     Are there other formulations of drugs that are more

Kibbe - direct

1    suitable for drugs that have a narrow index?

2    A.    Because of the nature of the sustained release, they

3    cause the drug to be absorbed gradually and they by

4    definition cause the peek levels of the drug to be lower

5    than an immediate release using the same amount of drug.

6    Q.    Thank you, Dr. Kibbe.  I believe you mentioned a

7    moment ago that there are some advantages that are unique to

8    sustained release formulations.  Can you elaborate on that?

9    A.    Well, we can go to some reference texts for sustained

10   release.  I have Remington which was this particular one was

11   published in 1985.  Remington has been with us a long time.

12   It was published by the Philadelphia College of Pharmacy,

13   and it was named after the gentleman who first published it,

14   Remington.  And it has -- it's kind of like the bible for

15   pharmaceutical manufacturing.  It has and describes all of

16   the various dosage forms, how they're made, examples and so

17   on.

18        Within this particular issue there is a chapter

19   on sustained release formulations, and it gives a table of

20   the advantages of sustained release formulations.  And there

21   are numerous ones.  There is another text that we referred

22   to which was Joe Robinson's text on sustained and controlled

23   release drug delivery system, that was published in 1978,

24   which means that there was sufficient information back in

25   '78 to justify a main treatise on just controlled release

Kibbe - direct

1    products.

2             So I want to go back to the table from Remington

3    now --

4    Q.    Before we discuss that table Dr. Kibbe, if we could

5    go back to the two reference slides.  So the Robinson text,

6    JTX 0079, is this a reference that you reviewed and relied

7    on for your opinions in this case?

8    A.    Yes, it's a great text.  I have it on the shelf on my

9    library at home.  You can't remember everything, I believe

10   Mark Twain said that the weakest ink is stronger than the

11   strongest memory.  If you want a reference you can go to,

12   you can always refresh your memory and get it right.

13   Q.    What about the Remington reference, JTX 82, is that a

14   reference you have relied upon to give your opinion?

15   A.    Yes, it is.  It's been the bible for us for years.

16   Q.    Let's go back to the advantages of sustained release.

17   A.    I think we talked a little bit about patient

18   compliance.  Imagine yourself being asked to take a tablet

19   four times a day at uniform time intervals, every six hours.

20   That means that you have to wake up in the middle of the

21   night to get the next dose, to get it because most people

22   sleep eight hours.  Now, if you're in the hospital that's

23   not a problem because the nurse will come by and wake you up

24   and give it to you.  If you want a patient to do that,

25   you're whistling in the wind.  That's not going to happen.

Kibbe - direct

1          So we know that the more consistent the patient

2     is in following the recommended dose and regimen, the better

3     the therapy will be.

4          We'll talk later about steady state, but if you

5     start changing the dose interval in a steady state, you

6     start getting much more fluctuation.  So the advantage of a

7     sustained release is you can have them take it twelve hours

8     apart.  And that's easy for patient.  If they get up in the

9     morning and they take it with breakfast at 7:30 and they

10    take it right after dinner at 7:30 and it doesn't interfere

11    with the rest of their working day.

12         That's really important.

13    Q.    Let's turn to the second advantage listed, employ

14    less total drug.  What do you understand that to be,

15    Dr. Kibbe?

16    A.    It's a mathematical certainty that if you go to

17    higher levels, you will lose drug quicker because the drug

18    is lost from the body as a fraction of the dose that's in

19    the body per unit time.  It's a first order process.

20         And so by having sustained release that go up

21    lower, they'll lose less drug over the course of therapy.

22    So you can maintain them with slightly lower dosages, so you

23    might be able to go from a 12 milligram four times a day to

24    a 20 milligram twice a day.

25         All right.  A couple of other items underneath

Kibbe - direct

1      that are equally important.

2                     Side effects.  We're always trying to control

3      side effects.

4                     If the drug is released all it once in the

5      stomach or the intestinal tract, it has a higher probability

6      of irritating the mucous membrane and causing local

7      irritation.

8                     If, however, it's released slowly like you have

9      with a sustained release, then less of it is presented to

10     the lumen, the mucous membrane at any one time, and you have

11     less irritation.

12                    Systemic side effects are a function of the

13     total amount that gets in and the highest concentration.

14     As we saw in that graph, the immediate release can sometimes

15     go above the side effects level.  So by using a sustained

16     release, you can reduce that.

17                    So those are real positives for the sustained

18     release.

19                    We improve efficiency in treatment.  That is all

20     a matter of getting the levels of the drug between the

21     minimum effective concentration and the toxic concentration

22     and keeping them there for the entire course of therapy.

23                    Now, remember that sustained release are only

24     useful for chronic medications, not immediate release

25     medications.

Kibbe - direct

1          You can improve the bioavailability.  If the

2     drug is poorly absorbed and you use a sustained release, you

3     spread the drug out over a longer section of the intestine.

4     That gives it a better chance of being absorbed because

5     diffusion from the lumen of the intestine to the blood

6     supply is a function of the surface area exposed to the

7     drug.  Okay?

8          And then there is some economic benefits that

9     can accrue to the manufacturer or the patent, depending on

10    how they work out.

11    Q.    I have one question.  When you were talking about

12    employing less total drug, if you end up needing less drug

13    over time with the sustained release formulation, how does

14    that effect the amount of drug and the dosage form that the

15    patient would have been taking versus immediate release?

16    A.    Okay.  Your real goal is to have the same amount of

17    drug in the body over a 24 hour period each day.  So if you

18    give immediate release 10 milligrams four times a day, that

19    is 40 milligrams.  If you give two 20 milligram tablets that

20    are sustained release, it's the same 40 milligrams.

21         And so invariably a dose, sustained release

22    dosage form will contain more active ingredient than its

23    immediate release counterpart, but the total exposure of the

24    patient will be the same or less with the sustained release

25    product.

Kibbe - direct

1   Q.    Besides the advantages that you have discussed here,

2   Dr. Kibbe, are there any additional considerations related

3   to the manufacture and use of sustained release formulations

4   that a person of ordinary skill in the art would take under

5   consideration?

6   A.    Yes.

7              THE COURT:  Let me interrupt you there.  I

8   suspected the answer is yes.

9              We'll hear the rest of that answer and the rest

10  of the presentation after we take a lunch break.  Let's aim

11  to start up a little after 2:00 o'clock.

12             We will be in recess.

13             MS. NOREIKA:  Your Honor, one question.  What

14  is your thinking about later in the day?  We just want to

15  make sure we have witnesses available for as long as need

16  be.

17             THE COURT:  Subject to anything that may be

18  waiting for me when I get back into my office, I was

19  planning to go to 6:00 o'clock today.  But if I hear that

20  there is something that will take me away, I'll let you know

21  as soon as I can.

22             MS. NOREIKA:  Thank you.

23             AFTERNOON SESSION, 2:05 p.m.

24             *     *     *

25             (Proceedings reconvened after recess.)

Kibbe - direct

1          THE COURT:  I think we're ready to continue.

2     BY MR. FLORENCE:

3     Q.     Dr. Kibbe, welcome back.

4     A.     Thank you.

5     Q.     I believe before we broke for lunch we were, I asked

6     you whether or not there were any additional considerations

7     related to the manufacture and use of sustained release

8     formulations, and you said yes, correct?

9     A.     Yes, there are.  There is a lot of standard testing

10    that is done in any dosage form development, compatibility

11    and stability testing, but there are some that I have

12    highlighted that might apply to sustained release in

13    products.  So we can go to that.

14    Q.     Do you have a demonstrative on that?

15    A.     Yes.

16    Q.     I see here you listed potential dose dumping as the

17    first consideration.  Can you explain to the Court what that

18    is, Dr. Kibbe?

19    A.     Because the sustained release dosage form would

20    contain approximately a double dose of the active

21    ingredient, if it fails to behave the way it is intended to

22    behave, we call that dose dumping, so if something goes

23    wrong with your product.

24          Now, during the development phase, you know that

25    is a concern, so you have to make sure that the formulation

Kibbe - direct

1    you design and manufacture is indeed capable of behaving the

2    way it is supposed to behave when you first make it and at

3    the end of its expiration date.

4    Q.    And how does that relate to sustained release

5    formulations in general?

6    A.    Well, every one of them has this potential, and

7    every one of them then was designed to avoid this potential

8    problem.

9    Q.    Next, you have potential patient misuse.  What is

10   that and how does it relate to your opinions?

11   A.    This usually is related to sustained release drugs

12   that are potentially abused or abused by patients.

13         So, for instance, when we made a sustained

14   release morphine, we had to consider what would happen if

15   the patient decided to chew it, grind it up, or could they

16   take it as an injectable when it was intended to be an oral

17   dose or something else.

18         This drug, although it has a reasonable amount

19   of potency, is for a patient who is well motivated to stick

20   to the dosage regimen designed.  They know they have serious

21   side effects that they condition.  And if they follow the

22   recommended dosage, they will get relief from those

23   conditions, and so they are really well motivated to use it

24   appropriately and not misuse it.

25   Q.    And what about in vitro and in vivo correlation, Dr.

Kibbe - direct

1    Kibbe?  What is that?

2    A.     When you make a drug for the first time, and then it

3    goes into clinical testing, you're going to test the drug in

4    the dosage form you are ultimately going to market.  But you

5    are not going to be able to market that whole batch for the

6    rest of the life expectancy for the tablet.  You have to

7    make additional batches, and you are not going to test each

8    batch in people.  You have to have an in vitro test that you

9    can use that is correlated with the in vivo test.  And so,

10   normally, we use a dissolution test and correlate it to the

11   blood level study that we do after we have designed the

12   product.

13          And so as you design the product, you come up

14   with what you think is a good dissolution platform rate of

15   release of the drug, liberation of the drug from the dosage

16   form in the in vitro test, and then you see if it correlates

17   with an in vivo bioequivalency or bioavailability test.

18          So that is something that is developed so that

19   you can, subsequent batches use the in vitro dissolution

20   test as a quality control test to make sure that each batch

21   that you made is behaving the same way.

22   Q.     Okay.  And you had testified that you will take your

23   dissolution test and match it up to a blood level study

24   after you designed your drug.  What if it doesn't match up?

25   A.     Well, then it usually is, the FDA has three ways of

Kibbe - direct

1    calculating an in vitro/in vivo correlation.  There is the

2    most rigorous and then there is lesser ones.

3            The issue is that it doesn't have to be

4    identical, it just has to be predictive.  And that usually

5    comes from if you have made a dissolution that you predict

6    will give you these blood levels, and, in fact, they do,

7    you have established that connection.  And now you can use

8    that dissolution apparatus, dissolution test to approve

9    subsequent batches.

10   Q.   Okay.  And, next, finally, you have listed on here,

11   possible first pass effect.

12           What is that, Dr. Kibbe?

13   A.   If a drug is highly metabolized by the liver, when

14   you take it orally, it gets absorbed into the blood, and the

15   blood from the GI tract goes directly to the liver before it

16   goes to the systemic circulation.

17           And if the liver is active, then the amount

18   that gets absorbed will be reduced by the amount the liver

19   metabolizes, and that is called first pass effect.  So, in

20   fact, the bioavailability of the drug would appear lower

21   than it normally would because of that.

22           If the drug itself is not metabolized at all,

23   then it can't have a first pass effect.  All it can have is

24   efficient absorption or inefficient absorption.  And if you

25   have something that is water soluble and is easily absorbed

Kibbe - direct

1    throughout the length of the GI tract, then you get

2    100 percent bioavailability, which means all the drug you

3    have given gets into the blood supply.

4    Q.    Now, would any of these considerations prevent a

5    person of ordinary skill in the art from considering, making

6    a sustained release formulation?

7    A.    No.  This is just part of not every single one of

8    the things you think of as a formulator as you go about the

9    process of making a sustained release.  The key is, is the

10   drug a potential candidate for it?  And, if so, then you can

11   move forward.

12   Q.    Okay.  So you said the key is if the drug is a

13   potential candidate for sustained release.  So if a person

14   of ordinary skill in the art was asked to make a sustained

15   release formulation for a particular drug, what

16   characteristics of the drug need to be considered?

17   A.    Well, I've got a demonstrative with four distinct

18   characteristics which I think are important.

19         First, you have to have a relatively short

20   half-life.  A drug with a half-life of 24 hours is not a

21   candidate for sustained release.  You would give it once a

22   day and that is exactly the way it should be given.

23         You have to have relatively efficient absorption

24   pattern.  That is, the drug has to be absorbed efficiently

25   throughout the GI tract.  And that is because your sustained

Kibbe - direct

1    release product, because it releases the drug slowly, will

2    migrate down the GI tract as it releases the drug, and so

3    the drug has to be able to be absorbed relatively

4    efficiently throughout the GI tract.

5           You need a dose that you don't mind doubling up.

6    And we're constrained by what people can swallow, and what

7    is convenient to put in to a dosage form.

8           When you are making a sustained release dosage

9    form, you have to use quite a bit of excipient that gives it

10   its sustained release characteristic.

11          And so if you had a drug with a normal acute

12   dose of 600 milligrams, if you try to make a sustained

13   release drug out of it, you'd have to use 1,200 milligrams

14   of the drug and then excipients.  You'd have something two

15   grams.  And that is really the size we like to administer to

16   horses and not convenient for people to swallow.  So it has

17   to be a potent drug and that lasts.

18          You have to treat a chronic condition.  If you

19   are trying to treat an acute condition with the same

20   release, you are working against the issues that are in the

21   best interest of the patient.

22          Chronic conditions go on for 24 a day for months

23   and months.  We want therapy to be at or above the minimum

24   effective concentration every single day for months and

25   months, and sustained release is one way of doing that.  But

Kibbe - direct

1    it's certainly not useful for acute situations.

2    Q.    And is there a particular prior art reference that

3    you relied on for this information?

4    A.    To get the information, to answer whether or not 4-AP

5    has these characteristics, yes.

6    Q.    What I'm just asking again, Dr. Kibbe, is it known

7    in the art about these particular characteristics?  Are

8    there references that a person of ordinary skill in the

9    art could turn to to see this is information that would be

10   considered?

11   A.    Yes, you could look at Remington's textbook.  There

12   isn't a table I could pull you out of Remington's, but you

13   could read in the text and every one of these things would

14   be in the text.

15   Q.    And do you have an opinion, Dr. Kibbe, as to whether

16   or not 4-AP has any of these characteristics?

17   A.    4-AP actually fulfills all of those characteristics.

18   Q.    And do you have a demonstrative that is related to

19   that?

20   A.    Well, I believe I do.  This is the first study that I

21   looked at.  It's 4-AP has the essential kinetics to be an

22   attractive sustained-release candidate.  So remember we want

23   a half-life to be relatively short, we want good uniform

24   bioavailability, and what have you.

25               And so the work of Uges which was published in

Kibbe - direct

1    May of 1982 look at 4-aminopyridine strictly for kinetic

2    evaluation.  Okay?

3              So if we go to the next one.

4    Q.    Dr. Kibbe, is the Uges reference a reference that you

5    reviewed and are relying on for your opinions in this case?

6    A.    Yes, it is.

7              So if you look at the abstract, Uges used nine

8    healthy subjects (seven men and two women), and they

9    received three different doses of 4-aminopyridine, a 20

10   milligram iv dose and enteric dose, and a 20 milligram

11   uncoated tablet.

12             So they were looking at the administration of

13   the drug iv orally in an immediate release and orally in a

14   delayed release, and they found that the half-life of the

15   drug in their hands was 3.7 hours, which is approximately

16   four hours when you put in the plus or minus.

17             That is a good half-life to look at in terms of

18   converting it to sustained release because if you have to

19   give it as immediate release, you have to give it every four

20   hours, but if we can get it to be absorbed slowly over a

21   longer period of time, we can give it every 12 hours.

22             There is a couple of other things in here that

23   really helps us understand that this is a good candidate.

24   Q.    What are those?

25   A.    The bioavailability of the enteric coated tablets is

Kibbe - direct

1      95 plus or minus 29 percent, which means it is almost

2      100 percent absorbed, even when its absorption has been

3      delayed by two hours because that is what enteric coat does,

4      which means it is being absorbed more or less informally

5      throughout the intestinal tract.

6              Then the last item on here, on this thing is

7      biotransformation is unlikely.

8              Now, what that tells us is that the drug is

9      excreted unchanged in the urine, and, in fact, urinary

10     excretion is 98 percent of the administered dose, which

11     means there is not going to be any first pass effect because

12     there is no metabolism.  Okay?

13             So now if we went back with this information and

14     look at that chart, we could tick everything off, and we

15     could say, okay, short half-life.  Okay.

16     Q.    Well, Dr. Kibbe, does the Uges reference make any

17     comparisons regarding the cumulative urinary excretions by

18     route of administration?

19     A.    Yes, okay.  That is a chart in here.

20             What he did here was he compared total urinary

21     collection based on the dose.  In other words, the fraction

22     of the dose he absorbed, what percent of it showed up in the

23     urine.

24             After iv administration, it was 100 percent.

25     After enteric coated tablets, it was 98 percent.  And after

Kibbe - direct

1    uncoated tablets, 95 percent.  So only a trace amount was

2    lost, and that's not statistically significantly different.

3              That's what makes me think we won't have a

4    problem with either absorption or elimination or changes in

5    kinetics when we use sustained release versus iv.

6    Q.    And you mentioned, Dr. Kibbe, that the study was done

7    on nine individuals.  Would a person of ordinary skill in

8    the art be discouraged by the fact that this study was only

9    done in nine individuals?

10   A.    We always like more data.  There isn't a scientist

11   that doesn't like more data, but you can't have a study like

12   this done on thousands of people when it's the first time

13   they're doing it.  And what it does for you is it gives you

14   information that motivates you to go forward.

15             If there were problems with it, if the half life

16   didn't match, if the bioavailability didn't match, then you

17   might be deterred, but in the presence of this data, you

18   would move forward and begin to generate a sustained release

19   product.

20   Q.    And how does the data from Uges apply to the

21   characteristics of a sustained release formulation?

22   A.    So we have a demonstrative which I was jumping the

23   gun and going to earlier.  Relatively short life, 3.6 hours.

24   Efficient absorption pattern, hundred percent

25   bioavailability, and relatively small dose, Uges uses 20

Kibbe - direct

1    milligram dose in IV, oral and in enteric coat.  And this

2    morning Dr. Peroutka talked about what one is the

3    appropriate dose and the condition that it would be

4    appropriate in and that would be MS and MS is a chronic

5    disease and the dose that he said was appropriate based on

6    his understanding of the literature was the 10 milligrams

7    twice a day.

8    Q.    In addition to Dr. Peroutka's testimony, did you look

9    at any prior art references that also relate to treating a

10   chronic condition with 4-AP?

11   A.    Yes.  Of course I looked at some of the same

12   references that he looked at.  The next slide is 4-AP was in

13   this -- they're talking about using it to improve clinical

14   signs in multiple sclerosis and that right away tells you

15   it's a chronic disease.  And they're using 4-aminopyridine

16   to treat that.  This is Stefoski article and Dr. Peroutka

17   talked about this this morning.  So we can talk about some

18   of the same characteristics that he talked about.

19   Q.    And what is your understanding, Dr. Kibbe, of how

20   they dose the drug in this study?

21   A.    Well, they got male patients with multiple sclerosis

22   and they gave it as an injection.  And they gave it between

23   seven and 35 milligrams of the drug, and one to five

24   milligram doses over a 60 minute time frame.  And then they

25   evaluated the benefits.  Dr. Peroutka talked about that, how

Kibbe - direct

1    the benefits started with the dose and ended at

2    approximately the same amount of time as a half life when

3    you compared it to Uges, this article quotes actually

4    references Uges, I think it's reference 24.  So they had

5    that information that they could relate to.  They say there

6    is no serious side effects in either normal subjects or

7    patients receiving 4-AP.

8    Q.    And when did the authors conclude?

9    A.    In their conclusion section, first in the abstract,

10   the improvement with 4-AP are substantial enough to be

11   transient therapeutic benefit in selected patients.  But in

12   their conclusion which we have a pull out of, they recognize

13   that side effects happen at high levels, but they said,

14   okay, putting that concern aside for a second, we believe

15   that the magnitude of the improvement we observed without

16   serious side effects suggest that clinical usefulness for

17   this agent, administered orally in selected patients.

18           You notice that their study was IV, but they're

19   recommending oral.  That's because the way they dosed is not

20   convenient for normal therapy for patient, it's a strictly

21   an experimental way of dosing.

22           They recognize based on the fact that they have

23   read Uges like I have, that you can give it successfully

24   orally and get blood levels that give you the therapeutic

25   effect you want, that's why they make that recommendation.

Kibbe - direct

1    Q.    Are you aware, Dr. Kibbe, of another prior art

2    reference where they did administer it orally?

3    A.    Yes.  We're going to go to Davis.  So 4-AP was

4    already being used immediate release to treat the chronic

5    disease MS, and Davis was testing oral administered

6    4-aminopyridine to improve clinical signs in multiple

7    sclerosis.  And so what he did was he took 20 male MS

8    patients and they were given either ten up to 25 milligrams

9    of 4-AP or lactose placebo capsules, and they were evaluated

10   for motor function.  And occular motor function.  And then

11   he concluded last part, we conclude that the oral

12   administered 4-AP produces clinically important improvements

13   in multiple chronic deficits in MS.

14   Q.    And did the authors of this study make any further

15   recommendations?

16   A.    Yes.  Of course we go to his conclusion area, and

17   although it's important to recognize the potential side

18   effects, just like it's important for a formulator to

19   recognize the problems associated with making a formulation,

20   they still conclude that our results suggest a safe and

21   effective therapeutic window for orally administered 4-AP

22   for visual and motor defects in selected MS patients.

23            This is the kind of conclusion you make for

24   every single drug because every drug is a poison.  I like

25   the Australian system.  They list them all under the

Kibbe - direct

1    poisons.  There is rat poison that's a real poison and then

2    there are drugs that can be used safely and effectively if

3    used correctly.  So every one of them you can get too much

4    toxicity so you're always looking for that window you can

5    operate in.  And if that window is narrow, it's a narrow

6    therapeutic index drug.  If the window is broad, it's not.

7    Even aspirin, you can take enough of it to really get you

8    sick, but everybody uses it for headache.

9              The fact that there are side effects really

10   doesn't deter you from moving forward if you can control the

11   levels well enough to stay within that sweet spot if you

12   will.

13   Q.    Let's go back to your slide relating the

14   characteristics of 4-AP as they relate to a sustained

15   release drug?

16   A.    Now, we have added references that I have looked at

17   and references that Dr. Peroutka looked at that say this is

18   for treating a chronic condition.  There is no doubt that

19   4-AP is to treat a chronic condition and it has all the

20   other characteristics that make it a good candidate for

21   sustained release.

22   Q.    Do you have an opinion as to whether or not a person

23   of ordinary skill in the art would be motivated to make a

24   sustained release formulation of 4-AP based on this

25   information?

Kibbe - direct

1   A.      Yes, I think it would be and I think it would be in

2   the best interest of the patient for a couple of reasons.

3   First, they would be able to take it on a more regular

4   dosage regimen twice a day.  And second, when you take an

5   immediate release dose late in the day, it starts to lose

6   concentration.  And if you're supposed to take it four or

7   six hours later and you're still sleeping, now it's going to

8   drop below the effective level.  This -- we see this in

9   arthritis medicine all the time, where people wake up with

10  morning stiffness, and so we like to give them a sustained

11  release product so that the sufficient drug available when

12  they wake up so that they're not stiff and they can start

13  taking the therapy and continue their therapy.

14          With this drug since we're dealing with motor

15  skills and difficulty in movement, you would want them to

16  have sufficient levels in the body when they wake up in the

17  morning so it would make them easier to get around that day.

18  Q.      So Dr. Kibbe, in 1990, once a person of ordinary

19  skill in the art had decided to make a sustained release

20  formulation of 4-AP, how would they go about doing it?

21  A.      Most formulators have a favorite platform, and there

22  are lots of different platforms that can be used to make a

23  sustained release.  If you go to Remington, Remington lists

24  several of them.  This is the 1990 edition of Remington.  In

25  the same chapter we looked at in 1985, there are a list of

Kibbe - direct

1   drugs that have been approved that are in each of these

2   different platforms.

3           So we go to the next page, we'll see reservoir

4   diffusion product, and these are products that are on the

5   market or were on the market in 1990 that use that system.

6   Matrix diffusion products, and you'll notice that we're

7   pulling these out of pages.  The verbiage in that page is

8   how you make each one of these, so it's not that they just

9   tell you these exist and good luck to you, they actually lay

10  out how you can make it and what excipients are appropriate

11  for these dosage forms.

12          The next page talks about matrix dissolution

13  products, and again a whole bunch of those, and encapsulated

14  dissolution products.  I told you that one of my teachers

15  was Rudy Blithe, and Rudy invented Contac which is on the

16  right-hand side and every one of the products that is called

17  spansule, he developed those in the 1950's.

18          In fact, his system is really straightforward.

19  If you wanted to use it, you could.  This drug would work in

20  his system quite nicely, but most people nowadays go to a

21  matrix system because the manufacturing process of a matrix

22  tablet has fewer steps, and everything is about saving

23  money.

24          So in a matrix tablet, all you do is blend the

25  active ingredient with your matrix polymer and the most

Kibbe - direct

1    common is hydroxypropylmethylcellulose, but there is a

2    handful of them.  When you get a uniformed blend and you

3    tablet it, when that tablet goes into water, the polymer

4    swells, forms a gel around the contents and the contents

5    then have to dissolve and diffuse out through this gel,

6    they're moving out to get into the bulk of the fluid of the

7    gut very slowly, thus we get slow sustained release.

8    Q.    Dr. Kibbe, what type of testing would a person of

9    ordinary skill in the art conduct to determine whether the

10   chosen platform was appropriately working for their

11   sustained release formulation that they were developing?

12   A.    Well, the first thing you need to do is select a

13   platform and select excipients you're going to use and then

14   do a compatibility test to see if the active ingredient has

15   any chemical reaction with any of those excipients.  If it

16   does, you shift away from this excipient.  You blend the

17   active ingredient at the dose you want to use with various

18   ratios of sustained release polymers, so you might have a

19   ratio of ten to one polymer to active ingredient or less,

20   and you make several of those.  And you can do that in a

21   day, day-and-a-half.  The blending process takes 15, 20

22   minutes and then you tablet them, then you will a have

23   several hundreds tablets of each type.

24           Then the next day you can go in and do a

25   dissolution test.  What happens is you get a series of

Kibbe - direct

1    dissolution curves that move from left to right faster and

2    slower based on the ratio that you used, and then you pick

3    one that will give you dissolution over six, eight hours so

4    that you're sure that when it's administered, it will

5    release the drug, at least over six hours or more to get you

6    to a sustained release product.  So it's really

7    straightforward.  And if you don't hit exactly what you

8    want, you will have bracketed it with some of your

9    experiment, so next week you come back and do it again.

10   Q.    And Dr. Kibbe, were you present in the courtroom

11   earlier today when the deposition testimony was played of

12   Dr. Michael Myers regarding what the Acorda inventors did

13   when they developed their formulation that's claimed in the

14   '938 patent?

15   A.    Yes, I was here.

16   Q.    How does that testimony relate to the process that

17   you've described here?

18   A.    I believe he said that they used a platform that

19   hadn't been developed.  So they had experience with a given

20   platform and then they just added this active ingredient

21   instead of a different one and adjusted the platform with

22   routine testing until they got the dissolution pattern and

23   therefore the blood level apparent that they wanted.

24   Q.    And do you recall how long, or approximately

25   Dr. Myers testified it took him to do that?

Kibbe - direct

1   A.     You know, it was a little mumbly, but it wasn't a

2   very long time.  Most formulators can do a really good job

3   in about four months.

4   Q.     Dr. Kibbe, summing up on your opinions of claims 3

5   and 8 of the '938 patent, what's your conclusion?

6   A.     I have a demonstrative with my conclusion.  The

7   claimed invention of the '938 patent is obvious.  A POSA

8   would have been motivated to make a sustained release

9   formulation of 4-AP because of the characteristics of the

10  4-AP and the characteristics of the patients who need it.

11         Sustained release products were well-known to be

12  advantageous over immediate release in chronic conditions,

13  and 4-AP has the characteristics necessary for it to be a

14  candidate for a sustained release formulation.

15         The prior art discloses that 4-AP was effective

16  in treating chronic disease and I rely on Dr. Peroutka for

17  that as well as for the references we looked at.  And the

18  prior art discloses well-known methods for making a

19  sustained release and I went to standard text and my own

20  years of experience on how to make it to say that.  So it's

21  obvious.

22  Q.     Dr. Kibbe, let's shift gears back to the Acorda

23  patents and go back to the asserted claims.  Do you have any

24  demonstrative slides that provides an exemplary claim to

25  these patents?

Kibbe - direct

1    A.      Yes, I do.  All of these patents have similar claims.

2    We're going to go to the claim 1 of the '826 patent and this

3    will give us a handle on what the elements are from my

4    perspective that are throughout all four of these patents.

5    First, their methods of treating, methods of maintaining a

6    therapeutic effective concentration of 4-AP in order to

7    improve walking in humans with multiple sclerosis.  4-AP

8    chronic condition MS, orally administering to a human a

9    sustained release composition, 10 milligrams daily at, twice

10   daily going forward.

11   Q.      And what's being administered?

12   A.      10 milligrams of 4-AP, twice daily in a sustained

13   release.  And then they tell you what the kinetics of the

14   drug and dosage form would yield in terms of the minimum and

15   maximum concentrations being in a ratio of one to 3.5 and

16   the average concentration being between 15 nanograms and 35

17   nanograms.  And so they're actually just claiming what I

18   consider to be the natural outcome administering this drug.

19   Q.      And Dr. Kibbe, have you prepared a demonstrative that

20   relates to these, specifically relates to these

21   pharmacokinetic parameters that are claimed and are common

22   throughout the Acorda patent claims?

23   A.      Yes, I did.

24   Q.      Let's go to that, please.

25   A.      So the four things that I really would like to talk

Kibbe - direct

1    about and where are they in all these patents, because there

2    is four patents and they all in someplace or another have

3    one or more of these elements.  So ten milligrams sustained

4    release 4-AP twice daily appears in all those patents and

5    all of the asserted claims listed next to the patents.  The

6    ratio of Cmin, Cmax appears in the '426.  The range of 15 to

7    35 nanograms per mil appears in all four patents, at least

8    one of the claims, or asserted claims.

9              And then another one which didn't appear in

10   claim 1 of the '426, but does appear in other places is

11   Tmax, which is the time to reach maximum concentration after

12   the administration of a dose.  And they appear there.

13   Q.    You have an asterisk next to the Tmax range.  What

14   does that mean, Dr. Kibbe?

15   A.    There is a statement in one of the claims that says

16   that release profile encompasses at least six hours.  And

17   that means that the drug after it's being administered, the

18   dosage form of releases the drug, continuously or sustained

19   release over a six hour or more period of time.

20   Q.    Dr. Kibbe, I want to make sure the record is clear.

21   Going back to the second pK parameter, Cmax steady state

22   ratio Cmin steady state ratio of 1.0 to 3.5, I think you

23   referred to the '426 patent.

24   A.    I'm sorry, '826.  My fault.  Too many numbers, too

25   many patents.

Kibbe - direct

1    Q.      And Dr. Kibbe, you prepared some demonstratives that

2    explain to the Court a little bit further what steady state

3    pK parameters mean?

4    A.      We're going to go back to an original slide that we

5    showed earlier that was stylized sustained release which was

6    Tmax and Cmax.  But we don't give it that way, we don't stop

7    after one dose, we give more.  So the next slide shows what

8    happens when you add a second dose to an already existing

9    blood level, you'll see that it comes up, goes down, but it

10   goes up higher.  The length of the increase is the same from

11   one place to the other, but because it's added on top of

12   what already exist, it's higher.  Okay?

13           So if I were to look at the distance from this

14   point to that point, it would be the same as the distance

15   from zero to that point.  Right.  And we keep doing that.

16   And what happens is as the levels build up, the rate of loss

17   increases because the rate of loss is a function of the

18   concentration times the rate constant for elimination.

19           Another one point, the amount that we're adding

20   each time will exactly equal the amount that is eliminated

21   during the dosing interval.  And there, we get to the green

22   which is called steady state.  And if we continue faithfully

23   to give exactly the same dose at exactly the same dosing

24   interval, that steady state becomes steady.  It doesn't

25   change.

Kibbe - direct

1           I have another demonstrative from Ritscchel, he

2    had several like that, where he shows that what we can then

3    say is that the lowest number, sometimes called the trough

4    number is C steady state minimum, and the other number is C

5    steady state maximum.  And going forward with routine

6    therapy in that patient, you would get those same numbers

7    going forward.

8           You will notice that they have a number at the

9    top, called tau, and that is a designation for dosing.  T is

10   designation for the time after the dose, but tau is the

11   distance between doses.

12          So for our case, 4-AP it would be 12 hours.

13   Q.    And, Dr. Kibbe, how many doses does it take before a

14   patient typically reaches steady state?

15   A.    Somewhere between five and seven doses.  There is a

16   rule of thumb that if you dose on the half-life, it's

17   exactly five.  But if you are slightly off the half-life,

18   then it takes five to seven.

19   Q.    And, Dr. Kibbe, how would a person of ordinary skill

20   in the art obtain steady state data for a particular drug?

21   A.    There are two approaches.  You can calculate and

22   estimate it or you can do a study and measure it.  Okay?

23          Once you know the half-life of the drug, the

24   size of the dose you are administering, and the time to

25   maximum concentration, you can then successfully calculate

Kibbe - direct

1    Cmin at steady state and Cmax at steady state.  And there

2    are other equations than can be applied to these systems.

3         Kinetics was developed in the '60s, early '60s,

4    and these equations were all derived back then, and they

5    have been in textbooks ever since.

6         I have an example equation to give you an idea

7    of what you can do.  This equation would calculate the

8    steady state for any drug given on a routine basis if you

9    know the dose and the rate constant for elimination.

10        So Csub-naught is the dose divided by the volume

11   of distribution which is indicative of how big your patient

12   is.

13        Kel is the rate of elimination, tau is the

14   dosing interval, and you can calculate CSSmin with this

15   equation.

16   Q.   Okay.  And, Dr. Kibbe, what determines what PK values

17   are actually obtained in an individual patient?

18   A.   Well, it usually is their size.  If you give a 10

19   milligram sustained release to someone who weighs 100 kilos,

20   you are going to get a lower Cmin than if you give a

21   10 milligram sustained release to someone who weights

22   50 kilos.  Okay?  So the Cmin/Cmax ratio would be constant

23   in those two individuals, but the window would move up and

24   down.  Okay?

25   Q.   Now that we've talked about what the steady state PK

Kibbe - direct

1   parameters are, do you have an opinion regarding the

2   asserted claims of the Acorda patents?

3   A.    Yes.  So this is a brief summary of my opinions on

4   Acorda.

5           The asserted claims of the Acorda patent are

6   obvious to a person of ordinary skill in the art over the

7   prior art.

8           The Acorda patents claim the use of an obvious

9   dosing regimen of 10 milligrams twice a day.

10          With a known sustained release formulation of

11  4-AP, which means that we know that there is sustained

12  release formulation out there.

13          To treat a symptom of MS, which, of course, is

14  the 10 milligram dose and the fact that we're treating MS

15  that was already discussed, and we're depending in part on

16  that for our opinion.  And we can arrive at the inherent

17  known PK values.  I could have calculate that from Uges, but

18  we're going fo look at data where they did the study and got

19  the data.

20  Q.    No. 2 on your summary here, it says there was a known

21  sustained release formulation of 4-AP.  What is the basis

22  for your opinion on that?

23  A.    We can go back to the '938.  And the '938 was issued

24  well ahead of the Acorda patents.  And so, therefore, it

25  constitutes prior art for the Acorda patents.

Kibbe - direct

1            And it says here that there will be, or they're

2    claiming a sustained release of 4-AP, which achieves

3    therapeutically effective blood levels over a 12 to 24 hour

4    period when administered on a once or twice a day.

5            So they're claiming the sustained release

6    product that will have that characteristics.

7    Q.    And does the '938 patent teach a person of ordinary

8    skill in the art how to manufacture a sustained release

9    formulation of 4-AP?

10   A.    It doesn't claim in the claims any particular form,

11   but in the specification, there are suggestions for how you

12   might do that.

13           And so in the specification, we pulled out a

14   couple of statements from the specification -- I'm sorry, I

15   didn't -- it's column 4, 41 to 46; is that right?

16   Q.    Yes, that is right.  You have good eyes.

17   A.    I can read it off the bottom.

18           So preferably the water soluble polymer in the

19   core, they're talking about making a matrix core or

20   membrane, which would mean something like the bead where the

21   drug is coated on the bead and then a membrane is put around

22   it, is the same or different and is selected from, and these

23   are commonly used coatings that will slow the release of the

24   drug or could be incorporated into a matrix to slow the

25   release of the drug.

Kibbe - direct

1          And I highlighted hydroxypropylmethylcellulose

2    because it is the most commonly used polymeric material in

3    sustained release matrix forms.

4          They go on to say that the pellets or granulates

5    may be compressed into tablets using a binder and a

6    hardening agent.

7          And microcrystalline cellulose is one of the

8    most common products added to aid with tableting.  And there

9    would be two or three other excipients that would be added

10   to the tablet, one a lubricant, one a glidant, but they

11   would have any affect on the functionality of the tablet.

12   Q.     And, Dr. Kibbe, in addition to the '938 patent, are

13   you relying on any other prior art references for your

14   opinion that a sustained release formulation 4-AP was

15   already known?

16   A.     Yes.  So we can go to some of the work of Hayes.

17         This is an open label, multiple dose study to

18   determine the pharmacokinetic and safety of fampridine SR in

19   patients with chronic spinal cord injury.

20         And this was done I think part of the phase

21   testing.  This is supportive data for that.

22         Basically, they administered -- or sorry.  This

23   was published in 2001.

24   Q.     And do you know if there was another Hayes reference

25   that you are relying on?

Kibbe - direct

1    A.      Yes, there is a second one.  We called it Hayes III.

2    It was published in 2003, and it's the pharmacokinetic study

3    of single and multiple oral doses of fampridine.  It was

4    nice of them to say:  sustained release 4-aminopyridine in

5    patients with chronic spinal cord injury.

6            And I have a pullup from both of them that I

7    have highlighted.

8            The study participants received multiple oral

9    doses of 10, 15, 20 or 25 milligrams twice a day; or in the

10   second study, they received 10 to 25 milligrams administered

11   as a single dose in 14 patients and twice daily for a week

12   in 16 patients.  So that they did both acute and chronic in

13   the second study and chronic in the first.

14   Q.      And how long was the duration of the study in the

15   first Hayes reference?

16   A.      It was one week.

17   Q.      And so, Dr. Kibbe, what does this information teach

18   to a person of ordinary skill in the art regarding whether

19   or not there was a sustained release formulation that

20   preexisted the Acorda patents for 4-AP?

21   A.      Well, the sustained release formulation that they

22   used had to have preexisted the Acorda patents because they

23   used it in the study which is prior art to the Acorda

24   patents.  So it had to exist.

25   Q.      And what pharmacokinetic data do the case studies

Kibbe - direct

1    disclose?

2    A.    Okay.  So we went to the Table 2 on -- there we go.

3          So they tested 10, 15, 20, and 25.  That tells

4    them some information across doses, but we're going to focus

5    on the 10 milligrams because the claims of the Acorda patent

6    are all about giving 10 milligrams twice a day.  Okay?

7    Q.    And, Dr. Kibbe, are you relying on Dr. Peroutka as to

8    whether or not 10 milligrams would be appropriate?

9    A.    Yes.

10   Q.    You are not a physician; right?

11   A.    No.  When I went to graduate school, I decided I

12   would rather dump my mistakes down the drain rather than

13   bury them, so I became a researcher.

14         So what we have here is a whole bunch of really

15   good data about 4-AP in chronic administration.  Remember,

16   they dosed it for a week, and remember I said that you could

17   get five to seven doses and you would get steady state.  And

18   so a week is 14 doses, so we clearly know they're at steady

19   state.  There is no argument there.  So these are steady

20   state values.  All right.

21   Q.    And how do these values relate to the pharmacokinetic

22   parameters in the claims of the patents?

23   A.    That's right, and we're going to talk about those.

24   You will notice there are three Cs over here, and they're

25   hard to read and they're even hard to read when you have the

Kibbe - direct

1      document right in front of you.

2                But it's Caverage, Cmax, and Cmin, one after the

3      other.

4                So the Caverage is 20.8 in a 10 milligram dose.

5      And that fits directly in the range of 15 to 35 that the

6      Acorda patents claim.

7                The reported values for Cmax and Cmin are 32.2

8      and 14.  And if you divide them, you get 2.3.  And 2.3 sits

9      right in the range of 1 to 3.5 for Cmin/Cmax in the '826

10     patent.  Okay?

11               Now, a little further down, there are two T

12     values.  One is Tmax, the first one.  And it is 2.7 plus or

13     minus 1.  And that also fits in the range that the patents

14     claim of 2 to 5.2 or 6.  Okay?

15               It also tells us the half-life.  And you will

16     notice the half-life is a little longer than what you saw

17     in the immediate release data that Uges had.  And that is

18     because with sustained release dosing, the drug is released

19     longer.  And even though it reaches peak, there is still

20     drug being absorbed, and that tends to make the half-lives

21     stretch out.  So that is slightly longer.

22               But, of course, they didn't claim a half-life,

23     so this is the natural consequence of administering this

24     drug anyhow.

25     Q.    Dr. Kibbe, did you look at any of the steady state PK

Kibbe - direct

1    data that was provided in the Acorda patents?

2    A.    Yes.  So if we turn to our next demonstrative.

3    Right.

4              So on the right is Table 7 directly from the

5    '826.  I always want to get my numbers right.  Okay?  And on

6    the left is Table 2 from the Hayes documents.

7              And what is interesting to me is they're

8    identical.  That the Hayes documents were used in or the

9    Hayes data was used in the Acorda patents, verbatim.

10             If you go down the list, Cmin, Cmax 32.2, in

11   table 7, Cmax in Hayes 3.2 and so on.  And you can do, I

12   highlighted all the things that match up and clearly they

13   do:  Tmax of 2.7 hours, Tmax of 2.7 plus or minus 1.  So

14   clearly they used the data that Hayes was generating in

15   support of the Acorda patents.

16   Q.    And, Dr. Kibbe, do you have an understanding as to

17   why the inventors of the Acorda patents would have used

18   steady state data from Hayes even though that was done in

19   spinal cord patients?

20   A.    Okay.  So what would be the difference in the

21   pharmacokinetics between an MS patient and a spinal cord

22   patient?  We've already established the drug is not

23   metabolized, so even if either one of those diseases affect

24   the liver, it wouldn't affect this drug.

25             What happens is this drug is eliminated by the

Kibbe - direct

1    kidney.  And unless these diseases materially impact the

2    kidney function, it would be no difference.  And, in fact,

3    they don't.  And so you would expect that dose in a normal

4    person would give you the same kind of results as a dose in

5    a spinal cord injury person or an MS person.  Okay?  And so

6    it doesn't affect.  They can use that same data as exemplary

7    pharmacokinetic data.

8    Q.    Dr. Kibbe, did you -- I know you looked at some

9    steady state data from the Acorda patents, but did you look

10   at any single point data from those patents as well?

11   A.    Yes, they report single point data in the patent.

12   And I have a table that puts together three of their tables.

13          So this is single point data in the Acorda

14   patent, and it confirms that the disease state is irrelevant

15   to the PK values.

16          So, in other words, it is just confirming what

17   I know to be the case with this drug.  And that is that

18   whether you give it to a multiple sclerosis patient, whether

19   you give it to a spinal Acorda injury patient, or whether

20   you give it to a healthy volunteer, you are going to get

21   approximately the same results.

22          And we picked two things, Cmax and Tmax,

23   because they are a function of the absorption and rate of

24   elimination which is the kinetic impact on them.  And you

25   will notice that they are in the same order of magnitude

Kibbe - direct

1    across all three sets of patients.

2    Q.    Dr. Kibbe, summing up.  Do you have a demonstrative

3    that relates to your summary opinion of the Acorda patents?

4    A.    I do.  So the claimed invention of the Acorda patents

5    are obvious in my mind.  And I think I have demonstrated

6    that through the references I have used.

7              Prior art discloses the use of twice daily

8    sustained release formulations of 4-AP for the treatment of

9    MS.

10             The claimed PK parameters resulting from the

11   administration of 10 milligrams grams BID of 4-AP were known

12   in the art and were a natural result of the administration

13   of the 10 milligrams sustained release product.

14             And a POSA would have been motivated to choose

15   10 milligrams as a dose and would have treated the MS

16   patients for at least two weeks because of its chronic

17   condition.

18             That last, I depend upon Dr. Peroutka for

19   because he is the clinician.  In the normal operation of

20   formulation development, the clinician comes to you with a

21   drug and says I need X number of milligrams to be delivered

22   every six hours, every eight hours, whatever, to get good

23   therapy, and then you design a dosage form that will deliver

24   that drug at that rate.

25   Q.    And, Dr. Kibbe, when you formulated your opinions of

Kibbe - direct

1    obviousness related to the '938 patent and the Acorda

2    patents, did you consider any secondary considerations of

3    nonobviousness?

4    A.    I did briefly consider them.

5    Q.    Do you have a demonstrative relating to that?

6    A.    I didn't find any secondary considerations that

7    overcome the obviousness of the asserted patents.

8              There is no evidence in my mind that the claims

9    of sustained release formulation of 4-AP satisfied a long

10   felt need.

11             No evidence of other attempts to make a

12   sustained release formulation of 4-AP but failing.

13             No evidence that others were skeptical about

14   making a sustained release formulation of 4-AP.

15             And no evidence that the sustained release

16   formulation of 4-AP resulted in unexpected results.

17             MR. FLORENCE:  Thank you, Dr. Kibbe.

18             Subject to redirect, Your Honor, I pass the

19   witness for cross-examination.

20             THE COURT:  That's fine.  Thank you.

21             We'll have cross-examination.

22             MR. STIEFEL:  Thank you, Your Honor.

23             May I approach?

24             THE COURT:  You may.

25             (Binders passed forward.)

Kibbe - cross

1            THE WITNESS:  A three hour cross are you

2     planning?

3                    CROSS-EXAMINATION

4     BY MR. STIEFEL:

5     Q.     Good afternoon, Dr. Kibbe.

6     A.     Good afternoon.  It's good to see you again.

7     Q.     Same here.  I just want to start by clarifying one

8     thing about the testimony you gave towards the end of your

9     presentation.

10            You were talking about there being a

11    pre-existing sustained release formulation.  You were

12    talking about at the time of the Acorda patents; is that

13    correct?

14    A.     Yes, it is.  The '938 happened so far earlier and

15    then we had a product made, and it was tested by Hayes.  And

16    so that is pre.  The Acorda patents really talks about

17    those.

18    Q.     You were not suggesting that there was a sustained

19    release formulation already in existence at the time of the

20    '938 patent; correct?

21    A.     No, unless the Russians come out and say they had one

22    years ago, we're all right.

23    Q.     Now, you are a -- you said you're professor emeritus

24    at Wilkes University?

25    A.     That's correct.

Kibbe - cross

1    Q.      And you joined Wilkes in 1992?

2    A.      Four.

3    Q.      '94.  So you have been there for twenty-two years?

4    A.      That's correct.

5    Q.      And during the twenty-two years, is it fair to say

6    that you published only one research paper in a peer

7    reviewed scientific journal?

8    A.      Most of the stuff that we did with our students got

9    presented as posters.

10   Q.      But you only -- only one research paper in a

11   scientific, in a peer reviewed journal?

12   A.      That's correct.

13   Q.      And that was entitled Effective Surfactant Polymers

14   and Nonionic Compounds at Surface Tension at Liquid Air

15   Interface; correct?

16   A.      That's right, it's a theoretical piece.

17   Q.      It had nothing do with sustained release formulation;

18   correct?

19   A.      We were interested in it because it affects the

20   reliability of sustained release products.

21   Q.      But it didn't involve the development of the

22   sustained release formulation?

23   A.      No, in fact not, it was a theoretical piece.

24           THE COURT:  Dr. Kibbe, it's important you wait

25   until the question is completed so we can have only one of

Kibbe - cross

1    you speak at a time.

2          Go ahead.

3    BY MR. STIEFEL:

4    Q.    You went through a series of slides which showed that

5    you had held various positions before you joined Wilkes

6    University.  Do you recall that?

7    A.    Yes.

8    Q.    And during -- in those positions you also did not do

9    research that you published in peer reviewed journals with

10   respect to the development of sustained release

11   formulations; is that correct?

12   A.    That is correct.

13   Q.    And the publications in your CV doesn't describe how

14   to prepare, how to develop a sustained lease formulation;

15   correct?

16   A.    We have done some evaluation work when I was at Old

17   Miss, so that there are some articles in there that deal

18   with controlled release, and one with delayed release that

19   we did describe how we made and then we tested it on animal

20   models, but no, we didn't teach people in the literature how

21   to do that.  We taught our students how to do that.

22   Q.    And you personally had no experience with MS drugs;

23   correct?

24   A.    No.

25   Q.    And no experience with 4-AP?

Kibbe - cross

1   A.      No.

2   Q.      And you're not an inventor on any patents; correct?

3   A.      That's correct.

4   Q.      And I think you told me at your deposition that until

5   you got involved in this case, you were not aware of Elan

6   having been a company that was dedicated to the development

7   of sustained release formulations?

8   A.      I was not familiar with Elan.

9   Q.      And is it fair to say, Dr. Kibbe, that you're not

10  aware of any drugs other than 4-AP in which the active

11  ingredient was first approved by the FDA in a sustained

12  release formulation?

13  A.      I didn't bother to do a search for that.  I know that

14  Contac was the first marketed approved product with a

15  sustained release which contained an antihistamine and a

16  decongestant, but those products were probably grandfathered

17  in before that happened.

18  Q.      So as of 1990, sustained release technology was being

19  used to improve upon drugs which were already approved in

20  immediate release form?

21  A.      In the most cases, yes.

22  Q.      And you're not aware of any cases in which it was

23  being used to develop sustained release in the first

24  instance other than 4-AP; is that correct?

25  A.      Well, before I got in this case, I wouldn't have

Kibbe - cross

1    known about off the top of my head 4-AP anyhow.

2    Q.    And is it fair to say that if a drug is approved in

3    immediate release form by the FDA, substantial amount of

4    information is available to the public and to researchers

5    about the physical chemical properties of the drug?

6    A.    Actually the submissions to the FDA are confidential.

7    Q.    Aren't there generally publications related to

8    approved drugs which would make available to the public

9    substantial amounts of information about the properties of

10   the drug?

11   A.    The publications are independent of whether the

12   information was used by the FDA to do anything, so that

13   information if it's in the literature, it's in the

14   literature.  Just like in this case, if it's in the

15   literature, if they were subsequently used to get approval,

16   but you would have known it.  So the act of getting FDA

17   approval doesn't automatically add a whole body of

18   information.

19   Q.    Isn't it fair to say that typically drugs that -- if

20   a drug has been approved by the FDA, there is substantial

21   information available and publications both about the

22   physical chemical properties of the drug and about the

23   safety and efficacy of the drug?

24   A.    It's fair to conclude that there would be literature

25   about it, but the decision to move forward is always based

Kibbe - cross

1    on whether you have enough information to make them

2    confident that you can go forward.

3    Q.      If a drug has been approved by the FDA, is it fair to

4    say that the correlation between the pharmacokinetic of the

5    drug and the efficacy of the drug would be known?

6    A.      Well, the agency will not approve something unless

7    you can show that it's therapeutically effective.  There are

8    compounds that can be approved that don't have good

9    pharmacokinetics at all.

10   Q.      But wouldn't the information available, wouldn't

11   there be substantial information available about the drug in

12   its immediate release form?

13   A.      I'm getting lost in the question.

14   Q.      My question is if a drug has been approved by the FDA

15   in immediate release form, wouldn't there be significant

16   information available to formulators about the efficacy and

17   safety of the drug?

18   A.      Well, obviously if a drug has been on the market for

19   a while, then we know something about its efficacy because

20   we can read the FDA official labeling.

21   Q.      And I assume you'll agree with me that in 1990, there

22   was no approved drug containing 4-AP; correct?

23   A.      Yes, I believe that is correct.

24   Q.      And is it also fair to say that in 1990, there was no

25   universal platform that could be used to make sustained

Kibbe - cross

1    release formulations of any and all drugs?

2    A.    The reason they had so many different platforms is

3    because each of them have a unique characteristic and in the

4    hand of the person that's expert in that platform, they

5    would use that.  Some platforms are able to handle lots of

6    different drugs quite efficiently and only have draw backs

7    in certain cases.

8              So if you have a drug with the characteristics I

9    talked about which is a relatively short half life, small

10   dose, a nice absorption pattern, you can probably put it in

11   a number of the different platforms and it would work.

12   Q.    But you weren't involved in develop -- in doing

13   research of that sort; correct?

14   A.    Excuse me?

15   Q.    You personally were not involved in doing research of

16   that sort; correct?

17   A.    Of comparing different platforms with the same drug?

18   We did some of that in our teaching, but we didn't publish

19   about it.

20   Q.    I would like you to -- well, in 1990, is it fair to

21   say that the FDA was still in the process of developing

22   guidelines for evaluating controlled release dosage forms?

23   A.    I don't think that would be fair to say they were

24   looking at always improving their guidelines, but they had

25   improved -- approved a large number of sustained release

Kibbe - cross

1    dosage forms already, which meant if they didn't have public

2    guidelines, they had internal guidelines, because that's how

3    they go about doing everything.

4              Then what they do, they call us in, those of us

5    who work in the area, to have a meeting to talk about what

6    would be a good set of information for them to use going

7    forward, and they did that with I think Dr. Skelly and a

8    group of pharmacokinetics from around the country.

9    Q.    When you say that they -- well, withdrawn.

10             Weren't they in the process of developing

11   guidelines that they could disseminate to the public so that

12   researchers could have guidance in developing sustained

13   release formulations?

14   A.    Yeah.  Originally the agency didn't tell anybody

15   anything.  And then the industry started getting anxious and

16   said tell us what we need to do so we can do it correctly,

17   early on the first things what are the stability

18   temperatures that you keep things at to keep them stable and

19   the agency would say whatever stability temperatures you

20   think would work, and people didn't like that, they wanted

21   something more concrete.

22             So in the case of sustained release products

23   which were being approved back in the fifties and sixties,

24   the companies were going to say well, you approved this one

25   and you're not going to approve this one, tell me why, where

Kibbe - cross

1    is the -- so eventually they'll come around to giving you a

2    guidance.  It's kind of like pulling teeth if you have ever

3    worked with the agency.

4    Q.    Could we turn to JTX 108.  And do you recognize JTX

5    108 as a report of the workshop on in vitro and in vivo

6    testing and correlations for oral controlled/modified

7    release dosage forms?

8    A.    Yes.

9    Q.    And is that, in fact, a report of an FDA workshop

10   with respect to controlled release dosage forms?

11   A.    Yes.

12   Q.    And there is a list of authors there.  And your name

13   is not included among the authors; correct?

14   A.    No, Les Bennett, Joe Robinson whose book we referred

15   to, Gordon Amidon, who is in Michigan, they are people who

16   are involved.  I knew them all.

17   Q.    Who is Joseph Robinson?

18   A.    He was the author of the book that we referred to

19   about controlled delivery systems and he was one of my

20   instructors when I was at Columbia University.

21   Q.    Wasn't he also one of the authors of the chapters in

22   Remington's that you relied on?

23   A.    Yes, he was.

24   Q.    And you consider him a real authority on sustained

25   release; correct?

Kibbe - cross

1    A.    He was.  He's passed away.

2    Q.    If you look at page 84, column two.

3    A.    Okay.

4    Q.    Do you understand this to be a release by the FDA of

5    guidelines with respect to the development of sustained

6    release formulations?  Looking at the -- well, I'm asking

7    you that --

8    A.    Yes.

9    Q.    We're looking at the second page on the first full

10   paragraph in the right-hand column, guideline?

11   A.    So, I wanted to answer that last question --

12               THE COURT:  Dr. Kibbe, hold on.  Let counsel ask

13   the question and you have been interrupting him a couple of

14   times.

15               THE WITNESS:  I'm sorry.  I apologize.

16               You asked me a question which I never got around

17   to answering.  This is a report of a workshop on that, and I

18   think the official guidelines have to come out in the

19   federal registry.

20   Q.    Would you read the first -- read that paragraph,

21   please, in the second column beginning with guidelines.

22   A.    Yes.  "Guidelines for evaluation of

23   controlled-release pharmaceutical dosage forms may provide

24   assistance to those designing, conducting and evaluating

25   studies.  However, it is important at the outset to

Kibbe - cross

1    recognize that each drug may possess inherent properties

2    that require considerations specific to that drug and its

3    dosage forms which may override the generalities of these

4    guidelines."

5    Q.     And can you read the next two sentences, please?

6    A.     "This paper revises the informal guidelines published

7    in 1987 for the design, construct, and evaluation of studies

8    of controlled-release pharmaceutical dosage forms."

9    Q.     Can you go on.

10   A.     "As was the case previously, no attempt has been made

11   to achieve completeness."

12   Q.     And one more sentence.

13   A.     "The report has been written with the recognition

14   that it can and should be improved."

15   Q.     So would you agree with me that -- what's the date on

16   this paper, 1990; is that correct?

17   A.     The report is from December of 1988, but it was

18   published in the International Journal of Pharmaceutics in

19   1990.

20   Q.     So at that point, the FDA was in the process of

21   developing guidelines to guide researchers in developing

22   sustained release formulations; correct?

23   A.     Well, of course they say that this paper revises the

24   informal guidelines published in '87, so they must have had

25   some document that they were working on originally, and now

Kibbe - cross

1    we are they're trying to improve it.  The agency has always

2    said that science wins, and if you have a good scientific

3    reason for doing something outside of the guidelines, you

4    can document it, they'll accept it.  So that's why they do

5    the little caveat about this isn't absolute, this is just a

6    guideline.

7    Q.    Now, you I think opined, at least in your report,

8    that a typical goal of a sustained release formulation is to

9    deliver the drug at a predetermined rate and maintain the

10   desired drug concentration.  Do you agree with that?

11   A.    The goal is to maintain Cmin Cmax constantly going

12   forward.

13   Q.    And one of the difficulties in developing a sustained

14   release formulation is the dissolution rate of the product

15   may not match up with blood levels that you would predict in

16   terms of the uptake of the ingredient in the body?

17   A.    If the ingredient has poor absorption characteristics

18   then that may be true and you may have to readjust your

19   dosage form.  But with an ingredient that is readily

20   absorbed, then the rate determining step is liberation from

21   the dosage form.

22   Q.    Would you look at the second paragraph on page 90 of

23   JTX 108.  And could you read that paragraph?

24   A.    Yes.  "The present state of the science and

25   technology does not always permit meaningfully correlations

1    between in vitro dissolution rates and the rate and extent

2    of availability as determined by blood concentrations,

3    and/or urinary excretion of drug or metabolites referred to

4    as an in vitro/in vivo correlation.  Development of such

5    correlations is an important objective and should be

6    vigorously and systematically pursued on a

7    product-by-product basis.  Such correlations allow one to

8    develop product specifications with bioavailability

9    implications providing maximum assurance and

10   predictability."

11   Q.    Now, in 1990, is it fair to say that there was no

12   already determined rate at which you would want to release

13   4-AP to treat multiple sclerosis?

14   A.    There is a reasonable rate that would give you an

15   extended release that you could then evaluate in a normal

16   human study.  One of the ways to go about it is to recognize

17   that this is an easily absorbed product, so liberation is

18   the key.  And so something that releases over six to ten

19   hours will likely give you a reasonable blood level curve

20   during the 12 hour dosing window.

21   Q.    Let me ask to you look at page 199 of your deposition

22   testimony in this case.  It says at the bottom on page 199,

23   do you have that?

24   A.    I'm getting there.

25   Q.    It says --

Kibbe - cross

```
 1              Question:  And I think I was reading from your

 2   report:  A typical goal of a sustained release formulation

 3   is to deliver the drug at a predetermined rate and maintain

 4   the desired drug concentration.

 5              Do you see that?

 6              Yes.

 7   A.    Yes.

 8   Q.         Question:  Okay.  And in the case of 4-AP at the

 9   time of the Masterson patent, is it fair to say that there

10   was no predetermined rate known that -- at which you would

11   want to release 4-AP?

12              And you said:

13              Answer:  Well, there was no single absolute

14   number.  That statement refers to the fact that you're

15   eventually going to have to come up with a rate of release

16   and a rate of absorption that gives you the 12 hours'

17   worth of blood level, but that's all a result of some

18   experimentation.  You start off with what we talked about,

19   kinetics and you go from there.

20              Do you see that?

21   A.    Yes, I do.

22   Q.    You gave that -- I asked that question and you gave

23   that answer; correct?

24   A.    Yes.

25   Q.    Would you look at PTX-95 in your cross binder?
```

Kibbe - cross

1   A.      The cross.  Okay.

2   Q.      This is from a chapter from a treatise entitled

3   Pharmaceutical Dosage Forms.

4   A.      This is Volume 3 of the tablets.

5   Q.      It's the tablets volume; is that correct?

6   A.      Tablet Volume 3.  There is three volumes for tablets.

7   It covers all the aspects.

8   Q.      And if we could look at -- and what is the date?  On

9   the third page of the exhibit, it has the date?

10  A.      Yes, the copyright is 1990.

11  Q.      Okay.  And that's the year we're talking about?

12  A.      Well, that's the copyright.

13  Q.      But that is the year.  You have opined with respect

14  to the obviousness of the '938 patent as of 1990; correct?

15  A.      Yes.

16  Q.      And if you would look at the first page of this

17  article, which is chapter 4.  It is entitled, Sustained Drug

18  Release From Tablets and Particles Through Coating.

19          Do you see that?

20  A.      Yes.

21  Q.      And who is the author?

22  A.      Joe Robinson, and one of his colleagues from Schering

23  Research, Rong-Kun Chang.

24  Q.      And so that is the same Joe Robinson who authored

25  the treatise you relied on and the Remington's treatise you

Kibbe - cross

1   relied on; correct?

2   A.    Yes.

3   Q.    And if you look at, in that first paragraph, the last

4   word on the line, about two-thirds of the way down is

5   "successful."  Do you see that?

6   A.    No.

7   Q.    "Successful."

8   A.    I think I've got it.  "Successful fabrication of

9   sustained release."

10  Q.    Yes.  Can you read that?

11  A.    Okay.  If you don't mind, I would like to point out

12  that he does say that the earliest sustained drug delivery

13  dosage, Your Honor, was made in 1938.

14          MR. STIEFEL:  Your Honor, I ask the question --

15          THE COURT:  I think he does mind.

16          THE WITNESS:  Really.

17          THE COURT:  Answer his questions.  He is allowed

18  to ask the question.

19  BY THE WITNESS:

20  A.    Successful clinical performance of these products can

21  vary considerably.

22  Q.    Can you go on?

23  A.    Successful fabrication of sustained release products

24  is usually difficult and involves consideration of the

25  physical-chemical properties of the drug, pharmacokinetic

Kibbe - cross

1    behavior of the drug, route of administration, disease state

2    to be treated and, most importantly, the placement of the

3    drug in a dosage form that will provide the desired temporal

4    and spacial delivery pattern for the drug.  This chapter is

5    devoted to an examination of one method of sustained release

6    drug delivery; namely coating.

7    Q.    And the various properties of 4-AP were, that are

8    discussed there were largely unknown as of 1990; isn't that

9    correct?

10   A.    No, I doubt that is true.  I don't think they are

11   largely unknown.  We had prior art that talked about the

12   kinetics of the drug and the nature of its availability and

13   whether it is metabolized, so we had lots of data.

14   Q.    So the "lots of data" you are talking about is the

15   Uges paper?

16   A.    Uges.

17   Q.    And what was known about the desired temporal and

18   spacial delivery pattern for the drug?

19   A.    If a drug has a window of absorption, then it needs

20   to release during that window of absorption.  This is for

21   drugs which have active transport mechanisms or have poor

22   membrane different fusion characteristics.

23          These drugs would not give rise to the same

24   bioavailability after an oral or enteric coated tablet.

25          They would have problems that would show up

Kibbe - cross

1    early in the development or early in your exposure of that

2    drug to testing.

3    Q.      Would you turn to page 201 of PTX-95?

4    A.      Okay.

5    Q.      Under the heading 2, Requirements For Sustained Drug

6    Release.  Can you read that first sentence?

7    A.      Design of a sustained-release product is normally a

8    very difficult task because of the interplay of the

9    physical-chemical-biological properties of the drug, and the

10   patient disease state.

11   Q.      And you told me at your deposition that you generally

12   agree with that statement; correct?

13   A.      I generally agree with that.

14   Q.      And you testified -- so, Dr. Robinson says that

15   design of a sustained release product as of 1990 at least is

16   normally a very difficult task; correct?

17   A.      It takes time.  It is --

18   Q.      Is that what -- excuse me.

19   A.      That is exactly what he said.

20   Q.      That is what Dr. Robinson said?

21   A.      Yes.

22   Q.      And you testified earlier this afternoon that the

23   process of developing a sustained release formulation is,

24   quote, "really straightforward;" correct?

25   A.      Yes.

Kibbe - cross

1    Q.      Now, you testified that it would have been obvious

2    to, in 1992, to try to develop a sustained release

3    formulation of 4-AP because of the advantages that that

4    would present; correct?

5    A.      Yes, that is correct.

6    Q.      And you posit that one would have been motivated

7    to come up with a more convenient 4-AP formulation

8    notwithstanding that the usefulness of 4-AP was an open

9    question and it wasn't approved by the FDA; correct?

10   A.      Well, the usefulness was being developed and being

11   examined, and it was clearly being shown to be useful or

12   could be useful, at least some of the MS patients.  So

13   without an FDA approval, that doesn't mean I'm not

14   interested in coming up with a dosage form that I could go

15   forward with and get FDA approval.

16   Q.      Okay.  But nobody else had done that as to any other

17   drugs as far as you knew; correct?

18   A.      What, developed a dosage form before they went to the

19   FDA?  They all do that.

20   Q.      Developed a sustained release dosage form before they

21   went to the FDA with respect to any -- with respect to an

22   immediate release formulation of the same drug.

23   A.      Okay.  So, yes, I said that I didn't know of any of

24   those sustained release products that are on the market that

25   weren't already there as an immediate release.  But I think

Kibbe - cross

1    often when they go to the agency to get a product on the

2    market, they're already working on the sustained release

3    independent of approval of their immediate release product.

4    Q.    Okay.  Let's look at JTX-137.

5    A.    JTX?

6    Q.    That's the Uges paper that you testified to.

7    A.    Yes.

8    Q.    And as far as you know, that was, as of 1990, the

9    only available published information about pharmacokinetics

10   of 4-AP; correct?

11   A.    This is the one I rely on.  This is the one we found

12   that I think applies to this situation, yes.

13   Q.    Okay.  And in, on the second page, page 588, there is

14   a table, Table 1.  Do you see that?

15   A.    Yes.

16   Q.    And that is a substantial part of the pharmacokinetic

17   information in this paper; correct?

18   A.    This is the kinetics that comes from the model that

19   they wanted to apply to the kinetics.

20   Q.    Okay.

21   A.    And the model has rate constant to move the drug

22   between different portions of the body, depending on how

23   rapidly it gets there and how hence it all decays.

24   Q.    And the model they used was a proprietary program

25   that wasn't available to the public; correct?

Kibbe - cross

1    A.      They might have had a proprietary program to do the

2    calculation, but the model is all in the literature.

3    Q.      And the data that you relied on or that you pointed

4    to in Table 1 comes from a total of nine subjects; correct?

5    A.      That's right.

6    Q.      And it comes -- and the data in Table 1 reflects,

7    doesn't it -- withdrawn.

8            The data in this paper reflects, doesn't it,

9    that there is a significant variability in the

10   pharmacokinetics of 4-AP from patient to patient?

11   A.      I'm sorry.  There is variability in all of the terms

12   that they calculate.

13   Q.      But doesn't the data in this paper reflect that there

14   is significant variability from patient to patient with

15   respect to the pharmacokinetics of 4-AP?

16   A.      Okay.  So the calculated values they have have

17   standard deviation numbers within them which reflects the

18   variability.  There are no patients in this paper.

19   Q.      Well, sorry.  These subjects --

20   A.      These are healthy subjects already.

21   Q.      Right.

22   A.      We can -- anyhow, that is neither here, nor there.

23   If you look at the data in fact on Table 2, you will see

24   that the standard deviations are less than 10 percent of the

25   mean values.  That doesn't make them significant.  Usually,

Kibbe - cross

1    you have a tighter range, if you will, when you are dealing

2    with normal subjects that you have selected from the age

3    group of 25 to 35, and ideal body weight, and all that.  And

4    we do that on purpose to get a real handle on what the

5    numbers are.

6    Q.    Well, would you agree with me first of all, Dr.

7    Kibbe, that the data in Table 1 shows that the nine subjects

8    can be broken down from a pharmacokinetics perspective to a

9    five where the data corresponds to a triexponential model

10   and four in which the data corresponds to a biexponential

11   model?

12   A.    Okay.  So the application --

13   Q.    Can you tell me "yes" or "no" whether that is what

14   Table 1 reflects?

15   A.    The authors decided to do that, to analyze it on the

16   basis of biexponential or triexponential decay curve.

17   Q.    And so --

18   A.    The data that they got from both of those things

19   match across both.  Oops.

20   Q.    So if one looks at -- you said that the data, the

21   dispersion or the variation is ten percent.  If you look at

22   item C1, that says that the mean is 7302, and the standard

23   deviation plus or minus 5893.

24   A.    Yes.

25   Q.    Correct?

Kibbe - cross

1    A.    Yes.

2    Q.    So way more than ten percent; correct?

3    A.    But C1 isn't --

4    Q.    Sir.

5    A.    Can I?

6    Q.    Well --

7    A.    C1 is an extrapolated value that often has a higher

8    variability than the standard numbers that you would use to

9    make predictions such as the terminal rate constant.

10   Q.    And C0 has similarly a mean of 7488 plus or minus

11   5905; is that correct?

12   A.    Yes.  They're trying to take five patients and push

13   them into a triexponential and extrapolate the concentration

14   back to zero time when they don't have data going back that

15   far and they get into this kind of an issue.

16   Q.    And when you look at, if you look at the T1/2, lambda

17   1, that value; correct?

18   A.    Yes.

19   Q.    You said that the bi- and triexponential values

20   correspond there, T1/1 is in the triexponential is .82 plus

21   or minus .28, and in the biexponential it is 5.15 plus or

22   minus 1.97; correct?

23   A.    In order to get there from the other ones, you have

24   to recognize in the triexponential they added an exponential

25   which gave them lambda 2 at 11.6.  So if you start to

Kibbe - cross

1    average lambda 1 and lambda 2, you will get lambda 1 in the

2    biexponential function or at least approximately that, and

3    then the terminal lambda or terminal rate constant is 234 to

4    198, and that reflects the differences in the model more

5    than the differences in the drug.

6    Q.    Would you expect that someone who undertaking to

7    develop a sustained release formulation of a drug that had

8    never been approved by the FDA in any form would want

9    pharmacokinetics data from more than nine subjects?

10   A.    Everybody wants more data than they have.  That's

11   kind of a rule.  But this data tells you what you need to

12   know about whether or not this drug is a good candidate

13   for sustained release.  And you know that you are going to

14   go forward with additional experiments to refine your

15   understanding.

16          If you look at the Figure 2, you will notice

17   that the terminal slope of the dosage administered orally

18   and the dosage administered orally that is enteric coated

19   are parallel, which means the drug acts and behaves

20   consistently regardless of those two dosage forms.  That

21   tells you a lot about the consistency you expect to get when

22   you finally make your sustained release product.

23   Q.    If you look at page 591 in the first column, at the

24   bottom, the bioavailability.

25   A.    Yes.

Kibbe - cross

1   Q.      You talked about the bioavailability of the drug as

2   being 100, essentially 100 percent; correct?

3   A.      Right.

4   Q.      And this reflects that the terminal T1/2 was 95 plus

5   or minus 29 percent; correct?

6   A.      Okay.  So let's read the whole sentence because

7   otherwise it will be misleading.

8           The bioavailability of the enteric coated tablet

9   calculated by means of the AUC and corrected for the

10  terminal half-life.

11          And what that means is they took the last

12  measured data point and they divided it by the terminal

13  half-life to get the tail that wasn't measured.  That is

14  what they mean.

15  Q.      But the terminal half-life was 95 plus or minus

16  29 percent; correct?

17  A.      No, that's wrong.  You are reading that wrong.  The

18  area under the curve --

19  Q.      Oh, sorry.  The bioavailability.

20  A.      Right, was 95.

21  Q.      Was 95 plus or minus?

22  A.      And 98 percent.

23  Q.      And 98 percent plus or minus.

24          THE COURT:  Hold on.  One at a time.

25          THE WITNESS:  I'm sorry.

Kibbe - cross

1           THE COURT:  Or this will make no sense to

2     anyone.

3           Go ahead, Dr. Kibbe.

4     BY THE WITNESS:

5     A.    Okay.  When you calculate an area under the curve,

6     you usually do the trapezoidal rule, which means that for

7     every segment of time, you go up to the curve line and get

8     the values and calculate area of that trapezoid.  At the

9     end, you only have one data point, and yet it goes on for

10    infinity, and to calculate the area for the last data point

11    to infinity, you take that data point and you divide it by

12    the terminal rate constant, and all that does is complete

13    your area under the curve.

14          And so that is what they did.  And the 95 that

15    is here refers to the area under the curve, not to the

16    half-life.

17    Q.    Okay.

18    A.    Okay.

19    Q.    So the 95 plus or minus 29 percent refers to the area

20    under the curve and the standard deviation?

21    A.    For that number.  For the area under the curve.  And

22    it did not differ from the bioavailability of 98 plus or

23    minus 8 percent calculated from total urinary excretion

24    which, is in some cases a cleaner number to get, but ...

25    Q.    And the Remington, you pointed to excerpts from

Kibbe - cross

1    Remington which listed a number of sustained release

2    formulation products that were available in 1990; correct?

3    A.      That's correct.

4    Q.      And you're not aware of any of those drugs having

5    been available -- you're not aware that any of those drugs

6    were available in sustained release formulation without

7    first having been available in an immediate release

8    formulation; correct?

9    A.      I haven't done an analysis to find that out because

10   it didn't affect my understanding of how you would proceed

11   to make a sustained release product.

12   Q.      But I asked you about that at your deposition and you

13   have not since then found that any of those drugs were

14   available in sustained release formulations before they were

15   available in immediate release formulations; correct?

16   A.      Okay.  That question -- I did not find that the

17   combination of products were available as an immediate

18   release.  They were only available as a sustained release.

19   But the individual elements were available as immediate

20   release.

21   Q.      Would you look at JTX 112.  That's the Stefoski paper

22   that you referred to; is that correct?

23   A.      Yes.

24   Q.      Maybe we can more easily cull up DTX 322, which I

25   think you looked at.  And that -- am I correct that that

1  reflects the abstract at the beginning?

2  A.    That's the abstract from the article, you're correct.

3  Q.    That reflects that this was a test involving 15 MS

4  patients; correct?

5  A.    20.  I'm sorry, 12.  12.  Sorry.

6  Q.    I think it says --

7  A.    12 temperature sensitive male patients with MS and

8  five normal.

9  Q.    I am on the wrong page.

10 A.    I feel better.

11 Q.    12, I stand corrected.  And if you look at the last

12 sentence of that abstract, can you read that, please?

13 A.    "The improvements with 4-AP are substantial enough to

14 be of therapeutic benefit in selected patients, transient

15 therapeutic.

16 Q.    To be of transient therapeutic benefit?

17 A.    Got it.

18 Q.    If you turn the page or if we move on to DDX 323,

19 that's a slide that you prepared?

20 A.    Yes.  It's from.

21 Q.    And you chose to highlight the language about the

22 magnitude of the improvements we observed without serious

23 side effects; correct?

24 A.    Yes.  But I did in court quote the entire sentence,

25 but talking about although there is side effects, and if you

Kibbe - cross

1    remember, the whole goal is to keep the levels below that

2    level that would kick in those side effects, and if you can,

3    then you can get...

4    Q.    After the highlighted part, after the part that says

5    that the magnitude of the improvements suggest a clinical

6    usefulness for this agent, it goes on to say, studies are

7    currently underway to assess this possibility; correct?

8    A.    Yes, it does say that.

9    Q.    And so the authors used the word possibility with

10   respect to the use of 4-AP; correct?

11   A.    They did.

12   Q.    And the last sentence goes on to say in addition a

13   search for new agents that can increase the conduction

14   safety factor and testing for their efficacy in MS are

15   warranted; correct?

16   A.    Yes.

17   Q.    So the author was saying notwithstanding what we

18   think about 4-AP, we should be looking for other things

19   besides 4-AP or other than 4-AP; correct?

20   A.    Yes, that's the general goal of any innovative

21   manufacturing company is to find new and better forms that

22   can treat the conditions they treat.

23   Q.    Would you look at -- now at -- and Stefoski, just to

24   be clear, Stefoski was an experimental use of 4-AP; correct?

25   A.    He was doing an experiment, these were not commercial

Kibbe - cross

1    products.

2    Q.     In we could just bring up DDX 3-23 again, when the

3    caption says 4-AP was already being used as an immediate

4    release to treat the chronic disease MS, we're talking only

5    about an experimental fashion in a very, very small number

6    of people; correct?

7    A.     Well, it hasn't been commercialized yet, so you're

8    always starting -- in the normal development of a drug, the

9    phase one test is in a small number.  And this is the

10   beginnings of getting that data together.

11   Q.     Now, would you look at JTX 43.  JTX 43 is the Davis

12   paper that you relied on; is that correct?

13   A.     Yes, it is.

14   Q.     And if we could cull up DDX 3-24, I think that shows

15   the abstract from JTX 43 that you pointed to; is that

16   correct?

17   A.     Yes, it is.

18   Q.     And in this, there -- this is a study involving 15 MS

19   patients; correct?

20   A.     Okay.  So that's kind of incorrect, too.  20

21   temperature sensitive male patients were given either 10 to

22   25 milligrams of 4-AP, it looks like 20.  Five lines down in

23   the middle.

24   Q.     20?  Or identically appearing lactose placebo

25   capsules.  20 in the study, but all of 15 MS patients given

Kibbe - cross

1    4-AP, there were only 15 that got 4-AP in this study.

2    A.    Yes.

3    Q.    It goes on to say at the end that -- would you read

4    the last sentence of the abstract.

5    A.    "Further studies are warranted to assess efficacy and

6    safety of prolonged administration."

7    Q.    And that wasn't something you highlighted on the

8    slide that you presented; correct?

9    A.    No.  I talked about the sentence in front of it.

10   Q.    Would you turn to JTX 27.  JTX 27 is a paper by

11   Bever; is that correct?

12   A.    That's what the author's name is, Christopher T.

13   Bever.

14   Q.    And it's dated 1994?

15   A.    Yes, Annals of Neurology, 1994.

16   Q.    And would you look at the page that has the number --

17   the page number in the document of S119, it's the second

18   page of the paper?

19   A.    Yes, I got it.  I keep looking at these.

20   Q.    If you look at the second column and the first full

21   paragraph, it says, there is a sentence that begins on the

22   last line with blinded?

23   A.    So I'm reading early clinical trials suggest that AP

24   and DAP.

25   Q.    I want you to read the sentence that starts with

Kibbe - cross

1   blinded, the third sentence in the paragraph.

2   A.      "Blinded controlled trials of intravenous and oral AP

3   in temperature sensitive MS patients also suggested

4   benefit."

5   Q.      But these.

6   A.      "But these studies were limited because they did not

7   use a randomized treatment design, were not double-blinded,

8   and relied on outcome measures that were not widely

9   accepted."

10  Q.      And the reference there to in brackets to references

11  19 to 21, if you turn to the last page of this paper,

12  references 19 and 20 are the Stefoski and Davis papers that

13  you just testified about; is that correct?

14  A.      Yes.

15  Q.      You testified about a Ritschel paper; is that

16  correct?

17  A.      No, a book.

18  Q.      A Ritschel book.  And the Ritschel book is dated

19  1999; is that correct?

20  A.      That was the edition I had in my office, yeah.

21  Q.      So that was not -- that's certainly not prior art to

22  the 1938 patent?

23  A.      No, I can't prove, but I will tell you that all those

24  equations were developed in the sixties.  This is an ongoing

25  text I use.  If I had retrieve earlier editions, I would

Kibbe - cross

1    have.

2    Q.    To the extent that you provided that to the Court,

3    it's the 1999 edition?

4    A.    Yes.

5    Q.    And that, the -- that treatise provided

6    pharmacokinetic data with respect to a variety of drugs;

7    correct?

8    A.    It has an appendix in the back that is reasonably

9    up-to-date.  But it's mostly used for the equations and the

10   references about how to use or apply those equations to get

11   individual treatment regimens for individual patients.

12   Q.    And that, the treatise didn't include any information

13   on 4-AP; correct?

14   A.    No, it didn't.

15             MR. STIEFEL:  I have no other questions.  Thank

16   you.

17             THE COURT:  Thank you.

18             Redirect.

19             MR. STIEFEL:  I have some exhibits to admit.

20             THE COURT:  Okay.  You may offer those now.

21             MR. STIEFEL:  My apologies, Your Honor.  One --

22   the plaintiffs offer JTX-108, PTX-95, and JTX-27.

23             THE COURT:  Any objections to those exhibits?

24             MR. FLORENCE:  No.

25             THE COURT:  Those are admitted.

Kibbe - redirect

1          MR. STIEFEL:  Thank you, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MR. FLORENCE:

4   Q.     Dr. Kibbe, I have a few more questions for you.

5   Remember earlier today you were asked whether or not you

6   conducted any research or published any research during your

7   time at Wilkes University?

8   A.     Yes.

9   Q.     Is the focus of Wilkes University, is the pharmacy

10  department a research department at Wilkes?

11  A.     No, Old Miss was research intensive.  Wilks is not a

12  research intensive institution.  I was happy to be able to

13  do trials with some of my students that resulted in posters.

14  Q.     Dr. Kibbe, if you can, let's turn to JTX 108, please.

15  And you recall being asked about this particular exhibit

16  during your cross-examination, Dr. Kibbe?

17  A.     Yes, I was.

18  Q.     I would like to have you turn to the second page,

19  please.  And the right-hand column, same paragraph that

20  counsel had you focus on before that begins with

21  "guidelines"?

22  A.     Yes.

23  Q.     And Dr. Kibbe, isn't it true that despite the absence

24  of guidelines in 1990, that the FDA for sustained release

25  formulations that there was still a large number of FDA

Kibbe - redirect

1    sustained release formulations?

2                    MR. STIEFEL:  Leading.

3                    THE COURT:  That is leading.  Ask a different

4    way, please.

5    THE ATTORNEY:

6    Q.    Dr. Kibbe, what amount of sustained release

7    formulations had been approved in 1990?

8    A.    There were a large number and we put up a slide with

9    a whole bunch of them that were approved prior to 1990.  In

10   fact, Contac was approved back in the '50s.  This was long

11   before this group got together.  The agency had been

12   approving sustained release products for a long time, and I

13   think I included that in my answer to the learned colleague

14   from across the aisle.

15   Q.    Dr. Kibbe, do you recall being asked whether or not

16   you knew if a sustained release formulation that's had been

17   approved at that time, whether or not they had all been

18   previously approved in an immediate release formulation?

19   A.    Yes, and I don't know.

20   Q.    But I just want to make sure the record is clear,

21   Dr. Kibbe, is it you don't know if they were approved or you

22   don't know that they weren't?

23   A.    Either, I don't know one way or the other.

24   Q.    Now, Dr. Kibbe, let's -- despite the fact that there

25   were not guidelines that were approved by the FDA in 1990

Kibbe - redirect

1    for sustained release formulations, does 4-AP have inherent

2    properties that make it attractive as a sustained release

3    formulation?

4    A.    Yes, it does, and we went through those in my direct.

5    Q.    In light of those characteristics, would a person of

6    ordinary skill in the art be motivated to develop a

7    sustained release formulation despite the absence of

8    guidelines?

9    A.    Yes.

10   Q.    Now, Dr. Kibbe, let's go to JTX 90, please.  Actually

11   that's not where I want to go.  Go ahead and take that down.

12            I just have a question for you, Dr. Kibbe.  Is

13   an in vitro/in vivo correlation required before a person of

14   ordinary skill in the art would be motivated to develop a

15   sustained release formulation?

16   A.    You can't have it until you have the formulation, so

17   it's not prerequisite to motivate you to do it, it's a

18   quality control test that you develop in the process of

19   making a sustained release, so you can correlate the in

20   vitro test what you do in a laboratory in each batch with an

21   in vivo results with a bioequivalency or bioavailability

22   studies.

23   Q.    Dr. Kibbe, let's turn to PTX 95, please.

24   A.    Oh, PTX.

25   Q.    Yes, please.

Kibbe - redirect

1   A.      I'm in the wrong binders, I'm sorry.  Right.

2   Q.      It should be --

3   A.      I have it.

4   Q.      And if you could turn to the next page, the

5   introduction.

6   A.      Right.

7   Q.      One more, please.  And you recall being asked about

8   the section where it begins at the bottom of the first

9   paragraph where it says, begins with successful fabrication

10  of sustained release products?

11  A.      Yes.

12  Q.      Dr. Kibbe, can the development of a dosage form be

13  both difficult and straightforward at the same time?

14  A.      Well, it can take time, but what you're doing is

15  standard tests which give you an answer to one question and

16  you move on to answer the next question.  And the more

17  information you have before you start or the more compliant

18  the active the pharmaceutical ingredient is in terms of it

19  being an outstanding candidate, the easier the process

20  becomes.

21  Q.      Let's go ahead and take a look at the Ritschel

22  reference.  It should be JTX 66.

23  A.      JTX 56.

24  Q.      JTX 66.

25  A.      66, that's better because I have 66, I don't have 56.

Kibbe - redirect

1    Yes.

2    Q.     And you recall, Dr. Kibbe, being asked whether or not

3    the Ritschel reference was prior art to the 1938 patent?

4    A.     That's right.

5    Q.     What were you relying on from the Ritschel reference

6    for your opinion?

7    A.     I was using it as an example of what goes on when you

8    give multiple doses on a stylized way to explain the meaning

9    of Cmin Cmax and the equations that are available to allow

10   you to calculate them.

11   Q.     And Dr. Kibbe, was there enough information in the

12   prior art that you didn't need to calculate this information

13   prior to 1990?

14   A.     That's true.

15   Q.     And what information were you relying on for that?

16   A.     I was using Hayes for that.

17   Q.     Dr. Kibbe, let's go to the Stefoski reference,

18   JTX-112.

19   A.     (Witness complies.)

20   Q.     And, Dr. Kibbe, you testified that the Stefoski

21   reference actually relied on the Uges data; is that correct?

22   A.     They quote or they reference Uges in the back of

23   their text, and it's my opinion that they are cognizant of

24   those numbers and know that the product is bioavailable when

25   given orally or they wouldn't have recommended oral dosing.

Kibbe - redirect

1   Q.     Dr. Kibbe, let's go ahead and take a look at the

2   Bever reference that you were questioned on.  It should be

3   JTX-27.

4   A.     (Witness complies.)

5   Q.     And if you recall, Dr. Kibbe, you were questioned

6   about a portion of this reference that is on the bottom of

7   the page of S-119.

8          And you were questioned about a portion of the

9   paragraph that begins, the first full paragraph in the

10  right-hand column that begins:  With early clinical trials.

11         And you recall Dr. Kibbe being questioned about

12  a sentence that states:  Blinding control trials of

13  intravenous and oral AP in temperature sensitive MS patients

14  also suggested benefits, but these studies were limited

15  because they did not use a randomized treatment design, were

16  not double blinded, and relied on outcome measures that were

17  not widely accepted.

18         Do you see that?

19  A.     Yes.

20  Q.     Do you have an understanding of what the term

21  "limited" means there?  How would you read that?

22  A.     That means that you can't draw a lot of conclusions

23  from them, but you can draw some.  And those conclusions

24  could be verified by a larger study.

25  Q.     And, Dr. Kibbe, let's go ahead and look at the front

Kibbe - redirect

1    of the Goodman reference.  Look at the publication date on

2    the front of that reference.

3    A.     Yes, it's 1994.

4    Q.     And what is the priority date for the '938 patent?

5               MR. STIEFEL:  Your Honor, I think counsel may

6    have misspoken.  Did you call this the Goodman reference?

7               MR. FLORENCE:  Oh, I did.  I did.  I misspoke.

8    To clear up the record, we're talking about the Bever

9    reference.

10              THE COURT:  Thank you.

11   BY THE WITNESS:

12   A.     Okay.  So this is not prior art to the '938 because

13   it's priority date is 1990, I guess.  I can't remember off

14   the top.

15   Q.     So, but would a person of ordinary skill in the art

16   have the benefit of Bever's thoughts regarding the

17   information contained in this reference?

18   A.     No, not when they were developing that patent.

19   Q.     Dr. Kibbe, let's go back to your demonstrative

20   slides, if we can, to your chart that applies the

21   characteristics of 4-AP to sustained release formulations.

22              Now, Dr. Kibbe, what was in the prior art that

23   would have motivated a person of ordinary skill in the art

24   to make a sustained release formulation of 4-AP?

25   A.     It has all the characteristics --

Kibbe - redirect

1                MR. STIEFEL:  Objection.  It seems to me this is

2      beyond the scope of the cross.

3                THE COURT:  What is your response?

4                MR. FLORENCE:  I disagree, Your Honor.

5                THE COURT:  Well, how is it not?

6                MR. FLORENCE:  Well, Dr. Kibbe was asked about

7      each one of these references that he is relying on in this

8      cross-examination.

9                THE COURT:  Mr. Stiefel, is there anything

10     further on that?

11               MR. STIEFEL:  Well, I don't think -- I'm not

12     sure exactly what you are going to do with this, but

13     certainly we didn't discuss whether 4-AP lent itself -- the

14     questions were not directed to whether 4-AP lent itself to

15     making a sustained release formulation.  The questions were

16     directed to whether it was a wise thing to be spending time

17     on and whether you could have done it, but not whether 4-AP

18     is something you could have made a sustained release

19     formulation.

20               THE COURT:  All right.  I will overrule the

21     objection.  We'll see where the question is going.  Go

22     ahead.

23     BY MR. FLORENCE:

24     Q.   Dr. Kibbe, would a person of ordinary skill in the

25     art have looked at each of the references that you have

Kibbe - redirect

1    referenced here in this chart individually?

2    A.    No, you take them as a body because you are looking

3    for all the characteristics of 4-AP that lend itself to the

4    possibility that you would have a high probability of being

5    successful when you made your sustained release product, and

6    you could get a drug that you could give twice a day,

7    because that really is what the patient needs.

8                  MR. FLORENCE:  I have no further questions,

9    Your Honor.  But I would like to enter a few exhibits into

10   evidence.

11                 THE COURT:  Okay.

12                 MR. FLORENCE:  If there is no objection, I would

13   like to enter the following exhibits:  DTX-129, JTX-79,

14   JTX-137, JTX-81, and JTX-66.

15                 THE COURT:  Is there any objection?

16                 MR. STIEFEL:  No objection, Your Honor.

17                 THE COURT:  Okay.  Those are all admitted.

18                 (Above referenced exhibits are admitted into

19   evidence.)

20                 THE COURT:  And we're done with this witness?

21                 MR. FLORENCE:  Yes.

22                 THE COURT:  Okay.

23                 MR. FLORENCE:  Thank you, Your Honor.

24                 THE COURT:  Dr. Kibbe, you may step down.

25                 THE WITNESS:  Thank you, Your Honor.

```
 1                    THE COURT:  What did defendants have in mind for
 2      next, please?
 3                    MR. KLEIN:  Your Honor, subject to any comments,
 4      I believe we're ready to close our case.
 5                    There is one logistical issue.  As you know, we
 6      had some demonstrative exhibits.  And I think the last time
 7      we had a trial, we introduced them into evidence as
 8      demonstratives and we would ask to introduce DDX-1 through
 9      3.
10                    THE COURT:  Is that the slides?
11                    MR. KLEIN:  Those are the slides, yes.
12                    THE COURT:  Are you seeking to put in all the
13      slides as just simply demonstratives?
14                    MR. KLEIN:  Correct.
15                    THE COURT:  Okay.  What is the plaintiffs'
16      position on that?
17                    MR. STIEFEL:  I think we have objection to the
18      demonstratives being admitted into evidence.  We think
19      they're prejudicial.
20                    THE COURT:  Right.  They're not --
21                    MR. STIEFEL:  They're misleading.
22                    THE COURT:  They're not being offered as
23      evidence.  I think they just want me to know that I have
24      them as demonstratives for whatever value they have.  And
25      I'm sure they don't object to you doing the same on your
```

1    side, but if you have an objection to that approach, that is

2    fine, but the objection can't be, well, they shouldn't be

3    evidence because they're not being offered as evidence.

4            MR. STIEFEL:  All right.  Notwithstanding our

5    view that they are misleading and should be treated

6    differently from evidence, we will withdraw our objection.

7            THE COURT:  All right.  Well, they will be

8    treated differently as evidence.  They are not evidence.

9    Right?  You are not offering them as evidence.

10           MR. KLEIN:  That's correct.  But we may

11   reference them in post-trial briefs as a demonstrative, not

12   as evidence.

13           THE COURT:  As a demonstrative, and I have them.

14           MR. KLEIN:  Right.

15           THE COURT:  So to the extent there is an

16   objection, it is overruled, but I don't believe there to be

17   an objection.

18           So with that?

19           MR. KLEIN:  We rest, Your Honor.

20           THE COURT:  All right.  Well, before we turn to

21   them for their case, we will take a break.  We will be in

22   recess.

23           (Brief recess taken.)

24           *      *      *

25           (Proceedings reconvened after recess.)

1          THE COURT:  Okay.  Plaintiffs may call their

2     first witness.

3          MR. STIEFEL:  Your Honor, before we do that, I

4     wanted to move under Rule 52(c) of the Federal Rules of

5     Civil Procedure and Paragraph 80 of the Pretrial Order for

6     judgment, essentially as a matter of law or judgment of

7     partial findings based on the fact that plaintiffs have --

8     the defendants have concluded their case on invalidity and

9     have not demonstrated, as they must by clear and convincing

10    evidence, that the patents in suit are obvious and invalid

11    on that basis.

12         We would also like to move similarly on the

13    grounds that the defendants have not proven that the

14    patents in suit are invalid under Section 112.  I think

15    their witnesses have, who had submitted reports with respect

16    to validity under Section 112, avoided those issues, as was

17    essentially indicated what happened in the opening by

18    counsel for the defendants.  And given that they did not put

19    on evidence at all on the issue of 112, the Court should

20    grant judgment on at least that issue, if not the entire

21    case at this juncture.

22         THE COURT:  Okay.  Do defendants want to address

23    that?

24         MR. KLEIN:  Your Honor, we defer to the Court.

25    Given that it's a bench trial and we're going to have

Cohen - direct

1    closing arguments on Friday, we ask you to deny the motion

2    without prejudice and address the issues they raise later,

3    but I'm happy, if you want to hear argument, I'm happy to

4    address them now.

5              THE COURT:  I am going to deny them without

6    prejudice, but if you want to be heard on them now, that's

7    up to you.

8              MR. KLEIN:  No, that's okay, Your Honor.  I'd

9    rather move forward.

10             THE COURT:  Okay.  Then the motions are denied

11   without prejudice, and let's move on with the evidence.

12             MR. DiNAPOLI:  Your Honor, plaintiffs call as

13   their first witness, Dr. Ron Cohen.

14             THE COURT:  Okay.

15              ... RON COHEN, having been first duly sworn,

16   was examined and testified as follows ...

17             THE COURT:  Welcome, Dr. Cohen.  Good afternoon.

18             THE WITNESS:  Thank you.

19             MR. DiNAPOLI:  Your Honor, may I approach the

20   witness?

21             THE COURT:  You may.

22             (Binders passed forward.)

23                      DIRECT EXAMINATION

24   BY MR. DiNAPOLI:

25   Q.    Dr. Cohen, are you currently employed?

Cohen - direct

1    A.      I am.

2    Q.      How?

3    A.      I am President and CEO of Acorda Therapeutics.

4    Q.      And are you the Ron Cohen that is named as an

5    inventor on the Acorda patents asserted in this case?

6    A.      I am.

7    Q.      What is Acorda?

8    A.      Acorda is a biopharmaceutical company focused on

9    developing therapies to improve or restore function in

10   people with neurological diseases.

11   Q.      And how many employees does Acorda have?

12   A.      Close to 600.

13   Q.      What products does Acorda sell?

14   A.      Our main product is Ampyra, for improving walking in

15   MS.  And we have two much smaller products, one called

16   Zanaflex capsules and the other one called the Qutenza

17   patch.

18   Q.      What is Ampyra?

19   A.      Ampyra is a twice daily pill formulation of

20   4-aminopyridine or dalfampridine indicated to improve

21   walking in people with MS.

22   Q.      I'm going to ask you about your development of

23   Ampyra, but first I want to ask you a few questions about

24   your background.

25           Did you go to college?

Cohen - direct

1    A.      I did.

2    Q.      Where?

3    A.      Princeton University, and I graduated with a BA

4    degree in Psychology in 1977.

5    Q.      And did you continue your formal education after

6    Princeton?

7    A.      Yes.  I obtained an MD degree from the Columbia

8    College of Physicians and Surgeons in New York in 1981.

9    Q.      What did you do after you graduated from Columbia?

10   A.      I completed a three year residency program in

11   Internal Medicine in 1984 at the University of Virginia in

12   Charlottesville.

13   Q.      And what did you do after your residency?

14   A.      I came back to New York City, which is my home town,

15   and practiced medicine for a time, and also was pursuing an

16   avocation which was an interest in theater.

17   Q.      Did you do anything else during that time?

18   A.      I did.  A couple, two and-a-half years or so into it,

19   I was recruited by a couple of scientists who had just

20   started an early stage biotechnology company based on

21   technology that they had invented for tissue engineering.

22   The company was called Marrow-Tech.

23   Q.      And what was Marrow-Tech?

24   A.      It was originally looking to grow human bone marrow

25   for bone marrow transplants in vitro in a dish and then also

Cohen - direct

1    to try to grow other organ and tissues like skin and so

2    forth.

3    Q.     And what were your responsibilities at Marrow-Tech?

4    A.     Well, I was the, I believe the fourth, there were

5    four or five of us in a very rapid period, so I was one of a

6    very small group, so my responsibilities covered almost

7    everything.  And I was originally hired to be VP of medical,

8    but in fact we all did everything.

9              And then as the company grew, my

10   responsibilities grew with it, and I became directly

11   responsible for all clinical and regulatory development,

12   quality assurance, quality control, actually the

13   communications function of the company, the investor

14   relations, the public relations and then I collaborated with

15   the chief scientists and/or the CEO on things like

16   intellectual property and business development and I was

17   also an internal director of the company.

18   Q.     Did your experience at Marrow-Tech influence your

19   career?

20   A.     Yes.  I would say it was transformative.  I was

21   magnetized by seeing firsthand and living firsthand taking

22   science out of the laboratory and trying to turn that into

23   useful medicines that would advance medical care and put

24   that in the clinic for patients.  So that experience gave me

25   my direction in life.

Cohen - direct

1    Q.     What did you do after Marrow-Tech?

2    A.     I left Marrow-Tech at the end, by then it was called

3    Advanced Tissue Sciences, same company.  I left, I took some

4    time to take stock, and then began to work on my own company

5    called Acorda.

6    Q.     And when did you begin working on your Acorda?

7    A.     In 1993.

8    Q.     And what was your plan for Acorda at that time?

9    A.     The original plan was to have a company that would be

10   dedicated to finding therapies to restore function to people

11   with spinal cord injuries and repair the spinal cord

12   injuries and then from there branch out if we were

13   successful into other areas of neurology like MS and

14   Parkinson's and stroke and the like.

15   Q.     How did you go about doing that?

16   A.     My original concept was to establish the company as

17   what we call a virtual company, meaning I had seen in my

18   earlier experience that, at Marrow-Tech, Advanced Tissue

19   Sciences, that we had to raise a lot of money all the time

20   from investors to do what we were doing, and having a lot of

21   fixed costs like a facility and a laboratory and employees

22   required even more money.  And we didn't have any revenue,

23   didn't know when we were going to, and similarly for me when

24   I started Acorda, I didn't even have a product.  So I

25   recruited ten of the world's leading scientists in the field

Cohen - direct

1    related to spinal cord injury and nerve repair to work with

2    me as a network, as a collaborative network out of their own

3    laboratories at their universities.

4    Q.    Was one of those scientists that you recruited

5    Dr. Blight?

6    A.    Dr. Andrew Blight, yes.

7    Q.    What was some of the early research that Acorda

8    worked on?

9    A.    We worked on a different number of molecules that

10   came to our attention that we were able to experiment with.

11   There was something called L1 which was a protein for

12   regenerating nerves.  There was a monoclonal antibody called

13   M1 at the time that was for repairing nerves.  And then at

14   some point we got ahold of rights to or certain rights to a

15   molecule called 4-aminopyridine.

16   Q.    How did you first become aware of 4-aminopyridine?

17   Is it okay if I call it 4-AP?

18   A.    Sure.  I learned about it through my initial

19   conversations with Andrew Blight when I was recruiting him

20   and then recruited him to be part of our scientific advisory

21   collaborative network.  He had told me that he had

22   personally been working with a molecule in his spinal cord

23   injury research, including in vitro experiment, animal

24   experiments and actually even a small human trial.

25   Q.    What was Dr. Blight doing at that time?

Cohen - direct

1    A.     He was the head of neurosurgical research at the

2    University of North Carolina in Chapel Hill.

3    Q.     After Dr. Blight brought 4-AP to your attention, what

4    do you do?

5    A.     He told me that he had worked with a neurosurgeon in

6    Canada to do some initial exploratory study with people with

7    spinal cord injury, and that based on that work, the

8    foundation in Canada that had funded the work had filed a

9    patent.

10          And so I called up the head of that foundation

11   and asked if that patent application were available for us

12   to license.  And I was told that it was not, that they had

13   already licensed it to another company.

14   Q.     And did you eventually obtain rights to that patent

15   application?

16   A.     We did.  Quite -- a number of months later, I don't

17   remember exactly, it could have been six months or so, I was

18   discussing with the scientific advisory group various types

19   of therapies that we could try to develop and one of them

20   raised 4-AP or fampridine, and we told them that we had

21   already looked into it, but then I took that as a prompt to

22   call the head of the foundation again just to check in.  And

23   I checked in and he told me that coincidently he had just

24   decided to take back the rights to the patent application

25   and he was willing to talk to us about it.

1              So Andy Blight and I flew to Florida where there

2    was going to be a spinal cord injury meeting within that

3    week and we met him there and agreed that we would get the

4    rights to it.

5    Q.    And what did you do after you obtained the rights?

6    A.    We -- well, we began to lay out a plan for developing

7    the drug to see if it could be made to work or if it worked

8    in spinal cord injury as a medicine.  The first thing we had

9    do was to actually get a formulation because we didn't have

10   one, we weren't manufacturers.  So we contracted with an

11   outside contract manufacturing organization or a CMO to make

12   a pill for us.

13   Q.    And what was the form of that pill?

14   A.    It was a simple immediate release pill, form of 4-AP,

15   meaning that it had to be taken around four times a day.

16   Q.    And did you ultimately change formulations?

17   A.    We did.

18   Q.    To what?

19   A.    We eventually changed to a formulation that had been

20   developed by Elan Corporation, which was a twice daily

21   sustained release formulation.

22   Q.    And what did Acorda do once they obtained that

23   sustained release formulation?

24   A.    Well, we obtained it in an agreement with Elan, the

25   very beginning of 1997.  And we then set out to design

Cohen - direct

1    clinical trials in people with chronic spinal cord injury to

2    see if we could find a medical, approvable medical use for

3    it.

4    Q.    Did you conduct clinical trials with 4-AP in spinal

5    cord injury?

6    A.    We did, we conducted several trials.

7    Q.    What happened?

8    A.    We went through phase one, phase two, and then

9    ultimately designed and executed two fairly large phase

10   three trials and unfortunately they failed.

11   Q.    When did Acorda first become involved with MS?

12   A.    In 1998.

13   Q.    And what happened at that time?

14   A.    We became aware through our contacts at Elan that

15   they were no longer interested in pursuing or supporting the

16   MS development of this molecule, of their sustained release

17   formulation of fampridine, so we approached them and asked

18   if they would allow us to take over the program, which they

19   did.

20   Q.    What did you learn of Elan's program at that time?

21   A.    Well, we learned that they had also sponsored

22   multiple trials along the way, and that they had done a 161

23   patient trial in MS which was a well-controlled placebo

24   controlled adequate trial, and it had failed.

25   Q.    Why were you interested in taking over the clinical

Cohen - direct

1   development in light of that failed trial?

2   A.    Our situation at the time was very different from

3   Elan's.  We were just a startup, and entirely dependent on

4   investor being interested in putting money in.  We had to

5   take much bigger risks than other companies.  Elan had

6   products on the market, they had revenue, they were

7   diversified, so we had to take really big risks and we knew

8   that.  So despite the fact that there were some daunting

9   challenges there, we felt we had to take the risk.

10  Q.    And after you decided to take over development, what

11  did Acorda do?

12  A.    Well, we reviewed all the information we could on the

13  Elan program.  We reviewed the literature on MS and

14  fampridine.  We actually convened a meeting of clinical

15  advisors that included one or two of the Elan people as

16  well, all to try to get a grounding in how might we proceed

17  at that point.

18  Q.    Did you review any clinical study reports?

19  A.    We did.

20  Q.    What were those study reports?

21  A.    We reviewed the available Elan study reports for

22  their program and in particular we were interested in this

23  161 patient trial and what happened?

24  Q.    In general what was the Elan clinical study reports?

25  A.    In all of them?

Cohen - direct

1    Q.      Just generally, general overview of what it is that

2    you looked at?

3    A.      We looked at their phase one data, their

4    pharmacokinetic data, their phase two where they were

5    exploring outcomes and then leading up to this larger study

6    which was meant to be if you will an acid test, something

7    that really would have the power to show effects.

8    Q.      Take a look at PTX 360 in your book and my question

9    is whether you can identify that document?

10   A.      Yes.

11   Q.      What is it?

12   A.      This is the Elan study report for this trial that I

13   was referring to, the 161 patient trial.

14   Q.      What is the date of the report?

15   A.      It is February 1996.

16   Q.      Is this one of the study reports that you reviewed in

17   1998?

18   A.      It is.

19   Q.      What's your understanding of the clinical study

20   described in that report?

21   A.      Well, this was a double blind randomized placebo

22   controlled study in 161 patients looking at both safety and

23   efficacy of sustained release form of fampridine twice a day

24   in people with multiple sclerosis with several different

25   outcome measures that they were looking at, two outcome

Cohen - direct

1    measures were prespecified in particular.

2    Q.    Did you have an understanding of what the primary

3    endpoints were?

4    A.    Yes.

5    Q.    And what were they?

6    A.    One of them was the Kurtzke EDSS which is the

7    disability score for people with MS.  And the other one was

8    a patient reported outcome with perception of their health

9    whether it had improved or not.

10   Q.    Do you know why the EDSS was selected as the primary

11   endpoint?

12   A.    I do.  If we go to page -- actually I'll go to page

13   102 of this document.  They actually specified why they

14   picked it.  And if you look at the first sentence in the

15   third paragraph, it says the major endpoints for this study

16   were selected on the recommendation of an MS advisory group

17   as these endpoints had already been used in previous studies

18   and were accepted by the MS community.  I think it's also --

19   I should point out that the protocol also says that this was

20   the largest study that had been done with fampridine.

21   Q.    Do you know what doses were tested in the study?

22   A.    Yes, I do.  They were three doses.  The people in the

23   study who got drug versus placebo started at 12-and-a-half

24   milligrams twice daily and that was increased over time by

25   five milligram increments to 17-and-a-half milligrams twice

Cohen - direct

1    daily and then 22-and-a-half milligrams twice daily, unless

2    it was not tolerated at a higher dose and then it was dialed

3    back.

4    Q.    And did you have an understanding of why the dose was

5    gradually increased?

6    A.    Yes.

7    Q.    What was that understanding?

8    A.    The molecule was known and continues to be known to

9    have potentially toxic effects, particularly as the doses

10   get higher and higher.  These include seizures, among other

11   serious events.  So the understanding of how to administer

12   the drug was to start with a low starting dose and then

13   raise it over time so that the patient could acclimate and

14   get to an ultimate dose hopefully without adverse event.

15   Q.    What does the study report say about the results of

16   the clinical study?

17   A.    The only outcome measure that had a statistical

18   significant difference in the drug versus placebo was a

19   secondary outcome which was the lower extremity motor score,

20   so the test of muscle strength in the legs.  The primary

21   outcomes failed and did not show significance, and the rest

22   of the secondary outcomes also failed.

23   Q.    I take it eventually Acorda did conduct a clinical

24   study?

25   A.    We did.

Cohen - direct

1    Q.      And what was that first study?

2    A.      The first study was actually looking at the eye

3    muscles, so we were looking at a very discrete type of motor

4    function, and that would be the nerves that innervate the

5    eye muscles.  And people with MS very frequently get

6    something called Internuclear Ophthalmoplegia, INO, where

7    certain muscles become weak and, therefore, the patient

8    cannot move their gaze.  They get blurry vision and double

9    vision.  That's what we looked at to see if we could improve

10   that.

11   Q.      Why don't you take a look at PTX 413A.

12   A.      Yes.

13   Q.      And can you identify that document?

14   A.      This is the clinical study report for that INO study

15   I just referenced.

16   Q.      If you look at the cover page, it says protocol

17   number MS-F200.  What does that refer to?

18   A.      That is the designator for this particular study.

19   Q.      Is it okay to refer to it as the F200 study?

20   A.      Yes.

21   Q.      What's the date of the report?

22   A.      The date of the report is November 5th, 2001.

23   Q.      When was the F200 study conducted?

24   A.      It was conducted between October 11th, 1999 and May

25   11th, 2000.

Cohen - direct

1   Q.      Can you generally describe what that study was?

2   A.      Yes.  This was a study in 24 people who had MS and

3   Internuclear Ophthalmoplegia, and it was looking at three

4   different doses of fampridine against placebo.  And there

5   was a device that could measure eye movements and the

6   velocity and direction of eye movements with tremendous

7   precision.  And the center in Texas that did the study under

8   our sponsorship had this device so they were able to execute

9   this study.

10  Q.      What were the results?

11  A.      None of the outcomes worked.  The study failed.  One

12  of the studies the placebo did better, the study failed.

13  Q.      After that failed eye movement study, what did Acorda

14  do?

15  A.      We took stock and in essence took a step back and

16  decided to start from an earlier point of view in our own

17  hands, we designed a dose ranging study to look primarily at

18  a range of doses and safety and tolerability and

19  pharmacokinetics at those doses and secondary to explore a

20  number of different outcome measures to see if any one of

21  them gave us a hint of where we might go next.

22  Q.      Take a look at PTX 466A.

23  A.      Yes.

24  Q.      Can you identify that document?

25  A.      Yes.  This is the clinical study report for the, what

Cohen - direct

1    we -- what we call the 201 study, but it was this dose range

2    study.

3    Q.      It's okay to refer to it as the F201 study?

4    A.      Yes.

5    Q.      What is the date of the report?

6    A.      July 15th, 2006.

7    Q.      When was the F201 study conducted?

8    A.      Between November 6th, 2000, and September 18, 2001.

9    Q.      And can you just briefly describe the design of the

10   study?

11   A.      Yes.  There were -- there was a total of 36 people

12   with MS in the study.  25 of them had -- were in the

13   randomized to the drug group and 11 of them were randomized

14   to the placebo group.  After a week of run in, I believe it

15   was a week, but after a period of run in, the drug group got

16   five milligrams twice daily for a week, the placebo group

17   got placebo.  And then every week the drug group got

18   escalating doses by five milligrams BID, meaning they would

19   start at 10, 15, 20, 25, all the way up to 40 milligrams BID

20   in the seventh week and the placebo would get the placebo

21   throughout that time.

22   Q.      Why did you chose the 10 milligram dose as the

23   starting dose?

24   A.      Again, as we previously discussed from the Elan

25   studies, we knew based on everything that we had learned

Cohen - direct

1    about the field that with this drug because of the risk of

2    severe toxicity it was important to have a low starting dose

3    and then titrate upward hopefully to get maximum effect

4    without getting intolerable side effects for the patient.

5    Q.    And what did you choose the 40 as the top dose?

6    A.    Based, we were also running a spinal cord injury

7    program at the time, and we had done dose ranging program

8    there.  Based on that, it was our strong impression that

9    above 40 milligrams twice a day, there was an intolerable

10   increase in the risk of severe adverse events so we should

11   not go above that.

12   Q.    What other measures did you include in the F201

13   study?

14   A.    We had quite a few.  We were particularly interested

15   in fatigue, and so we had at least two different fatigue

16   outcome measures in there.  We had the lower extremity

17   manual muscle test.  We had the multiple sclerosis

18   functional composite, which comprises three different tests.

19   The timed 25 foot walk, a nine hold peg test, and what is

20   called the PSAT-3 which is a cognitive test.  There were

21   also multiple subjective measures for both the clinicians

22   and the patients.

23   Q.    Well, what were the results of the F201 study?

24   A.    All of the prespecified analyses failed except for

25   the lower extremity manual muscle test which, when comparing

Cohen - direct

1    the seven week range drug group against placebo, was

2    statistically significant.

3    Q.     And so I'm clear, what were the results of the timed

4    walk?

5    A.     It was not at all significant.

6    Q.     And how did that compare to the Elan studies you had

7    reviewed?

8    A.     It was consistent with the Elan study, the 161

9    patient study.

10   Q.     And was it inconsistent with any of the Elan studies?

11   A.     It was inconsistent with a very small study that Elan

12   had sponsored after the failure of the 161 study -- 161

13   patient study.  They had sponsored a single center trial in

14   10 people with MS.  It was a crossover design so everyone

15   got placebo, everyone got drug, and they used the timed 25

16   foot walk, and that study indicated that the timed 25 foot

17   walk might work, but it did not work in our study.

18   Q.     If you turn to Figure 1 on page 63 of the study

19   report, the F201 study report.

20   A.     Yes.

21   Q.     And can you explain what you are showing here?

22   A.     Yes.  Yes, this is a graphic representation of each

23   week of the study with respect to the change in baseline,

24   in seconds on the timed 25 foot walk.  Now, this is average

25   for each group.  So the dark gray is the drug group, the

Cohen - direct

1    fampridine SR group the light gray is the placebo group.

2    And the zero line would be the baseline.  So that was before

3    anyone got randomized or got drug.  This was their baseline.

4              So what you are seeing is week by week what the

5    change in average seconds from baseline is for each group.

6    Q.    What does Figure 1 show about the results from the

7    placebo in an F201 study?

8    A.    It shows variability.  And there is, most of the

9    placebo weeks actually show some improvement.  The third

10   week you see an average worsening of 2.6 seconds or slowing

11   of 2.6 seconds.

12   Q.    And which is the best results shown on Figure 1?

13   A.    So if you look at all of the bars, the best result is

14   actually, if you look at placebo and drug, the best result

15   is actually the placebo group in week 7 showing 4.3 seconds,

16   4.32 second reduction in time.

17   Q.    And if you look at I guess study week 1, what was the

18   dose in study week 1?

19   A.    That was 10 milligrams twice daily.

20   Q.    What does Figure 1 show about the placebo data

21   relative to the 10 milligrams twice daily dose?

22   A.    Well, what you see here, in week one for the drug

23   group, there is an average decrease of 2.57 seconds.

24             If you look at the placebo experience in the

25   trial, three out of the seven weeks are actually a better

Cohen - direct

1    result than for that 10 milligram group.

2    Q.    Did you do any posthoc analysis of the data in the

3    201 study?

4    A.    Yes, we did.

5    Q.    What was that analysis?

6    A.    We analyzed the timed 25 foot walk according to speed

7    as opposed to time.

8    Q.    And what was the result of that?

9    A.    That showed a statistically significant difference

10   between the drug and placebo group.

11   Q.    After the F201 study, what did Acorda do?

12   A.    We then designed a next study which was designed to

13   explore what we had done in 201 and to then explore it and

14   see if we could make anything of it.  So we designed what we

15   call the 202 study.

16   Q.    And why was it that you continued development of 4-AP

17   after the 201 study?

18   A.    I'm sorry, I missed the question.

19   Q.    No problem.  Why was it you continued development of

20   the 4-AP and MS after the 201 study?

21   A.    We were quite discouraged after the 201 study.  The

22   only thing that we could point to was the posthoc analysis,

23   and we knew that posthoc analyses were particularly fraught

24   with risk as well as the fact that it was already a small

25   study to begin with.

Cohen - direct

1          However, it was all we had to go on.  So we

2     decided that we were going to take the walking speed based

3     on that posthoc analysis and see if we could get that to

4     work prospectively.

5     Q.    And why did you choose walking speed?

6     A.    Because that was the only meaningful -- well, I

7     shouldn't say meaningful.  It was the only test other than

8     the muscle strength that showed any hint of significance.

9     And we didn't really know what to do with the muscle

10    strength so we had to go with the walking.

11    Q.    Take a look at PTX-168A.

12    A.    168A.  Yes.

13    Q.    And can you identify that document?

14    A.    This is the clinical study report for that next study

15    that we designed, the MS-F202 study.

16    Q.    So it's okay to refer to that as the F202 study?

17    A.    Yes.

18    Q.    And what is the date of this report?

19    A.    It is November 30th, 2006.

20    Q.    And does it say when this study was run?

21    A.    Yes.  Between February 27th, 2003 and December 18th,

22    2003.

23    Q.    What doses did you use in the 202 study?

24    A.    On this study, we used 10, 15, and 20 milligrams

25    twice daily --

Cohen - direct

1    Q.    Why --

2    A.    -- versus placebo.

3    Q.    I'm sorry.

4    A.    I'm sorry.

5    Q.    No problem.  It was my fault.  Why did you choose

6    those doses?

7    A.    Based on my experience with the 202 study and our

8    overall experience, we were concerned about going higher.

9    It was clear that certainly above 25 milligrams twice daily

10   that we were seeing more and more serious adverse events

11   including seizure.

12            And in the 201 study, at least numerically, it

13   didn't seem that the 25 BID week was much different than the

14   20, so we also had to limit the size of the studies so we

15   thought that the range of 10 to 20 was the reasonable one to

16   test.

17   Q.    And is there anything about walking speed in general

18   that shed light on what dosages you would have wanted?

19   A.    Well, yes.  The whole point in walking speed is that

20   people with MS begin to lose walking ability and then

21   incrementally they lose more and more.  So it's a continuum.

22   It's not an on/off type of an outcome.

23            The whole point, if you want to be clinically

24   beneficial to these people, is that you have to get the

25   maximum effect that you can.  You have to improve their

Cohen - direct

1    walking speed as much as you can, because the more you

2    improve it, that's a very good proxy for overall walking

3    ability, so you are pushing them closer to normal state

4    walking as it were.  So it was very important to us that

5    we get the maximum benefit we could on walking for these

6    people.

7    Q.    What was the dosing design used in this study?

8    A.    There was a run-in period where people either got

9    nothing or they got placebo.  Then we had a two week up

10   titration period where -- well, it was two week up titration

11   period, then there was a 12 week period on final dose, we

12   call that the stable dose period, and then they came off

13   drug and we measured them two weeks later.

14   Q.    And why did you use an up titration period?

15   A.    Well, again, with this drug, it was necessary to have

16   a low starting dose and then increase it over time to get

17   to maximal dose, maximally beneficial dose hopefully without

18   getting into intolerable side effects.

19   Q.    What analysis did you originally plan to do in the

20   202 study?

21   A.    The original analysis was to do, to look at the

22   average change in walking speed across the stable, 12 week

23   stable dose period versus baseline and then compare those

24   changes between the different drug groups and placebo.

25   Q.    And what was the result of that analysis?

Cohen - direct

1   A.      It failed.  It did not show a statistically

2   significant difference for any of the drug groups versus

3   placebo.

4   Q.      And how did that compare to the 201 study?

5   A.      Well, the posthoc analysis in the 201 study looked at

6   speed, and that did show a statistically significant change.

7   In this case, the prospective analysis based on speed did

8   not.  So it was not consistent with that result.

9   Q.      And so after you reviewed -- after you received the

10  analysis showing that there was no statistical significance,

11  what did you do?

12  A.      Well, we looked more deeply at the study and we

13  looked at various parts of it.  And two things jumped out at

14  us.

15          One thing is that during the up titration period

16  where people were getting either placebo or 10 milligrams or

17  10 and then 15 milligrams for two week period, that that was

18  statistically significant versus placebo.

19          And then we looked at the latter part of the

20  study after stable dose when they stopped taking drug and

21  came back two weeks later and what we found was that all

22  three drug groups dropped back to baseline or even below

23  baseline level versus placebo, and that was also

24  statistically significant.  So that was the first thing we

25  did.

Cohen - direct

1   Q.      Did you do any other analysis?

2   A.      We did.  At that point, because of those findings in

3   the up titration and post-stable dose period, I asked the

4   statistician to give me printouts of all 206 people in the

5   study.  And I wanted specifically the graphs of their timed

6   walk speeds for all of the weeks of all of the visits of the

7   study and I wanted them blinded.  So she gave them to me

8   with number markers, but I didn't know who was in what

9   group, placebo or dose of drug or anything.

10          I then saw with Andy Blight who was my

11  collaborator and discussed it with him and then examined

12  each of those traces, all 206 of them, applying my clinical

13  acumen to them.  And I was looking to see whether I thought

14  I was persuaded that there was actually a meaningful

15  difference from baseline in one patient versus another.

16          And I ultimately separated these printouts into

17  two piles:

18          One pile was the pile where there was absolutely

19  nothing changing over time or it looked random enough to my

20  clinical eye that I was not persuaded that there was

21  actually a meaningful effect or not likely to be.

22          The other pile was one where I was either very

23  persuaded or extremely confident that there was a meaningful

24  change going on from baseline.

25          And I gave the two piles to the statistician and

Cohen - direct

1   asked her to unblind and tell me what I did.

2           When she came back, she gave me the results.

3   And the results showed that the group that I had designated

4   as very confident or extremely confident that there was a

5   meaningful change, positive change going on was

6   overwhelmingly filled with people in the drug groups versus

7   placebo.  And the P value on that was less than .0001.

8   Q.    And after you received this information, what did you

9   do?

10  A.    Well, I discussed it at great length with Andy, and

11  we converted that finding into what we called a responder

12  analysis.  And once we had the responder analysis, we gave

13  that to our statisticians and asked them to apply it to the

14  study as if they had just unblinded the study, and that this

15  was -- as if it were the primary analysis.  Of course, it

16  was posthoc.  And they did that.

17          And what they found was that the responders

18  under that responder analysis were again overwhelmingly

19  filled with drug patients versus placebo patients and the

20  P value on that was less than .0001.

21  Q.    Did you draw any conclusions about the relative

22  effects of the 10, 15, and 20 milligram dose?

23  A.    We did.

24  Q.    What was those conclusions?

25  A.    We were extremely surprised to see that there was

Cohen - direct

1    actually no meaningful difference among the three drug

2    doses, 10, 15, or 20.  10 was as good as 15 or 20 with

3    respect to the responder analysis.

4    Q.    And what was your reaction to that?

5    A.    We were extremely surprised, as I said.  Everything

6    that we had come to expect throughout the program told us

7    that we should be seeing more and more efficacy the higher

8    the dose went as long as the patients were tolerating it and

9    that turned out not to be the case.

10   Q.    And did you draw any conclusions with respect to the

11   titration of 4-AP in your clinical study?

12   A.    Well, based on that, we realized we didn't have to

13   titrate any more because 10 milligrams is what we would need

14   to use.  You want to use a dose that is not going to have

15   intolerable side effects as long as it is the most effective

16   dose, and since we now saw that it was as effective as 15

17   or 20, there was no reason to go higher and titrate.

18   Q.    After the 202 study, did Acorda continue the

19   development of 4-AP in MS?

20   A.    We did.

21   Q.    What did you do?

22   A.    We designed a Phase III study with the responder

23   analysis as the prospectively defined primary outcome

24   measure, and only one dose in the drug group, and that was

25   the 10 milligram BID dose or twice daily.

1    Q.     Was that one study?  What was the result of the

2    study?

3    A.     Well, we did two studies in sequence.  So we did one

4    and then we got the results, and then we did another Phase

5    III study that was very similar.

6    Q.     And what was the results?

7    A.     Both of them succeeded and showed that the primary

8    outcome hit, as it were, with P values less than .0001.

9    Q.     After the successful studies, what did you do?

10   A.     We prepared a new drug application, an NDA to get

11   approval, and we submitted that to the FDA.

12   Q.     Did you get any special review from the FDA in

13   connection with your NDA?

14   A.     We did.

15   Q.     And what was that?

16   A.     We got what is called priority review, which is a

17   shorter review than usual.

18   Q.     When was Ampyra approved?

19   A.     It was approved in January of January of 2010.

20   Q.     What is your understanding of how well received

21   Ampyra was following its approval?

22   A.     It was extremely well received.  It -- the uptake was

23   far more rapid than we or anyone else following us had

24   expected.  It turned out that doctors told me that they had

25   been, the word is "warehousing," but they had been taking

Cohen - cross

1    patient interest for a long time because the patients had

2    been following our clinical trials as they came out, so

3    there was a huge pent-up demand right when we launched in

4    March of 2010.

5    Q.    All right.  And was that reflected in the sales of

6    Ampyra?

7    A.    It was.  You know, the ten months sales period for

8    that year, we sold something over $130 million, which was

9    around twice what the projections had been.

10   Q.    Have the sales increased since then?

11   A.    They have.

12   Q.    What are they currently?

13   A.    We're projecting this year they'll be just short of

14   about $500 million.

15              MR. DiNAPOLI:  I have no further questions, Your

16   Honor.

17              THE COURT:  Okay.  Cross-examination.

18              MR. KLEIN:  May I approach?

19              THE COURT:  Yes, you may.

20              (Binders passed forward.)

21                      CROSS-EXAMINATION

22   BY MR. KLEIN:

23   Q.    Good afternoon, Dr. Cohen.

24   A.    Good afternoon.

25   Q.    My name is Chuck Klein and I will be asking you a few

Cohen - cross

1    questions on behalf of the defendants.

2              So you and Dr. Blight are the listed inventors

3    for all of the four Acorda patents at issue in this case; is

4    that right?

5    A.    Yes.

6    Q.    You didn't invent 4-AP, though; correct?

7    A.    Correct.

8    Q.    And you didn't invent the use of 4-AP to treat MS

9    patients; is that correct?

10   A.    We invented a particular use, but not -- I don't --

11   we invented a particular use.

12   Q.    Let me rephrase.  You didn't discover that 4-AP could

13   be used to treat MS; correct?

14   A.    Well, we discovered it could be used and how it could

15   be used to treat walking and MS.

16   Q.    But there were others such as Davis who wrote

17   articles before you even got involved in the issue about

18   using 4-AP to treat MS; correct?

19   A.    There were -- it had been proposed before we came

20   along.

21   Q.    And there had been testing as well; correct?

22   A.    Yes.

23   Q.    And you and Dr. Blight didn't invent the concept of

24   using 4-AP in a sustained release formulation to treat MS

25   patients; correct?

Cohen - cross

1    A.      Correct.

2    Q.      Elan Corporation invented that?

3    A.      Elan invented the sustained release formulation that

4    we used and are using.

5    Q.      Or they have a patent to it, they have a patent on

6    that topic; correct?

7    A.      Yes.

8    Q.      There is obviously a dispute as to whether it's

9    patentable.  And that patent, I don't know if you know the

10   number, it's the '938 patent, does that sound familiar?

11   A.      I have not read it in many years, but that sounds

12   familiar.

13   Q.      Fair enough.  But do you understand it issued in

14   1996?

15   A.      Again, not from memory.  I don't remember exactly

16   when, sorry.

17   Q.      But Acorda -- after that patent issued, Acorda took a

18   license, an exclusive license to that patent; is that right?

19   A.      Yes.  For spinal cord injury initially.

20   Q.      And then MS as well?

21   A.      Yes.

22   Q.      And that happened a couple of years after the patent

23   issued?

24   A.      Well, depending on -- what was the date you said?

25   Q.      1996.

Cohen - cross

1    A.     So assuming -- we did our deal with Elan January of

2    1997 for spinal cord injury, and then in 1998 for MS.

3    Q.     And you obtained the 10 milligram sustained release

4    4-AP product from Elan; right?

5    A.     Yes.

6    Q.     And you used Elan's formulation for the clinical

7    studies that you talked about on direct?

8    A.     Yes.

9    Q.     And you didn't do any development work on any

10   sustained release formulation for 4-AP; correct?

11   A.     Not at that time, no.

12   Q.     Not at any time; right?

13   A.     We have been doing work much more recently on another

14   type of sustained release, but we did not during that

15   program at all.

16   Q.     Certainly not before 2004?

17   A.     No.

18   Q.     And so before 2004, Acorda never modified the

19   sustained release 4-AP product that it got from Elan;

20   correct?

21   A.     No.

22   Q.     Now, on direct, you referenced a clinical study, it's

23   PTX 360, that I think you referred to as a failed Elan

24   study; is that right?

25   A.     I don't remember the designator.  If you can just

Cohen - cross

1   maybe point me to it.

2   Q.      Can you put up PTX 360.

3           PTX 360 is the study that you referred to as a

4   failed Elan study?

5   A.      I believe this was the 161 patient study that I

6   referred to.

7   Q.      Now, this study report was not made public; correct?

8   A.      I'm not aware that it was.  I wouldn't be final

9   arbiter on that, but I don't believe it was.

10  Q.      And the details as to this study weren't made public

11  either; correct?

12  A.      I believe that there was at least one published paper

13  that made a reference to an outcome or some of the outcomes

14  of the study.

15  Q.      Is that the Schwid paper?

16  A.      I believe so.

17  Q.      Other than the Schwid paper, you're not aware of any

18  other publication that discussed this Elan study reflected

19  in PTX 360?

20  A.      I'm not aware of one, no.

21  Q.      And you and Dr. Blight continued to use Elan

22  sustained release 4-AP formulation to develop a product even

23  after this study; correct?

24  A.      We did.

25  Q.      And you claimed to have found a preferred dose of the

Cohen - cross

1   Elan product for treating MS patients; is that right?

2   A.    We did.

3   Q.    And that dose is 10 milligrams taken twice daily;

4   correct?

5   A.    Yes.

6   Q.    Now, you then tested Elan's 10 milligrams 4-AP

7   product in phase two studies related to MS; correct?

8   A.    Yes.

9   Q.    And the first phase two study is what you refer to as

10  the F201 study?

11  A.    The 200 study.

12  Q.    The 200 study?

13  A.    Yes.

14  Q.    And then there was a phase two study referred to as

15  the F201 study as well?

16  A.    Yes.

17  Q.    And the results of the F201 study were made public

18  before 2004 by Dr. Goodman; correct?

19  A.    If you could maybe help me with a specific reference.

20  Q.    Sure.  Can you put up JTX 061.

21        It's -- just do the middle left-hand side for

22  now.  You see the date, April 1, 2003 at the top?

23  A.    Yes.

24  Q.    And then there is a title, placebo controlled

25  double-blinded dose ranging study of fampridine SR in

Cohen - cross

1    multiple sclerosis.

2    A.    Yes.

3    Q.    And the first author is Dr. Goodman?

4    A.    Yes.

5    Q.    And do you recognize this as reporting the results of

6    the F201 study?

7    A.    Yes.

8    Q.    If you go to the next page, the next column, rather.

9    You see the results paragraph?

10   A.    Yes.

11   Q.    Halfway into the results paragraph there is a

12   sentence that reads, "the fampridine", do you see that?

13   A.    Yes.

14   Q.    And there it says, "The fampridine SR group showed

15   statistically significant improvement from baseline compared

16   to placebo in functional measures of mobility timed 25

17   walking speed, P equals 0.04."  Do you see that?

18   A.    Yes.

19   Q.    That is an accurate characterization of the results

20   of the F201 study; is that right?

21   A.    It is an incomplete characterization.  Given that

22   there is no context, so if you just take it at face value,

23   it is accurate, but it is missing important context.

24   Q.    And the important context that you are referring to

25   is information that is in the clinical study report that you

Cohen - cross

1   discussed on direct examination?

2   A.      Specifically among other things it would be the fact

3   that it was a post hoc analysis.

4   Q.      And that comes from the data in the clinical trial

5   report?

6   A.      That is in the clinical trial report, yes.

7   Q.      The clinical trial report is -- was not made public

8   before 2004; correct?

9   A.      Not to my knowledge.

10  Q.      In fact, none of the clinical trial reports that you

11  went through on direct examination were made public before

12  2004; is that correct?

13  A.      To my knowledge they were not.

14  Q.      Were any of them ever made public, the actual

15  reports?

16  A.      To my knowledge, they are not.

17  Q.      Now, I think, correct me if I'm wrong, but on direct,

18  I think I heard you testify that you were discouraged after

19  the F201 study; is that right?

20  A.      Yes.

21  Q.      Now, but sir, the 201 study results actually

22  demonstrated that sustained release 4-AP improved walking

23  ability in MS patients; correct?

24  A.      They did not demonstrate that in the sense that they

25  did not remotely prove it.  They gave in a very small

Cohen - cross

1    exploratory study that was not at all powered or intended to

2    prove efficacy, they gave what I would call a clinical

3    suggestion about where you could go next.  This was what we

4    call a hypothesis generating study.  So they generated a

5    hypothesis that we could test, meaning we could do another

6    trial and see if walking speed was any good for this.

7    Q.     Now, sir, before 2004, Acorda announced to the entire

8    world that participants in MS studies with sustain release

9    4-AP had demonstrated improved walking ability and lower leg

10   strength; is that correct?

11   A.     Demonstrated is a term that means this is what the

12   study showed.  It does not say proved, it does not say that

13   there is confidence in that outcome, it just says that

14   that's what you saw when you analyzed it.

15   Q.     Let's go to DTX 584.  Do you recognize DTX 584 as

16   coming from Acorda's website?

17   A.     I don't directly recognize it.  It looks -- I mean,

18   it looks like it could be from the website.  I can't say I

19   directly read this any time recently.

20   Q.     At the top, you see there is a date, December 3, so

21   let's take that down for a minute.  And let's highlight the

22   first full paragraph, by heading, fampridine clinical

23   history in the first full paragraph, do you see that?

24   A.     Yes.

25   Q.     And the beginning of this discusses how approximately

Cohen - cross

1   550 people have been treated with fampridine SR in 14

2   clinical trials.  Do you see that?

3   A.     Yes.

4   Q.     And it goes on to talk about not only SCI, but also

5   six clinical trials for MS; right?

6   A.     Yes.

7   Q.     If you look at the last sentence it says,

8   "Participants in MS studies demonstrated improved walking

9   ability and lower leg strength."

10             Do you see that?

11  A.     I do.

12  Q.     Was that a statement that Acorda made before 2004 to

13  the public on its website?

14  A.     Well, I cannot personally attest to what we did on

15  the website.  I'm taking your word for it that this is our

16  website from that time.  And as we discussed, saying that it

17  demonstrated is simply saying that there were data that

18  showed this, it says nothing about whether the data were

19  reproducible or any good or true, it just says that's what

20  was shown.  It doesn't say anything about all the studies

21  that didn't work, for example.

22  Q.     This is referring to the F201 study; correct, given

23  the date?

24  A.     Well, we had other studies as well.  The 200 study,

25  for example.

Cohen - cross

1    Q.     Okay.  I mean --

2    A.     And it's not clear to me that it's referring only to

3    the Acorda sponsored trials.  It doesn't say Acorda's

4    trials, it says they have been treated.  So it might be

5    referring to academic trials or Elan trials, I don't know,

6    but it doesn't outright say that.

7    Q.     So when the website says participants in MS studies

8    demonstrated improved walking ability and lower leg

9    strength, you read that as referring to more than just the

10   F201 study?

11   A.     This is referring to eight clinical trials for spinal

12   cord injury and six clinical trials for MS.  To the best of

13   my recollection, we had not run at that point six clinical

14   trials in MS.  I could be misremembering it, but it's

15   referring to trials that had been done by someone, some of

16   them undoubtedly us, but not necessarily all.

17              And then it says, it gives sort of a global

18   summary saying that among all those studies, there were

19   studies that where they saw improved walking and lower leg

20   strength, that's all it says.

21   Q.     Can you also highlight the last paragraph.

22              So here it says Acorda is currently conducting

23   two phase three clinical trials of fampridine-SR in chronic

24   SCI as well as a phase two clinical trial in MS.  Given that

25   language, does that lead you to believe that at the time

Cohen - cross

1    this statement was made, the F201 study was completed, but

2    the F202 study was ongoing?

3    A.      Yes, that would be my impression.  Although,

4    actually, let me just say, it says as well as a phase two

5    clinical trial, well, the 201 was also a phase two study, so

6    I can't say that with assurance.

7    Q.      The F201 study was completed by December 3rd, 2003 --

8    A.      It was -- if this is reflective of December 3rd, it

9    would have been completed by then, this would have then

10   referred to the 202 study.

11   Q.      The F201 study results strongly supported using

12   Elan's 10 milligrams 4-AP formulation in future clinical

13   studies, do you agree with that?

14   A.      Not exactly as you pose it, and not strongly

15   supported.  I would not say that.  I would say that the 201,

16   the F201 study gave us a direction.  That was the best you

17   could say.  And that direction was to look somewhere in the

18   range of 10 and 20 milligrams BID and see whether we could

19   show an effect on walking speed.  It was a hypothesis

20   generating study.  And, in fact, as I pointed out, that

21   study did not work as designed.

22   Q.      So the F201 study supported looking to see if I think

23   you said 10 or 20 milligrams BID would work in a future

24   study?

25   A.      I said it supported looking at a range between 10 and

1    20 milligrams BID to see if anything could work.

2    Q.    And when you say could work, you're referring to --

3    A.    The walking speed based on the timed 25 foot walk.

4    Q.    For at least two weeks; correct?

5    A.    What are we talking about now?  What we learned from

6    that study, from the 201 study?

7    Q.    Let me rephrase.

8    A.    All right.

9    Q.    I believe you said that the F201 study supported

10   looking to see whether the -- whether a dose between 10 and

11   20 milligrams taken twice daily would improve walking speed

12   in MS patients.  Do I have that right?

13   A.    It gave us a hypothesis to test that between --

14   somewhere in the range of 10 to 20 milligrams that we should

15   test that range for walking speed in MS versus placebo.

16   That's all it told us.  It didn't tell us anything about

17   duration or anything of the kind.

18   Q.    But when you go ahead and conduct those tests, it

19   would certainly test whether a dose within that range would

20   work for at least two weeks in MS patients; correct?

21   A.    I can't tell you what it certainly would do.  I can

22   tell you what that study did in 202 which actually looked at

23   dosing for 14 weeks.

24           MR. KLEIN:  I have no further questions.

25           Thank you.

```
 1                    THE COURT:  Okay.  Redirect.

 2                    MR. DiNAPOLI:  I have no questions, Your Honor,

 3       but I do want to move into evidence four exhibits referred

 4       to during Dr. Cohen's direct, PTX 360, PTX 413A, PTX 466A,

 5       and PTX 168A.

 6                    THE COURT:  Are there any objections?

 7                    MR. KLEIN:  No objections.  And we would like to

 8       move in DTX 584.

 9                    THE COURT:  Was that DTX 584?

10                    MR. KLEIN:  Correct.

11                    THE COURT:  Any objection to that?  Any

12       objection?

13                    MR. DiNAPOLI:  Sorry.  No, Your Honor.

14                    THE COURT:  All five of those exhibits are

15       admitted.  You may step down.  Thank you, Doctor.

16                    Plaintiff can call their next witness.

17                    MR. STIEFEL:  Your Honor, plaintiff calls Dr.

18       Reza Fassihi.

19                    ... REZA FASSIHI, having first been duly sworn

20       on oath, was examined and testified as follows ...

21                    THE COURT:  Thank you.  Good evening.

22                    MR. STIEFEL:  May I approach?

23                    THE COURT:  Yes, you may approach.

24                    MR. STIEFEL:  Thank you, Your Honor.

25                    (Binders passed forward.)
```

Fassihi - direct

1                    DIRECT EXAMINATION

2    BY MR. STIEFEL:

3    Q.     Good afternoon, Dr. Fassihi.

4    A.     Good afternoon.

5    Q.     Would you state your name for the record?

6    A.     Razi Fassihi.

7    Q.     And how are you employed?

8    A.     I'm employed at Temple University, School of

9    Pharmacy.  I am Professor of Pharmacy there.

10   Q.     And what is that?  What field does that encompass?

11   A.     Being a Professor of Pharmacy, you teach

12   pharmaceutics courses.  You are involved with formulation

13   development.  You are involved in research activities and

14   responsibilities within the university.

15   Q.     And how long have you been at Temple University?

16   A.     I've been at Temple for 24 years.

17   Q.     And what generally are your duties at Temple

18   encompass?

19   A.     I teach at Temple University.  I do research and I'm

20   also involved in some administrative work.

21   Q.     Administrative work of what kind?

22   A.     I was director of graduate programs, and I'm a chair

23   of multiple committees that relate to education at all

24   levels.

25   Q.     Would you briefly describe your post-high school

Fassihi - direct

1    education?

2    A.    I got my Bachelor's of Pharmacy from Punjab

3    University in India.

4              From there, I went to United Kingdom.  I got my

5    Ph.D. from Brighton University in 1978.

6    Q.    And what did you do immediately after you received

7    your Ph.D. in 1978?

8    A.    After I got my Ph.D., I joined Isfahan University in

9    Isfahan as an Assistant Professor in Pharmacy.

10             Then in 1982, I joined, I went back to United

11   Kingdom and joined the School of Pharmacy at Brighton

12   University as a postdoctorate fellow.

13             The following year of that, 1983, I joined a

14   School of Pharmacy as a Senior Scientist at Welsh School of

15   Pharmacy in Cardiff.

16   Q.    And what did you do after the Welsh School of

17   Pharmacy?

18   A.    After there, I joined Rhodes University in

19   Grahamstown in South Africa as a Senior Lecturer, which is

20   equivalent to Associate Professor in U.S. terms.

21             And I was there, and after four years, I went to

22   Johannesburg, South Africa.  I became Head of Department and

23   Chair of School of Pharmacy, Chair of Pharmaceutics At the

24   School of Pharmacy at the University of Witwaterstrand.

25   Q.    And where did you go after Johannesburg?

Fassihi - direct

1   A.      In 1991, I joined University of Cincinnati as a

2   Visiting Professor working with Dr. Richard that was

3   mentioned here for a year.

4            And then in 1992, I joined Temple University as

5   Professor, and I've been at Temple since then.

6   Q.    And what courses have you taught at Temple

7   University?

8   A.      Well, at Temple, we have Pharm.D students, and Ph.D.

9   students, and amateur students.

10           So I teach the courses that I have taught are

11  pharmaceutics, drug formulation, controlled drug release

12  systems, the bioavailability, bioequivalency, and there are

13  model pharmaceuticals, these other particle preparations.

14  Q.    And do you teach a course on sustained release

15  formulations specifically?

16  A.      I do, yes.

17  Q.    And to whom do you teach that?

18  A.      Well, some basics of controlled release technology

19  very similar to what Dr. Kibbe described, I teach at the

20  Pharm.D level.  And then I have more advanced courses in

21  controlled release that are designed for Ph.D. students and

22  those who want to go to pharmaceutical companies.

23  Q.    What is the difference between a Pharm.D degree and a

24  Ph.D. degree?

25  A.      The Pharm.D degree is a six year program that is

Fassihi - direct

1    designed to train pharmacists, basically clinical

2    pharmacists that work in the pharmacies in the hospitals.

3    Sometimes also they join pharmaceutical companies.

4                The Ph.D.s is more advanced degree.  So after,

5    for example, they finish Pharm.D, which is pharmacy

6    doctorate, they can go for Ph.D. and spend another four

7    years, five years to get that degree.

8    Q.    Have you, in the course of your career, been an

9    advisor for Ph.D. students?

10   A.    Yes.  I have always had graduate students at the

11   Ph.D. level.  I have been major advisor to 27 Ph.D.

12   students.

13   Q.    Do you do research at Temple?

14   A.    I do, yes.

15   Q.    And can you tell us what sort of research you do?

16   A.    My research focuses on development of solid oral

17   dosage forms and specifically controlled release, sustained

18   release pharmaceuticals for oral administration and for

19   other routes of administration as well.

20   Q.    Would you turn to -- and have you done research

21   developing sustained release formulations?

22   A.    Yes, I have.

23   Q.    And what sort of research have you done developing

24   sustained release formulations?

25   A.    Most of the projects that I have done, obviously they

Fassihi - direct

1    relate to my Ph.D. graduate, so many of those projects were

2    sponsored by pharmaceutical companies and they involve

3    formulation developments of sustained release preparations,

4    the evaluation of them and bioequivalence, bioavailability.

5              We have also tried, for educational purposes, to

6    comply with the FDA regulatory side of the requirements for

7    development of pharmaceutical formulations.

8    Q.    Would you turn in your exhibit book to JTX-40?

9    A.    (Witness complies.)  Yes, I'm there.

10   Q.    Can you tell me what JTX-40 is?

11   A.    This is my CV.

12   Q.    And does your CV provide further detail regarding

13   your education, your work experience and research

14   experience?

15   A.    It does, yes.

16   Q.    Have you published your research in peer-reviewed

17   books and journals?

18   A.    Yes, I have about 135 peer-reviewed scientific

19   publications in the journals.  I have also book chapters.

20   And I also have seven U.S. patents issued.

21   Q.    Have you also delivered speeches and presentations?

22   A.    Yes.  During the course of my 24 years here, I have

23   always been invited at various meetings, control release

24   society, American Association of Pharmaceutical Scientists.

25   Regularly I go and present seminars, workshops.  I also have

Fassihi - direct

1    given seminars and still give seminars at FDA.

2    Q.    And are the peer-reviewed publications and

3    presentations that you have given over the years detailed in

4    JTX-40?

5    A.    They are.  They are listed there, starting on page 5

6    of my CV.

7    Q.    And to what extent do those publications and

8    presentations relate to research in the development of

9    sustained release formulations?

10   A.    The majority of my publications relate to sustained

11   release, controlled release, dosage forms for oral

12   administration.

13   Q.    And you mentioned that you are an inventor on several

14   U.S. patents.  Do any of those patents relate to sustained

15   release formulations?

16   A.    Except for one, which is apparatus, all of them

17   relate to controlled release delivery systems, yes.

18   Q.    Have you testified before as an expert in patent

19   cases?

20   A.    I have.

21   Q.    Have you testified for both branded companies and

22   generic companies?

23   A.    I have, yes.

24         MR. STIEFEL:  Your Honor, at this time,

25   plaintiffs would offer Professor Fassihi as an expert in the

Fassihi - direct

1    field of pharmaceutics and, in particular, sustained release

2    formulations.

3                    THE COURT:  Is there any objection to that?

4                    MR. FLORENCE:  No, Your Honor.

5                    THE COURT:  Okay.  He is so recognized.

6                    MR. STIEFEL:  Thank you, Your Honor.

7    BY MR. STIEFEL:

8    Q.    When you got involved in this case, did you review

9    the report which had been submitted by the expert report

10   which had been submitted by Dr. Kibbe?

11   A.    Yes, I reviewed that.

12   Q.    And what were you asked to do?

13   A.    Well, I was asked to review that and give my opinion

14   on the '938 patent.  So I read the report and I also read

15   the '938 patent, and I provided my opinion in my report.

16   Q.    And did you provide an opinion on the question of

17   obviousness that Dr. Kibbe raised?

18   A.    That is correct, yes.

19   Q.    And did you understand in doing that, that you

20   should, that you were to consider the validity issues from

21   the perspective of a person of ordinary skill in the art at

22   the time, as of the priority date of the '938 patent?

23   A.    Yes, I was aware of that.

24   Q.    And I'd like you to take a look at PDX-4-1.  Do you

25   see there a definition of a person of ordinary skill in the

Fassihi - direct

1   art?

2   A.      Yes.

3   Q.      Is that the definition that appears in your expert

4   report.

5   A.      It is, yes.

6   Q.      And did you -- and that was a definition that the

7   plaintiffs had subscribed to before you got involved; is

8   that correct?

9   A.      I believe so, yes.

10  Q.      And did you consider this a reasonable definition of

11  are person of ordinary skill in the art in the context of

12  the issues that you were being asked to consider?

13  A.      Yes, I think this was reasonable definition.  Yes.

14  Q.      Did you also review the definition of a person of

15  ordinary skill in the art that was set forth in Dr. Kibbe's

16  expert report?

17  A.      Yes, I also read that.  Yes.

18  Q.      And in terms of the opinions that you have arrived

19  at, is there -- does it matter whether you are applying the

20  definition that is reflected in PDX-4-1, which is on the

21  screen, or the definition that Dr. Kibbe provided in his

22  expert report?

23  A.      They are very similar, and I think they talk to the

24  same thing, so, no, there, no difference between them.

25  Q.      And you were present earlier today when Dr. Kibbe

Fassihi - direct

1   testified about his view of person of ordinary skill in the

2   art; is that correct?

3   A.     Yes.

4   Q.     And do your opinions change any if you apply the

5   opinion that -- the definition of person of ordinary skill

6   in the art that Dr. Kibbe provided at the time?

7   A.     No, I don't think it would change my opinion.  No.

8   Q.     Can we take a look at Plaintiffs' Exhibit 4-2.

9            Can you tell me what is reflected on Plaintiffs'

10  Exhibit 4-2?

11  A.     This is a description of what is obviousness and is

12  something that I have read and has been provided to me, and

13  I am familiar with it.

14           So it talks about the patent claims that are

15  invalid as obvious if the differences between the claimed

16  invention and the prior art are such that the claimed

17  invention as a whole would have been obvious before the

18  effective filing date of the claimed invention to a person

19  having ordinary skill in the art to which the claimed

20  invention pertains.

21  Q.     And is the contents of that slide, are those points

22  that you took into account in arriving at the opinions that

23  you have reached with respect to the '938 patent?

24  A.     Yes, I have looked at them carefully.  And, yes, I

25  have applied them.

Fassihi - direct

1    Q.      Would you turn to JTX-1?

2    A.      (Witness complies.)  Yes.

3    Q.      And you recognize that is the '938 patent; correct?

4    A.      That is correct.

5    Q.      And what is the U.S. priority date on that is what

6    date?

7    A.      The priority date on this one is November 1, 1991.

8    Q.      And you heard Dr. Kibbe provided an opinion with

9    respect to a priority date of November 1990; correct?

10   A.      Yes.

11   Q.      And does it matter in terms of your opinion whether

12   you use a priority date of November 1991 or November 1990?

13   A.      It wouldn't make any difference.  This is the same

14   thing.

15   Q.      And who do you understand the inventors of the '938

16   patent were?

17   A.      The inventors were Dr. Masterson, who was the MD and

18   had an MD, and Dr. Myers, which I saw the video earlier this

19   morning.  Those were the inventors.

20   Q.      And do you have an understanding as to who employed

21   Drs. Masterson and Myers at the time that they did the work

22   that is reflected in the '938 patent?

23   A.      They were employed by Elan Corporation.

24   Q.      And were you familiar with Elan Corporation in 1990?

25   A.      I was familiar with them, yes.

Fassihi - direct

1    Q.      And how were you familiar with them?

2    A.      Well, in 1990 -- towards mid '80s, 1990 and early

3    '90s, control release sustained release technology was

4    something which was emerging, so many people were showing

5    interest, but Elan Corporation was really on the forefront

6    of all of the other companies.  And their scientists were

7    for providing information at the meetings that I used to

8    attend, conferences, Controlled Release Society and other

9    meetings.  And I had heard them, so they were into the

10   development of sustained release, controlled release

11   delivery system ahead of everybody else.

12   Q.      And does that bear on your analysis here?

13   A.      Well, the people were there, you know, they had

14   obviously education, experience, the talent and for sure I

15   respect that.  I have, yes.

16   Q.      You heard testimony earlier about potential

17   advantages to sustained release formulations; correct?

18   A.      That's correct.

19   Q.      And do you have any disagreement with the fact that

20   there are, in certain instances, advantages to using

21   sustained release formulations?

22   A.      There are advantages to the sustained release

23   formulation, but there are also disadvantages associated

24   with them.  So I have no argument with that at all.

25   Q.      And what sorts of potential disadvantages are there

Fassihi - direct

1    to sustained release formulations?

2    A.    I think this morning, dose dumping was mentioned,

3    which is a serious issue.

4    Q.    What is that?  What does that mean?

5    A.    What it means is that most, all of controlled release

6    systems, dosage forms, they have larger dose of the drug and

7    the idea is that the release the drug very gradually, very

8    slowly at a controlled rate.

9          If they break down for some reason, if they

10   rupture, if they failure mechanically, they dump all the

11   drug, and that could cause toxicity and problems.  This can

12   happen by biting on the dosage form, this can happen by

13   consumption of maybe alcohol, and things like that.  That

14   could change the release rate, and it could cause problems

15   with that dose dumping.

16   Q.    What other, if any, potential disadvantages are there

17   to using sustained release formulation?

18   A.    Well, the sustained release formulations are more

19   difficult, much more difficult to design so they are more

20   expensive.  Not everybody has the knowledge to get -- to

21   design them.  Unlike immediate release, they don't dissolve

22   rapidly.  The drug travels from the stomach into a small

23   intestine and distal intestine, in all these environment the

24   drug has to function, has the release the drug, and the

25   absorption of the drug in the entire GI tract is not

Fassihi - direct

1    uniform.  We never know where in what part, how much is

2    absorbed.  A small intestine, the proximal has different

3    absorption capacity, distal part has different and ascending

4    colon also a different absorption capacity.  So those are

5    the complications.

6              The pH environment changes from pH one to three

7    in the stomach to four, five in the small intestine to 7.75

8    in the iliac area and colon.  All of these would impact what

9    happens to the dosage form and release.

10             The food that we ingest also is associated with

11   the influencing the nature of drug release, so these are

12   areas that when we are thinking of designing control drug

13   system, we have to pay at a lot of attention and understand

14   them very well before we do anything.

15   Q.    So is the development of the sustained release

16   formulation more difficult than the development of an

17   immediate release formulation?

18   A.    Of course it is.

19   Q.    How has the development of sustained release

20   formulation changed in the years between 1990 and the

21   present?

22   A.    Well, in 1990 we knew very little about controlled

23   release, how to design them, how to develop them in such a

24   way that they would work and not fail.  And we had limited

25   number of excipients that we could use; equipment were not

Fassihi - direct

1    as sophisticated as they are today, so today we have a lot

2    more of excipients, polymeric materials, sophisticated

3    equipment that none of them we had before, so it was much

4    more difficult in the 1990 time frame as compared to now.

5    Q.    Have you in the course of your work on this case

6    reached an opinion as to whether the development of the

7    sustained release formulation would have been considered --

8    withdrawn.

9          Have you reached an opinion in the course of

10   your work in this case as to whether the development of a

11   sustained release formulation of 4-AP would have been

12   considered routine work in 1990-91?

13   A.    Yes, my understanding reading the patent and

14   everything which was available regarding 4-AP,

15   4-aminopyridine, it was not routine experimentation at all,

16   because this is a toxic material that at the time it was

17   very toxic, induced seizures, so not much information was

18   available.  So no, it was not a routine experimental drug at

19   all.

20   Q.    Did you hear Dr. Kibbe's testimony this morning that

21   the development of the sustained release formulation as of

22   1990 was really straightforward?

23   A.    Well, that was Dr. Kibbe's opinion, but the fact is

24   that even today, designing sustainable release is a

25   challenge, even today, twenty years later, twenty-six years

Fassihi - direct

1   later, no, it's not a routine experimentation, it wasn't

2   then, it is not now.  If it was routine, I could not train

3   my Ph.D. student.

4   Q.      Would you look at PTX 95.  Are you familiar with PTX

5   95?

6   A.      Yes, it is a pharmaceutical dosage forms tablets,

7   authored by Lieberman, Lachman and Schwartz.

8   Q.      Specifically PTX 95 includes a chapter from that

9   treatise; is that correct?

10  A.      That is correct, chapter four on sustained drug

11  release from tablets and particles through coating.

12  Q.      Do you recognize the name Joseph Robinson as one of

13  the authors of chapter four?

14  A.      I do.

15  Q.      Who is Dr. Robinson?

16  A.      Dr. Robinson was a well-known pharmaceutical

17  scientist, especially in control release area.  He was

18  actively working in the area at the time.  He was definitely

19  knowledgeable and very knowledgeable professor, and a good

20  man.

21  Q.      And what was the year of this publication?

22  A.      This publication was -- this is 1990.

23  Q.      And did you hear Dr. Kibbe earlier today read from

24  page 201 of PTX 95 where doctor -- where the authors say

25  that design of the sustained release product is normally a

Fassihi - direct

1    very difficult task?

2    A.    Yes.

3    Q.    And do you agree with that view?

4    A.    I fully agree with that, yes.

5    Q.    In 1990 --

6              MR. STIEFEL:  Your Honor, I'm going to sort of

7    start on a new section right now.  Would this be an

8    appropriate time to break?

9              THE COURT:  Yes.  Thank you for that.  Bear with

10   me for a moment, Doctor.

11             Just for counsel's planning purposes, subject to

12   anything unusual happening tomorrow, I expect tomorrow will

13   look a lot like today.  We'll get started at 8:30 and I'm

14   available as of now until 6:00.

15             Anything we should talk about before we break?

16             MR. STIEFEL:  Not that I know of.

17             THE COURT:  Defendants.  Thank you for a good

18   first day.

19             We will be in recess.

20             (Court adjourned at 5:56 p.m.)

21

22        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                         /s/ Brian P. Gaffigan
                          Official Court Reporter
25                         U.S. District Court