```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
    ACORDA THERAPEUTICS, INC.,             :
 4                                         :      CIVIL ACTION
              Plaintiff,                   :
 5    v                                    :
                                           :      (Consolidated)
 6    ALKEM LABORATORIES LTD.,             :
                                           :      NO. 14-882-LPS
 7              Defendant.                 :
                                         - - -
 8
                              Wilmington, Delaware
 9                       Tuesday, September 20, 2016
                          Bench Trial - Volume B
10
                                  - - -
11
    BEFORE:           HONORABLE LEONARD P. STARK, Chief Judge
12
    APPEARANCES:                    - - -
13

14            MORRIS NICHOLS ARSHT & TUNNELL, LLP
              BY:  MARYELLEN NORIEKA, ESQ.
15
                   and
16
              KAYE SCHOLER, LLP
17            BY:  AARON STIEFEL, ESQ.,
                   DANIEL DiNAPOLI, ESQ., and
18                 SOUMITRA DEKA, ESQ.
                   (New York, New York)
19
                   and
20
              KAYE SCHOLER, LLP
21            BY:  SYLVIA M. BECKER, ESQ.
                   (Washington, District of Columbia)
22
                        Counsel for Plaintiffs Acorda
23                      Therapeutics, Inc., and Alkermes
                        Pharma Ireland Limited
24

25    Stacy Ingram                        Brian P. Gaffigan
      Certified Court Reporter            Registered Merit Reporter
```

1

2    APPEARANCES:  (Continued)

3

4                PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
             BY:  JOHN C. PHILLIPS, JR., ESQ.

5                    and

6                WINSTON & STRAWN, LLP
             BY:  CHARLES B. KLEIN, ESQ.
7                    (Washington, District of Columbia)

8                    and

9                WINSTON & STRAWN, LLP
             BY:  SAMUEL S. PARK, ESQ.,
10                   REID F. SMITH, ESQ., and
                 BRYCE A. COOPER, ESQ.
11                   (Chicago, Illinois)

12                   Counsel for Roxane Laboratories, Inc.,
                 Teva Pharmaceuticals USA, Inc., Apotex
13                   Corp. and Apotex, Inc.

14

15               MORRIS JAMES LLP
             BY:  MARY B. MATTERER, ESQ.

16                   and

17               PARKER POE ADAMS & BERNSTEIN, LLP
             BY:  ROBERT L. FLORENCE, ESQ,
18                   MICHEAL L. BINNS, ESQ., and
                 KAREN L. CARROLL, ESQ.
19                   (Atlanta, Georgia)

20                   and

21               PARKER POE ADAMS & BERNSTEIN, LLP
             BY:  CHRISTOPHER M. THOMAS, ESQ.
22                   (Raleigh, North Carolina)

23                   Counsel for Mylan Pharmaceuticals Inc.

24

25

```
 1                        - oOo -

 2                  P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following bench trial was

 4     held in open court, beginning at 8:35 a.m.)

 5              THE COURT:  Good morning.

 6              (The attorneys respond, "Good morning, Your

 7     Honor.")

 8              THE COURT:  Are there any issues from plaintiffs

 9     before we begin today?

10              MR. STIEFEL:  Your Honor, we have no issues at

11     the moment.  There is an evidentiary dispute with respect to

12     some documents relating to a later witness which, who may

13     get on today.  I don't know that Your Honor wants to deal

14     with that at this point.  I don't know that we may reach it

15     later.

16              THE COURT:  As long as you bring it up before

17     that witness takes the stand, that's fine.  It's a

18     plaintiffs' objection?

19              MR. STIEFEL:  No, it's actually a defendants'

20     objection.

21              THE COURT:  Okay.  So as long as defendants

22     don't mind deferring and you bring it up before the witness

23     comes to the stand.  Is there any concern about that?

24              MR. KLEIN:  No concern, Your Honor.

25              THE COURT:  All right.  Is there anything else
```

1    from defendants?

2              MR. KLEIN:  No, Your Honor.

3              MR. PARK:  Your Honor, there is a possibility

4    that plaintiffs may end their case-in-chief today.  But they

5    have agreed that if they end their case-in-chief, we do not

6    need to bring our rebuttal witnesses until tomorrow.  So we

7    wanted to flag that for Your Honor.  That might not happen

8    but in case that happens ...

9              THE COURT:  That could pose a problem.  I mean

10   in terms of are you still intending to use your full ten

11   hours?

12             MR. PARK:  Yes, sir.

13             THE COURT:  All right.  So what did you have in

14   mind?  Because I was planning, as of now I'm available

15   through 6:00 today, and I want to keep the trial moving.  So

16   tell me what you have in mind.

17             MR. PARK:  Well, what happened was that

18   plaintiffs didn't disclose they were going to finish their

19   case-in-chief today.  They disclosed they were going to call

20   their witnesses tomorrow.  So we didn't plan for presenting

21   any rebuttal witnesses today.

22             THE COURT:  All right.  And are they available

23   today?

24             MR. PARK:  They are available.

25             THE COURT:  Okay.  Is there any problem with

Fassihi - direct

1    bringing them here if we get to them?

2                MR. PARK:  We will, Your Honor.

3                THE COURT:  All right.  Is there anything else

4    from defendants?

5                No.  All right.  Well, I guess let's get started

6    then.  We'll bring the witness back.

7                THE WITNESS:  Good morning.

8                THE COURT:  Good morning, Dr. Fassihi.  Welcome

9    back.  I remind you that you do remain under oath, of course.

10               THE WITNESS:  Yes.

11               ... REZA FASSIHI, having been previously duly

12   sworn under oath, was examined and testified as follows ...

13               THE COURT:  Okay.  You may proceed, when ready.

14               MR. STIEFEL:  Thank you, Your Honor.

15                          DIRECT EXAMINATION

16   BY MR. STIEFEL:

17   Q.    Good morning, Dr. Fassihi.

18   A.    Good morning.

19   Q.    In 1990 and 91, were there in fact sustained release

20   drug formulations that had been approved by the FDA?

21   A.    There were a number of sustained formulations

22   approved by the FDA, yes.

23   Q.    And to your knowledge, were the drugs that were

24   included in those products drugs which had first been

25   approved by the FDA in immediate release formulations?

Fassihi - direct

1    A.      Yes.   I looked at the chapter that had listed those

2    sustained formulations.   I did search and I went to the

3    literature and books, and every single one of those was

4    available in the market, approved in the immediate release

5    form.

6    Q.      When you say you looked at the chapter, are you

7    referring to the Remington's chapter that Dr. Kibbe relied

8    on?

9    A.      That's correct.

10   Q.      And so are you aware of any drugs which as of 1990

11   were approved by the FDA in sustained release form without

12   having first been approved in immediate release form?

13   A.      To the best of my knowledge, I don't know any.

14   Q.      And is that significant?

15   A.      Well, it is significant in a way that if you want to

16   make sustained release preparation of something which has

17   never been consumed by population, by public, it would be a

18   challenge.   Very difficult.

19   Q.      Why is that?

20   A.      Well, because if a drug is approved by FDA in the

21   immediate release form, and it is on the market, it has

22   been consumed by millions of people, and there is a lot of

23   information on the pharmacokinetics of that drug, on safety

24   and efficacy of that drug, whatever that drug is.   And that

25   actually is something that would encourage people to maybe

Fassihi - direct

1    develop and use formulation which would be sustained release

2    of the same immediate release.

3    Q.    Is that, besides encouraging it, is that information

4    available in actually developing a sustained release

5    formulation?

6    A.    Yes, you can easily get that information.  It is,

7    people start publishing of them in the peer review journal.

8    Also, there is Freedom of Information Act at FDA.  You can

9    request FDA based on that.  And they would provide you with

10   all the details regarding dissolution, regarding

11   bioavailability.  All that information, you can access.

12   Maybe they redact certain areas but that is a decision FDA

13   would make but you can get information from FDA.

14   Q.    And is that information that is important to the

15   formulator?

16   A.    Well, what is important is the pharmacokinetics

17   information that FDA provides.  There is no question about

18   that.  About safety of the drug, efficacy of the drug, but

19   maybe most important would be the pharmacokinetics

20   information.

21   Q.    And why is that important?

22   A.    Well, because every drug that we consume is going to

23   be released in our body, is going to be absorbed, and it goes

24   into blood circulation.  It goes into all parts of our body.

25   It can go into the brain, into the bones, into the tissues.

1    That, all of that is defined by pharmacokinetics.  It has to

2    be metabolized.  It has to be excreted out of the body.

3              So that picture as a whole is very critical, but

4    if we lack information about that, we don't know exactly

5    where it goes, what happens to it.  And so that is critical.

6    That is why it is so important.

7    Q.    Is it your understanding that 4-AP was not approved

8    by the FDA in any form as of 1990?

9    A.    That is correct.

10   Q.    And if it had been approved in immediate release form

11   in 1990, would there have been information available to

12   formulators that would have been important in developing a

13   sustained release formulation?

14   A.    Yes.  Very similar to every other immediate release

15   which was approved on the market, sure, that information

16   would have been also available on 4-AP.

17   Q.    What was the FDA's approach to sustained release

18   formulations in the 1991 time frame?

19   A.    The approach was that there were not, no guidelines

20   really established guidelines, so FDA used to invite

21   scientists from all over the world and have these workshops.

22   I think yesterday I saw a couple of them, you pointed out

23   when you were talking to Dr. Kibbe.  So those are the sort

24   of workshops that basically they invite scientists.  There,

25   they give their opinion, they provide their experiences and

Fassihi - direct

1    they put them together and they will come up with a

2    guidelines which would help pharmaceutical companies to

3    develop drugs for other people who are interested to

4    understand more about the regulatory side of the formulation

5    development in the sustained release area.  So those

6    guidelines are essential.

7    Q.      And could you look briefly at JTX-108?

8    A.      Yes, I have that here.

9    Q.      And is that one of the workshop papers that you were

10   referring to?

11   A.      That is correct.  Yes.

12   Q.      And did you -- did the FDA's approach to sustained

13   release formulations at that point pose regulatory hurdles?

14   A.      Yes.  That's the reason why these workshops were

15   there.  Because for design sustained release preparation,

16   many people, many scientists, pharmaceutical companies, they

17   didn't know exactly where to go.

18            As I mentioned earlier in that chapter that I

19   looked at, all the sustained release preparations that were

20   approved, I think half of them were withdrawn from the

21   market over time.  And that is a hurdle for FDA that doesn't

22   know what to do with these things.

23            So these workshops were there to overcome that.

24   To get feedback from scientists so they can provide

25   guidelines that are meaningful, scientifically meaningful

Fassihi - direct

1    because always from FDA point of view, safety of the

2    patient, safety of the public is the key factor.

3    Q.    Was there, in 1990, a universal sustained release

4    platform that could be used to make sustained release

5    formulations of all pharmaceuticals?

6    A.    No, there is no such platform for all pharmaceuticals.

7    Every single drug has its own characteristics, its own

8    pharmacokinetics, its own physical chemically property,

9    its own pharmacokinetics and, therefore, there is no

10   universality in formulation.  You have to work and develop

11   and see what will give you the results that you are looking

12   for.

13   Q.    And you have been using the word "pharmacokinetics."

14   I just want to make sure.  Can you explain what

15   pharmacokinetics and pharmacokinetics data you are referring

16   to?

17   A.    Well, the pharmacokinetics data collectively is when

18   the process of release from the dosage form and it is rate

19   of release.

20         As pharmacokinetics describes, it is a kinetic

21   process, it is very dynamic process.  Everything, the rate

22   process.  So dosage form has certain release rate.  Then it

23   is followed by absorption rate into the blood circulation.

24   Then we have distribution, and that could be also rate

25   dependent, rate of distribution into different parts of the

Fassihi - direct

1    body.  Then you have metabolism and eventually elimination.

2              So collectively we refer to these as

3    pharmacokinetics.  So we need to have that information as a

4    whole to be able to act on it.

5    Q.    When you say we need to have that information to be

6    able to act on it, are you talking from the perspective of a

7    sustained release formulation developer?

8    A.    That is correct.  That is what I am saying, yes.

9    Q.    Would a potent drug be a particularly good candidate

10   for a sustained release formulation?

11   A.    No.  The potent drugs, in fact, FDA discourages

12   people who develop, unless they are very sure of what they

13   are doing.  Because potent drugs usually are associated with

14   low dose and very narrow therapeutic window, and the fact

15   that sustained release preparations do sometime break down

16   and cause that dose dumping that I talked about earlier

17   yesterday afternoon, that is a concern.  And because of that

18   potential dose dumping, potent drug with narrow therapeutic

19   index are not really desirable compounds for sustained

20   release preparation.

21   Q.    Is there a particular difficulty in formulating low

22   dose drugs in sustained release formulations?

23   A.    Yes, low dose has always been a challenge in both in

24   immediate release as well as in sustained release.  And the

25   reason for that is because from technological point of view,

Fassihi - direct

1    when you are manufacturing tablets or capsules that are

2    supposed to have exact amount of the drug in each of them,

3    distribution of the active drug in these dosage forms has to

4    be uniform.  And that is a challenge, always a challenge.

5             For example, there are one or two manufacturing

6    sites that, for example, produce digoxin.  Digoxin has

7    120 microgram quantity of the drug.  It is such a challenge

8    to make sure that the same amount remains in every single

9    drug.

10            In terms of many other dosage forms like many

11   other opioids, the dose is 8 milligram, 10 milligram, up to

12   20 milligram.  Again, very difficult, not easy to

13   manufacture them because of the distribution of the drug,

14   uniformity in all the dosage form.

15            FDA wants tablets to be taken in a reliable way

16   by patient and every time the same amount of active gets

17   into the body.  So that means the dosage form has to contain

18   exact amount.

19   Q.    Do highly soluble drugs pose a particular difficulty

20   for formulators in making sustained release formulations?

21   A.     That also is definitely a barrier because it is very

22   difficult to retain the highly soluble drug in the dosage

23   form.  It escapes very quickly for that reason.  In the

24   video that I listened to Dr. Meyers from Elan, I think he

25   also said the same thing.  And every scientist knows that it

Fassihi - direct

1    is difficult, when you are dealing with a highly soluble

2    drug, is much more difficult to control it, to retain it in

3    those dosage form.  It comes out too fast.  And then, of

4    course, coming out fast means showing a very rapid peak in

5    the blood, causing problem.

6    Q.    Is it your understanding that 4-AP is a highly

7    soluble drug?

8    A.    It is a soluble drug, yes.

9    Q.    And is 4-AP a low dose drug?

10   A.    It is also a low dose drug and it also has, based on

11   what I've heard regarding toxicity, seizure induction and

12   all of that, it is also an index drug.

13   Q.    You heard Dr. Kibbe's testimony yesterday, correct?

14   A.    Yes.

15   Q.    Do you agree with Dr. Kibbe's opinions that Claims 3

16   and 8 of the '938 Patent would have been obvious to a person

17   of ordinary skill in the art in 1990?

18   A.    Yes, I disagree with him completely.

19   Q.    And what was wrong with Dr. Kibbe's approach in your

20   opinion?

21   A.    Well, he's -- I don't -- kind of information that he

22   relied on was maybe not sufficient, maybe not accurate.  I

23   don't know exactly.  Maybe he doesn't have enough.  I don't

24   want to -- he's a colleague, so I don't know how much

25   experience he has in the field.  And so I do respect him as

Fassihi - direct

1    a colleague, as a scientist, but I think his opinion was --

2    doesn't fit, you know, what is described in the patent.

3    This patent has lots of novel aspects to it.  There's a

4    sustained release formulation development that the inventors

5    have put together.  They have provided all the details

6    regarding dissolution and instruction as to how to actually

7    have therapeutically effective levels.  It's obvious it was

8    not in formation on the pharmacokinetic drug, so of course

9    it was not obvious.  There was no immediate release

10   formulation of 4-aminopyridine available.

11   Q.    Would a -- in your view, would a person of ordinary

12   skill in the art have been unmotivated to undertake the

13   development of a sustained release formulation of 4-AP in

14   1990?

15   A.    Yes, that person would have been not motivated to

16   move on that, yes.

17   Q.    Okay.

18   A.    Because of all these difficulties.

19   Q.    Now, would you turn to JTX-137?

20   A.    (Witness complies.)  Yes.

21   Q.    JTX-137 is the Uges -- I'm sure I'm butchering that

22   name, but the Uges paper that Dr. Kibbe referred to?

23   A.    That's correct, yes.

24   Q.    Okay.  And did you understand that the -- Dr. Kibbe

25   to say that a formulator would have been able to rely on the

Fassihi - direct

1    pharmacokinetic data with respect to 4-AP that's laid out

2    here?

3    A.    I heard that, yes.

4    Q.    Are you aware, first of all, of other pharmacokinetic

5    data that was published with respect to 4-AP as of 1990?

6    A.    I'm not aware of any except this article, which is

7    important.

8    Q.    And do you have an opinion as to whether the

9    information that is provided in this paper would have been

10   the sort of information a formulator would need to develop a

11   sustained release formulation in 1990?

12   A.    Well, I looked at this article --

13             MR. FLORENCE:  Objection, Your Honor.  That's

14   beyond the scope of Dr. Fassihi's expert report.  He didn't

15   touch on any of that.

16             MR. STIEFEL:  I disagree.

17             THE COURT:  All right.  Can you provide me a

18   copy of where he has disclosed this opinion?  Give Mr.

19   Florence the reference first.

20             MR. STIEFEL:  Well, Page 32, the second bullet

21   point.

22             THE COURT:  Is the there's still an objection?

23   You'll need to pass up a copy of the report.

24             MR. FLORENCE:  It really depends, Your Honor,

25   what he asks and how far he takes it.

Fassihi - direct

1          THE COURT:  I'm sorry, is there an objection you

2     want a ruling on or is there not?

3          MR. FLORENCE:  Well, he definitely looked at

4     Uges, but he only looked at one aspect, so I'd like to see

5     how the questioning goes.

6          THE COURT:  I'll take it as withdrawn at the

7     moment and see where the questioning goes.

8     BY MR. STIEFEL:

9     Q.    I guess my question, Dr. Fassihi, is whether the

10    information that is provided in the Uges paper that Dr.

11    Kibbe testified about, would that have been the kind of

12    information a formulator would use in developing a sustained

13    release formulation of 4-AP in 1990?

14    A.    I read this article and read also the description or

15    discussion that Dr. Kibbe had presented in his expert

16    report.  And in this paper, first of all, there's no

17    sustained release preparation that's used -- they are using

18    nine subjects in this study, healthy subjects and they are

19    giving them 20 milligram of IV injection.  And the reason

20    this information is basically baseless as far as

21    pharmacokinetics is concerned regarding 4-AP required a lot

22    of activity.

23          MR. FLORENCE:  Objection, Your Honor.

24          THE COURT:  You're objecting to the answer now?

25          MR. FLORENCE:  Well, he's now giving an opinion

Fassihi - direct

1    he never gave in his report.  It's beyond the scope.

2              THE COURT:  All right.  Well, can you pass out

3    the copy of the report.  Let's get this resolved.  I mean to

4    me.  It was the second bullet point on Page 32; is that

5    correct?

6              MR. STIEFEL:  Right.

7              THE COURT:  Mr. Florence, I'm not sure I

8    understand the objection.

9              MR. FLORENCE:  My issue, Your Honor, is Dr.

10   Fassihi had not revealed anything in his report regarding

11   the pharmacokinetic data.

12             THE COURT:  Says the data from the nine subjects

13   would not have provided a meaningful basis for developing a

14   sustained release formulation.  How is that not saying

15   something about the data?

16             MR. FLORENCE:  Well, he's testified on that, but

17   he hasn't expounded as to why, why it wouldn't provide

18   anything.  There's nothing in his report on that.

19             MR. STIEFEL:  Well, Your Honor -- they took his

20   deposition, first of all, they had an opportunity to ask him

21   all about that.  It says it right there.  Second of all,

22   there were details that Dr. Kibbe, he spoke further to it in

23   his own reply expert report at his deposition and then

24   yesterday, I mean, there are points about the significance

25   of that data that Dr. Kibbe went on at length about

Fassihi - direct

1   yesterday which are not in his report.

2           THE COURT:  All right.  Thank you.  Any

3   response?

4           MR. FLORENCE:  We don't know those details.

5   Those details haven't provided by Dr. Fassihi.  His report

6   requires him under Rule 26 to give, give his complete

7   opinions.  He hasn't done that and now he's elaborating on

8   them.

9           THE COURT:  All right.  Well, the objection at

10  this point is overruled.  He has given his opinion that the

11  data would not have provided a meaningful basis and so far I

12  haven't heard anything that's inconsistent with that.  It

13  seems to be a fair elaboration at this point based on my

14  understanding of the record.  Feel free to object further if

15  you wish, but I do want to hear the answer to this question.

16  Mr. Stiefel, maybe you can reorient the witness.

17  BY MR. STIEFEL:

18  Q.    I think you were mid answer, so maybe you should

19  start at the beginning.  The question being whether the

20  pharmacokinetic data provided in the Uges paper would have

21  been the kind of information that would have allowed a

22  formulator to make a sustained release formulation of 4-AP

23  in 1990?

24  A.    My answer IS no.  This is really not provided

25  anything meaningful at all and the reason for that -- and

Fassihi - direct

1    when I read the article that was my response in my report,

2    baseless information basically, because what you have here

3    in the abstract, they have done, the study is nine subjects

4    and you can see on the second sentence, kinetic analysis of

5    serum concentrations after intravenous dosing resulted in

6    the best fitting of a triexponential model in five and

7    biexponential model in four subjects.  What it means, every

8    drug that follows decay that is normal follows in --

9           THE COURT:  Do you want to note your objection?

10           MR. FLORENCE:  I'd like to note my objection,

11    Your Honor.  Dr. Fassihi has provided nothing in his report

12    regarding the kinetic analysis in Uges.

13           THE COURT:  It's overruled for the same reason.

14    It's also consistent with an elaboration of the opinion he

15    did give and I'm going to allow it.  Go ahead.

16           THE WITNESS:  In my report I say it is baseless

17    because it doesn't follow a one compartmental model, which

18    normally drug products do, especially with regards to

19    sustained release preparations.  We want to have a

20    predictable pharmacokinetic.  Here in nine subjects, they

21    have already, the authors themselves, they say that in five

22    of the subjects it fit a triexponential model and four of

23    them biexponential.  It is by their rules.  And what they

24    mean is the reason for expressing that opinion is not so

25    much in the elimination of the drug from the body but rather

Fassihi - direct

```
 1   distribution of the drug in the body.  They have a figure
 2   that is there, if you've -- go to Figure 1, for example.
 3   And the lower curve is the IV injection and the reason this
 4   shows distribution, which is complicated and doesn't fit one
 5   model and it fits triexponential and biexponential.  And
 6   because the distribution is so fast, as you can see from the
 7   slope of the lower curve, the lower curve is IV injection,
 8   so that is all of the drug is given by IV in the body and
 9   what you see there are three phases, the phase one, vary
10   sharp slope.  The second phase is another slope that goes
11   on, and then it goes to the third one.  That's what they
12   describe, that's triexponential.  What it means is that the
13   distribution of this drug happens so rapidly in three
14   different compartments, maybe in the brain if it gets there.
15   If it doesn't, in the tissue, in there, in the other tissues
16   and then we have such a thing, that is all the side effects
17   of the drug, seizures, toxicities are related to this rapid
18   distribution that takes place in the early part.  All of
19   this happens in the first 100 minutes as you can see in the
20   figure.  This is the complication.  This is not an
21   uncomplicated pharmacokinetic.  This is a complicated
22   pharmacokinetic and requires -- very cautiously one has to
23   look at it and you need to gather a lot more information as
24   -- before you do anything as far as a sustained release
25   preparation is concerned.
```

Fassihi - direct

1   Q.    Does the fact that there are -- or withdrawn.  What

2   is the significance of the fact that there were nine

3   subjects that were used in collecting the data that's

4   reported in this paper?

5   A.    Well, this was a very basic elementary investigation

6   that they did.  They picked up nine subjects, healthy

7   subjects and they couldn't really come up with much, because

8   if in the entire body of the article, which I have looked

9   at, first of all the study was not controlled.  There are no

10  double blinding, there is no placebo control.  And we know

11  this is a drug that has placebo effect as well, that might

12  alter distribution of the drug.  We don't know that.  I

13  don't know that.  If you look at the, for example, Figure 2,

14  what we have here is IV, which we just went through, that

15  they show.  And this is of course a single computer graphic

16  of what they have done.  These are not individual data that

17  are there.  So they have given immediate release tablet,

18  which is the first curve that's on the -- that goes up and

19  then peaks and then comes down.  The first curve.  So we

20  have one that starts from the very top and goes all the way,

21  number one, that is IV.  Then you have number two, which is

22  the coated tablet.  You then have number three, which is

23  just simple tablet, uncoated tablet.  And the profiles are

24  there.  And even by looking at these, if I extrapolate the

25  tail of these, in other words, say from five minutes on, if

Fassihi - direct

1    I extrapolate, you see each line go somewhere.  Indicating

2    that they are kind of parallel phenomena, but it's not.  I

3    wish they were a pattern, means there is some predictability

4    in what happens to the drug.  They are not pattern.  Some of

5    them give away because of the distribution situation.

6           So this time of distribution tells me that the

7    distribution of the drug is critical.  Not so -- I would say

8    not so much elimination because it shows relatively high

9    bioavailability, means the drug gets into the body, but

10   what happens to it in the first 100 minutes, that is a

11   complication.  And that is something that if I design a

12   sustained release preparation, I like to look at that

13   because that is critical in what happens, what rate I should

14   come up with, that it would not result in maybe rapid peaks

15   and things like that.

16   Q.    I'd like you to turn now to JTX-112.

17   A.    Yes.

18   Q.    JTX-112 is the Stefoski paper that we heard testimony

19   about yesterday; is that correct?

20   A.    Yes.

21   Q.    And, first of all, does the Stefoski paper deal with

22   a sustained release formulation of 4-AP?

23   A.    It does not.

24   Q.    And does the Stefoski paper reflect that 4-AP was

25   being used at that time to treat multiple sclerosis?

Fassihi - direct

1    A.      No, it is an investigator paper.  It is something

2    that these researchers, they were trying to find out, you

3    know, if it has any effect, clinical effect.  So it was an

4    investigation.

5    Q.    And would you look at the last sentence of the

6    abstract, which says:  The improvements with 4-AP are

7    substantial enough to be of transient therapeutic benefit in

8    selected patients.

9          What do you understand that to communicate?

10   A.      Well, it indicates that 4-AP, the improvements with

11   4-AP are substantial enough to be transient to be of

12   therapeutic benefit in selected patients.

13         So this is something that they have observed.

14   And, in fact, I have read again this article.  If you go to

15   maybe the conclusion part, towards the end of the last

16   paragraph, which I think, if I'm not mistaken, Dr. Kibbe

17   also looked at that yesterday.

18         If you look at here, it does say, for example,

19   because in the second sentence:  Because seizures can be

20   triggered by ectopic activity in axons, the possibility

21   exists that patients with MS might be at higher risk for

22   seizures on exposure for 4-AP.  Although it is important to

23   recognize the potential for this serious side effect, we

24   believe that the magnitude of the improvements we observed

25   without serious side effects suggests a clinical usefulness

Fassihi - direct

1    for this agent, administered orally in selected patients.

2              So you see, everything is lots of suggestions

3    basically that the clinical usefulness of this is something

4    that they are thinking.

5              And they go on to say:  The studies are

6    currently underway to assess this possibility.

7              So they are not sure.  That is why this is how

8    they have put themselves as part of the conclusion.

9    Q.    Would you turn to JTX-43?

10   A.    (Witness complies.)

11   Q.    And this is the Davis paper that we heard testimony

12   about yesterday; is that correct?

13   A.    Yes.

14   Q.    And, at least two of the authors of JTX-43 and

15   JTX-112 are the same; is that correct?

16   A.    That's correct.  They are the same authors as the

17   previous ones.

18   Q.    Did JTX-43 establish that 4-AP would be useful in

19   treating neurological disease, at least as you read it?

20   A.    Well, again, very similar.  These are the same

21   authors and this paper was published in 1990.  I think the

22   other one was three years earlier.  And, again, if you --

23   just looking at abstract, the last sentence of abstract,

24   they spell out further studies are warranted to assess

25   efficacy and safety of prolonged administration.

Fassihi - direct

1          So basically I'm a scientist.  I publish papers.

2     When I cannot conclude anything in my paper, you know, I

3     would say further studies are warranted to assess what I

4     have looked at.  That is the meaning of that basically.

5          That means they are not sure of their outcome,

6     and they tell the scientific community that we have done

7     this, looked at it, and do further studies, and understand

8     the efficacy and safety.  And that is routine.  People do

9     that when they cannot conclude decisively what is the

10    outcome of the work.

11    Q.     Would you look at now at JTX-27?

12    A.     (Witness complies.)

13    Q.     This is the Bever paper that I asked Dr. Kibbe about

14    yesterday.  Do you recall that?

15    A.     Yes.

16    Q.     And if you look at the second column on the second

17    page of the article, which is S-119, there is the sentence

18    in the middle of that paragraph that says:  Blinded,

19    controlled trials of intravenous and oral AP in

20    temperature-sensitive MS patients also suggested benefit,

21    but these studies were limited because they did not use a

22    randomized treatment design, were not double blinded, and

23    relied on outcome measures that were not widely accepted.

24          Do you see that?

25    A.     That's correct.

1    Q.     And do you also see that the reference there is that

2    those studies are identified as references 19 to 21?

3    A.     Yes.

4    Q.     And are 19 and 20 the references, the references

5    numbered 19 and 20, the Stefoski and Davis papers that you

6    just testified about?

7    A.     They are, yes.

8    Q.     And are those shortcomings that Dr. Bever identified

9    with respect to Stefoski and Davis papers, are those

10   shortcomings that a person of ordinary skill in the art

11   would have been able to identify about those papers?

12   A.     Of course.

13   Q.     Would Dr. Bever --

14          MR. FLORENCE:  Objection, Your Honor.  There

15   hasn't been any foundation that Dr. Fassihi has conducted

16   any clinical studies, and there certainly hasn't been any

17   foundation that he has done any clinical work with this

18   particular drug.

19          MR. STIEFEL:  I agree with that.  And there has

20   been no foundation that Dr. Kibbe conducted clinical trials

21   or did any research on sustained release drugs and yet he

22   testified about both.

23          THE COURT:  Do you want to respond?

24          MR. FLORENCE:  Well, they didn't object at all

25   to Dr. Kibbe's testimony, Your Honor.  So it's a different

Fassihi - direct

1    issue.  They didn't ask Dr. Kibbe about whether or not he

2    had done that, those things.  Here, they're asking Dr.

3    Fassihi to draw a conclusion regarding the sufficiency of

4    these studies, and I don't know that he has the

5    qualifications to do that.

6              THE COURT:  All right.  Well, I'm going to

7    overrule the objection.  I think Dr. Kibbe was here and you

8    were free to ask him whatever he wanted then, and if he

9    comes back you can ask him whatever is proper when he comes

10   bang.  But in terms of this objection, you can go into it on

11   cross-examination, if you wish, but I'm not going to sustain

12   the objection.

13             MR. FLORENCE:  Thank you, Your Honor.

14   BY MR. STIEFEL:

15   Q.    I think the question was whether a person of ordinary

16   skill in the art would have recognized those shortcomings in

17   the Davis and Stefoski papers with or without Dr. Bever

18   having to identify them.

19   A.    Well, of course the persons of skill in the art would

20   look at the articles.  They review.  They are educated

21   enough to recognize shortcomings because that is what we

22   teach in our programs, to familiarize our students with

23   regulatory issues, with conducting types of studies that are

24   presented here in terms of clinical comparisons and things

25   like that.  We do that.

1    Q.      Would you look at JTX-81?

2    A.      (Witness complies.)

3    Q.      And do you recognize this as one of the Remington's

4    excerpts that Dr. Kibbe relied on?

5    A.      Yes.

6    Q.      Can you tell us what you understand the usefulness of

7    the Remington's textbooks to be?

8    A.      Yes.  Remington's Pharmaceutical Sciences is a very

9    nice textbook that we use it for teaching purposes.  The

10   introductory aspect, introduction to dosage forms,

11   chemistry, the biological aspect the chemical synthesis, all

12   of these things for educational purposes are fully described

13   in this book.

14            So it is a very well respected book, but it is

15   not for people who do research.  It is for people, for

16   professors in the university.  We tell our students go on

17   and look at chapter so-and-so in this book from educational

18   point of view.  So it is a very good book for that purpose,

19   but definitely it is not a book that a researcher who wants

20   to do advanced research would go there and find things out

21   about research activities.

22   Q.      Now, would you look at JTX-95?

23   A.      Yes.

24   Q.      And this is the paper authored by Robinson that you

25   have relied on?

Fassihi - direct

1   A.      Yes.  This is -- not this one on the screen.  That is

2   not it.

3   Q.      Sorry.  It's PTX-95.  My fault.

4   A.      Yes.  This one shows on the cover of the book,

5   Pharmaceutical Dosage Forms:  Tablets, Volume 3.

6            So there are seven volumes of this book, that

7   three of them or maybe four of them are, they talk about

8   tablets.  The other volumes speak about suspensions and --

9   mainly suspensions.

10           So this is a kind of book that is for

11  pharmaceutical companies.  This is a practical book that

12  people in the pharmaceutical companies, individuals who want

13  to do research and understand details of what goes into

14  dosage forms, formulation development, they use these as a

15  good source, as one source I would say.

16           So, yes, this is more oriented towards

17  researchers and manufacturers.  This is Volume 3 of the book

18  and there are other two volumes.  I think there is a fourth

19  volume as well.  I'm not sure.  But I think -- I have them

20  actually, and I often use them for my graduate students.

21           MR. STIEFEL:  I have no further questions of

22  this witness, Your Honor.

23           I would ask, we would offer JTX-40 with respect

24  to his CV in evidence.  I would, I think JTX-95 is already

25  in evidence, but I want to make sure that we offer that as

Fassihi - cross

1    well.

2                 THE COURT:  Okay.  Is there any objection to 40

3    or 95?

4                 MR. FLORENCE:  No, Your Honor.

5                 THE COURT:  Okay.  Those are admitted.

6                 (JTX-40 and JTX-95 are admitted into evidence.)

7                 MR. STIEFEL:  Thank you, Your Honor.  Thank you,

8    Dr. Fassihi.

9                 THE COURT:  We'll have cross-examination.

10                      CROSS-EXAMINATION

11   BY MR. FLORENCE:

12   Q.    Good morning, Dr. Fassihi.

13   A.    Good morning.

14   Q.    I'd like to circle back to some testimony that you

15   gave.  You stated that a person of ordinary skill in the art

16   would recognize the shortcomings in the Davis and Stefoski

17   references; correct?

18   A.    Yes.

19   Q.    And you also testified that the Davis article

20   suggested that there were some, there were some promising

21   results but that there would need to be additional research.

22   That was your testimony; correct?

23   A.    Whatever I referred to on the, in the text or

24   articles and I elaborated, yes.

25   Q.    So if a person of ordinary skill in the art could

Fassihi - cross

1    recognize the shortcomings of the studies done in those

2    references, then a person of ordinary skill in the art would

3    also have the skill set to design further studies; correct?

4    A.    Well, the person of ordinary skill in the art would

5    read the article and they can, if they want to investigate,

6    sure, they can move forward.  Sure.

7    Q.    And, in fact, you testified that moving forward was

8    routine; right?

9    A.    Well, it depends on specifics, you know, because

10   routine, what do you mean by routine?  Nothing is routine

11   because if you are doing research, and if, for example, a

12   person of ordinary skill in the art reading a research

13   article, and he is research oriented, yes, of course, he

14   would like to plan and execute a research project, and that

15   is how that person would move on.  Sure.

16            Is it routine?  Routine in that sense that you

17   design and you move on, yes.

18   Q.    Thank you.  And it's true, isn't it, Dr. Fassihi,

19   that there was some publicly available information regarding

20   4-AP; correct?

21   A.    I'm sorry.  Some?

22   Q.    Publicly available information regarding 4-AP.

23   A.    Well, limited, and quite a bit on the neurotoxic

24   part, the fact that it was used in bird control as a poison.

25   It was used in animal studies to induce seizures, to

Fassihi - cross

1    investigate anti-seizures drugs.  Yes, those informations

2    were known.

3    Q.    And, in fact, there was information disclosed

4    publicly in the Uges reference; correct?

5    A.    In the Uges reference, the one that eventual -- it

6    was limited data on that and I am very, you know,

7    uncomfortable with those pharmacokinetics information.

8    Q.    But that was publicly available; correct?

9    A.    It was published in, yes.  It was published.

10   Q.    And there was additional information on 4-AP in the

11   Stefoski reference; correct?

12   A.    They has also done some investigation, and they were

13   published, yes.

14   Q.    And additional information was done and published in

15   the Davis reference?

16   A.    It was additional information, yes.  It was all

17   published, yes.

18   Q.    Now, you testified earlier today that persons of

19   ordinary skill in the art can obtain information from the

20   FDA regarding the Freedom of Information Act, correct?

21   A.    Yes.

22   Q.    And isn't it also true, Dr. Fassihi, that prior to

23   1990, prior to the filing of the '938 patent, that there was

24   also an investigative new drug application, an IND had been

25   filed with the FDA by the Rush Medical Group for 4-AP?

Fassihi - cross

1    A.      Well, I can't comment.  I don't know.  I'm not aware

2    of it.

3    Q.      So you are not aware of that?  So that is not

4    something you considered as part of your opinions in this

5    case?

6    A.      You know, there you talk about investigation of

7    new drug.  Again, it is, I haven't opined on that, but

8    investigation of new drug, that means you have to get

9    permission if you want to use something which is going to

10   use in humans.

11              So, for example, if I want to get a new compound

12   such as, for example, 4-aminopyridine and go into doing

13   clinical studies, I have to get permission from FDA.  That

14   is under investigate -- investigation new drug.  So you have

15   to get that permission.  Otherwise, you cannot touch the

16   patient.

17              But that doesn't require information that such

18   as what we submit for approval.  That information, it is

19   investigation.  FDA says you can do limited work but you

20   have to do it under controlled condition.  You are

21   responsible if something happens.  We are not accepting

22   responsibilities.  That is how investigation of new drug

23   works.

24   Q.      Okay.  But regardless, Dr. Fassihi, you don't -- you

25   never looked at the investigative new drug application that

Fassihi - cross

1   was filed by the Rush Medical Group prior to 1990, did you?

2   A.    I'm not aware of that.

3   Q.    But as you testified, person of ordinary skill in the

4   art could have obtained that from the FDA through the

5   Freedom of Information Act?

6   A.    Again, the reason they do investigation --

7   Q.    That's not my question, Dr. Fassihi.  Would you

8   please answer my question?

9   A.    Sure.

10  Q.    A person of ordinary skill in the art could have

11  obtained that information from the FDA through the Freedom

12  of Information Act?

13  A.    To the best of my knowledge, I don't think there is

14  an investigational new drug, there is no pharmacokinetic.

15  Data, there's nothing, to the best of my knowledge.

16  Q.    I'm not sure you answered my question.  My question

17  is whether or not a person ordinary skill in the art could

18  obtain the investigative new drug information from the FDA?

19  A.    I'm not sure about investigational.  I know about

20  NDA, yes.  I don't know about investigational.  I don't know

21  that.

22  Q.    That's not something you looked into for your

23  opinion?

24  A.    I don't know if I can get that.  I don't know.  I

25  have never done it in the past.

Fassihi - cross

1    Q.    And Dr. Fassihi, you testified that you said well, we

2    know that 4-AP is a drug that has a placebo effect.  That

3    was your testimony, correct?

4    A.    That's what I heard yesterday, and I also read in

5    some of the articles.

6    Q.    And which of those articles establish that prior to

7    1990?

8    A.    I don't recall exactly, but I was here in the Court

9    yesterday and I was listening to experts in neurological

10   sciences and that's what I heard from them.  And it just

11   strengthens my belief that it is a complicated compound.

12   Q.    But you don't know if that was known as of 1990,

13   correct?

14   A.    They had reported some placebo effect in some

15   articles, I believe.  I don't know -- recall exactly where

16   it was.

17   Q.    But you don't know what the date was of those

18   articles is?

19   A.    I don't know the date.

20   Q.    Thank you.  Now, let's -- if we can, let's turn to

21   PTX-95, please?  And if we can turn to the start of Chapter

22   4, which is I believe is four pages in.  You testified, Dr.

23   Fassihi, that this is a reference that researchers rely on,

24   correct?

25   A.    I didn't say it was a book that researchers would

Fassihi - cross

1    rely on.  I would say they would use it along with

2    everything else that is done in research, yes.

3    Q.    And I believe you've also testified that sustained

4    release formulations -- you don't disagree, do you, that

5    sustained release formulations existed at the time in 1990

6    when the '938 Patent was filed, correct?

7    A.    There were sustained release preparations on the

8    market, yes.

9    Q.    And in fact, sustained release formulations had been

10   around for over 40 years at that point, correct?

11   A.    Well, the first sustained release preparation I think

12   which kind of -- when we say sustained release, with very

13   basic information which was available, which was approved I

14   think in '60s or something, yes, so it was something which

15   was there.  Again, all of those sustained release

16   preparations that were available, all of them were approved

17   as immediate release, on the market and were consumed by

18   millions of people and that's why they were available in the

19   sustained release, yes.

20   Q.    But the technology for sustained release pre-existed

21   even them, correct?

22   A.    What technology are we talking about?  Because people

23   use waxes, too, for example, mix the drug with wax and then

24   that wax would diffuse little by little.  Those technologies

25   were available, but nothing like what we have day.

Fassihi - cross

1    Q.     Let's take a look at the reference.  If we could

2    enlarge the first paragraph.  And the first sentence here,

3    Dr. Fassihi, states that probably the earliest work in the

4    area of sustained drug delivery dosage forms can be traced

5    to the 1938 patent of Israel Laposki, correct?

6    A.     That's what it says, yes.

7    Q.     And you have no reason to disagree with that,

8    correct?

9    A.     No.

10   Q.     And then it says this work involved coated pellets

11   for the prolonged release of the drug and was presumably the

12   forerunner to the development of the coated particle

13   approach that was sustained drug delivery that was

14   introduced in the early 1950's, correct?

15   A.     Yes.

16   Q.     And you don't disagree?

17   A.     I don't disagree, no.

18   Q.     And then the next sentence states there was 40 years

19   of research and development experience in the sustained drug

20   release area since that patent and a number of strategies

21   have been developed to prolong drug levels in the body,

22   correct?

23   A.     That's what they say, yes.

24   Q.     And you don't disagree with that?

25   A.     No.

Fassihi - cross

1    Q.     If we can, let's turn to JTX-81.  And you recall Dr.

2    Kibbe testifying regarding this reference yesterday,

3    correct?

4    A.     Yes.

5    Q.     And you also recall that he used some demonstratives

6    and looked at some tables of the different types of

7    sustained release platforms that existed at the time,

8    correct?

9    A.     Yes.

10   Q.     If we could go to some of those.  First one would be

11   bates number page I think one 177.  Let's do it this way.

12   The top -- the page number for the chapter, for the page I

13   want to go to is 1682.  And within this chapter of

14   Remington's, there's a section on oral dosage forms,

15   correct?

16   A.     That's correct.

17   Q.     You don't disagree that the different platforms that

18   are outlined in this subchapter, you don't disagree that

19   those platforms existed as of 1990, correct?

20   A.     They were all there.  They were all -- that's what's

21   there in that chapter, sure.

22   Q.     Let's turn the next page over, one more page, 1683,

23   please.  Bottom of the first column, one of the platforms is

24   listed here reservoir diffusion products.  Do you see that?

25   A.     Yes, I see that.

Fassihi - cross

1   Q.    And so reservoir diffusion products were known in the

2   art as of 1990, correct?

3   A.    Just a point that I'd like to raise here, that you

4   can see that there is a lot of mathematical equations here.

5   Q.    Dr. Fassihi --

6   A.    Sure.

7   Q.    Your counsel will have an opportunity to ask you

8   additional questions.  If you could focus on my questions,

9   please.

10  A.    Yes.

11  Q.    And in the table here, it lists some examples of some

12  products that are reservoir diffusion products, correct?

13  A.    That's correct.

14  Q.    And on the right it lists the manufacturers of those

15  products, correct?

16  A.    Yes.

17  Q.    And here it lists one of the manufacturers is Jones,

18  correct?

19  A.    Correct.

20  Q.    And Marion and Rorer and Winthrop, correct?

21  A.    Yes.

22  Q.    And so it lists four different manufacturers for this

23  type of a product, correct?

24  A.    That's what the table shows.

25  Q.    And if we go to the next page, please, the top of the

1  next page, Table 3, matrix diffusion products.  You don't

2  dispute that matrix diffusion products existed as of 1990

3  for sustained release as well, do you, Dr. Fassihi?

4  A.     I did not dispute that, no.

5  Q.     And a list of products here that were, in fact,

6  approved, matrix diffuse products, right?

7  A.     Yes.

8  Q.     And on the right are some manufacturers for these

9  products, correct?

10  A.     That's correct.

11  Q.     And some of these are large pharmaceutical companies,

12  correct?

13  A.     Yes.

14  Q.     Abbott is one of them, correct?

15  A.     Yes.

16  Q.     And Ciba?

17  A.     Correct.

18  Q.     And Parke Davis?

19  A.     Yes.

20  Q.     And if we could go over to the next page, first

21  table, Table 4, encapsulated dissolution products and you

22  don't dispute that encapsulated dissolution products existed

23  for sustained release in 1990, do you?

24  A.     I do not dispute that, no.

25  Q.     And there were manufacturers listed here, SmithKline

Fassihi - cross

1   is one of them, correct?

2   A.      Correct.

3   Q.      And also Lederle?

4   A.      Yes.

5   Q.      If we could go down to the next table.  And we have

6   some table.  This is matrix dissolution products, correct?

7   A.      Correct.

8   Q.      And you don't dispute that matrix dissolution

9   products existed as sustained release in 1990, correct?

10  A.      In that form, yes.

11  Q.      And here it lists quite a few products on the

12  left-hand side, correct?

13  A.      Correct.

14  Q.      And then on the right-hand side, again it lists

15  various manufacturers of those products, correct?

16  A.      Yes.

17  Q.      And here it lists Robins, correct?

18  A.      Yes.

19  Q.      And Roche?

20  A.      Yes.

21  Q.      And Lakeside?

22  A.      Yes.

23  Q.      And Schering?

24  A.      Sure.

25  Q.      And so it lists at least four different manufacturers

Fassihi - cross

1   of these products, correct?

2   A.    Yes.

3   Q.    And if you can go to the next table, Table 6.

4   Ion-exchange products.  And here in Table 6 you don't

5   dispute, do you, Dr. Fassihi, that ion-exchange products

6   existed as of 1990?

7   A.    No, I don't dispute that.

8   Q.    And you don't dispute that there was a manufacturer

9   of these products, correct?

10  A.    No.

11  Q.    So Dr. Fassihi, it's true, then, right, that at least

12  as of 1990 there were numerous pharmaceutical companies that

13  were making sustained release products, correct?

14  A.    That's what I said earlier on as well.

15  Q.    And so Elan was not the only pharmaceutical company

16  that was interested in sustained release, correct?

17  A.    Well, Elan had a different approach.

18  Q.    That may be the case, but the question is, Dr.

19  Fassihi, so Elan was not the only pharmaceutical company

20  that was, in fact, interested in sustained release products,

21  correct?

22  A.    Well, Elan was there and these companies were also

23  having these products on the market.

24  Q.    So the answer is yes, they were not the only company

25  that was interested in sustained release products, correct?

Fassihi - cross

1    A.      If you want to put it that way, yes.

2    Q.      In fact, numerous companies were making sustained

3    release products at this time, correct?

4    A.      About all these products that you showed, yes.

5    Everything that you showed in these tables, yes.

6    Q.      Thank you, Dr. Fassihi.  I'd like to turn back to

7    '983 Patent if we can, which I believe is JTX-1.  And if we

8    could turn to Column 2 of that patent, and focus on the

9    second paragraph.  The second paragraph.  And you see here,

10   Dr. Fassihi, it says further, in view of the nature of

11   neurological diseases, it can be appreciated that there is a

12   need for an improved dosage form.  Do you see that?

13   A.      Yes.

14   Q.      And above that it says in the use of a drug for

15   long-term therapy it is desirable that the drug be

16   formulated so that it is suitable for once- or twice-daily

17   administration for aid patient compliance?

18   A.      That's what it says, yes.

19   Q.      So the patent states that it's desirable -- there's a

20   need -- in fact, there's a need for therapy that's once or

21   twice daily to enhance compliance, to aid compliance,

22   correct?

23   A.      That's what the patent says, yes.

24   Q.      And in fact it says it can be appreciated that there

25   is a need for an improved dosage form, correct?

Fassihi - cross

1    A.      Yes, it says that.

2    Q.      And if we can turn to the claims of the '938 Patent,

3    and look at Claim 1, and you reviewed the claims of the '938

4    Patent, correct, Dr. Fassihi, as part of your opinion?

5    A.      Yes, I have.

6    Q.      Claim 1 does not require any particular sustained

7    release formulation, correct?

8    A.      It requires a sustained release formulation.

9    Q.      But it doesn't require a particular one, correct?

10   A.      My understanding as a scientist is, that what they

11   have described in the body of the patent and what they

12   already have specified, those are the ones that apply to

13   sustained release.

14   Q.      And Dr. Fassihi, you would agree with me, wouldn't

15   you, that the idea between -- the idea behind sustained

16   release is to control the Cmax of the drug distribution to

17   bring the Cmax down so that you can avoid toxicity and

18   undesirable side effects that might be seen with immediate

19   release, correct?

20   A.      That is one aspect, yes.

21   Q.      You'd also agree with me, wouldn't you, that it was

22   known that 4-AP had some potential of causing seizures at

23   higher doses?

24   A.      From what I have read and my understanding is that at

25   higher doses, yes, it induced more seizure.

Fassihi - cross

1   Q.    So you would agree with me then that in light of

2   that, it's desirable to lower the Cmax of the drug to have

3   it released over a longer period of time, correct?

4   A.    Again, because the drug has such a narrow particular

5   and the fact that the disease state is so undefined, I would

6   say lowering maybe the Cmax is one criteria.  That is what

7   they -- most of the inventors and other scientists at Acorda

8   have come up with.

9   Q.    And isn't it also true, Dr. Fassihi, that so a

10  formulator wants to have control over the Cmax so it doesn't

11  go too high to cause problems for the patient, correct?

12  A.    That's why we sometimes used sustained release for

13  that purpose.

14  Q.    And isn't it also true that the faster a dosage form

15  dissolves such as an immediate release, the higher the Cmax

16  will be, right?

17  A.    That is natural, yes.

18  Q.    And the rate of the dissolution determines the Cmax,

19  then, correct?

20  A.    The rate of release from the dosage form can dictate

21  Cmax, yes, I agree.

22  Q.    And you'd also agree with me Dr. Fassihi, that

23  generally a person of ordinary skill in the art can effect

24  the dissolution rate of a sustained release tablet by

25  modifying variables, such as the excipient contact or the

Fassihi - cross

1    amount of excipient that's in the dosage form, correct?

2    A.      That is a different part, yes.

3    Q.      But that's within their skill set, correct?

4    A.      Well, it depends whether they have the right

5    expertise in the field or not, so as we have defined person

6    of skill in the art, that person can do it, yes.

7    Q.      So as a person of ordinary skill has been defined in

8    this case, that person can do that, correct?

9    A.      That person can look into it, yes.

10   Q.      And, Dr. Fassihi, you believe that the novel aspect

11   of the '938 patent is in fact the dissolution profiles for

12   the dosage form rather than the particular manufacturing

13   technique that they're using; correct?

14            MR. STIEFEL:  Objection, that is beyond the

15   scope of the direct.

16            THE COURT:  Mr. Florence.

17            MR. FLORENCE:  He has testified that a person of

18   ordinary skill in the art, that it is difficult.  That there

19   is difficulty, Your Honor.  And he is also giving an opinion

20   regarding what he feels is -- excuse me.  He is also giving

21   an opinion regarding whether or not a person of ordinary

22   skill in the art would find the patent claims to be obvious.

23   And I think the question goes right to the line of

24   questioning that I have been providing so far that it is in

25   fact the dissolution profiles and not the sustained release

Fassihi - cross

1    formulation technology that is driving the invention.

2                THE COURT:  Mr. Stiefel.

3                MR. STIEFEL:  Well, I don't think we discussed

4    the dissolution profile particularly.  And I do think it is

5    beyond the scope of the direct.

6                THE COURT:  Well, the direct did bring out the

7    witness's opinion that the invention is not obvious, didn't

8    it?

9                MR. STIEFEL:  Absolutely.

10               THE COURT:  And wouldn't it be within the scope

11   of that to understand what the in invention is?

12               MR. STIEFEL:  I don't disagree.

13               THE COURT:  The objection is overruled.  You may

14   proceed.

15   BY MR. FLORENCE:

16   Q.    I'll re-ask my question.

17               Dr. Fassihi, you believe the novel aspect of

18   the '938 patent is in fact the dissolution profiles for

19   the dosage form rather than the manufacturing technique or

20   platform that was used to achieve the sustained release;

21   correct.

22   A.    Well, I have read the patent.  And the patent has

23   multiple aspects to it.  No. 1 is that they are for the

24   first time using 4-aminopyridine to design a sustained

25   release preparation of that.  So that is one unique aspect

Fassihi - cross

1    to it.

2             The second thing is that they have provided

3    multiple examples.  I don't recall exactly how many but

4    maybe 18-20 different examples of tablets, capsules,

5    pellets, patches and provided also a specific dissolution

6    conditions to achieve ranges that would, knowing that a

7    disease MS is not a very straightforward, well-defined

8    disease.

9             So they have come up with compositions,

10   sustained release preparations, release rates with the

11   specifics at every hour of how much of the drug should be

12   released.

13            Then they have also provided in the patent how

14   you can reach the therapeutic level.  Because, again, based

15   on the knowledge that maybe they have, whatever what was

16   going in their mind, I don't know.  I wasn't in their mind.

17   But they have come up with something which is very new, very

18   novel.  They give you all the information.  And that is what

19   patent says.  That is a novel aspect to it.

20   Q.    And you were asked -- well, you were deposed in this

21   case; is that correct, Dr. Fassihi?

22   A.    Yes.

23   Q.    And you were under oath at the time?

24   A.    Yes.

25            MR. FLORENCE:  Can we play page 134, 7 through

Fassihi - cross

1    17, please?  Of Dr. Fassihi's transcript.

2              "Question:  Did the inventors for the '938

3    patent use a technique for sustained release formulation

4    that was novel?

5              "Answer:  They had a technique.  The dosage form

6    dissolution profiles were novel, but the manufacturing of,

7    of course, they had special technology available to them

8    that they have exemplified in the patent.  But the novelty

9    was the dissolution profile that they provided, and what

10   they provided in the instruction to achieve therapeutic

11   efficacy."

12             MR. FLORENCE:  Thank you.

13   BY MR. FLORENCE:

14   Q.    And, Dr. Fassihi, as of 1990, 4-AP was found to

15   improve the conduction of nerve impulses thereby alleviates

16   symptoms of MS; correct?

17   A.    Very scattered information.  That we have already

18   been through the articles.  That was the amount of

19   information which was available.

20   Q.    But --

21   A.    Very incomplete, very incomplete.

22   Q.    But it was known, right, Dr. Fassihi?  That 4-AP, it

23   was found to improve the conduction of nerve impulses that

24   it alleviated the symptoms of MS, that was known?

25   A.    Aspect of that which they said in some patients they

Fassihi - cross

```
 1    had observed.  In some other, induced seizures.  It was

 2    taken off in few cases.  Patients were removed from the

 3    studies.  That is the kind of information which was

 4    available, yes.

 5    Q.    Dr. Fassihi, you are not a medical doctor; correct?

 6    A.    I am not.

 7    Q.    And you have never -- you have never worked with

 8    drugs for MS; correct?

 9    A.    Not for MS, no.

10    Q.    And that includes 4-AP?

11    A.    4-AP I have not worked, but similar compounds like

12    4-aminosalicylic acid I have worked on and published as

13    well.

14    Q.    And you have never created a sustained or controlled

15    release formulation for any MS drugs; correct?

16    A.    No, I have not created any dosage form for MS, no.

17    Q.    And you don't consider yourself an expert on 4-AP;

18    correct?

19    A.    An expert on 4-AP from an API, active pharmaceutical

20    ingredient?  Is that your question?

21    Q.    Yes.

22    A.    Yes, I am expert on that.  There is chemistry I have

23    had to understand, because I have worked in designs, so it

24    is a chemical agent that I know.  That I don't know about

25    the MS, sure.
```

Fassihi - cross

1   Q.      And, Dr. Kibbe, let's -- excuse me.  Dr. Fassihi,

2   let's look at your definition of a person of ordinary skill

3   in the art that you have provided to the Court.

4               And that should be on your slide from yesterday

5   which is PDX-4-001.

6               And under your definition of a person of

7   ordinary skill in the art, that person needs to be both an

8   MD and a Ph.D. along with many years of experience in the

9   field of controlled release; correct?

10  A.     That is what the definition of person of ordinary

11  skill in the art in this case has been, and I think the same

12  I think is presented with Dr. Kibbe as well.

13  Q.      Well, as defined here as having both an MD and Ph.D.,

14  you are not a person of ordinary skill in the art under the

15  definition that you have provided to the Court; correct?

16  A.      Well, I know that when people work in the

17  pharmaceutical companies, it is a team of people that work

18  together.  The inventors of this patent, Dr. Masterson was

19  an MD, Dr. Myers was a Ph.D.  And, in general, I think you

20  can have both of them as a person of skill in the art in

21  this case.

22  Q.      But you have defined it as one person having both

23  those qualifications; correct?

24  A.      I said someone with an MD with experience treating MS

25  patients and a Ph.D. in pharmaceutics.  So you can have it

Fassihi - cross

1    as one person or maybe two individuals.

2    Q.    Dr. Fassihi, I wanted to ask you something that you

3    said yesterday in your testimony.

4              Could we pull up from trial transcript

5    yesterday, page 328, line 20 through 329, line 3.

6              And, Dr. Fassihi, you were asked yesterday:

7              "Question:  Did you hear Dr. Kibbe's testimony

8    this morning that the development of sustained release

9    formulation as of 1990 was really straightforward?

10             "Answer:  Well, that was Dr. Kibbe's opinion,

11   but the fact is that taken today, designing sustainable

12   release is a challenge, even today, 20 years later -- 26

13   years later, no, it's not routine experimentation, it wasn't

14   then, it is not now.  If it was routine, I could not train

15   my Ph.D. student."

16   A.    That's correct.

17   Q.    Now, your Ph.D. student as one of the persons, your

18   Ph.D. student doesn't fit the definition of a person of

19   ordinary skill in the art; correct?

20   A.    Well, that is a different matter.  Because my

21   students, the reason I mention that, because we provide, we

22   train people to go into pharmaceutical companies and work

23   there.

24   Q.    Well, it may be a different matter, but your Ph.D.

25   students, they're not persons of ordinary skill in the art

Fassihi - redirect

1    under anybody's definition in this case; correct?

2    A.     What I have said, they are not.  The Ph.D. student is

3    still a student.  They are not persons of skill in the art.

4    But what I'm saying is --

5    Q.     Well, your counsel can ask you about that,

6    Dr. Fassihi.

7    A.     Okay.

8              MR. FLORENCE:  I have no further questions.

9              THE COURT:  Okay.  Redirect.

10             MR. STIEFEL:  Just one question, Dr. Fassihi.  I

11   guess it is two.

12                    REDIRECT EXAMINATION

13   BY MR. STIEFEL:

14   Q.     You recall being asked about the various sustained

15   release formulations -- excuse me -- various sustained

16   release formulations identified in Remington's and the list

17   of manufacturers of each of those drugs?  Do you recall that

18   counsel asked you about that?

19   A.     Yes.

20   Q.     In a list of manufacturers of those drugs, does it

21   identify the entity that developed the sustained release

22   formulations of those drugs?

23   A.     They do not describe it; and I know that often, you

24   know, they contracted out and they get the manufacturer from

25   all of them.

Fassihi - redirect

1          MR. STIEFEL:  Thank you, Dr. Fassihi.  I have no

2    further questions.

3          THE COURT:  I just have one, Doctor.

4          I would like to understand what you meant when

5    you said you would not be able to train your Ph.D. students

6    if this was routine.

7          THE WITNESS:  Sure.  Sure.

8          Well, routine work is something that really

9    doesn't leave much for research and investigation.  Because

10   if it is routine, you go to a training and you are done and

11   you go and do your routine work.

12         But Ph.D. projects that we, we have for our

13   students, they have to add something new to the scientific

14   knowledge that exists today.  The students cannot defend the

15   Ph.D. defense, they cannot pass if you are not adding

16   something to the existing art that is there.

17         So over past 20 years, in the area of controlled

18   release, we have always added something.  And, in fact, one

19   of the reasons that we can publish in peer review journals,

20   the peers that are expert in the field, they look and read

21   and they ask, the first question is what is the novelty

22   about this work that we want to publish?  And they want

23   that.  So we just have to make sure that we are adding a

24   dimension to further the scientific knowledge.

25         THE COURT:  All right.  Thank you.

Lublin - direct

1              Is there anything further as a result of my

2    question?

3              MR. STIEFEL:  No, Your Honor.

4              THE COURT:  From defendants?

5              MR. FLORENCE:  No, Your Honor.  Thank you.

6              THE COURT:  All right.  You may step down,

7    Doctor.  Thank you very much.

8              Plaintiffs can call their next witness.

9              MR. DEKA:  Your Honor, the plaintiffs will call

10   Dr. Lublin.

11             THE COURT:  Okay.

12             MR. DEKA:  And may I approach?

13             THE COURT:  Yes, you may.

14             (Binders passed forward.)

15             ... FRED DAVID LUBLIN, having been first duly

16   sworn, was examined and testified as follows ...

17             THE COURT:  Good morning.  Welcome, Dr. Lublin.

18             THE WITNESS:  Thank you.

19             MR. DEKA:  I'm not sure if Dr. Lublin got one.

20             (Binder passed forward.)

21             THE COURT:  You may proceed when you are ready.

22                     DIRECT EXAMINATION

23   BY MR. DEKA:

24   Q.    Dr. Lublin, would you give us your full name, please?

25   A.    Fred David Lublin.

Lublin - direct

1    Q.      What do you currently do for a living?

2    A.      I am Professor of Neurology at the Icahn School of

3    Medicine at Mt. Sinai.

4    Q.      Are you a practicing neurologist?

5    A.      I am.

6    Q.      Do you practice at Mt. Sinai?

7    A.      I do.

8    Q.      Do you have any board certifications?

9    A.      Yes, I'm board certified by the American Board of

10   Medical Examiners and the American Board of Psychology and

11   Neurology.

12   Q.      Would you please briefly describe your education and

13   medical training?

14   A.      I got my Bachelor's of Arts degree at Temple

15   University in 1968.

16           And I received an MD degree from Thomas

17   Jefferson University, Jefferson Medical College in 1972.

18           I also did an externship during that period at

19   the National Hospital For Neurological Diseases in London.

20   Q.      And did you have a residency?

21   A.      Yes.  I had an internship and a residency.  My

22   internship was at the Albert Einstein Medical Center, Bronx

23   Municipal Hospital from 1972 in the 1973.

24           And then from 1973 until 1976, I was a resident

25   in Neurology at the New York Hospital of Cornell Medical

Lublin - direct

1   Center.

2   Q.     What did you do after that?

3   A.     After that, I returned to Philadelphia, to Jefferson

4   Medical College and took a position as an instructor of

5   neurology and an adjunct instructor at the Department of

6   Biochemistry.

7   Q.     And what were the roles you have at Thomas Jefferson?

8   A.     At Thomas Jefferson, I had academic roles, so I went

9   up through the ranks to full professor.  I saw patients with

10  neurological diseases.  I taught medical students,

11  residents, fellows, and other physicians, and did research

12  in multiple sclerosis, in animal models of multiple

13  sclerosis.

14            In 1984, we set up a multiple sclerosis center

15  there.

16  Q.     And what did you do after your work at Thomas

17  Jefferson?

18  A.     In 1996, I left Jefferson and moved across town to

19  the Medical College of Pennsylvania, where I was the Service

20  Chief of Neurology and also set up a multiple sclerosis

21  center and a neurological clinical trials unit.

22  Q.     And after that?

23  A.     In 2000, I moved to New York and took my positions

24  as Professor of Neurology in what they call the Mt. Sinai

25  School of Medicine.

1   Q.     And you have been at Mt. Sinai from 2000 through the

2   present?

3   A.     Yes.

4   Q.     And are you a member of any scientific societies?

5   A.     I am.  Quite a few.  The American Neurological

6   Association, the American Academy of Neurology, and others.

7   Q.     Have you authored or coauthored peer-reviewed

8   articles?

9   A.     I have.

10  Q.     How many?

11  A.     It's over 180.

12  Q.     Any in MS?

13  A.     Almost all of them are in MS or MS-related diseases

14  or animal models of multiple sclerosis.

15  Q.     Have you been a peer reviewer for new publications?

16  A.     Yes, I peer reviewed for multiple journals:

17  Neurology, Annals of Neurology, Science, Annals of Internal

18  Medicine.  I have a few others.

19  Q.     And have you been an editor for any publication?

20  A.     I'm currently the co-chief editor of the Journal of

21  Multiple Sclerosis and Related Disorders.

22  Q.     Any others?

23  A.     That is what I'm editor of.  Did you want editorial

24  boards?

25  Q.     Can you describe generally what boards you have been

1   on?

2   A.      I've been on the editorial board of the Journal of

3   Neurology, the Multiple Sclerosis Journal, the Mt. Sinai

4   Journal of Medicine.

5   Q.      And could you please describe your role and

6   responsibilities in your current position at Mt. Sinai?

7   A.      My current position includes, I've been a director of

8   the MS divisions.  It has administrative duties.  I have a

9   clinical practice in neurology seeing primarily patients

10  with multiple sclerosis and related diseases.  I teach

11  medical students, residents, fellows, and other physicians.

12  And I do clinical research in primarily multiple sclerosis.

13  Q.      Approximately how many MS patients are under your

14  care?

15  A.      Approximately 2,000.

16  Q.      And when did you first start treating MS patients?

17  A.      1973.

18  Q.      And you've continued to specialize in MS and care for

19  MS patients to date?

20  A.      Yes.

21  Q.      How long have you been instructing physicians on

22  treatment and research for MS?

23  A.      Since 1984.

24  Q.      Can you please describe your current role in training

25  MS specialists?

Lublin - direct

1    A.      We have a fellowship program at Mt. Sinai that I'm

2    the director of and we train now three to four fellows a

3    year and we train them in the clinical care of multiple

4    sclerosis and also how to perform clinical trials in

5    multiple sclerosis and also to get involved in basic

6    research in multiple sclerosis.

7    Q.      Can you give us a brief description of your work in

8    clinical trials involved in the treatment of MS?

9    A.      I've been involved with clinical trials in MS since

10   probably 1988.  I've been involved in one way or another in

11   development of just about every MS approved agent.  We

12   currently have about six clinical trials under way of

13   therapeutic interventions plus maybe another dozen or 15

14   studies of different aspects of multiple sclerosis,

15   genetics, physiology, diet, things of that sort.

16   Q.      And you have designed clinical trials?

17   A.      I have.

18   Q.      Have you advised others on clinical trials?

19   A.      I have.  I have been advisor to multiple bio-tech and

20   pharmaceutical companies, the FDA, National Institutes of

21   Health.

22   Q.      What is the National MS Society?

23   A.      The National MS Society is a patient oriented

24   organization and it's the major patient organization in

25   multiple sclerosis in our country.  It has chapter in every

Lublin - direct

1    state and it serves to provide services to patients with

2    multiple sclerosis, education to patients with multiple

3    sclerosis, but it also funds research and fellowship

4    positions in multiple sclerosis and provides -- brings

5    together groups to develop guidelines and recommendations on

6    the care and the study of multiple sclerosis.

7    Q.     And have you been involved with the National MS

8    Society?

9    A.     I have since 1984.

10   Q.     Can you describe your involvement?

11   A.     Well, I've been involved in their, in their clinical

12   activities and guidelines.  In the mid '90s I was the

13   chairman of their clinical trials advisory program, which

14   was getting advice and soliciting advice on how to do or how

15   to best do clinical trials in multiple sclerosis and I was

16   chair of that committee.  And then I became chair of the

17   research programs advisory committee, which is their highest

18   level advice to the society on which research projects to

19   fund.

20   Q.     And if we take a look at JTX-37, it should be tab one

21   in your exhibit binder.  Can you identify this document?

22   A.     This is my curriculum vitae.

23   Q.     Does your CV include more details about your

24   education and experience?

25   A.     It does.

Lublin - direct

1    Q.      And how would you describe your expertise?

2    A.      My expertise is in the field of neurology, with

3    special expertise in the care and study of multiple

4    sclerosis.

5              MR. DEKA:  Your Honor, plaintiffs offer Dr.

6    Lublin as an expert in neurology with specific expertise in

7    the care and research on MS.

8              THE COURT:  Any objection?

9              MR. CARROLL:  No objection.

10             THE COURT:  Okay.  He's so recognized.

11   BY MR. DEKA:

12   Q.      Doctor Lublin, what is multiple sclerosis?

13   A.      Multiple sclerosis is an inflammatory and

14   degenerative disease of the central nervous system.  The

15   central nervous system is the brain the spinal cord and the

16   optic nerves.  And they can be involved anywhere along their

17   course with the disease.  It produces what's called

18   demyelination, which is a loss of myelin.  Myelin is a fatty

19   insulating material around many nerves in the central

20   nervous system.  And when it does that, it produces a

21   variety of symptoms.  And those symptoms can effect anything

22   that the brain or spinal cord can do.  So it could be

23   weakness, numbness, tingling, walking difficulty, visual

24   difficulties, double vision, sexual dysfunction, bladder

25   dysfunction, pain.  Very variable.

1    Q.      Does MS effect the peripheral nerve system?

2    A.      No, MS does not effect the peripheral nervous system.

3    Q.      And I think you mentioned myelin, but could you give

4    us a brief description of myelin?

5    A.      So many of the nerves in the nervous system have this

6    fatty insulating material called myelin and they have myelin

7    because it allows for faster and more efficient conduction

8    of signals along the nerves.

9    Q.      And how does MS effect myelin?

10   A.      It damages the myelin.

11   Q.      How do physicians treat MS patients?

12   A.      There's two main goals in treating multiple

13   sclerosis.  One are what are called the disease modifying

14   therapies.  These are agents that we now have that alter the

15   course of the disease; that is, lessen the chance of you

16   getting worse in one way or another.  And the second is what

17   are called symptom management therapies.  The symptom

18   management therapies take whatever symptoms the individual

19   may have and try to improve them and make their lives

20   better.  The way the disease works in it's most common form

21   it occurs as attacks.  You'll get an episode of something.

22   It may be blindness in one eye, it may be numbness and

23   tingling in the legs, weakness, incoordination.  It comes on

24   reasonably suddenly and lasts for days to weeks and then it

25   stops and it improves anywhere from zero to a hundred

Lublin - direct

1    percent.  The ones that don't get full improvement are left

2    with symptoms.  So they maybe left with a limp or maybe some

3    decrease in their vision or double vision or some numbness.

4    Those are the symptoms that the symptom management works to

5    treat.

6    Q.     How do you teach physicians to evaluate MS patients?

7    A.     So we teach them first to take a careful neurological

8    history and then do a careful neurological examination.  And

9    then we employ a number of tests and studies that maybe of

10   value.  MRI scans are quite useful.  We may use a book,

11   Potentials for Determining Subclinical Involvement.  We use

12   things like the 25-foot timed walk and a variety of other

13   measures.

14   Q.     What is the timed 25-foot walk?

15   A.     There's where you have a strip that's 25 feet long --

16   and we do this on every visit with every patient.  You have

17   them walk the strip and you time them.  We actually do it

18   twice.  They walk from one end to the other and then back

19   again and you take that timing and it's a nice way to follow

20   patients over time.

21   Q.     And what is visual evoked potential?

22   A.     That is a test where you have the individual sit in

23   front of a visual stimulus.  The commonest stimulus now is a

24   screen, is a checker board of black and white.  And the

25   checker board reverses.  The black squares become white, the

Lublin - direct

1   white squares becomes black at a set frequency and that's a

2   very potent visual stimulus.  And what you do is you measure

3   the time from when that stimulus hits the eye until it's

4   received in the back of the brain, what are called the

5   occipital lobes, because that's where vision comes to

6   consciousness.  So you put electrodes back there and you get

7   a wave form of the signal as it passes through.  And

8   typically it takes a hundred milliseconds from the time of

9   the flash until it's recorded back here in the occipital

10  lobes.  If you have a demyelinating lesions of the optic

11  nerve, remember the optic nerve is part of the central

12  nervous system, so it can be effected in multiple sclerosis,

13  it will slow that signal, so instead of getting there in 100

14  milliseconds, you might get there in 150 milliseconds.

15  Q.     And why was visual evoked potential, VEP developed?

16  A.     Well, I think you heard yesterday about the hot tub

17  test.  And the purpose was to pick up subclinical lesions.

18  The absence of diagnosing multiple sclerosis involves what's

19  called dissemination in time and dissemination in space.

20  Dissemination in time means more than one episode.  And

21  dissemination in space means more than one area of the

22  central nervous system.  That's the multiple part of

23  multiple sclerosis.  So sometimes an individual will come in

24  with just one episode or evidence of involvement in only one

25  area of the nervous system.  And so if we can find

Lublin - direct

1   subclinical evidence of another area, it enhances your

2   ability to diagnose the disease.  And what the visual evoked

3   response is for is picking up changes in the optic nerve

4   that weren't appreciated clinically.  So the individual may

5   not have complained of a visual complaint, you may have

6   checked their visual acuity and their visual acuity is okay.

7   But the test is quite sensitive, so it can pick up

8   subclinical involvement and that helps you make the

9   diagnosis.

10  Q.     Are there any other electrophysiological tests?

11  A.     They call it the brain stem evoked response or brain

12  stem evoked potential and perhaps I should say now, the

13  words response and potential are synonymous in this context.

14  And there you put clicks from headphones into the ear and

15  you measure how long that stimulus takes to get to the

16  hearing parts of the brain.  And then there's something

17  called somatosensory evoked potentials where you put little

18  shocks into the legs or the arms and you measure how long

19  that takes to get to the brain.

20  Q.     If you could please turn to JTX-65, which will be tab

21  2 in your binder.  Do you have it?

22  A.     I have it.

23  Q.     Could you identify this document?

24  A.     So this is a paper from the British Medical Journal

25  in 1973 by Halladay and McDonald and Lucien on visual evoked

Lublin - direct

1    response and the diagnosis of multiple sclerosis.

2    Q.      And what's reported in Halladay?

3    A.      What they report here is the use of the visual evoked

4    potential for picking up subclinical lesions in multiple

5    sclerosis.

6    Q.      And what techniques are they using?

7    A.      This is again, using the visual evoked response.  And

8    they were using the checker board, reversing pattern.

9    Q.      And how has visual evoked potential been used since

10   then?

11   A.      It's been used since then in clinical practice and we

12   still use it in clinical practice and it's been used in

13   clinical research for studying optic nerve function in

14   multiple sclerosis and we continue to use it in clinical

15   research for optic nerve lesions.

16   Q.      Let's turn to 4-AP, could you give us a brief

17   description of 4-AP?

18   A.      4-aminopyridine is a molecule that is a potassium

19   channel blocker.

20   Q.      And have you prepared slides to assist you with your

21   testimony today?

22   A.      Yes, I have.

23   Q.      And are those the slides marked PDX 1 through 11?

24   A.      Yes.

25   Q.      Could you walk us through what's shown on slides 1

Lublin - direct

1   through 11, please?

2   A.      Okay.  So what you see here is a healthy nerve.  The

3   blue parts are the nerve fiber.  Now, the nerve is covered

4   in orange.  That's the myelin.  The myelin is discontinuous

5   and so where the blue shows through from the myelin is where

6   the nerve is exposed and that's where the conduction occurs.

7               And so you can see from the yellow arrow,

8   instead of conducting the signal through the nerve, the

9   signal jumps from blue area to blue area.  Those are called

10  nodes of Ranvier.  It jumps from each of those nodes.

11  Again, this allows faster conductions, more efficient

12  conduction, doesn't take as much energy on the part of the

13  nerve.  So that's a healthy nerve.

14              In multiple sclerosis you lose the myelin, so

15  now you've exposed this area here that normally had been

16  under the myelin, under the orange area.  And when you do

17  that, you uncover potassium channels and you slow this

18  signal.  So here you can see it's slowed and then it goes on

19  to jump again.

20              So what happens is under the myelin there's

21  potassium channels.  Potassium channels inhibit conduction.

22  They allow potassium to leak out so you can't get as strong

23  of what's called an action potential.  The action potential

24  there is the nerve impulse.  That's the signal.  And so it's

25  slowed or it can even be blocked, but nevertheless what

Lublin - direct

1   happens is you don't have the efficient conduction any

2   longer.

3                Now, 4-aminopyridine blocks these potassium

4   channels, enhanced production, less enhancements release

5   through the demyelinated segment.  So you can see it moves

6   through a little faster.  That's the electrophysiologic

7   basis of what we're trying to do with 4-aminopyridine.

8   Q.      Thank you.  Are you familiar with the literature on

9   the development of 4-AP and its potential treatment?

10  A.      Yes.

11  Q.      Can we turn to PTX-599.  Should be Tab 3 in your

12  book.

13  A.      Yes, I have.

14  Q.      Do you recognize this document?

15  A.      I do.

16  Q.      And what is it?

17  A.      This is a paper from the Journal of Physiology in

18  1981 from Bostock, Sears and Sherratt, on the effects of

19  4-aminopyridine and tetraethylammonium ions on normal

20  demyelinated mammalian fibers.

21  Q.      Where was this study conducted?

22  A.      It was conducted at Queen Square in London.

23  Q.      And what's described in this paper?

24  A.      What's described in here is the use of

25  4-aminopyridine to improve conduction in experimentally

Lublin - direct

1    demyelinated nerves.

2    Q.    What's used is an animal model?

3    A.    They were actually using diptheria toxin as a

4    demyelinating -- it demyelinates and they were using

5    4-aminopyridine and it shows they were blocking potassium

6    channels and improving conduction.

7    Q.    Let's turn to JTX-25.  Should be Tab 5 in your

8    binder.  Do you recognize this document?

9    A.    I do.

10   Q.    And this is the Bever 1 that's been referred to in

11   this case?

12   A.    Yes, it is.

13   Q.    Could you tell us what's reported in this article?

14   A.    Here Chris Bever and his colleagues are doing a

15   preliminary trial of 3, 4 diaminopyridine in patients with

16   multiple sclerosis.

17   Q.    And if you turn to the second column of Page 422

18   under clinical evaluation, can you explain to us what's

19   being disclosed here with respect to visually evoked

20   responses?

21   A.    Okay.

22   Q.    Halfway down the paragraph, under clinical

23   evaluation.

24   A.    Okay.  So what they have here is visual evoked

25   responses were performed to determine whether delays, which

Lublin - direct

1    could be monitored during diaminopyridine treatment, were

2    present.  Because the primary goals of the study were to

3    evaluate toxicity in pharmacokinetics, patients with new

4    deficits or temperature-sensitive deficits were not sought

5    out for this trial.

6    Q.    VEP was being used as a measure in this study?

7    A.    Yes.

8    Q.    And if you turn to Page 426.  Could you tell us

9    what's described under changing VER latencies?

10   A.    So what they describe there is improvements in VER.

11   Remember VER and VEP are synonymous, so VER latencies were

12   noticed in 100 patients, the left eye of the patient number

13   had improved from 130 milliseconds before treatment to 119

14   milliseconds during treatment and then returned to 128

15   milliseconds following treatment.  So what they're

16   demonstrating here is a defect in conduction, a partial

17   improvement with the use of the diaminopyridine and then a

18   return to the baseline abnormality after the treatment is

19   resolved.

20   Q.    And if we turn to the top of the next column on that

21   same Page 426, can you tell me what's described starting

22   with the clinical improvement?

23   A.    So what's being described here is so you've heard a

24   bit about placebo effects.  And multiple sclerosis is a

25   disease in which there's lots of placebo effects, so any

Lublin - direct

1    time you do a study you have to control as best you can for

2    the possibility of placebo effects and one of the ways is by

3    using objective measures.  And so what the investigator is

4    reporting here is clinical improvement, is consistent with a

5    central effect meaning working within the central nervous

6    system.  Well, those changes could have been due to placebo.

7    The improvements in the VER latency suggest a central effect

8    because there's no placebo effect on the test.  The patient

9    just sits there and looks at a screen.  Doesn't matter what

10   they know or what they think they're getting.

11   Q.    Can we turn to JTX-43?  Should be Tab 6 in your

12   binder.  Do you recognize this document?

13   A.    I do.

14   Q.    And this is an article that's been referred to as

15   Davis in this case?

16   A.    Yes.

17   Q.    Can you tell us what's described in this paper?

18   A.    This is a paper from Davis and colleagues from the

19   Rush Medical Center on orally administered 4-aminopyridine

20   improves clinical signs in multiple sclerosis.

21   Q.    And if we turn to Page 187, looking at Table 1,

22   what's being illustrated there with respect to VEP?

23   A.    Well, he shows that they utilize VEP testing in some

24   of their individuals that they treated with the 4-AP and

25   some individuals that they treated with placebo and there's

Lublin - direct

1    a difference in the effect of the 4-AP group, at least to

2    finding a responder did better.

3    Q.    If I can direct your attention to Page 189, paragraph

4    starting latencies that continues onto Page 190, could you

5    tell us what's being described there?

6    A.    So here he says latencies improves in the 4-AP

7    treated group.  The mean postdose P-100 latency change for

8    FF, that was full field and CF, which is central field, is

9    just different ways of doing the evoked response, combined

10   was a 5.4 millisecond decrease in the 4-AP group and a 1.12

11   millisecond increase in the Placebo group.

12   Q.    And if we can please turn to page 191.  Halfway down

13   the first column, starting with 10 of our 15 MS patients.

14   BY THE WITNESS:

15   A.    So 10 of our 15 MS patients who received 4-AP

16   experienced transient mild paresthesia or transient mild

17   dizziness, lightheadedness, or both.  Though these patients

18   may have become unblinded, three had reversible improvements

19   in VEP testing after 4-AP that cannot be explained by

20   placebo effect.

21           So what is happening here is that when you give

22   the medication, it was fairly common to get -- paraesthesia

23   is tingling, and lightheadedness, dizziness is just as it

24   says.

25           So a patient feels that and may be unblinded and

Lublin - direct

1    they assume they are getting the real medicine.  And when

2    they assume they're getting the real medicine, that alters

3    how they perform, how they behave.  That is the typical

4    placebo effect.

5              Again, with VEP, we don't expect to see the

6    placebo effect, so that gives a little confidence in the

7    result.

8    Q.    And if you could turn to JTX-11, it should be Tab 7.

9              Do you recognize this document?

10   A.    I do.

11   Q.    This is what was referred to as Stefoski 2 in this

12   case?

13   A.    Yes.

14   Q.    Can you tell you what is described in this paper?

15   A.    So this is a paper by Stefoski and his colleagues at

16   Rush on 4-aminopyradine in Multiple Sclerosis in Prolonged

17   Administration, published in Neurology in 1991.

18   Q.    And if you could turn to the table on the top of page

19   1345.

20             What can you tell us about VEP as used in this

21   study?

22   A.    So here they performed VEP.  Five of the individuals

23   have received 4-aminopyridine and two of the individuals

24   have received placebo, and they show a differential effect

25   as they're measuring it.

Lublin - direct

1    Q.    Can you turn to page 1347?  The passage, "whereas

2    4-AP side effect."  Can you tell us what is being described

3    in that paragraph?

4    A.    Okay.  So, again, this issue of unblinding is

5    brought up.  It says:  Whereas 4-AP side effects might have

6    unblinded some patients, occurrences of similar symptoms

7    with placebo suggest that some patients could not

8    differentiate with certainty between the two agents.

9                And that is not surprising.

10               Strong support for a true pharmacologic effect

11   of 4-AP is provided by the improvements recorded with the

12   objective VEP -- and that is critical flicker fusion

13   testing -- and also the blindly rated videotaped

14   examinations.

15   Q.    And the contrast is drawn between VEP and other

16   clinical evaluations; is that correct?

17   A.    That is correct.

18   Q.    Dr. Lublin, why don't we turn to Tab 10.  It should

19   be JTX-1 in your binder.

20   A.    Okay.

21   Q.    Do you recognize this document?

22   A.    I do.

23   Q.    And this is what has been referred to as the '938

24   patent in this case?

25   A.    It is.

Lublin - direct

1   Q.      You were asked to evaluate the clinical aspects of

2   the '938 patent from the perspective of a person of ordinary

3   skill in the art as of November 1st, 1991; correct?

4   A.      Yes.

5   Q.      And let's turn to PDX-38.

6           And what is shown on this slide?

7   A.      This is the plaintiff's proposed definition of a

8   person of ordinary skill in the art.

9   Q.      And you heard yesterday defendants' proposed

10  definition of a person of ordinary skill in the art;

11  correct?

12  A.      I believe so.

13  Q.      And you considered both definitions in making your

14  opinions?

15  A.      I did.

16  Q.      And do your opinions change depending on which

17  definition of a person of ordinary skill of art is applied?

18  A.      They do not.

19  Q.      All right.  So turning back to JTX-1, can we look at

20  the claims which would be the second-to-last page?

21  A.      Okay.

22  Q.      And is it your understanding that claims 3 and 8 of

23  the patent are at issue in this case?

24  A.      Yes.

25  Q.      And that those claims depend from claim 1?

Lublin - direct

1    A.    Yes.

2    Q.    In forming your opinions, did you consider the

3    Court's Order and Memorandum Opinion on claim construction?

4    A.    I did.

5    Q.    And if we could take a look at slide PDX-3-9.

6          What is shown on this slide?

7    A.    These are the claim constructions, the claim term

8    for claims 3 and 8 of the '938 patent and the agreed

9    construction.

10   Q.    And neurological disease where the disease is

11   characterized by a slowing of nerve impulse transmission has

12   been construed as disease of the nervous system

13   characterized by a reduction of the electrical signals

14   across the nerve; correct?

15   A.    Yes.

16   Q.    And is MS such a disease?

17   A.    Yes.

18   Q.    And if we take a look at slide 3-10.

19         What is shown on this slide?

20   A.    Claim constructions for the claim term, for a

21   therapeutically effective blood levels for claims 3 and 8 of

22   the '938 patent and then the Court's construction of that

23   claim term.

24   Q.    And how does the construction of "therapeutically

25   effective blood levels" in the '938 patent contrast

Lublin - direct

1    "therapeutically effective concentration" in the '826

2    patent?

3    A.     They're pretty similar.

4    Q.     The construction for the '938 patent requires blood

5    levels sufficient to produce a therapeutic effect?

6    A.     Yes.

7    Q.     And then for the '826 patent, it is blood plasma

8    level of a drug that ameliorates a symptom; correct?

9    A.     Yes.

10   Q.     There is no requirement in the '938 patent claim to

11   ameliorate a symptom; correct?

12   A.     That is my understanding.

13   Q.     So if we turn to slide 3-11.

14          What is your understanding of what is shown

15   here?

16   A.     This is the explanation of the claim construction

17   provided by the Court.

18          The Court agrees with plaintiffs that it would

19   be improper to equate therapeutic effectiveness with

20   decreasing or preventing symptoms.

21          It goes on to say, the intrinsic record of the

22   '938 patent does not suggest that the claims are limited

23   to just one of these therapeutic effects.  Instead, the

24   prosecution history of the '938 patent indicates that a

25   drug is therapeutically effective if it ameliorates a

Lublin - direct

1    neurological disease with no requirement that the drug

2    benefit the afflicted patient in any particular way.

3    Q.     And you applied this analysis when you evaluated the

4    '938 patent?

5    A.     I did.

6    Q.     All right.  Let's turn back to the '938 patent.

7    JTX-1 at column 1, lines 22 through 29.

8    A.     Okay.

9    Q.     Does this definition of multiple sclerosis fit with

10   your opinion on the definition of multiple sclerosis?

11   A.     Yes, this is pretty close to what I had stated

12   earlier.  A degenerative and inflammatory disease affecting

13   the central nervous system, causing demyelination of nerve

14   fibers affecting nerve transmission.

15   Q.     If we go to, starting at line 52 through 66.

16   A.     So here, the patents providing background information

17   from the group at Rush Medical Center, which includes Davis

18   and Stefoski whom we already discussed, and their work in

19   4-aminopyridine, and then also work on 3,4-di-aminopyridine

20   from Dr. Bever we also discussed.  And they mentioned

21   briefly how they did their studies in terms of restoring

22   conduction, blocked nerves.  And it mentions in Bever that

23   it was found to improve specific neurological deficits of

24   visual evoked response latencies in MS patients.

25   Q.     Could you turn to column 13, line 65 through column

Lublin - direct

1   14, line 9.

2           Could you explain what is being described here

3   in the '938 patent?

4   A.    So what is being described here is a titration

5   schedule.  That is, how to give the drug or teaching on how

6   to give the drug.  And what they're saying is that you would

7   start with a dose of less than 15 milligrams a day until you

8   reach a tolerable state.

9           When that tolerable state is reached, you then

10  would titrate up by 5 to 15 milligrams a day until a

11  therapeutic dose is reached.

12  Q.    Is there anything other than an upward titration

13  regimen taught in the '938 patent?

14  A.    Not that I'm aware of.

15  Q.    And a person of ordinary skill in the art in November

16  1991 would have been familiar with upward dose titration?

17  A.    Yes.

18  Q.    Do you have an opinion on how a person of ordinary

19  skill in the art in 1991 would have understood how to

20  determine therapeutically effective blood levels using a

21  upward dose titration with respect to the '938 patent?

22  A.    So as I mentioned, you would start with less than

23  50 milligrams a day, reach a tolerable state, and then

24  gradually go up until you achieved what would be chosen as

25  your therapeutic dose.  Therapeutic dose would be correction

Lublin - direct

1   of some abnormality.

2           The abnormality that is taught here is, for

3   example, visual evoked response, although another objective

4   of an electrophysiological test could also be used.  So you

5   titrate up until you see that improvement because that is

6   the direct measure of the defect of altered nerve

7   conduction.

8   Q.    Let's change topics a little bit.  You understand

9   defendants assert that the asserted claims of the Acorda

10  patents are obvious to a person of ordinary skill in the art

11  in 2004.

12  A.    Yes.

13  Q.    And are you familiar with nerispiridine?

14  A.    I am.

15  Q.    And you were involved in a clinical study on

16  nerispiridine?

17  A.    Yes, I was.

18  Q.    Could you turn to what is marked as PTX-569.  It

19  should be tab 12 of your binder.

20          And do you recognize this document?

21  A.    Yes.  This is a clinical trial summary of

22  nerispiridine.

23  Q.    Could you tell us what is described with respect to

24  nerispiridine?

25  A.    This was a multicenter, phase 3 blind study to look

Lublin - direct

1    at the ability of nerispiridine to include walking in

2    patients with multiple sclerosis.  So nerispiridine was a

3    molecule  that also blocks potassium channels, like

4    4-aminopyridine, although the molecule is a little

5    different, and it has been shown in animal models that it is

6    an improved conduction through a demyelinated segment.  So

7    it was thought that the same could be applied to humans.

8              Now, nerispiridine also has a weaker sodium

9    channel blocking property.  It was hoped that by blocking

10   sodium channels in addition to the potassium channels that

11   you would listen the side effect profile and some of the

12   concerning safety issues of 4-aminopyridine.  That is why

13   this drug was moved forward into this study, and it was

14   looking at timed 25 foot walk or walking speed with a

15   responder analysis similar that had been done previously

16   with 4-aminopyridine.

17   Q.    And if you turn to page 3.

18              Can you tell us the results of this study?

19   A.    Well, there was no evidence of a specific significant

20   difference between the responders around the non-responders

21   that received nerispiridine or placebo.  In fact, the

22   placebo was a little better.

23   Q.    And what happened with the clinical development of

24   nerispiridine after the results of this study?

25   A.    Yes, I did.  It was discontinued.

Lublin - cross

1    Q.     And do you have an opinion whether the nerispiridine

2    project supports nonobviousness of the Acorda patents?

3    A.     I do.

4    Q.     What, if anything, does the clinical development of

5    nerispiridine show with respect to obviousness of the Acorda

6    patents?

7    A.     So this shows that even in 2008, when this study was

8    started, it was very difficult to develop an agent that

9    would reliably improve walking in patients with multiple

10   sclerosis.

11            MR. DEKA:  Thank you.  No further questions.

12            THE COURT:  All right.  Cross-examination.

13            MS. CARROLL:  Good morning.

14            THE COURT:  Good morning.

15            MS. CARROLL:  My name is Karen Carroll.  I'm

16   with the law firm of Parker Poe Adams & Bernstein.  I

17   represent the Mylan defendant but I will be conducting the

18   cross-examination of Dr. Lublin for all the defendants this

19   morning.

20            THE COURT:  Thank you very much.

21            MS. CARROLL:  May I approach?

22            THE COURT:  You may.

23            (Binders passed forward.)

24                    CROSS-EXAMINATION

25   BY MS. CARROLL:

Lublin - cross

1    Q.      Dr. Lublin, you testified that you are a practicing

2    neurologist that regularly treats multiple sclerosis

3    patients; is that right?

4    A.      That's right.

5    Q.      And you are not a formulator; is that right?

6    A.      That's right.

7    Q.      So just to be clear, you are not offering any

8    opinions on whether or not it would have been obvious to

9    develop a sustained release formulation for AP; is that

10   right?

11   A.      That is correct.

12   Q.      And you are not a pharmacokineticist either, are you?

13   A.      I'm not a pharmacokineticist.

14   Q.      So for clarity, you are not offering any opinions on

15   whether the PK parameters that are claimed in the Acorda

16   patents are obvious; is that right?

17   A.      That's correct.

18   Q.      I'd like you to turn JTX-001 which is the '938

19   patent.

20   A.      (Witness complies.)

21   Q.      And you were talking with counsel about dose

22   titration that I believe was on column 13, starting at 65,

23   to column 14, line 3; is that correct?

24   A.      Yes.

25   Q.      Now, if you can turn to the claims of the '938

Lublin - cross

1    patent.

2    A.      All right.

3    Q.      And if you look at claim 1, now claim 1 states, a

4    method for the treatment of a neurological disease where

5    the disease is characterized by a slowing of nerve

6    impulse transmission, which comprises administering to a

7    patient in need thereof a medicament containing a mono-

8    or di-aminopyridine active agent, said medicament being

9    effective to permit a sustained release of said mono or

10   di-aminopyridine active agent at a rate allowing controlled

11   absorption thereof which achieves therapeutically effective

12   blood levels over a 12-24 hour period in a dose generally of

13   a once to twice daily basis.

14           Is that what the claim says?

15   A.      Yes.

16   Q.      Is there any mention of dose titration in claim 1?

17   A.      Claim 1 is silent as to dose titration.

18   Q.      Okay.  And if you look at claim 5 of the '938 patent,

19   and you see that claim 5 depends from claim 1 and further

20   states, wherein the medicament is administered to a patient

21   at a dose and for a period -- excuse me -- sufficient to

22   allow said subject to reach a tolerable state such that said

23   subject is able to tolerate said dose without showing any

24   adverse effects and thereafter increasing the dose of said

25   mono or di-aminopyridine active agent at selected intervals

Lublin - cross

1    of time until a therapeutic dose is achieved.

2                Do you see that?

3    A.    Yes.

4    Q.    And it is your understanding that claim 5 does

5    require a dose titration?

6    A.    Yes.

7    Q.    And if you look at claims 3 and 8 of the asserted

8    patent, or the asserted claims of this patent, do either of

9    them depend from claim 5?

10   A.    No.

11   Q.    Are you aware that the '938 patent is listed in the

12   Orange Book for Ampyra?

13   A.    Maybe.  I'm not that familiar with the Orange Book,

14   but I think I have heard this.

15   Q.    And does Ampyra require dose titration?

16   A.    As it is currently prescribed?

17   Q.    As it is currently prescribed.

18   A.    No.

19   Q.    Now, you had also discussed various prior art or

20   disclosure in the '938 patent that talks about previous

21   studies conducted in 4-AP; is that right?

22   A.    Yes.

23   Q.    Okay.  And I believe that that was at column 1,

24   lines, I'd like to say 57 through 61.

25                Is that what we referred to before?

Lublin - cross

1   A.     Well, it actually started a little above that, but

2   those are the studies.

3   Q.     All right.  So the record is clear, we're looking at

4   lines 57 through 61.

5   A.     Okay.

6   Q.     Okay.  And it refers to clinical trials carried out

7   by Davis, FA and Stefoski, D from the Rush Multiple

8   Sclerosis Centre; is that correct?

9   A.     Yes.

10  Q.     And I believe that you stated that that was referring

11  to the Rush article that we've been discussing at JTX-43?

12  A.     I think it refers to all of their prior work.

13  Q.     Let's look at, like you opined or you mentioned that

14  in order to achieve a therapeutically effective blood level,

15  you would just need a correction of some abnormality as

16  shown in, for instance, an improvement in the VEP; is that

17  correct?

18  A.     Yes.

19  Q.     Well, let's look at JTX-0043.

20         And I believe that you had testified before that

21  on page 191, in the second paragraph, that Davis disclosed

22  that they did see improvements in VEP?

23  A.     Yes.

24  Q.     And that you have testified that VEP cannot be

25  explained by -- excuse me -- that a placebo effect cannot

Lublin - cross

1  be explained by VEP or it is not the same thing?

2  A.    What I said was you wouldn't expect to have a placebo

3  effect with VEP because it is an objective measurement.

4  Q.    Okay.  So a VEP is actually showing you an actual

5  response; is that right?

6  A.    It's showing you a conduction response, yes.

7  Q.    So would you agree with me then that Davis teaches a

8  response or therapeutic effect in multiple sclerosis

9  patients by administration of 4-AP.

10 A.    What Davis is showing there, that in some of the

11 patients there was improvement in the VEP.

12 Q.    And in your opinion that improvement of VEP is the

13 therapeutic effect?

14 A.    It can be a therapeutic effect, yes.

15 Q.    Now, we had talked before in

16 the -- when we had referred to the patent that Davis was

17 from the Rush Medical Group; is that right?

18 A.    Yes.

19 Q.    Are you aware that the Rush Medical Group filed an

20 IND on 4-AP?

21 A.    I am not.

22 Q.    You had also offered opinion that based on the drug

23 nerispiridine, it was difficult to develop a drug to improve

24 multiple sclerosis or to treat multiple sclerosis; is that

25 correct?

Lublin - cross

1    A.      No, that's not correct.

2    Q.      Okay.  Well, what was your -- what was your basis for

3    relying on nerispiridine?  Am I pronouncing that wrong?

4    A.      Nerispiridine.  I'm not even sure I'm right.  What I

5    said it was difficult to develop a drug to improve walking

6    in patients with multiple sclerosis.

7    Q.      Are you familiar with the structure of nerispiridine?

8    A.      I've seen it.

9    Q.      If you can pull up demonstrative DDX 4-2, does this

10   reflect the structure of nerispiridine?

11   A.      I'm not a biochemist, but if you tell me it is, I'll

12   take your word for it.

13   Q.      Do you see at the bottom it referenced pubchem.  Is

14   that a place where you can reference the structure of a

15   molecule?

16   A.      I don't know.

17   Q.      Well, that's where we got this molecule from, and I

18   represent that it is the structure.  Now, if you look at the

19   next demonstrative, DDX 4-3, do you recognize this as the

20   structure or 4-AP?

21   A.      Yes.

22   Q.      Now, looking at the two together, are they the same?

23   A.      Again, I'm not a biochemist, but they don't look the

24   same to me.

25   Q.      Okay.  Do you know how nerispiridine or its mechanism

Lublin - cross

1    of action is?

2    A.    Yes.

3    Q.    And what is that?

4    A.    It's a potassium channel blocker and to a weaker

5    extent a sodium channel blocker.

6    Q.    And 4-AP, it doesn't have any involvement in the

7    sodium channel blocking?

8    A.    Not that I know of.

9    Q.    Do you know whether or not the nerispiridine that was

10   being tested in the trials that you referenced were tested

11   in immediate release versus sustained release formulation?

12   A.    I believe it was immediate release.

13   Q.    And looking at PTX-0569, if you look at the study

14   period, do you see that it says the date first patient

15   enrolled is December 29th, 2008?

16   A.    That's correct.

17   Q.    And do you see that the date of the last patient

18   completed is March 2nd, 2010?

19   A.    Yes.

20   Q.    Do you understand that the Acorda patents were filed

21   in April of 2004?

22   A.    Yes.

23   Q.    And so this study occurred after the Acorda patents

24   were filed; is that correct?

25   A.    That's correct.

Lublin - cross

1           MR. CARROLL:  No further questions.

2           THE COURT:  Redirect?

3           MR. DEKA:  No, Your Honor.

4           THE COURT:  No.  Okay.  You may step down.

5           MR. DEKA:  I'm sorry, exhibits.

6           THE COURT:  I'm sorry?

7           MR. DEKA:  I forgot to read in the exhibit

8    numbers, I apologize.

9           THE COURT:  Okay.  You can keep going, doctor.

10   Thank you.

11          MR. DEKA:  So I think JTX-37, JTX-65, PTX-599,

12   JTX-25, JTX-43, JTX-113 and JTX-1.  I think one may already

13   be in.

14          THE COURT:  Any objection?

15          MR. CARROLL:  No objection, Your Honor.

16          THE COURT:  All right.  All those may be

17   admitted or readmitted.  We'll take a recess.

18          (Short recess.)

19          THE COURT:  Can you call the next witness?

20          MS. BECKER:  We'll be calling Dr. Andrew

21   Goodman.

22          THE COURT:  Okay.

23          MS. BECKER:  One more housekeeping.  May we

24   approach?

25          THE COURT:  Yes, you may.

Goodman - direct

```
 1                  MR. DEKA:  Your Honor, I may have left off an
 2      exhibit.
 3                  THE COURT:  Finish that.
 4                  ... ANDREW GOODMAN, having first been duly sworn
 5      under oath, was examined and testified as follows ...
 6                  THE COURT:  Good morning again.
 7                  MR. DEKA:  It's PTX-569.
 8                  THE COURT:  Okay.  Any objection to 569?
 9                  MR. CARROLL:  No objection, Your Honor.
10                  THE COURT:  Thank you.  569 is admitted.
11                  (PTX-569 is admitted into evidence.)
12                  THE COURT:  You may approach.  You may proceed.
13                          DIRECT EXAMINATION
14      BY MS. BECKER:
15      Q.      Good morning.
16      A.      Good morning.
17      Q.      Okay.  Can you please state your full name for the
18      record?
19      A.      Andrew David Goodman.
20      Q.      Dr. Goodman, could you please briefly summarize your
21      educational background?
22      A.      Yes.  I completed bachelors degree in biochemistry at
23      the Rutgers University.  This was followed by medical school
24      at the Rutgers New Jersey Medical School as it's now called.
25      This was in 1979.  I followed with the training in internal
```

1    medicine and neurology as a resident, all at Mt. Sinai

2    Medical Center in New York City.  This was followed by a

3    five-year research fellowship experience at the

4    Neuroimmunology Branch in the Intraneural Program of the

5    National Institute of Neurologic Diseases, NIH, in Bethesda,

6    Maryland.

7    Q.    And when did you complete that?

8    A.    I completed that between the years of 1983 and 1988.

9    Q.    Do you have any board certifications, Dr. Goodman?

10   A.    Yes.  I am board certified by the American Board of

11   Medical Examiners as well as the American Board of

12   Psychiatry and Neurology.

13   Q.    And did your education and training specialize in any

14   particular area?

15   A.    Yes.  So my training at Mt. Sinai was in adult

16   neurology and then the training I received at NIH was in the

17   area of neuroimmunology and multiple sclerosis.  And in that

18   experience I had training both in more basic laboratory

19   immunology studies focused on multiple sclerosis, such as

20   the interplay of viruses in the immune system in people with

21   MS., but I also -- I also had the experience of working on

22   clinical research and in particular clinical trials at that

23   time.

24   Q.    And have you published in your field, in that field?

25   A.    Yes.  I've published over 70 papers specifically on

Goodman - direct

1    multiple sclerosis.

2    Q.    And can you name some journals in which some of your

3    publications have appeared, any peer-reviewed journals?

4    A.    Yes, so Neurology, the Annals of Neurology, the

5    Lancet, Multiple Sclerosis, to name a few.

6    Q.    Thank you.  Have you participated in the peer review

7    of any other publications by others?

8    A.    Yes, so I've actually be a peer-reviewer for the

9    journals that I just cited and others as well.

10   Q.    Are you currently employed, Dr. Goodman?

11   A.    Yes, I'm employed at the University of Rochester.

12   Q.    And when and in what capacity did you begin your work

13   at the University of Rochester?

14   A.    I was recruited from NIH in 1988 as an assistant

15   professor of neurology at University of Rochester.

16   Q.    And has your career progressed?

17   A.    Yeah.  So over the 28 years now since I arrived in

18   Rochester I've been promoted through the academic ranks and

19   now I'm a full professor with tenure in the department of

20   neurology.

21   Q.    And what are your responsibilities in your current

22   position?

23   A.    So I direct the multiple sclerosis and actually we

24   call it immunology and multiple sclerosis division within

25   that department.  In that capacity I have administrative

Goodman - direct

 1    duties because there are other faculty that work under me,

 2    but there are basically three missions of the department and

 3    our division in which I work.

 4              The first is teaching and in teaching I instruct

 5    medical students, neurology and other residents and fellows

 6    in, in all aspects of general clinical neurology, both for

 7    inpatients as well as outpatients and in particular, with

 8    respect to residents and fellows, I teach them about

 9    clinical care and to the extent that they're interested,

10    clinical research and even basic research in the area of

11    multiple sclerosis.  Other duties involve patient care and

12    our center cares for over 2,500 people with multiple

13    sclerosis from Upstate New York and Pennsylvania for the

14    most part and I direct and am responsible for the care of

15    all of them.

16              And just going back to clinical teaching for a

17    moment, I neglected to mention that I am the director of our

18    National MS Society funded fellowship program in which we

19    have one to two fellows per year under my mentorship.  And

20    then lastly is the area of research.

21    Q.    May I just ask one additional question about your

22    patient care responsibilities?  Do you personally see

23    patients?

24    A.    Yes, so I have cut back on my patient care

25    responsibilities, but I still see on average something on

Goodman - direct

1    the order of 20 MS patients per week, but earlier in my

2    career it was 50 or more people with MS whom I would see

3    directly.

4    Q.    And over the course of your career, approximately how

5    many patients with MS would you think you --

6    A.    So this is an approximation, but it would be in the

7    thousands of people I've cared for with MS over the past 30

8    years.

9    Q.    Thank you.  And you were beginning, before I

10   interrupted, to tell us about the research?

11   A.    Again, as division chief I oversee our entire

12   research program, which includes faculty involved in

13   laboratory research, including animal models of MS and I

14   collaborate with some of the world's authorities on

15   developing stem cells as a potential treatment for or

16   potential therapy in MS and other neurologic diseases.  But

17   my major focus currently and has been for 20 years or more,

18   is on what we like to call experimental therapeutics and my

19   particular focus is on multiple sclerosis.  This means to

20   me, the study, investigation and hopefully development of

21   new or better therapies for people with multiple sclerosis.

22   Q.    And have you personally been involved in conducting

23   clinical trials in that area?

24   A.    I have been involved with dozens and dozens of

25   clinical trials over the past 30 years, beginning in 1985

Goodman - direct

1    when I was still a fellow at NIH.

2    Q.     Can you give us some examples of some of the types of

3    clinical trials that you've been involved in?

4    A.     So for the most part, as we heard from Dr. Lublin,

5    there have been many studies of what's called disease

6    modifying therapies of multiple sclerosis and by this we

7    mean since the disease at its heart is the immune system

8    attacking the nervous system.  We try to test therapies that

9    may alter or modify or ameliorate the effects of the immune

10   system as it has its tendencies to attack the nervous

11   system.  So that's the majority of the therapeutic trials

12   I've been involved in.  Among them, for example, was my

13   participation in what became a pivotal trial of Teva's

14   flagship medication for multiple sclerosis, now known as

15   Copaxone.  But also during the course of my career I focused

16   on developing symptomatic therapies as described by Dr.

17   Lublin and certainly the principle among them was my work in

18   the development of, of 4-aminopyridine, until its approval

19   or dalfampridine or Ampyra, the subject of this case.

20   Q.     Thank you.  Could you please turn to JTX-34, it's Tab

21   1 in your binder.  Like I said, it should be Tab 1.

22   A.     Got it.

23   Q.     Okay.  Can you please identify this document?

24   A.     Yes, this is a copy of a previous CV.

25   Q.     Does this summarize and provide further detail

Goodman - direct

1    regarding your background, qualifications and employed

2    history?

3    A.    Yes, it does.

4    Q.    What do you consider to be your areas of expertise as

5    relevant to this case?

6    A.    My areas of expertise are in neurology in general,

7    but specifically in the care of people with multiple

8    sclerosis, also the investigation and new therapies and

9    clinical trials involving multiple sclerosis.

10              MS. BECKER:  Your Honor, at this time we'd like

11   to offer Dr. Goodman as an expert in neurology, particularly

12   multiple sclerosis, the treatment of multiple sclerosis and

13   clinical trials in multiple sclerosis.

14              THE COURT:  Any objection?

15              MR. KLEIN:  No, Your Honor.

16              THE COURT:  So recognized.

17              MS. BECKER:  Thank you.

18   BY MS. BECKER:

19   Q.    Dr. Goodman, did you prepare a set of demonstrative

20   slides to assist you in your testimony today?

21   A.    Yes, I did.

22   Q.    And are those slides which you should have before

23   you, Slides PDX 2, 1 through 53?

24   A.    Yes.

25   Q.    Could you please turn to PDX 2-002.  Does this slide

Goodman - direct

 1    identify the subject matter about which your prepared to

 2    testify?

 3    A.      Yes, it does.

 4    Q.      Can you please walk us through what you have expected

 5    to testify or do expect to testify on?

 6    A.      So I had prepared to testify regarding the scientific

 7    background of multiple sclerosis, the development history of

 8    4-aminopyridine into Ampyra, the four Acorda patents in

 9    question today with particular emphasis on the

10    nonobviousness of the asserted claims of the Acorda patents

11    to a person of ordinary skill in the art and it's my

12    understanding that there's no longer a need for me to

13    discuss the sufficiency of disclosure in the Acorda patents.

14    Q.      Okay.  Thank you.  In your testimony regarding the

15    nonobviousness of the patents, do you understand that the

16    parties have proposed two different definitions of the

17    person of skill in the art for purposes of that analysis?

18    A.      Yes.

19    Q.      And have you seen the definitions proposed by

20    Defendants, for example, as testified to by Dr. Peroutka and

21    that proposed by Plaintiffs as testified to, for example, by

22    Dr. Lublin?

23    A.      Yes, I've seen them both.

24    Q.      And did you consider each of these definitions in

25    forming your opinion?

Goodman - direct

1    A.      Yes.

2    Q.      And does any opinion that you will be offering differ

3    depending on which of those definitions you would apply?

4    A.      No, I don't -- there wouldn't be any difference.

5    Q.      Thank you.  Okay.  If you could please turn to PDX 2,

6    4.  Titled background on multiple sclerosis.  Can you tell

7    us what's addressed here?

8    A.      Yes.  So again, it's the discussion on background of

9    multiple sclerosis and of course the Court has already heard

10   some of this previously yesterday and today, so I don't want

11   to be belaboring that, but it is important to remember the

12   complexity of the disease with respect to the interplay

13   between the immune system and the nervous system; that is,

14   as it attacks myelin and actually other aspects of the

15   central nervous system above and beyond the myelin.  Also

16   important to remember that it is a central nervous system

17   disease.  We heard yesterday that MS can affect the

18   peripheral nerves, but I entirely agree with Dr. Lublin

19   that's not true.  And importantly, importantly, it's not

20   just a question of inflaming and damaging myelin with it's

21   impact on nerve conduction, but it also causes scarring.

22   These are scars like anywhere else in the body except with

23   slightly different cells.  And the scarring is not only what

24   leads to permanent symptoms rather than transitory symptoms

25   as we heard with Dr. Lublin that can occur with inflammatory

Goodman - direct

1   attacks, but that's part of the degenerative process, but

2   importantly because it involves brain scarring it puts

3   people with MS at risk for seizures or convulsions and

4   that's a critical issue with respect to 4-aminopyridine.

5   Q.   Thank you.  And you mentioned here also the immune

6   systems attacks on myelin.

7           Turning to PDX-2-5.

8           Is this a slide describing that process?

9   A.   Yes.  So yesterday, we saw an animated version of a

10  similar cartoon.

11          Depicting on the left panel is the essentially

12  normal status of signalling within the central nervous

13  system white matter or nerve fibers.  And what is depicted

14  here is what is known as saltatory or jumping or

15  leapfrogging conduction over the myelin, myelin segments.

16          But on the right, we see on the right-hand side,

17  we see when the myelin is damaged or even stripped by the

18  immune system.  The signals are weakened or completely

19  blocked.

20  Q.   And turning to your slide PDX-2-6.

21          Can you --

22  A.   Yes.  As we heard the past two days, depending on the

23  real estate exactly where in the central nervous system

24  those areas of inflammation and then scarring occur will

25  naturally flow the wide variety of symptoms that occur with

Goodman - direct

1    people with MS.

2              Again, it is important to remember that this

3    happening in typically in people in their late 20s and early

4    30s, but it's a lifelong disease that sadly remains despite

5    all of our best efforts over decades.  It remains incurable.

6              So these symptoms lead to considerable

7    devastation often on the quality of life, and among the

8    issues that people most, most commonly find as devastating

9    as listed here is the loss of independence due to impairment

10   in their walking.

11             Another key point that I wanted to highlight

12   here is the great variability that these symptoms have in

13   individual patients.  And in subsequent slides, I will

14   emphasize that some more.

15   Q.    Thank you.  Let's turn to the next slide, PDX-2-7.

16             Can you tell us what is shown here?

17   A.    So this is a list of some of the commonest symptoms

18   of people with MS will suffer.  And we heard earlier from

19   Dr. Lublin that there are others such as sexual dysfunction

20   that can be troubling to people.

21             Impaired walking, as I mentioned, one of the

22   commonest and most devastating with respect to independence

23   and quality of life.

24             But I also highlight here cognitive dysfunction.

25   This is a manifestation of the brain disease, the brain

Goodman - direct

1    scarring people with MS suffer from, and, again, potentially

2    susceptible to toxic effects of the drug in question.

3    Q.     And you mentioned there are others as well.  But is

4    this just a selected listing?

5    A.     This is just a selected list.

6    Q.     And I see you also mentioned impaired vision.

7    A.     Yes.  So, again, this notion of the real estate.  So

8    when the optic nerve is involved, as Dr. Lublin mentioned,

9    then that can result in either transiently or permanently

10   impaired vision.  And so that is just an example of where

11   the disease hits, where the symptoms come from, depending

12   on the distribution from person to person, will follow the

13   panoply of symptoms that is different from one person to the

14   next.

15   Q.     And you will notice here, I noticed some other

16   symptoms that you mentioned:  spasticity, weakness, fatigue.

17   A.     So, again, these are quite common, quite common

18   symptoms relating to impact on the motor system in people

19   with MS.  And fatigue is a more complex and, to date, still

20   mysterious symptom that people with MS suffer from and often

21   quite troubling and disabling; in a very practical sense,

22   keeps people from working.

23   Q.     Can you turn to your next slide, PDX-2-8.

24          And can you tell us what points you are making

25   here?

Goodman - direct

1  A.     Yes.  So as I mentioned, I wanted to focus for a

2  moment on the variability that is a hallmark of MS.

3          And this variability, as I already alluded to,

4  speaks to the issue of variability from patient to patient.

5  And that is, as I mentioned, each MS, each person with MS

6  is going to be a universe on to him or herself in that they

7  have a different set of lesions and therefore a different

8  set of problems compared to the next person.

9          Further, there are different disease courses or

10  phenotypes that, as I mention often, in the most common form

11  will hit young people that are in their late 20s or early

12  30s with attacks or relapses, as we heard from Dr. Lublin

13  this morning.  But quite typically over time, over decades

14  with MS, so people into their 40s and 50s and beyond may

15  have fewer of those attacks, unpredictably, and they can

16  still have them even with people in their 60s and 70s,

17  unfortunately.  But the tendency, the trend is for MS to get

18  gradually and progressively worse, what has been called

19  secondary progression.

20          Now, there are a small minority of people that

21  actually have primary progressive MS.  These are people who

22  never have an initial attack.  Rarely, they may have them

23  later in their course, but they have a primarily worsening

24  course of their MS.  And, again, this varies from person to

25  person to person and, depending on the location, the

Goodman - direct

1    severity and the course of the MS, different people have

2    different levels of disability.

3            So I want to highlight here on the left-hand

4    panel is the variability from person to person with MS.

5            Now, on the right hand panel, a critical

6    distinction about variability is that within the same

7    person, they may vary.  As I described already, they may

8    vary during the course of their experience, their life with

9    MS in that they may have attacks and then remissions and

10   then attacks again.  But also at different stages in the

11   course of their life with MS, they may have different levels

12   of disease progression and therefore disability.

13           The other thing that is important about MS is

14   that it is not a static disease.  It is not a stable target.

15   It is always changing in one or two respects.  The pathology

16   tends to worsen over time, and that is what Dr. Lublin

17   called the degenerative aspect to the MS.

18           But also people, even people in more advanced

19   stage, may still get new lesions and have new problems.

20           So again, it is a moving target.  It is not a

21   fixed disease.

22           And then probably most importantly that I have

23   highlighted in the last bullet in the bottom on the right

24   is this notion of day to day, and I would actually say even

25   hour to hour variability that each patient with MS may

 1    experience in their level of function and may wake up in the

 2    morning and may be able to see well, and then as the day

 3    goes on and the temperature goes up, their vision may fade.

 4    The same thing may by true to their ability to walk and

 5    other aspects of their MS symptomology.

 6              And as I will discuss in additional slides, this

 7    has impact on the conduct and the interpretation of clinical

 8    trials.

 9    Q.    Thank you.  Let's turn to the next slide, slide

10    PDX-2-9.

11              Does the nature of MS pose difficulties

12    conducting clinical trials?

13    A.    Yes.  So what I have highlighted in the upper part of

14    the slide is because of this variety and variability as I

15    have just discussed among patients, it makes it challenging

16    to select clinical endpoints.

17              And, further, because even if you have selected

18    one or more clinical endpoints, things may improve in one

19    or, if we're talking about symptoms, may improve in one

20    symptom but not in another.  And then this can lead to

21    this notion of mixed results which something improves and

22    something doesn't improve or it improves in one person but

23    not in another person.

24              All of this adds to the complexity of both

25    clinical design, as I have said, and also interpretation of

Goodman - direct

1    results.

2              And then on the bottom, again, this notion of

3    variability and fluctuation, day to day, week to week, month

4    to month, and even hour to hour makes it extremely difficult

5    to make meaningful inferences about clinical effects, and

6    this is particularly, particularly problematic with respect

7    to symptoms.

8              So as I have described, that a person's symptoms

9    may fluctuate from hour to hour within the same day, and

10   this creates challenges for doing clinical trials.

11             For example, when doing a trial of function,

12   like looking at walking, which we will be discussing, one

13   has to be cautious to actually test the same patient at the

14   same time of day so as not to -- so as to try and minimize

15   this fluctuation-type phenomenon that occurs.

16             So, again, as an example, if you examined the

17   person who walks well at 10:00 o'clock in the morning but

18   can barely, barely get out of a wheelchair at 3:00 p.m., if

19   you examine them at 3:00 p.m. during the first visit of a

20   clinical trial, and then you would examine them a month

21   later at 10:00 a.m. and they're doing better, how would you

22   know, how would the patient know, how would the investigator

23   know whether or not that is an effect of an intervention or

24   that is simply their typical fluctuation?

25             These are some of the challenges that MS poses

Goodman - direct

1    to those of us trying to plan and implement clinical trials.

2    Q.    Thank you.  I'd like to talk now just about

3    4-aminopyridine or 4-AP.

4          Can you turn to the next slide, PDX-210.

5          And is the mechanism of action of 4-AP known?

6    A.    Yes.  With respect to, with respect to the central

7    nervous system.  The problem, a core problem in MS, which is

8    the slowing or loss of normally conductive signals through

9    the myelinated nerve fibers, the potassium channel block has

10   an impact, as we heard, both from physiologic studies in

11   animals but also in the selected studies of physiology such

12   as VEP in people with MS that there is an improvement or

13   normalization of conduction because of the potassium channel

14   blockade.

15         We have seen fancier slides with animation about

16   this previously.

17   Q.    Do 4-AP have any potential adverse effects?

18   A.    So as we have heard previously, yes.  And most, most

19   concerning of all is seizures or convulsions, but there

20   will other side effects including tremors, including

21   paresthesias.  You have heard of tingling.  Dysesthesias,

22   which means painful tingling.  And dizziness, nausea,

23   insomnia.

24         There are a number of side effects which, in my

25   estimation, directly relate to this potassium channel

439

Goodman - direct

1  mechanism, potassium channel blocking mechanism about

2  improving or enhancing nerve signal conduction.

3  Q.    So do I understand the seizure potential you referred

4  to is a result of the same mechanism of action as the

5  improvement that you --

6  A.    Yes.  So I believe that potassium channel blocking

7  mechanism or function is related to seizures in general.

8  And people without MS have had seizures because of what

9  happens in their brain.  And, of course, as I've said,

10  people with MS are even more susceptible to seizures even

11  without the addition of 4-aminopyridine.

12  Q.    I'd like to talk a bit about the development history

13  of 4-AP and the literature regarding that development?

14         Could you please turn to JTX-89, which is tab 6

15  in your binder.

16         Do you recognize JTX-89 as the reference that

17  was -- oh, I'm sorry.

18  A.    That is on the screen, but I don't have it here in my

19  binder yet.

20  Q.    That's all right.

21  A.    So this is tab 6.

22  Q.    Yes.

23  A.    Got it.

24  Q.    Okay.  Thank you.  And do you recognize JTX-89 as the

25  reference that has been referred to in this case as Murray?

Goodman - direct

1    A.      Yes.  Yes.

2    Q.      So to speak a little bit about Murray.  Were the

3    patients in this study MS patients?

4    A.      None of them.

5    Q.      What type of patients were they?

6    A.      So, to my recollection, they were people with

7    neuromuscular, disorders of neuromuscular transmission, and

8    in particular, Eaton-Lambert syndrome, myasthenia gravis and

9    congential myasthenia.

10   Q.      How did those diseases compare to MS?

11   A.      Well, certainly they're not MS but, importantly, both

12   physiologically and anatomically they are different.  As I

13   said and Dr. Lublin said, MS does not affect the peripheral

14   nervous system and neuromuscular junctions are anatomically

15   where the nerve, peripheral nerve meets the muscle.  So this

16   is specifically outside of the central nervous system.

17   Q.      Okay.  Turning to the article at page 558, in column

18   1, the second full paragraph.

19           Does that address the dosing scheme that was

20   used in this study?

21   A.      Yes.  It describes -- well, it starts, the starting

22   dose was 10 milligrams twice daily, and this was gradually

23   increased, depending on the response, to a maximum of

24   200 milligrams daily in one patient.

25   Q.      So do you understand the dose that was used in this

Goodman - direct

1    study to have been 10 milligrams twice daily?

2    A.    No, I understand that that was a starting dose in an

3    upward titration scream as described here.

4    Q.    And what does an upward titration scheme mean?  Could

5    you please explain?

6    A.    So as we heard yesterday, titration means adjusting

7    of doses up or down depending on some, some characteristic

8    response, including tolerability or clinical or some other

9    measurable response that one finds in the patient, but it

10   means dose adjustment on an individual basis.

11   Q.    Thank you.  Did Murray observe any adverse effects in

12   the patients?

13   A.    Yes, they did.

14   Q.    Can you give us an example?

15   A.    Well, remembering that there were a total of nine

16   patients in this study, three had seizures and one had an

17   acute confusional episode.

18   Q.    And if you turn to the last sentence in the study,

19   what did the investigators conclude?

20   A.    They concluded that the central -- and I take that

21   to mean the central nervous system -- effects of 4-AP,

22   especially seizures, limit its use.

23   Q.    Would this concern about seizures apply in MS

24   patients?

25   A.    Yes, absolutely.  Even more so, as I have already

Goodman - direct

1    testified.  One of the hallmarks of MS is brain scarring,

2    predisposing to an increased risk of seizures.

3              So in these patients who have no brain disease

4    and are having seizures, the concern for MS would be

5    obviously heightened because of they're already, they're

6    already predisposed to seizures even without adding

7    aminopyridine.

8    Q.   So would Murray's administration of 4-AP for 10

9    months or for a long period to patients suffering from

10   neuromuscular disorders suggest that that could be done in

11   MS patients?

12   A.   Not at all.  As I've said, it's not MS and it's a

13   different part of the nervous system and these patients

14   don't have brain scars, they are not predisposed to

15   seizures, so we don't learn about the critical, most

16   important, most concerning safety issue.

17   Q.   And do the results of Murray teach anything regarding

18   the efficacy of 4-AP in MS?

19   A.   Not at all.  Again, this is a condition of

20   neuromuscular -- these are conditions involving

21   neuromuscular transmission in the peripheral -- at the

22   peripheral neuromuscular junction and speak nothing to the

23   mechanism that we just discussed and has been discussed

24   previously about the improving nerve conduction in the

25   central nervous system within the central nervous system in

1    the myelin or abnormally myelinated nerve fibers within the

2    central nervous system.  This is not telling us anything

3    about that mechanism and therefore nothing about MS.

4    Q.     Turning to JTX-112, which is 10-7 in your binder.  Do

5    you recognize this exhibit as what has been referred to in

6    this case as Stefoski 1?

7    A.     Yes, I do.

8    Q.     And in addition to D. Stefoski it lists F.A. Davis as

9    an author.  Were these the researchers that we've heard

10   referenced as being from the Rush Institute?

11   A.     Yes, Stefoski and Floyd Davis worked together at Rush

12   for many years.

13   Q.     Okay.  And looking at your slide PDX-213, is this a

14   slide you prepared summarizing this reference?

15   A.     Yes, it is.

16   Q.     How would you describe the nature of this study?

17   A.     So first it was small, primary, but most importantly

18   I would characterize it as exploratory, seeking to see what

19   observable affection might occur with the administration

20   intravenously of 4-AP in these 12 people with MS and 5

21   normal men.

22   Q.     And looking at page ending in 138, the first column,

23   last paragraph, does this address the blinding of the study?

24   A.     Yes, very specifically it says because individuals

25   receiving 4-AP develop transient perioral tingling, this

Goodman - direct

1    study could not be double blinded.

2    Q.    Can you explain what the perioral tingling is there?

3    A.    It's tingling or numbness around the mouth and

4    obviously this was, was seen in many of the patients who

5    participated in the study and as we heard from Dr. Lublin

6    earlier this morning, it would signal to the patient what

7    they were getting as treatment and therefore both volitional

8    or non-volitional, meaning placebo or other behavioral

9    effects could be in play in whatever clinical, clinical

10   outcomes were looked at.  And this is why the physiologic

11   outcome such as VEP were important.

12   Q.    Is this tingling caused by 4-AP pose a blinding

13   problem commonly in MS studies?

14   A.    Well, it's a problem whenever 4-AP is given to

15   anybody, but in particular people with MS.

16   Q.    Okay.  And was this study randomized, the Stefoski 1

17   study?

18   A.    It was not.

19   Q.    Did the study identify a prospectively defined

20   efficacy endpoint?

21   A.    No.

22   Q.    And did that effect how one would interpret the

23   study?

24   A.    Yes.  What it signals is just as they described it,

25   as an exploration and a reader of the study would understand

Goodman - direct

1    that this is a primary exploratory study because they

2    haven't -- they are not really doing a clinical trial for

3    efficacy where one is -- if one is looking appropriately and

4    rigorously is prospectively defining one or more efficacy

5    end points.  This was just an exploration of what happens

6    when they give intravenous 4-AP.

7    Q.    And was there any evaluation of walking speed in this

8    study?

9    A.    No.

10   Q.    Does Stefoski 1 show that 4-AP improves MS symptoms

11   in patients?

12   A.    So I want to be clear about this.  So in as much as

13   improving nerve conduction such as in an individual with

14   evoked potential is a demonstration of the physiologic

15   improvement, that does not necessarily translate into any

16   symptomatic improvement.  For example, because we heard from

17   Dr. Lublin, VEP's are often used diagnostically to look for

18   subclinical effects, meaning somebody doesn't even recognize

19   that there's something wrong with their vision, but it can

20   be picked up by this very sensitive physiologic measure.  So

21   to improve that wouldn't necessarily translate into any

22   clinical effect.  And so that's just a, you know, one

23   example of how physiologic effects don't translate

24   necessarily into clinical effects.  Then there's the whole

25   other layer of concern which I voiced, which is, with an

Goodman - direct

1    unblinded exploratory study without any particular effort at

2    controlling, one really can't make any inferences about

3    clinical symptomatology that are meaningful.

4    Q.      Thank you.  Could you please turn now to JTX-43,

5    which is Tab 8 in your binder?

6    A.      Got it.

7    Q.      Did you recognize JTX-43 as what has been referred to

8    in this case as Davis?

9    A.      Yes.

10   Q.      And turning to slide PDX-214, is this a slide you

11   prepared summarizing the Davis reference?

12   A.      It is.

13   Q.      And again, how would you characterize the nature of

14   the study reported in Davis?

15   A.      Again, very similar to the work that he did with

16   Stefoski on the paper we just discussed, it's an

17   exploration, it's an exploratory study, this time with an

18   oral formulation rather than an intravenous administration.

19   An oral formulation here is an immediate release formulation

20   given on a single day in a single administration.

21   Q.      And how many patients were in this study?

22   A.      There were 20 patients, 15 of whom got active drug

23   and five were assigned to a placebo.

24   Q.      And looking at Page 71 in the first column and toward

25   the middle of the first full paragraph, does it address

Goodman - direct

1    blinding of this study here?

2    A.    So again to the credit of the authors, they

3    acknowledge and concede that these patients may become

4    unblinded.  And then they go on further as Dr. Lublin cited,

5    that this was why it was important to do VEP testing because

6    that's an objective measure which couldn't be influenced

7    behaviorally in the patient by signalling to them whether

8    they were on real drug or placebo.

9    Q.    And did this study identify a prospectively defined

10   efficacy endpoint?

11   A.    It did not.

12   Q.    And was there any testing of walking speed in this

13   study?

14   A.    No.

15   Q.    In your opinion, did this study show that 4-AP is

16   effective in improving walking?

17   A.    No, it did not, and for the reasons that I discussed

18   in the other Rush work previously, the study wasn't designed

19   adequately for a person to make those sorts of inferences.

20   Q.    Turning to JTX-113 at Tab 9 in your binder.

21   A.    Excuse me, what was the number?

22   Q.    Tab 9, PTX-113.  JTX, my mistake, sir.

23   A.    There actually are no tab numbers in this binder, so

24   I just have --

25   Q.    I apologize then?

Goodman - direct

1   A.      I just have the JTX numbers.

2   Q.      Yes.  I'm sorry.

3   A.      Got it.

4   Q.      And do you recognize JTX-113 as the reference that

5   has been referred to in this case as Stefoski 2?

6   A.      Yes.

7   Q.      And could you turn to your slide PDX-215?

8   A.      Yes.

9   Q.      Is this a slide you prepared summarizing the Stefoski

10  2 reference?

11  A.      Yes.

12  Q.      And how would you characterize the nature of this

13  study?

14  A.      So it's an extension of what they had -- the Rush

15  group, Davis and Stefoski, had done previously.  There's 17

16  patients, still small study and still exploratory in nature

17  to determine whether, whether facts observed in the

18  single-dose study could be observed after multiple doses.

19  Q.      And how many patients participated in the study?

20  A.      I mentioned 17.

21  Q.      Oh, I'm sorry.  And how long was the study?

22  A.      Well, not everybody was in the study for the maximum

23  length, as I recall, but it was up to five days.

24  Q.      What type of formulation was used?

25  A.      Immediate release formulation.

Goodman - direct

1   Q.      And looking at page 142 in the second column, that --

2   about five lines down, it says that total daily amounts were

3   determined by an optimal dose finding approach.  Can you

4   explain what an optimal does finding approach is?

5   A.      It's another word for titration.  Obviously they were

6   titrating on an individual basis, based on their response in

7   terms of tolerability and whatever effect that they were

8   seeking to assess.

9   Q.      So like the titration schemes that you described?

10  A.      It's an upward titration scheme.

11          THE COURT:  Doctor, if you could just wait until

12  the attorney is finished with the question, that would be

13  helpful.

14  BY MS. BECKER:

15  Q.      Does it address blinding on page 142 at the middle of

16  the second column?

17  A.      So they again, says in order to minimize unblinding,

18  so they again appropriately realize and conceded that

19  unblinding is an issue in the study as well.

20  Q.      Did this study identify a perspectively defined

21  efficacy endpoint?

22  A.      It did not.

23  Q.      Did it undertake an assessment of walking speed?

24  A.      No.

25  Q.      And does Stefoski 2 support a conclusion regarding

Goodman - direct

1    the safety or efficacy of prolonged administration of 4-AP

2    to MS patients?

3    A.      So although they clearly use that term in the

4    subheading of their title, it's hard to construe three to

5    five days as prolonged administration, but I understand in

6    this early exploratory phase for the first people being

7    exposed to this drug with MS or among the first, I should

8    say, it was more prolonged.  Three to five days was

9    obviously more prolonged than one day or just the

10   instantaneous effects have seen over hours after intravenous

11   administration.

12   Q.      Would you characterize any of the Rush research that

13   we've looked at as treatment of MS patients?

14   A.      So, I consider this an important issue.  To me

15   treatment is a therapy.  And here what we're talking about

16   is experimentation.  These are early on experiments

17   exploring whether or not the types of physiologic effects

18   that were seen in animal experiments and for that matter by

19   others, Jones and others in physiologic measures, could

20   actually begin to show some translatable effect into

21   clinical symptoms.  It is an early exploration of that.  And

22   by no means is experimentation in these couple of dozen or

23   more patients in my estimation constituting a treatment of

24   MS, much less an established treatment of MS.

25   Q.      Are you aware of any commentary in the literature

Goodman - direct

1    regarding the Rush research?

2    A.    I am.

3    Q.    Can you turn to JTX-28.  Do you recognize JTX-28 as

4    the reference referred to in this case as Bever 3?

5    A.    Yes.

6    Q.    And on Page 454 in the first column, the first

7    paragraph, toward the end of that, last sentence.  Do you

8    understand Dr. Bever to be talking about research by the

9    Rush Institute?

10   A.    The part where it starts these studies?

11   Q.    Right.

12   A.    Yeah, exactly.  Exactly.  He's referring to the work

13   done by Davis and Stefoski at Rush and he's describing

14   similar, similar to my opinion as to what the, what the

15   limitations of those studies are with respect to neurologic

16   deficits or symptoms.  And he specifically mentions

17   limitations including blinding, failure to randomize,

18   failure to use prospectively defined neurologic deficits.

19   He also adds in failure to adjust significant levels to

20   compensate for multiple comparisons.

21   Q.    And do you agree with Dr. Bever's assessment of the

22   study?

23   A.    Yes, I agree entirely.

24   Q.    Please turn now to PTX-330.  Do you recognize PTX-330

25   as the reference referred to as Van Diemen 2 in this case?

Goodman - direct

1   A.      Yes, I do.

2   Q.      And turning to your slide PDX-216, is that a slide

3   you prepared summarizing this reference?

4   A.      I have it as 17.

5   Q.      Sorry, my mistake.   17

6   describes -- thank you.  And this is an article by Van

7   Diemen and others.  Are you familiar with the work of Van

8   Diemen?

9   A.      Yes, this is the work of a group in Amsterdam that

10  I'm familiar.

11  Q.      And looking at the abstract of the study, what is the

12  stated purpose that they say they are -- what do they say

13  they will describe?

14  A.      So they are attempting to assess or describe the

15  relationship between dosage serum level efficacy and safety

16  of intravenously and orally administration 4-AP in, says the

17  same group of 70 MS patients.

18  Q.      And under study design, on Page 661, does it identify

19  the types of formulation is that were used?

20  A.      Well, it again, as it does in the abstract, both

21  intravenous and oral immediate release of 4-AP.

22  Q.      And there under study design, does it tell the dosing

23  protocol?

24  A.      Well, I'm aware that they, they use an individualized

25  titration scheme.  That was an upward titration based on

1    tolerability up to a maximum based on weight.

2    Q.    And was this a crossover design?

3    A.    Yes, it was a crossover design study.

4    Q.    What was the efficacy measure that was used?

5    A.    So they used -- they made an attempt at using a

6    different kind of physiologic measure which has to do with

7    what's called smooth pursuit eye movements.  It has to do

8    with how normally or not the eyes are moving from side to

9    side.  And it's a tool for monitoring this, actually you

10   heard testimony from Dr. Cohen yesterday about a study that

11   Acorda funded at the University of Texas and it's a similar

12   type of assessment.

13   Q.    Was there any assessment of walking speed in this

14   study?

15   A.    No.

16   Q.    All right.  And turning to the bates numbered page

17   ending 668, at the last paragraph in the first sentence,

18   what did the investigators conclude?

19   A.    So they concluded based on their observations at

20   higher doses that serum levels were likely to produce

21   greater improvement in those MS patients that are capable of

22   favorably responding to 4-AP.

23   Q.    And what would suggest?

24   A.    The implication is since they used an upward

25   titration scheme is that one would either use an upward

Goodman - direct

1  titration scheme on an individual basis or just target

2  higher, higher dose or serum levels in order to, in order to

3  achieve greater effects.

4  Q.    Could you please now turn to JTX-95, which should be

5  the next tab.

6  A.    Yes.

7  Q.    Do you recognize JTX-95 as the reference referred to

8  in this case as Polman 1?

9  A.    Yes, I do.

10 Q.    And if you look at your slide PDX-218, is this the

11 slide you prepared summarizing this reference?

12 A.    It is.

13 Q.    And what was the design of this study?

14 A.    So this is essentially an extended case series with

15 open label observations.  By "open label," I mean the

16 patients knew what they were getting.  There was no, there

17 was no attempt at blinding.

18 Q.    And was there a placebo control group?

19 A.    So the indication is that there was no placebo

20 control.

21 Q.    And what type of formulation was used in this study?

22 A.    Immediate release formulation.

23 Q.    And what was the dosing scheme employed in this

24 study?

25 A.    So this Amsterdam group, van Diemen worked with Chris

Goodman - direct

1    Polman, so it's the same type upward titration dosing scheme

2    that I just described based on tolerability and then maxed

3    out by weight.

4    Q.    And was there a prespecified outcome measure on this

5    study?

6    A.    It was not.

7    Q.    And on page 565, just above the heading Results.

8    What does it identify as the outcome measure?

9    A.    Yes.  So -- Pardon me.  So they analyze the efficacy

10   mainly based on subjective information from the patients,

11   obtained on regular visits at the outpatient clinic.

12   Q.    Was there any assessment of walking speed on this

13   study?

14   A.    No.

15   Q.    And turning to page ending 567 under Comment.  At the

16   bottom of the second paragraph and the top of the third

17   paragraph.

18        The investigators report that improvements in

19   fatigue and ambulation were mentioned quite often by the

20   patients as being responsible for the favorable overall

21   effect (Table 1).

22        It is important to emphasize the fact that only

23   a small minority of the favorable effects reported by the

24   patients resulted in significant changes in the EDSS.

25        Can you explain what is being reported there?

Goodman - direct

1   A.      So what is being reported is that the patients

2   reported improvements in fatigue and ambulation as being

3   mainly the main things that they found.  Objective

4   observers, meaning neurologists, weren't able to detect that

5   using EDSS.

6   Q.      Can you tell us what EDSS is?

7   A.      You heard a bit about this yesterday so it's Expanded

8   Disability Status Scale, which was developed by John Kurtzke

9   decades ago.  And it is a composite, a composite really

10  score or scale that describes the level of impairment and

11  disability a person with MS may have.

12          And embedded in it is walking, at least, and it

13  scored from, it scored from zero to no impact of MS and 10

14  is death from MS, but in between are the various levels of

15  disability that may accrue over time in a patient and may

16  fluctuate in a patient as well.  And the expanded version of

17  this, that Kurtzke made was by 0.5 increments.

18          And so an important part of the scale involves

19  assessment of, in particular, walking distance between 4.0

20  and 5.5, so that is several levels within the score.

21  Q.      Did the investigators here report adverse effects?

22  A.      They did.

23  Q.      Can you give us any examples?

24  A.      So there were two patients who had seizures, and we

25  actually heard this yesterday.  One of the patients had a

Goodman - direct

1    seizure after only the second day of exposure to two

2    5 milligrams of capsules of 4-AP, so this highlights again

3    that MS patients are different than other people exposed to

4    this drug.  And even at 5 milligrams, a person could have a

5    seizure even within two days.  But another patient who had a

6    total dose of 20 milligrams per day didn't have -- appeared

7    to be tolerating the medicine but yet, months later, had a

8    seizure.

9    Q.    And the last sentence on page 568, what does Polman 1

10   conclude?

11   A.    So he concluded that more studies are needed for

12   further elaboration of the exact value of 4-AP in the long

13   term treatment of patients with MS.

14   Q.    In your opinion, does this study teach that 4-AP

15   improves fatigue and ambulation long term?

16   A.    No.  For the reasons that we've said before, this

17   wasn't a blinded study, so one can't make an implicit

18   randomized and maybe, you know, prespecified outcome

19   measures.  So it wasn't designed to make a clear assessment

20   of clinical efficacy.  It was exploratory.

21   Q.    Turning now to JTX-28.  You have to go back to that,

22   because we had looked at that previously.

23          Do you recognize JTX-28 as the reference we

24   referred to earlier and has been referred to in this case as

25   Bever 3?

Goodman - direct

1    A.      Yes.

2    Q.      And turning to your slide PDX-2-19.  Is this the

3    slide you prepared summarizing this reference?

4    A.      It is.

5    Q.      And what was the purpose of this study?

6    A.      So it was a methodologic study using a technique

7    called concentration control.  And, again, it was a method

8    of hopefully being able to minimize the risk of 4-AP in

9    people with MS by keeping a monitor or monitoring the blood

10   levels or concentrations that were achieved rather than just

11   giving a particular dose or escalating doses, titrating

12   doses and not -- and just recording the blood level wherever

13   that was obtained.

14           This was actually a methodologic study to try to

15   keep a control level, so as to try to minimize potential

16   toxicity.

17   Q.      On page ending 451 in the first column, first full

18   paragraph, Dr. Bever states:  Drugs such as AP, with large

19   interpatient variability in pharmacokinetic and narrow toxic

20   to therapeutic ranges, present a difficult dilemma in trial

21   design.  Then he goes on about some of the challenges.

22           Can you explain what Dr. Bever is saying?

23   A.      So he is talking about a dilemma or a challenge

24   basically in designing a trial where there is such what has

25   been called a narrow therapeutic window or index or, in this

Goodman - direct

1   case, toxic to therapeutic range.  That creates a challenge

2   in particular for a drug where the toxicity appears to be

3   directly related to the mechanism of action.  So it makes it

4   very, it makes it very challenging to push a drug, as the

5   appears to be, push a drug in terms of upper titration to

6   the point where you get efficacy because you are becoming

7   perilously close or across the threshold where a person may

8   run into toxicity.

9   Q.    How many patients were in this study?

10  A.    A total of eight people with MS.

11  Q.    And what type of formulation was used?

12  A.    Immediate release 4-AP.

13  Q.    And what was the dosing scheme?

14  A.    So the scheme again was based, as I have said, on

15  individual titration to specific blood levels which they

16  wanted to control, the concentration they wanted to control

17  for.

18  Q.    And was there a predetermined primary efficacy

19  endpoint here?

20  A.    There was not.

21  Q.    At pages 451 to 52, the authors identify some of the

22  various methods that were used for evaluation.  And among

23  them was, on 452, you see Expanded Disability Status Scale

24  (EDSS score) and Ambulation Index (AI) --

25  A.    Yes.

Goodman - direct

1   Q.      -- were determined?

2   A.      Yes.

3   Q.      Can you tell us what the ambulation index is?

4   A.      So the ambulation index was a clinical trial tool

5   developed, to my recollection, in about 1983.  And embedded

6   in it is a timed walk test.  In this case, what was used was

7   a timed eight meter walk of approximately 26 feet rather

8   than 25 feet we have been hearing about.  So a timed walk

9   test is critical to the score in the ambulation index.

10  Q.      And does the study report any benefit in EDSS or AI

11  score?

12  A.      So it specifically says there was no benefit,

13  although they didn't show the data.

14  Q.      And under Toxicity on page 452, did they report any

15  serious adverse effects?

16  A.      They reported a number of adverse effects.  And among

17  them were the commonest things like dizziness.  But there

18  was also paresthesias, there was nausea, there was

19  nervousness or anxiety.  But, importantly, there were two --

20  again, this is among eight people -- there were two serious

21  adverse events, and one was an episode of encephalopathy,

22  which generally means, generally means either a confusional

23  state or disorientation.  And then there was a tonic-clonic,

24  grand mal tonic-clonic seizure, so the most serious type of

25  grand mal seizure.

Goodman - direct

1    Q.     And on page 454, the second column, first full

2    paragraph.

3            Does Dr. Bever identify some design limitations

4    of his own study there?

5    A.     Yes.  So, appropriately, he mentioned that the study

6    was limited by a small sample size and short duration.  Yes.

7    Q.     So so far, all of the studies we have discussed have

8    been using either intravenous or immediate release

9    formulations; is that right?

10   A.     Yes.

11   Q.     I'd like to talk now a bit about work on sustained

12   release in 4-AP, and turning first to JTX-1 which is Tab 14.

13   I'm sorry.  I forgot you don't have them.

14   A.     I got it.

15   Q.     And turning to PDX-2-20.

16           Is this a slide you prepared summarizing this

17   reference?

18   A.     Yes.

19   Q.     And do you recognize this reference as what has been

20   referred to in this case as the '938 patent or sometimes the

21   Elan patent?

22   A.     Yes, I do.

23   Q.     And do you understand the '938 patent to be based on

24   Elan's work to develop a sustained release 4-AP formulation?

25   A.     Yes.

Goodman - direct

1    Q.    Does the '938 patent disclose new clinical data or

2    any clinical work by Elan on 4-AP's use in MS?

3    A.    Not that I'm aware of.

4    Q.    And I'd like to direct your attention to column 1,

5    lines 52 through 61.  We can go up a few lines from there

6    for context.

7          Can you tell us what is addressed there?

8    A.    What we heard previously is that it is describing

9    improvement in conduction of nerve impulses, and then go on

10   to talk about the clinical studies done by Davis and

11   Stefoski at Rush, as we discussed, in two to five days in MS

12   patients.

13   Q.    Does the '938 patent teach treatment of specific

14   symptoms or symptomatic treatment of MS?

15   A.    No.

16   Q.    Does it disclose administration of 4-AP to improve

17   walking in MS patients?

18   A.    No.

19   Q.    And I'd like to direct your attention to column 13,

20   line 65, carrying over to column 14, line 9.

21   A.    I see it.

22   Q.    What do you understand the patent to be teaching

23   here?

24   A.    What I see here is a scheme for upward titration

25   beginning at a dose less than 15 milligrams per day until a

Goodman - direct

1    tolerable state is reached, and then a scheme again for

2    upward titration from there of at least 5 to 15 milligrams

3    per day until a therapeutic dose is reached.

4    Q.    And do you understand the '938 patent to teach any

5    specific dose of 4-AP administration?

6    A.    What I see is that upward titration scheme as I just

7    described.

8    Q.    Do you understand it to teach any non-upward

9    titration type administration?

10   A.    Not that I'm aware.

11   Q.    Turning now to JTX-69.

12         Do you recognize JTX-69 is the reference that

13   has been referred to in this case as Hayes 3?

14   A.    Yes.

15   Q.    And turning to PDX-2-21.

16         Is this a slide you prepared regarding the Hayes

17   reference?

18   A.    It is.

19   Q.    Can you tell us what Hayes 3 reports?

20   A.    So this is a study of patients with spinal cord

21   injury looking at, as we said, the sustained release

22   formulation of 4-AP, but specifically looking at the safety

23   profile and pharmacokinetic is.

24   Q.    And the dosing of those studies?

25   A.    So the dose, it was actually two studies embedded in

Goodman - direct

1    this report.  The first study had a dose, a dosing scheme

2    with the 10, 15, 20, and 25 milligrams once a week for four

3    weeks.  And the second study, same dose range, but it was

4    given twice daily for six days and then once on the seventh

5    day.

6    Q.    Did any patient in either of these studies receive

7    twice daily dose for more than one week?

8    A.    No.

9    Q.    And does Hayes 3 contain any data regarding clinical

10   efficacy of sustained release 4-AP at any blood level in

11   patients with MS?

12   A.    Well, no.  I mean there were no MS patients, so it

13   couldn't possibly speak to efficacy in MS.

14   Q.    And --

15   A.    At any dose at any blood level.

16   Q.    And does it address safety concerns in MS patients?

17   A.    In a general sense, yes, such as the dizziness and

18   insomnia and the sort of thing that anybody, anybody taking

19   this drug could get.

20          But, again, because spinal cord injury patients

21   specifically don't have brain injury, they don't have brain

22   scarring, they don't carry the same predisposition for

23   seizures.  So similar to what I said about the neuromuscular

24   diseases, this doesn't, this can't inform about the most

25   serious and concerning risks associated with this drug

Goodman - direct

1   which are the brain related toxicities, encephalopathy and

2   confusion and, most importantly, the seizures.

3   Q.      And turning to JTX-68.

4            Do you recognize JTX-68 as the reference

5   referred to in this case as Hayes 1?

6   A.      Yes.  Yes.  Yes.

7   Q.      And looking at your slide PDX-2-22.

8            Is this a slide that you prepared summarizing

9   this reference?

10  A.      It is.

11  Q.      And what does Hayes 1 report?

12  A.      As far as I can tell, it's basically the second part

13  of Hayes 3 that we just discussed, so I don't -- I'm not

14  aware of anything that's different.

15  Q.      So does he have any data about efficacy in MS

16  patients?

17  A.      As I've already testified, there's nothing about MS

18  here with regard to efficacy.  And as I already opined, the

19  safety issues of most importance are not addressed here

20  either.

21  Q.      Okay.  Please turn to JTX-104, which is -- do you

22  recognize JTX-104 as the reference referred to in this case

23  as the Schwid reference?

24  A.      I do.

25  Q.      And it lists a Goodman as an author.  Are you that

Goodman - direct

1    Goodman?

2    A.    Yes.

3    Q.    Let's turn to PDX 224 through 26.  Are these slides

4    that you prepared summarizing the Schwid reference?

5    A.    Yes.

6    Q.    Might actually go through 27.  All right.  Looking at

7    the article at the bottom of the first column, I'd like to

8    direct your attention to the paragraph beginning there at

9    the bottom of the first column and carrying over to the

10   second column.  I'm sorry, I think I may have -- please just

11   tell us what's reported there briefly and --

12   A.    So I think the question relates to the bottom of the

13   first column.

14   Q.    Exactly.

15            THE COURT:  Hold on.  Can you say what you were

16   saying?  I couldn't hear you over what counsel was saying.

17   What were you saying?

18            THE WITNESS:  I was asking her a question as to

19   whether she wanted me to comment on where it begins, in

20   1994, 161 subjects --

21            THE COURT:  Is that where you want him?

22            MS. BECKER:  That's where I was trying to direct

23   him.

24            THE COURT:  We were on the same page literally.

25   BY MS. BECKER:

Goodman - direct

1    Q.    And I believe PDX 2-024 is a slide that summarizes

2    the study that's done there; is that correct?

3    A.    Yes.

4    Q.    And can you tell us how many, how many patients were

5    in this study, the 1994 study there?

6    A.    So what's described here in this article is a study

7    we heard about yesterday as well.  It's a 161-patient study

8    in -- which was done in 1994 and this was a study done by

9    Elan with their sustained release formulation in 161 people

10   with MS for six weeks and importantly this study was

11   specifically designed for the purpose of assessing efficacy

12   of the formulation, the sustained release formulation of

13   4-AP.

14   Q.    How did the size of the study, the 161 patients

15   compare to previous studies that had been done?

16   A.    To my knowledge, it was the largest study by far ever

17   conducted in MS with 4-AP at that time.

18   Q.    And did it have a prospectively defined primary

19   efficacy endpoint?

20   A.    Yes.  From -- there was an objective endpoint of

21   EDSS.

22   Q.    So --

23   A.    So the EDSS was the outcome measure and what was

24   assessed was the proportion of people in either group being

25   the 4-AP group or the placebo group who improved on EDSS.

Goodman - direct

1    Q.      And looking at page 166739, it says -- it says there

2    that as planned that study had 80 percent power to detect

3    the difference between an improvement rate of five percent

4    in the placebo group and 20 percent in the sustained release

5    4-AP group.  What does that tell us?

6    A.      So the implication of this is, as Elan devised and

7    planned the study, there were sufficient numbers of people

8    in the study to make -- to be sensitive to that degree of

9    expected effect.  And so it was statistically powered in

10   order to detect the effect that they expected to see.

11   Q.      Does the report of this study here in the Schwid

12   reference provide sufficient information to know that this

13   was a study that was adequately designed to assess EDSS?

14   A.      It has -- it has many of the -- in fact all of the

15   important characteristics that one looks for as we've

16   discussed, a prospectively defined endpoint, a control

17   group, in this case a placebo control group.  It's a

18   randomized clinical trial meaning that it was randomly

19   determined who got assigned to active treatment or placebo

20   and there was an objective outcome measure.  There was a

21   parallel group designed, it was sufficiently powered at

22   least in the prospective design in order to detect an

23   effect, so it had all the key characteristics one looks for,

24   actually for a rigorous assessment of efficacy.

25   Q.      And what was the result that's reported here in

Goodman - direct

1    Schwid?

2    A.    Well, the study failed to show efficacy because 22

3    percent of the patients on 4-AP improved but the exact same

4    percentage, 22 percent improved in the placebo group.

5    Q.    And what would be the take away from a report like

6    this?

7    A.    So the take away was that despite all the prior,

8    prior reports of clinical effects in these small exploratory

9    uncontrolled studies or poorly controlled studies, some of

10   them did have controlled, but not adequately controlled

11   studies and certainly not rigorously designed studies, all

12   of that get cast into doubt or even blown away by the fact

13   that this rigorously designed study, larger study fails to

14   show an effect.  And in particular there's a big placebo

15   effect that makes it just, just another example of, of

16   studies that failed at MS because we can't tell a different

17   between what we're trying to do and placebo effect.

18   Q.    Does the Schwid reference, JTX-104, also report on

19   another study using 4-AP in MS?

20   A.    Yes, that's the purpose of the report in essence.

21   Q.    Okay.  And do slides -- PDX-225 through 27, are those

22   slides that you prepared summarizing that study?

23   A.    Yes, they are.

24   Q.    What was the purpose of this study?

25   A.    So as it says in the name, a methodological study to

Goodman - direct

1    pilot or test different outcome measures.  In this case what

2    was looked at were a variety of quantitative measures of

3    function in people with MS.

4    Q.    And how many individuals participated?

5    A.    10 patients.

6    Q.    And what type of a formulation did it use?

7    A.    So this was the Elan sustained release formulation

8    manufactured at 17.5 milligrams and it was given twice

9    daily.

10   Q.    And what was the study design?

11   A.    It was designed as a crossover design.  And I've got

12   a depiction of the design.  So patients were randomly

13   assigned, it's only 10 people, but they were randomly

14   assigned into two groups and half went into the -- they

15   didn't know which one they were getting, but half went into

16   the active 4-AP group for one week and the other half went

17   into the placebo group.  And then there was a one-week wash

18   out.  By that is meant that they took nothing, so in order

19   for the medication to wash out so to speak.  And then the

20   third week of the study was a crossover and by that is meant

21   that the people who were initially in the first week on 4-AP

22   crossover to getting placebo, all of them.  And then the

23   people who were initially that first week on placebo crossed

24   over to be in the active treatment group, so 4-AP.  But the

25   important takeaway here in terms of, in terms of the

Goodman - direct

1    exposure is that no person received 4-AP for more than one

2    week in the study.

3    Q.    So would a design like this permit any conclusion

4    about administering for a period of more than one week?

5    A.    Specifically not, as I've just said, nobody got it

6    for more than one week.

7    Q.    Okay.  I believe you said a number of outcome

8    measures or tests were assessed in this study.  And looking

9    at the abstract, does it identify or perhaps even our next

10   slide, I believe, what types of measures were assessed?

11   A.    Well, there was seven things that were assessed and I

12   can review them.  So MVICT stands for maximum voluntary

13   isometric contraction testing and that's testing of muscle

14   strength using a strain gauge hooked up to a computer to

15   read it out.  This was largely developed for neuromuscular

16   and muscle diseases, but we adopted it to using in MS or was

17   adapted to use in MS in this study.  Manual muscle testing

18   is simple strength testing.  This is done in routine

19   clinical practice, but with a prescribed scoring scheme.

20   Grip strength, time to ambulate 8 meters as was used in the

21   ambulation index at the time.  Time to climb 4 stairs, EDSS

22   as we've described it.  And then there was a global

23   impression score.

24   Q.    So does the inclusion of so many outcomes have an

25   impact on the statistical interpretation of the study?

Goodman - direct

1    A.     Yes, it does, as noted by Chris Bever on the previous

2    paper we discussed, if one were considering this an efficacy

3    study, which it was not, but if one were considering it as

4    an efficacy study then one would need to account for the

5    multiple comparisons, because although the P value here I

6    believe was .02, implication is that there's a two percent

7    chance that that could have -- two percent possibility that

8    that could have happened by chance alone.  But when you're

9    doing multiple comparisons you actually have to multiply by

10   each time you do the comparison in order to really see what

11   the chance -- what the possibility is that it could occur by

12   chance alone.  Every time you do that comparison, you have

13   to multiply and so that's what's called correction or

14   accounting for, for multiple comparisons.

15   Q.     So in the abstract where it states that, quote,

16   "timed gait was improved on 4-AP SR as compared to placebo

17   in 9 of 10 subjects, p equals 0.02," unquote; is that what

18   you were referring there?

19   A.     That's exactly what I was speaking to, yes.

20   Q.     And that's a reference to statistical significance,

21   but it's unadjusted for the number of outcomes that were

22   used in the study.  Did I understand you to --

23   A.     That's correct.  No indication of adjustment or

24   correction.

25   Q.     Did any other measures in this study achieve this,

Goodman - direct

1    quote, statistical significance?

2    A.    No.

3    Q.    And would this 10-patient study provide the basis for

4    any conclusion regarding efficacy of 4-AP on any of the

5    measures that were tested as test methodologies?

6    A.    No.  It was an exploration of tests.  It was a test

7    of tests to see which tests might be more sensitive and

8    might be useful in future trials in comparison to EDSS,

9    which was revealed here and it failed to show an effect.

10   Q.    And directing your attention to Page 741 in the last

11   paragraph, the first column --

12   A.    Sorry, which --

13   Q.    Page ending 741 in the last paragraph, first column.

14   A.    Yes.

15   Q.    Is there a discussion there about serum levels?

16   A.    Yes.  And it -- it says none of the patients with the

17   serum level less than 60 nanograms per milliliter felt

18   better, meaning according to the global impressions.

19   Q.    And on Page 742 under discussion, does it address

20   serum levels again there?

21   A.    Yeah.  So it mentions the treatment appeared

22   particularly efficacious in subjects who achieved serum 4-AP

23   levels above 60 nanograms ml with everyone improving in

24   timed gait testing and grip strength and subjective

25   impression.

Goodman - direct

1    Q.      What would that suggest then?

2    A.      Again, the notion is as much as one could infer

3    about, about efficacy in this methodologic study as much as

4    one company infer, it would teach that one needed to target

5    higher levels higher than 60 nanograms per ml if one were

6    going to be able to detect an efficacy signal using this

7    type of methodology.

8    Q.      And can you please explain what the investigators

9    conclude or say in that last paragraph on Page 742?

10   A.      Well, quote, in addition to establishing efficacy in

11   larger trials, future studies of 4-AP will need to examine

12   long-term efficacy and tolerability as well as further

13   refine dosing regimens that optimize delivery despite a

14   relatively narrow therapeutic window.

15   Q.      Thank you.  Can we turn now to JTX-62, please.  Do

16   you recognize JTX-62 as the reference referred to in this

17   case as Goodman 1?

18   A.      Yes.

19   Q.      And are you the Goodman identified as the lead

20   author?

21   A.      Yes.

22   Q.      And turning to slides PDX-228 through 29, are those

23   slides that you prepared summarizing this reference?

24   A.      Yes.

25   Q.      Who sponsored this study or does it say?

Goodman - direct

1    A.      I have to look and see.

2    Q.      I believe toward the end.

3    A.      Obviously I know, but I'll have to look and see

4    whether it says so.  Yes, it was funded by Acorda

5    Therapeutics.

6    Q.      And what does Goodman 1 say about the objective of

7    this study?

8    A.      Can we go back to the abstract where it says

9    objectives?  So it says the primary aim was to determine

10   safety and tolerability of escalating doses of a sustained

11   release formulation given orally to people with MS and the

12   secondary aim was to explore efficacy over a broad dose

13   range using measures of fatigue and motor function.

14   Q.      What does that tell us about the nature of the study?

15   A.      It uses -- the operative word here is explore.  It's

16   an exploratory, it's an exploration of outcome measures in

17   this context of 4-AP in MS.

18   Q.      And does it identify the size of the study?

19   A.      I'm sure it does, although I can't see it in front of

20   me at the moment, but --

21   Q.      It might refer to --

22   A.      So, I can't --

23   Q.      You can't find it.  That's fine.

24   A.      Well, I can see it.  I'll take a look here and see if

25   I see it in the abstract.  Obviously I know what was done.

1    Q.      There's only one.  467 to 68 under objectives.  I

2    think --

3    A.      So it says under methods, 36 patients at four

4    centers, 25 had active, 11 had placebo.

5    Q.      And under 416 under results, does it report any

6    withdrawals or adverse effects?

7    A.      Yes, five subjects withdrew because of seizures, in

8    two.  Tremor in one.  Dizziness and nausea, one each, and

9    leg pain in one.

10   Q.      What was the dosing regimen used in this study as

11   reported in the abstract?

12   A.      Can you direct me to the place in the abstract?

13   Q.      Methods again, carrying over, I believe, from 467 to

14   68, right at the top of 68 I believe it identifies --

15   A.      So what the abstract describes is a dose escalation

16   starting with placebo running for the first week, 20

17   milligrams or 10 milligrams twice a day for the second week

18   and then increasing in weekly increments of 10 milligrams

19   per day up to a total of 80 milligrams during the 8th week.

20   Q.      Would that kind of a dosing protocol provide any

21   information as to the efficacy of the single dose

22   administered as a stable dose, as a constant doze?

23   A.      No, it's the same -- to be clear, the same group of

24   25 people except for the dropouts were escalated on week to

25   week basis, so it's a moving, moving upward.  It's an

Goodman - direct

1    escalation, as opposed to a titration, where it's -- this is

2    forced.  It's not based on a response, it's just forced week

3    by week.

4    Q.    Okay.  And it reports that the fampridine SR group

5    shows statistically significant improvement from baseline

6    compared to placebo in functional measure of mobility (time

7    25 walking speed, P=0.04) and lower extremity strength

8    (manual muscle testing, P=0.01).

9              Does it tell you whether there was a

10   prospectively defined time endpoint among those measures

11   identified?

12   A.    No, it's silent on that.

13   Q.    And does it report whether there was any statistical

14   adjustment to account for the multiple outcomes?

15   A.    Again, silent on that.

16   Q.    And it says that, quote, "dose response curve" showed

17   increasing benefit in both measures in the 20 to

18   50 milligram per day range.

19              Do you see that?

20   A.    Yes.

21   Q.    And can you explain what that means and, in

22   particular, what dose response curve means?

23   A.    So dose response curve is looking at a series of

24   increasing or decreasing doses, and assessing the effects

25   seen at the different dose levels, one relative to the

Goodman - direct

1    other to see whether or not there is a pattern of a

2    correlation between, let's say, increasing a dose and

3    increasing a response, or the opposite, increasing a dose

4    and perhaps increasing tolerability.

5              So that is a dose response curve.  And the curve

6    is what it looks like on a graph.

7    Q.    Do I understand correctly then that it refers to the

8    relative relationship between the doses as opposed to --

9    A.    Exactly.

10   Q.    -- any particular dose, or no particular dose?

11   A.    So yes to the relative and yes to the -- and no to

12   the nothing about the particular dose in this situation.

13   Q.    And if one were to infer anything about the relative

14   relationship among the doses, what would this teach as to in

15   terms of suggesting for future study?

16   A.    Well, because it reports a dose response in the 20

17   to 50 milligram range, the implication could be that one

18   either would try to titrate and would speak about

19   implication, meaning for future studies, that one would

20   either try to titrate upward or target the higher doses,

21   because the dose response implies that you could do better

22   with higher doses.

23   Q.    Is the report of the statistically significant

24   improvement on the timed 25 foot walking speed and the lower

25   extremities strength a dose-specific finding on the

Goodman - direct

1    statistical significance?

2    A.    No, this was 4-AP grouping aggregate, not any

3    particular dose level, meaning all of the doses but none in

4    particular.

5    Q.    Thank you.  Turning to JTX-61.

6          Do you recognize JTX-61 as the reference

7    referred to in this case as Goodman 2?

8    A.    Yes.

9    Q.    And how did the disclosure in Goodman 2 compare to

10   the disclosure in Goodman 1?

11   A.    It was formatted for a different meeting but the

12   content is exactly the same.

13   Q.    And do the opinions that you expressed with Goodman 1

14   apply to Goodman 2?

15   A.    Yes.

16   Q.    Okay.  Turning now to JTX-80A.

17         Do you recognize JTX-80A as the document

18   referred to in this case as the Goodman poster?

19   A.    I do.

20   Q.    And looking at slides PDX-2-31 through 33.

21         Are these slides that you prepared summarizing

22   this reference?

23   A.    Yes.

24   Q.    Does the Goodman poster report the same study that is

25   disclosed in Goodman 1 and Goodman 2?

Goodman - direct

1    A.      Yes, it is showing more data than one could condense

2    into an abstract.

3    Q.      Could you look at the abstract section on the poster?

4            Can we call that up?

5            What does the abstract section report?

6    A.      So it's essentially, if not word for word, the same

7    as the two abstracts, Goodman 1, Goodman 2.

8    Q.      Let's focus on the methods section, right next to

9    that.

10           Does the methods section provide further

11   information about the design and objective of the study?

12   A.      Yes.  The resolution on the screen is obviously not

13   good.

14   Q.      Are you able to read it?  You have a copy I

15   understand as well.

16   A.      Being nearsighted, I can probably read it from the

17   document.

18           And, importantly, it says this study was

19   designed as a preliminary dose ranging study to assess

20   safety and to explore potential outcome measures for use in

21   later trials.

22           So, again, it emphasizes the word "explore."

23   Q.      And when it says assess outcome measures for use in

24   later trials, what does that convey?

25   A.      So it conveys this is a methodologic study assessing

1   endpoints, outcome measures, to explore whether or not it

2   was any value that might be determined for the possibility

3   of using if they were to be another trial.

4   Q.      Does the methods section provide more information

5   than the abstracts about the specific tests that were

6   assessed?

7   A.      Yes.

8   Q.      And what does it identify as the tests?

9   A.      So it used the EDSS, but it also used the timed 25

10  foot walk component of the multiple sclerosis functional

11  composite, manual muscle testing, as I described previously,

12  and patient self-reports using several validated subjective

13  fatigue scales.

14  Q.      And are each of these distinct tests?  In other

15  words, can one improve on one but not the other?

16  A.      Yes, they're distinct tests, and certainly one can

17  improve on muscle testing and not on walking, and one

18  could not improve on one and improve on the others and

19  various permutations and combinations given all these

20  assessments.

21  Q.      If you turn to the results summary, which is enlarged

22  on the last page, if it helps you.

23  A.      Got it.

24  Q.      First, under Safety.  What is the Results section of

25  the report?

Goodman - direct

1   A.      The most common adverse events in the

2   fampridine-treated group were consistent with the findings

3   of previous studies, dizziness, insomnia, paresthesia,

4   nausea, asthenia, headache and tremor.

5           It further reports that doses above 40

6   milligrams per day, more severe adverse events were

7   reported, including two cases of seizure (at 50 and

8   70 milligrams per day).

9   Q.   It goes on to say, as anticipated, the risk of

10   seizure requires further study and characterization

11   particularly in the anticipated dose range.

12          Can you tell us what that is communicating?

13   A.   Well, it is conferring the author's concern about the

14   abiding risk, an ongoing enduring risk of seizure as the

15   drug would be further studied if at all in even lower dose

16   ranges, if that was the anticipated dose range.

17   Q.   Okay.  And under 25 foot walk, it says, there is

18   significant improvements in walking speed was reported in

19   the fampridine treated group, P=0.4.  And there is an

20   asterisk.

21          Can you tell us what that asterisk refers to?

22   A.   It refers to the footnote on the bottom which

23   indicates that the P value that is cited of 0.04 was derived

24   from a repeated measures ANOVA analysis of variance,

25   statistical analysis based on weeks 1 through 7.  So the

Goodman - direct

1    implication here is that this was an aggregated assessment

2    of all the doses across weeks 1 through 7 and not any one in

3    particular.

4    Q.    If we look at the graph entitled 25 foot walk change

5    in space, that is the bar graph area of those two.  Thank

6    you.

7              Can you tell us what those figures show?

8    A.    Yes.  So on the upper, the upper part of the figures

9    is the change in walk speed based on the 25 foot talk test,

10   in the dose ranges of 25 to 50 milligrams per day, showing

11   an overall pattern that appeared to be better, and on the

12   better side of zero as opposed to the worst side of zero;

13   and, again, it is important to remember that this graph is

14   depicting the people as they moved through all of these

15   doses, not any one particular dose.

16   Q.    So when it says in the parenthetical on the side, 20

17   to 50 milligrams per day, it is again an aggregate

18   measurement for all of this?

19   A.    Yes.  This is not an indication of any one particular

20   dose, this is a fampridine group as a whole through those

21   doses compared to the placebo at that point.  So there is

22   nothing indicative of a particular dose there.

23              And then the bottom panel is the placebo group

24   was more or less evenly divided between getting better and

25   getting worse, but it is important to remember there were a

1    number of people that got better on placebo.

2    Q.    Okay.  And going to the figure entitled Dose

3    Response, 25 Foot Walk, beneath that.

4              Can you explain what is depicted here?

5    A.    So this is a dose response curve for the 25 foot

6    walk.  And here, in the Y axis, it is actually the time, it

7    is not the speed.  It's actually the time in seconds.

8    Q.    So is that --

9    A.    And then it is -- I'm sorry.

10   Q.    Please go ahead.  I didn't mean to interrupt.

11   A.    And then in the X axis, it shows the data points for

12   all subjects, and then just for the people who actually

13   completed the study, since there were five dropouts.

14             So it chose a "completer" curve and "all

15   subjects" curve across all of the weeks of the study.

16   Q.    Does the figure provide any information about the

17   placebo-treated group?

18   A.    No.

19   Q.    And I -- did you hear Dr. Peroutka's testimony

20   yesterday that the curve shows that over the range of 20 to

21   80 milligrams a day, the time it takes to walk was reduced

22   essentially by the same amount?

23   A.    I did hear that.

24   Q.    And is that correct?

25   A.    Well, I also heard him acknowledge that, for example,

1    the 40 milligram per day dose showed a shorter time and

2    thereafter a better result than the 20 milligram.

3    Q.     So what in your view does this curve depict with

4    respect to the --

5    A.     So it appears to show a dose, a dose response,

6    although not a smooth one because the 30 milligram,

7    30 milligram dose appeared to be more or less stuck where

8    the 20 milligram dose was.

9            But overall, the pattern between 20 to 40 is

10   showing a dose response curve, and then it appears to

11   flatten out after that.  Certainly, after 50 it appears to

12   flatten out, and depending on whether you are looking at the

13   "completer" group or the "all subjects" group, it is

14   somewhat confusing to interpret.  But overall it appears to

15   flatten out.

16   Q.     Does the Goodman poster report any dose specific

17   efficacy results on walking time or walking speed versus

18   placebo?

19   A.     No.

20   Q.     Okay.  If we just go back briefly to the results

21   summary.  And I'd like to talk briefly about the results

22   reported for leg strength under the heading LEMMT.

23           There is, it reports, statistically significant

24   improvement in the fampridine group.  And there is the

25   asterisk again after the P value.  And does that asterisk

Goodman - direct

1    have the same meaning that you testified earlier?

2    A.      Same footnote, repeated measures ANOVA analysis of

3    variance, weeks 1 through 7, meaning the fampridine group as

4    a whole over the course of the study performed better in the

5    lower extremity muscle testing than the placebo group, but

6    it doesn't give us any data about any particular dose.

7    Q.      And under fatigue there, it reports that substantial

8    improvements in fatigue were seen in both fampridine and

9    placebo-treated groups.  Overall, there was a trend toward

10   greater improvement in the placebo-treated group.  What is

11   the meaning of that result that you took away from that?

12   A.      It means that the placebo group looked better than

13   the 4-AP group.  And it is important to remember here I

14   think that there were a number of prior reports in the art

15   that said 4-AP was the treatment for fatigue or might be

16   a treatment for fatigue.  And here is an example of how

17   placebo gets in the way and confuses the issue.  We just

18   don't know here because placebo did better than the active

19   treatment could.

20   Q.      Okay.  Please turn to PTX-416.

21   A.      I got it.

22   Q.      Can you please identify the document that is marked

23   PTX-416?

24   A.      Yes.  This is the Cochrane review authored by Solari

25   and others, entitled Aminopyridines For Symptomatic

1    Treatment For Multiple Sclerosis.

2    Q.    Can you tell me what a Cochrane review is?

3    A.    So there is a Cochrane collaboration which sponsors

4    Cochrane reviews, which are then deposited in the Cochrane

5    Library, but this Cochrane collaboration is an effort to

6    have unbiassed independent expert review of various issues

7    in medicine or about medical treatments.  And it's a

8    rigorously done evidence-based systematic review.  That is

9    what Cochrane reviews are in general.

10            This one in particular happened to be about the

11   issue at hand today, aminopyridines in the treatment of MS.

12   Q.    Would a Cochrane review be relevant to assessing the

13   expectation of success with a drug treatment at the time of

14   the publication of such a review?

15   A.    Yes, that is exactly what it is about.

16   Q.    Okay.  I'm looking at your slide, PDX-2-34 and 35.

17            Are those slides you prepared summarizing this?

18   A.    They are.

19   Q.    Okay.  And looking at the article, not too far under

20   the title, does it identify the date that it was published?

21   A.    So there are a couple of dates.  One is the --

22   indicates that it is in the public library -- I'm sorry --

23   the Cochrane library, Issue 2, 2003.  And it refers to a

24   date most recent -- actually, same date but for both the

25   recent amendment, most recent amendment and most substantive

Goodman - direct

1    amendment, it is the same, July 15th, 2002.

2    Q.     What was your understanding of this?

3    A.     So my understanding is although this was published in

4    2003, it includes, it includes an assessment of what was in

5    the prior art up until July 15th, 2002.

6    Q.     And which aminopyridines in symptomatic therapy in MS

7    does Solari include?

8    A.     Both 3 and 4 diaminopyridines and 4 aminopyridine.

9    Q.     It's not paginated so you may have to count the

10   pages, but on the second page, the first full paragraph, I'm

11   sorry, under the heading objectives on the second page, what

12   does it state for objectives of the Solari review?

13   A.     To determine the efficacy and safety of

14   aminopyridines AP and DAP in improving neurological deficits

15   in MS patients.

16   Q.     Going back to the first page, reviewers' conclusions.

17   Do you see that?

18   A.     Yes.

19   Q.     What do the reviewers conclude?

20   A.     Currently available information allows no unbiased

21   statement about safety or efficacy of aminopyridines for

22   treating MS symptoms.  Furthermore, we could not obtain any

23   data on 3 unpublished randomized control trials including

24   more than 300 participants.  We conclude that publication

25   bias remains a pervasive problem in this area and that until

Goodman - direct

1    the results of these unpublished studies are available to

2    the scientific community, no estimate of effectiveness of

3    aminopyridines in the management of MS symptoms is possible.

4    Q.    On the same page under the heading selection

5    criteria, the authors talk about the criteria they used to

6    select the studies that they would consider.  Do you see

7    that?

8    A.    Yes.

9    Q.    And they identify randomized controlled trials,

10   adults with MS out of exacerbation, AP or DAP treatment

11   versus placebo and clinical end points.  Can you explain why

12   those criteria would be applied as a screen in this context?

13   A.    Well, in terms of the quality of the trials, meaning

14   randomized and controlled and versus placebo, the indication

15   is that in order to do an adequate meaningful data-based

16   assessment, they want to only look at trials or studies that

17   meet those standards.

18   Q.    Would those standards be relevant to a person of

19   skill assessing the art in this area?

20   A.    Yeah, absolutely.  So a person of skill, fully aware

21   of the tendency, the variability in MS patients, the

22   tendency for, or propensity for placebo effect, and fully

23   aware of the need to have, for those reasons, among others,

24   have a more rigorous approach to assessing efficacy, a

25   person of skill would realize that it's just this sort --

Goodman - direct

1   just the sort of standards one would need in order to make

2   meaningful inferences about efficacy or safety.

3   Q.      Okay.  And going to Pages 6 through 9, again, going

4   to count.

5   A.      I've got it.

6   Q.      Do you see a listing of characteristics of studies

7   included?

8   A.      Yes.

9   Q.      And there's a listing there that includes references

10  referred to as Bever 1994, Schwid 1997 and Van Diemen 1993.

11  Do you understand those to be the references that we've

12  discussed as Bever 3, Schwid and Van Diemen 2 on which

13  Defendants have relied?

14  A.      Yes, I do.

15  Q.      And there's a chart entitled characteristics of

16  excluded studies.  And shows Davis '90 as having been

17  excluded because it was non randomized.  Do you understand

18  that to be the Davis reference that we discussed earlier?

19  A.      Yes.

20  Q.      And it identifies Polman 1994A as excluded because it

21  was a, quote, case series.  Do you understand that to be the

22  Polman reference we discussed earlier?

23  A.      Yes.

24  Q.      And Stefoski 1987 and Stefoski 1991 as having been

25  excluded because they were non randomized studies.  Do you

Goodman - direct

1    understand those to be Stefoski 1 and Stefoski 2 references?

2    A.    Yes, I do.

3    Q.    And directing your attention to the section entitled

4    discussion on Page 5, so the authors there talk about

5    efficacy outcomes with regard to efficacy outcomes, since

6    aminopyridines are used to treat many symptoms of MS, the

7    number of outcomes considered in the studies and within a

8    single study was high, since few common end points were

9    available across trials and because of lack of information

10   on individual periods within all of the studies, none of the

11   data could be pulled for quantitative analysis, similarly

12   could not perform any subgroup analysis considering a

13   specific drug for AP or 3, 4 diaminopyridine dosage or

14   formulation, regular or sustained.  Can you just tell us

15   what the authors are expressing concern about that?

16   A.    What I infer from this statement is that the

17   reviewers here found the literature so disparate in its, in

18   the types of studies that were done that they couldn't pull

19   or aggregate in any way to do a kind of meta analysis where

20   they could actually add, add something from one study to the

21   next and the next and then say well, we've got now an

22   assessment of say 50 patients instead of five patients.

23   They are basically saying this was all over the place and

24   they weren't able to add things up.

25   Q.    And they also state there on Page 5 that the benefit

Goodman - direct

1    of aminopyridines may be over estimated in this review since

2    in all but two trials the primary endpoint was not specified

3    and with such a many outcome situation this raises the

4    distinct possibilities of false positive findings.  Can you

5    explain the concern that's being expressed there?

6    A.    This is exactly the concern that I've repeatedly

7    mentioned here.  Again, this possibility of overestimating

8    without specifying a primary endpoint or without correcting

9    for the many outcome situation as they call it.

10   Q.    And the bottom of the page there's another heading,

11   reviewers' conclusions.  And the subheading implications for

12   practice before it goes onto the next page.  Can you tell us

13   what the reviewers report there as their conclusions?

14   A.    This review cannot provide a reliable statement

15   concerning the efficacy of AP or DAP for treating symptoms

16   of people with MS.

17   Q.    And does this statement reflect how a person of skill

18   would be assessed, the prospect of treating symptoms in

19   people with MS at this time?

20   A.    Yes, I think so.

21   Q.    And jumping to the last page, under the heading

22   synopsis, the first sentence there.  It says the safety and

23   usefulness of potassium channel blocking drugs, AP and DAP,

24   for various symptoms of multiple sclerosis are unclear.  And

25   it goes on, potassium blocking drugs for aminopyridine AP

Goodman - direct

1    and 3, 4 diaminopyridine, DAP, may be able to improve nerve

2    function in nerves without enough myelin; however, the

3    review of trials found there is not enough evidence about

4    the safety of these drugs or whether benefits are certain.

5    Do you agree with that assessment?

6    A.    I do.  It's kind of a British English assessment here

7    with nerves without any of myelin, but I take it to mean

8    demyelinated nerves as we would call them in American

9    English.  And what's it's saying is that although it's --

10   they say it may be, may be proven that the potassium channel

11   blocking drugs can improve nerve function.  What they are

12   saying is it doesn't necessarily translate, as this next

13   sentence goes, into whether or not there are certain --

14   whether clinical benefits are certain because of the lack of

15   evidence.  There's not enough evidence.

16   Q.    In your opinion, Dr. Goodman, does this reflect the

17   view of the prior art regarding symptomatic treatment in MS

18   with 4-AP than a person of skill would have had at this

19   time?

20   A.    Yes.

21   Q.    Do you know whether Cochrane reviews are updated?

22   A.    They can be.

23   Q.    Can we turn to PTX-787.  Can you please identify

24   PTX-787?

25   A.    So this is a reprint of the Cochrane review by the

Goodman - direct

1    same, same authors.  And this one was published in the

2    Cochrane library in 2009.

3    Q.     And it states, quote, review content assessed as up

4    to date, 28 December 2004.  Do you see that?

5    A.     Actually I don't.

6    Q.     It's right in those highlighted there.

7    A.     Ah, yes.

8    Q.     Do you have an understanding of what that means?

9    A.     It means that they updated their assessment as of

10   December 28th, 2004.

11   Q.     And does it report --

12   A.     In terms of the -- I'm sorry.  In terms of the

13   content.

14   Q.     And does it report any change in conclusion right

15   above that line, the location status and dates right above

16   the highlighted line?

17   A.     It says no change to conclusions.

18   Q.     And on the next page in the first sentence under the

19   heading author's conclusions, what do the authors say?

20   A.     Yes, it reiterates what was in the previous version.

21   Currently available information allows no unbiased statement

22   about safety or efficacy of aminopyridines for treating MS

23   symptoms.

24   Q.     And in your opinion, would that reflect a person of

25   skill's view as of the date of the update, December 28th,

Goodman - direct

1    2004?

2    A.    Yes.

3              THE COURT:  Is that it for Solari for now?

4              MS. BECKER:  Yes.

5              THE COURT:  It is?  We'll take a short lunch

6    break.  Come back around 2 o'clock.

7              (Luncheon recess.)

8              THE COURT:  You may proceed.

9              MS. BECKER:  Thank you, Your Honor.

10   BY MS. BECKER:

11   Q.    Dr. Goodman, do you have an opinion as to whether a

12   person of skill in 2004 in view of the published literature

13   would have been motivated with a reasonable expectation of

14   success to improve walking or increase walking speed in MS

15   patients by administering 10 milligrams of sustained release

16   4-AP twice daily?

17   A.    Yes, I have formed an opinion and it is that such a

18   person of skill would not have a reasonable expectation of

19   success.

20   Q.    And please turn to your slide, PDX-2037.  Is this a

21   slide you prepared summarizing reasons for your opinion?

22   A.    Yes.

23   Q.    Can you explain?

24   A.    Yes.  So as I've testified, the prior art contained

25   small exploratory and/or methodologic studies not adequately

Goodman - direct

1   designed to show efficacy, including some of my own work.

2   Among the studies that were in the prior art, in aggregate

3   they were difficult to interpret, lots of variability among

4   the patients for sure, but placebo effects were issues and

5   the multiple variety of end points pointing in a variety of

6   directions would make a POSA have difficulty and have a lot

7   of doubt in understanding any expectation of success.  A

8   POSA would also have in mind and it would cast an enormous

9   doubt in the mind of a hypothetical POSA having read about

10  the failed large-scale line study, although he wouldn't have

11  known it was a line, about the failed large-scale study

12  which was adequately designed and specifically designed to

13  test for efficacy, clinical efficacy and it failed.  The

14  enduring concern that I've expressed regarding the risk of

15  seizure and much of the prior art suggested targeting higher

16  doses, higher dose levels or titrating to higher dose level.

17  So for these reasons I formed my opinion.

18  Q.    Thank you.  Do you understand that Defendants contend

19  that the asserted claims of the Acorda patents would have

20  been obvious to a person of skill in 2004?

21  A.    Yes, that's why we're here.

22  Q.    And is it your understanding that the obviousness or

23  nonobviousness of a claim must be determined looking at the

24  claim in its entirety and not just at individual element or

25  limitations of the claim?

Goodman - direct

1     A.     That's how I've been instructed.

2     Q.     And do you understand that all of the asserted claims

3     of the Acorda patents are addressed to improving walking or

4     increasing walking speed in an MS patient by orally

5     administering 10 milligrams of sustained release 4-AP twice

6     daily in all of, at least, those requirements.  Do you

7     understand that?

8     A.     Yes, I understand.

9     Q.     Okay.  Please turn to slide PDX-238, which shows

10    Claim 2 of the '437 Patent as an example.  Can you please

11    walk us through the element of this representative claim?

12    A.     Yes.  The elements are method of improving walking in

13    a human multiple sclerosis patient in need thereof

14    comprising orally administering to said patient a sustained

15    release composition of 10 milligrams of 4-aminopyridine

16    twice daily for a period of at least two weeks, wherein said

17    10 milligrams of 4-aminopyridine twice daily are the only

18    doses of 4-aminopyridine administered to said patient during

19    said time period.

20    Q.     And is it your understanding that Claim 2, when

21    looked at in its entirety, would require meeting each of

22    those limitations together?

23    A.     Yes, that's what I understand.

24    Q.     Let's focus for a moment, keeping in mind that all of

25    the elements have to be viewed in combination, but we heard

Goodman - direct

1    testimony focusing on particular limitations yesterday, so

2    let's look and focus first on the limitation improving

3    walking in a patient with multiple sclerosis.  And I think

4    you've highlighted that on PDX-2039.  In connection with

5    this limitation improving walking in a patient with multiple

6    sclerosis, Defendants have identified, have focused

7    particularly on the Goodman references, Goodman 1, 2 and the

8    Goodman poster as meeting that limitation, but they've also

9    contended that Schwid and Davis show improvement in walking

10   and that Polman 1 showed improvement in fatigue and

11   ambulation.  Have you considered those references in

12   connection with this claim limitation?

13   A.    Yes, I have.

14   Q.    And is slide PDX 240 a slide you prepared to talk

15   about how a person of skill would view those references with

16   respect to the improving walking limitation in the claim and

17   this claim and other asserted claims?

18   A.    Yes.

19   Q.    Okay.  Focusing in particular on Goodman first, can

20   you explain to us what your opinion here is?

21   A.    Yeah, so the Goodman references here are all the same

22   study.  And as I've said, it was designed as an exploration,

23   a methodologic exploration of the sensitivity and usefulness

24   of the outcome measures that we were studying.  It was not

25   an efficacy study.  It wasn't intended to be an efficacy

Goodman - direct

1    study and most particularly what we did learn, had no dose

2    specific information versus placebo with regard to any of

3    the outcome, outcome measures that we used.

4    Q.    And with respect to Schwid?

5    A.    With respect to Schwid, again, this was a

6    methodologic study testing the usefulness of the variety of

7    actually six quantitative functional measures that we looked

8    at and that was the subjective measure, but there were six

9    quantitative functional measures that we used studying the

10   value of or testing the tests, in essence to see whether or

11   not they were sensitive and might have any value in

12   understanding whether there were or were not any efficacy

13   signal to be gleaned in people with MS at this particular

14   dose for this particular time frame.

15          With respect to Davis, as I've said, not

16   adequately designed as an efficacy study.  There were a

17   number of design limitations, which we've already discussed.

18   And likewise with respect to Polman 1, again, clearly not an

19   efficacy study.  There was no control group.  This was a

20   case of a series of people self reporting how they felt.

21   And it's subject to all the concerns about overestimating

22   efficacy due to placebo effects and self report and patients

23   being motivated to do well and please their doctors and so

24   on and so forth.  So for all of these reasons, the Polman

25   study was not an adequately designed study for assessing

Goodman - direct

1   efficacy of walking or improved walking and it's important

2   to remember that just as illustrative of this issue of

3   patient self report concerns, that when objective observers

4   try to look at their walking as a benefit of the EDSS, and

5   other aspects are assessed in EDSS, only a small minority

6   they reported were able to actually show effect under EDSS.

7           So for these reasons, none of these studies were

8   actually sufficiently informative regarding the issue of

9   improving walking.

10  Q.    Okay.  In your opinion, in view of these references,

11  would a person of skill in the art in 2004 have had a

12  reasonable expectation of success in improving walking using

13  10 milligrams sustained release 4-AP twice daily?

14  A.    No, there is not enough here for the reasons that I

15  have explained.

16  Q.    And would, in your opinion, a person of skill in 2004

17  have had a reasonable expectation of success in improving

18  walking using sustained release 4-AP at any dose based on

19  these --

20  A.    Well, there are a variety of -- I'm sorry if I ...

21  Q.    Please go ahead.  (Continuing):  -- on any or all of

22  these references?

23  A.    Yes.  Embedded in these references are a variety of

24  doses and dosing schemes, but none of them, as I said,

25  because of the inherent limitations of the purpose of the

Goodman - direct

1    design of the study, none of them would be sufficient to

2    rely on to predict success.

3    Q.    Okay.  Now let's look at claim 1.  You can see it

4    depicted on the next slide, PDX-241.

5              Focusing in on the limitation of "increasing

6    walking speed in the human multiple sclerosis patient in

7    need thereafter."

8              And with respect to this limitation, defendants

9    again focus primarily on the Goodman reference, and they

10   also identify Schwid as disclosing that 4-AP was effective

11   increasing walking speed in MS patients.

12             And did you prepare a slide summarizing your

13   opinion as to how a person would view these references with

14   respect to the "increasing walking speed" limitation in some

15   of the asserted claims?

16   A.    Yes, it's the next slide.

17   Q.    Thank you.

18             And can you briefly explain your opinion?

19   A.    For both?

20   Q.    Yes.

21   A.    Yes.  So with respect to the Goodman study embedded

22   in the three Goodman, or about which the three Goodman

23   references are, again, not designed as an efficacy study, no

24   dose specific information versus placebo, although as was

25   reported, the group as a whole, when doing the repeated

1   measures ANOVA, did show that 4-aminopyridine as a group,

2   that group was statistically better than placebo.  But,

3   again, because it wasn't an efficacy study, a POSA would not

4   expect to see and there was no mention of correcting for

5   multiple comparisons with a multiple endpoints that were

6   used because it was a methodologic study.

7           And with respect to Schwid, again, a

8   methodologic study.  A test of tests tried to understand

9   whether or not there would be any, any inkling of an

10  efficacy signal at that particular dose.  And it is

11  important to remember that Schwid also disclosed a study of

12  the 161 patients that was designed as such as an efficacy

13  study, also, of course, also casting doubt on efficacy in

14  general although not speaking to walking speed specifically

15  in this case.

16  Q.    In your opinion, in view of these references, would

17  a person of skill in the art in 2004, have a reasonable

18  expectation of success in increasing walking speed using

19  10 milligrams sustained release 4-AP twice daily?

20  A.    So before I answer that, I just want to make one more

21  point about the Schwid, if I may.

22          And that is, walking speed per se was not

23  reported.  And although it seems intuitive that walking,

24  walking time and walking speed are the same, in fact, they

25  behave differently mathematically, and so it is not a given

Goodman - direct

1    that speed and time give the same answers statistically.

2              That said, neither one of these studies, for the

3    reasons that I have cited, would be sufficient for a POSA to

4    have a reasonable expectation of success.

5    Q.   And would that be at the 10 milligram twice daily BID

6    dose that they would not have a reasonable expectation of

7    success?

8    A.   So, Schwid didn't use that dose, so certainly not.

9    And Goodman titrated or escalated, I should say, escalated

10   from that dose to higher doses.  But certainly not any

11   specific information about that specific dose.

12   Q.   And does your opinion that a person of skill would

13   not have a reasonable expectation of success extend to the

14   use of sustained release 4-AP at any dose for the purpose of

15   increasing walking speed?

16   A.   That's correct.  It does not.

17   Q.   All right.  Let's look again at claim 1 of the '437

18   patent.

19             And we prepared PDX-2-043, highlighting the

20   limitation of "orally administering to said patient a

21   sustained release composition of 10 milligrams of

22   4-aminopyridine twice daily."

23             With respect to this limitation, the defendants

24   again contend that Goodman discloses the claimed dose.

25             And if you could turn to the next slide,

Goodman - direct

1    PDX-2-44.

2              Is this a slide you prepared to convey your

3    opinion of how a person of skill would view the Goodman

4    references with respect to the limitation requiring that

5    particular dosing regimen?

6    A.    Well, it was one of several doses.  And it was the

7    first level of dosing, and then the escalation is done from

8    there, up to 80 milligrams, without giving us efficacy data

9    for any specific dose versus placebo for sure against the

10   specific dose levels.

11             And, therefore, it would not be sufficient for a

12   POSA to have a reasonable expectation of success regarding

13   in the big picture, but not enough about the 10 milligrams

14   twice daily for one week for a POSA to go on.

15   Q.    Okay.  Let's take a look at the next slide, PDX-2-045.

16             And, again, using claim 1 of the '437 patent as

17   representative and zeroing in now on the limitation

18   requiring "administration for a time period of at least two

19   weeks."

20             With respect to this limitation, and others

21   requiring specific time periods of administration in the

22   Acorda patents, defendants have contended that the '938

23   patent, which they say teaches administration of 4-AP for an

24   unlimited duration would meet this or teach this limitation,

25   and they have also noted long term administration of 4-AP in

Goodman - direct

1    Polman 1 and Murray and in van Diemen 2.

2                    And if we turn to the next slide, PDX-2-046.

3                    Is this a slide you prepared summarizing your

4    opinion as to how a person of skill would view these

5    references with respect to the limitation requiring

6    "administration of 4-AP for a time period greater than two

7    weeks?"

8    A.    Yes.  I would like to note a typographic error here.

9    It says van Diemen 1 but it is really referring to the data

10   in van Diemen 2.

11   Q.    Thank you.  We will correct that.  Please go ahead

12   and explain your position.

13   A.    Excuse me.  (Talking a drink of water.)

14                   So, again, my understanding is that the claim

15   includes the whole picture and not just these carved out

16   aspects.  So while it's true there were, at least in the

17   case of the three studies besides Murray, while it is true

18   there were people in these studies -- sorry.  Without

19   carving out -- let me start from the beginning, if I may.

20                   So the '938 patent, as we discussed previously,

21   teaches upward titration scheme without any specific dose

22   other than the starting dose of 10 to 15 milligrams, and it

23   certainly doesn't teach anything about, about improving

24   walking in MS.

25                   With respect to the Polman, yes, there were

Goodman - direct

1    patients who received, who received 4-aminopyridine.  And by

2    the way, it was immediate release, not sustained release

3    for more than two weeks.  But we have no evidence that it

4    worked, as I have described, other than complications such

5    as seizures that were in the dose range of 20 milligrams and

6    below.

7              With respect to Murray, it's not MS patients.

8    And the most critical concerns were regarding safety just

9    simply can't be addressed in people who don't have brain

10   disease.

11             And, further, obviously there is nothing about

12   efficacy and improving walking or timed walking.

13             And, lastly, van Diemen 2, they didn't look at

14   walking.  They looked at eye movement.

15             So, yes, there may have been patients who got

16   4-AP for two weeks and they were titrated on an individual

17   basis, and so it doesn't fit with the entirety of the claim.

18   Q.    In view of these references, would a person of skill

19   in the art in 2004 have had a reasonable expectation of

20   success in administering sustained release 4-AP for more

21   than two weeks in the context of this claim and others, the

22   other asserted claims?

23   A.    They would not.

24   Q.    Okay.  Let's take a look at PDX-2-047, which shows

25   claim 7 of the '826 patent.  And you have highlighted here

Goodman - direct

1    the limitation "requiring administration of the dose without

2    a prior period of 4-aminopyridine titration" and "without a

3    subsequent period of 4-aminopyridine titration."

4              What is your understanding of that additional

5    requirement in this claim?  I think you explained what

6    titration means.  I just want to be sure we're --

7    A.    So titration means adjusting the dose on an

8    individual basis depending on whatever response it is

9    targeted to be assessed.

10   Q.    So is it your understanding that this claim makes

11   clear that that is not the type of dosing regimen that was

12   used?

13   A.    Yes, very specific without a prior period of

14   titration.

15   Q.    And how does a non-titration dosing regimen compare

16   to the prior art in general that we talked about today?

17   A.    Well, most of the prior art suggests either, either

18   individual titration or targeting a specific blood level or,

19   in fact, targeting a specific blood level to -- at a minimum

20   to achieve an effect, a measurable effect.

21   Q.    With respect to this limitation, the defendants focus

22   on the '938 patent which they contend does not require

23   titration and they also point to Schwid.

24              Could you please turn to PDX-2-048.

25              And is this a slide you prepared summarizing

Goodman - direct

1    your opinion as to how a person of skill would view these

2    references with respect to that limitation, the no titration

3    limitation?

4    A.    Yes.  So my understanding of the '938 patent is that

5    it does teach individual upward titration for initially

6    tolerability and then titration for effect.

7              And the effect was not walking, it was the

8    type of physiologic effects as demonstrated by Davis and

9    Stefoski.

10             And with respect to Schwid, of course, it was a

11   17.5 milligram dose, not a 10 milligram dose; and, yes, it

12   was a single stable dose for one week at most.  And if

13   anything, it suggested that one needed to target serum

14   levels of at least 60 nanograms per ml which would again

15   suggest a target level or a method of titration to get to

16   that level.

17   Q.    In view of these references, would a person of skill

18   in the art in 2004 have had a reasonable expectation of

19   success in administration of sustained release 4-AP without

20   a prior or subsequent period of titration in the context of

21   the asserted claims?

22   A.    No.

23   Q.    All right.  Do you understand that some of the

24   asserted claims of the Acorda patents require a sustained

25   release composition that achieves certain specified

Goodman - direct

1  pharmacokinetic parameters or a particular release profile?

2  A.     Yes.

3  Q.     And if you turn to slide 2, PDX-2-049.

4         You depicted claim 38 of the '703 patent as the

5  example.  And what is the pharmacokinetic parameter that is

6  called out in that claim?

7  A.     It specifies a mean Tmax in a range of about 2 to

8  about 6 hours after administration of the sustained release

9  composition.

10 Q.     And then on PDX-2-050, you depicted claim 1 of the

11 '826 patent.

12        And what pharmacokinetic parameter is called for

13 in that claim?

14 A.     Well, here, excuse me, it calls for an in vivo 4-AP

15 Cmax steady state to Cmin steady state ratio of between 1 to

16 3.5 and a Caverage steady state of 15 nanograms to 35

17 nanograms per ml.

18 Q.     And, finally, on PDX-2-051, you have highlighted

19 claim 3 of the '685 patent showing the limitation requiring

20 that the "sustained release composition is capable of

21 providing a release profile of 4-aminopyridine extending

22 over at least 6 hours."

23        So in an attempt to take these together,

24 defendants have focused on Hayes 1 and Hayes 3.  And is

25 PDX-2-052 a slide that you prepared to address how those

Goodman - direct

1    references would speak to those limitations as they appear

2    in the asserted claims?

3    A.      It is.

4    Q.      Can you explain?

5    A.      Well, the Hayes references here, again, not MS

6    patients, so they teach nothing regarding the efficacy of MS

7    or the most critical safety concerns.

8            Obviously, they may show, as we said earlier in

9    the trial, they may certainly show the pharmacokinetic

10   profile that's analogous to what would be found in MS

11   patients.  I don't have any dispute with that.  But in terms

12   of the overall claim, as I've said, they teach little to

13   nothing.

14   Q.      In summary, do the prior art references identified by

15   defendants in connection with each of these limitations of

16   the asserted claims, when viewed in any combination, provide

17   a person of skill in the art in 2004 a motivation with a

18   reasonable expectation of success to arrive at the claimed

19   invention, in your opinion?

20   A.      In my opinion, for all the reasons I have cited,

21   absolutely not.

22   Q.      And, in your opinion, does the prior art taken as a

23   whole provide a person of skill in 2004 with the motivation

24   with a reasonable expectation of success to arrive at the

25   claimed inventions?

511

Goodman - direct

1    A.    In my opinion, the prior art as a whole does not

2    lead a person of skill in the art to be motivated with a

3    reasonable expectation of success.

4    Q.    Thank you, Dr. Goodman.  Were you asked to provide an

5    opinion on whether so-called secondary considerations or

6    objective indicia of nonobviousness support the

7    nonobviousness of the Acorda patents?

8    A.    Yes.

9    Q.    And what is your opinion?

10   A.    Well, there are some.  On --

11   Q.    Okay.  And turning to your slide PDX-2053, does that

12   identify some of the considerations that you believe support

13   the nonobviousness of the patents?

14   A.    It does.

15   Q.    So let's talk about some of those considerations.  In

16   your opinion, did the invention of a method of administering

17   10 milligrams sustained release 4-AP twice daily to improve

18   walking or to increase walking speed in MS patients satisfy

19   a long-felt, unmet need?

20   A.    Absolutely, yes.  I'd like to expand on that if I

21   may.

22   Q.    Please do.

23   A.    So as the Court has heard and I've testified, walking

24   problems are a major issue in people with MS.  When people

25   start to lose and then finally lose their ability to walk,

Goodman - direct

1    it robs them of their independence and obviously has a major

2    impact on their psyche and their quality of life.  So the

3    notion that a therapy could improve upon that actually to

4    the patients has a huge impact.  And yes, there was an unmet

5    need, so I can expand further on the this.

6    Q.    Go ahead.

7    A.    When the FDA granted Acorda a priority review for

8    their new drug application, the implication is that the FDA

9    viewed this as a potential important therapy for an

10   important condition.  So in essence an unmet need.  As I've

11   said, walking is prevalent and devastating for people with

12   MS and it's important to remember that Ampyra was the first

13   and remains the only drug specifically approved for

14   improving walking in people with MS.

15   Q.    And had 4-AP been previously approved by the FDA for

16   any pharmaceutical use at all to your knowledge?

17   A.    Not to my knowledge.

18   Q.    And were there treatment options, treatment options

19   prior to the approval of Ampyra?

20   A.    So as I've said, there was none and there still is

21   none other than Ampyra as a treatment specifically to

22   improve walking.  While it's true that there are treatments

23   for pain and such that might allow a person suffering from

24   those aspects of MS to walk better, in terms of specifically

25   treating the walking issue in MS, there is only one

Goodman - direct

1   available therapy.

2   Q.      Are you familiar with any failed efforts to develop a

3   therapy like Ampyra?

4   A.      Yes, although we've lost our slides there for a

5   second.  Yes, so obviously we already discussed the failed

6   Elan study, where EDSS is the prespecified outcome measure.

7   And we heard earlier today in Dr. Lublin's testimony about a

8   different potassium channel blocker developed by

9   Sanofi-Aventis that failed.

10  Q.      And what was that?

11  A.      Nerispiridine.

12  Q.      And were you familiar with that failure prior to

13  hearing Dr. Lublin's testimony today?

14  A.      I was, because I was asked to be an investigator in

15  that study, but I declined of potential conflict with what I

16  was doing with Acorda.

17  Q.      Do you know whether the trial used the timed 25-foot

18  walk?

19  A.      To my knowledge, it did.  That's how it was designed.

20  It was designed along the lines of the Acorda studies.

21  Q.      And do you know what the results of the study were?

22  A.      Yeah, the result is that it failed and never went

23  anywhere.

24  Q.      And in your view, how does that effect your

25  obviousness analysis?

Goodman - direct

1    A.     Well, it shows that it's a different -- the failures

2    of the study, particularly the Elan study, wasn't known that

3    it was an Elan study, but it was known that it was a

4    sustained release formulation from the disclosure in the

5    Schwid paper.  And this cast, as I've said, a huge amount of

6    skepticism and doubt as to whether any of the primary

7    exploratory observations that had been made in Chicago and

8    in Amsterdam and in Baltimore, in all the papers that had

9    been reviewed during this case, it casted doubt on all of

10   that because this was an efficacy study that failed to show

11   efficacy.  That would, in the mind of a POSA, at the time,

12   contemporaneously or in 2004, reading the entire spectrum of

13   the art would be skeptical about it.  And I should also

14   point out when we reviewed the Solari study, Solari sort of

15   knew about that their hands were tied.  They knew that there

16   was bias in the literature meaning that the Elan study

17   hadn't been published.  So they couldn't, by their rules,

18   include it.  And even they had doubts.  Obviously they

19   couldn't come to a conclusion.  They had doubts about the

20   efficacy of 4-AP even without those data.  But a POSA would

21   have been able to include and consider that failed study as

22   disclosed in Schwid, would have had even more doubt that

23   Solari already expressed.  So it seems to me that the

24   failures cast a huge shadow on this whole field.

25   Q.     What about Sanofi Aventis' later failure with their

Goodman - direct

1   drug nerispiridine, does that illustrate anything that

2   effects your opinions?

3   A.     It's a hard thing to do.  And that even though you

4   think you're doing the same study with a similar drug it

5   doesn't necessarily come out the way you expect.

6   Q.     In your opinion did the claimed invention yield any

7   unexpected results?

8   A.     Yes.  So the 10 milligram twice daily sustained

9   release as the, in essence, preferred dosage, was surprising

10  given the prior art suggesting a need to go to higher,

11  higher doses and higher blood levels.  And Ron Cohen talked

12  yesterday about, about the responder analysis that was

13  developed after what he called, was called the 202 study,

14  that in essence failed in its primary endpoint.  But then

15  the responder analysis filtered the noise, is one way to

16  think about it, or through a particular lens of the math,

17  basically, of the responder analysis, it clarified what the

18  failure, apparent failure was about.  And that was -- and

19  that was that there was a subgroup of people who met the

20  criteria for responder analysis and hugely surprising was

21  that the proportion of people who met that response analysis

22  threshold was equivalent in the 10 milligram, 15 milligram

23  and 20 milligram dose.  And I particularly remember being

24  very surprised by that, because I actually didn't believe

25  the 10 milligrams would be an effective dose.

Goodman - direct

1   Q.      Could you please turn to JTX-3.  It's toward the

2   beginning of your binder.  Could you look at Column 19,

3   lines 18 through 45, please?  Okay.  Can you tell us what's

4   described there?

5   A.      Where it starts with post hoc analysis?

6   Q.      Right.

7   A.      Yeah, so post hoc or after the fact analysis means

8   that first analysis, the planned analysis actually didn't

9   work as well as they had anticipated across the entirety of

10  the study and so post hoc analysis was generated and that

11  suggested that again, as I said, that a relatively highly

12  selective criterion for a likely treatment responder, and

13  this was based on consistency, would be a subject with a

14  faster walking speed for at least three visits during the

15  double-blind treatment period as compared to the maximum

16  value among a set of five non-treatment visits, four before

17  treatment and one after discontinuation of treatment.  It

18  goes on to say that the four visits before initiation of

19  double-blind treatment provided an initial baseline against

20  which to measure the consistency of response during the four

21  double-blind treatment visits.  The inclusion of the follow

22  up visit as an additional component of the comparison was

23  useful primarily in excluding those subjects who may be

24  false positives.  That did not show the expected loss of

25  improvement after coming off the drug.

Goodman - direct

1   Q.      So do I understand correctly that this post hoc

2   responder analysis focused on consistency of walking speed

3   improvement as opposed to, for example, magnitude of --

4   A.      Exactly, and that was this lens that was looked

5   through that clarified, that clarified the data that had

6   been generated by the 202 study.

7   Q.      And if you could look at Figure 7, please, of the

8   patent.  It's at the beginning at bates number page 18090.

9   A.      Got it.

10  Q.      And can you tell us what's shown in this figure?

11  A.      Yeah, so in the Y axis it's the proportion or

12  percentage of responders in the post hoc can analysis which

13  we just reviewed.  And what it shows is that, that there was

14  a difference among 10, 15 and to equilibrium group that were

15  virtually the same of approximately 35 percent responders

16  versus a much smaller number, less than 10 percent among the

17  placebo group who qualified as responders.  So what it says

18  is number one, that as a whole, the aminopyridine group was

19  much better than the placebo with respect to this lens, this

20  filter, this responder analysis.  And further to my

21  surprise, the 10 milligrams appeared to be just as

22  efficacious in this respect as the other two higher doses.

23  Q.      And looking at Column 27, lines one through 31 of the

24  patent.

25  A.      So which slides, please?

Goodman - direct

1    Q.    At 1 through 31, the top of that column there.  Can

2    you explain basically what's being described there in the

3    text?

4    A.    I'm not sure where you're --

5    Q.    Column 27, starting with the conclusions.  If you can

6    give us a synopsis of what's being reported.

7    A.    Yes, so take it as a whole, but what it's saying is

8    that despite the prior reports in art expecting that higher

9    doses would be required by either targeting or by titration,

10   that 10 and 15 milligrams showed to be about the same.  And

11   the table, table 15, it goes over seven different, seven

12   different measures comparing 10 milligrams to 15 milligrams,

13   as I've said, the proportion of responders number was

14   exactly the same, slightly different because there was a

15   slightly different number assigned to the total number of

16   patients, but 35 to 36 percent.  The average percent change

17   from baseline in walk speed was very similar.  The percent

18   change in walk speed by visit, the range was very similar,

19   so it wasn't just the average, the range was also similar.

20   And the subjective global impression of the patients was --

21   so this is not just, not just what, what the investigators

22   were measuring, but what the patients felt, the subjective

23   global impression was about the same and this hasn't come up

24   before, so the MSWS12, which is the Multiple Sclerosis

25   Walking Scale 12 developed at the National Hospital for

Goodman - direct

1    Nervous Diseases at Queen Square in London, which we heard

2    about this morning, developed there, as a patient-reported

3    outcome measure focused on the impact of walking in 12

4    different domains by 12 questions, specifically for MS

5    patients.  What it found was in this scale, lower numbers or

6    more negative numbers indicates improvement and in this

7    scale it actually surprisingly showed a somewhat better

8    effect in the 10 milligram dose than the 15 milligram dose.

9    And it turns out that the authors of this MSWS12 now feel

10   that anything greater than 7 or 8 point change is a

11   clinically meaningful change.  So turns out that the 10

12   milligram had, if anything, a more clinically meaningful

13   improvement than did the 15 milligram.  I'm not saying that

14   10 is necessarily better than 15, but overall they appeared

15   to be surprisingly similar.

16   Q.    And looking at Column 27, lines 40 to 42, what is

17   reported there with respect to adverse effects?

18   A.    Well, it's specifically talking about serious adverse

19   events.  And it says serious adverse events were more

20   frequent in the 15 and 20 milligram BID groups.  10 percent

21   and 12 percent in those groups, versus zero percent in the

22   10 milligram group and four percent in the placebo group.

23   Q.    Okay.  Looking a little bit further down at Column

24   27, lines 44 through 47, based on this data, what is being

25   reported there?  Last couple lines there.

Goodman - direct

1    A.     Based on these data, it would appear that a 10

2    milligram BID dose is preferred because of its favorable

3    risk to benefit ratio compared with the 15 and 20 milligram

4    doses.

5    Q.     And compared to the types of dosing regimens that had

6    been described in the prior art as we reviewed it, what is

7    the advantage of this preferred dose disclosed in the Acorda

8    patent?

9    A.     So we've heard over the past two days, discussion

10   about, about narrow therapeutic window, narrow therapeutic

11   index, looking for a sweet spot where one might be able to

12   deliver, deliver frankly any efficacy with respect to --

13   with respect to acceptable tolerability and safety.  But

14   what's important -- Ron Cohen touched on this a bit, but

15   what's important for these people with MS, they need to get

16   the maximum amount of benefit.  It's not a yes or a no.

17   It's a gradation and we want to try and eek out as much

18   benefit for each patient as possible.  And what was

19   surprising is that that could be done at least with this

20   subset of patients, that that could be done with a single

21   dose without having to do what was described in the prior,

22   in the prior art of titrating or individualizing or

23   maximizing doses in order to gain efficacy with the peril of

24   coming close to the toxic range.  Here we have a sweet spot

25   at 10 milligrams with no or minimal at least serious adverse

Goodman - cross

1    events but still having equivalent efficacy compared to

2    these other doses.  So this was an unexpected, surprising

3    and happy discovery.

4                    MS. BECKER:  Thank you very much, Dr. Goodman.

5    I do not have any further questions.

6                    THE COURT:  Okay.  Cross-examination.

7                    MR. KLEIN:  May I approach?

8                    THE COURT:  Yes.

9                          CROSS-EXAMINATION

10   BY MR. KLEIN:

11   Q.      Afternoon, Dr. Goodman.

12   A.      Good afternoon.

13   Q.      Nice to see you again.  You personally wrote both the

14   Goodman 1 and Goodman 2 abstracts, correct?

15   A.      Yes.

16   Q.      And when you wrote those abstracts, you did your best

17   to accurately characterize the results of the Acorda 201

18   phase 2 study, correct?

19   A.      So the abstracts were reported -- were -- is a method

20   of reporting results to be presented hopefully, if it gets

21   accepted, at a meeting.  And in as much as it's an abstract,

22   one can't possibly encapsulate all the data, so one, one

23   abstracts the data and tries to highlight as best as

24   possible those data which, want things to be important to

25   report in the meeting.

Goodman - cross

1    Q.      Sir, did you do your best at the time to accurately

2    describe the Acorda 201 study in the abstract?

3    A.      So what I said in the abstract was accurate.  But as

4    I said, it's by definition an abstract.  It is, it is an

5    extract, it is just some of the data.  And, of course, as I

6    have said.

7    Q.      Sir.

8    A.      If I may?  As I said, an abstract submitted is in

9    essence an application to present, to present something at

10   the meeting.  And it has to be, in essence, something that

11   will be interesting to the people running the meeting in

12   order to be accepted.

13   Q.      So, let me try it one more time.  It's a yes-or-no

14   answer.

15          Did you do your best at the time to accurately

16   describe the Acorda 201 study in the Goodman references, in

17   the abstract?

18   A.      Yes, it's an accurate abstraction.

19   Q.      Thank you.  You also personally wrote the Goodman

20   poster; right?

21   A.      So, I was responsible for the content, but I can't

22   remember whether I specifically -- because I can't remember

23   exactly how that poster -- how what is called a poster here,

24   because that is obviously not a poster, it's a facsimile of

25   the data, because a poster is something that hangs on a

Goodman - cross

1    wall.  And I can't, I can't remember, from 14 years ago or

2    whenever it was, I can't remember exactly what the

3    relationship was between the data that is called a -- I

4    prefer to call it a presentation, and I can't know for sure

5    that I personally did exactly what ended up on the poster.

6    Q.     Sir, did you tell me at the deposition that you

7    prepared this facsimile of the poster?

8    A.     As I said, I was responsible for what went into the

9    poster, yes.  I don't remember specifically what I said at

10   the deposition.

11   Q.     Okay.  Did you personally present the Goodman poster?

12   A.     Yes.

13   Q.     And I understand that the document in your binder is

14   not the actual poster, but is it okay if I refer to that as

15   the poster for convenience?

16   A.     I would prefer to call it the presentation, or the

17   data that was presented.

18   Q.     Okay.  So the Goodman presentation, does that work?

19   A.     Yes.

20   Q.     You personally presented the Goodman presentation;

21   correct?

22   A.     Yes.

23   Q.     Okay.  And you presented the Goodman presentation at

24   a conference in Baltimore, Maryland in September 2002; is

25   that right?

Goodman - cross

1    A.      To the best of my recollection, yes.

2    Q.      That was at the seventh annual meeting of the

3    America's Commission For Treatment and Research in Multiple

4    Sclerosis?

5    A.      Yes, America's Committee.

6    Q.      Sorry.

7    A.      Yes.

8    Q.      And you presented the Goodman presentation once again

9    in 2003; correct?

10   A.      Yes.  The America Academy of Neurology.

11   Q.      And so there is certainly no question that you

12   displayed and presented on the Goodman presentation in the

13   public domain before December 2003; correct?

14   A.      Yes.

15   Q.      And when you presented on this presentation, you did

16   so to your peers; correct?

17   A.      Some of the people there, yes.

18   Q.      Okay.  And you didn't mislead your peers about the

19   results of the Acorda 201 study; right?

20   A.      So I would not have had an intention of being

21   misleading, no.

22   Q.      Right.  And you didn't intentionally omit placebo

23   information from your presentation; correct?

24   A.      So there was some placebo information on it, if

25   we're speaking about the poster or presentation --

Goodman - cross

1    poster/presentation.  There was some placebo information on

2    there.

3    Q.    Right.  You intended to disclose placebo information;

4    right?

5    A.    There was some placebo information disclosed.

6    Q.    Okay.  Now, on direct, at one point you looked at

7    a portion of the poster and you noted that there was not

8    placebo information with regard to the dose response curve.

9    Do you remember that?

10   A.    Yes.

11   Q.    You did not intentionally omit placebo information in

12   connection with that dose response curve; right?

13   A.    That is right.

14   Q.    And you didn't hide any data from the 201 study to

15   skew the results of the study from your peers; correct?

16   A.    Correct.

17   Q.    Okay.  And you didn't omit important context that

18   your peers would have found material to the 201 study

19   results; right?

20   A.    Correct.

21   Q.    And you stand by everything you wrote in the Goodman

22   1 and 2 abstracts; right?

23   A.    Yes.

24   Q.    You also stand by everything you wrote in the Goodman

25   presentation; is that right?

Goodman - cross

1    A.    Yes.

2    Q.    Okay.  And a person of ordinary skill in the art,

3    hearing your presentations in 2002 and 2003, could have

4    reasonably believed what you had to say about the 201 study;

5    correct?

6    A.    Yes.

7    Q.    And when you presented on the Goodman presentation,

8    you didn't say that Acorda's 4-AP development program for

9    multiple sclerosis was coming to an end; right?

10   A.    Well, that wouldn't have been something that I would

11   have known.

12   Q.    Well, you didn't characterize the Acorda 201 study as

13   a failure when you presented on the abstracts; right?

14   A.    So it's important to remember, I had specific

15   knowledge of 201 in a more ample, in a more ample fashion.

16   And I can't remember whether I knew everything about 201 at

17   the time that the abstracts were written or the poster was

18   presented.  So what is in the abstracts or what is on the

19   poster is not equivalent to 201.  It's about 201 but it is

20   not equivalent to 201.

21   Q.    Before 2004, the only thing the public knew about

22   the 201 study was what you presented in the abstracts in the

23   Goodman presentation; right?

24   A.    Yes.

25   Q.    And you never told any members of the public either

Goodman - cross

1    in the abstracts or in your written or oral presentations

2    that the 201 study was a failure; correct?

3    A.    Not in what is written, but it may have come out in

4    discussion.

5    Q.    You think you told members of the public, when you

6    were presenting on the 201 study, that the study was a

7    failure?

8    A.    So I obviously can't remember discussions because as

9    you heard yesterday, a poster presentation is about people

10   walking up to you and discussing what is there.  And I

11   certainly can't remember what I did or didn't say 14 years

12   ago as people walked up and talked to me about the poster.

13   Q.    Okay.  Well, a skilled artisan reading the Goodman

14   references in 2003, including the Goodman presentation,

15   would have found the reported 201 study results pleasing; do

16   you agree?

17   A.    I can't comment on the emotional reaction of a POSA,

18   whether or not they would be pleased or not.

19   Q.    Well, when you first learned the results of the 201

20   Phase II study for Ampyra, you found them pleasing; right?

21   A.    Well, I think I am recalling, but I don't remember

22   the specifics, that I testified to something to that effect

23   in my deposition.

24   Q.    Yes, I was reading from your deposition, so you have

25   a good memory.

Goodman - cross

1            MR. KLEIN:  Mr. Young, can you put on DDX-5-4,

2    please.

3    BY MR. KLEIN:

4    Q.    On the screen is a snapshot from -- I apologize, we

5    have been calling it the Goodman poster, but it is the

6    Goodman presentation.  And this is the conclusions box from

7    that presentation.

8            Do you recognize that?

9    A.    Yes.  Yes.

10   Q.    And here in this conclusions box, you wrote that

11   there was evidence of dose response in 20 to 40 milligram

12   per day range; right?

13   A.    Yes.

14   Q.    And when you said 20 milligrams per day, that is

15   referring to 10 milligrams sustained release 4-AP taken

16   twice daily; right?

17   A.    Yes.

18   Q.    And the range of 20 to 40 milligrams per day in the

19   context of the 201 study is referring to three doses, 10,

20   15, and 20 milligrams, taken twice daily; right?

21   A.    So you are going back and forth between what is on,

22   what is on the presentation and what is the 201 study.  And

23   as I said, this reports some of the data.  This is not the

24   final report.  There was a publication years later that has,

25   that explains the entire -- explains to the world in a

Goodman - cross

1    meaningful way in its entirety.  This is just, these are

2    just summaries.  This is just abstractions.  These are

3    summaries.  And, yes, it does say that.  Of course.

4    Q.    Well, just so I'm clear.  20 to 40 milligrams per day

5    in the Goodman presentation refers to three doses, 10, 15,

6    and 20 milligrams, of 4-AP sustained release taken twice

7    daily; right?

8    A.    In the dosing scheme that we used in the escalating

9    dosing scheme that we used in this study, yes.

10   Q.    All right.  Let's go to DDX-5-5.

11          So I have added in the box entitled Results

12   Summary.  Do you see that?

13   A.    Yes, that is part of it.

14   Q.    It is part of it.  The first bullet is cut off but I

15   wanted to focus on the second bullet.  And because it is

16   small, I blew it up as much as I could.

17          Here it says:  At doses above 40 milligrams per

18   dame, more severe adverse events were reported, including

19   two cases of seizure.  And it says at 60 and 70 milligrams

20   per day.

21          Do you see that?

22   A.    Yes.

23   Q.    So, in other words, the Goodman presentation teaches

24   that the range for further testing would be the 20 to

25   40 milligram per day range; right?

Goodman - cross

1   A.      To the extent that it teaches anything.  As I have

2   said, this is a methodologic study, not an efficacy study,

3   so we're getting hints and suggestions, and that is what we

4   get out of this type of study.

5   Q.      Okay.  But if there were to be further studies, what

6   you are teaching in the two boxes on DDX-5-5 is that the

7   dose range for future studies would be 20 to 40 milligrams

8   per day; right?

9   A.      As a range, yes.

10  Q.      And that is because, in the results summary, you were

11  teaching away from using 4-AP doses above 40 milligrams a

12  day to treat MS patients; right?

13  A.      Yes, to the extent that -- yes.  To the extent this

14  small study teaches, yes.

15  Q.      And you mentioned concerns about seizures at the time

16  in 2004; right?

17  A.      Yes.

18  Q.      And here, in the bullet, we just looked at it, we

19  just looked at you mentioned there were two cases of

20  seizures at 60 and 70 milligrams per day; right?

21  A.      Yes.

22  Q.      Concerns about seizures with 4-AP including Ampyra

23  remain to this day; right?

24  A.      Yes.

25  Q.      So even though Ampyra is FDA approved, there is still

Goodman - cross

1     concerns that 4-AP can cause seizures in MS patients; right?

2     A.     Yes.

3     Q.     Let's go to DDX-5-6.

4            Now, the conclusions from your presentation were

5     also reported in different prose in the Goodman 1 and

6     Goodman 2 abstracts; right?

7     A.     Yes.

8     Q.     And in the results section of Goodman 1 and Goodman

9     2, you said the fampridine SR group showed statistically

10    significant improvement from baseline compared to placebo in

11    functional measures of mobility (timed 25 -- I think it is

12    25 foot -- walking speed).  Right?

13    A.     Speed, yes.

14    Q.     And it's 25 foot, right?

15    A.     It should have been, yes.

16    Q.     Okay.  And you stand by this characterization of the

17    201 study data; right?

18    A.     Yes.  Inasmuch as it says the group, what is not

19    referenced here but is in the presentation is that it

20    further expands on how that P value is reached, as I have

21    explained with the repeated measured ENOVA across weeks 1

22    through 7 and not saying anything about any particular dose.

23    Q.     And --

24    A.     Again, this is an abstraction or, you know,

25    abbreviations of the more ample data set than you can fit on

Goodman - cross

1    a poster.

2    Q.    Functional measures of mobility.  That refers to the

3    time that it takes a patient suffering from MS to walk

4    25 feet; right?

5    A.    Well, in this case, specifically in regard to the

6    statistically significant P value, it was speed derived

7    from the time of walk.  As I said earlier, it turns out

8    mathematically they don't behave exactly the same.

9    Q.    Well, what you actually did was test how much it

10   takes to walk the 25 feet; right?

11   A.    So if the test was how long it takes to walk 25 feet,

12   but the variable, if you will, that was statistically

13   significant was the derived speed from that timed walk test.

14   Q.    And in the conclusions block from the Goodman

15   presentation, you more succinctly said "significant benefit

16   on timed walking;" right?

17   A.    Correct.

18   Q.    Let's go to DDX-5-7, please.

19          All right.  So here on the screen is a callout

20   from Goodman 1.  And on direct, counsel pointed you to

21   the highlighted sentence that says:  Dose response curves

22   show increasing benefit in both measures in the 20 to

23   50 milligram per day range.

24          Do you remember that?

25   A.    Yes.

Goodman - cross

1  Q.     And to be clear, this dose response curve did not

2  detect any statistically significant differences among doses

3  within the 20 to 50 milligram per day range; right?

4  A.     Right.

5  Q.     And a skilled artisan reading the Goodman references

6  in 2004 could not expect in the dose in the 20 to 50

7  milligram per day range to be more effective than any of

8  the other doses, correct?

9  A.     As I opined previously, there is only so much

10  inference about efficacy one can make from this methodologic

11  study looking at different measures.

12  Q.     So to make sure I understand your answer, could a

13  skilled artisan in 2004 expect, based on what was reported

14  in the Goodman references, any dose in the 20 to 50

15  milligram per day range to be more effective than any of the

16  other doses?

17  A.     So, again, just to clarify.  One can't get much

18  efficacy inference out of it.  But to the extent one tries

19  to eke out some efficacy inference, what we're looking at

20  is some curve with one data point in relation to the other,

21  and the implication of the dose response across a range is

22  in this case that the higher end of the range gets more

23  efficacy than the lower end of the range as much as one can

24  infer efficacy, one relative to the other, but not in

25  comparison to placebo which one would want in an efficacy

Goodman - cross

1    study.

2    Q.    Sir, you are not offering an opinion that any of the

3    doses in the 20 to 50 milligram per day range were any more

4    effective than any of the others, correct?

5    A.    So we can't base an inference about any one specific

6    inferences.  What we can infer is just the pattern.

7    Q.    So just so I have a yes or no to that question,

8    please.  You're not offering an opinion that any of the

9    doses in the 20 to 50 milligram per day range were more

10   effective than any of the others; is that correct?

11   A.    Well, I would say that the higher doses were -- the

12   higher the dose to up to 40 or 50 depending on how you would

13   read the curve, was relatively, in that context, without

14   placebo control, was showing a faster walking time, you

15   know, shorter walking time and therefore a -- well, a

16   shorter walking time.

17   Q.    Sir, you were deposed in this case, right?

18   A.    Yes.

19   Q.    Okay.  Mr. Young, can you play the deposition 220,

20   page 220, line 11 to 220, line 19?

21            "Question:  Okay.  Fair enough.  Now, with

22   regard to the dosing -- the effects from the 201 study that

23   you saw in the 20 to 50 per milligram per day range, are you

24   offering an opinion that any of those doses would be more

25   effective than any of the others?

Goodman - cross

1          "Answer:  No, because we didn't have anything to

2    go by other than the suggestion that there was a dose response."

3          Was that your testimony?

4    A.    Yes.

5    Q.    Okay.  Now, on direct you concluded that the Acorda

6    patents are not obvious, right?

7    A.    Yes.

8    Q.    And those patents you understand protect Acorda's

9    drug Ampyra from competition?

10   A.    Yes.

11   Q.    And Ampyra is Acorda's biggest product.  Do you

12   understand that?

13   A.    You know, I don't know the details of them, but, of

14   their financial situation, but I think I heard, come to

15   think of it, Ron Cohen say yesterday that it was their

16   biggest product.

17   Q.    And Acorda has an exclusive license to the earlier

18   patent issued by Elan.  Were you aware of that?

19   A.    I heard you say it yesterday.

20   Q.    Okay.  And Alkermes is a successor to Elan.  Do you

21   understand that?

22   A.    Yes.

23   Q.    Now, your relationship with Elan and Acorda dates

24   back for more than two decades; is that right?

25   A.    Well, I haven't heard from Elan or Alkermes for

Goodman - cross

1    probably 10 or 15 years, so I

2    did -- I did -- I was an investigator, as I said, starting

3    in 1994 with Elan and then I advised and consulted for them

4    after that for several years and then with respect to issues

5    in this case, and then I have worked with Acorda for about

6    since, I guess the late 1990s or early 2000.

7    Q.    And around that time period you started working with

8    Acorda in connection with its drug development of what

9    ultimately became Ampyra, correct?

10   A.    Yes.

11   Q.    And Acorda retained you as a consultant for that

12   purpose, correct?

13   A.    Yes.

14   Q.    And that was a paid consulting arrangement?

15   A.    So during the course -- yes, with a qualification.

16   And the qualification is that the money, the money was paid

17   to my employer, the University of Rochester, not to me.

18   Q.    So when you received your honorarium, that money

19   didn't go to you?

20   A.    I said during the course of the clinical trials.  And

21   after the approval of the drug, I was a paid consultant.

22   And yes, I did receive honorarium.

23   Q.    You've known the inventors of the Acorda patents,

24   Drs. Blight and Cohen, for years, right?

25   A.    Yes.

Goodman - cross

1   Q.    Dr. Cohen is the President and CEO of Acorda?

2   A.    Yes.

3   Q.    And Dr. Blight is Acorda's chief scientific officer,

4   right?

5   A.    Yes.

6   Q.    And you understand this litigation is important to

7   both Drs. Cohen and Blight, right?

8   A.    They are the named inventors.

9   Q.    You've worked side by side with Drs. Blight and Cohen

10  for the clinical trials for Ampyra, right?

11  A.    Not recently, but during the course of the studies,

12  yes.

13  Q.    You've also advised Acorda on matters outside the

14  context of this litigation and outside of the clinical

15  trials, correct?

16  A.    Yes, not in the last year, but yes.

17  Q.    Well, you sit on an MS advisory committee for Acorda,

18  right?

19  A.    Correct, although I didn't go to this year's meeting.

20  Q.    Okay.  And you've served in that role for the last

21  five years or so?

22  A.    Except this year, yes.

23  Q.    And Acorda pays you for serving on that committee?

24  A.    When I show up.

25  Q.    Okay.  Now, switching gears a little bit, sir.  You

Goodman - cross

1    testified on direct as to whether Ampyra satisfied a

2    long-felt and unmet need for therapy to improve walking in

3    MS.  Do you remember that?

4    A.    Yes.

5    Q.    Ampyra hasn't actually satisfied such a long-felt and

6    unmet need, right?

7    A.    Well, in as much as -- I don't know what you mean by

8    satisfied.  If by satisfied you mean that it cures MS,

9    obviously not.  If it means that people who are bed ridden

10   in nursing homes can get up and run a marathon, obviously

11   not.  But if it means that it improves some peoples quality

12   of life by being able to walk better, absolutely yes.

13   Q.    And when you say some people, you're talking about 33

14   to 40 percent of the time?

15   A.    Well, what was found in the pivotal trials was

16   somewhat north of 35 percent in one study and I think 41

17   percent in the second study, so somewhere in that raining.

18   Q.    Okay.  And indeed you've never seen an MS patient for

19   whom you've prescribed Ampyra walk normally, right?

20   A.    That's not true.  I have.  And I can give you

21   anecdotes if you care to let me tell.

22   Q.    Well, you've never seen somebody for whom you've

23   prescribed 4-AP who walks entirely normally if they are

24   getting what appears to be a robust response to the

25   treatment; is that correct?

Goodman - cross

1    A.      Again, it's not.  I can give anecdotes if you care to

2    let me, about people who have done astonishingly well.  I

3    wish it happened with everybody, but it does happen.

4    Q.      You didn't give any anecdotes when I asked you that

5    question in the deposition, right?

6    A.      I don't remember exactly what I said in the

7    deposition.

8    Q.      All right.  Why don't we play Page 81, lines 15 to

9    25.

10           "Question:  How often do you see a patient, an

11   MS patient who has difficulty walking able to walk normally

12   after taking Ampyra?

13           "Answer:  That's -- that's a hard question for

14   me to answer.  I can't say that I've ever seen somebody for

15   whom I've prescribed 4-AP who walks entirely normally even

16   if they're getting what appears to be a robust response to

17   the treatment.

18           Is that your testimony, sir?

19   A.      That's what I said at the time.

20   Q.      Okay.  Only about 10 percent of your patients are

21   currently prescribed Ampyra; is that right, 10 percent of MS

22   patients?

23   A.      Something like that, I would say, yeah.

24   Q.      And even among your patients who suffer from walking

25   difficulties, again, referring to MS patients, only about 15

Goodman - cross

1   to 20 percent are prescribed Ampyra, right?

2   A.    I can't recall -- that sounds about right.

3   Q.    Now, switching gears again on direct, you testified

4   about this Elan's large-scale study that was reported in

5   Schwid, right?

6   A.    Yes.

7   Q.    And I wrote down during the direct you said that this

8   failed study cast a huge shadow over this whole field,

9   right?

10  A.    I don't remember if those were my specific words, but

11  something to that effect.

12  Q.    That's a bit of an exaggeration, right, sir?

13  A.    So, to -- well, I'm not sure it's an exaggeration.

14  And so I'm not -- I don't want to contend that the Schwid

15  paper per se cast a shadow, but those people, a hypothetical

16  POSA reading it in 2004 would be concerned about it.  But

17  what I meant to say is the people in the field and many of

18  us were involved in clinical trial where we're actually

19  quite, quite unpleasantly surprised by the results, because

20  we had thought the prior art was leaning towards what we're

21  now calling prior art, but what was in the literature we

22  would have anticipated that we would have found at least

23  something and we found nothing.  So that really cast doubt

24  on the notion that there were clinical effects of 4-AP other

25  than the stuff that Davis and Stefoski found in terms of

Goodman - cross

1    either the immediate effects that were first sort of

2    transient effects from an intravenous dose or for the

3    physiologic effects that they found which we found

4    believable.  But the idea that you couldn't find a clinical

5    effect with a big study was, in fact, devastating.

6    Q.    Now, to be clear, the Schwid reference only mentions

7    this failed study in passing.  It wasn't a point of the

8    Schwid reference?

9    A.    I disagree with that.

10   Q.    Okay.  Well, the Schwid reference is the only public

11   discussion of this failed Elan study -- excuse me, in the

12   prior art, correct?

13   A.    Well, in the prior art that's been put into evidence,

14   I'm aware of at least one other place where it's written.

15   Q.    In the prior art that's been put in the evidence, you

16   haven't seen this failed Elan study anywhere other than the

17   Schwid reference, correct?

18   A.    Yes.

19   Q.    Let's go to JTX-104.  Is this a copy of the Schwid

20   reference?

21   A.    Yes.

22   Q.    And you are the senior author?

23   A.    Yes.

24   Q.    Okay.  So you actually had inside information about

25   this failed Elan study that the public didn't have, right?

Goodman - cross

1    A.      Yes.

2    Q.      Let's put that down and let's go to the bottom of the

3    first column and the entire carryover paragraph.  Correct.

4    Now, other than the brief mention in the abstract, this is

5    the discussion in Schwid concerning this failed Elan study,

6    right?

7    A.      To the best of my recollection, yes.

8    Q.      And the study of this -- that you're discussing was

9    in 1994, right?

10   A.      Yes.

11   Q.      Okay.  That's a full decade before the priority date

12   for the Acorda patents, right?

13   A.      Yes.

14   Q.      And the study used the EDSS test, right?

15   A.      Yes.

16   Q.      And you characterize it as a failure because of

17   what's said in the last sentence of the paragraph, right?

18   A.      Yes.

19   Q.      Okay.  Let's go to the next paragraph.  Okay.  So

20   here Schwid teaches that the EDSS, however, may have been an

21   inadequate outcome variable for this trial, right?

22   A.      Yes.

23   Q.      And the Schwid reference actually says this because

24   you were the one who advised Acorda that the failed Elan

25   study used an inadequate outcome variable, right?

Goodman - cross

1    A.      This was the idea that Steve Schwid and I had, yes.

2    Q.      And on direct you said all the key characteristics of

3    the failed Elan study were disclosed in the Schwid

4    reference; is that right?

5    A.      I don't recall if I said exactly those words.

6    Q.      Okay.  Well, that's what I wrote down.  Do you

7    disagree with it?

8    A.      Want to repeat it for me, please?

9    Q.      All of the key characteristics of the failed Elan

10   study were disclosed in Schwid?

11   A.      So I actually don't remember saying exactly that.

12   What I recall, the gist of what I recall is saying that the

13   key characteristics that one would -- a POSA would look for

14   in terms of defining as an adequately designed efficacy

15   study were.

16   Q.      Schwid didn't report data from an Elan study that

17   failed?

18   A.      Well, I don't know.  22 percent was data.

19   Q.      Can you put that paragraph back up, please?  Schwid

20   doesn't disclose the dose that was used, right?

21   A.      That's right.

22   Q.      Or whether there was more than one dose used, right?

23   A.      That's correct.

24   Q.      And how long the patients were dosed, right?

25   A.      That's correct.

Goodman - cross

1    Q.      Any statistical data?

2    A.      So statistics are a method of analyzing data.  The

3    data are here.  It says 22 percent of patients in the 4-AP

4    group improved on EDSS, but the same percentage, 22 percent

5    improved in the placebo.  That's data.  And one doesn't need

6    a statistician to say that 22 equals 22.

7    Q.      Other than the Schwid reference, there's no data that

8    was publically available to a person of ordinary skill in

9    the art as of 2004 based on the references that have been

10   introduced into evidence in this case, correct?

11   A.      Based on those references that have been selected for

12   this case, yes, I believe that's true.

13   Q.      Now, the Goodman references we talked about earlier

14   disclose much more data than what's disclosed about the

15   failed Elan study in Schwid, right?

16   A.      Could you repeat that, please?

17   Q.      The Goodman references we discussed earlier disclose

18   much more data than what was disclosed about the failed Elan

19   study in Schwid, right?

20   A.      So I'll accept your premise with the caveat that if

21   you're just counting the amount of data, sure, that's

22   correct.  But more importantly is the context of the data

23   and what's described here is a page or study with 161

24   patients designed for assessing efficacy as opposed to a

25   small methodologic exploratory study as reported in the

Goodman - cross

1    Goodman references.

2    Q.    Okay.  And the failed study -- the failed Elan study,

3    that's what we've been calling it, which was a decade before

4    the priority date, didn't stop others from investigating

5    4-AP to treat MS during that decade, correct?

6    A.    So I don't know exactly what you mean by others.

7    Q.    Well --

8    A.    If you mean Acorda, it didn't stop Acorda.  They

9    bought the rights.

10   Q.    That's what I was getting at.  In fact, it didn't

11   stop you from further investigating 4-AP's effects on MS,

12   right?

13   A.    That's correct.

14   Q.    And in fact, since this failed Elan study was

15   published in the Schwid reference, no other study published

16   before 2004 tested 4-AP using solely EDSS as an outcome

17   variable, right?

18   A.    Please repeat that.

19   Q.    Since the Schwid reference, no other study that

20   tested 4-AP before 2004 focused solely on EDSS as an outcome

21   variable, correct?

22   A.    I just want to make sure I understand.  So I've been

23   up here for a long time.

24   Q.    I can rephrase.

25   A.    I've been up here for a long time.

Goodman - cross

1    Q.    Let me rephrase.  After the Schwid study, the other

2    studies between Schwid and 2004 used other variables in

3    addition to EDSS, correct?

4    A.    Yes.

5    Q.    Okay.

6    A.    EDSS is still used and was used, even in the Acorda

7    studies to describe the patients who entered into the study,

8    so it's not dead, it's still available.

9    Q.    So the Elan study didn't even stop investigators from

10   still using EDSS as an outcome variable, right?

11   A.    That's not what I said.  I said it was used as a

12   descriptor of the patient's level of disability, not

13   necessarily as an outcome measure, although even in the

14   Schwid study we used EDSS as a comparator.  This was the

15   whole notion behind it is to discover whether there were

16   other tests that might be -- might be more sensitive to rely

17   on to detect an efficacy signal.

18   Q.    And that's what skilled artisans learn from the

19   Schwid reference, was that if you use EDSS alone it would be

20   an inadequate outcome variable?

21   A.    Well, it says may have been.  And that's what we were

22   exploring in the Schwid study.

23   Q.    And you agree that it was, right?

24   A.    I agree that you can get additional information

25   about, about a person's walking ability from using a time,

Goodman - cross

1    in this case we used 8 meters, but a timed walking test

2    gives you additional information than one can glean from

3    EDSS which basically looked at a distance of over 100

4    meters.

5    Q.    The Schwid reference itself wasn't focusing on the

6    Elan study, it was focusing on a different clinical study,

7    right?

8    A.    So it was motivated to explore possible methods that

9    might explain at least in part why the Elan study failed.

10   And I'll call your attention to the fact that the study was

11   funded by Elan and two of the authors, David Mason and David

12   Tierney were employees of Elan because they were interested

13   in trying to figure out, if they could, what went wrong.

14   And decide for their company whether or not there's anything

15   -- there's a drug here, whether or not it does anything or

16   was it a methodologic issue or some combination of problems

17   that we couldn't figure out.  But that was the purpose of

18   the study.

19   Q.    Sir, the Schwid reference is discussing a clinical

20   study with 4-AP sustained release, 17.5 milligrams BID;

21   correct?

22   A.    Yes.

23   Q.    That is different than the failed Elan study?

24   A.    Yes.

25   Q.    That is all I was getting at.

548

Goodman - cross

1          Let's go to the abstract.  And if you could pull

2    out the conclusion, or highlight it.

3          Do you see the conclusion there?

4          4-AP sustained release improved motor function

5    in MS.  That is what you wrote in this article, right?

6    A.    Yes.

7    Q.    And do you stand by this statement?

8    A.    In the context in which it was written.

9    Q.    On direct, you also discuss a reference by Solari.

10   A.    Yes.

11   Q.    It was PTX-416 and PTX-787.  I don't think we need to

12   put it up.

13         That was a review article, right?, or review

14   articles?

15   A.    So what it is, it's an evidence-based -- it's an

16   evidence-based review of the state of the art.

17   Q.    Now, sir, did you apply the same standard as Cochrane

18   did when assessing reasonable expectation of success in this

19   case?

20   A.    It is not exactly the same exercise, because a POSA

21   would also have all of the art, not just the things that

22   they chose to exclude because of their exercise is evidence

23   based, and they require, as I have said, quality evidence.

24   Q.    Cochrane applies a very high standard.  Do you agree

25   with that?

Goodman - cross

1    A.     I agree that they apply an appropriately high

2    standards for assessing, as I have said, quality evidence

3    as opposed to a POSA who, yes, will have other art that they

4    clearly, and from my perspective understandable reasons,

5    exclude it.

6    Q.     The standards applied by Cochrane are similar to

7    those applied by the FDA?

8    A.     No, not at all.

9    Q.     Well, Cochrane excluded nonrandomized studies; right?

10   A.     Yes.

11   Q.     And the Solari references that you looked at, neither

12   one mentions any of the Goodman references that we talked

13   about today; right?

14   A.     The reason is because they weren't published.

15   Q.     Okay.  But the answer is they don't mention?

16   A.     They don't because they weren't, they weren't

17   published.  They were in print but not published.

18   Q.     Let's go to DDX-5-11.

19           Okay.  Going back to the Goodman references.

20   The 201 study results from the Goodman references suggested

21   a path for future studies; right?

22   A.     Could you show me where it shows that.

23   Q.     I'm just asking a question.  It doesn't say that, but

24   the information on the screen on DDX-5-11, along with the

25   other information in the Goodman references, suggested a

Goodman - cross

1  path for future studies; right?

2  A.    So, as I have opined and as I wrote, this was

3  methodologic, methodologic exploration of outcome measures

4  that might be used in future studies, and I'll agree to

5  that.

6  Q.    Well, you certainly viewed the results as preliminary

7  evidence suggesting one possible path in which to take next

8  for future studies; right?

9  A.    I suspect you are quoting from my deposition.

10  Q.    I am.  Do you agree with that?

11  A.    I agree that that is what is in the deposition.

12  Q.    Are you changing what was in the deposition?

13  A.    So it depends on the question.  And I'd have to hear

14  the question.

15  Q.    Well, the question was, and I can play it if you

16  would like.

17        "Question:  As of December 2003, did you feel

18  that based on the results of the Goodman 1 and Goodman 2

19  testing that it made sense from a drug development

20  perspective to go to the next step and conduct a further

21  study?"

22        And you testified:

23        "Answer:  So I viewed, I view the results that

24  we had as preliminary evidence suggesting one possible path

25  in which to take next for future studies.

Goodman - cross

1        And, for the record it is 170, lines 7 to 19.

2    A.    Yes.  So you will recall that you invited me during

3    the deposition to opine both as an expert witness but also

4    as a factual witness.  And with respect to that question, I

5    was opining as a factual witness of what we, meaning I,

6    meaning I and my collaborators, Acorda, what we did.

7    Q.    Okay.  You are a person of ordinary skill in the art;

8    right, sir?

9    A.    Yes.  But during the course of the deposition, there

10   was at least on my part some confusion generated by the fact

11   that I was allowed and even invited by you to opine in both

12   regards.

13   Q.    Well, the path that you had in mind involved using

14   the 10, 15, and 20 milligram 4-AP sustained release doses

15   twice daily for longer durations; right?

16   A.    So, again, this was me with my particular, my

17   particular interest in the work and me with my particular

18   knowledge set, which is, was clearly at the time different

19   than a POSA with respect to 4-AP.

20   Q.    So just so I understand, you're saying your view

21   at the time would have -- was to go forward with further

22   testing involving those three doses but a person of ordinary

23   skill in the art would have had a different view?  Is that

24   your testimony?

25   A.    So there are a number, there were a number of

Goodman - cross

1    possibilities.  So, you know, what is in Goodman is a range,

2    20 to 40 milligrams.  And within that range, one could

3    choose, as we did with Schwid, 17 and-a-half, 22 and-a-half,

4    37 and-a-half.  There are a whole number of, there are a

5    whole number of doses within that range that a POSA -- of 12

6    and-a-half.  There are all kinds of doses that could have

7    been chosen by somebody.  It's a range.

8    Q.    Now, follow-up studies to the 201 study needed to

9    test 4-AP doses for longer than two weeks.  Do you agree

10   with that?

11   A.    Well, you know, I certainly opined at my deposition

12   that one would want to see more than a week that that was

13   here.  And two weeks, as a minimum, absolutely.

14   Q.    And a person of ordinary skill in the art would also

15   know that a stable 4-AP dose would need to be tested in MS

16   patients for at least two weeks; right?

17   A.    So not necessarily based on, based on what was known

18   in 2004.  Again, a POSA could look at the entirety of the

19   art and still believe that there was a desire to increase,

20   escalate, titrate doses towards higher levels.

21            So I don't know that there was a reason that

22   a POSA, in 2004, based on all the art, would have come

23   to   the conclusion that a stable dose of anything had a

24   reasonable expectation of success or would even be worth

25   testing.

Goodman - cross

1   Q.      A person of ordinary skill in the art would know that

2   eventually one has to test for stable dose format for 4-AP;

3   right?

4   A.      So I need your definition of "stable dose format."

5   Q.      I would just like a yes or no, depending on how you

6   interpret that term.

7   A.      So eventually it would be desirable that one would

8   have some, some dose that one would take, the patient would

9   be prescribed to take on a regular basis.  But that doesn't

10  -- so, but that stable dose format doesn't mean that one

11  couldn't have to titrate or investigate what would be an

12  optimal, an optimal dose for a patient, and that might take

13  some, some weeks of titration, and it is not unusual to

14  titrate drugs based on the patient's tolerability and

15  response.

16          So there are many drugs that we titrate over

17  time and then find, and find a particular dose, and in that

18  context, yes, it would be obvious that eventually there

19  would need to be one or more stable doses that could be

20  prescribed.

21  Q.      It's obviously much more convenient for an MS patient

22  suffering from a chronic disease to take a stable dose than

23  to have to titrate; correct?

24  A.      So they're not mutually exclusive, as I tried to just

25  explain.  One might have to titrate a patient, which is not

Goodman - cross

1     what was suggested by Acorda, but one might have to titrate

2     not 4-AP but other drugs, which we do, for example, in

3     antiepileptics and other medications, spasticity drugs in

4     MS.  We titrate based on their tolerability and response,

5     and then arrive at a stable dose.  So both things can

6     happen.  They're not mutually exclusive.

7              To your point, is it desirable to have,

8     necessary to have some stable or particular doses that won't

9     be prescribed for MS or any other condition?  Yes.

10    Q.    The lowest effective dose for 4-AP to treat MS was a

11    desirable thing to know.  Do you agree with that?

12    A.    No.

13    Q.    Okay.

14    A.    Not per se.

15    Q.    You don't think it is a desirable thing to know, for

16    a drug like Ampyra, the lowest effective dose to minimize

17    side effects?

18    A.    So what was discovered is that, as I said in my

19    direct testimony, that the lowest dose that Acorda tested

20    prior to FDA approval turned out to be equivalent in

21    efficacy, and that was, that was a real win for people with

22    MS.

23              That said, what we really want to find is the

24    most effective dose that can be given safely.

25    Q.    And isn't that the lowest effective dose to minimize

Goodman - cross

1   side effects; sir?

2   A.      So, it's not necessarily, but it happened to be with

3   the Acorda discovery.

4   Q.      Well, the doses in the 201 study that were reported

5   in the Goodman references informed another study for Ampyra;

6   right?

7   A.      Repeat that, please?

8   Q.      The doses from the 201 study that were reported in

9   the Goodman references informed another clinical study.

10  A.      So I testified to something to that effect in my

11  deposition.

12  Q.      Right.  And that next study was the 202 study?

13  A.      The next from 201 is 202, yes.

14  Q.      And by the way, Phase II studies like the 201 and 202

15  studies are routine in drug development; right?

16  A.      So Phase I and Phase II are routine in drug

17  development.  There was nothing routine about the Acorda

18  studies.

19  Q.      The 201 and 202 studies were both Phase II studies;

20  right, sir?

21  A.      That's fair to call them that, yes.

22  Q.      And the Ampyra 202 study tested a stable 4-AP dose of

23  10 milligrams twice daily for 12 weeks?

24  A.      The 20?

25  Q.      2.

Goodman - cross

1   A.      The 202.  Among two other doses, the total of three

2   doses, yes.

3   Q.      Right.  The 10, 15, and 20; right?

4   A.      Yes.

5   Q.      And, ultimately, the results of that study supported

6   the Acorda patents; right?

7   A.      Yes.  In particular, as I pointed out earlier, after

8   the posthoc responder analysis really clarified the data

9   from that study, yes.

10  Q.      And you probably haven't memorized the patent numbers

11  but Example 5 of the '437 patent reports on the 202 study.

12  Does that sound right?

13  A.      (Nodding yes.)

14  Q.      I think you have to say yes or no.  I don't know

15  if --

16  A.      Okay.  Yes.

17  Q.      And in Example 8 of the '826 patent reports on the

18  202 study; right?

19          I'm quoting from your report.  I know you

20  haven't memorized the numbers, but does that sound right?

21  A.      It sounds right.

22  Q.      Okay.

23  A.      I'm counting on you being correct.

24  Q.      Well, counsel will correct me if I'm wrong, I'm sure.

25          The 202 study results are not in the prior art,

Goodman - cross

1    right?

2    A.      The 202 studies are in the patents.

3    Q.      Right.  But the 201 study results were published in

4    the Goodman references and are in the prior art; right?

5    A.      So again, I can't, I can't accept the premise of your

6    question because, as I have said, you know, the abstracts

7    were printed in the meeting announcements and the poster

8    was not an enduring publication, it is an evanescent

9    presentation at the meeting.  So to the extent you call that

10   publications that have the same weight as a peer review

11   journal, you know, that has been published, it's not the

12   same as a publication.  But to the extent that you would

13   accept my explanation and caveats, yes.

14   Q.      All right.  Well, at the time, before 2004, a skilled

15   artisan would know the next step in drug development would

16   be to test at least the 10 milligram 4-AP dose in MS

17   patients for at least two weeks; right?

18   A.      So a person of skill in the art actually only had

19   what was in print, and if they happened to be at either the

20   two meetings where the presentation was or read the

21   abstracts and the announcements, they would have been in

22   possession of some of the data from 201 but not the entirety

23   of the 201 that I was in possession of.

24   Q.      Okay.  But --

25   A.      So the answer is I disagree with that.  A person of

Goodman - cross

1    skill, a person of skill armed with only the knowledge that

2    had been in print, where if they happened to be at those

3    meetings, would not necessarily -- they would have many

4    options and they would still have, I would think, many

5    questions about where to go with, if they were going to do

6    another study.

7    Q.    Well, sir, a skilled artisan in 2004 -- before 2004

8    with knowledge of all the prior art, including the Goodman

9    references, would know that a reasonable next step in drug

10   development would be to test the 10 milligram 4-AP dose in

11   MS patients for at least two weeks; right?

12   A.    So I think a person of skill in the art would have

13   had many options.  And as I already opined, a person of

14   skill might not have chosen 10 milligrams, they might have

15   said let's pick something in the middle.  Let's pick, you

16   know, 20 to 40, let's pick 15 milligrams and study that and

17   only that.  You know, there are many options that a person

18   of skill could have considered given what was in the art.

19           And, again, most of the art talked about higher

20   doses, higher blood levels, titration and so on.  So there

21   were many paths that a person of skill in the art could have

22   chosen.

23   Q.    Okay.  And if the person of ordinary skill in the art

24   chose to test at least the 10 milligram twice daily dose,

25   that would be a reasonable next step; right?

Goodman - cross

1  A.    So 10 milligrams by itself, I don't think -- if you

2  mean reasonable with reasonable expectation of success, I

3  don't think, and I didn't think at the time, that that would

4  have been a smart thing to do.

5  Q.    I didn't say 10 milligrams by itself.  If the person

6  of ordinary skill in the art chose 10 milligrams twice daily

7  as one of the doses for a future study, that would be a

8  reasonable step in light of what was disclosed in the prior

9  art, including the Goodman references; correct?

10  A.    One among many steps that could have been chosen.

11  Yes.

12  Q.    And a person of ordinary skill in the art in December

13  2003 would have been motivated based on the 201 study to

14  design a study along the lines of what became the 202 study,

15  right?

16  A.    So, no.  Because a person of skill in the art

17  wouldn't have had the results of the 201 study beyond what

18  was demonstrated in what's called Goodman in this case.

19  Q.    Let's play your deposition 179, lines 17 to 23.

20        "Question:  And so would a person of ordinary

21  skill in the art in December 2003 be motivated based on the

22  201 study to design a study along the lines of what became

23  the 202 study.

24        "Answer:  Well, I mean, the historical truth is

25  that we did, so yes.

560

Goodman - redirect

1      Was that your testimony, sir?

2  A.    Yeah.  So this is my testimony.

3  Q.    That's all I asked.  Was this your testimony?

4  A.    Yes, of course.

5          MR. KLEIN:  No further questions.

6          THE COURT:  Okay.  Redirect.

7                 REDIRECT EXAMINATION

8  BY MS. BECKER:

9  Q.    Dr. Goodman, first could I have your turn to JTX-104,

10  please, the Schwid reference?

11  A.    Yeah.

12  Q.    Thank you.  And again focusing on the paragraph

13  reporting on the 1994 failed Elan study.  Highlight that.

14  A.    Yes.

15  Q.    I believe in response to Mr. Klein's questioning, you

16  testified that it did not disclose the duration of the

17  study.  Do you recall that?

18  A.    I recall that and I see that I messed up.  It does

19  say six weeks.

20  Q.    And what other details of the study does this report?

21  A.    It reports it was placebo controlled parallel-group

22  defined as either 4-AP or placebo for six weeks, multi

23  center, double-blind, so it was a good description of how it

24  was designed and how it was conducted.

25  Q.    Thank you.  And do the Goodman abstract and

Goodman - redirect

1   presentation report all of the results and data from the F

2   201 study?

3   A.      No.  An abstract is an abstract.  It's -- it's

4   condensed as well as a poster can only show so much on the

5   space given.  And so no, it was a necessarily a partial

6   highlighted report of the methodologic study.

7   Q.      And in the context of the questioning at the

8   deposition that Mr. Klein played for you, it referred to the

9   201 study.  What did you understand the reference to the 201

10  study to refer to?

11  A.      So in the context in which the question was asked in

12  the deposition whereas, you'll recall, I was -- I was both

13  giving testimony as an expert witness, but also as a factual

14  witness, I was talking about what I knew about the 201 study

15  in its entirety, not just what was in the presentation or

16  the abstract.

17  Q.      And what you knew was based on your personal work?

18  A.      On my personal knowledge being the lead investigator

19  of that study and in collaborating with Acorda in designing

20  and implementing and assessing that study over time.

21  Q.      And with whom specifically were you collaborating?

22  A.      With the inventors of the patents in question Cohen

23  and Blight.

24              MS. BECKER:  Thank you.

25              THE COURT:  Doctor, I know you've been up there

Goodman - redirect

1    a while.  I have a few questions for you as well.

2           You talked about the differences in your mind

3    between an efficacy study and a methodological study.  I'd

4    like to better understand why in your opinion it's improper

5    or at least questionable to draw efficacy conclusions for

6    studies focused on methodology.

7           THE WITNESS:  So the particular methodology

8    questions that were here were actually tests of the tests or

9    the outcome issues.  Now, we could have a landmark study

10   with all the bells and whistles as described in the

11   methodology study, so methodology study per se is not meant

12   to be pejorative, but in this context what I meant by

13   methodology was that we were exploring or others were

14   exploring methods to see whether or not it was a signal.

15   But without predefining which method, which tests that

16   you're using is fraught with misinterpretation and the

17   potential for overestimating or incorrectly making

18   inferences, this is what Bever spoke about in his discussion

19   of limitations in the Stefoski and Davis work.

20          And this is why that people of skill in the art

21   look for predesignated or prospectively defined outcome

22   measure or measures or an analytic method that takes into

23   the account the fact that you're testing a whole basket of

24   things and then to happen to find one or two things that

25   work and it looks like it could have happened by chance, but

Goodman - redirect

1    the fact is you actually tested a whole basket full of

2    things, you have to account for that.  You can't just say

3    well, there's only a two percent chance that this could have

4    happened by chance alone, so you actually looked seven

5    different times.

6            So it's really a 14 percent chance you would

7    have to take into consideration that it could happen by

8    chance.  But if you just go by that simple, simple analysis,

9    you can be fooled.  And this is what, you know, Bever talked

10   about and this is why Solari is selective about what they

11   will consider as meaningful evidence for efficacy.

12           THE COURT:  Is it nonetheless possible that even

13   if you're not intending to look for efficacy that your data

14   might reveal something meaningful about efficacy?

15           THE WITNESS:  Yes.  And in fact, looking back,

16   in retrospect you can see that there were signals about,

17   about certain things like that it turned out in retrospect

18   many believe the signals, but a person of skill who is

19   analytic about this realizes that that's not enough to go on

20   until you do further testing to actually see whether or not

21   what you thought was a signal is in fact a real signal, a

22   reproducible -- you know, that's what the art is, is to try

23   and actually find, find through, you know, through rigor,

24   real signals of what -- that there's a real pharmacologic

25   effect.

Goodman - redirect

1            That's what the art of doing clinical trials is,

2    as particular as I discussed.  It's particularly challenging

3    in MS because of all the variability because of all the

4    fluctuations and because of all the propensity for a placebo

5    effect.  So this is why a person of skill always has that in

6    the back of their mind.  How do we know particularly with

7    symptoms that could be effected by a persons state of mind

8    being conscious or otherwise that in terms of effort or

9    because of unconscious impact on their behavior that we're

10   not being fooled?  And so, yes, one could say, aha, there's

11   a signal there, that's interesting, maybe there's something

12   there.  But then you actually have to go out and convince

13   yourself.

14            THE COURT:  One more thing.  You mentioned

15   Solari.  That's also a, you referred to as Cochrane study;

16   is that correct.

17            THE WITNESS:  Cochrane review, yes.

18            THE COURT:  I understand your testimony to be

19   essentially that the intended audience for the Cochrane

20   review is not a POSA.  Did I understand that correctly?

21            THE WITNESS:  If you did, that's not what was my

22   intention, because I think a POSA would take into account

23   what's in a Cochrane review.  I think a POSA would be most

24   interested in a Cochrane review.

25            What I tried to say is that a POSA would not

1    have their hands tied by the evidence based methods that are

2    used in a Cochrane review, which, for example, would include

3    things that I had done that were called Goodman 1, 2 and 3,

4    because they weren't published.

5                THE COURT:  Is there, to your understanding, an

6    intended audience for the Cochrane review?

7                THE WITNESS:  So I think the intended audience

8    is people in the field in which, you know, POSA's, in

9    essence, in the field in which whatever the review is about

10   is addressing.  So it's not exactly the same as what a POSA

11   has, because there's -- it sets less, but I think POSAs are

12   interested and indeed impressed by the evidence-based,

13   systematic and independent review the Cochrane collaboration

14   produces.

15               THE COURT:  Okay.  Thank you.  Any follow up

16   from counsel?  Plaintiffs?

17               MS. BECKER:  I would just like to put the

18   exhibits in.

19               THE COURT:  Okay.  One second.  Any follow up

20   for defense?

21               MR. KLEIN:  No, Your Honor.

22               THE COURT:  Sit tight one more second so that he

23   moves the documents into evidence.

24               MS. BECKER:  To the extent not already admitted

25   I'd like to move into evidence JTX-34, PTX-416, PTX-787 and

```
 1    PTX-330.  And I'd also like to offer the demonstratives.

 2                THE COURT:  All right.  Any objections?

 3                MR. KLEIN:  No objections.

 4                THE COURT:  Okay.  The evidence is admitted and

 5    the demonstratives will be taken as demonstratives.

 6                (Above-referenced exhibits are admitted into

 7    evidence.)

 8                MR. KLEIN:  With regard to demonstratives, they

 9    are DDX 5-1, DDX 5-4, DDX 5-5, DDX 5-6, DDX 5-7, DDX 5-11

10    and I will hand them up.

11                THE COURT:  Any objection?

12                MS. BECKER:  No objection.

13                THE COURT:  The DDX demonstratives will be

14    accepted as exhibits.

15                (Brief recess taken.)

16                   *      *      *

17                (Proceedings reconvened after recess.)

18                THE COURT:  All right.  What is next?

19                MR. COOPER:  Your Honor, before the plaintiffs

20    call their next witness, the defendants have an exhibits

21    objection for that witness.

22                THE COURT:  Okay.

23                MR. STIEFEL:  Your Honor, I left two copies of

24    the exhibits up on the desk there.

25                THE COURT:  By my law clerk here?
```

1          MR. STIEFEL:  Yes.

2          THE COURT:  Okay.  Do you see it?

3          MR. STIEFEL:  Well, that's the demonstratives

4     and that's the exhibits.

5          And that has the exhibit.

6          THE COURT:  The exhibit that is in question?

7          MR. STIEFEL:  Yes.

8          THE COURT:  Okay.  Do you want to pass one up.

9          (Document passed forward.)

10          MR. COOPER:  Your Honor, this is actually three

11    exhibits.  It is PTX-794, PTX-795, and PTX-796.

12          And if Your Honor takes a look at these

13    exhibits, they appear to be Excel spreadsheets.  These are

14    Excel spreadsheets that plaintiffs' next expert, Dr. Bell

15    relied upon in his report.  However, they have not been

16    admitted into evidence yet in a trial.

17          We don't expect Dr. Bell to be able to lay a

18    foundation for those exhibits for admission because we have

19    already asked him about them at his deposition.  He was

20    unaware of where they came from, other than they came from

21    Acorda.  He could not identify when they were created, who

22    created them or if, most importantly, whether or not they

23    were created for the sole purpose of this litigation.

24          And so for that reason, we have objected to them

25    based off of hearsay grounds, and so we would ask that they

1   not be admitted into evidence.

2           THE COURT:  All right.  What is the response?

3           MR. STIEFEL:  Your Honor, the nature of

4   financial information these days is that you can't just look

5   in somebody's files and find a piece of paper and pull it

6   out.  And so the nature of the information, that has to be

7   generated upon request.

8           We, at Dr. Bell's request, we did get from, we

9   did request from Acorda and got these documents from the

10  Executive Director of Accounting, and from the Senior

11  Director of Commercial Operations at Acorda.

12          We had not planned to bring them as witnesses

13  to describe the fact that they had produced these in the

14  ordinary course of their work, but they were prepared for

15  the litigation, and we asked for data on sales and unit

16  sales and profit and loss with respect to the product and

17  they provided it as part of their duties.

18          THE COURT:  But first off, Dr. Bell, you don't

19  envision will be able to testify to that today?

20          MR. STIEFEL:  Well, I don't think he will be

21  able -- he will be only be able to testify to the fact that

22  he asked counsel to get the documents from Acorda.  We do

23  have a declaration from the Director of Litigation who -- at

24  Acorda who directly requested those, which identify the

25  people that he requested it from and the fact that they

1    provided it, provided the information in the course of their

2    duties.

3            THE COURT:  But how is it that we're ending up

4    at trial and they have an objection, and let's assume

5    everything you told me is correct.  I have no reason to

6    doubt it.  Evidently, you are not able to prove that with

7    admissible evidence at trial.  Is that the situation?

8            MR. STIEFEL:  Well, the situation is that, when

9    Your Honor says how did we end up here at this point?  They

10   objected I think to essentially -- this might be a slight

11   overstatement but only a slight overstatement.  They

12   objected to every document on our exhibit list.  And so

13   until we got to trial, there was no way to know which

14   exhibits they were actually objecting to and which exhibits

15   we had to undertake to prove at trial were what we said they

16   were.

17           And so they put us in a position where these

18   documents they're pressing their objections to, they dropped

19   their objections to I think essentially everything else.

20           I suppose we could have these people come in and

21   testify to that, but I don't know that that is what happens

22   in the ordinary course.  I mean my experience has been that

23   experts of the sort who are testifying on commercial success

24   are going to rely on commercial data that they get from the

25   client, and they're not going to -- and you don't have the

1    people who actually pulled the numbers off the computer come

2    in to testify in support of that.

3            But if that is what is required, I suppose we

4    could try to make that happen tomorrow.

5            THE COURT:  Thank you.  What is the reply?

6            MR. COOPER:  Your Honor, there is a couple

7    issues here.

8            One is just looking at the face of these

9    documents, this is the problem is there is just no

10   foundation, it is just numbers on a spreadsheet, which is

11   exactly why we -- I asked him during his deposition these

12   questions.  So they were on notice that this is clearly of

13   interest to us.  We objected to them timely in the pretrial

14   order, and now we're raising them as they're trying to

15   introduce them into evidence.  So to the extent --

16           THE COURT:  Is it true that you all objected to

17   almost every document on their exhibit list?

18           MR. COOPER:  I think both sides objected to a

19   number of documents.  (Nodding yes.)

20           MR. STIEFEL:  (Standing up.)

21           THE COURT:  I'll give you another chance in a

22   minute.

23           MR. COOPER:  Part of the issue is that the

24   actual numbers, the internal, the fact that our experts says

25   where are these internal numbers for these, all of these

1    costs.  That is an issue between the two experts, and the

2    fact that Dr. Bell has no foundation for these documents is

3    an issue.  And I think it's been an issue since the

4    deposition and we raised the question.

5              THE COURT:  All right.  Thank you.

6              Mr. Stiefel.

7              MR. STIEFEL:  Well, as I understand it, we

8    objected to somewhere between 10 and 20 percent of their

9    documents initially.  Obviously, we have to press those to

10   the extent that we haven't objected.

11             My understanding and recollection is that they

12   objected to 80 percent of our documents.  And so the idea

13   that, well, we knew this was an issue, we knew because they

14   timely objected, essentially they, from my point of view,

15   made a mockery of the pretrial order and hid whatever real

16   objections they had among dozens and dozens and dozens of

17   objections that they had no intention of pressing.

18             THE COURT:  All right.  Well, I'm not going to

19   rule on the objection right now, but I am going to let the

20   witness testify as if the document is in evidence and as if

21   it is coming into evidence.

22             We'll keep the record open.  I'd like an update

23   tomorrow morning after you all meet and confer in light of

24   what is happening today.

25             Ultimately, it may be that we have to keep the

1    record open beyond tomorrow.  It may be that the witnesses

2    show up tomorrow to authenticate the documents and they get

3    admitted.  It may be that all you have to brief this along

4    with briefing the merits of the case and I have to make a

5    ruling later.

6              But I assume the witness is here, we're ready

7    to hear his testimony.  I don't think there is any unfair

8    surprise whatsoever to the defendants.  And if I have to

9    make a decision, I will certainly consider the full context

10   and would like to be further enlightened on the full context

11   as to how each side has handled their objections to the

12   admission of documents and whether or not the plaintiffs

13   should have anticipated being in this situation today.

14             Are there any other issues from the defendants?

15             MR. COOPER:  No, Your Honor.

16             THE COURT:  All right.  You may call your

17   witness, unless there is something else.

18             MR. STIEFEL:  Thank you, Your Honor.  The

19   plaintiffs call Dr. Gregory bell.

20              ... GREGORY KNOX BELL, having been first duly

21   sworn, was examined and testified as follows ...

22             THE COURT:  Good afternoon, Dr. Bell.  Welcome.

23             THE WITNESS:  Good afternoon.

24             THE COURT:  You may proceed.  Thank you.

25

Bell - direct

1                      DIRECT EXAMINATION

2      BY MR. STIEFEL:

3      Q.      Good afternoon, Dr. Bell.

4              How are you currently employed?

5      A.      I am a Group Vice President at Charles River

6      Associates.

7      Q.      And what is Charles River Associates?

8      A.      It's a global economics and management consulting

9      firm.

10     Q.      And how long have you been employed by Charles River

11     Associates?

12     A.      I believe since 1992.

13     Q.      And can you describe your post-high school education?

14     A.      So I have a Bachelor of Arts with highest honors from

15     Simons Fraser University, major in Business Administration,

16     minor in Economics.

17             I have a charter accountancy.  I'm a chartered

18     accountant in Canada, the same thing as a CPA here in the

19     U.S.

20             I have as master's in Business Administration

21     with high honors from Harvard University and a Ph.D. in

22     Business Economics, also from Harvard University.

23     Q.      And when did you receive your Ph.D.?

24     A.      1992.

25     Q.      Would you describe your current job responsibilities

Bell - direct

1    at Charles River?

2    A.    Well, I have some admin responsibilities as a Group

3    VP.  Four practices report to me:  Energy, Auctions,

4    Transfer Pricing, and Life Sciences.

5              I'm also the global head of the Life Sciences

6    practice.  And as a practice, we do work in strategy,

7    launching products, pricing products, marketing strategy

8    issues, competitor response, how payors respond to the

9    introduction of new drugs, how physicians respond, patient

10   patients respond, et cetera.

11             I do a little work in policy, particularly

12   around creating an environment for research and development

13   in pharmaceuticals, reimbursement of pharmaceuticals, et

14   cetera, and this kind of litigation work.

15   Q.    And have you done any work specifically with respect

16   to multiple sclerosis products?

17   A.    Yes, I have.

18   Q.    Can you elaborate?

19   A.    Sure.  I've done a couple of strategy assignments.

20   One with one of the major manufacturers in the multiple

21   sclerosis space in terms of how they position their

22   portfolio of MS drugs on a global basis.  So they've got

23   several products, and how they go to market with those

24   products, work with payers, work with physicians work with

25   patient advocacy, et cetera.

Bell - direct

1          Another project, there is about to be introduced

2     a new disease modifying therapy in the MS space.  And the

3     issue is how do we anticipate that product is going to be

4     launched and priced and marketed.  And then how would we

5     anticipate, what would we propose that the client do in

6     response to that launch?

7          With respect to litigation, regulatory type of

8     assignments, I have appeared before the Patent Medicines

9     Price Review Board in Canada regarding the pricing of

10    Copaxone, which is a disease modifying therapy used in MS.

11         And I am also an expert witness in commercial

12    success issue with respect to Copaxone 40, which is a thrice

13    weekly administration of the product.

14    Q.    Have you, in the course of your work, written

15    articles and made presentations regarding the economics of

16    the pharmaceutical industry?

17    A.    Sure.  Yes.

18    Q.    And have you been accepted by federal courts as an

19    expert with respect to the economics of the pharmaceutical

20    industry?

21    A.    Yes, I have.

22    Q.    Would you turn in your exhibit book to JTX-38?

23    A.    Okay.

24    Q.    And can you identify JTX-38?

25    A.    Yes.  This is my CV presumably as of the time of my

Bell - direct

1    reports in this case.

2    Q.    And does your CV include more details regarding your

3    professional experience and qualifications?

4    A.    It does, yes.

5            MR. STIEFEL:  Your Honor, plaintiffs at this

6    time offer Dr. Bell as an expert in the economics of the

7    pharmaceutical industry.

8            THE COURT:  Is there any objection?

9            MR. COOPER:  No, Your Honor.

10           THE COURT:  Okay.  He is so recognized.

11           MR. STIEFEL:  Thank you, Your Honor.

12   BY MR. STIEFEL:

13   Q.    Doctor Bell, what were you asked to do in connection

14   with this case?

15   A.    I was asked to assess the commercial success of

16   Ampyra as a secondary indicator of nonobviousness with

17   respect to the patents-in-suit.

18   Q.    What sorts of documents did you review in arriving at

19   your opinions?

20   A.    Well, that's sort of standard types of documents.  It

21   would be financial information about the product, sales

22   information, marketing strategy, brand strategy plans,

23   journal advertising, advertising that may be done with

24   respect to patients, market research results for the

25   product.  That kind of thing.

Bell - direct

1    Q.      And how do you understand commercial success relates

2    to the obviousness or nonobviousness of a patent?

3    A.      So in -- when I'm opining on commercial success as a

4    secondary indicator of nonobviousness, it's about two

5    aspects; one is was there a market opportunity for the

6    product.  And the idea is, from an economics perspective,

7    is that the market abhors a vacuum.  So if there's an

8    opportunity in the marketplace for a product and it's

9    obvious what that product is, one would expect that product

10   to be introduced.  And so when I'm looking at commercial

11   success as a secondary indicator of nonobviousness, the

12   issue is was there market opportunity, and then was that

13   market opportunity due to the patented attributes.  That's

14   the next us issue.  Or was the market opportunity due to

15   other stuff.  And so it's those two aspects, assessment of

16   the market opportunity and then assessing how closely that

17   market opportunity was tied to the patent attributes.

18   Q.      And have you formed an opinion as to whether Ampyra

19   in that context is a commercial success?

20   A.      I have, yes.

21   Q.      And what is your opinion?

22   A.      It is my opinion that Ampyra is a commercial success

23   as a secondary indicator of nonobviousness with respect to

24   the patents-in-suit.

25   Q.      And does that relate both to profitability and nexus?

Bell - direct

1    A.     Yes, it does.  So you know, at a high level the

2    product has earned, or has realized more than $1.7 billion

3    in sales just in the US.  My understanding of the

4    contribution to the profits Acorda is in the neighborhood

5    of a billion dollars, again, just considering the US, so

6    there's clearly a market opportunity for this product.  And

7    the product is 10 milligrams of a sustained release 4-AP

8    dosed twice daily for the improvement of walking in MS

9    patients.  That's what it's approved for.  That's what the

10   clinical trials in Phase 3 were designed to do.  That's how

11   Acorda markets the product.  That's why payors, you know,

12   managed care organizations pay for the product.  That's why

13   physicians prescribe it and that's why patients use it.

14   Q.     Have you prepared a set of slides to assist you in

15   providing your opinion today?

16   A.     Yes.

17   Q.     Could we turn to the first of those slides, PDX

18   6-001?  Doctor Bell, can you explain what you've depicted on

19   Slide PDX 6-001?

20   A.     So it's basically two different depictions of sales.

21   The blue line is read off the blue axis.  And that's showing

22   tablet sales or unit sales of Ampyra in the US marketplace

23   going from 8 million tablets in 2010, so the product was

24   launched in March 2010, to 16.6 million tablets for 2015.

25   And then the green line which you read off the right-hand

Bell - direct

1    side, green scale, showing the annual net sales, so they're

2    net of any price discounts or anything like that.  The

3    annual net sales going from 133 million in 2010 up to 437

4    million in 2015.  Again, this just being the US sales.  So

5    you can see on the left, I called out the growth rates.  20

6    percent per year in dollar sales, 8 percent per year in

7    tablet sales indicating again a significant market

8    opportunity for the product.

9    Q.    And what were the total net sales as you understand

10   it over the course of the life of the product through the

11   end of 2015?

12   A.    So total net sales of Ampyra in the US is 1.8 bill

13   through 2015, $1.7 billion.

14   Q.    And let me just ask you, since the issue of the

15   documents has come up, to look briefly at PTX-794, 95 and

16   96.

17   A.    Okay.

18   Q.    Okay.  And are those spread sheets to include

19   financial data that you relied on in part in preparing PDX

20   601?

21   A.    Yes, that's correct.

22   Q.    And can you tell me how you came to obtain that

23   information?

24   A.    Well, these documents were produced to me by counsel

25   or actually they came to me as Excel files, so

Bell - direct

1    electronically in response to my request for financial

2    information regarding the performance of the product --

3    well, financial and marketing information regarding the

4    performance of the product.  And as such it's information

5    similar to information I see in my regular consulting

6    activities in terms of product performance, considerations

7    of unit sales, considerations of WAC pricing, et cetera.

8    Q.     And is this information similar to the kind of

9    information you rely on generally in opining in litigations

10   with respect to the issues of obviousness of commercial

11   success?

12   A.     Yes, it is.

13   Q.     How does the data that's reflected on PDX 6-001 bear

14   on your opinion that Ampyra is a commercial success?

15   A.     Well, as I said, I mean, it's indicating significant

16   sales opportunity, so we're talking about $1.7 billion of

17   sales just in the US, Sales that are increasing each year,

18   says that were actually able to sustain significant price

19   increases and still continue to grow unit sales.  All of

20   this is indicating demand for the product, demand for the

21   product even after patients have tried it, so physicians are

22   continuing to prescribe it, payors are continuing to

23   reimburse for it, patients are continuing to use it

24   presumably because it's working for the ones who continue to

25   use it.

Bell - direct

1    Q.     Can we turn please now to PDX 6-002?  Can you explain

2    to us, Dr. Bell, what's reflected on this slide?

3    A.     Well, this is just picking up the net income or the

4    product contribution of Ampyra with respect to US sales to

5    Acorda.  So it's based on net sales, less cost of sales,

6    less what I understood to be the incremental selling,

7    general and administration costs that were allocated against

8    those sales numbers.

9    Q.     And that totals from 2010 through the end of 2015

10   about a billion dollars?

11   A.     Right.  You start off in 2010 at a loss position, not

12   unusual for the launch of a new pharmaceutical to result in

13   losses in that first year.  Obviously physicians have to be

14   made aware of the product, there's launch expenditures, et

15   cetera, but then net income climbs quite rapidly for the

16   product and over the course of time just based on the US

17   sales of the product, between it's launch in March of 2010

18   through the end of 2015, we're talking about a build product

19   contribution opportunity.

20   Q.     Can we turn now to PDX 6-003?  Can you tell me what

21   is reflected on this slide, Dr. Bell?

22   A.     Sure.  So Acorda licensed Dalfampridine to Biogen

23   Idec, which is another manufacturer in the MS space.  And

24   Biogen Idec has the rights to commercialize dalfampridine

25   outside the U S.  Outside the US it tends to be called

Bell - direct

1    Fampyra rather than Ampyra and Biogen Idec paid 110 million

2    up front for the rights to license the product and

3    commercialize it outside the US.  In 2011 there was a

4    milestone payment paid to Acorda and there's an expectation

5    of at least an additional 15 million in milestone payments

6    and then there's, in addition, double-digit -- described as

7    double-digit tiered royalties on the sales of fampridine

8    that will Biogen Idec makes to Acorda, based on its

9    international sales of the product.  And there could be an

10   additional 365 million of additional milestone payments.  So

11   to date Acorda has received an extra $135 million that was

12   not related to the, for instance, the product -- the product

13   contribution of a billion dollars that I showed on the

14   preceding page.  That was all based on results from the US

15   sales.  This is going to be sales outside the US.

16   Q.    And how, Dr. Bell, do sales outside of the US bear on

17   the question of commercial success?

18   A.    Well, from the standpoint of commercial success as a

19   secondary indicator of nonobviousness, from an economics

20   perspective it doesn't really matter where the sales may

21   occur.  The issue would be that if the innovation were

22   obvious, then somebody else would be practicing it.

23   Somebody else would have introduced a product like this

24   outside the US and there'd be no need for Biogen Idec to pay

25   a significant upfront payment for the rights to

Bell - direct

1   commercialize Fampyra outside the US.

2   Q.      And would you -- could we look again briefly at PDX

3   6-001?  And at the bottom you've identified the documents

4   that you've relied on, correct?

5   A.      Yes.

6   Q.      And so did you rely on -- and I think this applies

7   through the first three slides that we looked at.  Have you

8   relied on PTX-528A, 542, 794, 795, 796 and JTX-12, 13, 14,

9   15, 16, 733 and 76 for the data reflected on the slides?

10  A.      Sure.  It was PTX-733 and JTX-76, but yes.

11  Q.      Okay.  Thank you for that.  What's your understanding

12  of the invention claimed in the '938 Masterson patent?

13  A.      So it's my understanding that the Masterson patent

14  reads on mono and diaminopyridines which would be a

15  sustained release versions of which would be used to treat

16  neurological diseases, an example of which would be multiple

17  sclerosis.  So 4-AP is one of these mono or

18  diaminopyridines, sustained release of which would be

19  covered in the Masterson patent.

20  Q.      And what's your understanding with respect to the

21  invention claimed in the Acorda patents, and by that I mean

22  the four other patents in the suit besides the '938?

23  A.      So I understand that relate to the dosing, i.e.,

24  twice daily dosing of 10 milligrams of sustained release

25  4-AP and then for the indication, i.e., to improve walking

Bell - direct

1    in afflicted MS patients.

2    Q.    And do you have an understanding as to whether all of

3    those patents, meaning all five of the patents, have or

4    contribute to the commercial success of Ampyra?

5    A.    Sure.  It's my understanding that the Masterson

6    patent relates to the sustained release version, and then

7    the Acorda patents relate to the dosing, twice daily 10

8    milligrams.  And the indication or the reason for taking it,

9    being walking improvement in MS patients.

10   Q.    Can we turn now to PDX 6-004?  Can you tell me what

11   you've put on this slide?

12   A.    So this is an excerpt from the approved label and,

13   you know, the label for a pharmaceutical, particularly a new

14   ethical pharmaceutical wear ethical is defined as one that

15   requires a prescription, new meaning one after the FDA came

16   into being, et cetera, requires presentation of information.

17   And here it's presenting the information from the pivotal

18   Phase 3 clinical trials of Ampyra showing the dosing, 10

19   milligrams twice daily and showing the efficacy consequence,

20   in terms of improvements in walking as measured by the T25FW

21   which is the timed 25-foot walk.

22   Q.    And how does this bear on your opinion?

23   A.    Well, this really goes towards that nexus issue.

24   Basically without FDA approval, you can't have sales of a

25   new ethical pharmaceutical in the U.S.  Without the sales,

Bell - direct

1    you don't have the profits that I was talking about earlier.

2              So this issue of the clinical trials being

3    10 milligrams of sustained release 4-AP dose twice daily to

4    generate improvements in walking, all of which were the

5    patented attributes as I understood it, is essential to

6    Ampyra, the product, and to the commercial success that it

7    has enjoyed.  So it's clearly that nexus between the

8    marketplace opportunity and the patented attributes.

9    Q.    Let's turn to PDX-6-005.

10             Can you tell me what is reflected on this slide?

11   A.    So here I'm looking at some of those market research

12   results, looking at physicians and how they respond to

13   Ampyra and patients and how they responded to Ampyra.

14             In each case, it had to do with the improvements

15   in walking.  It's indicating, for instance, physicians in

16   2011, 87 percent describing themselves as moderately or

17   highly satisfied with Ampyra.

18             Patients, 83 to 87 percent reporting moderately

19   to extremely satisfied with Ampyra.

20             Now, I want to be clear, these aren't

21   satisfaction ratings that are going to end up being

22   maintained because Ampyra isn't for every MS patient; and

23   even for those with walking difficulties, it won't

24   necessarily work for all of them.  But it does work for

25   many of them, as we can see in the bottom panel there.

Bell - direct

1          In 2012 and 2013, the persistent patients on

2    therapy accounted for 78 percent and 76 percent of annual

3    revenue, and that is basically meaning these are patients

4    that tried the product and continued to fill prescriptions.

5          Their physicians have continued to write the

6    prescription for the product.

7          And the managed care organizations or the payers

8    have continued to reimburse the prescription, presumably

9    because it's having a positive effect on the patient.

10   Q.    And is it fair to say that Ampyra works well enough

11   that a number of generic companies want to market copies of

12   it?

13   A.    Well, that would appear to be the case.  I mean I

14   assume that is why we're here.

15   Q.    And how do the prescriber and patient responses to

16   the product bear on your opinion?

17   A.    Well, again, it's getting at what is the reason

18   that the marketplace opportunity existed.  And here, it's

19   apparent that the reason for the opportunity existing is

20   because of this benefit that Ampyra has with respect to

21   improved walking.  That's why physicians are prescribing the

22   product, why patients are using the product, and why payers

23   agree to reimburse the product.

24   Q.    Are you relying on PTX-547, 549, 556, 579 and 604

25   with respect to information on this slide?

Bell - direct

1    A.      Yes, I believe that is correct.

2    Q.      Can we turn now to PDX-6-006.

3            And can you explain what is set forth on this

4    slide?

5    A.      Sure.  The previous slide talked about physician

6    reaction and patient reaction.  This slide talks about the

7    sort of third leg of the stool in healthcare which is the

8    payer reaction, here, calling out three significant managed

9    care organizations and summarizing their what are called

10   prior authorization requirements.

11           And the basic idea is, you know, before the

12   managed care organization or the insurer will agree to

13   reimburse the prescription, these organizations are

14   requiring demonstration of the fact that the patient has a

15   walking impairment and that they have MS.

16           You can see Blue Cross-Blue Shield of Michigan.

17   Not only that, but in order to get the prescription renewed

18   so that the patient continues to take the product, the payer

19   continues to pay for it, they must show a significant

20   improvement in that test of walking ability, i.e., the timed

21   25 foot walk.

22   Q.      And is this information similarly supportive of your

23   view of the nexus issue?

24   A.      Yeah.  Again, it's showing, well, managed care

25   organizations, you know, payers are not going to reimburse

Bell - direct

1    every product out there.  Here, we're seeing examples of

2    barriers in some sense that had been put in place such that

3    Ampyra is only being prescribed to those patients which

4    might be expected to benefit from it.  And the benefit from

5    it is the improvement in walking as indicated in the patents

6    at issue.

7    Q.    Dr. Bell, are you relying on PTX-543, 603 and 664

8    with respect to the information set forth in this slide?

9    A.    Yes.  I believe that is correct.

10   Q.    Can we now turn to PDX-6-007.

11         Can you tell us, Dr. Bell, what is reflected on

12   this slide?

13   A.    So here I'm looking at what is it that Acorda

14   actually markets when it goes out into the market and talks

15   with physicians, for instance, or the sales reps go out in

16   the market and talk to physicians about Ampyra.

17         And, first, in the pharmaceutical industry,

18   promotion is restricted based on approved indications, by

19   and large.  There are some exceptions.

20         And so the marketing materials talk about the

21   improved indication, which is based on the patent attributes

22   being walking improvements in patients with MS.

23         The clinical information, the only MS therapy

24   indicated to improve walking as proven in two randomized

25   well controlled clinical trials.

Bell - direct

1           And then talking about the actual messaging.

2    The first two are sort of tag lines from advertisements,

3    journal ads, for instance, or sales materials that

4    physicians would have.

5           And it's, think about improving your patients

6    walking with Ampyra, think MS.  Think walking, think Ampyra.

7    So it's the way that Acorda is marketing Ampyra goes

8    directly to the patented attribute of improving walking in

9    MS patients.  And as the last one, last point talks about

10   marketing the product as the walking pill.

11   Q.     And are you relying on JTX-99, PTX-111, 115, 116,

12   121, 556, 566, and 586 for the information in this slide?

13   A.     Yes, I believe that is correct.

14   Q.     Can we turn now to PDX-6-008.

15          Can you tell me Dr. Bell what is shown on

16   PDX-6-008?

17   A.     So here, this is an example of an advertisement

18   targeted at patients as opposed to the preceding slide which

19   is mostly focused on physicians.

20          Here, this is a web page and a banner.  And my

21   sense of what it is trying to do is trying to drive home to

22   patients how improvements in their ability to walk might

23   affect their what we call ADL, activities of daily living.

24          So it's talking about walking the child to

25   school or walking to your favorite park or not having MS

Bell - direct

1    slouch you down so you can't walk with friends, et cetera.

2              And, again, this is how emblematic how Acorda is

3    marketing Ampyra to patients focusing on those patented

4    attributes.

5    Q.     Do you rely on PTX-119 for the information contained

6    in this slide?

7    A.     Yes, that is correct.

8    Q.     Can we turn now to PDX-6-009.

9              And can you tell me briefly what is reflected in

10   this slide?

11   A.     Well, here I'm making the point that Acorda has not

12   marketed Ampyra overly aggressively.  I reviewed other

13   documents showing that Ampyra has been detailed to

14   physicians about as often as some of the other disease

15   modifying therapies that are used in MS.

16             Here, we see sales on the green line going

17   from $133 million back in the launch year in 2010 up to the

18   $437 million, but over that time, the SG&N, the selling

19   general and administrative expenses, the incremental ones

20   that the company has allocated to Ampyra have declined over

21   time, and it certainly declined as a percent of sales.  So,

22   in other words, we're not seeing the sales increases

23   happening because marketing expenses are ramping up in a

24   significant way over time.

25   Q.     Can we turn now to PDX-6-010.

Bell - direct

1           And can you tell us, Dr. Bell, what is reflected

2      on this slide?

3      A.    Well, what is reflected here is only part of what I'm

4      hoping will be reflected.  Yes, there we go.

5           So in 2010, there was 100 sales reps that Acorda

6      had for Ampyra, looking at 5,500 physicians.  We talk about

7      targeting physicians.  So who are the physicians they're

8      going to call on in the U.S., 5,500 of them.

9           In 2012 to 2015, the number of sales reps

10     actually declined so it's only 90 sales reps.  And their

11     reach has broadened so instead of just going after 5,500,

12     they're now going after 7,000 physicians.  So 10 percent

13     fewer reps calling on 27 percent more physicians.

14          The physicians are getting, each individual

15     physician is getting called on less often.  And this just

16     feeds into the idea that the sales increases that obviously

17     observed from 2010 through 2015 haven't come about as a

18     result of overly aggressive marketing.

19     Q.    And, Dr. Bell, are you relying on PTX-528B as well as

20     some other exhibits we have already mentioned for the

21     information reflected on this slide?

22     A.    Certainly, PTX-528B.  Yes, I got it, and I can't

23     recall whether we mentioned the previous slide or the other

24     slides.

25     Q.    I hope so.  Can we turn now to PDX-6-011.

Bell - direct

1          And can you tell me what is reflected on this

2     slide?

3     A.    Well, here I'm looking at another reason typically

4     that folks assess in terms of commercial success.  You know,

5     has the product sold so much because it's particularly low

6     priced.  And what we see here is the net price per tablet

7     going from $17 in 2010 up to about $26 in 2015, so a

8     significant increase in price per tablet over time, and yet

9     tablet sales have continued to grow.

10          So, again, this is indicative of demand for the

11    product that increases in the price per unit are not leading

12    to decreases in total unit of unit sales but actually

13    progressively increasing total unit sales.

14    Q.    Dr. Bell, I think we can take down the slide.

15          Have you reviewed Dr. McDuff's report?

16    Dr. McDuff being the expert for the defendants on the

17    commercial success issue.

18    A.    Yes, I have.

19    Q.    And have you reviewed his deposition testimony in

20    this case?

21    A.    Yes, I did.

22    Q.    Have you seen that Dr. McDuff uses comparisons of the

23    sales of Ampyra to various other products in reaching his

24    opinion?

25    A.    Yes, that is correct.  That is certainly part of it.

Bell - direct

1    Sure.

2    Q.    And do you have a view as to whether Dr. McDuff is

3    correct in comparing the sales of Ampyra to the sales of

4    other products in determining in fact Ampyra is a commercial

5    success?

6    A.    Well, again, I'm looking at commercial success as a

7    secondary indicator of nonobviousness.  I don't take issue

8    with the numbers and the comparisons that Dr. McDuff has

9    presented.  I think some of them might be global sales

10   rather than just U.S. sales.

11         But the point isn't has Ampyra been as successful

12   as some other products, some other CNS products -- central

13   nervous system -- some other MS products, other orphan drugs,

14   the point is was there market opportunity for this product.

15   It's not was Ampyra as successful or more successful than

16   others in the marketplace, it's, nonetheless, was there market

17   opportunity for this product?

18         And in my considered opinion, yes, there was.

19   It was a market opportunity that is generated $1.7 billion

20   in U.S. sales alone.  It's a marketplace opportunity that

21   appears to have generated a billion dollars in product

22   contribution to Acorda.

23         And are there products that are more successful

24   than that?  Absolutely there are.  But that is not the issue

25   with respect to -- in my consideration, that is not the

Bell - direct

1   issue with respect to commercial success as a secondary

2   indicator of nonobviousness for the product or for the

3   patents in suit.  There, it is about was there a marketplace

4   opportunity?  And I think it is quite evident that there

5   absolutely was.

6   Q.     Do you further understand that Dr. McDuff plans to

7   opine that Ampyra is not a profitable from some sort of

8   overall economic perspective?

9   A.     Yes, that is my understanding certainly of what he

10  said in his report, at least.

11  Q.     And what is your response?

12  A.     Well, I think there are a couple of things to look

13  at.

14          One is the sort of foundation, as I understand

15  it, of Dr. McDuff's opinion is based on research and

16  development costs.  And what he does is take studies that

17  have been done about the cost of research and development in

18  the pharmaceutical industry and compare that to the profits

19  using the same information that I used of Ampyra for Acorda.

20          And there is sort of two major issues with the

21  way I believe he has approached it:

22          First, the issue again is nonobviousness.  So

23  the alternative is that the innovation is obvious.  If the

24  innovation is obvious, there are certainly costs that must

25  be incurred in order to bring that innovation to market.  An

Bell - direct

1    obvious innovation isn't a costly one.

2              But Dr. McDuff talks about total R&D costs being

3    approximately in the neighborhood of $2.5 billion.  But the

4    primary driver of that is because on average in the

5    pharmaceutical industry, only 12 percent of the products

6    that start clinical trials, you know, Phase I, Phase II,

7    Phase III, only 12 percent of those products make it to

8    market.

9              But if it's an obvious innovation, it's obvious

10   that it is going to make it to market.  It is going to have

11   a meaningful effect on walking improvement in MS patients.

12   There aren't going to be significant adverse side effects.

13   And so one doesn't need to account for those kinds of

14   failures.

15             And when you look at it that way, those R&D

16   costs for what might be considered an obvious innovation

17   drop to say somewhere in the neighborhood of $300 to

18   $500 million.

19             Secondly, 4-AP is not a new chemical entity out

20   there.  It's been known for decades.  So basic research in

21   terms of identifying a potential compound didn't have to

22   happen.  Basic development in terms of isolating that

23   compound didn't have to happen.

24             A lot of what we call the preclinical costs,

25   i.e., before you get to testing in humans, didn't have to

Bell - direct

1    happen because the product was well known and had been well

2    known for decades.  And so those costs that Dr. McDuff

3    actually includes, because they are included as part of

4    standard R&D costs in the pharmaceutical industry, would

5    never have been incurred with respect to the innovations

6    that we're talking about today.

7              So those preclinical costs tend to be in the

8    neighborhood of 30 to 45 percent of total R&D costs.  You

9    take those out, you are talking about a reduction of a

10   billion dollars.

11             In addition, there is a study out there that

12   says that orphan drugs have a higher success rate than,

13   quote-unquote, "regular products."  Tend to be about double

14   the success rate of regular products.

15             Dr. McDuff uses success rate of regular

16   products.

17             One might suggest it might more appropriate to

18   use a success rate for orphan drugs.  If you did that, that,

19   too, drops a billion dollars out of the costs that Dr.

20   McDuff is considering.

21             And so I look at it on a couple of different

22   fronts:

23             One.  If the innovation is obvious, you are

24   expecting $300 to $500 million max in costs, and that is

25   absolute max because that also include preclinical costs.

Bell - direct

1    And to imagine that just that amount of investment, one

2    isn't making a billion dollar profit opportunity in U.S., or

3    an opportunity to sell $1.7 billion of product doesn't make

4    sense.

5              Secondly, there is the issue that all of those

6    calculations are based solely on the U.S. sales of the

7    product.

8              The product is sold globally.  Biogen Idec has

9    got approvals for the product throughout Europe, and I

10   believe Asia and Canada.  And so none of the returns from

11   those opportunities are being included, are being

12   considered, rather, by Dr. McDuff in reaching his

13   conclusion.  And when you do consider those, obviously that

14   only increases the value of the marketplace opportunity

15   associated with the innovations that are dalfampridine.

16             MR. STIEFEL:  Thank you, Dr. Bell.

17             I have no further questions.

18             I would move some exhibits into evidence.  I

19   will skip the exhibits that are in dispute.

20             They are JTX-12, 13, 14, 15, 16, 38, 76, 99; and

21   PTX-111, 115, 116, 119, 121, 528A, 528B, 542, 543, 547, 549,

22   556, 566, 579, 586, 603, 604, 664, and 733.

23             THE COURT:  Is there any objection to any of

24   those?

25             MR. COOPER:  No objection to those.

Bell - cross

1        THE COURT:  Okay.  Those are all admitted.  And

2   as I said before, you can update me tomorrow on the status

3   of the three that are objected to.

4        MR. STIEFEL:  Thank you, Your Honor.

5        (Above-listed exhibits are admitted into evidence.)

6        THE COURT:  Cross-examination.

7        MR. COOPER:  Your Honor, again, Bryce Cooper on

8   behalf of Teva, Apotex, and Roxane.  I'll be questioning the

9   witness on behalf of all the defendants.

10                    CROSS-EXAMINATION

11  BY MR. COOPER:

12  Q.    Good afternoon, Dr. Bell.

13  A.    Good afternoon.

14  Q.    Dr. Bell, when you were not serving as an expert

15  witness in litigation, you also do strategy consulting work

16  in the life sciences industry, correct?

17  A.    Yes.

18  Q.    And that includes consulting with pharmaceutical

19  companies about whether developing a potential drug product

20  presents what you've called a marketplace opportunity,

21  correct?

22  A.    Sure, yeah.

23  Q.    And drug companies seek your expertise because while

24  it may be technically feasible to develop a drug, there

25  might not be any economic incentive to do so, correct?

Bell - cross

1   A.      Yes.

2   Q.      And as an expert here, when you were performing a

3   commercial success analysis, you were also assessing whether

4   or not there were economic incentives to develop a product

5   back at the time of the alleged invention, correct?

6   A.      Yes.  Yes, that's my understanding.

7   Q.      And you've also referred to this as assessing again

8   whether there was a marketplace opportunity, right?

9   A.      Sure, yeah.

10  Q.      Now, you showed us during your direct a slide of what

11  you said is Ampyra's net income growth.  Can we bring that

12  up?  And counsel pointed you to your source for this,

13  PTX-795, right?

14  A.      Correct.

15  Q.      And this refers to an excel spread sheet, correct?

16  A.      Yeah, that's how it was produced to me.

17  Q.      And you said you rely on a few different spread

18  sheets for your calculations in both your first and second

19  slide that you showed us today, right?

20  A.      Yes, yeah, that's right.

21  Q.      But you didn't create those spread sheets, correct?

22  A.      Correct.

23  Q.      Acorda created those spread sheets?

24  A.      I believe so, yes.

25  Q.      And you don't know who at Acorda created them,

Bell - cross

1    correct?

2    A.    Yes, that's correct.

3    Q.    Or when exactly they were created, correct?

4    A.    Obviously before I got them, but beyond that, no, I

5    don't really know.

6    Q.    You don't know whether Acorda created them for the

7    purposes of this litigation, correct?

8    A.    I don't know one way or the other.

9    Q.    Let's talk about what goes into this $999 million

10   figure you have here.  Now, from a general accounting

11   definition, net income, that's revenue less expenses,

12   correct?

13   A.    Yes, sure.

14   Q.    And net income can also be referred to as accounting

15   profits; is that right?

16   A.    Yes.

17   Q.    And that's what you put on the slide here, accounting

18   profits or net income for Ampyra from 2010 to 2015, right?

19   A.    Correct.  It's the incremental net contribution of

20   the product, yes.

21   Q.    So you have a data point for each year, is that what

22   you mean?

23   A.    Well, yes, there is a data point for each year, but

24   it's also incremental in the sense that fixed costs would

25   not necessarily be deducted.  You know, you've got to pay

Bell - cross

1     the president of the company irrespective of --

2     Q.     So those fixed costs that Acorda bears, that's not

3     reflected in your net income analysis?

4     A.     Unless they were specifically associated with Ampyra,

5     that's correct, yes.

6     Q.     And it starts in 2010 and late 2010 is when Ampyra

7     launched, correct?

8     A.     No, I think it was like March 2010, right?  That's my

9     understanding.

10    Q.     Thank you.  But this slide, it doesn't show all the

11    costs according incurred before 2010 to bring Ampyra to

12    market; is that right?

13    A.     That's correct, yes.

14    Q.     Okay.  And because in performing your commercial

15    success analysis, you didn't quantify the total amount of

16    money Acorda spent on research for Ampyra, correct?

17    A.     Correct.  I did not -- it wasn't essential for my

18    opinion because I am generally aware of research and

19    development costs in the pharmaceutical industry and I was

20    aware that this was a product that didn't require basic

21    research, but there was also the issue that Acorda licensed

22    the product from Elan and I definitely didn't have any

23    information on any costs that Elan had incurred.

24    Q.     Okay.  So you didn't quantify the total amount of

25    money that Elan spent on research that led to Ampyra,

Bell - cross

1    correct?

2    A.      Correct, I did not.

3    Q.      And you didn't quantify the amount of money Acorda

4    spent on research that led to Ampyra, correct?

5    A.      Correct.  I did not.  Again, given the opportunity I

6    was observing, it wasn't expected to overwhelm the

7    opportunity.

8    Q.      And I said research, but you didn't quantify those

9    values for any of the clinical development costs or other

10   commercialization costs before the date that you've shown

11   here, correct?  You didn't quantify that?

12   A.      Correct.  I believe I was provided with some

13   information that was just related to Acorda's costs.  Again,

14   on a spread sheet, but I don't recall explicitly adding it

15   up and putting it in my report.

16   Q.      But it's not disclosed in your report, correct, the

17   quantification of that?

18   A.      Sure, yes.  I believe that's a fair statement.

19   Q.      And you agree it's possible to earn an accounting

20   profit after launch but not to make a total economic profit

21   over the life cycle of the drug, correct?

22   A.      Yeah.  As a general matter, that is a true statement.

23   I don't believe it applies here, but it's a true statement.

24   Q.      Because while accounting profits are revenues less

25   expenses, there are more costs associated with an economic

Bell - cross

1    profit calculation, correct?

2    A.     Well, hang on just a second.  You know, accounting

3    profits would equal economic profits over a longer period of

4    time, for instance, if you started the accounting profits

5    back at the start of the investigation of the R&D, then you

6    would pick all of those up.  But the standard perspective

7    would be that accounting profits, for instance, don't make a

8    charge for the use of capital and somebody who is looking at

9    a, quote unquote, economic profit may well take a deduction

10   for the use of capital, they may consider that capital being

11   the investment in R&D in prior years which for accounting

12   purposes would be expense and for economic purposes would

13   not be expense.

14   Q.     So let me ask it this way.  You're familiar with the

15   term opportunity costs, correct?

16   A.     Sure.

17   Q.     And opportunity costs, they're part of a calculation

18   for economic profit, correct?

19   A.     Yes, they can be.

20   Q.     And one opportunity cost is the risk of product

21   development not being successful or gaining FDA approval,

22   correct?

23   A.     There's certainly a cost to using capitol if the, you

24   know, investment doesn't pan out.  Some may refer to that as

25   a, as an opportunity cost.  You tend to think about it more

Bell - cross

1    at the time, you know, like I can invest in A or I can

2    invest in B as an example.  And the opportunity cost of

3    investing in A is we're going, strangely enough, the

4    opportunity to invest in B.

5    Q.      Well, let me ask it this way.  When you're providing

6    a commercial feasibility assessment for a drug company about

7    whether to continue developing a drug, do you consider the

8    risk of the product development, that the product

9    development would not be successful or obtain FDA approval,

10   correct?

11   A.      I build that risk in from the standpoint of how the

12   technical folks inform me so I don't have the technical

13   ability to assess whether or not this particular investment

14   opportunity is likely to achieve technical success.  I'm

15   asked to assume it achieves technical success and then

16   assess the market opportunity from an economic perspective

17   and then weight that by the likelihood that success would be

18   achieved from a technical perspective.

19   Q.      So you don't have the expertise to know whether or

20   not a drug will be successfully developed down the line; is

21   that fair?

22   A.      Well, I would break it out into two pieces.  I am not

23   -- I don't have the expertise to assess the technical

24   likelihood that this innovation will prove to result in a

25   product that could be approved.  I do have the expertise and

Bell - cross

1    I'm called on to use my expertise to assess if it's

2    approved, then what's the marketplace opportunity for the

3    product.  And of course both of them are required in terms

4    of making an assessment of success, the potential for

5    success for the product.

6    Q.    And you understand that from the economic literature

7    from authors like DiMasi, that the economic costs of drug

8    development -- sorry.  Withdraw that.  Let me ask this

9    again.  You're familiar with Joseph DiMasi, correct?

10   A.    Yes.

11   Q.    And you understand from the economic literature, from

12   authors like Professor DiMasi that discuss economic costs of

13   drug development, those articles address what are called the

14   predicted overall clinical success rate, correct?

15   A.    Sure.  The average clinical success rate, that's that

16   12 percent figure, but of course the expectation is those

17   innovations weren't obvious.

18   Q.    And Professor DiMasi in the economic world, he's

19   respected for the work that he's done regarding R&D costs in

20   the pharmaceutical industry.  You'd agree with that, right?

21   A.    Well, sure.  DiMasi and his group for years have sort

22   of been collecting this information on costs that expand

23   what's the likelihood that a product is successful in Phase

24   1, what's the likelihood that it moves to Phase 2, how long

25   does it spend in Phase 1, how long does it spend in Phase 2,

Bell - cross

1    what's the likelihood of success at each successive phase,

2    et cetera, sure.

3    Q.     And I think my question was

4    just -- you agree that Professor DiMasi is respected in the

5    economic world for the work he's done regarding economic

6    costs in pharmaceutical development, correct?

7    A.     Sure, yeah.  He's done work in the area.

8    Q.     And in the real world the money companies make with

9    successful drugs, it has to make up for all the ones that

10   failed in development because otherwise the company is not

11   going to be successful.  You'd agree with that, right?

12   A.     Well, obviously not quite, right, because the failed

13   companies don't make up.  So the successful ones are able to

14   make up the costs and of course some of the successful ones

15   may not have a failure coming out of development.

16   Q.     Now, you told us on direct that Acorda didn't have to

17   discover the 4-AP compound, correct?

18   A.     Correct, yes.

19   Q.     But you do agree that someone had to bear the costs

20   of discovering the 4-AP compound in order to get to the

21   claimed invention is, correct?

22   A.     Well, the 4-AP compound had to be known.  Again, it's

23   my understanding it's been around for decades.  I don't know

24   if somebody spent money to discover it decades ago or not.

25   Q.     In any event you didn't calculate how much it cost to

Bell - cross

1   discover the 4-AP compound?  You didn't calculate that,

2   correct?

3   A.    Well, I didn't calculate it.  I'm not sure it's the

4   case.  I'm not even sure how one would go about calculating

5   such a thing.

6   Q.    You don't know how much it cost to discover the 4-AP

7   compound, correct?

8   A.    Hang on.  With all due respect, the premise of your

9   question is there was a cost and there was a discovery as

10  opposed to just some sort of revelation.  I don't know

11  either way, so I'm not sure it's fair to say I don't know

12  the cost of the discovery.

13  Q.    Dr. Bell, is it fair to say, though, that you didn't

14  calculate the preclinical costs for Ampyra?

15  A.    I did not calculate preclinical costs for Ampyra

16  specifically, that is correct.  What I did do was consider

17  the preclinical costs that Dr. McDuff presented.

18  Q.    Okay.  You do agree, though, that the majority of

19  drug development does occur after the preclinical stage,

20  correct?

21  A.    On average I believe that is a fair characterization,

22  yes.  I'm sorry, for successful products.

23  Q.    And you told us on direct that if there's an obvious

24  innovation, it's obvious that drug will make it to market,

25  correct?

Bell - cross

1    A.    Well, in the context of this innovation, yes, I

2    believe that's correct, because what was patented I

3    understood was the indication and the dosing regimen and the

4    sustained release of the 4-AP.  So if all of those are

5    obvious, i.e., that the product actually works, I certainly

6    don't see any reason why it wouldn't get to market unless

7    there's no real marketplace opportunity for the product.

8    Q.    Dr. Bell, you agree that an invention can be obvious,

9    but is not ultimately approved by the FDA, correct?

10   A.    Well, sure.  You could have an invention that doesn't

11   work.  And that wouldn't be approved by the FDA.

12   Q.    And a drug may not get FDA approval because it fails

13   during the preclinical development, correct?

14   A.    Well, but I'm sorry, if it fails, then it wasn't

15   obvious that it would work.  And the whole point is as

16   indicated in the patents here, actual results of walking

17   improvements in the timed 25-foot walk, as an example.

18   Q.    I'm asking a narrow question.  You agree that drugs

19   can fail during preclinical development, correct?

20   A.    Oh, sure, absolutely.

21   Q.    And a drug may not get FDA approval because a company

22   chooses not to continue to develop the product.  That

23   happens, correct?

24   A.    Sure.  Again, it wouldn't be a sensible thing to do,

25   if there's a significant marketplace opportunity, but yeah,

Bell - cross

1    if the company doesn't file the drug for FDA approval, I'm

2    not aware of any way that the FDA would approve it.

3    Q.    And you're not offering an opinion as to how many

4    drugs that are covered by obvious inventions ultimately

5    gain FDA approval, you're not offering that opinion,

6    correct?

7    A.    That's correct.

8    Q.    And even for an obvious invention you do agree that

9    there is still an economic cost associated with opportunity

10   costs, correct?

11   A.    If there's an obvious invention and you have to spend

12   money to bring it to market, right, then there may be an

13   opportunity to cost associated with those, with that

14   spending.  Now, that opportunity cost may be equal to the

15   amount of money that you spent.  So you're question is not

16   really terribly clear.

17   Q.    Well, let me ask it again.  For an obvious

18   invention --

19   A.    Okay.

20   Q.    -- there is still an economic cost associated with

21   opportunity costs, correct?

22   A.    Yeah, I'm not following the distinction you're trying

23   to make between the costs you have to incur to bring the

24   product to market.  And I agree with that, there's a cost

25   associated with that.  Whether or not there's an additional

Bell - cross

1    opportunity cost over and above that, other than say the

2    time value of money, I'm not really sure what you might be

3    driving at.

4    Q.    Well, can you answer my question yes or no?  For an

5    obvious invention there is still an economic cost associated

6    with opportunity costs?

7    A.    I'm not sure I can answer it any more than I just

8    did.

9    Q.    Okay.  Dr. Bell, you were deposed in this matter,

10   correct?

11   A.    Yes.

12   Q.    And let's -- you told the truth, right?

13   A.    Sure.

14   Q.    Let's pull up on the screen just transcript 276 at

15   line 23.

16        MR. COOPER:  Your Honor, may I approach?  I also

17   forgot to --

18        THE COURT:  You may.

19        MR. COOPER:  Thank you.

20        "Question:  For an obvious invention, is it your

21   -- would you -- is there still an economic cost associated

22   with opportunity costs?

23        "Answer:  Yes.

24        Was that your testimony?

25   A.    Yes.

Bell - cross

1   Q.     And for an obvious invention, there is still an

2   economic cost associated with the cost of capital; correct?

3   A.     Well, that is the opportunity cost that I was talking

4   about.  This time value of money, for instance.

5   Q.     So your answer is "yes?"

6   A.     Yeah, consistent with what I have already said here

7   today.

8   Q.     And, Dr. Bell, in other cases in which you served as

9   a commercial success expert, you have compared sales levels

10  of drugs to other drugs; correct?

11  A.     Where it is appropriate, sure.

12  Q.     And in your commercial success analysis here, you

13  did not compare Ampyra unit sales to any other drug;

14  correct?

15  A.     That is correct.  There is information in the

16  documents, but that is correct, not in my report.

17  Q.     And you didn't compare Ampyra net sales to any other

18  drug; correct?

19  A.     That is correct, although, of course, we don't have

20  net sales for any other products.

21  Q.     And you didn't compare the price of Ampyra to the

22  price of any other drugs; correct?

23  A.     Not that I explicitly recall.  There are list prices

24  available for other products but not net prices.

25  Q.     Well, you talked about Ampyra's increasing price

Bell - cross

1    during the direct examination.  You agree that more often

2    than not, drug prices increase over time; correct?

3    A.     Sure.  At rates that are less than the rates at which

4    the product Ampyra had its price increased, yes.

5    Q.     You also didn't assess Ampyra's market share in this

6    case; correct?

7    A.     Well, as I have already said, there is no

8    economically defined market or I didn't define a market for

9    Ampyra.  There are other MS products that are typically

10   considered, like the DMTs, the disease modifying therapies.

11   Ampyra doesn't compete with those.  Ampyra --

12   Q.     You didn't --

13   A.     Ampyra is a product for improvement of walking in MS

14   patients.  I'm not aware of a competing product, and neither

15   is the company, although the company has indicated in its

16   10-Ks that there could about a potential competitor on the

17   horizon that might have a similar indication.

18   Q.     You didn't define a market for Ampyra; correct?

19   A.     Correct.  It's not relevant to commercial success to

20   do so.

21   Q.     Now, you mentioned during your direct that Acorda

22   expects some royalties on sales outside the U.S.  But you

23   don't actually know what the sales of dalfampridine are

24   outside of the U.S.; correct?

25   A.     That is correct.

Bell - cross

1   Q.      And you mentioned a Biogen license on your direct

2   exam; right?

3   A.      Yes.

4   Q.      And that, your reference for that was PTX-733.  So

5   let's, can you pull that up on the screen, please.

6               Now, Dr. Bell, you understand the Biogen license

7   is an exclusive license; correct?

8   A.      I believe that is correct for outside the U.S.,

9   although I must admit I don't know the extent to which

10  Acorda continues to retain rights outside the U.S.

11  Q.      Now, as part of your work in this case, you

12  considered whether there was a nexus between Ampyra sales

13  and the patents in suit; correct?

14  A.      Yes.

15  Q.      But you are not offering any opinions as to the

16  relative contribution of the '938 patent alone to Ampyra's

17  commercial success; right?

18  A.      Yes, I think that is a fair characterization.

19  Q.      And you are not offering any opinion as to the

20  relative contribution of the Acorda patents alone to

21  Ampyra's commercial success; correct?

22  A.      That is a fair characterization, sure.  Yes.

23  Q.      You understand that the Ampyra patents do not cover

24  the 4-AP compound; correct?

25               THE COURT:  That would be the Acorda patents?

Bell - cross

1          MR. COOPER:  Thank you.

2    BY MR. COOPER:

3    Q.     You understand that the Ampyra patents do not cover

4    the 4-AP?

5               THE COURT:  You mean the Acorda patents.

6               MR. COOPER:  I do.  I'm sorry.  Thank you, Your

7    Honor.

8               THE COURT:  I know it's getting late.

9    BY MR. COOPER:

10   Q.     You understand that the Acorda patents do not cover

11   the compound 4-AP; correct?

12   A.     Yes.  It's my understanding again that 4-AP has been

13   around for awhile.

14   Q.     You do agree that 4-AP is part of what is required

15   for Ampyra to be a success; correct?

16   A.     Yes, I think that is a fair characterization.  Sure.

17   Q.     But you did not do any analysis as to the relative

18   contributions of the 4-AP compound to Ampyra's commercial

19   success?

20   A.     No, not beyond my conclusions that there was a nexus

21   between the patented attributes which don't include just the

22   4-AP molecule itself but obviously the sustained release,

23   dosing indication, et cetera, and the commercial success or

24   the marketplace opportunity that was apparent.

25   Q.     Dr. Bell, to the best of your recollection, you

Bell - cross

1    have offered an opinion regarding the commercial success

2    of the pharmaceutical product in 13 cases before this one;

3    correct?

4    A.    I don't, I don't really recall.  This may be an

5    outgrowth of the deposition where I think we went through,

6    so I'll simply take your word for it.

7    Q.    And of the 13 cases in which you have offered an

8    opinion related to commercial success, you have never

9    offered an opinion that the market performance of the drug

10   suggested that the drug is not a commercial success;

11   correct?

12   A.    I believe that is a fair characterization, yes.

13   Q.    And from the standpoint of commercial success as a

14   secondary indicator of nonobviousness, if a drug is

15   economically profitable by only $100, to you that would

16   indicate there was a marketplace opportunity for the drug;

17   correct?

18   A.    I don't recall ever forming an opinion to that

19   extent.

20   Q.    You never offered an opinion in court to that

21   opinion.  That is what you are saying?

22   A.    I believe that is correct, yes.

23   Q.    But my question is in the standpoint of commercial

24   success as a secondary indicator of nonobviousness, if a

25   drug is economically profitable by only $100, to you, that

Bell - cross

1    would indicate that there was a marketplace opportunity for

2    the drug; correct?

3    A.    It may.  I just never had to determine such an

4    opinion.  It would depend on circumstances, but if there is

5    a profit, if there is a marketplace opportunity out there,

6    pardon me, and an innovation were obvious, then economics

7    would suggest that marketplace opportunity is going to be

8    acted upon.

9    Q.    Okay.  I just want to make sure I am clear because I

10   think you just said "may."  So I want to ask it one more

11   time.

12          From the standpoint of commercial success as a

13   secondary indicator of nonobviousness, if a drug is

14   economically profitable by only $100, to you, that would I

15   indicate there was a marketplace -- a market opportunity for

16   the drug; correct?

17   A.    Now, you are asking this has a hypothetical.  I don't

18   know all of the things you are considering in economic

19   profit.  But it certainly may from the standpoint of --

20   again, the market abhors a vacuum.  If there is a profit

21   opportunity out there and an innovation is obvious, one

22   would expect that profit opportunity is going to be acted

23   upon.

24   Q.    Your testimony is it may but not that it would.  Is

25   that what I'm hearing?

617

Bell - cross

1    A.     Well, I mean you can take this sort of to the absurd.

2    $100, 100 cents, eight cents, 1/100th of a cent, epsilon

3    above zero.

4          I mean, again, the point is if there is -- I

5    never had to -- actually, I never been in a situation where

6    the line has been that fine.  And my opinion is, and I think

7    it is the reason why economics is asked to consider

8    questions of commercial success.

9    Q.     Dr. --

10   A.     Is there a marketplace opportunity such that if the

11   innovation were obvious, somebody would already be acted

12   upon it.

13   Q.     Dr. Bell, I'm going to put up on the screen the

14   transcript to your deposition, 87, 25 to 88, 8.

15          And the question, the question is:

16          "Question:  So in your opinion, it's possible

17   that a drug could be a commercial success even if it was

18   only economically profitable by $100?"

19          And you said:

20          "Answer:  From the standpoint of commercial

21   success as a secondary indicator of nonobviousness,

22   you know, that would indicate there was a market

23   opportunity."

24          Now, were you asked that question and did you

25   give that answer?

```
1    A.      I did.

2                  MR. COOPER:  No further questions.

3                  THE COURT:  Okay.  Redirect.

4                  MR. STIEFEL:  I have no questions, Your Honor.

5                  THE COURT:  Okay.  You may step down.  Thank you

6    very much.

7                  MR. COOPER:  Your Honor, could I -- oh.  I'm

8    sorry.  Nothing.

9                  THE COURT:  Nothing?  All right.  What is next

10   from the plaintiffs?

11                 MR. DiNAPOLI:  Your Honor, plaintiffs have no

12   further witnesses.

13                 THE COURT:  All right.  Back to the defendants.

14   Where are we?

15                 MR. COOPER:  Your Honor, defendants call

16   Dr. Deforest McDuff in rebuttal.

17                 THE COURT:  All right.  Well, we can start with

18   him.  I assume he will be more than 15 minutes.

19                 MR. COOPER:  Yes.

20                 THE COURT:  Okay.  We'll get started.

21                 ... DAVID DeFOREST McDUFF, having been first

22   duly sworn, was examined and testified as follows ...

23                 MR. COOPER:  Your Honor, this is going to take

24   a few minutes.  The defendants would offer to charge the

25   remaining 15 minutes to us.
```

```
 1                    THE COURT:  And just start in the morning?

 2                    MR. COOPER:  Yes.

 3                    THE COURT:  That's fine.  Is it okay with you,

 4     Doctor?

 5                    THE WITNESS:  That's fine.  Thank you.

 6                    THE COURT:  Well, all right.  We'll stop with

 7     the swearing in then.

 8                    Give me a heads up.  What else to you expect to

 9     do tomorrow?

10                    MR. KLEIN:  Just one witness after Dr. McDuff.

11     So we will finish -- we anticipate finishing tomorrow

12     morning.

13                    THE COURT:  Okay.  And then plaintiffs may have

14     a rebuttal witness or do we know yet?

15                    MR. STIEFEL:  I don't think we have any further

16     witnesses, Your Honor.

17                    THE COURT:  All right.  Well, then we will

18     charge the last 15 minutes today to defendants, and we'll

19     start at 8:30 tomorrow morning.

20                    Is there anything else?

21                    MR. KLEIN:  The only other question, Your Honor,

22     is if we finish early tomorrow, would you rather have -- and

23     I haven't spoken to the plaintiffs about this, but would you

24     rather have closing Thursday afternoon instead of Friday

25     morning?
```

1        THE COURT:  Why don't you confer on that and

2   tell me your views tomorrow.  I do have a few things

3   scheduled Thursday but they may be able to be moved around.

4   So if you come in with a uniform proposal in the morning,

5   I'll do my best to accommodate it.  But we'll just have to

6   see tomorrow.

7        Is there anything from plaintiffs?

8        MR. STIEFEL:  No, Your Honor.

9        THE COURT:  All right.  We'll see you tomorrow.

10        (Proceedings adjourn at 5:47 p.m.)

11

12

13        I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

14

15                        /s/ Brian P. Gaffigan
                          Official Court Reporter
16                         U.S. District Court

17

18

19

20

21

22

23

24

25