```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     ACORDA THERAPEUTICS, INC.,              :
 4                                           :    CIVIL ACTION
                  Plaintiff,                 :
 5   v                                       :
                                             :    (Consolidated)
 6   ALKEM LABORATORIES LTD.,                :
                                             :    NO. 14-882-LPS
 7                Defendant.                  :
                                      - - -

 8
                              Wilmington, Delaware
 9                     Wednesday, September 21, 2016
                          Bench Trial - Volume C
10
                              - - -
11
     BEFORE:           HONORABLE LEONARD P. STARK, Chief Judge
12
     APPEARANCES:                    - - -
13

14              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  MARYELLEN NORIEKA, ESQ.
15
                     and
16
                KAYE SCHOLER, LLP
17              BY:  AARON STIEFEL, ESQ.,
                     DANIEL DiNAPOLI, ESQ., and
18                   SOUMITRA DEKA, ESQ.
                     (New York, New York)
19
                     and
20
                KAYE SCHOLER, LLP
21              BY:  SYLVIA M. BECKER, ESQ.
                     (Washington, District of Columbia)
22
                              Counsel for Plaintiffs Acorda
23                            Therapeutics, Inc., and Alkermes
                              Pharma Ireland Limited
24

25   Dale Hawkins                           Brian P. Gaffigan
     Registered Merit Reporter              Registered Merit Reporter
```

1    APPEARANCES:  (Continued)

2

3                    PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
                     BY:  JOHN C. PHILLIPS, JR., ESQ.

4                         and

5                    WINSTON & STRAWN, LLP
                     BY:  CHARLES B. KLEIN, ESQ.
6                         (Washington, District of Columbia)

7                         and

8                    WINSTON & STRAWN, LLP
                     BY:  SAMUEL S. PARK, ESQ.,
9                         REID F. SMITH, ESQ., and
                          BRYCE A. COOPER, ESQ.
10                        (Chicago, Illinois)

11                        Counsel for Roxane Laboratories, Inc.,
                          Teva Pharmaceuticals USA, Inc., Apotex
12                        Corp. and Apotex, Inc.

13

                     MORRIS JAMES LLP
14                   BY:  MARY B. MATTERER, ESQ.

15                        and

16                   PARKER POE ADAMS & BERNSTEIN, LLP
                     BY:  ROBERT L. FLORENCE, ESQ,
17                        MICHEAL L. BINNS, ESQ., and
                          KAREN L. CARROLL, ESQ.
18                        (Atlanta, Georgia)

19                        and

20                   PARKER POE ADAMS & BERNSTEIN, LLP
                     BY:  CHRISTOPHER M. THOMAS, ESQ.
21                        (Raleigh, North Carolina)

22                        Counsel for Mylan Pharmaceuticals Inc.

23

24

25

1                          - oOo -

2                    P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following bench trial was

4      held in open court, beginning at 8:30 a.m.)

5              THE COURT:  Good morning.

6              (The attorneys respond, "Good morning, Your Honor.")

7              THE COURT:  Do you we have any update on the

8      documents objection issue, Mr. Stiefel?

9              MR. STIEFEL:  Thank you, Your Honor.  I am

10     pleased to report that we have resolved the issue.  We filed

11     actually the declaration of Anthony Michael, the Director of

12     Litigation from Acorda, which explains the origin of the

13     data, and the defendants have agreed to withdraw their

14     objection.  So we would move that DTX -- PTX-794, 795, and

15     796 be entered into evidence.

16             THE COURT:  Okay.  Thank you.  Is there any

17     objection?

18             MR. COOPER:  No objection.

19             THE COURT:  Those are all admitted.  Thank you

20     for that.

21             (Above referenced exhibits are admitted into

22     evidence.)

23             Are there any issues from plaintiffs before we

24     get started?

25             MR. STIEFEL:  No, Your Honor.

```
 1                    THE COURT:  And from defendants?

 2                    MR. COOPER:  No, Your Honor.

 3                    THE COURT:  All right.  And have you talked

 4     about whether you want to do closing arguments tomorrow?

 5                    MR. STIEFEL:  Yes.  I think we've agreed on

 6     Friday.

 7                    THE COURT:  Oh.  You have agreed on Friday; is

 8     that correct?

 9                    MR. KLEIN:  Yes.  We're open to Thursday

10     afternoon or Friday.  If they prefer Friday, that's fine

11     with us.

12                    THE COURT:  Okay.  But you prefer Friday?

13                    MR. STIEFEL:  That's our preference.

14                    THE COURT:  Okay.  I don't believe we had set a

15     time; is that correct?

16                    MR. STIEFEL:  I think it was 10:00 o'clock.

17                    THE COURT:  Oh.  Was it 10:00 o'clock?  Is that

18     still preferable to plaintiffs?

19                    MR. STIEFEL:  Yes, that's fine.

20                    THE COURT:  10:00 o'clock.

21                    MR. KLEIN:  Yes.

22                    THE COURT:  Then we'll stick to 10:00 o'clock

23     Friday.

24                    I believe defendants were about to call a

25     witness.
```

McDuff - direct

1              MR. COOPER:  We were, Dr. DeForest McDuff.

2              THE COURT:  Okay.

3               ... ROBERT DeFOREST McDUFF, having been duly

4      sworn, was examined and testified as follows ...

5              THE COURT:  Good morning, and welcome.

6              THE WITNESS:  Good morning.

7              MR. COOPER:  May I approach?

8              THE COURT:  You may approach.

9              (Binders passed forward.)

10             MR. COOPER:  May I proceed?

11             THE COURT:  Yes.

12                     DIRECT EXAMINATION

13     BY MR. COOPER:

14     Q.     Good morning.  Could you state your name?

15     A.     DeForest McDuff.

16     Q.     Are you serving as an expert witness today on behalf

17     of defendants?

18     A.     Yes.

19     Q.     What are you an expert in?

20     A.     I'm an expert in economics and the evaluation of

21     economics and pharmaceuticals.

22     Q.     Could you please tell the Court what the subject

23     matter of your testimony is today?

24     A.     I am evaluating the commercial success of Ampyra.

25     Q.     Were you present in the courtroom for the testimony

McDuff - direct

1    of Dr. Bell, plaintiffs' expert?

2    A.    Yes.

3    Q.    Do you agree with his conclusions regarding the

4    commercial success of Ampyra?

5    A.    No.

6    Q.    Have you prepared any slides to assist with your

7    testimony today?

8    A.    Yes.  That is up here on the screen.

9    Q.    Before we get to your opinions, let me ask you a few

10   questions about your qualifications to serve as a expert.

11   Can you identify what DTX-132 is?

12   A.    This is a copy of my expert CV.

13   Q.    Could you briefly describe your educational

14   background, Dr. McDuff?

15   A.    I have bachelor's degrees in Economics and

16   Mathematics from the University of Maryland; and I have a

17   master's degree and a Ph.D. in Economics from Princeton

18   University.

19   Q.    Where did do you currently work?

20   A.    I work at a company called Intensity.

21   Q.    What is Intensity?

22   A.    We are a consulting firm with expertise in economics,

23   finance, law, computer science, and data science.

24   Q.    What are your job responsibilities at Intensity?

25   A.    I'm a vice president there.  I'm head of the Boston

McDuff - direct

1    office.  I primarily serve as an economic consultant,

2    consulting with businesses making strategic decisions as

3    well as serving as an expert witness in litigations like this.

4    Q.    Have you analyzed the commercial success of a

5    patented technology before?

6    A.    Yes, more than 25 times.

7    Q.    Have you analyzed the commercial success specifically

8    of a pharmaceutical product before?

9    A.    Yes, around 20 times.

10   Q.    Have you testified as an expert witness in a patent

11   case before?

12   A.    Yes.

13          MR. COOPER:  Your Honor, at this time we would

14   like to offer Dr. McDuff as an expert on economics and

15   commercial success as it relates to patentability.

16          MR. STIEFEL:  No objection, Your Honor.

17          THE COURT:  He is so recognized.

18   BY MR. COOPER:

19   Q.    Dr. McDuff do you have a summary of your opinions

20   today for the Court?

21   A.    Yes, on the next slide.

22   Q.    Before we dig into them further, can you please

23   summarize those opinions?

24   A.    Yes.  No. 1, that Ampyra has not been a commercial

25   success.

McDuff - direct

1      No. 2, that the existence of a blocking patent

2   of the '938 patent limits the relevance of any success for

3   the Acorda patents.  And,

4      No. 3, that a weak nexus limits the relevance of

5   any success, even if it did exist.

6   Q.   How did you go about developing your opinions in this

7   case?

8   A.   I went about them as I do in every case like this.  I

9   analyzed sales and profits of the product at issue.  I

10  analyzed economic profitability, analyzed sales of

11  comparison products, examined business documents from

12  Acorda, market document, things of that nature.

13  Q.   Let's start with your opinion that Ampyra has not

14  been a commercial success.  Now, how is commercial success

15  relevant to a patent case?

16  A.   Commercial success is one secondary consideration that

17  maybe considered in the context of obviousness.  The idea is

18  that if an invention is obvious and it's a commercial

19  success, the market would have brought that product sooner,

20  would have brought that product to market sooner.

21  Q.   Do you have a slide to illustrate how you approach

22  commercial success?

23  A.   Yes.

24  Q.   Could you describe how this slide illustrates your

25  approach?

1  A.    This describes how commercial success is relevant in

2  the pharmaceuticals context.  You can see the blue arrows

3  on the screen representing the pharmaceutical development

4  process from research and development to particular clinical

5  development, clinical trials, FDA approval, and ultimately

6  sales and profits.

7            The idea is that we observe the sales and

8  profits now with hindsight and we ask the question, are

9  those sales and profits large enough to make an inference

10  about the commercial opportunity or the economic incentives,

11  back at the time of the alleged invention.

12  Q.    Thank you, Dr. McDuff.  Let's move to your opinion

13  that there is a limited commercial opportunity for Ampyra.

14  Why is a product's commercial opportunity relevant to your

15  analysis of commercial success?

16  A.    It's relevant because we're trying to figure out

17  whether the opportunity or the sales and profits that we

18  see are large enough to make the market interested in that

19  product.

20  Q.    Now, Dr. McDuff, you understand we're here today

21  because the defendant companies have filed ANDAs seeking

22  approval from the FDA to file a generic version of Ampyra;

23  correct?

24  A.    Yes.

25  Q.    Doesn't the fact that the defendants want to make

McDuff - direct

1    a generic version of this drug evidence that there is a

2    commercial opportunity for it?

3    A.    No, that is not correct reasoning.  And if you think

4    about the previous slide, just because generics are

5    interested in selling a product now that it is on the market

6    doesn't infer that a company would bring that to market if

7    they had to incur all of the commercialization costs.

8    Generics have a streamlined process for getting a product to

9    market so there is a much lower bar for them to be

10    interested.

11    Q.    Now, do you have is a slide summarizing the factors

12    that support your opinion that Ampyra has a limited

13    commercial opportunity?

14    A.    Yes.

15    Q.    Could you describe what those factors are that you

16    identified in your analysis?

17    A.    Well, the three up here on the screen are, it's

18    limited label, it's limited efficacy, and it's limited

19    patient population.

20    Q.    And do you have an understanding, for instance, as to

21    whether Acorda ever sought other indications for its label?

22    A.    Yes.  Originally, it was seeking a broader indication

23    to treat MS as well as spinal cord injury.  It achieved

24    neither of those indications and ultimately got a narrow

25    label just to improve walking in patients with MS.

McDuff - direct

1    Q.    So how did these three factors about the limited

2    label, efficacy, and patient population for Ampyra impact

3    your overall analysis for commercial success?

4    A.    Well, they show that as a starting point, Ampyra's

5    opportunity isn't that large.  Ampyra is an orphan drug.  It

6    has a limited patient population.  Even within the MS

7    patient population, only 25 to 30 percent of the patients

8    are eligible or to be considered for Ampyra.

9              Its efficacy relative to other drugs isn't that

10   differentiated.  The evidence that I reviewed indicated that

11   that that was one of the limitations of Ampyra use, that

12   there was a perception of relatively weak efficacy compared

13   fo alternatives.

14             So all of those things together indicate that

15   the commercial opportunity just isn't that large.

16   Q.    And you have some sources here, exhibits, JDX-76,

17   DTX-419, DTX-57.  Are those documents that you relied upon

18   in your analysis for commercial success?

19   A.    Yes.

20   Q.    Did you review any economic evidence related to

21   Ampyra's commercial opportunity?

22   A.    Yes.  We can see one in the next slide.

23   Q.    What economic evidence did you review?

24   A.    Well, this is an example of comparing Ampyra sales to

25   sales of other products in the pharmaceutical industry.  You

McDuff - direct

1    can see a comparison of Ampyra sales in the blue, the X axis

2    being the sales from year since launch, the Y axis being the

3    revenues, and you can see this comparison.

4    Q.    Now, why did you make these comparisons?

5    A.    Well, it's important to put the sales into context.

6    When you start seeing numbers like $100 million, $300

7    million, $1 billion, it may sound large in ordinary context,

8    but in the pharmaceuticals industry, it's really not that

9    big.

10   Q.    And so you have heard Dr. Bell yesterday testify that

11   Ampyra has made over $900 million in net income; is that

12   right?

13   A.    Yes.

14   Q.    So why is it necessary, in your opinion, to make

15   these comparisons?

16   A.    Well, it's important to make these comparisons to put

17   Ampyra into context.  So, for example, compared to first

18   decile drug, or the top ten percent of drugs, Ampyra is just

19   a fraction of those.  These top decile drugs are the true

20   Blockbuster drugs, selling $1 billion or more than $2

21   billion a year.

22         The second decile drugs is the next ten percent

23   of drugs.  Ampyra is just a fraction of those as well.

24         Those two deciles are really the drivers of

25   profit in the pharmaceutical industry, and drug companies

McDuff - direct

1    are seeking those kinds of opportunities.  Those are the

2    kind of opportunities that really drive profitability, not

3    the level of sales that you see for Ampyra.

4    Q.    Now, does a drug have to be in the first decile or

5    meet the second decile in order to be a commercial success?

6    A.    Not as a requirement, but it is representative of

7    the kind of opportunity that generates interest in this

8    industry.

9    Q.    And how does Ampyra compare to average drug sales?

10   A.    Well, as you can see, they're right around average.

11   It's known in the economic literature that average drugs are

12   around break-even economically.  Some are profitable, some

13   are not, but it definitely warrants further inquiry.

14   Q.    What other comparisons about Ampyra sales did you

15   make?

16   A.    We can see another one on the next slide.  This is a

17   comparison of Ampyra sales to other MS drugs.

18   Q.    Why did you compare Ampyra to other MS drugs?

19   A.    Again, it's relevant for putting them into context

20   and to see what kinds of commercial opportunities are out

21   there for treating MS.

22   Q.    How do Ampyra sales compare to other MS drugs?

23   A.    As you can see here, they are just a fraction of top

24   selling MS drugs.  Performing a comparison, Ampyra is just

25   two to three percent of the top ten MS drugs in terms of

McDuff - direct

1   revenue, so, you know, thinking of MS in terms of a market

2   share, at most two to three percent is Ampyra.

3   Q.      Did you make any other sales comparison?

4   A.      Yes.  You can see one more in the next slide.

5           This is a comparison of Ampyra to other orphan

6   drugs.

7   Q.      Why did you compare Ampyra to other orphan drugs?

8   A.      This is important because it shows how orphan drugs

9   become a good commercial opportunity.  Some orphan drugs

10  have very high revenue per patient, and they may treat

11  cancer and have revenue of tens of thousands of dollars a

12  year.  Several of these top orphan drugs are other MS drugs,

13  and because they treat MS more broadly, they can charge more

14  per patient.

15          Ampyra doesn't fit that profile.  Ampyra not

16  only has a small limited patient population but it also has

17  a relatively low revenue per patient.

18  Q.      How do these comparisons of Ampyra sales with other

19  drugs inform your commercial success analysis?

20  A.      They show that Ampyra sales really aren't that

21  impressive, not when they're put in the proper context and

22  compared to opportunities that are more interesting in the

23  pharmaceutical industry; in other words, indicate a relative

24  lack of commercial success.

25  Q.      Did Dr. Bell do any of these comparisons?

McDuff - direct

1   A.      No.

2   Q.      Do you have a summary of critiques you have of

3   Dr. Bell's analysis?

4   A.      Yes.

5   Q.      If we can look at that.

6           Can you explain to the Court, what are your

7   primary critiques of Dr. Bell's commercial success analysis?

8   A.      Well, fundamentally, Dr. Bell's analysis is flawed

9   because he provides essentially zero context for his sales.

10  He had two slides about sales and tablets, and he puts them

11  up on the screen and says that looks like an opportunity to

12  him.

13          But there is no benchmark or no evaluation to

14  make a determination of whether or not those are large

15  enough.  He has no comparison to other drugs in the

16  industry, no comparisons to other MS drugs, no comparisons

17  to other orphan drugs, no evaluation of the very expensive

18  commercialization process or economic profit.  It really

19  just is not enough to draw a conclusion of commercial

20  success.

21  Q.      You mentioned economic profit and I would like to

22  move to that part of your opinion next.  You said Dr. Bell

23  didn't evaluate economic profit.  What did he do?

24  A.      Dr. Bell did have a slide where he evaluated the

25  accounting profit or the incremental profits that were

McDuff - direct

1    earned on an annual basis, but he didn't evaluate the

2    overall economic profit of the product.

3    Q.      Just to be clear, what is accounting profit?

4    A.      Accounting profit is just on an annual basis revenue

5    minus costs of production and marketing costs.  It doesn't

6    take into account other economic costs or the cost of

7    commercialization.

8    Q.      Is there a type of a profit that is appropriate to

9    look at for commercial success analyses?

10   A.      Yes, the full economic cost.

11   Q.      Did do you that?

12   A.      Yes.

13   Q.      Do you have a slide summarizing that?

14   A.      Yes.

15   Q.      Could you just describe first what is economic profit

16   with the assistance of this illustration?

17   A.      This is the same picture as we had before which shows

18   the drug development process.  Economic profit is an

19   evaluation of all of the costs from start to finish for a

20   product including the costs that are listed up here on the

21   screen.

22   Q.      What are the relevant costs that factor into economic

23   profitability?

24   A.      Number one, out-of-pocket costs or direct

25   expenditures in dollars.  Number two, success rates.  The

McDuff - direct

1    idea of the likelihood of getting a product to market.

2    Three, development time, the fact that pharmaceutical

3    research and development occurs ten to fifteen years before

4    sales and profits occur.  And number four, costs of capital,

5    the idea that when you're making an outlay or an investment

6    you have to get an adequate return on that investment.

7    Q.    You mentioned these relevant economic profitability

8    costs.  Is that something that you, Dr. McDuff, came up

9    with?

10   A.    No, I certainly resonate with them as an economist,

11   but these costs come from dozens of papers in the peer

12   reviewed literature on how to evaluate costs in bringing

13   products to market.

14   Q.    Do you have a slide summarizing those?

15   A.    Yes.

16   Q.    What does the literature say about including things

17   like opportunity costs and costs related to the likelihood

18   of approval in an economic profitability analysis?

19   A.    In every single paper on this topic spanning multiple

20   decades, these four costs are included in determining the

21   costs of bringing the drug product to market.

22   Q.    Could you describe what some -- could you describe

23   what you have on the slide here?

24   A.    These are two examples showing these four costs in

25   the drug development process.  The one on the left is

McDuff - direct

1   Messeri-Fernandez 2012, the one on the right is DiMasi and

2   coauthors, 2016.

3   Q.     Does the literature assign a monetary value to these

4   economic costs?

5   A.     Yes.  And in large part that's the purpose of the

6   literature, you can see both of these papers showing the

7   out-of-pocket costs, success rates, development times, cost

8   of capital, and both papers are aimed specifically at

9   quantifying these.

10  Q.     You have a source here, JTX 88 and JTX 44, are those

11  two documents that you relied upon in your commercial

12  success analysis?

13  A.     Yes.

14  Q.     Did you go about analyzing the economic profitability

15  of Ampyra as part of your analysis?

16  A.     Yes, I did.

17  Q.     Did Acorda produce information related to Ampyra's

18  commercialization costs?

19  A.     Not to my knowledge.

20  Q.     Did Dr. Bell provide any information in his report

21  that you responded to about the commercialization cost of

22  Ampyra?

23  A.     No.

24  Q.     If you don't have access to Acorda data, what is your

25  starting point for assessing Ampyra's economic profits?

McDuff - direct

1    A.     I utilized this academic literature which is

2    specifically aimed at the determining the cost of drug

3    development.

4    Q.     And do you have a summary slide describing that

5    analysis?

6    A.     Yes, you can see that on the next slide.

7    Q.     Where did you start on your analysis?

8    A.     The most applicable paper for Ampyra is DiMasi, et

9    al. 2016.  This is a paper that's part of a series of

10   research over decades and some of the most widely cited

11   literature on the topic.

12   Q.     What are the type of commercialization costs

13   reported?

14   A.     They analyze new chemical entities that have FDA

15   marketing approval from 2005 to 2013 and initial clinical

16   testing from 1995 to 2007.

17   Q.     And what is the total costs of commercializing those

18   drugs that DiMasi looked at?

19   A.     They come up with a cost of commercialization of

20   $2.588 billion per approved drug.

21   Q.     Where is the DiMasi data where you start your

22   analysis?

23   A.     Because Ampyra fits squarely in the type of drug

24   that's analyzed in that research.  Ampyra is a new chemical

25   entity.  It has FDA marketing approval in 2010, squarely in

1   the range.  It has initial clinical testing no later than

2   1999, right in the range.  And its time to approval and time

3   to clinical testing are if anything a bit longer than what

4   you see on average.

5   Q.    Did you use the 2.588 billion that DiMasi reports in

6   your analysis?

7   A.    I used that as a starting point and I adjusted that

8   to make it specific to Ampyra.

9   Q.    Could you describe what adjustments you made?

10  A.    Yes.  You can see that in the next slide.  I made

11  three adjustments.  One I made a downward adjustment for

12  lower clinical costs for orphan drugs of 12.1 percent.

13          I made an upward adjustment for the fact that

14  it's a central nervous system drug and neurological R & D

15  costs tend to be higher on average by 15 percent.  And I

16  made an adjustment for the specific time of launch of minus

17  6.4 percent.

18  Q.    Now the percentages that you base these adjustments

19  on, where did you get those from?

20  A.    Those come from the peer reviewed literature on the

21  commercialization costs for different types of drugs.

22  Q.    And how did you use that estimated commercialization

23  costs for Ampyra in your overall economic profitability

24  analysis?

25  A.    We using DiMasi 2016 as a starting point and these

McDuff - direct

1    adjustments specific to Ampyra, I applied those adjustments

2    to get an economic cost estimate of $2.564 billion.

3    Sometimes when I do my work in these cases I'll make a large

4    adjustment either downward or upward.  For Ampyra it just so

5    happens the adjustments are countervailing, so Ampyra is

6    close to the average and that's not that surprising given

7    that it fits the profile of an average drug.

8    Q.    Could you describe the calculations you made after

9    that?

10   A.    Yes, you can see the calculation of economic profit

11   on the next slide.

12   Q.    Could you please explain what you have on this slide?

13   A.    This is the calculation of economic profit.  This is

14   a standard net present value calculation that's performed in

15   economics and performed in the literature on the topic.  It

16   starts with the R & D, or the commercialization costs

17   estimate in the top row.  And then it provides a calculation

18   of the sales and profits not only that have occurred to date

19   that we know as well as projected into the future.

20   Q.    You mentioned present value.  Why do you put the

21   dollars into present value?

22   A.    You put future sales in dollars into present value.

23   It's standard in this context to discount everything to the

24   time of FDA approval.  You do that because future sales in

25   dollars are uncertain and to take into account time value,

McDuff - direct

1    risk and cost of capital, you discount those to present

2    values, that's a standard approach.

3    Q.     How do you select the discount rate that you use?

4    A.     The discount rate here is 15 percent.  I evaluate a

5    range of discount rates.  It's common in the pharmaceutical

6    industry to have a discount rate of 10 to 15 percent because

7    there is additional risk of potential generic entry.  Also,

8    Acorda is a relatively small company and when I analyze

9    their internal documents I saw discount rates even higher up

10   to 30 percent, 15 percent seems like a reasonable baseline

11   discount rate.

12   Q.     Has Ampyra after you have done your calculation

13   achieved economic profitability?

14   A.     No, it hasn't.  So compared to the present value

15   costs 2.56 billion, the present value of income and profits

16   is only 1.48 billion.  In other words, leading a negative

17   present value to relative to the total economic cost of 1.08

18   billion of a loss.

19   Q.     And according to your calculations, will Ampyra

20   achieve economic profit in the future?

21   A.     No.

22   Q.     Do you have a slide illustrating the results of this

23   calculation?

24   A.     Yes.  You can see the calculation visually on the

25   next slide.  This slide shows on the X access from 2010 to

McDuff - direct

1    2027, the net present value of the revenues and profits are

2    the colored lines here.  There are four lines to show the

3    variability to the discount rate.

4              And the idea with this analysis is to compare

5    whether those lines grown to a point that exceed the

6    commercialization cost.  You can see the $2,54 billion on

7    the screen for the full economic cost and the sales and

8    profits don't reach that.

9    Q.    Are these sales and profits now that we do know them

10   large enough to have generated a commercial opportunity for

11   Ampyra in your opinion?

12   A.    No, they are not.

13   Q.    Are you aware of criticisms that Dr. Bell has made

14   regarding the adjustments that you referred to to arrive at

15   your analysis of Ampyra's commercialization cost?

16   A.    Yes, I summarized some of those in the next slide.

17   Q.    What is -- could you describe what Dr. Bell's

18   criticisms of your economic profitability analysis?

19   A.    The first as we heard from him on his testimony

20   yesterday is that he says Ampyra should have a higher

21   success rate than the average drug.

22   Q.    What success rate did Dr. Bell suggest?

23   A.    Well, he suggested two.  One he suggested was a 22

24   percent success rate because of literature on orphan drugs.

25   Q.    Do you agree that the 22 percent success rate is

McDuff - direct

1    appropriate?

2    A.    No, I don't.  The reason why orphan drugs have a

3    higher success rate because many of them are linked to

4    genetic modifications or genetic mutations and the treatment

5    relates to specific protein treatment.  And the authors of

6    the papers that he cites say that that's why there is a

7    higher success rate, that's not what Ampyra is about.

8    Q.    Even if you take Dr. Bell's 22 percent success rate

9    and apply that to your analysis, what is the result?

10   A.    Nevertheless, I do the calculations so the Court can

11   see the sensitivity.  When you apply the 22 percent success

12   rate, you have an adjustment downward of the

13   commercialization cost of $431 million, yet even with the

14   lower commercialization cost, the sales and profits still

15   don't reach that level.

16   Q.    Did you hear Dr. Bell suggest that perhaps a 100

17   percent success rate should be applied because defendants

18   are alleging in this case that the patents-in-suit are

19   obvious?

20   A.    I did, yes.

21   Q.    Do you agree with that?

22   A.    No, I don't.  I think it's flawed to assume that just

23   because an invention is obvious, it's automatically a

24   commercialized approved FDA product.  There are plenty of

25   inventions that obvious that don't get FDA approval.  It's

McDuff - direct

1    not a given that that will occur.  And it's contrary to all

2    of the economic literature on the topic.

3    Q.    Could you describe Dr. Bell's second critique of your

4    analysis?

5    A.    The second critique he has is that Ampyra has lower

6    preclinical costs because the compound already existed.

7    Q.    Do you agree with that criticism?

8    A.    No, I don't.

9    Q.    Why not?

10   A.    Well, it doesn't line up with the timing of Ampyra's

11   commercialization costs.  From 1997 when they started their

12   joint venture with Elan, it was thirteen years to approval.

13   That more or less lines up with the length of time that it

14   takes for an average drug development cost.

15   Q.    Now, does Dr. Bell suggest an appropriate amount for

16   preclinical costs in this case?

17   A.    He suggest they should be zero and I don't find that

18   plausible.

19   Q.    To your knowledge, have plaintiffs produce any

20   information as to what their preclinical costs were?

21   A.    No.

22   Q.    Now, you mentioned two critiques here.  Even if you

23   make an adjustment to address both of those critiques, how

24   does that affect your ultimate analysis?

25   A.    None of these adjustments change the result.  So I

McDuff - direct

1    make an adjustment for lower preclinical cost, I reduce them

2    by half, how would that affect things.  And then I applied

3    both the higher success rate and the lower preclinical costs

4    together.  If you apply them both together, it does make a

5    one billion dollar reduction in the cost of

6    commercialization, but even still with the cost of

7    commercialization of $1.54 billion, the net present value of

8    Ampyra sales is still negative .61 billion through 2018,

9    that's the expiration of the '938 patent, and still almost

10   break even but slightly negative at minus .06 billion

11   through 2027, even projecting sales out more than ten years.

12   Q.    Do you have a slide to illustrate that?

13   A.    Yes.

14         So here you can see the net present value

15   calculations with the alternative benchmarks or the

16   alternative commercialization costs.  Most of the lines lie

17   below even the lowest plausible commercialization cost.  And

18   if there is going to be an amount of sales and profits that

19   reach that commercialization cost, they have not occurred to

20   date and they wouldn't occur for many years into the future.

21   Q.    We also heard yesterday from Dr. Bell some testimony

22   about sales of dalfampridine outside of the US.  Do you

23   recall that?

24   A.    I do.

25   Q.    Even if you consider what the evidence in this case

McDuff - direct

1    has shown that Acorda has made based on those sales or

2    licenses, how does that affect your analysis?

3    A.      Dr. Bell testified that Acorda has earned around a

4    $150 million in licensing fees.  If you add that to the

5    analysis, in other words you raise the net present value

6    lines by roughly $150 million, you're still largely below

7    the commercialization cost, in essence the result doesn't

8    hinge on that.

9    Q.      We heard from Dr. Bell that marketing costs for

10   Ampyra went down after launch.  Do you recall that?

11   A.      I do.

12   Q.      Is that unusual in the pharmaceutical industry?

13   A.      That's the typical path.  I wouldn't read anything

14   into that.

15   Q.      We heard from Dr. Bell that Acorda's sales force went

16   down after the launch.  Do you recall that?

17   A.      I do.

18   Q.      Is that unusual in the pharmaceutical industry?

19   A.      No, it's typical as well.

20   Q.      Did you reach a conclusion about the economic

21   profitability of Ampyra?

22   A.      I did.  After performing the analysis, I did not find

23   that Ampyra has earned an economic profit based on sales and

24   profits earned to date, nor is it likely to achieve an

25   economic profit into the future.

McDuff - direct

1    Q.      Thank you, Dr. McDuff.  Let's move on to your opinion

2    that a blocking patent limits the relevance of Ampyra's

3    success.  First, what is a blocking patent?

4    A.      A blocking patent is a patent that effectively blocks

5    commercialization of another entity from bringing the

6    product to market.

7    Q.      How is the presence of a blocking patent relevant to

8    a commercial success analysis?

9    A.      Blocking patents are relevant because even if there

10   is a commercial opportunity, that blocking patent

11   disincentivizes or blocks other entities from bringing a

12   product to market sooner, so there is no inference for

13   obviousness in that case.

14   Q.      Did you find that there was a issue for blocking

15   patent in this case?

16   A.      I did.

17   Q.      What is the blocking patent at issue here?

18   A.      The blocking patent at issue here is the '938 patent.

19   It's listed in the FDA orange book for Ampyra and it issued

20   in 1996.

21   Q.      What does it mean to be listed in the FDA orange

22   book?

23   A.      What that means is Acorda has listed it to cover

24   Ampyra and it's effectively a notice to others that this is

25   a patent that covers their product.

McDuff - direct

1    Q.      When did the Elan patent issue?

2    A.      In 1996.

3    Q.      Do you have an illustration of the timeline in which

4    the '938 patent has served as a blocking patent?

5    A.      Yes, that's on the next slide.

6    Q.      Could you describe what the relevant events related

7    to the '938 patent serving as a blocking patent are?

8    A.      Yes.  There are three main rows here.  The top row is

9    the Acorda patents which have priority back to April 2004.

10   The middle row is the Elan patent which claims priority back

11   to 1990 and issued in July 1996.  And the bottom row is the

12   Elan/Acorda exclusive license which began in 1997-1998

13   period.

14   Q.      Is the Elan patent still serving as a blocking patent

15   today?

16   A.      Yes.

17   Q.      When does the Elan patent expire?

18   A.      In 2018.

19   Q.      You have a reference there to PTE in March 2010.

20   What is PTE?

21   A.      That is a Patent Term Extension.  That refers to the

22   USPTO granting an extension to the expiration of the patent.

23   Q.      Was Elan granted a patent term extension?

24   A.      Yes.

25   Q.      Did Acorda represent to the Patent Office in the

McDuff - direct

1    patent term extension that Ampyra is covered by the '938

2    patent?

3    A.      That is my understanding, yes.

4    Q.      So how that is relevant to your blocking patent

5    analysis?

6    A.      Well, it shows that there is a long period of time

7    where the blocking patent is in place.

8    Q.      Do you have an understanding as to whether Elan ever

9    licensed the '938 patent?

10   A.      Yes, they licensed it to Acorda.

11   Q.      Do you have an understanding of the timing of those

12   licenses?

13   A.      Yes.  In January of 1997, they provided with an

14   exclusive license for spinal cord injury.  In April 1998,

15   provided them with an exclusive license for MS.

16   Q.      To from April 1998 to today, Acorda has held an

17   exclusive license for the '938 patent; is that right?

18   A.      Yes.

19   Q.      And how is that relevant to your commercial success

20   analysis?

21   A.      It's relevant because Acorda is the only entity that

22   can get access or can get a license to the '938 patent.  In

23   effect, other entities that might want to pursue commercial

24   opportunity like Ampyra, even if they would -- again, I

25   don't find that, but if they would, they would not have

McDuff - direct

1    access to it because Acorda has that exclusive license.

2    Q.    Now, you listed several sources here for your

3    analysis:  JTX-001, 002, 003, 004, 005, 006, 020, and 021.

4    Are those documents you relied upon in your blocking patent

5    analysis?

6    A.    Yes.

7    Q.    And do you have a slide summarizing your opinion in

8    that regard?

9    A.    Yes.

10   Q.    Now, Dr. McDuff, are you aware of any evidence put

11   forth by plaintiffs that Elan was willing to license the

12   '938 patent to anyone else beside Acorda?

13   A.    No.

14   Q.    Are you aware of any evidence put forth by plaintiffs

15   that Elan did license the '938 patent to anyone else besides

16   Acorda?

17   A.    No, I'm not.

18   Q.    Are you aware of any evidence put forth by plaintiffs

19   that Elan attempted to license the '938 patent to anyone

20   else besides Acorda?

21   A.    No.

22   Q.    You are aware of any evidence put forth by plaintiffs

23   about the terms of any proposed license for the '938 patent

24   between Elan and anyone but Acorda?

25   A.    No.

McDuff - direct

1    Q.      Now, how does the timing of the license agreements

2    between Elan and Acorda for the '938 patent affect your

3    blocking patent analysis?

4    A.      There is a very narrow window of time between

5    issuance of the '938 patent in 1996 and the exclusive

6    license in January 1997 and April of 1998, less than two

7    years.  So there is not a large window of opportunity when

8    another entity could have brought this product to market

9    sooner, not before the exclusive license was in place.

10   Q.      What does that tell you about commercial success in

11   this case?

12   A.      What it says is that commercial success, even if it

13   exists, isn't relevant for the Acorda patents because the

14   Elan patents is a blocking patent.

15   Q.      Thank you, Dr. McDuff.  Let's turn to your last

16   opinion about the weak nexus limits relevance of commercial

17   success.

18           What does the nexus analysis evaluate in a

19   commercial success analysis?

20   A.      The nexus analysis evaluates what is driving sales

21   and whether there is a sufficient connection between those

22   sales and the contributions of the patents in suit.

23   Q.      What materials did you review in that regard?

24   A.      I reviewed business documents on the topic.  I also

25   relied on the expert opinion of Dr. Peroutka.

McDuff - direct

1   Q.     Do you have a slide illustrating your opinions?

2   A.     Yes.

3   Q.     So how do the patents in suit contribute to the sales

4   of Ampyra?

5   A.     Well, what this slide shows is that the

6   patents in suit have relatively weak contributions to the

7   overall product.  The 4-AP compound itself has existed for

8   a long time.  It is the primary basis for the clinical

9   efficacy of the drug.  Based on Dr. Peroutka's opinion, it

10  comprises the vast majority of that clinical benefit.

11          By contrast, the Elan patent providing a

12  sustained release and the Acorda patents providing optimal

13  dosing or the 10 milligram BID dosing, those two factors are

14  not nearly in the same magnitude of the 4-AP compound

15  itself.

16  Q.     And you have listed 10 milligrams BID as the dose

17  claimed by the Acorda patents.  How is that relevant to your

18  analysis?

19  A.     It's relevant because I understand Dr. Peroutka says

20  that a 15 milligram or a 20 milligram product would be just

21  as clinically effective as a 10 milligram product.  So from

22  a sales perspective or commercial success perspective, the

23  sales in prescriptions would essentially be unchanged if

24  they were selling a 15 milligram or 20 milligram product.

25  In other words, no nexus to the Acorda patents.

McDuff - direct

1    Q.      What did you conclude about the nexus of Ampyra sales

2    to the patents in suit?

3    A.      That they are a weak nexus, if any, and even weaker

4    for the Acorda patents than the Elan patent.

5    Q.      Have you seen any evidence in Acorda's internal

6    documents that relates to the nexus of sales to Acorda's --

7    to the patents in suit?

8    A.      Yes.  In my review of the business documents, I

9    didn't see reference at all to the optimal dosing or the

10   sustained release being a driver of sales.

11   Q.      So, in conclusion, could you summarize your opinions

12   for the Court?

13   A.      Yes.  Again, to reiterate, No. 1, Ampyra has not been

14   a commercial success and is unlikely to be commercial

15   success in the future.

16           No. 2, the blocking patent of the '938 patent

17   limits the relevance of any success to the Acorda patents.

18   And.

19           Third, the weak nexus limits the relevance of

20   any success even if it exists.

21           MR. COOPER:  Thank you, Dr. McDuff.

22           THE WITNESS:  Thank you.

23           MR. COOPER:  I pass the witness.

24           THE COURT:  All right.  Cross-examination.

25           MR. STIEFEL:  Thank you, Your Honor.

McDuff - cross

| 1 | CROSS-EXAMINATION |
| 2 | BY MR. STIEFEL: |
| 3 | Q.     Good morning, Dr. McDuff. |
| 4 | A.     Good morning. |
| 5 | Q.     You received your Ph.D. in 2009; is that correct? |
| 6 | A.     Yes. |
| 7 | Q.     And that is when you joined essentially your current |
| 8 | employer? |
| 9 | A.     Yes. |
| 10 | Q.     And at your deposition, you testified that about |
| 11 | 75 percent of what you do is litigation related? |
| 12 | A.     Yes. |
| 13 | Q.     And about a third to a half of that 75 percent of |
| 14 | what you do is related to pharmaceutical litigation? |
| 15 | A.     More or less, yes. |
| 16 | Q.     And you provided expert report -- expert opinions in |
| 17 | other cases; correct? |
| 18 | A.     Yes. |
| 19 | Q.     And you have testified in multiple cases that |
| 20 | branded drugs that were approved by the FDA and sold by |
| 21 | pharmaceutical companies were not commercial successes; |
| 22 | correct? |
| 23 | A.     Yes. |
| 24 | Q.     And if you would turn to your CV, DTX-132, item -- |
| 25 | well, item 3.  And you will recall that I asked you to |

McDuff - cross

1    identify for me on your CV -- at your deposition, I asked

2    you to identify for me on your CV all the instances in which

3    you had opined at a trial about whether a product was a

4    commercial success or not.  Correct?

5    A.     I recall that, yes.

6    Q.     And item 3 is a case in which you opined on behalf of

7    a generic that an Orexo Zubsolv product was not a commercial

8    success; correct?

9    A.     Yes, I provided a report and deposition testimony.

10   The plaintiffs dropped their assertion of commercial success

11   before trial.

12   Q.     And in item 4, you opined on behalf of generic Mylan

13   that Pfizer's Toviaz product was not a commercial success?

14   A.     Yes.

15   Q.     And on item 5, you testified that Sanofi's Multaq

16   product was not a commercial success?

17   A.     Yes, correct.

18   Q.     And on August 31 of this year, Judge Andrews issued

19   an opinion after trial concluding that Multaq was a

20   commercial success?

21   A.     It was one consideration.  I would defer to the

22   opinion itself.

23   Q.     But you know that he concluded that it was a

24   commercial success, correct?, and specifically said that?

25   A.     I think he said at most, a moderate commercial

McDuff - cross

1    success.  We can look at it.

2    Q.     But he disagreed with your opinion, correct?

3    A.     He took my opinion into account, sure.

4    Q.     And your opinion was that it was not a commercial

5    success?

6    A.     Correct.

7    Q.     And if you look at item 14, you opined on behalf of

8    Warner-Chilcott that Merck's NuvaRing product was not a

9    commercial success; correct?

10   A.     Correct.

11   Q.     In item 16, you opined on behalf of the defendant

12   generics that Eisai's Banzel product was not a commercial

13   success?

14   A.     I did not provide testimony at trial but, yes, that

15   was my opinion.

16   Q.     And in item 18, you opined on behalf of defendant

17   generics that UCB's Vimpat product was not a commercial

18   success; correct?

19   A.     Yes.

20   Q.     And on item 24, you opined on behalf generic Teva

21   that UCB's Metadate CD was not a commercial success?

22   A.     Yes, correct.

23   Q.     And you are not aware, other than the Multaq

24   decision, you are not aware of any of the courts deciding

25   the commercial success issue in those cases; correct?

McDuff - cross

1   A.      That is not true anyone, no.

2   Q.      In which case was there a decision?

3   A.      There was the Merck case related to NuvaRing.  That

4   was with Judge Sleet.  He had a finding that plaintiffs did

5   not prove commercial success, their analysis was unreliable.

6   I would think it was essentially agreeing with my testimony.

7           Then there was the UCB case with Vimpat in which

8   there was a finding of commercial success.

9   Q.      Which was contrary to your opinion?

10  A.      Yes, as I would think of it.

11  Q.      Now, in every instance in which you opined regarding

12  commercial success of a pharmaceutical product, you opined

13  as you do here against the branded companies; is that

14  correct?

15  A.      No, that is not true.  I haven't found that in every

16  case.  The cases that have gone to trial, that is true.  I

17  provided opinions of no commercial success, but I have found

18  drugs to be commercially successful.

19  Q.      But you have never -- but you have always opined

20  against the branded company; correct?  That was my question.

21  A.      Well, that is true for the cases that have gone to

22  trial, but that is not true generally.  I worked on cases

23  where I provided an opinion that the branded drug was

24  commercially successful.

25  Q.      And those cases didn't go to trial?

McDuff - cross

1    A.      Correct, or another expert was the testifying expert.

2    Q.      Well, could you answer my question?  Have you always

3    been against the branded companies?

4    A.      I don't usually think of being for or against, but I

5    don't typically get retained by branded companies, no.

6    Q.      When you say typically, isn't the -- by typically,

7    you mean you never get retained by branded companies;

8    correct?

9    A.      That's not true.  A lot of companies these days are

10   to some degree branded and to some degree generic.  And I

11   have worked on cases where I have been retained by a

12   branded -- by a company that is selling a branded product,

13   and I have been on that side of the case.

14   Q.      If you turn to your deposition at page 27 of your

15   deposition.

16           At line seven, it says, I asked you:

17           "Question:  In all the instances you were

18   against the branded company, all the instances in which you

19   testified or which your firm rendered an opinion, you were

20   against the branded company; correct?

21           "Answer:  That may about true for the cases I've

22   worked on.  I know there's at least one case right now where

23   the firm is retained on behalf of a branded pharmaceutical

24   company.  And there may be others as well."

25           Did you give that testimony?

McDuff - cross

1    A.    I did.  Perhaps I was misremembering because I'm

2    recalling at least one case right now where I'm working on

3    behalf of a company selling a branded drug.

4    Q.    So your testimony now is different from the testimony

5    you gave at your deposition?

6    A.    It is not different.  I mean it's similar in the

7    sense that I more commonly get retained by generic

8    companies, but there is at least one instance I can think

9    of being retained by a company selling a branded drug.

10   Q.    And to the extent you do consulting work for

11   pharmaceutical companies, it has been for generics; is that

12   correct?

13   A.    That's true, yes.

14   Q.    Your understanding is that commercial success is

15   relevant to the issue of obviousness in patent cases because

16   if the invention presented an economic opportunity, somebody

17   else would have brought the product to market sooner;

18   correct?

19   A.    Yes, that is generally fair.

20   Q.    And you agree that in the pharmaceutical industry,

21   significant resources are expended on failures; correct?

22   A.    Yes.

23   Q.    And so it is in the interest of pharmaceutical

24   companies to expend their resources on products that are

25   more likely to be successful than less likely to be

McDuff - cross

1    successful; correct?

2    A.    They would seek to do so.  There is, of course, some

3    degree of uncertainty with every product.

4    Q.    Now, Ampyra is the only drug approved to treat

5    walking in MS patients; correct?

6    A.    With that specific indication, that is my

7    understanding, yes.

8    Q.    And in testifying today seemingly about shortcomings

9    of Ampyra, you have not spoken to any MS patients about

10   their experience with Ampyra, have you?

11   A.    No, not personally.

12   Q.    So you don't know whether the patients who are taking

13   Ampyra are benefitting from the effects multiple sclerosis

14   even if they are not as many patients as may be taking some

15   blockbuster drugs; correct?

16   A.    They may to some degree, but again the overall

17   opportunity is limited because of that.

18   Q.    From an economic point of view?

19   A.    Yes.

20   Q.    Now, Ampyra is approved as an orphan drug; correct?

21   A.    Yes.

22   Q.    And it's approved as an orphan drug because there is

23   a more limited number of people who may be able to benefit

24   from the drug than, say, a cholesterol drug which everybody

25   may be able to benefit from; correct?

McDuff - cross

1    A.    Yes.  In other words, more limited opportunity.

2    Q.    And the law incentivizes companies because of the

3    public interest to invest in orphan drugs that may help

4    people, albeit a smaller universe of people; correct?

5    A.    Yes.

6    Q.    And among those incentives are tax breaks; correct?

7    A.    Yes.

8    Q.    Can we look at DTX-337.

9          Do you recognize DTX-337 as an attachment to

10   your expert report in this case?

11   A.    Yes.

12   Q.    And this reflects sales data and net income with

13   respect to Ampyra?

14   A.    Yes.

15   Q.    And that is data that you relied on in giving your

16   opinion here?

17   A.    It is.  As we discussed at deposition, I did see

18   internal information which indicated lower profits which to

19   some degree called this into question for me, yet I did use

20   it in the calculations I presented as a rebuttal to

21   Dr. Bell.

22   Q.    And the data that you, what you looked on that

23   suggested lower profits were projections in advance of what

24   the numbers would be as opposed to actual numbers; correct?

25   A.    I believe so.  That was the best information I found

McDuff - cross

 1    internally.

 2    Q.    But it was numbers that were projecting into the

 3    future what the sales would be and, in fact, Acorda reported

 4    that the sales were better than they were projected to be;

 5    correct?

 6    A.    I'd have to go back and refresh my memory.  I believe

 7    they were to some degree projected, yes.

 8    Q.    Weren't they all projected because they were in

 9    advance of the numbers you were looking at in terms of the

10    actual sales?

11    A.    I don't remember.  I'd have to go back and look.

12    Q.    If you look at Exhibit 337, the net sales reflect, is

13    data that came from the SEC filings; correct?

14    A.    Yes.

15               MR. STIEFEL:  Okay.  Well, let's just take a

16    look at JTX-23.

17               (Counsel confer.)

18               MR. STIEFEL:  May I approach?

19               THE COURT:  Yes, you may.

20               (Binders passed forward.)

21    BY MR. STIEFEL:

22    Q.    JTX-23 is the document you referred to which you said

23    raises questions in your mind about the accuracy of the

24    Acorda data?

25    A.    Yes, because the profit margins are significantly

McDuff - cross

1   lower than the other document.

2   Q.    Okay.  And those projections were from 2012; correct?

3   This was a document that was created in 2012; is that right?

4   A.    Yes.  So, again, to some degree relying on actual

5   information through 2012 and being projected going forward.

6   Q.    Okay.  Now, I think we can move on.

7         You say you looked at, during your direct, you

8   made some comparisons of the sales of Ampyra to sales of

9   other multiple sclerosis drugs; correct.

10  A.    Yes.

11  Q.    And could we take a look at DDX-8-9.

12        That is, you were comparing the sales of Ampyra

13  to other MS drugs; correct?

14  A.    Yes.

15  Q.    And you were comparing the worldwide sales of those

16  MS drugs to the U.S. sales of Ampyra; correct?

17  A.    I believe those are worldwide.  Ampyra is not sold

18  outside the U.S., so its U.S. sales are essentially its

19  worldwide sales.

20  Q.    But we did hear that there are sales of the product

21  outside the US; correct?

22  A.    There is a different product called Fampyra sold by

23  Biogen.  My understanding is that sales to date have been

24  are very low, just a fraction of Ampyra sales.

25  Q.    But you didn't deduct the US, the foreign sales of

McDuff - cross

1   those other drugs in making this slide; correct?

2   A.    I don't know if I would have had the ability to do

3   so.   The source I used provide worldwide sales, but if you

4   add in the international sales of Fampyra to the yellow bar,

5   the picture would look essentially the same, the sales are

6   very low.

7   Q.    You don't know, at least you didn't at your

8   deposition, whether those other drugs that we're looking at

9   are drugs which are different in kind from Ampyra in that

10  they are disease modifying drugs as opposed to drugs which

11  are approved to treat a symptom of multiple sclerosis; is

12  that correct?

13  A.    I have heard the term.  My understanding is they do

14  have different indications in a way broader than the narrow

15  indication of Ampyra.

16  Q.    But they are different in kind, aren't they, in that

17  they treat the underlying disease and carry higher prices

18  than Ampyra which treats a symptom; correct?

19  A.    I understand what you're saying.  In my view that's

20  what limits the opportunity of Ampyra relative to those

21  drugs.

22  Q.    But to an extent, in comparing those sales, you're

23  comparing apples and oranges; correct?

24  A.    I don't think of it that way.  The whole purpose is

25  to figure out what kind of opportunity in this space is

McDuff - cross

1    worth while and there are much larger opportunities than

2    Ampyra out there.

3    Q.    So your opinion is that Ampyra -- I think we can take

4    that down.

5          Your opinion here is that Ampyra is not a

6    commercial success even though the net sales totaled $1.7

7    billion between the product launch in 2010 and the end of

8    2015, and now it's even more; correct?

9    A.    Yes, correct.  As I've explained --

10   Q.    That was sufficient.  I asked a question and you

11   answered it.  If your counsel wants to bring out more, they

12   can.

13         Your opinion then is that Ampyra is not a

14   commercial success even though Acorda's net income from

15   Ampyra was close to a billion dollars in the time that it

16   since launched through the end of 2015; correct?

17   A.    In accounting profits over these years, yes.

18   Q.    And your view is that if you take into account the

19   total economic costs, that's when you arrive at a conclusion

20   that Acorda -- that Ampyra is not a commercial success

21   because the costs, the economic costs as you called them

22   exceed the profits; correct?

23   A.    That's part of my opinion, yes.

24   Q.    And that's because in your view, the costs of

25   developing a product is -- should essentially -- the actual

McDuff - cross

1    costs of developing a product for purposes of your analysis

2    gets multiplied by some number in order to take into account

3    the failures of products across the industry generally;

4    correct?

5    A.    Yes, it compensates for the risk of failure.  And as

6    discussed, that is the standard approach in calculating

7    pharmaceutical development costs.

8    Q.    And that's the standard approach in calculating the

9    pharmaceutical development costs across the industry;

10   correct?

11   A.    Yes.

12   Q.    And it's not -- none of the articles that you cited

13   in your report or here discuss the notion of multiplying for

14   a failure rate or success rate in the context of deciding

15   commercial success in a patent case where the question is

16   whether the product, if obvious, would have presented a

17   commercial opportunity; correct?

18   A.    Those papers don't specifically address commercial

19   success, but at their core, that's what they are about.

20   They're trying to figure out which drugs are successful or

21   which drugs get adequate return on investment, that's how

22   success is defined in this industry and which drugs don't.

23   Q.    But none of them talk about commercial success in the

24   litigation context; correct?

25   A.    Not in a litigation context, not as a secondary

McDuff - cross

1    consideration of obviousness, but they are about commercial

2    success.

3    Q.    And Professor Grabowski is one of the authors of

4    those papers; correct?

5    A.    Yes.

6    Q.    And you know he testifies regularly in patent cases

7    on behalf of branded companies; correct?

8    A.    Yes.

9    Q.    And so he knows a lot about commercial success in the

10   litigation context and doesn't mention it in any of those

11   articles; correct?

12   A.    I'm sorry, I don't follow the question.

13   Q.    He doesn't mention commercial success in the

14   litigation context in any of the articles you're referring

15   to?

16   A.    Not to my knowledge, but again, they're about success

17   generally in the industry.

18   Q.    And so your conclusion about the costs of developing

19   Ampyra allocates -- includes an allocation for the average

20   cost of drug development, of failed drug development

21   efforts; correct?

22   A.    That's how it's calibrated in the literature, but

23   that's not the right way to think about it.  The right way

24   to think about it is a success rate.  If idea is that if you

25   are going to spend say a hundred million dollars or $200

1   million on a clinical trial, you don't know whether that's

2   going to work.  If it doesn't work, you have lost an

3   investment of 100 to $200 million.  And for pharmaceutical

4   companies to be profitable, their drugs that do make it to

5   approval need to compensate for that loss or that risk.

6   Q.    And it's more likely to work in a case where the

7   invention that we're talking about, the product is obvious

8   than in a case where it's not; correct?

9   A.    Generally I don't agree with that.  Just because an

10  invention is obvious doesn't mean you will get FDA approval.

11  Q.    Can we look at JTX 64.  This is one of the articles

12  by Grabowski and DiMasi that you relied on in your report;

13  correct?

14  A.    Yes.

15  Q.    And if we look at page 23, column one, paragraph

16  three, it says, "Since the average R & D costs includes an

17  allocation for drugs that drop out during the development

18  process, an unprofitable drug that more than covers variable

19  costs going forward contributes positively to the firm's

20  bottom line."

21        Do you see that?

22  A.    I do.

23  Q.    So Grabowski and DiMasi referred to it as an

24  allocation for dropout drugs; correct?

25  A.    They do in this context.  This is exactly the concept

McDuff - cross

1    that I have been trying to explain to you which is that drug

2    companies may be interested in continuing their products

3    once they have gotten FDA approval, it makes sense to sell

4    the product and earn profits going forward, but because of

5    that risk of failure, they're unprofitable when you consider

6    the full costs and risks involved.

7    Q.    But you said it was not appropriate to look at it as

8    an allocation for failure, and the authors that you're

9    relying on did think it appropriate and described it as an

10   allocation of cost for failure; correct?

11   A.    I think you can think of it either way.  I think it's

12   more intuitive to think of it as a risk of failure.  I think

13   you can think of it as an allocation for drugs that drop

14   out, that's how the risk of failure is calibrated.  I think

15   you can think of it either way if that's easier.

16   Q.    But the authors that you're relying on thought about

17   it as an allocation for failure; correct?

18   A.    No, they think about it both ways.  From my direct

19   testimony, they had a table which talked about success

20   rates, they talk about risks of approval, so they're talking

21   about it both ways as well.

22   Q.    So in your view based on your analysis and your

23   reliance on these papers, most approved drugs are not

24   economic profitable; correct?

25   A.    Most drugs do not recoup their investment costs.  As

McDuff - cross

1    we talked about, the average drug is about break even, some

2    are below, some are above.

3    Q.     When you say do not recoup the costs, you're not

4    talking about recouping the out-of-pocket costs, you're

5    talking about recouping the economic costs after you

6    multiply the actual out-of-pocket costs by a factor of eight

7    or nine which accounts for failures in the industry;

8    correct?

9    A.     That's not correct.  The approval rate is about

10   around 11 percent.  But that doesn't translate into an eight

11   or nine multiplication.  Because you spend dollars early on

12   with high probability and spend dollars later on with low

13   probability, the adjustment is more in the range of

14   two-and-a-half or three.

15   Q.     We'll take a look at that.

16          And you can't cite any authority, any case law

17   or otherwise, that does discuss your theory in the context

18   of a commercial success analysis for purposes of an

19   obviousness inquiry; is that correct?

20   A.     I'm not an attorney, so I wouldn't cite to case law,

21   but economically, absolutely.  There is a book chapter where

22   they talk about the primary evaluation of commercial success

23   is there an adequate return on investment taking into

24   account all costs and risks.

25   Q.     And that's in the litigation context?

McDuff - cross

1    A.    It is.  It's an article about commercial success and

2    secondary consideration.

3    Q.    You haven't cited that here?

4    A.    I don't remember, but it definitely guides my

5    thinking.

6    Q.    So your opinion here is not relying just on the

7    actual costs of developing Ampyra, but you're building in a

8    multiple based on what you consider an allocation or -- an

9    allocation for failure, or in your view a success rate;

10   correct?

11   A.    The whole idea is to figure out whether there is an

12   economic incentive to bring this product to market at the

13   time of the invention, so many years back, so yes,

14   absolutely, you want to take that into account.

15   Q.    At the time of the invention that we're talking

16   about, in the first case in the '938 patent, at the time of

17   the invention, 4-AP had already existed for a while;

18   correct?

19   A.    Yes.

20   Q.    And 4-AP had already been put in people; correct?

21   A.    I don't recall.

22   Q.    And 4-AP had been tested in animals; correct?

23   A.    I believe so, yes.

24   Q.    And so at that point in terms of the economic

25   opportunity that was being presented, some of the costs that

McDuff - cross

1    one would ordinarily incur had already been incurred by

2    others; correct?

3    A.      To some degree that may be true.

4    Q.      So at that point in terms of the economic

5    opportunity, one would be able to reduce the costs that one

6    would ordinarily have to incur in developing a product by

7    whatever work had already been done in actually finding the

8    active ingredient and in doing certain preclinical work and

9    even some work in humans; correct?

10   A.      I understand that argument theoretically.  It's not

11   consistent with the timing of Ampyra's development.  The

12   timing of development from the joint venture to the approval

13   is about the same length of time as the average drug,

14   whether it's preclinical or clinical.  The point is it lines

15   up almost exactly with the profile of drugs study had.  I

16   don't find it consistent with the facts, but I understand

17   that argument theoretically.

18   Q.      The facts that you're relying on the years that

19   passed, not on what actual work was done; correct?

20   A.      In part, yes.

21   Q.      Now, can we look at JTX 44.  Let's put up -- let's

22   show the screen DTX 345.  If we could blow up the upper part

23   of that so that we can see those numbers.  Thank you.

24           Now, if you would look at that.  Just so we

25   understand, that is the calculation of costs that you

McDuff - cross

1    included in your expert report; correct?

2    A.    Yes.

3    Q.    And if you look at JTX 44, that's the article that

4    you used in large part in doing your calculations; correct?

5    A.    Yes, in part.

6    Q.    And so your estimate here was that the -- with the

7    orphan tax credit, you expected the R & D costs of Ampyra to

8    be $1.87 billion; correct?

9    A.    With the orphan drug tax credit, I'm not aware of any

10   evidence that Acorda took that credit.  It's not often

11   taken, but I did consider it.

12   Q.    And it's something that would be part of a potential

13   economic opportunity for somebody considering an investment

14   in what is deemed an obvious product?

15   A.    It depends because as I mentioned the orphan drug tax

16   credit for reporting reasons s not often taken.  It would be

17   a case by case scenario.  I'm not aware of it being taken

18   here.

19   Q.    You did put that in your expert report; correct?

20   A.    I did consider it, yes.

21   Q.    Okay.  And if you look at the end of page 21 of JTX

22   44, it says in basic form, "The paradigm portrays new drug

23   discovery and development as proceeding along a sequence of

24   phases and activities, some of which often overlap.  Basic

25   and applied research initiate the process with discovery

McDuff - cross

1    programs that result in the synthesis or isolation of

2    compounds that are tested in assays and animals models in

3    preclinical development."

4            Correct?

5    A.    I'm not seeing where you're reading.

6    Q.    I'm sorry?

7    A.    I'm not seeing where you're reading in the article.

8    Q.    It's at the bottom of page 21.

9            But they were accounting for preclinical work

10   finding the compound, and during this case, there hasn't

11   been any evidence of that work being done by Elan or Acorda;

12   correct?

13   A.    I think that misses the point because there is a lot

14   of preclinical work that occurs after discovery.  On average

15   of two-and-a-half years after discovery through that

16   preclinical work it's not plausible to me that preclinical

17   costs would be zero, so I did on my direct testimony show

18   you what happens when you reduce them by half.  The

19   conclusion is the same either way even if that's true.

20   Q.    If you look at page -- well, isn't it the case that

21   the authors in this study used -- did not take account of

22   drugs that were licensed, that had been developed by others

23   initially and then licensed out; correct?

24   A.    Yes, they do that so they can get a total cost of

25   drug development.

McDuff - cross

1    Q.    Okay.  So Ampyra would not be one of the drugs that

2    they would have considered in this study?

3    A.    I'm not sure.

4    Q.    Now, you used the number that you come up with at

5    the beginning, the clinical costs number of $1.46 billion.

6    You got that using table 2 in JTX-44 -- table 4 in JTX-44;

7    correct?

8    A.    In part, yes.  It's also in Figure 2 and Figure 3.

9    Q.    Okay.  So you got, you started with a $172.7 million

10   average cost for development; correct?, which came from the

11   paper; right?

12   A.    No.  That is an average expected cost because

13   sometimes you don't pay the future costs.

14   Q.    Right.  But you used that in arriving at the

15   $1.46 billion number; correct?

16   A.    You can use it to build it up to it, but it is not

17   the cost of an improved product.  The cost of an improved

18   product is greater than that.  That is the expected cost

19   going in.

20   Q.    Well, my question is how you calculated

21   $1.46 billion.  Didn't you do that by multiplying the

22   $172.7 million number over here by a factor of 8.45?  You

23   said that cost of $172.7 million is 11.38 percent of

24   $1.46 billion; correct?

25   A.    That is true, but what I'm trying to convey is a

McDuff - cross

1    misinterpretation of yours that there is an adjustment of 8

2    from the cost of an approved product to the expected costs.

3    Q.    And how many times --

4    A.    The actual adjustment are two and-a-half or three.

5    Q.    Is $172.7 times 8.45, $1.46 billion?

6    A.    It is, but $172 is not the cost of an improved

7    product.

8    Q.    I understand.  But that is the way you calculated the

9    $1.46 billion, correct?

10   A.    It is.  It is also reported directly.

11   Q.    And so you did that because the $1.46 billion then

12   takes into account the fact that only 11.38 percent of drugs

13   by JTX-44 calculation succeed; correct?

14   A.    Yes.

15   Q.    Okay.  And so in arriving at that total

16   $1.46 billion, it was assuming that the costs would bear

17   the costs of the 78 percent of -- the 88 percent of failures

18   that the industry experiences; correct?

19   A.    Yes.  In order to be a profitable opportunity, it has

20   to.

21   Q.    And you didn't reduce the -- and you used that

22   11.83 percent success rate even though there is an article

23   which talks about a 22 percent success rate for orphan

24   drugs; correct?

25   A.    Well, as I explained --

McDuff - cross

1    Q.      Is that correct?

2    A.      It's correct.  I don't agree with the 22 percent.

3    Q.      Okay.  And you also didn't reduce, you didn't

4    change the success rate that they dealt with because of

5    the obviousness or the supposed obviousness, at least from

6    defendants' point of view, of the inventions we're talking

7    about here; correct?

8    A.      Well, I did.  I showed the sensitivity to that on my

9    direct.  When you double the success rate and use that, it

10   reduces the commercialization costs some but not enough to

11   be profitable.

12   Q.      Now, let's look at, in this slide, what you did.  If

13   we continue to look at the With Orphan Tax Credit, you,

14   after arriving at that $1.46 billion average economic cost

15   for developing a drug, which is a multiple of the actual

16   expected costs, the adjustment, you make an adjustment for

17   lower orphan drug costs; correct?

18   A.      Yes.

19   Q.      And you did that -- well, withdrawn.

20           And you then made an adjustment for the orphan

21   drug tax credit for the clinical costs; correct?

22   A.      In that scenario, and then not on the one on the

23   right.

24   Q.      Correct.  Then you had a clinical cost estimate.

25   You arrived at a clinical cost estimate after orphan drug

McDuff - cross

1    adjustments of about $642 million; correct?

2    A.    In that column.  And $1.28 billion in the right

3    column.

4    Q.    And if we just stick to the With Orphan Tax Credits

5    which is one of the scenarios you provided in your expert

6    report.  You then added the pre-human costs of

7    $1.098 billion; correct?

8    A.    Yes.  Those are not expended dollars.  That is the

9    economic cost because they occur very early, 10 to 15 years

10   before approval, and they are always incurred.  They are

11   always incurred whether you fail in Phase I, Phase II, or

12   Phase III, or approved.  That is why the cost is large.

13   Q.    But that also is a grossed up number which includes,

14   which is calculated using the success rate that Drs.

15   Grabowski and DiMasi arrived at; correct?

16   A.    You call it grossed up but it is correctly adjusted

17   upward, yes.

18   Q.    So it is not reflecting actual out-of-pocket costs.

19   It includes a factor which is based on a multiple for

20   failures in the industry; correct?

21   A.    Yes, and it is correct to do so.

22   Q.    And then you adjust it for CNS drugs having a higher

23   cost, 1.15 per -- 1.15.  You also adjusted for inflation and

24   you came out with a $1.873 billion cost; correct?

25   A.    In that column.  It is $2.38 in the other column.

McDuff - cross

1   Q.     Let's put up quickly PDX-5-001.  Well, wait.  Let's,

2   just before we get to that, let's look at DDX-819.

3          You had here, Ampyra is not economically

4   profitable even accounting for Dr. Bell's critiques.

5          Do you see that?

6   A.     Yes.

7   Q.     And this doesn't take into account his critique of

8   this notion that you have that you should account for

9   failures regardless of whether they happened or not;

10  correct?

11  A.     I address his critique that there is a potentially

12  higher success rate.  His critique of 100 percent success

13  rate, I do not find that plausible or agreeable, so I do not

14  do the calculations for that.

15  Q.     But you don't address the idea that you should be

16  dealing with the out-of-pocket costs as opposed to the

17  theoretical costs building in an allocation for failures;

18  correct?

19  A.     No, it would be incorrect to do that.

20  Q.     Okay.  Well, I take it you didn't agree with

21  Dr. Bell.  You purported to address his critiques here, but

22  you didn't agree that critique.  You didn't recalculate to

23  take into account that critique; correct?

24  A.     I didn't provide alternative calculations there

25  because I don't take that argument seriously.  I don't think

McDuff - cross

1    that it is plausible.

2    Q.    Would you look -- even though no court has ever

3    agreed with you on that subject; correct?

4    A.    I don't think a court has specifically addressed

5    that, agreed or disagreed.

6    Q.    Would you look at PDX-5-001.  Let's put that up.

7                (Counsel confer.  Elmo settings adjusted.)

8                MR. STIEFEL:  Okay.  So much for high tech.

9    BY MR. STIEFEL:

10   Q.    Now, if we -- I have, in the left column there the

11   numbers that we just looked at from PTX-345, and I put in

12   the right column adjustments to that number.

13                Isn't it a fact that if you had excluded the --

14   if you had looked at JTX-44 and looked at the actual cost

15   of going through Phase I, Phase II, and Phase III studies

16   that Drs. Grabowski and DiMasi reported, you come up with a

17   number of $458.9 million which comes from that same table 4

18   in a different column?

19   A.    I don't know what these calculations are that you are

20   showing me.  It's in that range.

21   Q.    Okay.  Well, if you look at JTX-44, we don't have to

22   put that up, but if you look at table 4 in the column that

23   says Capitalized Mean Phase Cost, that would be for drugs

24   that go through all phases, and I'll represent to you if you

25   add those up, you get to $458.9 million.  Would that be a

McDuff - cross

1    way to get there?

2    A.    I'll take your word for it.

3    Q.    Well, you agree that that is the number we should be

4    looking at as the actual out-of-pocket costs that they

5    estimate for the clinical development of an average drug?

6    A.    I'd have to go back and look into this.  It's

7    probably in that range.

8    Q.    Okay.  And if you then adjust it for lower clinical

9    costs as you did and adjusted it for orphan drug tax credit,

10   you'd arrive at a number of $201 million.  And if you used

11   $130 million pre-human cost number, which is the actual

12   number before it gets grossed up, you would get to $331

13   million.  Is that correct?

14   A.    I see your math, but I have not done this calculation.

15   Q.    So you haven't done a calculation where you take out

16   the success factor that you're building in?

17   A.    No.  Because as we have been talking about, that is

18   a huge component of pharmaceutical costs.  It would be

19   inappropriate and completely inconsistent with the

20   literature to take it out.

21   Q.    And you agree -- so, in your view, if Acorda had $172

22   million to spend on the product, only spent $172 million on

23   the product, never had another dime, this product would be

24   unprofitable because the cost of developing it would be over

25   $2 billion; correct?

McDuff - cross

1    A.    Well, it's different depending on what you think

2    about as unprofitable.  I understand why you think that it

3    is profitable and why the profits earned are greater than

4    that amount, but if you are talking about incentives to

5    bring this product to market sooner, you need to think more

6    broadly about the correct economic costs.

7    Q.    You testified about a blocking patent concept.  The

8    blocking patent concept, the blocking patent first came into

9    existence in 1996 when the Masterson patent issued; correct?

10   A.    Yes.

11   Q.    So the blocking patent has nothing to do with whether

12   the Masterson patent was, whether that invention was obvious

13   or not; correct?

14   A.    I'm not providing that opinion, no.

15   Q.    Okay.

16   A.    It's for the Acorda patents.

17   Q.    And so until the Masterson patent issued in 1996,

18   anybody could have developed a product that, or had an

19   invention, they could have invented a sustained release

20   formulation that would be administered twice a day,

21   10 milligrams, for improvement of walking; correct?

22   A.    I suppose it depends on whether they build on each

23   other.  There is some degree to which that building would

24   prevent that from happening.

25   Q.    And --

McDuff - redirect

1    A.      I'm not providing a technical opinion on that.

2    Q.      And once the -- after Acorda licensed the product, if

3    at some point after that it had become obvious, Acorda could

4    have presumably accelerated the development process which

5    you said took inordinately long; correct?

6    A.      I'm not sure what you mean.  I didn't say it was

7    inordinately long.  I said it was longer than average.  I

8    don't know what you mean about accelerating the process.

9    Q.      Well, it could have raised more money, sped up the

10   efforts, found others to invest or other licensees to take

11   on the product when it became obvious, if it became obvious

12   later; correct?

13   A.      Well, I'm not aware of Acorda being constrained in

14   some way by lack of funds or the development process took

15   what it took.  It takes a long time.

16           MR. STIEFEL:  I have no further questions of

17   this witness.  Thank you.

18           THE COURT:  Okay.  Redirect.

19                   REDIRECT EXAMINATION

20   BY MR. COOPER:

21   Q.      Dr. McDuff, have you seen this chart before today?

22   A.      No.

23   Q.      Did Dr. Bell create this chart?

24   A.      I have no idea.

25   Q.      Did Dr. Bell have the opportunity to respond after --

McDuff - redirect

1    and by issuing a supplemental report after your report and

2    deposition in this case?

3    A.    Yes.

4    Q.    So as far as you know, this chart was created by

5    plaintiffs' counsel?

6    A.    I have no idea.  It may well be.

7    Q.    Did you see in this chart that this chart has -- I'm

8    sorry.  For the record, this chart is PDX-5-001.

9          And do you recall in this chart that there is an

10   adjustment that has been made by whoever created this chart

11   for an orphan drug tax credit?

12   A.    Yes.

13   Q.    Do you understand whether there is any evidence that

14   has been entered into evidence in this case that Acorda

15   actually took an orphan drug tax credit?

16   A.    No.  As I explained, I have not seen any evidence

17   that they have taken it, and also it's not common to take it

18   because of the reporting requirements.

19              MR. COOPER:  Thank you.

20              I have no other questions but I would like to

21   enter some exhibits.

22              THE COURT:  Okay.  I have a few questions.  So

23   let me do that and then we'll get to the documents.

24              MR. STIEFEL:  Okay.  Fine.

25              THE COURT:  Dr. McDuff, first, in terms of the

McDuff - redirect

1   retentions and work you have done that have resulted in

2   litigation, I understood you to say that you have had at

3   least one retention you can think of for a company that

4   markets a branded pharmaceutical; is that correct?

5           THE WITNESS:  Yes.

6           THE COURT:  Now, did you mean to say that that

7   is the project you were working on, a project that relates

8   to that company's branded pharmaceutical?

9           THE WITNESS:  I'm not sure I understand.

10          THE COURT:  Okay.  Let me ask you this.  The

11  company or the retention you have in mind, does that

12  company have branded pharmaceuticals as well as generic

13  pharmaceuticals?

14          THE WITNESS:  They do, and the specific

15  retention is for their branded product.

16          THE COURT:  So the project that you are working

17  on or have worked on is for their branded pharmaceutical?

18          THE WITNESS:  Yes, correct.

19          THE COURT:  In terms of drug development costs

20  and whether they should be included in a calculation of

21  economic profit, in this case, if some of those drug

22  development costs were borne by Elan, are they factored into

23  your calculation of economic profit?

24          THE WITNESS:  They could be in there to some

25  degree if there was a royalty paid to Elan, and that would

McDuff - redirect

1   be in the profit margin, so to some degree those could be in

2   there.  I'm not sure because the information provided by

3   Acorda was not clear on that.

4            I've not specifically made an additional

5   allocation for any work that could have gone back to 1990 in

6   the priority of the '938 patent, so if there was additional

7   work that was before the 1997 joint agreement, then that

8   could add to the commercialization cost.

9            THE COURT:  So would you -- let's just say

10  theoretically if a company like Acorda makes a payment in a

11  joint venture context, either a flat fee or an ongoing

12  royalty or both, would that fully account for the measure of

13  all of the preclinical and other development costs that

14  predate that agreement or might you have to add to that some

15  other costs?

16           THE WITNESS:  They wouldn't necessarily account

17  for it because the time when they're negotiating, those

18  costs are all sunk so they're negotiating not on a cost

19  incurred but based on a value that was created, so you might

20  have a royalty that dramatically understates the costs

21  because you incurred that costs, but it didn't result in

22  anything that was -- you know, you're not paying the full

23  amount in the royalty, in other words.

24           THE COURT:  So if you were trying to calculate

25  whether there was economic profit from a perspective of

McDuff - redirect

1    Acorda that entered into the joint venture after some of the

2    sunk costs, theoretically what would you include from the

3    Acorda perspective, the sunk costs and/or what Acorda pays

4    out to Elan which may be very different?

5                THE WITNESS:  I think if you're evaluating the

6    commercial success of the product, you want to think about

7    the full development cost because you don't have a situation

8    where somebody comes in at the very end of development, they

9    take a license and pay a relatively low amount because say

10   it's not that big of an opportunity, and then take it to

11   market.  It might be profitable for that company's

12   perspective because they paid very little and earned a lot,

13   but that wouldn't reflect the full development of the

14   product.

15               THE COURT:  All right.  And then there was some

16   questioning I think of Dr. Bell yesterday that you were here

17   to see that; correct?

18               THE WITNESS:  Yes.

19               THE COURT:  It went along the lines of how small

20   of a profit might there have to be in order for it to be

21   your opinion, Dr. Bell, that this is a commercial success,

22   or at least an opportunity that a company might pursue.  Do

23   you remember that?

24               THE WITNESS:  I do.

25               THE COURT:  Do you have a view on that?  I guess

McDuff - redirect

1    the way to put it, is there some minimum dollar value of

2    accounting profit that you believe is necessary before you

3    could find there to be commercial success?

4              THE WITNESS:  Well, the exercise of the economic

5    cost is to take into account the full economic cost, and

6    then if that provides a positive number, a net present

7    value, that indicates a desire to go forward.  The question

8    is, is it simply positive for being greater than zero, is

9    that enough of an incentive?

10             I understand what Dr. Bell was saying, if it's

11   positive by a hundred dollars if you take into account the

12   full economic cost, in theory somebody could be interested

13   in that, that could be profitable, but in practice, there

14   has to be a big enough economic profit for companies to want

15   to invest in that versus some other opportunity.

16             THE COURT:  If we look at it from the

17   perspective of your concept of economic profit,

18   theoretically the economic profit once you have calculated

19   all the development and the preclinical costs and risk of

20   failure and everything else that you have put in there, if

21   the economic profit calculated was a hundred dollars, would

22   that be probative of commercial success?

23             THE WITNESS:  As I think about it, no, because

24   we're making an inference 10 to 15 years earlier about the

25   invention of the patent based on sales that are occurring

McDuff - redirect

1    now and into the future, so to me that's a pretty strong

2    inference, and you want to have strong evidence of

3    commercial success in order to make an inference of

4    commercial success.  If it's on the boarder of leaning

5    towards not having a finding or not having a commercial

6    success influence the finding, but in theory, zero is

7    supposed to be the cutoff.

8                THE COURT:  Thank you.

9                Any follow-up from defendants?

10               MR. COOPER:  No, Your Honor.

11               THE COURT:  And from plaintiffs?

12               MR. STIEFEL:  No, Your Honor.

13               THE COURT:  Thank you.  Just sit tight for a

14   moment.  They want to move some evidence in, I believe.

15               MR. COOPER:  Your Honor, to the extent that

16   they're not already in evidence we would like to move JTX

17   001, 002, 003, 004, 005, 006, 020, 021, 044,076,088, and DTX

18   132, 57 and 419.

19               THE COURT:  Any objections?

20               MR. STIEFEL:  No objection, Your Honor.

21               THE COURT:  Those are all admitted.

22               MR. COOPER:  And we would like to move the

23   demonstratives for the sake of demonstratives.

24               THE COURT:  The demonstratives will be taken as

25   demonstratives.  Thank you.

McDuff - redirect

1            MR. STIEFEL:  And DTX 337, we would ask that

2     that be entered in evidence.  And we would also offer the

3     demonstrative that we used as a demonstrative.

4            THE COURT:  Any objection?

5            MR. COOPER:  I have an objection as to the

6     demonstrative.  Lack of foundation.

7            THE COURT:  Well, that objection is overruled.

8     The demonstrative will be taken as a demonstrative.  Any

9     objection with respect to the document they want to move

10    into evidence?

11           MR. COOPER:  No, Your Honor.

12           THE COURT:  That one is admitted as well.

13           You may step down.  Thank you very much.

14           I believe defendants have another witness.  You

15    may call the witness.

16           MR. PARK:  Your Honor, Samuel Park on behalf of

17    the defendants.  The defendants call back Dr. Stephen

18    Peroutka.

19           THE COURT:  Okay.  Good morning, Dr. Peroutka.

20    Welcome back.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  I remind you that you remain under

23    oath.

24           ... STEPHEN J. PEROUTKA, having previously sworn

25    under oath, was examined and testified as follows ...

Peroutka - direct

1           THE COURT:  Mr. Park.

2                    DIRECT EXAMINATION

3     BY MR. PARK:

4     Q.     Dr. Peroutka, were you here yesterday for Dr.

5     Goodman's testimony?

6     A.     Yes.

7     Q.     Let's put up PDX-2-53.

8                    Now, do you understand that these were

9     Dr. Goodman's objective considerations for nonobviousness?

10    A.     Yes.

11    Q.     So let's talk about surprising and unexpected results

12    first.

13    A.     Okay.

14    Q.     So do you agree with Dr. Goodman that there are

15    surprising and unexpected results?

16    A.     No.  10 milligrams twice a day sustained release 4-AP

17    improved walking.  We have seen through the past literature

18    that going back to 1987, the first mention of improvement of

19    gait, gait of course is a synonym for walking, for

20    ambulation, multiple publications over the last thirty years

21    and up to the priority date of 2003, including Dr. Goodman's

22    work in 2002 and three, including the Solari review of the

23    literature.

24    Q.     Now, you mentioned Dr. Goodman's work and Solari.

25    Let's first talk about Goodman and then let's talk about

Peroutka - direct

1   Solari.  Let's go to JTX 80A, the Goodman poster.  It's also

2   been referred to as the Goodman presentation.

3   A.    Yes, the Goodman presentation formally known as the

4   Goodman poster.

5             MR. PARK:  May I approach, Your Honor?

6             THE COURT:  Yes.

7   BY MR. PARK:

8   Q.    Let's go to second page lower left corner,

9   objectives.  Dr. Peroutka, what were the objectives of the

10  Goodman study?

11  A.    Well, Dr. Goodman listed two, number one, to

12  determine safety of multiple doses of fampridine SR, one

13  week each of 20 as listed to up to 80 milligrams a day.  And

14  the second objective was to obtain evidence of efficacy and

15  dose response using several outcome measures, and they're

16  listed there, some of them.

17  Q.    So evidence of efficacy was one of the objectives?

18  A.    Yes.  As stated.

19  Q.    And in your view, is this a purely a methodological

20  study?

21  A.    No, it's a phase two study with two very clearly

22  stated objectives.

23  Q.    And did the Goodman poster report evidence related to

24  efficacy on walking?

25  A.    Yes.

Peroutka - direct

1    Q.      Let's go to the third page, 25 foot walk chart.  And

2    did the Goodman poster show evidence of efficacy at 10

3    milligrams twice daily for walking?

4    A.      Yes, they -- as shown here, the baseline values for

5    the subjects in the study was about 16 seconds to walk 25

6    feet.  They show that at the lowest dose that they use, 20

7    milligrams, that is 10 milligrams twice a day, there was a

8    decrease of about three seconds.  And then give or take a

9    second, all the other doses were in the same basic range.

10   Q.      Let's go to the last page under results summary.  The

11   25 foot walk.

12   A.      Yes.

13   Q.      And what is the Goodman poster data show about the

14   average improvement in walking speed?

15   A.      Well, the middle line there, if you can highlight, it

16   states that the average improvement in walking speed during

17   the low dose period, that is defined as 20 to 50 milligrams

18   per day, included a greater than 20 percent increase for

19   nine of the 25 subjects.

20   Q.      So I just want to make sure that I understand.  So

21   nine out of 25 subjects.  Is that 36 percent?

22   A.      Yes, so 36 percent of the subjects as stated, nine of

23   the 25, had a greater than 20 percent increase in their

24   walking speed.

25   Q.      And to be clear, the Goodman poster here is looking

Peroutka - direct

1   at 20 to 50 milligrams; right?

2   A.    As stated, yeah, the range that they're talking about

3   is 20 to 50.

4   Q.    Now, for the -- for at least the 20 milligram dose,

5   the twice -- the 10 milligrams twice a day, is that -- the

6   data that's up here, was that eventually confirmed by the

7   Acorda studies?

8   A.    Yes.

9   Q.    Let's pull up Ampyra's label, JTX 76.  Let's go to

10  the eighth page, figures one and two.  Dr. Peroutka, what do

11  these figures show about Ampyra's efficacy?

12  A.    Well, these are showing figure one and two, but from

13  two different trials.  The average walking speed change,

14  percent, from baseline during the double blind phase.  So if

15  we can highlight greater than equal the 20 percent group,

16  both graphs, what it's showing in the first trial they

17  reported what is it, about 31, 32 percent of the treated

18  patients had an increase of greater than or equal to 20

19  percent.

20          In the second trial below, it looks like about

21  35, maybe, percent of the subjects treated with Ampyra at 10

22  milligrams BID had a greater than 20 percent in speed.

23  Q.    Those percentages that were just mentioned, is that

24  generally consistent with the 36 percent that was reported

25  in the Goodman poster?

Peroutka - direct

1  A.     Yes, of course, 36 is almost identical to the two

2  reports here in the package insert.

3  Q.     So would you have expected that 10 milligrams twice a

4  day would be as efficacious as the higher doses that are

5  based on the Goodman poster?

6  A.     Yes, going back to the figure in the Goodman poster,

7  the dose response data that they elude to shows that all of

8  the tested doses, actually back to the poster.

9  Q.     80A.

10  A.     So as we discussed I guess two days ago, starting at

11  20, then subjects in 30 got a little slower, then a little

12  faster, meaning by a second or so, a little worse, mixed and

13  then a little slower.

14         But in terms of a dose response, a dose response

15  is starting at baseline, the doses should change based on

16  the effect observed, and then ultimately a dose response

17  reaches a plateau response where additional doses may give

18  more side effects, but do not give more efficacy.  This is

19  showing they're at a plateau, from 20 a day to 80, the

20  average is all plus minus a second, roughly.

21  Q.     Dr. Peroutka, you also mentioned the Solari review

22  and that is relevant to your analysis on unexpected results.

23  Let's go to PTX 416, the Solari paper, or it's been

24  referenced as the Cochrane review.  First of all, what is

25  the level of review that the Cochrane review uses?

Peroutka - direct

1  A.      Cochrane on their website, they state that they use

2  the highest level review in order to create evidence based

3  medical guidelines for the field of medicine.  What that

4  means is essentially like the FDA, they only look at

5  randomized trials.  I think you heard testimony to this in

6  the past couple of days, they exclude -- they don't even

7  look at the entirety of the prior art.  They focus on what's

8  considered the gold standard, randomized control placebo and

9  double-blind studies.

10 Q.      Let's go to the second page, types of outcome

11 measures.  So for what types of symptoms did Solari measure

12 outcomes?

13 A.      So as they state in this review article, what they

14 looked at, the outcome measures, the main events of interest

15 as they state were number one, safety, and then in terms of

16 efficacy, they looked at number two, changes in disability

17 or impairment scales assessing (A) motor function, (B)

18 visual acuity, (C) cognition, and (D) fatigue.  They also

19 looked at quality of life which is an efficacy measure, and

20 also patient's subjective response.

21 Q.      Did Solari find evidence of efficacy for some

22 symptoms but not others?

23 A.      Yes.  I know that their conclusion says that they

24 couldn't make any definitive statement, but when you break

25 it down by their subtypes of things that they looked at,

Peroutka - direct

1   they did.  For example, motor function, they looked at

2   ambulation, I mean, motor strength or motor function, if we

3   highlight that.

4   Q.     It's on page four.

5   A.     So motor function.

6   Q.     And then ambulation is on page five.

7   A.     And I think they we reviewed this on Monday.  It's a

8   P value of .001 for motor function, the three randomized

9   trials that they looked at.  For ambulation, which again is

10  a synonym for gait which is a synonym for walking, they said

11  that three studies, 54 patients assessed the efficacy of

12  aminopyridine on ambulation, which was assessed on the

13  ambulation index, the two Bever papers, or with the timed

14  gait, the Schwid paper, overall nine patients with 17

15  percent of the group improved in ambulation during study

16  treatment versus none during placebo and the P value was P

17  less than 001, one in 10,000, which is highly significant.

18  Q.     So one in 10,000, can you explain to the Court what

19  that means?

20  A.     That the odds of this is just a random finding as

21  opposed to a real finding is one in 10,000.

22  Q.     And the Schwid reference that's referenced here, is

23  that the Schwid reference that you discussed during your

24  direct?

25  A.     Yes, of course.

Peroutka - direct

1   Q.    So you mentioned the conclusions part.  So let's go

2   there.  End of page five to six, reviewers conclusions,

3   implications for practice.

4             So what is the Solari review mean when the paper

5   states, "The review cannot provide a reliable statement

6   concerning the efficacy of AP or DAP for treating symptoms

7   of people with MS"?

8   A.    Well, I can give my opinion of what the group is

9   trying to say here, but they looked at a wide variety of

10  symptoms.  I think the title is even symptoms of MS,

11  cognition, fatigue, visual changes and motor function.  And

12  a composite of all of the symptoms of MS, I think that's

13  what this sentence refers to, this review cannot provided a

14  reliable statement concerning the efficacy of AP or DAP for

15  treating symptoms, meaning the big picture symptoms of MS.

16  Q.    Can if you break down the symptoms in categories, was

17  Solari able to find evidence of efficacy?

18  A.    Yes, ambulation and motor strength, motor skills were

19  both P values of less than 001 or 0001 respectively,

20  ambulation being significant.

21  Q.    Based on Solari, a person of ordinary skill in the

22  art in 2003 reviewing Solari, what would that person have

23  expected, what symptoms of MS would that person have

24  expected would be helped by 4-AP?

25  A.    I think it would teach a person of ordinary skill in

1    the art not to focus on fatigue or cognition or even visual,

2    but to focus on the two that were highly significant, that

3    is ambulation and motor strength.

4    Q.    Dr. Peroutka, even today, is there an expectation

5    that 4-AP will improve the symptoms, all symptoms of MS?

6    A.    No.

7    Q.    Now, based on Solari and Goodman, would a POSA had

8    expected substantial safety issues as of 2003 with 10

9    milligrams 4-AP sustained release twice a day?

10   A.    No, I don't believe so.  I think we reviewed this

11   where going back to the 1980's, there was multiple doses

12   used and as Dr. Goodman concluded in the ten to 40

13   milligrams a day range were generally safe, they weren't

14   devoid of side effects, but they were considered tolerable.

15   Q.    Based on Goodman and Solari, was it surprising and

16   unexpected that 10 milligrams 4-AP twice a day improved

17   walking in MS patients?

18   A.    I don't believe so.  And not just those, I think the

19   entire prior art going back to the early '80s.

20   Q.    And based on Goodman and Solari was it surprising and

21   unexpected that 10 milligrams 4-AP twice a day was as

22   efficacious, but with lower adverse effects than higher

23   doses?

24   A.    No, again, prior art as well as those two references.

25            MR. PARK:  Let's go back to PDX-2-53.

701

Peroutka - direct

1    BY MR. PARK:

2    Q.      Let's talk about long felt but unmet need.

3    A.      Okay.

4    Q.      Okay.  Now, in the field of MS, multiple sclerosis,

5    what is the greatest need for therapy?

6    A.      Well, I think everybody would agree the greatest

7    unmet need is the cure for the disease.  You want to have

8    something that stops MS.  Once it is diagnosed, that the

9    patient can be cured permanently to never have exacerbations

10   again.

11           Failing that, I think the second level of unmet

12   need would be to limit the number of exacerbations both in

13   frequency and severity.  That is why we have a number of

14   drugs on the market today that have that quality.

15           Failing that, if the person still has an

16   exacerbation in symptoms, you would want to revert back to

17   normal the symptoms that the MS causes.

18           So in the case --

19   Q.      Go ahead.

20   A.      In the case of Ampyra, it's addressing a symptom and

21   a subset of MS patients, and even then it is not reversing

22   to normal.

23           An average human should be able to walk 25 feet,

24   which is about from here to that screen, in less than four

25   seconds.

Peroutka - direct

1         And as you showed me in Goodman, Ampyra does.

2    With someone impaired to 16 seconds, and that is a

3    significant impairment to walk from here, say, to that

4    screen.  They drop from 16 to 13, but normal would be less

5    than four seconds.  So Ampyra is partially addresses a

6    subset need and a subset of patients, but not completely.

7    Q.    Okay.  So although clinically meaningful, does Ampyra

8    fall short of meeting the unmet needs of MS patients?

9    A.    I think so.  It partially treats one symptom in a

10   third of the subjects who might need it and doesn't reverse

11   it to normal.

12   Q.    All right.  Let's talk about failure of others.

13         First of all, do you agree with that?

14   A.    I'm sorry.  Did I agree with?

15   Q.    That there was failure of others.

16   A.    No.

17   Q.    And so let's take what they have on the screen one at

18   a time.

19         The "Elan failure," is that referring to the

20   1994 study that is noted in Schwid?

21   A.    I believe so.

22   Q.    As an expert in drug development, do you believe that

23   the 1994 study that is referenced in Schwid was a failed

24   study?

25   A.    No.  And let me explain why, Your Honor.

Peroutka - direct

1          A study is designed to test a hypothesis, so a

2     hypothesis is generated and then the primary endpoint of the

3     study states the hypothesis they hope to prove or disprove.

4     So a study in my mind is successful if you can answer the

5     primary hypothesis that was generated.

6          So in that sense, I don't believe the study was

7     a failure because there is data reported on the hypothesis

8     that was tested.

9          The hypothesis was not confirmed, so you can

10    state that the hypothesis failed to be met or failed to be

11    confirmed, but the study itself, again, we don't have all

12    the data, we don't know the doses, we don't know a lot of

13    information about it.  But I wouldn't call a study a

14    failure, I would say the hypothesis failed to be confirmed.

15    Q.    In what way did the 1994 study add value to 4-AP's

16    development?

17    A.    I think significantly, when you look in the

18    description of the paragraph after the description of the

19    study, Dr. Goodman and his colleagues point out exactly.  I

20    don't know if you want to go to it and show it, but I can

21    address it.

22          We talked about cane issue.  So the EDSS scale

23    is fairly broad.  It looks at all symptoms of MS disability

24    resulting from the symptoms.  And they use the example,

25    which I think is a good one, which is there is a 100 meter

704

Peroutka - direct

1   walk involved in the EDSS criteria; and to improve upon

2   that, as one example, a person would need a cane to go

3   100 meters.  They would have to get to the point of not

4   needing a cane in order to change on their EDSS score.  And

5   that is a pretty big increase.

6            Another one that I actually read was the worst

7   cases was where you are bedridden and you can't communicate,

8   you would have to go from that state to being able to

9   communicate and another to show improvement on EDSS.

10           So they're fairly large, if you will, changes in

11  clinical function whereas as we can see, we're talking about

12  a 20 percent change in walking speed, which is a fairly

13  modest change.  That is simply is not reflected in EDSS.

14           So your question -- I'm sorry.  Your question I

15  think was, was it important?  And the answer is yes, because

16  it told people, it taught that EDSS was not a sensitive

17  enough measure, and that there was a need to create more

18  sensitive measures.

19  Q.    Was Ampyra improved on the basis of an EDSS test?

20  A.    No.

21  Q.    Now let's talk about nerispiridine.  Let's pull up

22  PDX-569.

23           We heard yesterday that nerispiridine is a

24  different chemical compound than 4-AP.  Do you agree with

25  that?

Peroutka - direct

1    A.      Yes.  Of course.  We just saw the structures.

2    They're completely different.

3    Q.      And as an expert in pharmacology, have you heard

4    any evidence that nerispiridine and 4-AP have the same

5    pharmacological effects?

6    A.      No.  We heard that they're both "positive potassium

7    channel blockers" but the reality is the potassium channels

8    is not a single entity.  There are actually five major

9    subfamilies, different voltage channels.  In addition, there

10   is different subunits, molecular subunits based over 80

11   mammalian genes have been defined as subunits of potassium

12   channels.  So each of us has different subunits, different

13   combinations, and there is no such thing as a potassium

14   channel, if you will.  There are multiple different subtypes.

15          Moreover, drugs, as pharmacologists, these

16   channel drugs, sometimes they're agonists, antagonists.  You

17   would have to go across the entire array of human channels

18   and provide data that 4-AP and nerispiridine has the

19   identical effects at multiple sites to lead me to conclude

20   they were similar pharmacological agents.

21          MR. STIEFEL:  Your Honor, I have an objection.

22   Dr. Peroutka did not comment on nerispiridine in his expert

23   report.

24          THE COURT:  It's an objection that it is beyond

25   the scope?

Peroutka - direct

1            MR. STIEFEL:  Correct.

2            THE COURT:  Mr. Park.

3            MR. PARK:  Your Honor, I believe it is addressed

4    in paragraphs 85 through 89 of his expert report.

5            And if you want, we can take a look at that.

6            THE COURT:  Plaintiffs take a look at that.  If

7    you have an objection, you will have to pass up a copy to

8    me.

9            MR. PARK:  Excuse me.  The reply report.

10           THE COURT:  The reply report.

11           MR. STIEFEL:  I withdraw my objection, Your

12   Honor.

13           THE COURT:  All right.

14   BY MR. PARK:

15   Q.     Dr. Peroutka, this was a Sanofi study?

16   A.     Yes.

17   Q.     And did you hear any testimony from anyone from

18   Sanofi about why this drug development was discontinued?

19   A.     No.

20   Q.     Okay.  Let's finish with the nexus for commercial

21   success.

22           You heard testimony from Dr. Bell yesterday

23   there was a nexus between success of Ampyra and the asserted

24   patents?

25   A.     Yes.

Peroutka - direct

1   Q.    In your view, how much of Ampyra's alleged success,

2   if any, is based on the active ingredient 4-AP as opposed to

3   its formulation?

4   A.    I guess the majority, and quantitatively, maybe 50 to

5   80 percent, since if you took 4-AP out of the formulation,

6   you'd be left with placebo; right?  You'd be left with the

7   carrier.  But at the same time, the controlled release

8   improves compliance, so that does add some value, too.

9   Q.    And as a pharmacologist, would you expect that

10  15 milligrams a day, so that is 7.5 milligrams twice a day,

11  would provide a similar benefit as 10 milligrams twice a

12  day?

13  A.    I would.  And by "similar," I mean that within

14  reasonable expectation of the parameters that are being

15  measured based on the fact that pharmacologically, 15 to

16  20 milligrams is a really small change in a dose.   In

17  pharmacological terms, dose response, when you are out on

18  the flat part of the curve, it is possible it would decrease

19  a little bit, but probably not much because it is such a

20  close dose difference.

21  Q.    So wrapping up.  Based on the analysis that you

22  conducted during your direct examination and now taking into

23  consideration the secondary evidence of nonobviousness or

24  obviousness, is it your opinion that there is clear and

25  convincing evidence that the asserted patents are obvious?

Peroutka - cross

1    A.    Yes.  I think the prior art is extensive, starting in

2    the 1980s, with multiple sclerosis in 4-AP and the data on

3    the dose rages, the data on the clinical effects, improving

4    symptoms of ambulation, gait, and walking were all in the

5    prior art.

6              MR. PARK:  Thank you.

7              THE WITNESS:  Thank you.

8              THE COURT:  Cross-examination.

9              MR. DiNAPOLI:  Would you pull up JTX-80A.

10                    CROSS-EXAMINATION

11   BY MR. SKWR-AO:

12   Q.    Dr. Peroutka, counsel asked you questions about the

13   poster, the 2002 poster of Dr. Goodman.  Do you recall that?

14   A.    Yes, I saw that.

15   Q.    And if we look at the objectives, you will agree

16   that -- not that objective, in the Methods.

17              You will agree that Dr. Goodman in the poster

18   did say that with respect to the efficacy measures that he

19   was conducting that it was to explore potential outcome

20   measures for use in later trials, isn't that true?

21   A.    Yes, that is what is stated.

22   Q.    And if we go to the figure, the timed 25 foot walk

23   figure.  No, I'm sorry.  The figure, not the dose response.

24              And I know we talked about this before but I

25   just want to confirm.  Now, I know you said that it was

1    flat, but there is an improvement, there is what I think

2    you said almost like a one second improvement from the 20

3    milligrams to the 40 milligram dose; isn't that correct?

4    A.    Well, on this particular slide, yes.

5    Q.    Yes.  And there is no -- as we also talked about,

6    that there was a placebo group in this study?

7    A.    Yes.

8    Q.    11 patients?

9    A.    Correct.

10   Q.    And that is not plotted here; correct?

11   A.    That is not plotted.

12   Q.    So a person of skill in the art wouldn't know how

13   somebody on placebo compared to this?

14   A.    Well, it does state it in the results section,

15   placebo data.  It said that this is significantly different

16   than placebo in the results section.

17   Q.    It said that on time?

18   A.    You'd have to refresh my memory, but there is mention

19   of the effect.

20   Q.    But not by dose.  The statistical significance did

21   not say any particular dose was effective?

22   A.    I believe they used the entire dose range compared to

23   placebo.

24   Q.    So when they calculated the data, they used the

25   measures from all of the doses, from the 20 milligrams to

Peroutka - cross

1   80 milligrams?

2   A.      That is my understanding.

3   Q.      So one couldn't draw a conclusion about any

4   particular dose since all of the data was pooled?

5   A.      Conclusion in terms of what?

6   Q.      What dose might be effective.

7   A.      Well, they average all of that and, to me, that looks

8   like a flat line given the small variation.

9   Q.      I'm talking about the statistical significance

10  analysis.

11  A.      Right.  It was based on the composite analysis.

12  Q.      Right.  And that didn't break out, the analysis

13  wasn't broken out by individual dose but rather by patient.

14  It was all their times over the entire doses, on the

15  20 milligram, 30 milligram, 40 milligram, 50 milligram,

16  60 milligram, 70 milligram, 80 milligram average together

17  with each patient, and that is what was statistically

18  significant; correct?

19  A.      Correct.

20  Q.      It wasn't that there was statistical significance at

21  the 20 milligrams?

22  A.      Correct.

23  Q.      Or at the 30 milligrams?

24  A.      Correct.

25  Q.      And I can go down the line.

Peroutka - cross

1    A.      Well, they didn't mention, so it is possible there

2    was, but they didn't mention it.

3    Q.      They didn't mention it.

4            And if we turn to PTX-416.  It's the Solari

5    article that you talked about.  And under Objectives.

6            I know you commented about the standard that

7    Dr. Solari was using.  But you do agree that what she set

8    out to do was to determine the efficacy and safety of

9    aminopyridines for neurological deficits in MS people.

10   A.      Correct.

11   Q.      And if we look at the Results.  The Reviewer's

12   Conclusions, actually, all the way at the bottom.

13           She did conclude that this review cannot provide

14   a reliable statement concerning the efficacy of AP or DAP

15   for treating symptoms of people with MS.

16           That was her conclusion?

17   A.      Correct.

18   Q.      And she also drew a conclusion on safety, didn't she?

19   A.      Correct.

20   Q.      And her conclusion on safety was:  A conclusion on

21   the safety of these preparations is even more problematic

22   due to the limited power of the current systematic review to

23   reliably detect major adverse events, and to the low

24   external invalidity of the results (narrow entry criteria).

25           Do you see that?

Peroutka - cross

1    A.      Yes.

2    Q.      So, again, she had even more problems with

3    determining that it was safe, in her view?

4    A.      Correct.

5    Q.      And I believe you commented on the motor function

6    results that she reported on?

7    A.      Yes.

8    Q.      And the motor functions are testing of muscles

9    throughout the body; correct?

10   A.      Yes.

11   Q.      And it could include things like grip strength?

12   A.      Correct.

13   Q.      And upper arm strength?

14   A.      And lower strength.

15   Q.      And lower strength.  So it is a composite of various

16   muscles throughout the body?

17   A.      Well, it depends on the paper, so each paper had

18   potentially different muscles involved.

19   Q.      You also had commented on whether Ampyra satisfied a

20   long felt need with MS patients.

21   A.      Yes.

22   Q.      And I believe you concluded that it didn't?

23   A.      Correct.

24   Q.      Now, in 2010, when Ampyra was approved, you weren't

25   treating MS patients at that time; correct?

Peroutka - cross

1    A.    Correct.

2    Q.    And you are not currently treating MS patients?

3    A.    Correct.

4    Q.    So you haven't consulted with any of your MS patients

5    as to the impact that Ampyra made on their lives, have you?

6    A.    Not my own patients, but I read significantly about

7    the issues.

8    Q.    And you haven't treated patients for the last

9    25 years; isn't that correct?

10   A.    26.

11   Q.    26.  And you also talked about a lack of nexus

12   between the commercial success of Ampyra and -- well, I

13   guess the nexus between commercial success in Ampyra and the

14   patent; is that correct?

15   A.    Yes.

16   Q.    And I think you attributed it mostly to 4-AP itself?

17   A.    Yes.

18   Q.    And 4-AP has been around for over 100 years; is that

19   correct?

20   A.    Correct.

21   Q.    And it has only been commercially successful in the

22   last six?

23   A.    Correct.

24              MR. SKWR-AO:  One second, Your Honor.

25              (Counsel confer.)

Peroutka - redirect

1          MR. SKWR-AO:  Your Honor, I have nothing

2    further.

3          THE COURT:  Okay.  Redirect.

4                REDIRECT EXAMINATION

5    BY MR. PARK:

6    Q.    Dr. Goodman -- excuse me.  Maybe it has been too long.

7          Dr. Peroutka, did you have additional references

8    in addition to Solari in your review of whether what doses

9    of 4-aminopyridine were safe, reasonably safe as of 2003?

10   A.    Yes.  We reviewed those I think throughout the last

11   three days starting, well, really going back to 1977 up

12   through the 80s, 90s up to I guess the last publication

13   would be Dr. Goodman's in 2003.

14   Q.    Let's take a look at Exhibit 80A, third page under

15   Conclusions.

16         Dr. Goodman states here that safety profile

17   consistent with previous experience.

18   A.    Correct.

19   Q.    Would you explain to the Court what that means?

20   A.    I think he was looking at the prior art.  He had done

21   a lot of the work; the Schwid paper, for example.  All the

22   papers we have been talking about, Stefoski, Polman, van

23   Diemen, numerous others, is something in the neighborhood of

24   15 to 20 publications of 4-AP in humans that were available

25   to assess.

715

Peroutka - redirect

1            MR. PARK:  Thank you.  Nothing further.

2            THE COURT:  Okay.  Thank you.  You may step down.

3            THE WITNESS:  Thank you, Your Honor.

4            THE COURT:  Is there anything further from

5    defendants?

6            MR. KLEIN:  No, Your Honor.  We rest our

7    rebuttal case.

8            THE COURT:  Anything further from plaintiffs?

9            MR. DiNAPOLI:  No, Your Honor.

10           THE COURT:  Anything we should discuss before I

11   let you go for the day?  Defendants?

12           MR. KLEIN:  Not unless Your Honor has any issues

13   you would like us to focus on in particular at closing.

14           THE COURT:  No.  I probably will have questions

15   for you, but what they will be, I'll know by Friday.

16           Is there anything from plaintiffs?

17           MR. DiNAPOLI:  No, Your Honor.

18           THE COURT:  I will see you on Friday morning.  I

19   believe we said at 10:00.  We'll be in recess.

20           (Court adjourned at 10:45 a.m.)

21

22       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                          /s/ Brian P. Gaffigan
                            Official Court Reporter
25                            U.S. District Court