1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
     ACORDA THERAPEUTICS, INC.,              :
4                                            :    CIVIL ACTION
                 Plaintiff,                  :
5    v                                       :
                                             :    (Consolidated)
6    ALKEM LABORATORIES LTD.,                :
                                             :    NO. 14-882-LPS
7                Defendant.                   :
                                             - - -
8
                         Wilmington, Delaware
9                    Friday, September 23, 2016
                      *Bench Trial - Volume D*
10
                              - - -
11
     BEFORE:        HONORABLE **LEONARD P. STARK**, Chief Judge
12
     APPEARANCES:                    - - -
13

14          MORRIS NICHOLS ARSHT & TUNNELL, LLP
            BY:  MARYELLEN NORIEKA, ESQ.
15
                 and
16
            KAYE SCHOLER, LLP
17          BY:  AARON STIEFEL, ESQ.,
                 DANIEL DiNAPOLI, ESQ., and
18               SOUMITRA DEKA, ESQ.
                 (New York, New York)
19
                 and
20
            KAYE SCHOLER, LLP
21          BY:  SYLVIA M. BECKER, ESQ.
                 (Washington, District of Columbia)
22
                         Counsel for Plaintiffs Acorda
23                       Therapeutics, Inc., and Alkermes
                         Pharma Ireland Limited
24

25   Dale Hawkins                         Brian P. Gaffigan
     Registered Merit Reporter            Registered Merit Reporter

```
 1    APPEARANCES:  (Continued)

 2
                    PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
 3                  BY:  JOHN C. PHILLIPS, JR., ESQ.

 4                       and

 5                  WINSTON & STRAWN, LLP
                    BY:  CHARLES B. KLEIN, ESQ.
 6                       (Washington, District of Columbia)

 7                       and

 8                  WINSTON & STRAWN, LLP
                    BY:  SAMUEL S. PARK, ESQ.,
 9                       REID F. SMITH, ESQ., and
                         BRYCE A. COOPER, ESQ.
10                       (Chicago, Illinois)

11                       Counsel for Roxane Laboratories, Inc.,
                         Teva Pharmaceuticals USA, Inc., Apotex
12                       Corp. and Apotex, Inc.

13
                    MORRIS JAMES LLP
14                  BY:  MARY B. MATTERER, ESQ.

15                       and

16                  PARKER POE ADAMS & BERNSTEIN, LLP
                    BY:  ROBERT L. FLORENCE, ESQ,
17                       MICHEAL L. BINNS, ESQ., and
                         KAREN L. CARROLL, ESQ.
18                       (Atlanta, Georgia)

19                       and

20                  PARKER POE ADAMS & BERNSTEIN, LLP
                    BY:  CHRISTOPHER M. THOMAS, ESQ.
21                       (Raleigh, North Carolina)

22                       Counsel for Mylan Pharmaceuticals Inc.

23

24

25
```

```
 1                         - oOo -

 2                  P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following bench trial was

 4    held in open court, beginning at 10:04 a.m.)

 5              THE COURT:  Good morning.

 6              (The attorneys respond, "Good morning.")

 7              THE COURT:  Welcome back.  Are there any issues

 8    before we turn to closing arguments?  Is there anything from

 9    plaintiffs?

10              MR. STIEFEL:  No, Your Honor.

11              THE COURT:  From defendants?

12              MR. KLEIN:  No, Your Honor.

13              THE COURT:  Okay.  I assume we're going to hear

14    from defendants first.  Now would be the time then.

15              MR. KLEIN:  Okay.

16              Thank you, Your Honor.

17              The defendants presented clear and convincing

18    evidence that all the asserted patent claims are invalid as

19    obvious.

20              In the opening statement, I explained that the

21    issues in this case are straightforward and our themes are

22    simple.

23              The trial record supported our two key themes.

24              First, as to the asserted claims of the Elan

25    patent, they cover a known drug, (4-AP) for a known use,
```

1    (treating MS), with a known formulation type, (sustained

2    release).

3                And as to the Acorda patents, these claims are

4    even more obvious because they simply narrowed the Elan

5    patent to a known dose, (10 milligrams twice daily), for a

6    known MS treatment, (to improve walking).

7                THE COURT:  Do you think the record could

8    support an outcome from an Elan patent as not invalid but

9    the Acorda patents are invalid?

10                MR. KLEIN:  Yes, it could.  The validity or

11    invalidity of the Elan patent should not affect the Acorda

12    patent analysis.  If the Elan patent is invalid, it further

13    supports that the Acorda patents are invalid, but even if it

14    is valid, it is prior art and it is enabling and that would

15    support invalidity for the Acorda patents as well.

16                So to start with, the Elan patent, just to

17    orient, Your Honor, there are two asserted claims.  And they

18    cover the use of 4-AP to treat MS in a sustained release

19    formulation.  And, of course, the heart of this patent is

20    the formulation, the sustained release formulation.

21                And, importantly, these patents don't claim a

22    particular sustained release formulation.  There is not a

23    particular recipe that is claimed in the patent.  It doesn't

24    claim the formulation for Ampyra.  It is any sustained

25    release formulation that achieves therapeutic effective

1    blood levels over a 12 to 24 hour period when administered

2    on a once- to twice daily basis.  So the claims are very

3    broad.

4            My presentation today, for purposes of the Elan

5    patent, is divided into two parts:  First, I want to talk

6    about motivation to combine, and then I want to talk about

7    reasonable expectation of success.

8            And in terms of the prior art, we're looking at

9    before 1991.

10            And so in 1990, shortly before that prior art

11   cutoff, of course, we have the Davis reference which taught

12   that using 4-AP to treat MS was a known drug for a known

13   use.

14            The conclusion was that orally administered 4-AP

15   produced clinically important improvements in mildly chronic

16   deficits in MS.  And, in particular, we're talking about

17   things like gait, improved gait in 9 of 13 involved, and

18   gait is referring to walking.  So this is known in the prior

19   art.

20            Davis also taught that there was a safe and

21   effective therapeutic window, but it could be narrow and

22   there were side effects.  Too much 4-AP could cause

23   seizures.

24            4-AP was also known to have a short half-life.

25   So as Dr. Blight, who is one of the inventors of the Acorda

1    patents, testified:  It's not unusual to be interested in

2    sustained release for a drug which has a short half-life,

3    which dalfampridine has.  It wasn't particularly mysterious.

4              It wasn't mysterious in the late 1990s when

5    Acorda took the license to the Elan patent.  And it wasn't

6    mysterious back in the -- in 1990 either.

7              At the time, in 1990, it was known that a drug

8    with a short half-life had to be taken multiple times a day,

9    and especially when you are talking about a chronic disease

10   like MS that is not practical.  You are going to have

11   patient compliance concerns.

12             So it was known in the art that an immediate

13   release formulation would have to be taken many times a day,

14   and immediate release formulation could have side effects,

15   including seizures, which are obviously very serious.

16             The inventor, Dr. Myers, testified through

17   deposition designations by video, and he confirmed what was

18   understood in the prior art.

19             He said there was a general understanding that

20   we, Elan, could improve patient compliance by reducing the

21   frequency of medications that have to be taken.

22             This wasn't specific to 4-AP.  It was known to

23   have a short half-life.

24             Sustained release formulation can improve

25   patient compliance because the patients will have to take

1    fewer pills per day.

2              And he also confirmed that at the time he began

3    his project, he knew that developing a controlled release

4    formulation could potentially reduce or eliminate some of

5    those side effects, such as seizure.

6              So this was known in the art, according to the

7    inventor.  It's confirmed by the prior art.  Remington's,

8    1985, six years before the priority date.

9              This is obviously a well known treatise.  It

10   talks about the potential advantages of sustained drug

11   therapy.

12             No. 1, avoid patient compliance problems.

13             This was why you use a controlled release

14   formulation, when you have a short half-life.  And without

15   the controlled release, the patients would have to take

16   multiple pills per day.  This was well known.

17             No. 2, minimize or eliminate local side effects.

18   That would include seizures in this case.

19             This is why you look to a sustained drug

20   therapy.

21             THE COURT:  So by 1990, was it obvious to take

22   any immediate release medication that might need to be dosed

23   more than once a day and turn it into a sustained release?

24             MR. KLEIN:  Well, it certainly would be obvious.

25   You say more than once a day?

 1                    THE COURT:  Right.

 2                    MR. KLEIN:  Yes.

 3                    THE COURT:  Would one of skill in the art by

 4       1990 have known, look, we have this IR medication but you

 5       got to take it at least twice, three times, four times a

 6       day.  More than once.  Would it therefore be obvious to try

 7       and make it into a sustained release at that time?

 8                    MR. KLEIN:  It would, yes, Your Honor.  Unless

 9       there were some unique reasons why you shouldn't, which I

10       can't think of right now.

11                    But, yes, patient compliance is a big issue.  So

12       it is obviously very inconvenient to take a pill twice,

13       three, four five times a day.  So it was known in the art

14       that for the drug to be effective, it had to be taken

15       multiple times a day.  It would be obvious to a skilled

16       artisan to look for a sustained release formulation.

17                    THE COURT:  Now, here, there was at least some

18       testimony that 4-AP is the only drug that has ever been

19       approved by the FDA for sustained release without first

20       being approved for immediate release.

21                    Is that what the record shows?

22                    MR. KLEIN:  I believe that is what the record

23       shows.

24                    I don't know too much about the earlier drugs

25       and the history and why there was an immediate release

```
 1    approved first; but in this case, as the patent itself

 2    confirms, it really wouldn't make sense to go through the

 3    drug development process for a drug like 4-AP that would

 4    have to be taken four or five times a day for a chronic

 5    disease.

 6            It seemed like a waste of money, of drug

 7    development time, to develop a product like that when there

 8    is an obvious solution.  You just reformulate the drug in a

 9    sustained release dosage form, and then you can avoid the

10    patient compliance problem.

11            So that is the explanation as to why there is no

12    FDA approval of immediate release 4-AP.

13            And, of course, the drug has been available for

14    a long time.  So a skilled artisan could get the drug, they

15    could run whatever tests they want to run on the drug.

16    There is no issue there.

17            The patent itself, when it discusses the prior

18    art, specifically says:  4-AP has been found to improve the

19    conduction of nerve impulses, thereby alleviated symptoms in

20    MS patients.

21            This is referring to Davis, among other prior

22    art, which talked about improving gait.

23            And the patent itself says, it can be

24    appreciated by those skilled in the art that there is a need

25    for an improved dosage form.
```

1            And that is what I was getting at.  You are not

2    going to want to develop 4-AP in immediate release because

3    that will not be convenient, and it could be dangerous.

4            And such a formulation must result in a

5    controlled release of the drug.  That is what the patent is

6    saying about the prior art.

7            This is not what the patent is saying is the

8    invention.  It is literally described in the background of

9    the prior art, and these types of admissions, as the

10   PhamaStem case says, are binding in the obviousness content.

11           And it is supported by the prior art.  It is

12   supported by what the inventor said.

13           So motivation to combine, we submit, Your Honor,

14   is well established by clear and convincing evidence.  It

15   just made common sense to take a drug, a known drug that was

16   known to treat, that known to be effective and MS patients

17   but inconvenient and had safety concerns to formulate in a

18   sustained release dosage form.

19           So the real question for this patent is would a

20   skilled artisan, a formulator have a reasonable expectation

21   of taking the 4-AP and finding a suitable sustained release

22   formulation for it?

23           Again, any sustained release, as long as it can

24   have a therapeutic drug level with once or twice daily blood

25   dosing, then the patent is obvious.

```
 1              The patent does not require or the obviousness
 2    principles do not require defendants to come forward with
 3    evidence that there was a reasonable expectation that the
 4    particular drug, the formulation for Ampyra was obvious.
 5              Any sustained release formulation, if this
 6    sustained release formation is obvious, the patent was
 7    obvious.
 8              THE COURT:  Let's just talk about that for a
 9    moment.
10              MR. KLEIN:  Sure.
11              THE COURT:  Do you agree that the record would
12    support a finding that in and around 1990 or thereabouts
13    there were a number of different ways that one of skill in
14    the art would have looked to do sustained release?
15              MR. KLEIN:  Absolutely.  And actually that is
16    what I have on this slide.
17              THE COURT:  But your argument is, even if it
18    wasn't obvious, out of that large number of ways one could
19    do it, to pick the one that turned out to work, even if you
20    haven't proven that that was obvious to pick that one out
21    of the many, the Elan patent is to any type of sustained
22    release so therefore you just need to prove it would have
23    been obvious to do it somehow; is that right?
24              MR. KLEIN:  That is correct.  And by no means
25    are we conceding that what the inventors did wasn't obvious.
```

1    We're just saying we don't have to prove that a skilled

2    artisan would follow the path of the inventor.  The skilled

3    artisan could have followed any number of paths, and if that

4    skilled artisan would have a reasonable expectation that any

5    of the various options for sustained release would work,

6    then the patent is object.

7              And there were various options.

8              The first patent on sustained release, coated

9    pellet, came out in 1938.

10             And the coated pellet, Contac is a good example.

11   Your Honor may remember the old commercials from the 70s.

12             Then by 1990, Remington's teaches how to make

13   and use a number of different types, of different platforms

14   for sustained release:

15             Reservoir diffusion.

16             Matrix diffusion.

17             Encapsulated dissolution.

18             Matrix dissolution.  And,

19             Ion exchange.

20             So these are five examples, different paths a

21   skilled artisan would follow.  And the only question is

22   would a skilled artisan, we're talking about an experienced

23   formulator at the time, have a reasonable expectation that

24   this drug with a short half-life could be formulated as a

25   sustained release formulation.

1           The inventor, Dr. Myers, testified that what he

2    did was purely routine.  His boss, Dr. Devane, came to him

3    and asked him to go ahead, take this 4-AP, which Dr. Myers

4    didn't know anything about, and formulate it into a

5    sustained release formulation.  And he said he looked at

6    the drug's physical-chemical properties, how soluble it was,

7    were there any other issues he needed to take into

8    consideration, and then he said it took three or four weeks

9    to put on paper three or four formulations.

10          So he came up with three or four recipes in

11   three or four weeks.

12          If the skilled artisan could come up with just

13   one of those recipes, the patent is obvious.  And then it

14   took him only a day to make the formulation.  This is just

15   routine experimentation.  It's what any formulator at the

16   time would have done.  As the PharmaStem case says, routine

17   research methods using routine research methods does not

18   give rise to a patentable invention.

19          So what do the plaintiffs say.  Well,

20   Dr. Fassihi placed a lot of reliance on an old reference by

21   Dr. Robinson.  This reference dates back to 1978, so

22   thirteen years before the priority date.  And there is a

23   vague sentence or sentence fragment in the middle of this

24   article that says design of a sustained-release product is

25   normally a very difficult task.

1          Well, that's a vague comment and there is no

2     question that the formulation sciences, that's an expert

3     field.

4          The designing a sustained release product may

5     take trial and error, may take experimentation, it may even

6     be difficult, but it's still routine.

7          For example, preparing a Supreme Court brief is

8     a very difficult task, but it's obviously routine for

9     Supreme Court practitioners.  And the same is true for

10    formulation.

11         In the Allergan case, the Federal Circuit

12    reversed the district court because the district court found

13    there was no reasonable expectation of success in view of

14    the general unpredictability of the formulation arts.  And

15    this is their argument.  Their argument is that formulation

16    is difficult, as a result they're entitled to a patent.  But

17    all the inventor did and all the patent claims is routine

18    experimentation.

19         So the evidence was clear, it was convincing,

20    the two Acorda patent claims that are asserted are invalid

21    as obvious.  I'll switch gears to the Acorda patents unless

22    you have more questions on the Elan patent.

23         THE COURT:  You can move on at this time.

24         MR. KLEIN:  As to the Acorda patents, as

25    explained in the opening and as Dr. Peroutka explained in

 1    his testimony, although there are sixteen claims, there are

 2    five common limitations.  There are some, a couple of other

 3    limitations that really aren't important like they require

 4    an excipient and that kind of thing, but these are the five

 5    key limitation that's cut across all the asserted claims.

 6              Method of treating MS patients with sustained

 7    release 4-AP.  10 milligrams BID, that is the key

 8    limitation, it's the dose.  This patent is about the 10

 9    milligram dose.  Improved walking or increase walking speed.

10    Then there are the pK limitations.  And the patent requires

11    a stable dose taken for at least two weeks, in other words,

12    no titration.  So these are the key limitations, and again

13    the most important one is the dose.

14              So for purposes of these patents, Your Honor, I

15    have divided the presentation into three parts.  First I

16    want to spend some time explaining why these patents, the

17    asserted claims are prima facie obvious as a matter of law

18    based on the case law.  And because they're prima facie as a

19    matter of law, the next step is you skipped directly to

20    secondary considerations.

21              In our view reasonable expectation of success is

22    academic because there is prima facie obviousness as a

23    matter of law.  Obviously there is a lot of time spend on

24    reasonable expectation of success, so I will address that

25    issue as well.  And finally, I want to spend some time

1    anticipating the arguments that I expect counsel to present.

2              So as for prima facie obviousness, there is no

3    question that the Acorda patents are a subset of the Elan

4    patent.  All these patents are listed in the orange book.

5    There are stipulations of infringement for all the patents.

6    Ampyra is covered by the Elan patent as well as the Acorda

7    patents.  When you look at the key elements one by one, they

8    both require sustained release 4-AP.

9              Elan sets forth a range, an unspecified range of

10   therapeutic dose, QD once a day, or BID, twice a day,

11   whereas the Acorda patents require 10 milligrams twice

12   daily.

13             The Elan patent says treat MS patients, includes

14   the symptoms.  Acorda is limited to a specific symptom,

15   improve walking speed.  The Elan patent requires therapeutic

16   blood levels and the Acorda patent specifies some of the pK

17   levels.

18             And finally the Elan patent doesn't require any

19   specific duration, doesn't require stable or titrated dose,

20   it covers everything.  Acorda patents are limited to two

21   weeks for a stable dose.  The Acorda patents are a subset of

22   the Elan patent.

23             THE COURT:  You say there is no question of

24   that.  But I heard something in opening from the plaintiffs

25   that they take the position the Acorda patents somehow

1    expand the Elan patent.  Do you have an understanding or a

2    response to that argument?

3              MR. KLEIN:  I don't understand the argument.  I

4    honestly don't understand it.  If they explain it in their

5    closing, I will address it on rebuttal, but the Acorda

6    patents are a subset, and we have gone through all the key

7    limitations.  I don't understand how the Acorda patents can

8    cover something that the Elan patent does.

9              So just a year after the Elan patent issued in

10   1996, the Schwid article came out.  So that's the 1997

11   article.  This is -- the Schwid article discusses a study

12   that Dr. Goodman was involved in as well.

13             And this study come very close to the Acorda

14   patents.  It's seven years before the Acorda patents, but it

15   finds 4-AP sustained release in a 17.5 milligram dose, BID,

16   stable dose, one week, timed gait was improved, that's

17   improving walking speed.  And the conclusion, 4-AP sustained

18   release improved motor function in MS patients.

19             There are only two differences between this

20   reference and the Acorda patent.  One of the differences is

21   that it's a stable dose for one week instead of two, we

22   submit that is not material, because stable dose works for

23   one week, it is not an inventive step to expand that an

24   extra week.

25             So the only real difference between the Schwid

1    and the Acorda patent, this is seven years before the

2    priority date, is that Schwid used a 17.5 milligram dose,

3    Acorda used a 10 milligram dose.  And Schwid was using the

4    Elan formulation.  Schwid was practicing the Elan patent,

5    this is an Elan study.

6              So the inventor confirmed that part of his

7    invention is the dose.  I asked him:

8              "Question:  You claim to have found a preferred

9    dose of the Elan product for treating MS patients; is that

10   correct?

11             "Answer:  We did.

12             "Question:  And that dose is 10 milligrams taken

13   twice daily?

14             "Answer:  Correct."

15             The heart of this invention is that Dr. Cohen

16   said he found that ten instead of 17.5 taken twice daily

17   improves walking.  That's what he claims to be the

18   invention.

19             But the prior art reported the use of Elan's 10

20   milligram dose as having a significant benefit on timed

21   walking.  So the heart of what Dr. Cohen says is the

22   invention is expressly reported in the prior art in the

23   Goodman references.  Dr. Goodman said 20 milligrams per day,

24   range of 20 to 40, including 20, which is 10 milligrams BID,

25   showed evidence of a dose response.  And the specific

1    response we're talking about is a significant benefit on

2    timed walking, a statistically significant benefit as

3    confirmed by the P value.  What Dr. Cohen said he invented

4    was disclosed in the prior art before the 2004 priority

5    date.

6            We will spend just a moment talking about these

7    pK limitations.  Dr. Cohen doesn't claim to have invented

8    any pK limitations.  He used Elan's formulation, he's not a

9    formulator.  If you look at the patent itself, the patent

10   set on forth the pK limitation, this is the '826 patent,

11   table seven.  These data, the pK data come directly from the

12   Hayes III 2003 prior art.  So the pK limitations in the

13   patent for all intents and purposes are irrelevant.

14           The Santarus case makes it clear that if the

15   dose were obvious, if the 10 milligram dose were obvious,

16   then these serum concentrations cannot save the patent.

17           So what do we have here, we have a range

18   disclosed in the prior art, and a claimed invention that

19   falls within that range, and the burden of production shifts

20   to the plaintiffs.  It's clearly what we have.

21           We have the Elan patent, a range of doses, it

22   has to be therapeutic, sustained release 4-AP to treat MS.

23   And then Schwid and Goodman narrowed down that range to

24   simply 10 to 20 milligrams.  And there were four doses

25   tested within that range, 10, 15, 17.5 and 20, all four had

1    a dose response.  All four improved walking in MS patients

2    when taken twice daily.  All the Acorda patents do is pick

3    the lowest effective dose.

4              We submit that is prima facie obvious as a

5    matter of law.  Not only the Galderma case says this, but

6    the Tyco case from the Federal Circuit says the same thing.

7    Ordinarily where there is a range disclosed in the prior

8    art, and the claimed invention falls within that range,

9    there is a presumption of obviousness.

10             And we can take advantage of that presumption

11   here because we have a range disclosed in the prior art and

12   simply an optimized dose picked from that range.

13             That presumption according to the Tyco case is

14   rebuttable either by showing that the prior art taught away

15   from the invention or by showing new and unexpected results.

16             In the opening, I mentioned that plaintiffs said

17   in their pretrial statement that they were going to present

18   evidence of teaching away, and they were going to argue that

19   the Goodman references teaches away from what the Goodman

20   references say, and I said that's not credible.

21             Well, it appears that they came to the same

22   relation because there was no evidence of teaching away in

23   this case, so plaintiffs have not come forward with any

24   evidence of a teaching away theory.

25             And as for unexpected results, I'll turn to that

1    in a moment, but the results were entirely consistent with

2    what Acorda ultimately found, there are no unexpected

3    results in this case.

4            So under the law, we submit the Court should

5    turn to secondary considerations at this point.  Even if you

6    were to assume for the sake of argument that there is no

7    prima facie obviousness as a matter of law, there was

8    absolutely a reasonable expectation of success with regard

9    to the claimed invention here.

10           So Dr. Cohen said that when he looked at the 201

11   study it supported looking at a range between 10 and 20

12   milligrams BID to improve walking speed based on the timed

13   25 foot walk.  That's how he interpreted the 201 study.

14           And Dr. Goodman said that's exactly how a person

15   of ordinary skill in the art would view the results of the

16   201 study as reported in the Goodman references.  I asked

17   him if he were -- if there would be further studies after

18   the 201 study, what you're teaching in the two boxes, that's

19   the Goodman reference, that is the dose range for future

20   study would be 20 to 40 milligrams per day, as a range, yes.

21   Conceding that's the range of the prior art.  And 20 to 40

22   milligrams per day obviously in the context of the study is

23   three doses, 10, 15 and 20, one of which is the claimed

24   dose.

25           Now, Dr. Goodman in his deposition also

1    testified that -- I asked him, would a person of ordinary

2    skill in the art in December 2003 be motivated based on the

3    201 study, which was reported in the Goodman references, to

4    design a study along the lines of what became the 202 study

5    which formed the basis for the patent, tested the 10

6    milligram BID dose for 12 weeks, stable dose, when I asked

7    him that question at the deposition, he said yes.

8         Now, I fronted this testimony in this opening

9    statement.  Dr. Goodman was aware I was going to ask him

10   this very same question.  And at the end of the

11   cross-examination, I asked this question, and he changed his

12   yes to a no.  He changed his testimony.  And the reason he

13   changed his testimony was because he knew that the answer he

14   gave at his deposition hurt plaintiff's case.

15        Your Honor, we submit that Dr. Goodman is a

16   biased witness.  He has been working for Elan and Acorda for

17   two decades.  He was part of the drug development team for

18   Ampyra for many years working side-by-side with the

19   inventors.  And he is a paid consultant outside the context

20   of this litigation so when he changed his answer from yes to

21   no, we submit he was right the first time in the deposition,

22   a person of ordinary skill in the art would have been

23   motivated to go forward with these further studies.

24        And on redirect, he tried to explain his changed

25   answer by saying, when I asked about a person of ordinary

1    skill in the art, he thought I was asking about his personal

2    experience as a fact witness.  Your Honor, we submit that's

3    not credible.  The question is unambiguous.  I asked for his

4    opinion as an expert, answer to whether a person of ordinary

5    skill in the art would have been motivated, he said yes, and

6    that's the correct answer.

7            THE COURT:  Of course your position is that

8    Dr. Goodman, if anyone, basically invented the Acorda

9    patents, and yet he repeatedly denied that he did.  I mean,

10   you're suggesting he was on to a whole lot more than he's

11   been given credit for.  Why would he deny that?

12           MR. KLEIN:  Well, I'm not going that far, Your

13   Honor, because he might have -- he was working with the

14   inventors, so I'm not necessarily saying that there is an

15   inventorship issue in this case, but he reported what the

16   inventors claim to be their invention in the prior art.

17   Whether it was his idea or not, I'm not going that far, but

18   clearly he reported it in the prior art.

19           THE COURT:  I think you did bring out that among

20   various criteria or endpoints in the EDSS, it was his idea

21   to focus on just walking speed, I think it was.  He didn't

22   seem to want to necessarily take credit for even that.

23           It is an odd sort of bias.

24           MR. KLEIN:  Right.  No, that is absolutely true.

25           And in terms of the test, the 25 timed walking

1    speed, that was advice that he gave to Elan that was

2    reported in the Schwid study.  It wasn't anything Dr. Cohen

3    came up with.  It was before Dr. Cohen even licensed the

4    patents from Elan and started thinking about MS.

5              So, yes, that came from, I agree that did come

6    from.

7              THE COURT:  Is there anything in the record

8    about how much financial interest Dr. Goodman may have

9    perhaps in this case or in the patents being found valid?

10             MR. KLEIN:  I'm not sure there is a dollar

11   figure but he received honoraria for his work in connection

12   with the Goodman references and the Goodman poster; and he

13   is a paid consultant for serving on an MS advisory

14   committee.  He said he skipped this year's meeting but he

15   didn't say he is off the committee.

16             So I don't know the dollar amount, but he is

17   paid to serve Acorda's interest.  I believe he even said he

18   turned down another potential assignment because it would

19   conflict with the work he was doing for Acorda.

20             So Dr. Goodman's ultimate conclusions as to

21   obviousness we submit are tainted.  He is a biased witness.

22             But he did give some very critical concessions

23   along the way, including this concession about motivation.

24             For example, I asked him whether follow-up

25   studies to the 201 study were needed to test 4-AP doses for

1    longer than two weeks.

2                    He agreed.  Two weeks at a minimum, absolutely.

3                    This was obvious.  You take what was reported in

4    the 201 study, you go to another study and you test for two

5    weeks.

6                    And the same question with regard to a stable

7    dose.  That was obvious.

8                    He said eventually it would be desirable that

9    one would have some, some dose that one would take, the

10   patient would be prescribed to take on a regular basis.

11                   Two weeks, stable dose, these are not meaningful

12   limitations in the patents.

13                   The PK parameters again, those are inherent.

14   We're talking about the dose.  Was it obvious to use the ten

15   milligram dose?  And it was.

16                   And I'm not going to read this paragraph again

17   from KSR.

18                   But we submit the evidence at trial fits very

19   neatly within the KSR framework.  At a minimum, it was

20   obvious to try these future tests, 4-AP, 10 milligrams

21   sustained release twice daily, at least two weeks at a

22   stable dose, at a very minimum.

23                   But I'm not sure you even need to get to the

24   obvious to try standard.  The patent is just obvious.

25                   And, critically, conclusive proof of efficacy is

1    not necessary to show obviousness.

2              The Federal Circuit has said this time and

3    again.  All that is required is a reasonable expectation of

4    success.

5              You don't have to wait until a large scale

6    randomized clinical trial completes and you have the results

7    and the full clinical trial report to support a patent or as

8    prior art to render the patent invalid as obvious.  That is

9    not necessary.

10             And, in fact, Your Honor, it's also not

11   necessary, when assessing reasonable expectation of success,

12   to look at whether it was reasonable to expect FDA approval.

13             That is not the standard.  The standard is not

14   FDA approval.

15             As the Allergan case held, the Federal Circuit

16   held in Allergan, there is no requirement that one of

17   ordinary skill have a reasonable expectation of success in

18   developing the commercialized product.

19             That is not the question.  The person of

20   ordinary skill need only have a reasonable expectation of

21   success of developing the claimed invention.

22             The claimed invention is satisfied if a single

23   MS patient with difficulty walking takes the 10 milligram

24   dose twice daily and the walking improves.  That is all

25   that is required.

1           And so the question is, for reasonable

2    expectation of success, is simply was it reasonable for a

3    skilled artisan, given what was recorded in Schwid and the

4    Goodman references and the prior art as a whole, to expect

5    at least one MS patient taking 10 milligrams twice daily to

6    have walking speed improve?

7           And the answer, of course, is yes.  That is what

8    Dr. Goodman reported.

9           So I now want to talk about Acorda's arguments.

10   And I'm going to focus on arguments that were presented in

11   Acorda's case.  I haven't seen their slides; and to the

12   extent they raise additional arguments, hopefully I'll have

13   some time left to rebut those.

14          There was a lot of testimony to rebut our

15   showing of reasonable expectation of success.  And there was

16   a common theme in Acorda's case.  And that common theme was

17   that the contemporaneous documents don't mean what they say.

18   This was a common theme.

19          For example, Dr. Cohen testified that when the

20   Goodman I reference said that the 4-AP group showed

21   statistically significant improvement in functional measures

22   of mobility, he said that is an incomplete characterization

23   of the 201 study report.

24          And, yes, the 201 study report as a whole isn't

25   in the prior art.  We have what the Goodman references

1    report.

2              And Dr.  Cohen said the Goodman references are

3    missing important context.  That was his testimony.

4              Well, Dr. Goodman then came to the stand,

5    testified he personally wrote the Goodman references.  He

6    personally presented them to his peers.  And he did not omit

7    any important context that his peers would have found

8    material to the 201 study results.

9              The documents mean what they say, and they

10   accurately characterize the salient points from the 201

11   study.

12             THE COURT:  Now, would it matter anyway?  I mean

13   let's just assume if you had the full 201 study report, it

14   had all sorts of negative stuff just for sake of argument.

15   It showed indisputable failure and no one would ever look at

16   this again, but that is not in the public prior art.  What

17   is in the public prior art is just, let's say, Goodman

18   selectably cherry picking something that looks positive.

19             If that were the factual record, would it matter

20   what the 201 actually would say in full context?

21             MR. KLEIN:  No, it wouldn't.  Because

22   obviousness, prima facie obviousness focuses on the priority

23   date, and what would a skilled artisan know based on the

24   publicly available literature.

25             So what was said in some commercially

1    confidential document that wasn't shown to the public is

2    irrelevant in that context.  I agree.

3            So you see this theme about the documents don't

4    mean what they say.  Again, this is repeated theme that we

5    saw during the trial.

6            So Dr. Goodman said his studies, for example,

7    the 201 study was a small exploratory and methodological

8    study not designed to show efficacy.  And that was a key

9    theme we heard shown throughout Acorda's presentation.

10   These small studies were not designed to show efficacy.

11           But at the time Dr. Goodman wrote this poster,

12   he called it a presentation, and he presented on it

13   personally twice to his peers and said there were two

14   objectives of the 201 study, and the objective was to

15   obtain evidence of efficacy and dose response.  Obtain

16   efficacy.

17           He says it is not designed to show efficacy.

18   The documents at the time say it was absolutely designed to

19   obtain efficacy, and not only was it designed to obtain

20   efficacy but the study found efficacy.  The conclusions make

21   it clear there was evidence of a dose response in the 20 to

22   40 milligram per day range.  And, again, that dose response

23   was a significant benefit on timed walking.

24           The contemporaneous documents mean what they

25   say.

1              We see another example of this theme that the

2      prior art doesn't mean what it says.

3              Dr. Cohen testified that the 201 study results

4      did not demonstrate, they did not remotely prove that

5      sustained release 4-AP improved walking ability in MS

6      patients.

7              That is what he said when he came in here and

8      testified under oath.

9              But the documents at the time say the precise

10     opposite.  He is the CEO of Acorda.  His company, on its

11     website, in December 2003 reported that fampridine 4-AP SR

12     was in clinical trials and participants in these MS studies

13     demonstrated improved walking ability.

14             That is what Acorda said at the time, and

15     Dr. Cohen came in and said the precise opposite.

16             Dr. Goodman also talked about seizure risk.

17     Again, this is the theme.  The contemporaneous documents

18     don't mean what they say.

19             It says there was an enduring concern regarding

20     seizure risk.  And that would have meant a skilled artisan

21     would not have reasonable expectation of success.

22             He didn't go so far as to say a skilled artisan

23     would have thought 4-AP drug development for MS would have

24     come to a halt after the 201 study.  He doesn't go that far;

25     and we think that is how far he would have had to go, to

1   basically say it teaches away.  He doesn't do that.  He

2   doesn't say that.  He dropped that argument because it

3   wasn't credible.

4                   So the prior art, including the Goodman poster,

5   says there was a safety profile consistent with previous

6   experience.  We're talking about risk of seizure.

7                   And there still is a risk of seizure, no

8   question.  But the Goodman poster says there was increased

9   AEs -- it's hard to read that but it is adverse events -- at

10  doses above 50 milligrams per day.

11                  So there were seizure risks if you took higher

12  doses.

13                  But the safety profile of the lower doses was

14  established in the prior art.  And even to this day, Your

15  Honor, there is seizure risks with 4-AP.  It's in the FDA

16  approved label.  It hasn't stopped anyone from drug

17  development.

18                  And the previous experience that is referenced

19  in the poster is talking about the prior art as a whole.

20  Dr. Peroutka talked about this.  And there is wealth of

21  prior art discussing how lower doses of 4-AP sustained

22  release were safe and effective.

23                  So Solari, we heard about the Solari reference

24  as well.  And this is from 2002.

25                  The Solari reference we submit isn't

1    particularly relevant here; and to the extent it is

2    relevant, it actually helps our position.

3                So in the discussion section, Ms. Solari says

4    Elan and Acorda devised an oral slow release AP formulation,

5    obviously talking about the sustained release formulation

6    covered by the Elan patent, and sponsored a multicenter

7    randomized clinical trial.

8                Presumably, that is referring to the 201 study.

9                The trial has not published so far in the slow

10   release formulation has not been registered.

11               Solari didn't address key prior art.  So

12   whatever Solari has to say about the state of the art in

13   2002, it is not the state of the art in 2004.

14               And to the extent Solari talks about walking

15   speed, it supports our position.  Solari talked about the

16   Schwid reference from 1997 and said nine participants,

17   17 percent improved in ambulation, walking speed, during

18   study treatment versus none during placebo.

19               A P valve of less than .0001.

20               As Dr. Peroutka said, odds this is just a random

21   fining as opposed to a real finding and effect on walking is

22   one in 10,000.

23               So Solari is supporting a reasonable expectation

24   of success to use 4-AP sustained release to treat, to

25   improve walking.

1              THE COURT:  Talk a little bit about MS has all

2    these different symptoms and deficiencies that people suffer

3    from.  And there is EDSS which I see maybe you are planning

4    to move on to anyway.

5              But is it probative of obviousness or

6    nonobviousness that maybe there is 10, 15 or more things

7    that unfortunately go wrong with people who suffer from MS

8    and what the inventors here found was let's focus on just on

9    walking and actually just on walking speed and maybe that

10   part of what 4-AP does was not obvious because people before

11   them were testing to see if it did a whole bunch of things.

12              Is that probative to the analysis?

13              MR. KLEIN:  It is not given the wealth of the

14   prior art and the history of the prior art in this case.

15              So if you start with Davis, Davis talks about

16   different things, different types of symptoms, and 4-AP was

17   tested to see whether it alleviated different symptoms.

18              And over time, you go to Schwid, Schwid starts

19   talking about walking speed.

20              And then by the time you get to the Goodman

21   references, the focus is on 4-AP sustained release to

22   improve walking speed.

23              So the obvious focus of a skilled artisan in

24   2004, in light of Schwid and the Goodman references, would

25   be on the use of sustained release 4-AP to improve walking

1    speed, in particular the 25 foot walking test.  That is

2    where the dose response was found.  That is where a skilled

3    artisan would focus.

4              And I think, getting to your point, Dr. Goodman

5    said there were failure of others.  This is now, we're now

6    getting into secondary considerations, and he had a slide at

7    the end of his presentation, that this is the secondary

8    considerations he thought were relevant.

9              And he said, failure to show unpredictability in

10   the first failure -- he refers to this Elan EDSS test that

11   he called a failure.

12             Now, this study was never actually reported in

13   the prior art or at least according to the evidence.  It is

14   not in the record that there is any evidence that this study

15   was reported on in the prior art.

16             Schwid references it in passing because it's

17   drawing on that quote-unquote "failure" to teach a skill the

18   artisan that the EDSS may have been an inadequate outcome

19   variable for trial.

20             And Schwid says because there wasn't an

21   effect seen in the EDSS, Schwid and Dr. Goodman -- on

22   Dr. Goodman's advice, in fact -- created a new study to

23   assess the effect of 4-AP SR or more sensitive, quantitative

24   measures of function on MS.

25             And from Schwid up through 2004, EDSS was not

1   the sole outcome variable anymore.  Other outcome variables,

2   quite frankly, were added and were more sensitive, including

3   the timed 25 foot walk.

4           So the notion that a study on EDSS failed in

5   1994, a decade before the prior art, the notion that that

6   quote-unquote "failed study" would have dissuaded a skilled

7   artisan in 2004 to use 4-AP for the timed 25 foot walk test

8   is incredible.  The failed Elan study led skilled artisans

9   directly to the timed 25 foot walk test.

10          THE COURT:  The defendants aren't disputing that

11  what Schwid is referring to here is the so-called failed

12  Elan study of 161 patients; correct?

13          MR. KLEIN:  Correct.  No, we're not disputing

14  that it is referencing that study.  We don't know the dose

15  of the study.  We don't know a number of details.  But, no,

16  what Schwid is doing is saying there is a study out there

17  that relied on EDSS.  EDSS isn't sensitive enough, so we

18  looked at different outcome measures, and then from then on,

19  these different outcome measures were being used for 4-AP

20  testing.

21          So then Dr. Goodman and Dr. Lublin talked about

22  this failure for another compound called nerispiridine.

23  It's a Sanofi drug.

24          And we submit this is apples and oranges.  This

25  purported failure is completely irrelevant to this case.

1    The compound, as Dr. Lublin conceded, these are totally

2    different compounds, and, more importantly, the claimed

3    invention in this case is not to the compound.  It is not --

4    it was already known that 4-AP could be used to treat MS.

5           The invention claimed in the Acorda patents is a

6    dose.  It is a 10 milligram dose.  And the failure of this

7    other compound has no relevance to whether a skilled artisan

8    would have a reasonable expectation of success with the

9    10 milligram dose.  It is apples and oranges.

10          So then Dr. Goodman talked about surprising and

11   unexpected results.  And this is one of the secondary

12   considerations that the case law says is important when you

13   have a dose range disclosed in the prior art and claimed to

14   a particular dose within that range.

15          The case law says, well, you want to look to see

16   whether there was some kind of surprising or unexpected

17   result and that makes sense.

18          Here Dr. Goodman identified two important,

19   surprising and unexpected results.  The first one again,

20   this is Dr. Goodman saying contemporaneous documents don't

21   mean what they say.  It says 10 milligrams twice daily

22   sustained release 4-AP improved walking.  He said that was

23   surprising even though in 2002 and 2003, he said precisely

24   the same thing, 20 milligrams per day, significant benefit

25   on timed walking.  It wasn't surprising if you believe what

1   Dr. Goodman said at the time.

2           The second -- oh, also I should note, Your

3   Honor, that the results weren't surprising when you looked

4   at the future studies.  If you look at what Dr. Goodman said

5   in his post, he said the average improvement in walking

6   speed during the low dose period, 20 to 50 milligrams a day

7   including a greater than 20 percent increase for nine of the

8   25 subjects.  If you do the math, that's 36 percent of the

9   patients improved.

10          If you look at the Ampyra label which reports on

11  the study after the 2004 date, 32 to 36 of patients

12  improved.  These future studies just confirm what

13  Dr. Goodman was teaching in the prior art, there were no

14  unexpected results.

15          Dr. Goodman then says well, it was unexpected

16  that 10 milligram twice daily was as efficacious as the

17  higher doses that had side effects.  In other words, he's

18  saying we didn't expect 10 milligrams to work as well as 20.

19  But on cross, and he's referring to that dose response curve

20  Your Honor saw, right, if you eyeball it, it looks like 20

21  had more of an effect than 10, but on cross he testified

22  that this dose response curve did not detect any

23  statistically significant differences among the doses within

24  a 20 to 50 milligram per day range.  Meaning that if you

25  eyeball it, it may look like 20 would be better than 10, but

1      statistically they might be identical, you can't tell.

2              So there is no expectation in 2004 as to whether

3      10 would be better than 20.  You would think they both would

4      have a dose response, but you don't know if one would be

5      better than the other, so it's not surprising if you later

6      learn that 10 is as good as 20.

7              And I mentioned this in the opening, even if

8      that were surprising, it doesn't matter for purposes of

9      obviousness.  It's a difference of percentage, it's a

10     difference in degree rather than kind, as a matter of law,

11     it's not relevant.

12             So I now want to combine commercial success and

13     unmet need, because I view this as two sides of the same

14     coin.  They're both looking at the same question.

15             Given sales of Ampyra, FDA approval of the drug,

16     how strong would the incentive of development been back in

17     2004.  So the question here is analytically, if you go back

18     to 2004, was there a scientific and economic motivation for

19     those skilled in the arts to practice the claimed invention.

20     And if others didn't, well, that could suggest the patents

21     may not be obvious.  That's the idea.

22             In this case, however, that doesn't work because

23     the Elan patent, which indisputably covers Ampyra in the

24     claimed invention, disincentivized a person of ordinary

25     skill in the art from practicing the claimed invention.

1    Even if there were scientific and economic motive in 2004,

2    there was a legal, a strong legal disincentive that would

3    explain why others didn't practice the invention.  There was

4    a blocking patent and that blocking patent was exclusively

5    licensed to Acorda.

6              So the courts, including Your Honor, I think

7    you're quoting Judge Chesler here from New Jersey have said

8    this Court does not find commercial success to have much

9    value as an indicator of nonobviousness because others were

10   legally barred from commercially testing the claimed

11   invention.

12             The Elan patent blocked and still blocks others

13   from practicing the Acorda patent.  Commercial success,

14   unmet need, it's the same analytical concept, it doesn't

15   apply here because there is a blocking patent.

16             Putting aside the blocking patent, Ampyra still

17   has not satisfied a long felt unmet need, and Your Honor, I

18   just want to pause, I am not in any way shape or form

19   suggesting that Ampyra does not help patients.  It

20   absolutely helps patients, it helps patients walk.  And to

21   the extent a patient can walk a couple seconds faster that

22   can absolutely have a meaningfully difference in their life.

23   No question about it.  I am not implying otherwise.

24             But that's not relevant to long felt unmet need

25   because Dr. Goodman said only 15 to 20 percent of his MS

1    patients who suffer from walking difficulties are prescribed

2    Ampyra.  80 to 85 percent of MS patients with walking

3    difficulty were not taking Ampyra.  So Ampyra has not

4    satisfied a long felt, unmet need for therapy to improve

5    walking in MS.

6              As for commercial success, putting aside the

7    blocking patent, there wasn't any commercial success for

8    purposes of obviousness either in 2004 for the Acorda patent

9    or 1990 for the Elan patent.  Of course, Ampyra has made

10   more than a billion dollars, that's true, but that's not

11   what commercial success is talking about.

12             You have to go back in time and look at the

13   economic incentives.  At the time Ampyra presented with

14   limited commercial opportunity, talking about a limited

15   label, limited efficacy, limited patient populations.  If

16   you look at it today, the sales are unimpressive compared to

17   other MS drugs, other orphan drugs.  And at the time, a

18   skilled artisan would not believe that the actual and

19   expected profits would outweigh the costs, both the R & D

20   costs, the opportunity costs, where else would the skilled

21   artisan invest, and the risks.  And plaintiffs -- so

22   Dr. McDuff talked about this, and plaintiff's expert,

23   Dr. Bell, failed to consider these considerations and he

24   didn't even mention the blocking patent.

25             So to wrap up, Your Honor, our themes are very

```
 1    simple.  The asserted Elan patent claims are obvious.  They

 2    cover a known drug for a known use with a known formulation

 3    type.  The prior art as the patent itself concedes as the

 4    inventor, motivated skilled artisans to take a 4-AP and

 5    improve the dosage form to make it a sustained release.  And

 6    it's just routine experimentation to come up with a suitable

 7    sustained release formulation.

 8              As to for the Acorda patent, they narrow the

 9    Elan patent for a known dose for known MS treatment, they're

10    prima facie obvious, there was a reasonable expectation of

11    success and of course secondary considerations fail

12    factually and legally.

13              For these reasons, Your Honor, we ask that the

14    Court hold that all the asserted claims of the asserted

15    patents are invalid as obvious.

16              THE COURT:  There is one other question.

17    Dr. Cohen testified, and part of what I understood him to be

18    talking about was sort of a subjective experience of him as

19    an inventor and as Acorda as a company and the money they

20    spend, and we do the 201 and we think we're going to get

21    this and we don't, even before that, we thought we had an

22    invention that would work on spinal injuries and then that

23    didn't work out.  What I took from that was at least their

24    subjective experience was challenging and expensive and

25    fraught with at least economic risks.  If I was -- if I
```

 1    found that credible, how do you square that subjective

 2    experience with the idea that as a matter of fact these

 3    patents were obvious all along?

 4              MR. KLEIN:  Well, I don't see them as

 5    inconsistent.  Remember, Acorda had a license to the Elan

 6    patent.  So others in the field may have thought the same

 7    thing, they couldn't do anything about it, because they

 8    would infringe the patent.  And Dr. Cohen, what he's saying,

 9    well, we started with spinal cord, we went to MS, and then

10    he looked at the 201 study results, and he said well, you

11    know, further testing in the 10 to 20 milligram dose, that's

12    what I think we should -- that's what I think we should do

13    and that's the heart of his invention.  And Dr. Goodman

14    disclosed that very thing, so it's in the prior art.  What

15    Dr. Cohen said he did was in the prior art before 2004, and

16    therefore the patents are obvious.

17              THE COURT:  But if it was obvious all along, why

18    would a company that had a financial interest, had a license

19    to the patent, had all sorts of motivations, why would it

20    make so many mistakes, expensive mistakes on the way to

21    ending up with Ampyra?

22              MR. KLEIN:  Well, drug development is very

23    expensive and there are things you always learn along the

24    way that don't work out that inform and push you in a

25    particular direction, and that's what happened with

1    Dr. Cohen.

2              And at the time, remember they licensed the Elan

3    patent.  It's not even expired yet.  It doesn't expire until

4    2018, so you're talking in the early 2000's, he had time to

5    work on this, and he invested, he's paying a royalty to Elan

6    for this patent right, so he had the motivation to go ahead

7    and continue drug development which is what he did.

8              And by the time you get to 2004, he disclosed

9    his work.  He disclosed the studies that they did.  And a

10   skill artisan with the benefit of what Dr. Goodman and

11   Schwid were teaching would know full well that future

12   studies would focus on this 10 to 20 milligram dose.

13             I hope that answers your question.

14             THE COURT:  It does.  Thank you.  We'll save

15   your time for rebuttal.  We'll hear from plaintiffs.

16             MR. STIEFEL:  Good morning, Your Honor.  I'm

17   going to address the '938 patent, and if time allows, I'll

18   say something about the commercial success.  Sylvia Becker

19   is going to speak about the Acorda patents.

20             As Your Honor was just discussing with

21   Mr. Klein, we're here because both Elan and later Acorda,

22   which was a startup company founded by Dr. Cohen undertook

23   the risky challenge of attempting to identify and develop a

24   way of turning 4-AP, a compound which had been known for

25   decade, into a safe and effective multiple sclerosis

1    treatment.  And precisely because of the inventions of the

2    patents-in-suit, Acorda's flagship product Ampyra is today

3    the first and only drug approved by the FDA to treat walking

4    in MS patients.  Specifically per the claims of the Acorda

5    patents, Ampyra is indicated to improve walking when 10

6    milligrams sustained release tablets are administered twice

7    daily.

8              As Your Honor has heard, walking difficulties is

9    among the most common and most disabling of the many

10   symptoms suffered by MS patients, and though Ampyra does not

11   work for everyone with MS, it improves the lives of

12   thousands of MS patients every day.  And while defendants

13   here for purposes of the litigation have tried to diminish

14   the importance of Ampyra, the inescapable fact is that ten

15   generics are lined up looking to make copies of Ampyra and

16   that speaks volumes.

17             Your Honor, before turning to the '938 patent, I

18   just want to briefly discuss the experts and the parties

19   choices, and I think they are telling.  Dr. Fassihi, Your

20   Honor, is a widely published researcher in the field of

21   sustained release development and he's devoted his career to

22   that.

23             Dr. Kibbe, neither research nor published on

24   sustained release.

25             Dr. Goodman and Lublin, they're clinicians.

1    They treat multiple sclerosis patients all the time and they

2    are heavily involved in clinical research.  Dr. Peroutka

3    does neither.

4         Your Honor, the '938 patent claims cover the use

5    of sustained release formulations to provide patients with

6    therapeutic blood levels of 4-AP to improve nerve conduction

7    in multiple sclerosis patients, and we submit that

8    defendants have failed to meet their high burden of

9    demonstrating by clear and convincing evidence that claims 3

10   and 8 of the '938 patent were obvious.

11        The issue before the Court is whether as of

12   1991, would a person of ordinary skill in the art have been

13   motivated to make a sustained release formulation of 4-AP

14   with a reasonable expectation of success.  And the evidence

15   demonstrates that the answer to that is no.

16        Now, in their opening, the defendants

17   articulated the question somewhat differently, and we didn't

18   see that question, I think they may have abandoned it a bit

19   in the course of the case.  But they were suggesting that

20   the question is whether it was obvious to formulate a known

21   drug for a known use in a sustained release formulation.

22        And the fact is, Your Honor, that 4-AP was not a

23   known drug.  It was a known compound, there is no doubt

24   about that.  But nobody -- there is no evidence that anybody

25   was using it for anything in the 1990 time frame.

1          Was it known that it was used for -- a least it

2     wasn't being used to treat patients.  It was used

3     experimentally.  Was it a known use to treat MS?  No.  There

4     were two studies, the Davis study and Stefoski study, and

5     they didn't show much.  And that was not a known use to

6     treatment MS patients, it was purely experimental and small.

7          Sustained release technology, their question

8     omits the whole notion of likelihood of success.  And of

9     course as we heard, the sustained release technology was a

10    nascent technology, and given how little information was

11    available about 4-AP at the time because it wasn't being

12    used in patients, there was no reasonable expectation of

13    success that one would make a sustained release formulation

14    that would allow one to provide sustained therapeutic blood

15    levels over the course of 12 to 24 hours.

16          Now, let's turn to the record as to the state of

17    4-AP as of 1990 and '91.  First of all, we know that 4-AP

18    was used as a bird toxin.  It was used to induce seizures in

19    animals in testing, and there was this minimal experimental

20    testing in MS patients.  That's it.

21          As Dr. Fassihi explained, the shortcomings, the

22    fundamentals shortcomings of Stefoski and Davis which were

23    later identified in the Bever paper in '94, they would have

24    been readily evident to a person of ordinary skill in the

25    art.  There were a small number of patients, 12 to 15

 1    patients.  That's not telling you much about what 4-AP can

 2    do in MS patients.

 3            There was no randomized treatment design.  Those

 4    studies were not double blinded.  They relied on outcome

 5    measures that were not widely accepted and basically all

 6    they said was do further studies.

 7            And on that basis, a person of ordinary skill in

 8    the art looking to invest resources would not have been

 9    motivated to, let's try using an improved version of 4-AP.

10    Let's move to the next generation.  There was hardly any

11    reason to think that 4-AP would do anything.

12            THE COURT:  Let's explore that a little bit.

13            So out of the whole world of compounds and the

14    whole world of diseases, at this time it seems undisputed

15    that maybe it's only 27 patients, maybe it's only two

16    studies, maybe there are all those deficiencies and

17    limitations in these studies, there is a whole world of

18    compounds and a whole bunch of diseases, and the fact is by

19    1990 at least two experimenters had put into human beings

20    that had MS this specific compound.  They didn't die.  We

21    knew that, you know, this could go into human beings, that

22    there was reason to think that maybe you would want to do

23    that to people with MS.  Isn't all that pretty relevant to

24    show that one of ordinary skill in the art, again, with the

25    whole world in front of them, might actually be interested

1    in looking at this little corner of the world?

2         MR. STIEFEL:  I think there is no question about

3    that, that there was reason to look at that.  Those were

4    single dose studies, and they were suggesting that maybe you

5    should look at prolonged administration, because we heard a

6    lot about how this was something that would have to be used

7    over time, and how would that work.  But we were just at the

8    very beginning of looking at the compound, and I think in

9    the context of the '938 patent, the question is well, would

10   this had been a point where you would say let's move on to a

11   sustained release formulation.

12        We heard that sustained release formulations are

13   not as easy to make this immediate release formulation, and

14   the idea that one would undertake the task of all the

15   research that one is going to do, if you're going to work on

16   sustained release formulation, there were plenty of other

17   drugs presumably, because we didn't see that many that were

18   in sustained release formulation at the time, there were

19   plenty of other drugs that were approved and a lot more

20   known about where one would invest resources in sustained

21   release formulation.

22        The idea that it would be obvious, there would

23   be a motivation to make a sustained release formulation of a

24   compound about which there was just a hint of usefulness I

25   think is a stretch.  But that's only half the question in

1   that was there some motivation, even if there was a

2   motivation to do it, was there a reasonable expectation of

3   success in making a sustained release formulation.

4          And if we look at the -- if we move on to --

5   well, what was the state of sustained release.  Dr. Myers

6   testified that controlled release at that point in time was

7   very much in its infancy.  It was a very new concept.  He

8   said there wasn't any database established that he could

9   study.  And Dr. Fassihi agreed.  This is not a well

10  developed technology.  Sustained release is just in its

11  infancy.  It's just not that easy.  And certainly Dr. Myers,

12  he thought he had an invention.  He applied for a patent on

13  what he had done.  He didn't see it as routine.

14          Could we go to the next slide?

15          And at the same time, we heard that the FDA

16  guidelines that one of the authors was Dr. Robinson.  The

17  FDA was still developing their guidelines in 1990.  And so

18  it was hardly an established technology.

19          If we could go to the next slide.

20          Dr. Fassihi testified that, as Your Honor I

21  think brought up earlier, that at the time, the only

22  sustained release drugs that were approved -- and we saw a

23  list of them in Remington's -- the only sustained release

24  drugs that were approved were drugs that had been approved

25  initially in immediate release form.

1          And so certainly that was the mindset of

2   sustained release formulators.

3          And Dr. Fassihi explained the importance of

4   that.  He said it was significant because if you had an

5   immediate release form of the drug, you would have

6   experience putting it into patients.

7          You have pharmacokinetic data, you have safety

8   data, you would have efficacy data.  And that is the kind of

9   data you would need to make a formulation.  And he said

10   without that data, making a sustained release formulation,

11   he says it would be a challenge, very difficult.

12          And if we go to the next slide.

13          He explained that, particularly you would want

14   pharmacokinetic information about what happens to the drug

15   when it goes into the body, where does it go.

16          And the testimony in this case was only

17   pharmacokinetic data available about 4-AP in 1990 was the

18   Uges paper which had data from nine people.  And Uges, the

19   data that was there showed that there was wide variability

20   from patient to patient.

21          Essentially then, it was meaningless.  It wasn't

22   telling you much.  And Dr. Fassihi testified that, from his

23   perspective, Uges did not provide anything meaningful at

24   all.

25          And Dr. Fassihi testified that in looking at the

```
1   data that was disclosed in Uges, it was a complicated
2   pharmacokinetic.
3           And one would have to look at it carefully,
4   and you need to gather a lot more information before you do
5   anything as far as a sustained release formulation is
6   concerned.
7           Now, what did Dr. Kibbe say?
8           Dr. Kibbe, with impeccable 20/20 hindsight, and
9   no experience, making sustained release formulations, he
10  said it's really straightforward.
11          Now, I just want to clarify something because
12  counsel said that we were relying on a 1978 book by
13  Dr. Robinson.  That is incorrect.
14          And if we could show PTX-95.
15          In fact, the document, the book that Dr. Kibbe
16  relied -- Dr. Fassihi relied on is 1990.  It is exactly the
17  time we're talking about.
18          Now, if we could go back.  It is not 1978.
19          And exactly that time, Dr. Kibbe said it's
20  really straightforward, Dr. Robinson, says:  Successful
21  fabrication of sustained release products is usually
22  difficult and involves consideration of the physical
23  -chemical properties of the drug, pharmacokinetic behavior
24  of the drug, route of administration, disease state to be
25  treated, and, most importantly, placement of the drug in a
```

1    dosage form that will provide the desired temporal and

2    spacial delivery pattern for the drug.

3            It's a very difficult task.  That is what

4    Dr. Robinson said about the art at the time.  He wrote the

5    book that Dr. Kibbe said was the Bible.

6            THE COURT:  But there is a book.  I mean it may

7    have been in its infancy, but people were doing it, lots of

8    companies were doing it.  Do you dispute that it was

9    obvious, given the nature of MS and the half-life of 4-AP

10   in 1990, to be looking into trying to develop a sustained

11   release?

12           MR. STIEFEL:  Well, there is a couple questions.

13           One is, again, the idea that there would be a

14   -- that one would undertake the task of making sustained

15   release formulation of 4-AP I think was, was dubious at the

16   time given how little there was that was known about whether

17   it would work at all.  One would presumably want more

18   evidence that it worked in an immediate release formulation

19   before you would even try to make a sustained release

20   formulation.

21           THE COURT:  But given the nature of MS, and the

22   half-life of 4-AP, why would anyone want an IR version of

23   it?

24           MR. STIEFEL:  That is fair.  And I do think that

25   it ultimately, in hindsight, proved to be the case that

1   there were sustained -- that sustained release formulation

2   was useful.  But, on the other hand, I think the same thing

3   could be said about basically all the drugs -- about many

4   drugs, and the fact was that at the time, all of the

5   sustained release formulations were drugs that had been

6   approved in immediate release form.

7           So this would have been a novel approach to say

8   let's skip the immediate release form and go immediately to

9   sustained release.  Certainly, there are advantages and

10  proof to the advantages to sustained release, but at the

11  time, given how new sustained release was, it wasn't the

12  place to go first.

13          And Elan did, but they were among the few.  And

14  Elan did it here, and 4-AP stands out in that sense in that

15  it was, and became a sustained release form when there was

16  no IR form approved.

17          And, beyond that, I think the question is, what

18  Dr. Fassihi said, and apparently Dr. Myers thought, that it

19  was inventive given how little information was available.

20  There was no pharmacokinetic information available about how

21  this drug behaves in the body.

22          The two studies by Davis and Stefoski didn't

23  prove that.  And given how little information there was, the

24  idea that one could get the therapeutic blood levels over 12

25  to 24 hours was something that there would not have been a

1     reasonable expectation of success.

2               So, Your Honor, in conclusion, our view is that

3     defendants have not met their burden of proving by clear and

4     convincing evidence that the '938 patent is invalid as

5     obvious.

6               THE COURT:  Do you -- the defendants say that

7     any form of sustained release is within the scope of the

8     '938 patent.  Do you agree with that?

9               MR. STIEFEL:  I think that that is true.  And

10    there are essentially various ways laid out in the patent.

11    I think Dr. Kibbe did not identify really any ways that

12    one at the time, in particular, that one would have used to

13    develop a sustained release formulation of 4-AP if one sat

14    down at the time and said what is available to me.  He just

15    listed a bunch of methods that were used in other drugs but

16    didn't say how a researcher at the time would have tackled

17    the problem.

18              THE COURT:  Now, I know you are not going to

19    discuss the Acorda patents, but what is your view of the

20    record overall?  Could I find that the '938, for instance,

21    is not obvious and the Acorda patents are obvious or do they

22    all rise and fall together?

23              MR. STIEFEL:  Well, I think you would be wrong

24    if you found them all invalid, but I think that the Acorda

25    patents, there are significant advances that the '938 patent

1    is limited essentially to improving nerve conduction and

2    doesn't get at all into particular clinical benefit, and I'm

3    sure Ms. Becker will get into that in greater detail.

4             So I think that the '938 patent could be -- I

5    don't think that they're inextricably intertwined, although

6    I'm rather convinced that all of them are valid and

7    nonobvious.

8             THE COURT:  Thank you.

9             MR. STIEFEL:  Thank you, Your Honor.

10            MS. BECKER:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            MS. BECKER:  I'd now like to talk about the

13   Acorda patents.

14            We have the representative claim.  And as

15   illustrated here, all of the Acorda patents are directed to

16   methods of improving walking or, in some cases, increasing

17   walking speed in an MS patient using a dosing regimen of

18   administering 10 milligrams of sustained release 4-AP twice

19   daily.

20            Defendants say that the key is all about the

21   dose, but you always have to take that specified dosing

22   regimen in connection with this claim of improving walking

23   or increasing walking speed.  And already, even just looking

24   at those two core limitations sort of puts a light on a

25   fallacy in the approach that the defendants have taken by

1    identifying as a limitation treating MS with 4-AP.

2              It's an abstraction from the claims.  The claims

3    are about improving walking.  That it what this invention is

4    about, and every single claim is about that.  And it's not

5    about some abstraction.

6              And then as it was already pointed out, some of

7    the claims also add additional limitations; for example,

8    specifying a period of time during which the treatment is

9    administered or providing for no titration before and after

10   that administration or requiring particular PK parameters or

11   a particular release profile.

12             All of the Acorda patents claim priority to

13   April 2004.  And the question before the Court therefore

14   is as of April of 2004, would a person of skill have been

15   motivated to arrive at the claimed invention with a

16   reasonable expectation of success?

17             And the answer, as shown by the evidence

18   presented in court, is no.

19             As in the case of the '938 patent, the

20   defendants pose a different question which is premised on

21   unsubstantiated assumptions and is at odds with the evidence

22   that was adduced at trial.

23             They ask, was it obvious to use a known and

24   preferred dose of 10 milligrams BID for a known MS treatment

25   (to improve walking) for at least two weeks?

1           But the record shows that there was no

2     reasonable expectation of success for any dose of 4-AP and

3     no reasonable expectation that 4-AP could improve walking.

4           This is not a case where the inventors were

5     working off of or seeking to refine some already established

6     4-AP treatment for walking at any dose.  This is the first

7     bringing of 4-AP walking treatment to the world.

8           And the evidence at trial demonstrates that in

9     view of the state of the art, in 2004, defendants have not

10    met their very high burden of showing by clear and

11    convincing evidence that a person of skill would have been

12    motivated with a reasonable expectation of success to arrive

13    at the claimed invention when viewed as a whole.

14          So let's review the state of the art as of 2004.

15          First of all, the art recognized the enormous

16    challenges of developing drugs for MS because of the nature

17    of the disease.

18          MS is a very complex disorder involving both the

19    central nervous system and the immune system, both

20    notoriously difficult to treat.

21          And as you heard from Dr. Goodman, one

22    particular feature of MS is the scarring in the brain of MS

23    patients.  And that scarring makes MS patients susceptible

24    to seizure.

25          And that is particularly important here because

1    that perilous risk of seizure in MS patients is aggravated

2    by 4-AP because, as Dr. Goodman explained, 4-AP can cause

3    seizures by virtue of the very same mechanism that is

4    believed to be the basis of its effectiveness to improve

5    walking.

6            And the enduring seizure risk of 4-AP is

7    manifest in the entire course of the development history of

8    4-AP.

9            You heard Dr. Fassihi testify about its use as a

10   bird toxin, and its use to induce seizures in animal testing

11   and antiseizure models.

12           And in Murray, ironically relied on by the

13   defendants to show that 4-AP can be administered long term,

14   there, three of the only nine non-MS patients studied

15   suffered seizures, and the authors concluded that the

16   central effects of 4-AP, especially seizures, limits its

17   use.

18           Dr. Goodman testified that this concern would be

19   heightened in MS patients because of their particular

20   susceptibility to seizure.

21           In Polman I, we saw seizure after just two five

22   milligram capsules; and with another patient, at

23   20 milligrams per day.

24           And in Bever III, there was a grand mal

25   tonic-clonic seizure which Dr. Goodman says is the worst

1     type of seizure.

2               And the issue of seizure was not resolved.  It

3     continued to be a concern as of April 2004.

4               In the study reported in the Goodman abstracts

5     and the Goodman poster, there, again, they saw two seizures.

6               And the poster, as pointed out by Mr. Klein,

7     does report, quote, "a safety profile consistent with

8     previous experience."

9               But consistent with previous experience, it

10    states that, as anticipated, the risk of seizure requires

11    further study and characterization particularly in the

12    anticipated dose range.

13              The Goodman poster does not suggest that the

14    seizure has been put to rest by the fact that in this study,

15    the two cases that they observed happened at above

16    40 milligrams per day.

17              THE COURT:  Other than the two individuals

18    reported in Polman, is there any evidence in the record

19    of anybody suffering a seizure on 4-AP at a dose below

20    40 milligrams?

21              MS. BECKER:  I can't speak to the prior art on

22    that but, quite frankly, Your Honor, seizures are reported

23    even in the doses administered.  People with MS have

24    seizures even without 4-AP in, and any amount of 4-AP can

25    induce seizures.  And they have reports of seizures, it is

1    my understanding, even in clinical trials at the FDA, you

2    know, in the FDA trials.

3              THE COURT:  I imagine, unfortunately, people

4    with MS have seizures who aren't even on 4-AP, but in terms

5    of the record, you drew attention to Polman which has two

6    people who happened to have relatively low doses of 4-AP,

7    but my understanding was that other than that, there is no

8    evidence in the record of anyone having a dose at 20

9    milligrams with a seizure in the record.

10             MS. BECKER:  I think other prior art record

11   reports of seizures did report at higher doses, but I think

12   as Dr. Goodman conveyed, a concern remained even in the low

13   ranges.  It is a constant looming issue that one has to

14   consider, especially when treating MS patients with 4-AP.

15             And, in fact, that enduring concern about the

16   seizure risks posed by 4-AP was noted in the Cochrane review

17   of the prior art in 2003, published in 2003 and again

18   republished.

19             There, the authors stated that a conclusion

20   on the safety of aminopyridine preparations is even more

21   problematic than an assessment of their efficacy.  So safety

22   concerns remain at that time in the art, and that enduring

23   concern about the seizure risk posed by 4-AP we submit would

24   temper and undermine any reasonable expectation of success

25   at the time that one could in fact come up with a both safe

1   and efficacious dose.

2              THE COURT:  There was some testimony about

3   something I think maybe called a therapeutic window.

4              MS. BECKER:  Right.

5              THE COURT:  Am I using the right term?

6              MS. BECKER:  That's right.  As we'll see, the

7   art, when it tried to address the seizure concern, it's the

8   reason for titration schemes.  That was the idea.  The art

9   was characterized by titration schemes for the very reason

10  of this fear of when you seek efficacy, you constantly have

11  to be careful about touching up on that dose.

12             So Dr. Bever, getting to your question, he

13  pointed out very succinctly that drugs such as AP with large

14  interpatient variability in pharmacokinetics and a narrow

15  toxic-to-therapeutic range, I think sometimes referred to as

16  the therapeutic window, he talks about how they present a

17  difficult dilemma in, even in trial design, much less

18  actually treating patients.

19             Because, as he says, to avoid serious side

20  effects in the patients having the highest serum drug

21  levels, doses must be kept as low as possible, but this

22  means that patients with the lowest drug levels may have

23  levels inadequate to produce any therapeutic effect.

24             So this challenge of even being able to find a

25  dose that can be safely tested to see whether you can get

1   effect was a constant challenge, and it is illustrated by

2   the titration schemes that are used throughout the prior

3   art.

4            We saw them in -- individualized titration in

5   van Diem II, individualized titration in Polman I, a

6   concentration controlled titration scheme in Bever III.  The

7   Elan '938 patent also teaches an individualized titration

8   scheme, which we'll talk a little bit more about, but

9   there, they're even teaching it with a sustained release

10  formulation.  So it's not like titration was -- the need for

11  titration or the desirability of titration for the safety

12  point was resolved even with the sustained release

13  formulation.

14            THE COURT:  This therapeutic window concept,

15  though, was there testimony about how broad a window that

16  actually is for 4-AP?

17            MS. BECKER:  I don't think there was a defined

18  therapeutic window that was identified by any testimony

19  or -- I think that the testimony about the therapeutic

20  window was to point out that it was recognized in the art to

21  be narrow because of the severe toxicity of the drug and at

22  least the very limited showing of efficacy at any dose.

23            And again, Dr. Goodman used -- he and his study

24  that's reported in the Goodman references, used an escalated

25  dosing regimen which again the doses were increased each

1   week unless the patients were unable to tolerate the

2   increase.

3              And so the state of the art as of April 2004

4   with respect to administration of 4-AP did not suggest using

5   stable dosing like that claimed in the Acorda patents, it

6   suggested these safety driven titration schemes.

7              But interestingly the dosing regimens that were

8   disclosed in the prior art, all again to this therapeutic

9   window also illustrate the desire to get as high as you

10  could get, as close to that toxic limit you could get in

11  order to be able to maximize efficacy, as long as you didn't

12  reach toxicity.

13             For example, Polman 1, she said higher dosages

14  in serum levels are likely to produce greater improvement in

15  those MS patients who are capable of favorably responding to

16  4-AP.  I believe the correct reference would have been

17  Polman 1.

18             Schwid, which used the dose of 35 milligrams per

19  day which is considerably higher than the claimed dose

20  observed that treatment appeared, to the extent that it

21  could be observed in a limited ten patient study, appeared

22  to be particularly efficacious in subjects who achieved

23  serum levels above 60 nanograms per milliliter.

24             Dr. Goodman testified that thus as much as one

25  could infer about efficacy in that study, it would teach

1    that one needed to target higher levels than 60 nanograms

2    per milliliter if one would be able to detect efficacy using

3    the types of methodologies that are explored there.

4           As submitted by Dr. Peroutka, the Hayes III

5    reference on which defendants rely to show the pK parameters

6    of the claim, if you use that reference to identify the dose

7    needed to sustain a 60 nanogram per milliliter level, you

8    would need doses higher than 25 milligrams BID.

9           So, again, the art was teaching both titration

10   schemes and while trying to avoid toxicity, higher dosing

11   levels.  And Dr. Goodman also explained that to the extent

12   any -- we're going to talk about this more, but to the

13   extent that one can have any inference out of the Goodman

14   disclosures of the dose response curve that's reported

15   there, it was a response curve that was reported to show

16   increasing benefit in the 20 to 50 milligram per day range,

17   which as he explained, would -- it showed if anything, that

18   the higher doses were better than the lower doses.  And, in

19   fact, Dr. Peroutka admitted that the curve shows that the 40

20   milligram doses and those after were better than the 20

21   milligram per day dose there.

22          So again, state of the art in 2004 with respect

23   to administration of 4-AP does not suggest stable dosing and

24   it doesn't suggest the low stable dosing that is the subject

25   of the Acorda patents.

1              What else did the art in 2004 know?  It would

2       also recognize the challenges to MS drug development posed

3       by the extreme variability that characterizes MS.

4       Dr. Peroutka's slide actually quite beautifully illustrates

5       the wide variety of symptoms caused by MS and this create a

6       multiplicity of possible endpoints.  And we saw so many

7       different various endpoints investigated throughout the

8       prior art studies in evidence.

9              Dr. Goodman also testified about the challenges

10      that this very -- the variety of symptoms poses to MS

11      clinical trials.  He pointed out the difficulty in selecting

12      clinical endpoints.  The possibility that you would observe

13      improvement in one or some symptoms but not all.  And the

14      difficulty of interpreting such mixed results on different

15      symptoms.

16             He went on to also address the challenges posed

17      by the great inter and intra patient variability in MS

18      patients.  Because it makes it difficult to determine

19      whether you're getting a treatment effect when you're doing

20      a clinical trial, or whether what you're observing is simply

21      due to the normal fluctuations in the course of these

22      patient's diseases.

23             THE COURT:  After the 201 study, is there any

24      evidence of looking at EDSS or another way to put it, wasn't

25      the endpoint, the clinical endpoint to be studied obvious by

1    the time you get through the 201 study?

2            MS. BECKER:  EDSS was considered the gold

3    standard as far as it's my understanding still used as the

4    metric for evaluating function in MS patients.  It's true

5    that Schwid and the Goodman references were suggesting that

6    if you want to kind of get a higher resolution, think of it

7    as a higher resolution lens, if you want to better see

8    whether or not you're getting an effect from 4-AP treatment,

9    that the EDSS was a rather rough measure, and that the

10   quantitative methods that were pioneered in the Schwid and

11   Goodman references, that they would give you a better focus.

12   So in your next trial, you might actually be able -- you

13   could hope that maybe you could still see some effect even

14   though you didn't see it in EDSS.  They didn't predict that

15   you would see the effect, but they were saying that maybe

16   with these new tools, you can better assess whether, in

17   fact, there is an effect or not.

18           So they're trying to salvage sort of a failure

19   of one measure to showing the effect, saying maybe if we use

20   a more sensitive measure, we can get at this issue a

21   different way.

22           THE COURT:  Isn't that another way of saying

23   yes, it was obvious at that point that you would look at

24   something refined, specifically walking speed, and even

25   though it may have been unclear before that point, that

 1    that's what you should look at by that point it's clear that

 2    you should look at that.

 3              MS. BECKER:  If after the failure in the largest

 4    and best controlled study on 4-AP done to that date, if you

 5    are still motivated after that failure on a test largely

 6    focusing in on walking, you would be taught that if you're

 7    going to do another trial, try these different methods.

 8              THE COURT:  But Goodman tells us it wasn't a

 9    failure.  I mean, it says they found efficacy, they found

10    safety.

11              MS. BECKER:  We're going to get to sort of the

12    course, they found efficacy, again, they found safety.

13              THE COURT:  Consistent with the earlier results.

14              MS. BECKER:  They found a statistically

15    significant efficacy in a range in an aggregate group

16    measured throughout the study, not by dose, not specific by

17    weight, but in the whole study which covered a range of 20

18    milligrams per day to 80 milligrams per day.  So when taken

19    together as an aggregate, that group performed better than

20    placebo.  That's the only placebo information that the

21    Goodman reference gives us.  It does not report placebo

22    information for any specific dose.  And as we can see

23    because it's another -- in fact, I was just about to talk

24    about how the pervasive placebo effect in clinical trials of

25    MS make people of skill keenly aware, keenly aware that

1    placebo can be performing as well or better in any one of

2    these trials.  There is evidence of that in the public

3    record and there is evidence of that in the work that Acorda

4    did itself.  And that placebo effect is -- makes

5    interpretation of MS trials very difficult, both Dr. Lublin

6    and Goodman testified to that effect.

7           And you still see it in the studies.  In fact,

8    let's look at the Goodman poster.  The Goodman poster itself

9    reports that both the fampridine treatment group, again, in

10   the aggregate, not looked at dose specific, but in the

11   aggregate looked at in the entire dose range up to very high

12   doses, and the placebo group both showed substantial

13   improvement on fatigue, and that the placebo group actually

14   performed better than the drug treatment on fatigue.

15          This report right in the Goodman poster would

16   sensitize the person of skill reading this study to know

17   that placebo effect was big in this study, and on fatigue it

18   even out did the treatment group.

19          When you look at the dose response curve shown

20   in the Goodman poster, there is no data on placebo.  It's

21   not reported.  It reports only the patients compared to

22   themselves.

23          THE COURT:  But elsewhere the Goodman poster

24   tells us that in the 20 to 50 range at least it's

25   statistically significant over placebo, doesn't it?

```
1              MS. BECKER:  The statistical significance first

2    of all that was reported was on the entire range.  The 20 to

3    50 I think they focus in, they focus --

4              THE COURT:  Maybe it's the 20 to 80 range.

5              MS. BECKER:  The whole range was tested.

6              THE COURT:  But one skilled in the art reading

7    the entire poster would know hey, we found a statistically

8    significant improvement in walking speed with 4-AP compared

9    to placebo.

10             MS. BECKER:  Compared to placebo, when viewed in

11   an aggregate, you have no idea where that statistical

12   significant is.  We know that the higher doses shown, to the

13   extent that you can make any inference from this, which is

14   not compared to placebo, you show this increasing dose

15   response so one might infer that one would expect that it

16   was the higher doses that were driving that number.  It's

17   not clear, it's simply not clear.  The test was not designed

18   to answer the question.  So a person of skill looking at

19   this is going to know I have no idea what's driving that

20   statistical significance number in terms of which actual

21   doses are doing it.  All I know is that in the aggregate

22   they saw a statistical significance.  If I note, they know

23   that they saw that statistical significance in a multi

24   endpoint small study that -- where the number of statistical

25   significance number was not controlled or adjusted to
```

1   account for the multiple endpoints, so it's type of study

2   that's simply not designed and people of skill looking at it

3   would recognize that it's simply not designed to draw

4   conclusions about individual doses.

5           And they wouldn't do so.  And they certainly

6   wouldn't do so in the absence of placebo when they know

7   people of skill in the art who actually treat patients who

8   actually do clinical trials know that placebo effect is huge

9   in these studies and sometimes does as well and in the case

10  of fatigue in this particular study even better than the

11  drug treatment.

12          And indeed, if we take at look at this very

13  issue, Dr. Cohen testified, he gave us the information about

14  the study that's underlying the Goodman poster, he actually

15  testified that in this study on the walking issue, they --

16  there is the placebo data that's not reported on the Goodman

17  curve, and it shows that the placebo group performed best of

18  all at week seven.

19          THE COURT:  Is this in the prior art, the

20  publicly available prior art?

21          MS. BECKER:  No, it's not.

22          THE COURT:  Does it have any relevance to that

23  analysis?

24          MS. BECKER:  I believe it does, because it

25  illustrates exactly the phenomenon that the person of skill

1    already knows that if you're looking at data in a MS study,

2    you're aware of the placebo effect.  If you're looking at a

3    chart or a report that doesn't give you the comparison to

4    placebo group, you have to ask yourself the question, well,

5    how did the placebo group do on that.

6         THE COURT:  For me to be persuaded by that, I

7    have to be persuaded I think by what one of ordinary skill

8    in the art would have known and seen from the publicly

9    available studies and data, that if the record were that

10   only Dr. Cohen or only Acorda knew this, it would not be

11   relevant, would it?

12        MS. BECKER:  I agree that with respect to the

13   201 study, the whole point is that the person of skill does

14   not have the placebo data, and how does that affect their

15   reading of the data.  I'm not suggesting that the person of

16   skill would actually have access to this particular data.

17        They would, however, know from many reports in

18   the public record that the question, how is the placebo

19   performing, is this actually a result that's better than

20   placebo, Goodman tells me it's better than the placebo

21   result when looked at in the aggregate, but it tells me

22   nothing about how individual doses are responding to placebo

23   and I as a person of skill from the public record in other

24   trials and my own experience, I know that without that data,

25   I cannot make a judgment as to --

```
 1                  THE COURT:  Let's assume that you're right, that

 2       at that point in the analysis the one of skill in the art

 3       would say I really would like to know the placebo data, I

 4       really don't know yet whether this is going to work, how

 5       does that lead to a conclusion that they wouldn't be

 6       motivated with a reasonable expectation of success to

 7       continue to look into that?

 8                  MS. BECKER:  Because it robs them basically of

 9       their reasonable expectation of success.

10                  THE COURT:  The fact that they don't have the

11       placebo data?

12                  MS. BECKER:  The fact that they can't make a

13       judgment based on this as to individual doses.  They may

14       want to inquire further, again, you have to keep in mind,

15       they have the largest study to date, that failed in a

16       well-controlled placebo controlled study where they know

17       that the placebo performed equally well as the treatment

18       group, so they have that in their mind, too.

19                  They look at this, they say okay, now have some

20       placebo group controlled data, but it's only across the

21       entire spectrum of the doses tested which range very broadly

22       from 20 to 80 milligrams per day, and they -- and they know

23       that this dose, this curve, this thing about individual

24       doses, the only information given about individual doses is

25       not reported vis-à-vis placebo, so they would have very
```

1   limited basis for any type of expectation that any one of

2   those doses, even the ones that are identified as, you know,

3   in the curve and under the seizure risk, they would have

4   very limited basis to know how those would perform.

5           They might want to check it out.  They want to

6   go into a next study, until they look at the next study

7   that's actually powered and designed to inquiry of about

8   individual doses, they wouldn't know.  And again, you have

9   to remember the backdrop, they know how hard this is, they

10  know how many failed lead and how many false positives

11  happen in this art.

12          In fact, you mentioned the perspective of the

13  person of skill in this point is also informed by that

14  report that the largest and best controlled study to that

15  date using an endpoint that has a big walking component had

16  failed, had showed equal placebo to treatment effect.  And I

17  know defendants would like to pretend that a person of skill

18  would ignore this report, but I submit that it would really

19  actually catch a person of skill's attention.

20          Negative clinical trials at this time were

21  required to be reported were rarely reported, it's a problem

22  that we'll see Dr. Solari's review reports.

23          So to get a report that there was a large study

24  like this that failed would actually make an impression and

25  it was after all by far the largest and best controlled

1    study of any compared to the little exploratory studies that

2    had been reported before.

3              And the person of skill looking at this knows

4    it's got 161 subjects, it's multicenter, it's double lined,

5    it's placebo controlled, it's parallel groups, it has a

6    specified preclinical outcome, so it's statistically much

7    more rigorous than those small multi endpoint studies.

8              And again, they see that it simply shows placebo

9    to work as well as the treatment.  That's clearly a failure.

10   In fact, the abstract of this study refers to it quite

11   expressly as not having a positive result.

12             THE COURT:  The defendants have cited to me the

13   Hoffmann case which they say stands for the proposition that

14   conclusive proof of efficacy is not necessary to show

15   obviousness.  Do you agree that that's the law?

16             MS. BECKER:  Yes, conclusive proof of efficacy

17   is not, but I don't think that's what is being demanded here

18   when we say a person of reasonable skill wouldn't have a

19   reasonable expectation of success.  That's what's demanded,

20   a reasonable expectation of success.

21             We're talking about a reasonable expectation of

22   success in a treatment method, in achieving treatment for

23   walking in an MS patient.  And for that type of an effect, I

24   submit that a person of skill, especially against the

25   backdrop of the complexity of MS and the placebo effect and

1     the variability and all the things that make clinical trials

2     incredibly difficult to interpret in this area, they're

3     going to demand randomized clinical trials, they're going to

4     demand a level of evidence that actually informs the

5     question of whether efficacy can be seen.  And they're not

6     going to take the word of an observation of three or seven

7     patients in a ten patient study or a statistical

8     significance report that's not adjusted for the fact that

9     seven of ten outcomes were used.  They're going to read

10    those reports in context and they're not going to view them

11    as reliable evidence that they have an expectation of

12    success, not only as reliable as proof of efficacy, but not

13    even as reliable evidence from which one could form a

14    reasonable expectation of success.

15              THE COURT:  So Goodman, I think the poster or

16    the presentation says one of his objectives was to look for

17    a proof of efficacy and that he found it.  I understand he

18    didn't testify to that.  But that's what his poster says,

19    doesn't it?

20              MS. BECKER:  I submit it does not.  Pull up the

21    poster.  If we look at the methods.  It talks about trying

22    to find evidence of efficacy.  It does talk about finding

23    evidence of efficacy I think in their other parts, but in

24    the method section --

25              THE COURT:  But the part that he calls

1    objectives.

2              MS. BECKER:  Right.  If we can go to the

3    objectives, that would be fine.

4              He does identify -- can we go there?

5              I think it has to be viewed in the context of

6    what is said in the method statement, quite frankly.

7              But even when you look in terms of, the

8    objectives, first of all, identifies safety as the primary

9    objective.  But then it's, "obtain evidence of efficacy and

10   dose-response using several outcome measures:  standard

11   measurements such as this ..."

12             Even that statement, especially when read in light

13   of the way it is described in the method statement section,

14   they're trying to get a signal.  They're trying to see

15   whether there is any evidence.  They're not trying to prove

16   efficacy -- it's not even just prove, they're not doing an

17   efficacy study.  They've got a design that is not really

18   rigorous enough to inquire specifically into efficacy.  But

19   they're trying to see whether these measurements can provide a

20   signal of efficacy, some evidence that would permit future

21   trials.  It refers to future trials and informing the design

22   for future trials.

23             This is the type of test that is supposed to

24   inform how -- what tools to use, what looks like it might,

25   you know, pan out.  It clearly does express a hope that

```
 1    there will be some evidence here that will provide some

 2    basis to try and actually test efficacy the way efficacy is

 3    tested in an efficacy study.

 4              THE COURT:  And he says he found that; right?

 5              MS. BECKER:  He says in the results section that

 6    he found across the entire broad range, when taken as an

 7    aggregate, they did find that on the measure of walking

 8    speed, which incidentally is not the measure that is

 9    reported in the dose-response curve, it is time.  And as

10    Dr. Goodman testified, there is mathematically in some

11    statistical significant point of view a difference.  And we

12    can get into that in a little bit more in another context.

13              But, yes, here he does report significant

14    improvement in walking was observed in the

15    fampridine-treated group.

16              So as an aggregate, the fampridine did appear

17    to perform better than placebo, but he doesn't provide any

18    information about dose specifically, whether the

19    fampridine-treated group at X dose performed better than

20    placebo.

21              THE COURT:  All right.  I'm starting to cause

22    you to run out of time.  Let me just ask you a few more

23    questions.

24              With respect to the limitation about the PK data

25    in the Acorda patents, do you dispute that the Hayes
```

1    references disclose all of that data?

2              MS. BECKER:  All of the Hayes -- the Hayes

3    references are not done in MS patients.  We don't dispute

4    that they show that the 10 milligram sustained release

5    formulation tested there can result in the PK parameters

6    of the claims.

7              However, they make no link of those PK

8    parameters with efficacy.  None whatsoever.

9              THE COURT:  Right.  But I think even your

10   witness allowed there is no reason to think that the PK data

11   would differ in different patient populations; right?

12             MS. BECKER:  No reason to think that if a PK --

13   with this sustained release, you can get this PK in one

14   patient, you couldn't get them in an MS patient, no.  But

15   no linkage to improving walking.  They're conflating --

16             THE COURT:  Wait.  Hold on.  There are different

17   limitations in these patents.  Even you all have agreed

18   there is different limitations.  If I'm just looking at the

19   limitation on the PK data, do I have any basis to find that

20   it was anything other than obvious?

21             MS. BECKER:  Absolutely, because it appears in

22   the claim that links those PK values to improving walking.

23             THE COURT:  If I'm just looking at the data

24   itself, was that data obvious?

25             MS. BECKER:  It was known in the art that a

1    sustained release formulation of 10 megs BID could achieve

2    that PK, not that that PK would yield any efficacy for

3    walking.

4              THE COURT:  All right.  The relationship between

5    the '938 patent and the Acorda patents, I understood the

6    argument from plaintiffs to be that the Acorda patents are

7    actually broader and expand the '938 patent.  How is that?

8              MS. BECKER:  They build on the '938 patent because

9    the '938 patent, as testified to by Drs. Lublin and Goodman,

10   and as recognized by this Court's claim construction, talks

11   about therapeutic effect and the therapeutic effect when we're

12   talking about the '938 -- can you call up the slide on the

13   '938? -- is the physiological level effect of improving nerve

14   conduction.

15             It remained to be seen whether that physiological

16   improvement on neuronal conduction could actually be

17   translated into symptomatic treatment or symptomatic therapy.

18   That is not what the '938 addressed.  That was still a long

19   hoe to hoe in the prior art.

20             And the Solari review, for example, recognizes

21   precisely this distinction between the type of nerve

22   conduction effect that is the subject of the '938 patent and

23   the state of the art at that time versus what we're talking

24   about when we're talking symptomatic therapy like improving

25   walking.

1      THE COURT:  All right.  But if I understood the

2  argument to be that expand meant somehow the Acorda patents

3  cover something, they claim scope that is not part of the

4  '938 Elan patent, I would have misunderstood; that is not

5  your argument, is it?

6      MS. BECKER:  Scope in terms of breadth.  I think

7  the improvement in neuronal conduction that is captured by

8  the '938 does subsume in that respect, from a claim coverage

9  point of view, the effect that you get with improving nerve

10  conduction when it is demonstrated to do the symptom.  It's

11  just that that is not what that patent teaches.

12      THE COURT:  Okay.  Thank you.

13      At some point, it seemed as if you all were

14  challenging whether or not the Goodman references were all

15  actually prior art, whether they were all publicly

16  available.  Is that something you are contested?

17      MS. BECKER:  We have left the defendants to

18  their proof on that.  There were -- it was a fleeting poster

19  presentation.  Under some circumstances, that can constitute

20  prior art.  We haven't taken the position that --

21      THE COURT:  Other than Dr. Goodman saying it was

22  available to everyone at the conference.

23      MS. BECKER:  Yes, they walk by.  Yes.  We have

24  not affirmatively taken a position that it is not prior art.

25  We have left the defendants to their proofs.

1          THE COURT:  And we were shown again DTX-584.  It

2     is something, I think a press release or a page of Acorda's

3     website seemingly touting the success of 4-AP in I think

4     2003.  Help me understand your view of that.

5          MS. BECKER:  Right.  And I think the focus of it

6     was that participants in MS studies demonstrated improved

7     walking ability and lower leg strength.

8          In fact, participants in some studies did show

9     improvement on walking and LLMT, but that doesn't tell you

10    that the studies were successful in showing that 4-AP and

11    particularly not any particular dose would improve walking

12    in MS patients.

13         "The participants demonstrated" doesn't mean

14    that it was a real result.  I mean if you are just simply

15    observing the fact that there are participants that had that

16    improvement, we know, for example, about the placebo effect.

17    We don't know --

18         THE COURT:  Is this document relevant to whether

19    one of skill in the art at the time would have a reasonable

20    expectation of success and be motivated to continue to work

21    in this area?

22         MS. BECKER:  I think just as reports of

23    improvements in the arts and other studies, they would look

24    at it in context and recognize that we still needed tests.

25    Tests were needed to determine whether that improvement in

1    walking was really a 4-AP drug result.

2              Certainly, it doesn't speak to anything about

3    the specific dosing regimen that is claimed in the Acorda

4    patents.  It doesn't give any indication of what was being

5    tested there with respect to specific dosing regimen.

6              THE COURT:  All right.  You have about two more

7    minutes.  You have answered my questions, but please use

8    them however you wish.

9              MS. BECKER:  Well, I would like to, again,

10   underscore the background and the complexity and the

11   unpredictability to touch on these secondary considerations

12   because Dr. Goodman explained that the invention, which

13   became the first and remains the only approved therapy to

14   improve walking, was in fact an answer to a long-felt need;

15   and he also explained to you how the surprising and

16   unexpected results revealed in the Acorda patent, that

17   the 10 milligram dose was as efficacious as the 15 and 20

18   without having to -- while those had more adverse effects.

19             That is a difference in kind.  As he explained,

20   that was the light, the sweet spot, the showing that in fact

21   you could dose at a particular dose and not have to titrate

22   up toward those dangerous doses in order to achieve maximum

23   therapeutic benefit, which is what you are trying to get,

24   especially in a walking impairment where you are trying to

25   get the best result possible.  So it showed you could get

1    the maximum therapeutic effect without flirting with that

2    dose range.

3            He also pointed to the patent which showed that

4    these few seconds of increased, you know, of improvement

5    walking that the defendants seek to trivialize in this

6    case actually translated to very significant clinical

7    meaningfulness.  And he pointed out the table in the patent

8    that shows subjective measures in MSW12 and also these

9    other measures that sort of test those seconds against

10   other clinically meaningful improvement.

11           So he really showed how that surprising effect was

12   a difference in kind and how in fact this drug did address

13   long-felt need and against, of course, the backdrop of the

14   extreme unpredictability of this art and of the MS space in

15   general, and particularly the drug development history of

16   4-AP, a person of skill would have the impression in April

17   of 2004, getting back to more general considerations of

18   obviousness, that you just didn't know.  You just didn't know.

19   You had a nerve conduction improvement.  You didn't know how

20   to translate that.  The fact that the inventors were able to

21   translate that into an improvement in walking that stayed

22   clear of dangerous doses was not something that one could

23   have reasonably expected at the time.

24           THE COURT:  Okay.  Thank you very much.

25           Mr. Klein, you have about four minutes, if you

1    want them.

2              MR. KLEIN:  Thank you.  I'll be quick.

3              First of all, Your Honor, I want to focus on the

4    '938 first, and then I will turn to the others unless you

5    have any questions.

6              Mr. Stiefel noted that Dr. Kibbe didn't say that

7    any particular sustained release formulation works.  Well,

8    on page 209 of the transcript, he did say, an encapsulated

9    dissolution product would work quite nicely for 4-AP.

10             And he also relied on Remington's for other

11   examples on pages 208 to 209 of the transcript.

12             Counsel also said that Dr. Kibbe has not made

13   sustained release formulations.  That is not true.  Pages

14   174 to 175 and 178 of the transcript.

15             Counsel talked about Dr. Peroutka.  Dr. Peroutka

16   is an MS, a Ph.D.  He did treat MS patients, and he is an

17   expert in drug development, which is really what this case

18   is about.

19             As for the '938 patent itself, Mr. Stiefel said

20   there is no evidence that 4-AP was used to treat patients,

21   and Your Honor had the right response.

22             If we could go to JTX-1, quickly.

23             So Mr. Stiefel said 4-AP was not a known drug

24   for a known use.

25             Can you go to column 1?  Yes.

 1              So this is from the patent itself discussing the

 2     background.

 3              4-AP has been found to improve the conduction of

 4     nerve impulses, thereby, alleviated symptoms in MS patients.

 5              This also addresses Ms. Becker's comment.  The

 6     '938 is talking about use of 4-AP to alleviate symptoms in

 7     MS patients.

 8              It is citing the Davis and Stefoski references.

 9     Davis talks about improving gait.

10              So it was known, even back in 1990 at the time

11     of the '938 patent, that 4-AP could be used to improve

12     walking.

13              To the extent counsel or Acorda is arguing

14     otherwise, this is the 112 alternative argument that I

15     referenced in the opening.

16              If they're arguing that a skilled artisan

17     wouldn't know that 4-AP was a known drug with a known use in

18     1990, well, the inventors didn't do more tests with 4-AP.

19              So then they've got a written description and

20     potentially an enablement problem.  And that is the 112

21     issue I referenced in opening.

22              As for Polman, Your Honor asked if there was

23     evidence of seizures at the low doses.

24              I'm aware of no evidence of any seizure in

25     sustained release 10 milligrams taken twice daily.  Polman

1    was immediate release.

2              As for the Robinson article, I just want to

3    apologize, the date is wrong.  It is 1990.  There is more

4    than one Robinson reference and one is 1978, but it doesn't

5    change my point, which is that difficulty in the formulation

6    arts is not a ground to sustain a patent.

7              And, finally, if we can go to DDX-8-22.

8              Ms. Becker said that the dose response, the

9    Goodman references said that across the entire broad range

10   there was evidence of a dose response, but Dr. Goodman

11   again focused on evidence of a dose response in the 20 to

12   40 milligram per day range.  That is what he reported to

13   his peers in the poster.

14             Unless Your Honor has further questions.

15             THE COURT:  No.  Thank you very much.

16             MR. KLEIN:  Thank you.

17             THE COURT:  All right.  I know we had agreed on

18   the timing for the findings of fact and the briefs.  I don't

19   recall if we set any page limits or if there is anything

20   else outstanding that we need to work out or discuss before

21   I let you all go.

22             Is there anything to say on that from the

23   plaintiffs?

24             MR. STIEFEL:  I don't think so, Your Honor.

25             THE COURT:  Okay.  Is there anything from

1    defendants?

2              MR. KLEIN:  No, Your Honor.  Although I do have

3    copies of demonstrative, I'd be happy to hand up.

4              THE COURT:  Ones that were used today.

5              MR. KLEIN:  Yes.

6              THE COURT:  Sure.  And if plaintiffs have

7    copies, we would like to have yours as well.  Why don't you

8    go ahead and pass those up.

9              (Demonstratives passed forward.)

10             THE COURT:  All right.  If there is nothing

11   else, let me thank you for a well tried and very efficiently

12   tried case.  We got it done within the time limits, and I

13   very much appreciate that.

14             And I appreciate your participation in my

15   experiment with the rapid briefing, and we'll see whether or

16   not it puts me in a position to get you a decision more

17   quickly than some that I have issued.

18             So thank you all very much.  I wish you safe

19   travels and a good weekend.  We will be in recess.

20             (Bench trial concludes at 12:08 p.m.)

21

22        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                      /s/ Brian P. Gaffigan
                        Official Court Reporter
25                        U.S. District Court