IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 14-882 (LPS) |
| v. | ) | (CONSOLIDATED) |
| | ) | |
| ROXANE LABORATORIES INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' POST-TRIAL ANSWERING BRIEF ON VALIDITY AND
OPENING BRIEF ON SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS**

OF COUNSEL:

Aaron Stiefel
Daniel P. DiNapoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 683-3500

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real | Suite 400
Palo Alto, CA 94306
(650) 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 326-5825

*Attorneys for Acorda Therapeutics, Inc.
and Alkermes Pharma Ireland Limited*

October 28, 2016

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
jtigan@mnat.com

**<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ...............................................................................................1

    The Asserted Claims of the '938 Patent Were Not Obvious .............................................2
    The Asserted Claims of the Acorda Patents Were Not Obvious .......................................4

BACKGROUND ..............................................................................................8

    Multiple Sclerosis............................................................................................8
    Ampyra ......................................................................................................10

ARGUMENT...................................................................................................11

I.      THE APPLICABLE LEGAL STANDARD.................................................................11

    A.      The Obviousness Standard ................................................................11
    B.      Secondary Considerations of Nonobviousness....................................................12

II.    DEFENDANTS FAILED TO DEMONSTRATE BY CLEAR AND
       CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS OF THE '938
       PATENT WERE OBVIOUS AS OF 1991 ...................................................................13

    A.      Given How Little Was Known About 4-AP, A POSA Would Not Have
             Been Motivated To Develop A Sustained Release Version In 1991. ...................14

         1.     Prior art studies of patients with medical conditions that did
                not involve the central nervous system....................................................14
         2.     The Stefoski and Davis prior art publications............................................15
         3.     The '938 Patent's discussion of unpublished work by Davis
                and Stefoski.............................................................................17
         4.     Plaintiffs do not contend that only conclusive proof of
                safety and efficacy could render the claims of the '938
                Patent obvious. ......................................................................19

    B.      Defendants Failed To Demonstrate That A POSA Would Have Had A
             Reasonable Expectation Of Success In Developing A Sustained Release
             Version Of 4-AP In 1991. ................................................................20

III.   THE COMMERCIAL SUCCESS OF AMPYRA IS FURTHER EVIDENCE OF
       THE NONOBVIOUSNESS OF THE CLAIMS OF THE '938 PATENT......................26

IV.   DEFENDANTS FAILED TO DEMONSTRATE BY  CLEAR AND
       CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS OF THE
       ACORDA PATENTS WERE OBVIOUS AS OF 2004.................................................26

A.    The Acorda Inventors Developed the Claimed Inventions Through
      Perseverance and Risk-Taking in the Face of Great Uncertainty.........................26
B.    The Inventions Claimed in the Acorda Patents ...................................................29
C.    A POSA, as of 1994, Would Not Have Had a Reasonable Expectation of
      Success in Using any Dose of Sustained Release 4-AP to Improve Walking
      or Increase Walking Speed in MS Patients. ........................................................31

      1.    The Art Recognized the Enormous Challenges of
            Developing Treatments for MS...............................................................32

            a.    MS drug development is complex and unpredictable..................32
            b.    The variability that characterizes MS makes clinical trials
                  difficult to conduct and interpret. .................................................33

                  (1)    The wide variety of MS symptoms ...................................33
                  (2)    Variability among and within patients ..............................36

            c.    The significant placebo effects seen in MS trials. ........................36

      2.    4-AP Poses Special Challenges in MS Trials. .........................................39

            a.    The risk of seizures and other serious adverse events. .................39
            b.    The prior art taught upward titration as a means of
                  addressing 4-AP's narrow therapeutic index................................40
            c.    The prior art suggested testing higher doses. ...............................42

      3.    The largest, placebo-controlled study of 4-AP in MS
            patients prior to April 2004 had failed.....................................................44
      4.    An unbiased review of the literature published in 2003
            confirmed the uncertain state of the art. .................................................47
      5.    Unpublished data confirm the unpredictability of the art as
            of April 2004. ..........................................................................................50
      6.    The published prior art relied on by defendants did not
            provide a POSA with a reasonable expectation that 4-AP
            could be used to improve walking or increase walking
            speed. .......................................................................................................51

D.    Defendants' Obviousness Analysis Is Based on Impermissible Hindsight..........52

      1.    The Acorda Patents did not merely narrow a previously
            established treatment using a known dose range. ....................................52

            a.    The '938 Patent........................................................................56

                  (1)    The '938 Patent does not teach treatment of MS
                         symptoms. .......................................................................56
                  (2)    The '938 Patent does not teach fixed/stable dosing. .........59

b. Schwid ................................................................ 59

(1) Schwid does not teach efficacy of sustained release 4-AP to improve walking or increase walking speed. ............................................................... 59

(2) Schwid suggests trying higher doses than the 10 mg twice daily dose claimed in the Acorda Patents ............... 62

c. The Goodman References ........................................... 63

(1) The MS-F201 study reported in the Goodman references was not designed as an efficacy study. ............ 64

(2) The statistical significance values reported in the Goodman references were not adjusted for the study's use of multiple outcomes. .................................. 65

(3) The Goodman references provide no dose-specific information about the performance of sustained release 4-AP versus placebo. ........................................... 66

(4) To the extent the Goodman references teach anything about dose, they suggest higher doses are more efficacious than lower doses. ................................. 70

d. The Hayes References ............................................... 71

2. Defendants' Obvious To Try Argument Fails ........................................ 72

a. The 10 mg BID stable dose was not obvious to try, with a reasonable expectation of success. ................................................. 73

b. There were many options that a POSA could have pursued. ........ 77

3. The Limitations Requiring Stable Dosing for More Than Two Weeks Support the Nonobviousness of the Claims. ......................... 78

4. The "No Titration" Limitations Support the Nonobviousness of the Asserted Claims ...................................... 82

5. The claimed pharmacokinetic values support the nonobviousness of the Asserted Claims. ................................... 82

V. SECONDARY CONSIDERATIONS FURTHER SUPPORT THE NONOBVIOUSNESS OF THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ................................................................................................. 85

A. The Commercial Success of Ampyra .................................................. 85

B. Satisfaction of Long-Felt Unmet Need .............................................. 89

C. Failure of Others ............................................................................. 92

D. Surprising and Unexpected Results ................................................... 93

1. The efficacy of the 10 mg BID dose was surprising. ............................... 93

2.      The fact that the 10 mg BID dose was as effective as higher
        doses while avoiding adverse effects was surprising. .............................95

CONCLUSION...........................................................................................................97

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   212 F.3d 1272 (Fed. Cir. 2000)......................................................................92

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013)................................................................25, 83

*Allergan, Inc. v. Sandoz Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015)........................................................11, 58, 97

*Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*,
   745 F.2d 1 (Fed. Cir. 1984) ...........................................................................94

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
   580 F.3d 1340 (Fed. Cir. 2009).......................................................................31

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 2015-1171, 2016 WL 5864573 (Fed. Cir. Oct. 7, 2016) (en banc) .................... 13, 85, 89

*ArcelorMittal France v. AK Steel Corp.*,
   700 F.3d 1314 (Fed. Cir. 2012).......................................................................85

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
   776 F.2d 281 (Fed. Cir.1985)..........................................................................63

*AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*,
   No. 10-CV-1835 JAP TJB, 2012 WL 1065458 (D.N.J. Mar. 29, 2012), *aff'd*,
   498 F. App'x 999 (Fed. Cir. 2013)..................................................................76

*Avanir Pharms., Inc. v. Actavis S. Atl. LLC*,
   36 F. Supp. 3d 475 (D. Del. 2014), *aff'd per curiam sub nom*, *Avanir Pharms.*
   *Inc. v. Par Pharm. Inc.*, 612 F. App'x 613 (Fed. Cir. 2015) ...........................*passim*

*Bayer Pharma AG v. Watson Labs, Inc.*,
   No. CV 12-1726-LPS, 2016 WL 3946916 (D. Del. July 18, 2016)..................55, 89

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
   320 F.3d 1339 (Fed. Cir. 2003).......................................................................92

*Cadence Pharm., Inc. v. Exela Pharma Scis., LLC*,
   No. CV 11-733-LPS, 2013 WL 11083853 (D. Del. Nov. 14, 2013), *aff'd*, 780
   F.3d 1364 (Fed. Cir. 2015) .............................................................................90

*Eli Lilly & Co. v. Sicor Pharm., Inc.*,
  705 F. Supp. 2d 971 (S.D. Ind. 2010), *aff'd*, 424 F. App'x 892 (Fed. Cir.
  2011) ...................................................................................................................93

*Forest Labs. Holdings Ltd. v. Mylan Inc.*,
  No. CV 13-1602-SLR, 2016 WL 3677148 (D. Del. July 11, 2016) ......................................38

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013) .................................................................................*passim*

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics., Inc.*,
  655 F.3d 1291 (Fed. Cir. 2011) ...............................................................................59

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966) ............................................................................................ 13, 89, 92

*Impax Labs., Inc. v. Aventis Pharm. Inc.*,
  468 F.3d 1366 (Fed. Cir. 2006) ...............................................................................12

*In the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
  831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995) .............................90

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) ......................................................................... 72, 77, 78, 92

*In re Fine*,
  837 F.2d 1071 (Fed. Cir. 1988) ...............................................................................12

*In re Montgomery*,
  677 F.3d 1375 (Fed. Cir. 2012) ...............................................................................20

*In re Peterson*,
  315 F.3d 1325 (Fed. Cir. 2003) .............................................................................54, 58

*In re Soni*,
  54 F.3d 746 (Fed. Cir.1995) ...............................................................................93, 94

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
  106 F.3d 1563 (Fed. Cir. 1997) ...............................................................................85

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*,
  367 F.3d 1381 (Fed. Cir. 2004) ...............................................................................93

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................................... 12, 31, 76, 77

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) .............................................................................90, 91

*M/A COM Tech. Solutions Holdings, Inc. v. Laird Tech., Inc.*,
No. CV 14-181-LPS, 2014 WL 2727198 (D. Del. June 13, 2014) (Stark, C.J.) ................... 86

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................................................................................... 85

*Microsoft Corp. v. i4i Ltd. P'Ship*,
564 U.S. 91 (2011) ......................................................................................................... 12

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ....................................................................................... 35

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ................................................................................. 12, 77

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ....................................................................................... 76

*Par Pharm., Inc. v. TWI Pharm.*,
773 F.3d 1186 (Fed. Cir. 2014) ................................................................................. 83, 84

*Pfizer Inc. v. Watson Pharm., Inc.*,
920 F. Supp. 2d 552 (D. Del. 2013) ................................................................................. 12

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ....................................................................................... 18

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ............................................................................... 11, 12, 89

*Sanofi v. Glenmark Pharm. Inc., USA*,
No. CV 14-264-RGA, 2016 WL 4569680 (D. Del. Aug. 31, 2016) .................................... 73

*Santarus, Inc v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ....................................................................................... 84

*Shire LLC v. Amneal Pharm., LLC*,
802 F.3d 1301 (Fed. Cir. 2015) ....................................................................................... 11

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ....................................................................................... 13

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
192 F.3d 1353 (Fed. Cir. 1999) ....................................................................................... 86

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
642 F.3d 1370 (Fed. Cir. 2011) ....................................................................... 52, 53, 54, 55

*UCB, Inc. v. Accord Healthcare, Inc.*,
   No. CV 13-1206-LPS, 2016 WL 4376346, at *29 (D. Del. Aug. 15, 2016) .............. 26, 86, 91

*Warner Chilcott Co., LLC v. Lupin Ltd.*,
   No. CIV A. 11-5048 JAP, 2014 WL 202659 (D.N.J. Jan. 17, 2014), *aff'd*, 580
   F. App'x 911 (Fed. Cir. 2014) ........................................................................................ 91

**Statutes**

21 U.S.C. § 355(j) ............................................................................................................... 1

35 U.S.C. § 103 ................................................................................................................. 11

35 U.S.C. § 103(a) ............................................................................................................ 12

35 U.S.C. § 112 ........................................................................................................... 18, 57

35 U.S.C. § 282(a) ............................................................................................................ 11

**Other Authorities**

Manual of Patent Examining Procedure § 2107.03 ...................................................... 19

## INTRODUCTION

This case concerns defendants' aim to make generic copies of Ampyra®, the principal product of plaintiff Acorda Therapeutics, Inc. (Acorda), a small biotech company. Ampyra was the result of years of perseverance and risk-taking by the inventors in the face of discouraging and inconsistent clinical trial results. Ampyra was approved by the FDA in 2010 and remains the only drug approved by the FDA to improve walking in patients suffering from multiple sclerosis (MS). Ampyra improves the lives of thousands of people who have MS every day. And the commercial success of Ampyra allows Acorda to continue its efforts to develop additional novel therapies for neurological diseases.[1]

Defendants stipulated to infringement in this case (PF[2] ¶ 60) leaving only the validity of the Asserted Claims of the patents-in-suit to be tried.[3] Defendants argue that all of the Asserted Claims are obvious. Their arguments, however, are contrary to the factual record and are based on hindsight that oversimplifies complex and contradictory data and selectively characterizes the prior art in an attempt to manufacture a reasonable expectation of success where none existed. The arduous path that Acorda followed in developing Ampyra was a consequence of the complexity of MS, the difficulty of developing central nervous system (CNS) therapies, and the fact that 4-AP's narrow therapeutic index, which can pose serious safety issues. Determining whether and how 4-AP could be used to treat MS safely was not straightforward or obvious. Defendants' arguments fall far short of proving, by clear and

---

[1]    The statutory thirty month stay deadline, pursuant to 21 U.S.C. § 355(j), is July 22, 2017, with respect to each defendant. (Pretrial Order, D.I. 252 ¶¶ 151-54).

[2]    Citations to "PF" refer to the Plaintiffs' Proposed Findings of Fact, D.I. 262.

[3]    The patents-in-suit are U.S. Patent No. 5,540,938 ('938 Patent) and the Acorda Patents: U.S. Patent Nos. 8,007,826 ('826 Patent), 8,354,437 ('437 Patent), 8,440,703 ('703 Patent) and 8,663,685 ('685 Patent). The "Asserted Claims" refers to: '938 Patent claims 3 and 8; '826 Patent claims 1, 7, 38 and 39; '437 Patent claims 1, 2, 5, 22, 32, 36 and 37; '703 Patent claims 36, 38 and 45; and '685 Patent claims 3 and 5.

convincing evidence, that the Asserted Claims would have been obvious to a POSA as of the respective priority dates.[4]

**The Asserted Claims of the '938 Patent Were Not Obvious**

Defendants failed to satisfy their burden of proving at trial, by clear and convincing evidence, that in 1991 a person of ordinary skill in the art (POSA) would have been motivated, with a reasonable expectation of success, to undertake the development of a sustained release formulation of 4-aminopyridine (4-AP) that would, per the '938 Patent, maintain therapeutically effective blood levels over 12-24 hours when administered once- or twice-daily to improve nerve conduction in a patient stricken with MS.

At the time, sustained release was an emerging technology that was employed to produce advanced versions of drugs that were already FDA-approved in immediate release form. (PF ¶¶ 72, 75, 76). However, in 1991, 4-AP was not FDA-approved for any purpose. It had been used as a bird toxin and to induce seizures in animals used in drug testing. (PF ¶¶ 27-28, 71). The prior art relied on by defendants described a couple of very small, exploratory studies which had shown that single doses of 4-AP, administered intravenously or in immediate release capsules, improved nerve conduction and might provide some clinical benefit to MS patients. (PF ¶ 71). Hence, in 1991, the prior art showed only that 4-AP warranted further study. Contrary to defendants' contention, 4-AP was not then "known" to provide any specific clinical benefit to MS patients. And the '938 Patent does not suggest otherwise. Under those circumstances, a POSA would not have been motivated to devote time and resources to developing a new formulation of 4-AP. (PF ¶ 86).

---

[4]     The parties agree that the priority date is Nov. 1, 1991 for the '938 Patent and Apr. 9, 2004 for the '826, '437, '703 and '685 Patents (the Acorda Patents).

Furthermore, defendants failed to establish at trial that a POSA who had undertaken to develop a sustained release formulation of 4-AP in 1991 would reasonably have expected to succeed in producing a composition that would maintain therapeutic blood levels in accordance with the claims of the '938 Patent.  (PF ¶ 84).  Defendants' evidence of obviousness consisted of the conclusory testimony of Wilkes University professor emeritus Dr. Arthur Kibbe, who has never conducted research or published on sustained release formulations, yet cavalierly described the process of developing a sustained release formulation as "really straightforward." (Tr., Kibbe, 245:22-25; PF ¶ 66). [5]

Dr. Kibbe's testimony was decidedly outweighed by directly contrary views expressed (1) in 1990, by Dr. Joseph Robinson, acknowledged by Dr. Kibbe as a titan in the field, and (2) at trial, by Dr. Reza Fassihi, a Ph.D. in pharmaceutics from Brighton University (U.K.) and longtime professor at the Temple University School of Pharmacy, who regularly does research on, publishes on, and teaches Ph.D. candidates about the development of sustained release formulations.  (PF ¶¶ 62, 73).

At precisely the relevant time, Dr. Robinson characterized the task of designing a sustained release formulation as "very difficult," involving "the physical-chemical properties of the drug, pharmacokinetic behavior of the drug, route of administration, disease state to be treated, and . . . the desired temporal and spatial delivery pattern for the drug."  (PTX-0095 at 199, 201; PF ¶ 73).  Try as they might, defendants cannot square Dr. Kibbe's testimony with Dr. Robinson's view.

Dr. Fassihi concurred with Dr. Robinson's opinion and disagreed "completely" with Dr. Kibbe's opinion that the '938 Patent claims would have been obvious in 1991.  (Tr.,

---

[5]      Citations to "Tr." refer to the trial transcript in this case.

Fassihi, 329:23-330:4, 343:15-18).   Dr. Fassihi explained:   "[W]e knew very little about controlled release, how to design them, how to develop them in such a way that they would work."  (Tr. Fassihi, 327:19-328:4).   The FDA was still in the process of developing sustained release guidelines for the pharmaceutical companies.   (PF ¶ 75).   Elan Corporation (the predecessor of plaintiff Alkermes Pharma Ireland Limited (Alkermes)), which employed the inventors of the '938 Patent, was at the "forefront in the field."  (Tr., Fassihi, 325:5; PF ¶ 74). Dr. Fassihi described the design of sustained release formulations as involving multiple factors, including the solubility, toxicity, and efficacy of the drug; the dose of the drug; and the absorption of the drug across the varying environments of the intestine.  (PF ¶¶ 79, 82).   Dr. Fassihi testified that developing a sustained release formulation of 4-AP absent an FDA-approved immediate release version would have been a "very difficult" challenge owing to the lack of information about the safety, efficacy, and pharmacokinetics of the drug.  (Tr., Fassihi, 336:10-337:20; PF ¶ 76).

Accordingly, the testimony of Dr. Kibbe was not the clear and convincing evidence that defendants had to advance in order to overcome the presumption that the '938 Patent is valid.

As also shown below, the nonobviousness of the '938 Patent is further supported by the undeniable commercial success of Ampyra.  (PF ¶ 87).

**The Asserted Claims of the Acorda Patents Were Not Obvious**

Defendants likewise did not meet their high burden of proving, by clear and convincing evidence, that the inventions claimed in the Acorda Patents were obvious as of 2004.

The work of inventors Ron Cohen and Andrew Blight made the hundred-year old potassium channel blocker 4-AP available for the first time as a safe and effective therapy to improve walking in patients with MS.  (PF ¶¶ 26-28).   While previous work (as reported in the

'938 Patent) had shown that 4-AP improves nerve conduction in MS patients, the inventions of the Acorda Patents went beyond that physiologic effect to the treatment of a clinical manifestation of the disease and the identification of a treatment regimen that was both safe and effective, thereby expanding on the '938 Patent.  (PF ¶ 110).

The inventors overcame enormous challenges and uncertainties inherent in developing treatments for MS, an extraordinarily complex disease that involves both the CNS and the immune system and causes a multitude of symptoms.  (PF ¶¶ 9, 13-15).  A POSA in 2004 would have been aware of the unpredictability of CNS research and would also have known that the significant variability that characterizes MS and the pronounced placebo effect seen in MS trials complicate the design and interpretation of MS clinical trials.  (PF ¶¶ 13-15). Recognizing the difficulties inherent in MS research, a POSA would not have found small, exploratory trials reporting symptom relief in a few patients sufficient to form a reasonable expectation of success in treating symptoms of MS.  Such an expectation would have required evidence from a randomized, placebo-controlled trial specifically designed to show efficacy.

A POSA in 2004 would also have been aware of the risk of dangerous seizures in MS patients and 4-AP's capacity to induce seizures as well as other serious adverse effects.  (PF ¶¶ 12, 23-25).  This risk loomed over the work exploring the use of 4-AP in MS and was reflected in the prior art studies' reliance on individualized titration schemes, which, in contrast to the fixed (stable) dosing regimen of the Acorda Patent claims, were designed to start at low doses and to gradually increase doses to the highest levels that could be tolerated in an effort to avoid toxicity while at the same time exploring efficacy and attempting to reach maximum therapeutic benefit.  (PF ¶¶ 142-146).

Before the inventors devised the claimed therapeutic regimen, treatment of walking impairment (or any other clinical deficit) in MS patients with 4-AP had not been established.  (PF ¶¶ 132-141).  Only a few randomized clinical trials of 4-AP had been conducted in MS.  An independent, systematic review of the outcomes of those trials authored by Solari, et al. in 2003 concluded that the available information allowed no unbiased statement about safety or efficacy of aminopyridines for treatment of MS symptoms.  (PF ¶ 98).

The largest, placebo-controlled study of 4-AP prior to the effective filing date of the Acorda Patents was conducted by Elan in 1994 and was disclosed in Schwid 1997.  (PF ¶¶ 89, 117).  That study used as its primary endpoint the widely-accepted Expanded Disability Status Scale (EDSS), a significant component of which evaluates walking ability.  (PF ¶¶ 89).  The study failed to show clinical efficacy of 4-AP.  (*Id.*).  A POSA would thus have discounted the seemingly promising data points from other trials of 4-AP that were not designed as efficacy studies, but, rather were small, exploratory and/or methodologic studies that yielded inconsistent results.  (PF ¶ 137).  Like the Solari reviewers, a POSA in 2004 would have been skeptical about the safety and efficacy of 4-AP for any symptomatic therapy in MS and would have needed positive evidence from a large enough, randomized, placebo-controlled clinical trial specifically designed to show efficacy to form a reasonable expectation that sustained release 4-AP could be used to improve walking.

The Schwid and Goodman References relied on by defendants were not efficacy trials; they were multi-endpoint studies intended to explore possible measures for use in future trials.  (PF ¶ 132).  If corrected for use of multiple endpoints, their results on walking did not achieve statistical significance.  (PF ¶ 139).  As plaintiffs' expert Dr. Goodman testified, they did not, alone or in combination with each other or any other prior art, provide a POSA with a

reasonable expectation that *any* dose of sustained release 4-AP would safely and effectively improve walking in MS patients. (PF ¶¶ 140-141). Acorda's own work showed that the effects on walking observed in Schwid and Goodman were not reproducible in subsequent clinical trials, just as other seemingly promising leads from other exploratory studies of 4-AP did not prove successful in subsequent trials.

Acorda's MS-F202 study, reported in the Acorda Patents, failed to yield statistically significant results on walking speed using the planned analysis that had been applied in Acorda's previous MS-F201 study (the subject of the Goodman references). (PF ¶¶ 131, 138). An innovative, post hoc "responder analysis" developed by the Acorda inventors, based on consistency rather than magnitude of walking speed increases, was required to demonstrate a statistically significant improvement in walking speed after administration of the claimed 10 mg twice daily (BID) dose of sustained release 4-AP. (*Id.*). That analysis also showed that the 10 mg twice daily dose was as effective as the higher (15 mg and 20 mg twice daily) doses tested while avoiding the adverse effects seen at higher doses, eliminating the need for upward dose titration taught by the prior art. Both Dr. Cohen and Dr. Goodman testified that they were surprised by the results of the MS-F202 study. (*Id.*).

Thus, as discussed in greater detail below, a person of skill would certainly not have had a reasonable expectation in April 2004 that 4-AP would improve walking or increase walking speed using the claimed stable dosing regimen of 10 mg of 4-AP BID.

Moreover, several objective indicia of nonobviousness support the asserted claims of the Acorda Patents, including the commercial success of Ampyra, the long-felt unmet need addressed by Ampyra for a therapy to improve walking in MS patients, the failure of others to translate potassium channel blocking activity into a therapy to improve walking in MS patients,

7

and the surprising and unexpected result that the claimed stable dose of 10 mg twice daily is a

"sweet spot" that achieves maximum effect on walking without titrating to or otherwise targeting

higher, more dangerous doses, as had been typical in the prior art. (PF ¶¶ 156-174).

## BACKGROUND

**Multiple Sclerosis**

      MS is a degenerative and inflammatory neurological disease that involves both

the CNS and the immune system. (PF ¶ 9).[6] In the body, a fatty material, known as myelin,

insulates axons (part of a nerve cell), enabling signals to travel along axons rapidly and

efficiently. In MS, the patient's immune system damages or destroys the protective myelin

sheath around axons. This demyelination of nerve fibers exposes potassium channels in the

axonal cell membrane, allowing the leakage of potassium current. This results in the short-

circuiting of nerve impulses and a slowing or blocking of transmission along the nerve fibers,

with associated disabling symptoms. (PF ¶¶ 10-11).

      MS patients suffer diminished coordination of nervous system signals which can

be manifested in a wide variety of symptoms affecting multiple body parts and systems. These

symptoms include walking impairment, visual difficulty, fatigue, spasticity, bladder dysfunction,

tingling or pain, sexual dysfunction, balance problems, and cognitive changes. (PF ¶ 11).

Difficulty walking is one of the more common and devastating problems faced by patients with

MS. (PF ¶ 17).

---

[6]     Plaintiffs' experts, Drs. Fred Lublin and Andrew Goodman, are board certified neurologists who have specialized in treating MS patients and conducting MS clinical trials for decades. (PF ¶ 63). Both have treated thousands of MS patients, have published widely regarding MS, and teach and train doctors regarding the care of MS patients. (*Id.*).

Designing, conducting, and interpreting clinical trials of MS drug candidates is extremely challenging. The broad range of symptoms allows for multiple potential clinical endpoints and may yield mixed test results. (PF ¶ 13).

The task is further complicated by the substantial variability of MS among patients and even within a single patient. (PF ¶ 14).[7] Symptoms can change on a day-to-day, or even hour-to-hour, basis. (*Id.*). Consequently, the critical task of distinguishing clinical effects of the drug candidate from natural variation of the disease is quite difficult. (PF ¶ 15). Researchers must also discriminate between drug effect and the considerable placebo effect seen in MS patients. (PF ¶¶ 21, 130, 140).

Additionally there is an array of methods for assessing disease state in individuals with MS. Some measures use numerical scales designed to interpret patients' subjective, self-reported interpretation of particular symptoms, such as fatigue or walking in general, or the patient's overall global impression of their condition. (PF ¶ 18). Other methods are more objective in nature, such as timed walking measures, including the timed 25-foot walk (T25FW). (*Id.*). Further tests, not involving clinically evident symptoms, more directly assess the slowing of nerve impulse transmission caused by demyelination. For example, researchers and clinician can measure subclinical visually evoked potentials ("VEP") to detect the slowing of nerve transmission in MS patients. (PF ¶ 19).

---

[7]     Defendants' expert, Dr. Stephen Peroutka, is an M.D. and a Ph.D. in pharmacology and experimental therapeutics. (PF ¶ 65). Dr. Peroutka treated roughly 100 MS patients during the 1980s, but otherwise has not treated MS patients or conducted MS research. (*Id.*). Dr. Peroutka has not published any articles relating to MS. (*Id.*).

**4-AP**

4-AP, also known as dalfampridine, is the active ingredient in Acorda's flagship product, Ampyra. 4-AP is a potassium channel blocker. By blocking potassium leakage from demyelinated nerves, 4-AP improves nerve conduction. (PF ¶ 22).

4-AP has a long history, having been marketed as a bird poison. (PF ¶ 24). 4-AP was also used to generate seizures in animal models for use in the testing of anti-seizure medications. (*Id.*).

The toxicity of 4-AP has long been recognized to limit its application. (PF ¶ 25). Most significantly, 4-AP poses risks of serious adverse effects, including seizures, in MS patients. (*Id.*). The concern about seizures is heightened in MS patients because "one of the hallmarks of MS is brain scarring, predisposing [MS patients] to an increased risk of seizures." (Tr., Goodman, 441:23-442:16; PF ¶ 25). A POSA would have been particularly concerned because 4-AP's seizure risk was linked to the mechanism of action through which 4-AP provides therapeutic benefit. (PF ¶ 25).

**Ampyra**

Ampyra was approved by the FDA in January 2010, and Acorda has been marketing and selling it in the U.S. since March 2010. (PF ¶¶ 27, 30).

Ampyra was the first FDA-approved use of 4-AP. (PF ¶ 28). Improving walking in MS patients is the only FDA-approved use of 4-AP. (PF ¶ 29).

The label for Ampyra states, under the heading "INDICATIONS AND USAGE," that "AMPYRA (dalfampridine) is indicated as a treatment to improve walking in patients with [MS]. This was demonstrated by an increase in walking speed . . . ." (JTX-0076 at AMPDEL0170808; PF ¶ 31). In both the "DOSAGE AND ADMINISTRATION" and "DESCRIPTION" sections the label states that Ampyra contains 10 mg dalfampridine tablets for

twice-daily administration, the latter adding that Ampyra is formulated as an extended release tablet.   (JTX-0076 at AMPDEL0170808, AMPDEL0170611; PF ¶ 32).   The label also provides: "No additional benefit was demonstrated at doses greater than 10 mg twice daily and adverse reactions and discontinuations because of adverse reactions were more frequent at higher doses." (JTX-0076 at AMPDEL0170808; PF ¶ 32).

## ARGUMENT

## I.   THE APPLICABLE LEGAL STANDARD

### A.   The Obviousness Standard

The claims of the patents-in-suit are presumed valid, 35 U.S.C. § 282(a), and defendants "bear[ ] the burden of proving invalidity by 'clear and convincing evidence.'"  *Shire LLC v. Amneal Pharm., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015).

Defendants' invalidity challenges to the Ampyra Patents are predicated on 35 U.S.C. § 103, pursuant to which defendants must establish that the claimed inventions were obvious "before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."   Here, defendants must prove, by clear and convincing evidence, that as of November 1, 1991, for the '938 Patent, and as of April 9, 2004, for the Acorda Patents, "the differences between the claimed subject matter and the prior art [were] such that the subject matter as a whole would have been obvious at the time of invention to a person having ordinary skill in the art."  *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1303 (Fed. Cir. 2015).

In order to invalidate the patents-in-suit on obviousness grounds, the defendants must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so."

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009); *see also Microsoft Corp. v. i4i Ltd. P'Ship*, 564 U.S. 91, 95 (2011).

Hindsight reasoning "is always inappropriate for an obviousness test based on the language of Title 35 that requires the analysis to examine 'the subject matter as a whole' to ascertain if it '*would have been obvious at the time the invention was made.*'" *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (quoting 35 U.S.C. § 103(a)) (emphasis in original); *see also In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to depreciate the claimed invention.").

"When the prior art was before the examiner during prosecution of the application, there is a particularly heavy burden in establishing invalidity." *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006); *see also Pfizer Inc. v. Watson Pharm., Inc.*, 920 F. Supp. 2d 552, 563 (D. Del. 2013) (while "the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the [PTO]").

A defendant cannot prove that a claim is obvious by showing that the particular combination was "obvious to try" unless, at a minimum, "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions," and the combination "leads to the anticipated success." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

**B.     Secondary Considerations of Nonobviousness**

"The Supreme Court [has] explained that various factors 'may . . . serve to "guard against slipping into use of hindsight" and to resist the temptation to read into the prior art the

teachings of the invention in issue.'   These factors are commonly known as secondary considerations or objective indicia of non-obviousness." *Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171, 2016 WL 5864573, at *12 (Fed. Cir. Oct. 7, 2016) (en banc) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966)). "Objective indicia of nonobviousness must be considered in every case where present." *Id.* at *8. "'[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record.  It may often establish than an invention appearing to have been obvious in light of the prior art was not.  It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'" *Id.* at *12 (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983)).

## II.    DEFENDANTS FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS OF THE '938 PATENT WERE OBVIOUS AS OF 1991

Defendants did not come close to meeting their burden of proving by clear and convincing evidence that Claims 3 and 8 of the '938 Patent would have been obvious to a POSA as of 1991.  Given what was then known (and not known) about 4-AP and given the nascent state of the complex art of developing sustained release formulations, in 1991, a POSA would not have been motivated to try to develop a sustained release 4-AP formulation that would achieve therapeutically effective blood levels over 12-24 hours when administered once- or twice-daily, as claimed in the '938 Patent, with a reasonable expectation of success.  (PF ¶ 70).[8]

---

[8]    Plaintiffs have defined a POSA as someone having the knowledge of an M.D. with experience treating MS patients and a Ph.D. in pharmaceutics, or pharmacology, and at least five years of experience in clinical research and drug development, including researching, designing and testing drug formulations, particularly for the treatment of multiple sclerosis.  (PF ¶ 68).  Plaintiffs' and defendants' experts all testified that their opinions regarding obviousness would be the same regardless of whether the Court adopts plaintiffs' definition or defendants' definition.  (PF ¶ 69).

### A.   Given How Little Was Known About 4-AP, A POSA Would Not Have Been Motivated To Develop A Sustained Release Version In 1991.

As of 1991, although the chemical compound 4-AP had long been known, it had not been approved by the FDA as a drug for any purpose in any form. (PF ¶ 71). 4-AP was used as a bird toxin and for inducing seizures in animals. (PF ¶ 71). There was meager data in the prior art that 4-AP could be safely administered as a drug to provide meaningful clinical improvement of any symptom in MS patients. (PF ¶ 71). Indeed, it is undisputed that as of 1991, 4-AP had been administered to MS patients only experimentally and in small, limited studies.

### 1.   Prior art studies of patients with medical conditions that did not involve the central nervous system.

Defendants point to a one patient study and a six patient study conducted in the late 1970s in patients with myasthenia syndrome that supposedly showed "the safety profile of 4-AP" and that 4-AP could improve the strength of neurotransmission. (Defs. Br. at 12). Defendants further cite Murray (JTX-0089), a nine patient 1981 study, as having demonstrated that 4-AP could improve neuromuscular transmission and "established the safety of long-term use of 4-AP in humans." (Defs. Br. at 13; D.I. 263 ¶ 56). In fact, all three studies involved subjects who suffered from medical conditions which, unlike MS, did not impact the central nervous system (and 4-AP has never been approved to treat those conditions). (PF ¶ 101). None of the test subjects had MS. (PF ¶ 101). In Murray, only one individual received 4-AP for ten months (JTX-0089 at 269); three of the study participants experienced seizures and one had an acute confusional episode. (PF ¶ 101). Unlike MS patients, the subjects of those studies would not have had brain scarring and thus would not have been predisposed to seizures. (Tr.,

Goodman, 441:23-442:16; PF ¶ 150).  Hence, the studies did not establish the safety of 4-AP in

MS patients for any period, much less long-term.[9]

### 2.  The Stefoski and Davis prior art publications.

Defendants cite two papers by Stefoski (1987, JTX-0112) and Davis (1990, JTX-

0043), researchers at the Rush Institute in Chicago, as supposedly demonstrating that it was

known in 1990 that 4-AP could be used to treat MS.  (Defs. Br. at 2, 13).

The Stefoski reference described a small study, with no placebo control, in which

twelve men with MS and five normal men were dosed intravenously with 7 to 35 mg of 4-AP.

(PF ¶ 102).  The Stefoski study was not randomized or double-blinded.  (PF ¶ 102).  The

researchers conducted a battery of tests, though they did not test walking speed.  (PF ¶ 102).  No

prospectively defined efficacy endpoint was specified.  (PF ¶ 102).  And not all variables were

measured in all patients.  (PF ¶ 102).

Although most of the MS patients tested in Stefoski showed some improvement

(JTX-0112 at 73), no statistical analysis was provided given the lack of placebo control and the

small study size.  Dr. Goodman testified that a "reader of the study would understand that this is

a primary exploratory study" and that the researchers were "not really doing a clinical trial for

efficacy."  (Tr., Goodman, 444:22-445:6).  In fact, the Stefoski paper itself noted that studies

were then "under way to assess [the] *possibility*" that 4-AP would have "clinical usefulness."

(JTX-0112 at 76 (emphasis added); PF ¶ 102).  If anything, Stefoski exhibited a lack of

confidence in the usefulness of 4-AP, suggesting that "a search for new agents that can increase

the conduction safety factor and testing for their efficacy in MS are warranted."  (PF ¶ 102).

---

[9]     Defendants word their description of Murray so as to suggest that a dose of 10 mg twice
daily was found to improve neuromuscular transmission.  (Defs. Br. at 13).  In fact, in
Murray, the "starting dose was 10 mg twice daily, and this was gradually increased,
depending on the response, to a maximum of 200 mg daily in one patient."  (JTX-0089 at
266).

In Davis, the same researchers administered single oral doses of 10 to 25 mg of immediate release 4-AP to fifteen MS patients. (PF ¶ 103). The Davis study, too, involved an array of tests, and not all variables were tested in all patients. (PF ¶ 103). There was no prospectively defined efficacy endpoint and no test of walking speed. (PF ¶ 103). The authors reported improvements in the subjects that received 4-AP, although again, there was no statistical analysis. (JTX-0043 at 187).[10] Dr. Goodman testified, however, that, as in the case of the Stefoski study, the Davis study "wasn't designed adequately for a person to make . . . inferences" as to whether 4-AP is effective to improve walking. (Tr., Goodman, 447:15-19; PF ¶ 103). The Davis paper made clear that the import of its findings was limited: "The *possible* use of oral 4-AP as a clinical treatment in MS requires further study to assess long-term efficacy, safety, and patient selection criteria." (JTX-0043 at 190 (emphasis added); PF ¶ 103).

Dr. Fassihi confirmed that, as of 1991, a POSA would have recognized, as Bever pointed out in a 1994 article, the takeaway from the Davis and Stefoski papers was limited in that the studies were very small, did not use a randomized treatment design, were not double-blinded, and relied on outcome measures that were not widely accepted. (PF ¶ 71; *see also* Tr., Fassihi, 357:15-25).[11] The Stefoski and Davis publications did little more than suggest the need for further studies. (PF ¶ 71). Given that, as of 1991, there were, at best, fragmentary hints that 4-AP might have some clinical usefulness in MS patients, a POSA would not then have been motivated to invest in developing a second generation 4-AP formulation. (PF ¶ 71).

---

[10]     Defendants represent that Davis reported a significant improvement in gait for nine of 13 MS patients. (Defs. Br. at 2). In fact, the paper reports improved "motor function" in nine of 13 subjects, but "motor function" encompassed movement of arms and legs and included "both simple function tests and the performance of complex motor tasks such as gait and repetitive movements." (JTX-0043 at 188).

[11]     Bever further critiqued Davis and Stefoski in another 1994 article stating that "the studies were limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively defined neurologic deficits or adjust significance levels to compensate for multiple comparisons." (JTX-0028 at 1058).

Plaintiffs do not dispute defendants' assertion that the Davis and Stefoski publications confirmed the effect of 4-AP "using visual evoked potential ("VEP"), a test that eliminates the possibility for a placebo effect," and "detects[s] subclinical lesions in MS patients." (Defs. Br. at 15). As Drs. Lublin and Goodman testified, though, a therapeutic effect as measured by VEP testing does not necessarily translate into any clinical symptomatic effect. (PF ¶ 19; *see also* Tr., Goodman, 445:10-446:3). Indeed, in construing the term "therapeutically effective blood levels" in the '938 Patent claims to mean "blood levels sufficient to produce a therapeutic effect," (D.I. 195 at 6), the Court observed that in the context of the '938 Patent "it would be improper to equate therapeutic effectiveness with 'decreas[ing] or prevent[ing] symptoms'" in that "a drug may have desirable effects besides decreasing or preventing symptoms." (D.I. 195 at 7). In other words, Davis and Stefoski left open the question of whether the improved nerve conduction caused by 4-AP could have meaningful clinical effects.

### 3. The '938 Patent's discussion of unpublished work by Davis and Stefoski.

Defendants attempt to make much of the statement in the specification that "4-AP has been found to improve the conduction of nerve impulses, thereby, alleviating symptoms in MS patients." (JTX-001 at 1:51-53). Specifically, the patent states that the Rush Institute researchers administered 4-AP to MS patients "in multiple daily doses over 2-5 days" with "mild to marked improvements being noted and minimal side effects." (JTX-001 at 1:59-61). Plainly, however, those statements were not referring to the single dose studies reported in the prior art Davis and Stefoski publications. And, the patent cites no Davis or Stefoski publication. Hence, the statement in the patent apparently reflects the inventors' personal knowledge about the continuing work by Davis and Stefoski, and is not a representation as to what was in the publicly

available prior art.[12]  Accordingly, those statements have no bearing on whether the claimed inventions of the '938 Patent were obvious.  Consequently, defendants' reliance on *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007), with respect to a patentee's statements about the prior art is misplaced.  In *PharmaStem*, the patentee attempted to rely on expert testimony regarding the prior art that the Federal Circuit said "cannot be reconciled with statements made by the inventors . . . and with the prior art references themselves."  491 F.3d at 1361.  Here, in discussing the work of Davis and Stefoski, the patent was not characterizing published prior art.[13]

If anything, the statements in the '938 Patent specification about the work of Davis and Stefoski is at odds with defendants' assertion that in 1991, following the 1987 Stefoski and 1990 Davis publications, "the next logical step in drug development" was a sustained release formulation of 4-AP.  (Defs. Br. at 28-29).  To the contrary, the next step that Davis and Stefoski took was further testing of immediate release 4-AP in multiple doses over several days.

In a footnote, defendants describe a third publication by Stefoski and Davis, 4-Aminopyridine in Multiple Sclerosis:  Prolonged Administration, Neurology (September) 1991; 41:1344-1348 (JTX-0113) as prior art to the '938 Patent if plaintiffs rely on the November 1, 1991 priority date for the '938 Patent.  (Defs. Br. at 16 n.2).  In the pretrial order, however, defendants identified the 1991 paper as prior art only with respect to the Acorda Patents, but not the '938 Patent.  (UF[14] ¶ 63).  Had the September 1991 publication been asserted as prior art

---

[12]    On September 7, 1990, the Rush Institute had entered into an agreement with Elan regarding the development and marketing of 4-AP.  (JTX-0113 at 1348).  Thus, the inventors of the '938 Patent had access to non-public information about the work at Rush.

[13]    The patent application's statements about work by Stefoski and Davis that was not then published did, however, provide support for the claims under 35 U.S.C. § 112.

[14]    Citations to "UF" refer to the parties' Joint Statement of Uncontested Facts, D.I. 252, Ex. 1.

against the application for the '938 Patent, filed shortly thereafter, plaintiffs would have had an opportunity to show that their invention had preceded the publication.  Consequently, defendants waived the right to rely on the 1991 publication as invalidating prior art now.  In any event, the 1991 publication was identified by Bever as having suffered from the same shortcomings as the prior Davis and Stefoski publications.  (JTX-0027 at S119, S121).

Defendants also err in suggesting (Defs. Br. at 3) that the '938 Patent made a concession about the prior art in stating that "in view of the nature of neurological diseases, it can be appreciated that there is a need for an improved dosage form" of 4-AP.  (JTX-001 at 2:11-13).  The inventors were describing their invention.  If that "need" had been identified in the art, defendants would no doubt have cited it.

### 4.    Plaintiffs do not contend that only conclusive proof of safety and efficacy could render the claims of the '938 Patent obvious.

Contrary to defendants' assertions (Defs. Br. at 15-16), plaintiffs are not suggesting that the claims of the '938 Patent could only have been obvious if there was "[c]onclusive proof of efficacy."  Plaintiffs merely maintain that proof of safety and efficacy beyond what could be gleaned from the Davis and Stefoski publications would be needed to motivate a POSA to undertake the development of a sustained release formulation of 4-AP. Defendants, who bear the burden of proving that the claims of the '938 Patent were obvious, fail to cite a single instance in which such sparse evidence of clinical safety and efficacy motivated the development of a sustained release formulation.

Defendants argue that the mere fact that the FDA approved an Investigational New Drug Application allowing the clinical studies conducted by the Rush Institute researchers demonstrated that there was a reasonable expectation that 4-AP would be effective in MS patients.  (Defs. Br. at 17).  However, Manual of Patent Examining Procedure § 2107.03, on

which defendants rely, concerns the utility of a patent claim, not obviousness. The Federal Circuit's decision *In re Montgomery*, 677 F.3d 1375, 1382-83 (Fed. Cir. 2012), which defendants cite (Defs. Br. at 17), involved "an advanced stage of testing designed to secure regulatory approval" and is likewise inapposite.

### B.   Defendants Failed To Demonstrate That A POSA Would Have Had A Reasonable Expectation Of Success In Developing A Sustained Release Version Of 4-AP In 1991.

Defendants also failed to prove, by clear and convincing evidence, that a POSA that embarked in 1991 on an attempt to create a sustained release formulation of 4-AP would have had a reasonable expectation of success. The mere fact that sustained release was a "known formulation type" did not make the claims of the '938 Patent obvious as defendants argue. (Defs. Br. at 1).

Defendants' evidence consists of the testimony of Dr. Arthur Kibbe, professor emeritus at Wilkes University, who never conducted research on sustained release formulations and never published on sustained release formulations. (PF ¶ 66; Tr., Kibbe, 228:23-25).[15]

Dr. Kibbe opined that 4-AP was a "potential candidate" for sustained release because it has a short half-life, has relatively efficient absorption, is administered in relatively small doses and would be used to treat a chronic disease. (Tr., Kibbe, 198:4-200:17). According to Dr. Kibbe, creating a sustained release formulation of 4-AP would have taken just a couple of days and would simply have involved "select[ing] a platform," choosing and testing excipients, blending the 4-AP "at the dose you want to use" with various ratios of polymers, and then performing a dissolution test. (Defs. Br. at 32-33; Tr., Kibbe, 208:18-211:9). Notwithstanding

---

[15]   During his 22 years at Wilkes, Dr. Kibbe published only a single article in a peer-review journal and it had nothing to do with sustained release formulations. (Tr., Kibbe, 229:1-23). Unlike Dr. Fassihi, who was an inventor on several patents (Tr., Fassihi, 319:16-20, 320:13-17), Dr. Kibbe is not an inventor on any patents. (Tr., Kibbe, 231:2-3).

his lack of practical experience, Dr. Kibbe pronounced the process of crafting a sustained release formulation to be "really straightforward." (Tr., Kibbe, 211:6-7).[16]

Dr. Kibbe's facile description of the process of developing sustained release formulations flies in the face of the opinion of Dr. Joseph Robinson—who Dr. Kibbe identified as "a real authority on sustained release" (Tr., Kibbe, 236:17-237:1) and who authored the Remington's treatise that Dr. Peroutka described as "the Bible of pharmaceutical sciences." (Tr., Peroutka, 81:16). In 1990, Dr. Robinson wrote that the "[d]esign of a sustained-release product is normally a very difficult task." (PF ¶ 73). Dr. Robinson taught that development of sustained release formulations is a complex effort: "Successful fabrication of sustained-release products . . . involves consideration of the physical-chemical properties of the drug, pharmacokinetic behavior of the drug, route of administration, disease state to be treated and, most importantly, placement of the drug in a dosage form that will provide the desired temporal and spatial delivery pattern for the drug." (PF ¶ 73).

Dr. Fassihi echoed Dr. Robinson's view at trial. In Dr. Fassihi's opinion, creating a sustained release formulation of 4-AP would not have been routine experimentation. (PF ¶ 72). In 1991, sustained release technology was only at a nascent stage. (PF ¶ 72). The FDA was still in the process of composing guidelines to aid pharmaceutical companies in developing formulations. (PF ¶ 75). The knowledge and experience of formulators and the number of excipients and technology available to formulators were limited. (PF ¶ 72). Moreover, each active pharmaceutical ingredient ("API") is unique, with its own physical-chemical properties

---

[16]  It is telling that Dr. Kibbe's testimony did not make clear whether he was describing the development of sustained release formulations in 1991 or in 2016, nor did he say whether, in his view, there would be any difference.

and pharmacokinetics.  (PF ¶ 78).  There was (and is), therefore, no universal sustained release formulation that would work for all drugs.  (PF ¶ 78)

In 1991, Elan Corporation, the company that employed inventors Masterson and Myers – was at the "forefront" in the development of sustained release formulations.  (PF ¶ 74). Sustained release was "very much in its infancy."  (Tr., Myers, 151:14).  As Dr. Myers testified: "[T]his was all very new, and it was changing very rapidly."  (Tr., Myers, 153:8-9).  The drugs that were then available in sustained release dosage forms, such as those identified in Remington's (1990) (JTX-109), all had previously been approved by the FDA in immediate release form.  (PF ¶ 76).  Thus, at the time, sustained release technology was being used to improve drugs already approved in immediate release form.  (Tr., Kibbe, 231:18-21).[17]

Dr. Fassihi testified that the availability of a drug in immediate release form facilitated the development of a sustained release version.  (PF ¶ 76).  He explained that once a product has been widely consumed in immediate release form, copious information becomes available about the safety, efficacy, and pharmacokinetics of the drug.  (PF ¶ 76).  Developing a sustained release formulation without that wealth of information would have been, in Dr. Fassihi's words, "very difficult."  ( Tr., Fassihi, at 336:14-18; PF ¶ 76).

In 1991, because 4-AP had not been approved by the FDA in any form, very limited information was available about the compound.  (PF ¶ 77; *see also* Tr., Fassihi, 338:7-9). A POSA would not have known what in vitro dissolution profile would be needed in order to achieve sustained blood levels of 4-AP that would be therapeutic, yet safe, over time.  (PF ¶ 77).

---

[17]     Dr. Kibbe nonetheless insisted, with no apparent basis, that "a POSA would not have been dissuaded by the fact that a commercial, FDA-approved immediate release form of the product was not yet marketed."  (Defs. Br. at 26-27, citing Tr., Kibbe, 198:4-11).

Pharmacokinetic information is important to developing sustained release formulations because the pharmacokinetics of the drug define how, after administration, the drug is released, distributed, metabolized and eliminated.  (PF ¶ 79).  Unlike immediate release formulations, sustained release formulations do not dissolve immediately.  (PF ¶ 79).  Rather, they travel throughout the gastrointestinal tract, subjecting the drug to various environments in which it may be absorbed.  (PF ¶ 79).

Yet, no meaningful pharmacokinetic information was available regarding 4-AP in 1991.  (PF ¶ 80).  It is undisputed that Uges (1982, JTX-0137) was the only publication containing any 4-AP pharmacokinetic information and that it reflected data from just nine individuals.  (PF ¶ 80; *see also* Tr., Fassihi, 345:4-7).  The data disclosed in Uges reflects significant pharmacokinetic variability among the nine test subjects and thus a lack of predictability.  (PF ¶ 80).  For example, Table I in Uges shows that the $C_o$ concentration in micrograms per liter was $7488 \pm 5903$ (*i.e.*, 1,585 to 13,391) for five subjects that fit a "triexponential" pharmacokinetic model and $439 \pm 257$ (182 to 696) for the four subjects that fit a "biexponential" model; and the AUC in mg per liter was $29.3 \pm 5.9$ (23.4 to 35.2) for the five triexponential patients and $24.1 \pm 4.0$ (20.1 to 28.1) for the four biexponential patients.  (JTX-0137 at 588).

Dr. Kibbe failed to explain how the scant pharmacokinetic data reported in Uges could be used in designing a sustained release formulation.  (Tr., Kibbe, 201:4-204:7).  And Dr. Fassihi testified that Uges did not provide "anything meaningful."  (Tr., Fassihi, 348:18-349:8; PF ¶ 80).  According to Dr. Fassihi, the fact that Uges indicated "rapid distribution" of 4-AP that fits two distinct pharmacokinetic models (triexponential and biexponential) showed that the pharmacokinetics of 4-AP are "complicated" and that one would "need to gather a lot more

information" before doing "anything as far as a sustained release preparation is concerned." (Tr., Fassihi, 349:16-350:25; PF ¶ 80). Thus, a formulator would not have relied on Uges to develop sustained release 4-AP. (PF ¶ 80).[18]

The evidence adduced at trial also showed that development of a sustained release formulation is complicated generally by the fact that sustained release formulations introduce larger total amounts of drug, as compared with individual immediate release dosage forms, with the expectation that the drug will be released more slowly, over a longer period of time. (PF ¶ 81). As a result, sustained formulations pose a risk of "dose dumping," *i.e.*, releasing too much drug too soon. (PF ¶ 81). That was a real issue with respect to 4-AP, which was known to be toxic. (PF ¶ 81).

In addition, the high solubility of 4-AP made the task of creating a sustained release version of 4-AP particularly challenging because the more soluble the active ingredient, the more difficult it is to slow the release of the drug. (PF ¶ 82). The potency and low dose of 4-AP further complicated designing a sustained-release formulation because of concerns about dose dumping and the need for uniform distribution of the API throughout the dosage form. (PF ¶ 82). The seizures seen in past trials of immediate release 4-AP suggested that the therapeutic window of 4-AP was narrow. (PF ¶ 82).

Dr. Robinson's 1985 and 1990 Remington's treatises (JTX-0081, JTX-0082), the prior art references asserted by defendants to support their contention that the process of developing a sustained release formulation of 4-AP would have been obvious, merely demonstrate that by 1991 (1) certain platforms had been used to produce sustained release

---

[18]     Significantly, Dr. Kibbe did not take the position that the data in Uges was sufficient to allow the development of a sustained release formulation. He characterized Uges as merely providing "information that motivates you to go forward." (Tr., Kibbe, 203:6-19).

formulations; and (2) certain drugs that were already FDA-approved in immediate release form had also been produced in sustained release formulations. (PF ¶ 83). Remington's does not speak to whether and how one of ordinary skill in the art of formulation development would have developed a sustained release formulation of 4-AP, particularly in light of the fact that much was unknown about 4-AP and that 4-AP had not been approved by the FDA even in an immediate release formulation. (PF ¶ 83).

Thus, the formulator as of 1991 did not know whether it was possible, without undue experimentation, to develop a pharmaceutically acceptable formulation that would release 4-AP at the rate necessary to achieve therapeutically effective blood levels. (PF ¶ 84). In Dr. Fassihi's view, the '938 Patent was novel in that the inventors (1) prepared for the first time a sustained release formulation of 4-AP; (2) disclosed release rates with the specifics at every hour of how much of the drug should be released; (3) described multiple examples of sustained release formulations of 4-AP; and (4) taught how to achieve therapeutic blood levels of the drug via titration. (PF ¶ 85).[19]

In sum, a POSA, as of 1991, would not have been motivated to develop a sustained release formulation of 4-AP that would maintain therapeutically effective blood levels over 12 to 24 hours, when administered once- or twice-daily with a reasonable expectation of success. (PF ¶ 86).

---

[19]    Defendants rely on *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292-93 (Fed. Cir. 2013), where the court reversed a district court decision which held patent claims nonobvious on the basis of "general statements regarding the unpredictability associated with developing drug formulations and specific challenges associated with the development" of the commercial product that "contain[ed] many elements in addition to those embodied in the claims." The court made clear, though, that in order to prove the claims obvious a challenger must show that a POSA would "have a reasonable expectation of success of developing the claimed invention." *Id.* at 1292. Here, the testimony of Dr. Kibbe fails to make the requisite showing. Moreover, plaintiffs are not relying on the unpredictability of the formulation arts, but rather on the complexity of sustained release formulations, the emerging state of the art, and the dearth of information regarding the safety, efficacy and pharmacokinetics of 4-AP.

**III.    THE COMMERCIAL SUCCESS OF AMPYRA IS FURTHER EVIDENCE OF THE NONOBVIOUSNESS OF THE CLAIMS OF THE '938 PATENT**

This Court has stated that "to protect against the improper use of hindsight when assessing obviousness, the Court is required to consider objective . . . considerations of . . . non-obviousness, such as commercial success. . . ." *UCB, Inc. v. Accord Healthcare, Inc.*, No. CV 13-1206-LPS, 2016 WL 4376346, at *29 (D. Del. Aug. 15, 2016).  As detailed below in Point V.A, the undeniable commercial success of Ampyra is additional evidence that the '938 Patent claims would not have been obvious to a POSA as of 1991.

**IV.    DEFENDANTS FAILED TO DEMONSTRATE BY  CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS OF THE ACORDA PATENTS WERE OBVIOUS AS OF 2004.**

**A.    The Acorda Inventors Developed the Claimed Inventions Through Perseverance and Risk-Taking in the Face of Great Uncertainty**

The sole reason that people suffering from MS have the opportunity to have their lives improved daily by Ampyra is the groundbreaking research of Drs. Ron Cohen and Andrew Blight reflected in the Acorda Patents.  Their work only came about because Dr. Cohen, the founder of Acorda, dared to take the risk that 4-AP could benefit MS patients despite the fact that Elan's large-scale, 161-patient clinical trial of 4-AP had failed.  At trial, Dr. Cohen explained his reasoning as follows:

> Our situation at the time was different from Elan's.  We were just a startup, and entirely dependent on investor[s] being interested in putting money in.  We had to take much bigger risks than other companies.  Elan had products on the market, they had revenue, they were diversified, so we had to take really big risks and we knew that.  So despite the fact that there were daunting challenges there, we felt we had to take the risk.

(Tr., Cohen, 281:25-282:9; PF ¶ 90).

Acorda's path to overcome those "daunting challenges" was fraught with peril for Acorda and reflected the highly unpredictable nature of CNS and MS clinical research.  Yet, Acorda persevered when others would not and did not.  Indeed, Acorda learned of the

26

opportunity to take over Elan's MS clinical development of 4-AP because Acorda had already

been working with Elan on clinical development of 4-AP in spinal cord injury patients.  (PF ¶

88).  Dr. Cohen testified that that work also failed:

> We went through phase one, phase two, and then ultimately designed and
> executed two fairly large phase three trials and unfortunately they failed.

(Tr., Cohen, 281:8-10; PF ¶ 88).

Acorda's MS effort was likewise often discouraging.  Acorda's first clinical trial

tested whether 4-AP could improve eye muscles.  (PF ¶ 91).  People with MS frequently have

weakened eye muscles which results in blurry and double vision.  (Tr., Cohen, 286:5-9).  The

clinical trial failed and, in one of the outcome measures, the placebo performed better than 4-AP.

(Id., at 287:11-12; PF ¶ 92).  This failure contrasted with the reported success in an eye

movement study published earlier in Van Diemen II.  (PF ¶ 99).

Dr. Cohen then "took stock and in essence took a step back."  (Tr., Cohen,

287:15).  He designed a "dose ranging study" to look "primarily" at "safety and tolerability" of a

range of doses.  (Id., at 287:17-18; PF ¶ 92).  The study also was to have a secondary aim: "to

explore a number of different outcome measures to see if any one of them gave [Acorda] a hint

of where [Acorda] might go next.  (Tr., Cohen, 287:19-21).  This became Acorda's MS-F201

study (which is the subject of the Goodman References).  (PF ¶ 92).

MS-F201 involved 25 patients on 4-AP and eleven patients on placebo.  (Tr.,

Cohen, 288:12-14; PF ¶ 92).).  Each of the twenty-five patients on 4-AP started at 10 mg BID

and was "titrated" up an additional 5 mg BID each week of the study to a final dose of 40 mg

bid.  (PF ¶ 92).  MS-F201 tested "quite a few" outcome measures, specifically: two different

fatigue measures, the MS Functional Composite, the timed 25 foot walk, the nine hole peg test, a

cognitive test, called PSAT-3,  the lower extremity manual muscle test (LEMMT) and subjective measures for both the clinicians and the patients.  (Tr., Cohen, 289:14-22; PF ¶ 92).

For each of the outcome measures the preplanned analysis looked at whether a patient improved on 4-AP – with all of the doses pooled together for the patient – versus placebo. All outcome measures failed under the preplanned analysis, except for the LEMMT.  (PF ¶ 92). In other words, 4-AP failed to improve walking as measured by the time to walk twenty-five feet.  This failure stood in contrast with the success reported in Elan's ten-patient Schwid study.

Despite the failure of MS-F201, Dr. Cohen did a post hoc analysis of the 25-foot timed walk data, looking at speed rather than time.  (PF ¶ 92). [20]  That analysis showed that patients on 4-AP had experienced a statistically significant improvement in walking speed (as opposed to time to walk).  (Id.).  Regardless, Dr. Cohen was "quite discouraged after the 201 study."  (Tr., Cohen, 292:19-25).  He recognized the risk of continuing the research, and that the post hoc analysis provided only a "hint of significance."  (Tr., Cohen, 293:8; PF ¶ 92).

Nonetheless, Dr. Cohen then planned and conducted the MS-F202 study, a large 206-patient, Phase II study.  MS-F202 tested whether 10 mg, 15 mg, and 20 mg of 4-AP BID could improve walking as measured by an improvement in walking speed (not time) in the 25 foot walk test.  The preplanned analysis looked at whether each dose improved walking speed relative to placebo.  (PF ¶ 93).  Based on that analysis, the MS-F202 study failed:  none of the doses tested showed a statistically significant improvement in walking speed versus placebo. (Id.).  This failure contrasted with the improvement in walking speed seen in the post hoc analysis of the MS-F201 results.  (Tr., Cohen, 296:4-8).

---

[20]     Dr. Goodman explained that time to walk and walking speed, while based on data derived from the same timed walk test, do not behave the same mathematically in a statistical analysis. (Tr., Goodman, 502: 22-503:1).

Still unwilling to give up, Dr. Cohen looked "more deeply" at the MS-F202 data.

(Tr., Cohen, at 296:12).  He and others at Acorda developed a unique "responder analysis."  (PF

¶ 94).  This analysis showed that the subjects that had responded in the MS-F202 study were

overwhelmingly those that had received 4-AP, not placebo, and the p-value in that regard was

less than .0001.  (*Id.*).  In other words, all three doses – 10 mg, 15 mg, and 20 mg – administered

BID improved walking speed.  Significantly, the 10 mg dose worked as well as the 15 mg and 20

mg dose, and the 10 mg dose had fewer side effects.  (PF ¶ 95).  Dr. Cohen testified that he was

"extremely surprised" at that result.  (Tr., Cohen, 299:4-9).  Based on this unexpected finding,

Dr. Cohen concluded that 10 mg of 4-AP BID could be used without titration:

> [W]e realized we didn't have to titrate anymore because 10 milligrams is
> what we would need to use.  You want to use a dose that is not going to
> have intolerable side effects as long as it is the most effective dose, and
> since we now saw that it was as effective as 15 or 20, there was no reason
> to go higher and titrate.

(Tr., Cohen, 299:12-17; PF ¶ 95).

Following the MS-F202 study, Acorda completed two successful Phase III

Studies that used the responder analysis as part of the preplanned analysis.  (PF ¶ 96).  Acorda

filed an NDA, and the FDA granted Acorda priority review and ultimately approved Ampyra.

(PF ¶ 97).

### B.   The Inventions Claimed in the Acorda Patents

All of the Asserted Claims of the Acorda Patents are directed to improving

walking or increasing walking speed in MS patients by administering 10 mg sustained release

tablets of 4-AP twice daily.  Most of the Asserted Claims further require that the claimed 10 mg

twice daily dose be administered for a specified period of time (*e.g.*, at least two weeks or twelve

weeks[21]) and that the claimed 10 mg twice daily dose be the *only* dose administered during that

---

[21]    *See* '826 Patent (JTX-0002) claims 1, 37 (not asserted), 38 (dependent from claim 37), 39
(dependent from claim 37); '437 Patent (JTX-0003) claims 1, 2, 5, 18 (not asserted and

period of time.[22]  Thus, these claims mandate that the 10 mg twice daily dose remain fixed (or

stable) during the stated period -- in contrast with a titration or escalating dosing scheme which

would provide for increasing the dose over time.  Others of the Asserted Claims, rather than

reciting a particular dosing period, specify that there be no titration before or after the

administration of the 10 mg twice daily dose.[23]  These "no titration" claims thereby expressly

preclude *any* adjustment of the claimed 10 mg twice daily dose at *any* time.

Accordingly, all of the Asserted Claims of the Acorda Patents are directed to

administration of a fixed (stable) dosing regimen of 10 mg sustained release 4-AP in order to

improve walking or increase walking speed in MS patients.  Several of the Asserted Claims

further specify particular pharmacokinetic parameters[24] or a particular release profile[25] that are to

be achieved by administering the specified dosing regimen to improve walking or increase

walking speed.

The Asserted Claims are, therefore, not directed simply to a 10 mg twice daily

dose of sustained release 4-AP.  Additional limitations include the objective of the 4-AP dose

(improving walking or increasing walking speed), the type of dosing regimen (stable dosing for a

specified period of time, or no titration), and the recited pharmacokinetic parameters.  All of

---

dependent from claim 1), 22 (dependent from claim 18), 32, 36, and 37; '703 Patent (JTX-0004) claims 2 (not asserted), 36 (dependent from claim 2), 38 (dependent from claim 2), 45; '685 Patent (JTX-0005) claims 1(not asserted), 2 (not asserted), 3 (dependent from claim 2), 5 (dependent from claim 1).

[22]   *See* '437 Patent (JTX-0003) claims 1, 2, 5 (dependent from claim 1), 18 (not asserted and dependent from claim 1), 22 (dependent from claim 18), 32, 33 (not asserted), 36 (dependent from claim 32), 37 (dependent from claim 33).

[23]   *See* '826 Patent (JTX-0002) claims 6 (not asserted), 7 (dependent from claim 6).

[24]   *See* '826 Patent (JTX-0002) claims 1, 6 (not asserted), 7 (dependent from claim 6), 37 (not asserted), 38, 39 (dependent on claim 37); '437 Patent (JTX-0003) claim 22; '703 Patent (JTX-0004) claims 2 (not asserted), 36 (dependent from claim 2), 38; and '685 Patent (JTX-0005) claims 2 (not asserted), 3 (dependent on claim 2), 5.

[25]   *See* '685 Patent (JTX-0005) claim 3.

these elements are integral to the claims, and this Court must consider all of the elements of the claims in combination. This Court has made clear that "a party asserting obviousness must show that 'the subject matter [of the asserted claims] *as a whole* would have been obvious.'" *Avanir Pharms., Inc. v. Actavis S. Atl. LLC*, 36 F. Supp. 3d 475, 499 (D. Del. 2014) (quoting *KSR*, 550 U.S. at 406), *aff'd per curiam sub nom, Avanir Pharms. Inc. v. Par Pharm. Inc.*, 612 F. App'x 613 (Fed. Cir. 2015). Thus, it "would be improper to focus only" on individual elements of the claim, such as the 10 mg dose of 4-AP "in isolation." *Avanir*, 36 F. Supp. 3d at 499 ("[T]he Court must consider the claimed subject matter as a whole and, in doing so, it would be improper to focus only on the dosage of Q in isolation.").

    **C.**    **A POSA, as of 1994, Would Not Have Had a Reasonable Expectation of Success in Using any Dose of Sustained Release 4-AP to Improve Walking or Increase Walking Speed in MS Patients.**

As detailed below, given the state of the art in April 2004, a POSA would not have had a reasonable expectation that sustained release 4-AP could be used successfully at any dose – much less in accordance with the specific dosing regimen of the Acorda Patent Claims -- to improve walking or increase walking speed in MS patients. (PF ¶¶ 98, 132). Defendants therefore cannot meet their burden to show that the Asserted Claims of the Acorda Patents were obvious. *See Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009) ("An obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art.").

Defendants' obviousness challenge to the Asserted Claims of the Acorda Patents simply does not square with the reality of the state of the art in 2004. First, defendants ignore the difficulty of developing drugs for MS in light of the complexity of the disease, the pronounced variability of the disease both among and within patients, and the significant placebo effect seen in MS trials. Second, defendants discount the significant challenge that researchers faced

because of the recognized risk that 4-AP would induce seizures in MS patients, which dictated the use of titration dosing schemes in contrast with the fixed/stable dosing regimen claimed in the Acorda Patents.   Third, defendants attempt in vain to diminish the fact that the largest, placebo-controlled clinical trial investigating the efficacy of 4-AP in MS patients had recently failed -- as measured by the widely accepted EDSS, a significant component of which is that included an assessment of walking ability.   This enormous setback cast substantial doubt on earlier positive findings in a few small, exploratory or methodological studies of 4-AP that had not been designed as efficacy studies and also raised serious questions about any future effort to develop 4-AP as a treatment for MS.   Fourth, defendants ignore the conclusion reached by a contemporaneous, unbiased, evidence-based review of the literature regarding the use of aminopyridines in MS patients, which stated that "[c]urrently available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms." (PTX-0416 at 1; PF ¶¶ 98, 133).

**1.     The Art Recognized the Enormous Challenges of Developing Treatments for MS.**

**a.     MS drug development is complex and unpredictable.**

MS is a highly complex disorder involving both the central nervous system and the immune system – both notoriously difficult to treat.   (PF ¶ 9).   As Dr. Goodman explained, "at its heart," MS "is the immune system attacking the nervous system," and "it is important to remember the complexity of the disease with respect to the interplay between the immune system and the nervous system."   (Tr., Goodman, 427:7-8, 430:11-13).   This Court has itself recognized that "[a]s a general matter, CNS drug development is challenging and unpredictable."   *Avanir*, 36 F. Supp. 3d at 505.   This known complexity and unpredictability would have influenced the

expectations of a POSA regarding the potential use of 4-AP to treat MS in light of the very limited clinical studies involving 4-AP that had been conducted as of 2004.

> **b.    The variability that characterizes MS makes clinical trials difficult to conduct and interpret.**

A POSA as of 2004, having experience treating and conducting clinical trials in MS patients, would have recognized that the variability that characterizes MS poses significant challenges with respect to the design, conduct, and interpretation of MS clinical trials.

### (1)    The wide variety of MS symptoms

Dr. Goodman testified that the broad range of symptoms caused by MS complicates the selection of the clinical endpoints to be used in MS drug trials and confounds interpretation of test results which may show improvement in one or some symptoms, but not others. (PF ¶ 13). Dr. Goodman cited the multiple endpoints pointing in a variety of directions as one of the reasons a POSA would not have had a reasonable expectation of success in using 10 mg of 4-AP BID to improve walking as of 2004. (PF ¶¶ 132, 139).

The difficulties posed by the availability and use of multiple endpoints are manifest in the prior art studies, which were generally small, exploratory or methodological studies that looked at numerous endpoints and pointed inconsistently in a variety of directions. The results of those studies would not have supported an expectation of success in treating MS patients with 4-AP as claimed in the Acorda Patents. (PF ¶¶ 132, 137).

As Dr. Goodman pointed out, the studies reported in Stefoski I, Stefoski II, Davis, Bever III, Schwid, and the Goodman References (JTX-0062 (Goodman I); JTX-0061 (Goodman II); JTX-0080A (Goodman Poster)) all explored a number of endpoints. None of those studies had a prospectively identified primary efficacy endpoint, and none of the references reported the statistical adjustments necessary to account for the use of multiple endpoints. (PF ¶¶ 102-105, 109, 114, 122, 124-125). Bever characterized the studies reported in Davis and Stefoski as

33

"limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively defined neurological deficits or adjust significance levels to compensate for multiple comparisons."  (JTX-0028 at 1058; PF ¶ 106).

In testifying about the Schwid reference, which measured *seven* different outcomes and reported a statistically significant result of p = 0.02 for only *one* of those measures, Dr. Goodman explained how the assessment of multiple outcomes in a single study affects the statistical analysis of the study:

> [I]f one were considering this an efficacy study, which it was not, . . . then one would need to account for the multiple comparisons, because although the P-value here I believe was .02, [the] implication is that there's a two percent chance that that could have . . . happened by chance alone.  But when you're doing multiple comparisons you actually have to multiply by each time you do the comparison in order to really see what the chance . . . is that it could occur by chance alone.  Every time you do that comparison, you have to multiply and so that's what's called correction or accounting for . . . multiple comparisons.

(Tr., Goodman, 472:2-14).

In response to the Court's questions regarding the difference between an efficacy study and a methodological study as in Schwid, Dr. Goodman expounded:

> [I]n this context what I meant by methodology was that we were exploring or others were exploring methods to see whether or not it was a signal.  But without predefining which method, which tests . . . you're using is fraught with misinterpretation and the potential for overestimating or incorrectly making inferences, this is what Bever spoke about in his discussion of limitations in the Stefoski and Davis work.  And this is why . . . people of skill in the art look for predesignated or prospectively defined outcome measure or measures or an analytic method that takes into the account the fact that you're testing a whole basket of things.

(Tr., Goodman, 562:12-24).  Dr. Goodman observed that if a researcher such as Schwid looks at multiple outcome measures and "happen[s] to find one . . . thing[] that work[s]," the researcher cannot properly isolate that one outcome and "say well, there's only a two percent chance that this could have happened by chance alone."  (Tr., Goodman, 562:24-25, 563:3-4).  According to

Dr. Goodman, because Schwid actually looked at seven different outcomes, "it's really a 14 percent chance . . . that it could happen by chance." (Tr., Goodman, 563:6-8).[26]

Dr. Goodman also explained that a POSA would realize that positive signals from multi-endpoint studies are "not enough to go on until you do further testing to see whether or not what you thought was a signal is in fact a real signal, a reproducible . . . real pharmacological effect." (Tr., Goodman, 563:12-25).

A 2003 Cochrane Review, entitled "Aminopyridines for Symptomatic Treatment in Multiple Sclerosis," authored by A. Solari, *et al.*, (the Solari Review), similarly expressed concern about the risk of overestimating the clinical benefit of aminopyridines on the basis of multiple-endpoint studies. The Solari Review stated that "the number of outcome[s] considered in the studies and within a single study was high" and pointed out that in most studies "the primary endpoint was not specified." (PTX-0416 at 5). Consistent with Dr. Goodman's testimony, the Solari review noted that "in such . . . many-outcome situation[s]" there is a "distinct possibility of false positive findings." (*Id.*; PF ¶¶ 99, 114, 122).

The published literature regarding the use of 4-AP in MS patients illustrates this "false positives" phenomenon. Many of the leads that had appeared promising on the basis of reports on small, multiple-endpoint studies were not reproducible. For example, early reports of improvement in fatigue (as in Polman I) were not borne out by the results on fatigue reported in the Goodman Poster. (PF ¶¶ 108, 130). Similarly, early reports of improvement in "gait" or "ambulation" (as in Davis and Polman I) were inconsistent with the results in the 161-patient

---

[26] "The p-value is a value that statisticians use to show the level of uncertainty in a study's results. A p-value is 'statistically significant' if it is 0.05 or less, which indicates that there is 5% or less likelihood that the outcome was the result of pure chance." *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1350 n.3 (Fed. Cir. 2013) (citation omitted). Clearly, a p-value of .14, or 14%, would exceed the 5% limit for statistical significance.

Elan study (discussed in greater detail below), which used as its primary outcome measure the EDSS, a longstanding composite measure of function in MS patients with a large component assessing walking ability.  (JTX-0043 at 186 (abstract); JTX-0095 at 293, 295; JTX-0104 at 817).  Seemingly contradictory results were observed even within a single study. Indeed, in Polman I, although patients reported subjective improvement in ambulation, objective observers were unable to detect that improvement.  (PF ¶ 108).

### (2)      Variability among and within patients

In addition to the wide range of symptoms suffered by MS patients, there is substantial variability in how MS is manifested in a single patient and among patients.  (PF ¶ 14). MS is not a static disease; it is a moving target.  (*Id.*).  There can be substantial variability of symptoms on a day-to-day or even hour-to-hour basis.  (*Id.*).

Dr. Goodman testified that the high degree of inter- and intra-patient variability makes it difficult for researchers looking at changes in symptoms to distinguish drug effects from natural fluctuations or variation in the disease course and to compare effects across patients.  (PF ¶ 15).  Dr. Goodman identified this difficulty of interpreting the results of clinical trials in MS patients as one of the reasons that a POSA would not have had a reasonable expectation of success at arriving at the claimed inventions of the Acorda Patents as of 2004.  (PF ¶ 132).

### c.      The significant placebo effects seen in MS trials.

Another challenge that MS researchers face in designing and interpreting clinical trials is the strong placebo effect.  *See Avanir*, 36 F. Supp. 3d at 485 ("When no causality is established, a placebo effect, or a false positive — which is known to be very common in CNS drugs — cannot be ruled out as the reason for the apparent efficacy.").  Dr. Goodman pointed to placebo effects as one of the reasons that the prior art exploratory and/or methodological studies, including some of his own work, were not adequately designed to show efficacy, were difficult

to interpret, and would not have allowed a POSA to have a reasonable expectation of success in achieving the inventions claimed in the Acorda Patents.  (PF ¶¶ 128, 130, 132, 140).

Dr. Lublin testified that "multiple sclerosis is a disease in which there's lots of placebo effects, so any time you do a study you have to control as best you can for the possibility of placebo effects and one of the ways is by using objective measures."  (Tr., Lublin, 401:24-402:3).  Dr. Lublin explained that electrophysiological measurements, such as visual evoked responses (also known as visual evoked potentials), were used in early studies because they were objective measures and were therefore more reliable than observations regarding symptoms.  (PF ¶¶ 19-21).  Dr. Goodman testified that a POSA, fully aware of both the variability of MS and the propensity for placebo effects in MS patients, would apply a more rigorous approach to assessing efficacy and would not draw meaningful inferences about safety and efficacy from the results of studies that were not randomized and controlled versus placebo.  (PF ¶ 132).

The prior art regarding the administration of 4-AP prior to April 2004 confirms the powerful placebo effect in MS trials.  The 161-patient Elan trial disclosed in Schwid found that, as measured by EDSS, 22% of patients improved on 4-AP.  However, the very same percentage of patients improved on placebo.  (PF ¶ 100).  Dr. Goodman pointed to the Elan study as just one example of an MS study that failed because of an inability to distinguish between drug effect and a "big placebo effect."  (Tr., Goodman, 469:5-17).

Similarly, the Goodman Poster reported that in Acorda's MS-F201 study both the 4-AP treatment group (in the aggregate) and the placebo group showed substantial improvement. In fact, the placebo group actually performed *better* than the drug treatment group with respect to fatigue.  (PF ¶ 130).  Dr. Goodman testified as follows regarding that finding as to fatigue:

> [I]t is important to remember here I think that there were a number of prior reports in the art that said 4-AP was the treatment for fatigue or might be a treatment for fatigue.  And here is an example how placebo gets in the

> way and confuses the issue.  We just don't know here because placebo did
> better than the active treatment could.

(Tr., Goodman, 486:7-19).  The Goodman Poster bar graphs showing change in walking speed

also show that "a number of people got better on placebo."  (Tr., Goodman, 483:25-484:1).

In sum, in view of the challenges posed by the complexity, variability, and high

placebo effect that characterize MS and complicate the design and interpretation of MS trials, a

POSA would not have had a reasonable expectation of success in using 4-AP to treat MS

symptoms on the basis of reports of improvement of various symptoms in a few individuals in

small, uncontrolled or exploratory studies.  Given the nature of the disease, a POSA would not

have an expectation of success in using 4-AP to treat any symptom of MS absent a randomized,

placebo-controlled clinical study properly designed to assess efficacy.  That is not to say

(contrary to defendants' mischaracterization of plaintiffs' argument (Defs. Br. at 16-17, 49-50),

that a reasonable expectation of success would need to be supported by a showing that would

support FDA approval.  Plaintiffs have never contended that an FDA standard is applicable, only

that, given the nature of MS and the difficulties of developing treatments for MS patients, a

reasonable expectation of success that the Asserted Claims could be practiced even in a single

patient would require testing that a person of skill would recognize as more than merely

hypothesis-generating.  *See Forest Labs. Holdings Ltd. v. Mylan Inc.*, No. CV 13-1602-SLR,

2016 WL 3677148, at *24 (D. Del. July 11, 2016) (In the context of obviousness, references

discussing the results of "small, open-label, non-placebo controlled trials" are generally

ineffective at establishing a reasonable expectation of success because they "would not be

accepted by persons of ordinary skill in the art as establishing the efficacy of a drug for the

treatment of [a particular condition] for many reasons, including the introduction of patient and

doctor bias, false positives due to a placebo response, and lack of sufficient patients.").

2.       **4-AP Poses Special Challenges in MS Trials.**

a.       **The risk of seizures and other serious adverse events.**

MS patients are particularly susceptible to seizures because of the brain scarring that is characteristic to MS.  (PF ¶ 12).  This serious risk is aggravated by 4-AP, which can cause seizures via the very same mechanism of action -- potassium channel blockade – that makes 4-AP effective in improving nerve conduction.  (PF ¶¶ 23, 25).  4-AP may also have other adverse effects that relate to its potassium channel blocking mechanism, including tremors, paresthesia, dysesthesias (painful tingling), dizziness, and insomnia.  (PF ¶ 23).

As mentioned above, the toxicity of 4-AP – in particular its capacity to induce seizures – was well known in 2004,  and weighed heavily against any reasonable expectation that a safe and efficacious dose could be found for treatment of MS patients.  (PF ¶ 25).

The prior art reflects that the dangerous toxicity and seizure-inducing capacity of 4-AP loomed over the research that was conducted on 4-AP.  In the 1981 Murray study, which did not involve MS patients, three of the nine patients who received 4-AP suffered seizures, and a fourth had an acute confusional episode.  (PF ¶ 101).  The Murray publication concluded that "central effects of 4-AP, especially seizures, limit its use."  (JTX-0089 at 270; PF ¶ 101).  Dr. Goodman testified that the concern expressed in Murray with respect to 4-AP would be heightened in MS patients because "one of the hallmarks of MS is brain scarring, predisposing [MS patients] to an increased risk of seizures."  (Tr., Goodman, 441:23-442:7; PF ¶ 25).

In Polman I, two MS patients suffered seizures.  One seizure occurred after the subject had received just two 5 mg capsules.  Another patient had a seizure at a dose of 20 mg/day.  Polman I thus demonstrated that 4-AP's known seizure risk is not limited to high doses. (PF ¶¶ 25, 108, 149).

In Bever III, which involved only eight patients, one patient suffered a grand mal tonic-clonic seizure, the most serious type of seizure, and another experienced an episode of encephalopathy, meaning a confusional state or disorientation.  (PF ¶¶ 25, 109).

The concern about the safety risks associated with 4-AP remained an important issue at the time of the invention of the Acorda Patents.  Evaluating safety was the primary aim of Acorda's MS-F201, which is the subject of the Goodman References.  (PF ¶¶ 119, 121).  In that study, there were two instances of seizure.  (PF ¶¶ 25, 119, 124, 126).  The Goodman Poster reported a "[s]afety profile consistent with previous experience" and – consistent with that previous experience – stated that "[a]s anticipated, the risk of seizure requires further study and characterization, particularly in the anticipated dose range."  (JTX-0080A at Results Summary, Conclusions).  Dr. Goodman testified that this statement communicated his "concern about the abiding risk, an ongoing enduring risk of seizure as the drug would be further studied if at all in even lower dose ranges."  (Tr., Goodman 482:9-16).[27]

Further illustrating the continued concern about 4-AP's toxicity, the 2003 Solari Review of the prior art stated that "[a] conclusion on the safety of [aminopyridine] preparations is even more problematic" than an assessment of their efficacy.  (PTX-0416 at 6; PF ¶ 25).

### b.    The prior art taught upward titration as a means of addressing 4-AP's narrow therapeutic index.

The prior art shows that the concern about 4-AP's safety profile led to the use of titration in dosing the compound.  Titration "means dose adjustment on an individual basis" such as "adjusting of doses up or down depending on some . . . characteristic response, including

---

[27]    As later studies showed, there is increased seizure risk starting as low as just above the 10 mg BID dose. The Seizures subsection in the Warnings and Precautions part of Ampyra's approved label states that "[i]n open label extension trials in MS patients, the incidence of seizures during treatment with dalfampridine 15 mg twice daily (1.7/100PY) was over 4 times higher than the incidence during treatment with 10 mg twice daily (0.4/100PY).  (JTX-0076 at AMPDEL0170808).

tolerability or clinical or some other measurable response that one finds in the patient." (Tr., Goodman, 441:4-10).  As explained by Dr. Cohen, because 4-AP was known to have potentially toxic effects, including seizures, it was understood in the field that 4-AP should be administered with a low starting dose, to be increased over time so that "the patient could acclimate and get to an ultimate dose hopefully without adverse event."  (Tr., Cohen, 285:4-14; PF ¶ 89).

Virtually every prior art reference in evidence employed a titration dosing scheme.  Murray used a titration protocol starting at 10 mg twice daily and gradually increased the dose to as much as 200 mg daily.  (PF ¶ 101).  Stefoski II used an "optimal dose finding approach," which Dr. Goodman explained as "another word for titration."  (JTX-0113 at 1344; Tr., Goodman, 449:1-10; PF ¶ 104).  Van Diemen II and Polman I also involved upward titration schemes based on tolerability, with a maximum dose based on weight.  (PF ¶¶ 107-108).

The eight patient Bever III study employed a titration scheme that targeted particular blood concentration levels.  Bever explained the reason for using that dosing protocol in terms of the "difficult dilemma" posed by drugs with a narrow therapeutic window, such as 4-AP:  "[t]o avoid serious side effects in the patients having the highest serum drug levels, doses must be kept as low as possible, but this means that patients with the lowest drug levels may have levels inadequate to produce any therapeutic effect."  (JTX-0028 at 1055; PF ¶ 109).  As Dr. Goodman testified, this statement reflects the challenge faced by researchers in even finding a dose of 4-AP to *test* for an effect without risking seizures:

> [Bever] is talking about a dilemma or a challenge basically in designing a trial where there is . . . what has been called a narrow therapeutic window or index or, in this case, toxic to therapeutic range.  That creates a challenge in particular for a drug where the toxicity appears to be directly related to the mechanism of action.  So it makes it . . . very challenging to push a drug . . in terms of upper titration to the point where you get efficacy because you are becoming perilously close or across the threshold where a person may run into toxicity.

41

(Tr., Goodman, 458:17-459:8)

Furthermore, Elan's '938 Patent introduced a sustained release formulation of 4-AP to the art, but still taught an individual titration dosing scheme, starting with a dose of "less than 15 mg/day until a tolerable state is reached," then titrating up "by amounts of at least 5 - 15 mg/day until [a] therapeutic dose is reached."  (JTX-0001 at 14:4-9; PF ¶¶ 110, 143).  Although the scope of some of the '938 Patent's claims (including claims 3 and 8 asserted in this case) is not limited to administration of 4-AP using an individual titration dosing scheme, the '938 Patent does not disclose administration other than via upward titration.  (PF ¶¶ 110, 143).

Acorda's MS-F201 study that was the subject of the Goodman References employed an escalating dosing regimen under which, after a placebo run-in for the first week, an initial dose of 20 mg/day (10 mg BID) was increased in weekly increments of 10 mg/day (5 mg BID) to a total of 80 mg/day (40 mg BID), unless patients were unable to tolerate the increase.  (PF ¶¶ 120, 124-125, 145, 152).  The MS-F201 dosing protocol is called an escalation, rather than a titration, because the dose is increased weekly, not solely on the basis of patient response.  (Tr., Goodman, 476:20-477:3).  However, a dose escalation regime is consistent with the prior art's teaching of administering increasing doses, rather than a single, fixed dose.

Thus, the art in April 2004 taught the administration of 4-AP in increasing doses, in contrast with the fixed dosing regimen of 10 mg BID claimed in the Acorda Patents.  The art would not have provided a POSA with a reasonable expectation of success in using a stable dosing regimen to improve walking or increase walking speed in MS patients.  (PF ¶¶ 142-146).

### c.    The prior art suggested testing higher doses.

The 4-AP prior art reflected not only a preference for titrated dosing of 4-AP -- starting low to avoid toxicity and tolerability problems – but also demonstrated an

understandable inclination to seek maximum benefit by administering as high a dose as possible, short of precipitating adverse effects.

The study reported in Van Diemen II was intended to assess the relationship between dosage serum level efficacy and safety of 4-AP. (PF ¶ 107). Dr. Goodman explained that Van Diemen II concluded that "higher dosages and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP." (PTX-0330 at 203; PF ¶ 107). The implication was that "one would either use an upward titration scheme on an individual basis or just target higher . . . dose[s] or serum levels in order to … achieve greater effects." (Tr., Goodman, 453:23-454:3; PF ¶ 107).

The sole prior art reference that disclosed administration of a fixed dose of 4-AP over a period of time was the Schwid reference, described by Dr. Goodman as a "test of tests." (Tr., Goodman, 473:3-9). Schwid disclosed administration of 35 mg/day (17.5 mg bid) to just ten patients for a period of only one week. Thus, Schwid used a dose that was 75% higher than the 10 mg BID dose prescribed by the Asserted Claims. (PF ¶ 113).

Schwid also observed that "[t]reatment appeared particularly efficacious in subjects who achieved serum levels above 60 ng/ml" and noted that "[n]one of the patients with a serum level less than 60 ng/ml felt better." (JTX-0104 at 819, 820; PF ¶ 115). Dr. Goodman testified that "as much as one could infer . . . about efficacy in this methodologic study. . . [Schwid] would teach that one needed to target . . . levels higher than 60 nanograms per ml if one were going to be able to detect an efficacy signal using this type of methodology." (Tr., Goodman, 474:1-7; *see also id.*, at 508:10-16 ("if anything [Schwid] suggested that one needed to target serum levels of at least 60 ng per ml which would again suggest a target level or a method of titration to get to that level")). Significantly, as Dr. Peroutka admitted, the Hayes III

43

reference on which defendants rely teaches that a dose higher than 25 mg BID – more than 150% above the 10 mg BID dose of the Acorda Patent Claims -- would be required to sustain an average serum level of 60 ng/ml.  (PF ¶ 144).

In sum, the prior art only disclosed the use of low doses of 4-AP, such as the 10 mg BID dose claimed in the Acorda Patents, as a starting dose in an upward titration or escalating dose regime, *not* as a therapeutically effective stable dose.  The prior art taught targeting higher doses to achieve higher serum levels, thereby achieving maximum benefit.[28]

### 3.     The largest, placebo-controlled study of 4-AP in MS patients prior to April 2004 had failed.

In April 2004, a POSA considering the use of 4-AP in MS patients to improve walking would not only have been fully familiar with the many challenges involved in treating MS and in performing and interpreting clinical trials in MS patients as discussed above, but would also have been painfully aware that the largest, placebo-controlled clinical trial to that point, which was conducted by Elan, had failed.  Specifically, the study had failed as measured by the prospectively identified endpoint, the EDSS, which includes a significant walking component.

The failure of the 1994 Elan study was disclosed in the Schwid reference that was published in the well-respected journal *Neurology* in 1997.  (PF ¶ 117).  Schwid reported that the study had included 161 subjects (far more than any other study of 4-AP in MS to that date), was a multi-center, double-blind, placebo-controlled, parallel-groups study which lasted six weeks, and had employed the EDSS as the primary outcome variable.  (PF ¶ 89).  Dr. Goodman explained that an important aspect of the EDSS is an assessment of walking.  (*Id.*).  Dr. Peroutka

---

[28]     Dr. Cohen explained that in order to be clinically beneficial to people with a condition, such as walking impairment, which is a "continuum . . . not an on/off type of an outcome," it is important to get "the maximum benefit" possible so as to "push[]" patients "closer to [a] normal state of walking."  (Tr., Cohen, 294:17-295:6; *see also* Tr., Goodman, 520:5-521:3; PF ¶ 135).

acknowledged that the EDSS includes a walking component, is one of the most widely utilized assessment tools in the MS field, and has been used in many clinical trials. (*Id.*).[29] Schwid also disclosed that the study had 80% power to detect the difference between an improvement rate of 5% in the placebo group and 20% in the sustained-release 4-AP group. (PF ¶ 100).

Dr. Goodman testified that the information that Schwid provided about the failed Elan study would have informed a POSA that the 161-patient study was adequately designed to assess EDSS. (PF ¶ 117). According to Dr. Goodman, Schwid disclosed "all of the key characteristics that one looks for" to obtain "a rigorous assessment of efficacy," including that the Elan study had a prospectively defined endpoint and a placebo control group, that it was a randomized clinical trial (meaning that it was randomly determined who got assigned to active treatment or placebo), that there was an objective outcome measure, that there was a parallel group design, and that the study was large enough to be statistically powered in order to detect drug effect that they expected to see. (Tr., Goodman, 468:1-24).

Schwid also clearly disclosed the discouraging result of the 161-patient study: "Twenty-two percent of patients in the 4-AP SR group improved on the EDSS, but the same percentage improved in the placebo group." (JTX-0104 at 817; PF ¶ 100).[30] Thus, Schwid reported, the Elan study was "unable to establish clinical efficacy." (JTX-0104 at 817; PF ¶ 100).

Not surprisingly, the failure of the largest and best-controlled study evaluating the use of 4-AP in MS patients to that time raised serious questions about earlier published reports of

---

[29]   Dr. Cohen testified that EDSS was selected by Elan as an outcome measure on the recommendation of an MS advisory group because it had been used in previous studies and was accepted by the MS community. (Tr., Cohen, 284:10-20; PF ¶ 89).

[30]   The 161-patient Elan study tested ambulation index as a secondary endpoint but found no difference between 4-AP and placebo. (PTX-0360 at 102).

4-AP having clinical effects in MS patients.  As Dr. Goodman testified, the prior reports of clinical effects in "small exploratory uncontrolled . . . or poorly controlled studies" were "cast into doubt or even blown away" by the fact that the larger and "rigorously designed" Elan study "fail[ed] to show an effect."  (Tr., Goodman, 469:5-17).

Dr. Goodman made clear that the failure of the large-scale Elan study, which was adequately and specifically designed to test for clinical efficacy, would have raised "an enormous doubt" in the mind of a POSA as of April 2004 (even after the Schwid and Goodman references relied on by defendants) and was a further reason that a POSA at the time would not have had a reasonable expectation of success in improving walking or increasing walking speed in MS patients by administering 10 mg of sustained release 4-AP twice daily.  (Tr., Goodman, 495:11-496:17; *see also id.* at 514:1-24 (testifying that the failure of the Elan study generated "a huge amount of skepticism and doubt as to whether any of the primary exploratory observations that had been made in Chicago and in Amsterdam and in Baltimore, in all the papers . . . reviewed during this case . . .  because this was an efficacy study that failed to show efficacy. . . . [T]he failures cast a huge shadow on this whole field.").  Dr. Goodman recalled that he and others in the field were "quite unpleasantly surprised by the results" because, on the basis of the prior literature

> [W]e would have anticipated that we would have found at least something and we found nothing.  So that really cast doubt on the notion that there were clinical effects of 4-AP other than the stuff that Davis and Stefoski found in terms of either the immediate effects that were first sort of transient effects from an intravenous dose or for the physiologic effects that they found which we found believable.  But the idea that you couldn't find a clinical effect with a big study was, in fact, devastating.

(*id.*, at 540:7-541:5).

Plainly, news of the failed Elan study had a profound effect.  Before the Elan study, several research groups, including researchers in the UK, the Netherlands and the US, had

investigated the clinical application of 4-AP in MS.   (PF ¶¶ 101-104, 107-109).   But after

Schwid's disclosure of the failed Elan study, the only research reported with respect to 4-AP and

MS prior to the April 2004 effective filing date of the Acorda Patents was Acorda's MS-F201

study, which was the subject of the Goodman References.   (PF ¶ 118).   MS-F201 was "designed

as a preliminary dose-ranging study to assess safety and to explore potential outcome measures

for use in later trials."   (JTX-0080A at Methods; PF ¶¶ 119, 125).   Dr. Goodman explained that

this indicated that MS-F201 was "a methodologic study assessing endpoints, outcome measures"

for possible use "if [there] were to be another trial."   (Tr., Goodman, 480:8-481:3; *see also id.*, at

498:19-499:3; PF ¶ 125).[31]

### 4. An unbiased review of the literature published in 2003 confirmed the uncertain state of the art.

The 2003 Solari Review regarding published clinical research undertook to

"determine the efficacy and safety of aminopyridines for neurological deficits in MS people."

(PTX-0416 at 1).   The Review reported on studies published before July 2002 regarding the

potassium channel blockers 4-AP (referred to as "AP" in Solari) and 3,4-diaminopyridine

(referred to as "DAP" in Solari).   (PF ¶ 98; *see also* Tr., Goodman, 493:23-495:3).

On the basis of an analysis of randomized clinical trials, including the Van

Diemen II (PTX-0330) and Schwid (JTX-0104) references on which defendants rely, Solari

concluded that "[c]urrently available information allows no unbiased statement about safety or

efficacy of aminopyridines for treating MS symptoms."   (PTX-0416 at 1; PF ¶¶ 98, 133).   Solari

observed that "[t]his review cannot provide a reliable statement concerning the efficacy of AP or

DAP for treating symptoms of people with MS" and that "[a] conclusion on the safety of

---

[31]   In order to assess endpoints for use in future studies it was necessary, as the Goodman Poster states, to "[o]btain evidence of efficacy and dose-response using several outcome measures."   (JTX-0080A at AMPFH0007503).   Nonetheless, the study was not designed to establish efficacy.

[aminopyridine] preparations is even more problematic."   (PTX-0416 at 6; PF ¶ 25).   The

Review's synopsis stated:

> The safety and usefulness of potassium channel blocking drugs (AP and
> DAP) for various symptoms of multiple sclerosis are unclear. . . .
> Potassium blocking drugs (4-aminopyridine AP and 3, 4 diaminopyridine
> DAP) may be able to improve nerve function in nerves without enough
> myelin.  However, the review of trials found there is not enough evidence
> about the safety of these drugs or whether benefits are certain.

(PTX-0416 at 15; PF ¶ 98).

Dr. Goodman testified that a POSA in 2004 would have agreed with the Solari

Review's assessment of the art as not supporting a conclusion that 4-AP would be useful in

symptomatic treatment of MS.  (Tr., Goodman, 492:10-20; *see also id.* at 494:18-495:2).  In

particular, Dr. Goodman opined that a POSA would agree that while it "may be proven that the

potassium channel blocking drugs can improve nerve function . . . . it doesn't necessarily

translate . . . into whether . . . clinical benefits are certain because of the lack of evidence."  (*id.*

at 492:21-493:20).

Dr. Goodman also stated that a POSA would be "interested and indeed impressed

by the evidence-based, systematic, and independent review the Cochrane collaboration produces

and that a Cochrane Review would be "relevant to [a POSA] assessing the expectation of success

[of a particular] drug treatment."  (Tr., Goodman, 487:12-15, 565:5-14).  Dr. Goodman explained

that the Cochrane Collaboration sponsors Cochrane Reviews in an effort to carry out an

"unbiassed [sic.] independent expert review of various issues in medicine or about medical

treatments."  (*Id.*, at 487:2-7).  He described Cochrane Reviews as "rigorously done evidence-

based systematic review[s]."  (*Id.*, at 487:8).  Dr. Goodman opined that a POSA "fully aware of

the . . . variability in MS patients, the . . . propensity for placebo effect, and . . . the need to have,

for these reasons, among others . . . a more rigorous approach to assessing efficacy" would

realize that the selection criteria applied by the Solari Review, under which they considered only

randomized, placebo controlled clinical trials using clinical endpoints, would be "just the sort of standards one would need in order to make meaningful inferences about efficacy or safety." (Tr., Goodman, 489:18-490:2).[32]

      Defendants ignore the Solari Review's overall conclusion that "[c]urrently available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms." (PTX-0416 at 1; PF ¶¶ 98, 133). Defendants instead contend in error that the Solari Review "found that 4-AP significantly improved 'ambulation' (a synonym for walking) in MS patients." (Defs. Br. at 50). Quoting Dr. Peroutka, defendants assert that "[t]he improvement in walking discussed by Solari had a p-value of less . . . than 0.0001, which means that 'the odds of this is just a random finding as opposed to a real finding is one in 10,000'" and that Solari thus "'would teach a person of ordinary skill in the art not to focus on fatigue or cognition or even visual, but to focus on the two [aspects] that were highly significant, that is ambulation and motor strength.'" (Id.). Solari's calculation, however, was based on "[t]hree studies (54 patients) [that] assessed the efficacy of aminopyridines on ambulation, which was assessed with Ambulation Index [Bever 1994b, Bever 1996] or with timed gait . . . [Schwid 1997]." (PTX-0416 at 5). Defendants fail to point out that only two of the three studies included in Solari's discussion of "ambulation" were studies of 4-AP. (Bever III, which involved eight patients, and Schwid, which involved ten patients). The third study (referred to in Solari as "Bever 1996") was a study of 3,4-diaminopyridine – not 4-AP.[33] Thus, of the total of

---

[32]    The criteria applied by Solari et al. excluded Stefoski I, Stefoski II and Davis because they were nonrandomized and excluded Polman I because it was a "case series" – not the type of rigorous scientific evidence on which a POSA would rely in assessing drug treatment. (PTX-0416 at 9-10).

[33]    Solari identifies Bever 1996 as: Bever CT, Anderson PA, Leslie J, Panitch HS, Dhib-Jaibut, Jhan OA, et al. Treatment with oral 3,4 diaminopyridine improves leg strength in multiple sclerosis patients: Results of a randomized, double-blind, placebo controlled, crossover trial. Neurology 1996; 47(6): 1457-1462."

54 patients included in the pooled analysis that generated the 0.0001 p-value cited by defendants, only 18 received 4-AP.  Defendants' argument is therefore specious.

Moreover, the overall conclusion of the Solari Review, that "the safety and usefulness of potassium blocking drugs (AP and DAP) for various symptoms of multiple sclerosis are unclear," was reached after full consideration of these data on ambulation.  (PTX-0416 at 15).  The reasons given for rejecting the idea that the ambulation data represented a "real finding" laid out in the Review, including the problems of selective reporting, the small and disparate nature of the underlying studies and the fact that several different measures were evaluated in each study without allowing for the profound statistical impact of multiple comparisons.  (PF ¶ 99).  Considering that Solari combined both of the aminopyridines, any conclusion regarding specific effects of 4-aminopyridine would have been even less justified.

5.    **Unpublished data confirm the unpredictability of the art as of April 2004.**

The Solari Review stated that "publication bias remains a pervasive problem in this area."  (PTX-0416 at 1; PF ¶ 99).  The reviewers complained that certain unpublished randomized clinical trials were unavailable and that the currently available evidence on the efficacy of aminopyridines for treating symptoms of MS patients was therefore biased.  (PF ¶¶ 98-99, 133).  The unpublished data in evidence in this case confirms that publication bias in favor of successful studies existed in the literature as of April 2004 regarding the study of 4-AP in MS patients.

Acorda's unpublished data show failures of several measures that had appeared to be promising on the basis of prior reports of exploratory or methodologic studies that were not designed as efficacy studies.  For example, early successes on eye movement testing, as reported

in Van Diemen II, were not confirmed when Acorda tested eye movement in MS-F200, its first clinical study of 4-AP after taking over the development program from Elan. (PF ¶ 99).

Additionally, Dr. Cohen also stated, that the seeming promise of the timed walk measure reported in the Schwid quantitative methods study was not borne out by the MS-F201 study. (PF ¶ 92). A post hoc analysis converting time to walk to walking speed was required to achieve a statistically significant positive result. (*Id.*).

Moreover, as Dr. Cohen also stated, even when walking speed was then used as the prospectively defined endpoint in Acorda's MS-F202 study, the analysis failed to yield a statistically significant positive result. (PF ¶ 93). An innovative post hoc responder analysis (based on consistency, rather than magnitude of improvement) was required to establish a statistically significant outcome. (PF ¶ 93). However, as Drs. Lublin and Goodman testified, when the same post-hoc responder methodology applied by Acorda to analyze the data from the MS-F202 study was used by Sanofi-Aventis in an attempt to demonstrate that another potassium channel blocker – Nerispirdine – could improve walking, that effort failed. (PF ¶¶ 169-171).

In sum, in light of the complexity of MS, the toxicity of 4-AP, the difficulty of conducting and interpreting studies of MS patients using 4-AP, and the limited and inconsistent study results as of 2004, a POSA would not have had a reasonable expectation of success in improving walking with the dosing regimen claimed in the Acorda Patents.

### 6. The published prior art relied on by defendants did not provide a POSA with a reasonable expectation that 4-AP could be used to improve walking or increase walking speed.

The principal references relied on by defendants – the Elan '938 Patent, the Schwid reference, the Goodman references, and the Hayes references – disclosed only small exploratory or methodologic studies that were not designed as efficacy studies and would not have been viewed by a POSA as providing a reasonable expectation of success in using 4-AP to

improve walking or increase walking speed as claimed in the Acorda Patents, particularly when balanced against the failures and inconsistent results of other prior art studies. (PF ¶ 132). Those references are, in part, addressed above. Additional discussion of those references further demonstrating that they would not have supported a reasonable expectation that 4-AP could be used to improve walking or increase walking speed appears below in immediately following Point V.D in responding to defendants' arguments.

### D. Defendants' Obviousness Analysis Is Based on Impermissible Hindsight.

The defendants improperly apply hindsight in an effort to recast the state of the art as of April 2004, ignoring the challenges and unpredictability of developing a 4-AP treatment for MS and downplaying the failure of what was to that point the largest and most rigorous clinical trial using 4-AP in MS patients. Armed with the knowledge that the Acorda inventors ultimately succeeded in showing that the 10 mg twice daily dose of the Asserted Claims improves walking, defendants look backwards to mischaracterize the Acorda inventors' work as mere dose optimization, even though it was not previously known that 4-AP could safely and meaningfully improve walking at any dose. And, using the path actually followed by the inventors as a map, defendants argue that it would have been obvious to follow that path with a reasonable expectation of success. Both arguments fail.

### 1. The Acorda Patents did not merely narrow a previously established treatment using a known dose range.

Defendants make a futile attempt to shoehorn the facts of this case into the legal framework of formulation cases involving dose ranges, such as *Galderma Labs., L.P. v. Tolmar, Inc.,* 737 F.3d 731 (Fed. Cir. 2013) and *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 642 F.3d 1370 (Fed. Cir. 2011).

In *Galderma*, the claimed invention modified the concentration of adapalene -- an ingredient in a product approved by the FDA for treatment of acne -- from 0.1%, which had been thought to be the optimal concentration for the treatment of acne, to 0.3%. *Galderma*, 737 F.3d at 734. The prior art taught a range of 0.01% to 1%, which encompassed both the prior art commercial embodiment and the claimed invention. *Id.* at 736. "The sole dispute between the parties [was] whether it was obvious to use a 0.3% adapalene composition for the treatment of acne." *Id.* at 737.

The patentee in *Galderma* did not dispute that the prior art had disclosed that the claimed concentration of 0.3% would be effective to treat acne. The patentee's nonobviousness position relied on evidence showing that increasing the dose of adapalene likely increased the incidence of certain side effects and that 0.1% had been considered the optimal adapalene concentration for the treatment of acne. The Federal Circuit held, however, that because the prior art had already taught a range of adapalene concentrations safe and effective for treating acne and the claimed invention fell within that range, the burden of production fell upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) the invention produced new and unexpected results relative to the prior art; or (3) the existence of other pertinent secondary indicia of nonobviousness. *Galderma*, 737 F.3d at 737-38.

In *Tyco*, the claimed invention was a capsule containing a specified amount of temazepam. (One claim was directed to a composition containing a range of 6 to 8 mg, and another recited 7.5 mg.) *Tyco*, 642 F.3d at 1371. Pharmacological formulations of temazepam, including dosages containing 15 mg and 30 mg, had been approved and marketed for treatment of insomnia prior to the filing date of the patent. *Id.* "[T]he only limitation of the [asserted]

claims that was not fully disclosed by the prior art Restoril capsules [was] the lower dosage of temazepam," and the prior art taught "that a person of ordinary skill in the art could consider temazepam dosages between 5 mg and 15 mg to treat insomnia." *Id.*, at 1372, 1374.[34]

      *Galderma* and *Tyco* thus rest on previous case law, also cited by defendants, holding that "[a] *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003). The rationale for this rule, as pointed out by defendants themselves, is that "[t]he normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages." *Id.* at 1330.

      Here, though, unlike in *Galderma* and *Tyco*, there was no prior art teaching that *any* dose of 4-AP -- any single dose or any range of doses -- was safe and effective to improve walking or increase walking speed in MS patients. The Acorda inventors were not seeking to improve upon what was already a known process, and their invention was not the mere optimization of a known dose range. The invention of the Acorda Patents was the inventors' identification, for the first time, of a low, stable dose of sustained release 4-AP that could be safely and efficaciously used for a prolonged period to improve walking or increase walking speed in MS patients. Accordingly, the Asserted Claims of the Acorda Patents, unlike those at

---

[34]     A reference book published in the United Kingdom specifically directed physicians to use temazepam at a dosage between 5 and 15 mg for the treatment of insomnia in the elderly. *Tyco*, 642 F.3d at 1371. The Federal Circuit agreed that the British reference book provided no clinical or statistical evidence demonstrating that a dose within a range of 5-15 mg would work in treating insomnia, but noted that the claims at issue did not discuss the intended use of the capsules and thus did not address efficacy to treat insomnia. *Id.* at 1373. Thus, the "recommendation in the [British reference] of a range of temazepam dosages that include the [claimed] dosages" rendered obvious the claims to those dosages "even in the absence of documentation in the [British reference] of the effectiveness of such dosages." *Id.* at 1373-74. In this case, by contrast, efficacy to improve walking or increase walking speed is specifically addressed in the Asserted Claims. The Federal Circuit's rationale would, therefore, not apply.

issue in *Galderma* and *Tyco*, combine multiple elements, and are not addressed merely to a particular dose amount selected from a previously established range. *See Bayer Pharma AG v. Watson Labs, Inc.*, No. CV 12-1726-LPS, 2016 WL 3946916, at *32 (D. Del. July 18, 2016) (distinguishing Galderma as directed to a single element from a case in which "the skilled person . . . has to make at least five decisions to come up with a regimen"). Contrary to defendants' mischaracterization, the invention of the Acorda Patents was *not* merely a selection invention specifying a particular example of a previously demonstrated method of treating MS patients.

In their failed effort to analogize this case to *Galderma* and *Tyco*, defendants argue that the claims of the Acorda Patents merely narrow the scope of the '938 Patent to using sustained release 4-AP to treat a particular symptom of MS (impaired walking), using an optimized dose (10 mg twice daily) that has certain inherent pharmacokinetic results upon administration. (Defs. Br. at 38). Relying on the '938 Patent, the Schwid reference, the Goodman References, and the Hayes References, defendants assert incorrectly that the prior art expressly or inherently disclosed or suggested each of the limitations of the Asserted Claims of the Acorda Patents. In particular, they argue that "taken as a whole the Elan Patent, Schwid, and the Goodman References taught a POSA that 20-40 mg per day of sustained release 4-AP is a safe and effective dose range for improving walking speed in MS patients." (Defs. Br. at 41).[35]

When viewed from the perspective of a POSA as of April 2004, however, none of those references, alone or in combination with each other or any other prior art, demonstrated or even provided a reasonable expectation that any dose of 4-AP – much less the specific stable

---

[35]   Defendants cite "Tr. (Cohen) 306:6-8" as support for this statement, but the cited testimony by Dr. Cohen states only that he and coinventor Dr. Blight "tested Elan's 10 milligrams 4-AP product in phase two studies related to MS," and thus in no way supports defendants' erroneous contention that the prior art "taught that 20-40 mg per day of sustained release 4-AP is a safe and effective dose range for improving walking in MS patients."

dosing regimen claimed in the Acorda Patents -- could be successfully used to improve walking or increase walking speed in MS patients, especially in light of the prior art.

> ### a.   The '938 Patent[36]
>
> #### (1)   The '938 Patent does not teach treatment of MS symptoms.

Defendants inaccurately assert that the Acorda Patents simply narrow the Elan Patent to treating a known symptom of MS with a specific dose. (Defs. Br. at 5). Defendants contend that a POSA would have known from the '938 Patent that a sustained release formulation of 4-AP could be used to treat MS and would have had a reasonable expectation that administering such a formulation would result in the therapeutic efficacy claimed in the '938 Patent. (DF[37] ¶ 126). Defendants' argument fails, however, because the therapeutic efficacy taught in the '938 Patent – improving nerve conduction – is distinct from the symptomatic therapy of improving walking (or increasing walking speed) claimed in the Acorda Patents.

The '938 Patent focused on Elan's development of a sustained release formulation of 4-AP. The '938 Patent does not describe clinical testing of the disclosed formulations or provide any new clinical data regarding the use of 4-AP in MS patients. With respect to 4-AP, the patent references only the work by Davis and Stefoski, who had already published the 1987 Stefoski and the 1990 Davis papers. (PF ¶ 110). As discussed above, and as Drs. Fassihi, Lublin, and Goodman testified at trial, the Davis and Stefoski publications concerned small exploratory studies that verified 4-AP's ability to improve nerve conduction in MS patients, but did not show – they only suggested the possibility – that 4-AP could safely achieve a clinical benefit in terms of symptom relief for MS patients. (PF ¶¶ 102-105). Dr. Goodman explained that improving nerve conduction – as measured via VEP -- "is a demonstration of . . .

---

[36]   The '938 Patent is cited on the face of the '826, '437, '703, and '685 Patents.

[37]   Citations to "DF" refer to the Defendants' Proposed Findings of Fact, D.I. 263.

physiologic improvement that does not necessarily translate into any symptomatic improvement.

. . . [T]hat wouldn't necessarily translate into any clinical effect."  (Tr., Goodman, 445:10-24).

Dr. Goodman made clear that, contrary to defendants' characterizations, the work

of Davis and Stefoski cited in the '938 Patent did not constitute treatment of the clinical

manifestations of MS:

> [H]ere what we're talking about is experimentation.  These are early
> experiments exploring whether or not the types of physiologic effects that
> were seen in animal experiments and for that matter by others . . . in
> physiologic measures, could actually begin to show some translatable
> effect into clinical symptoms.  It is an early exploration of that.  And by no
> means [does] experimentation in these couple of dozen or more patients in
> my estimation constitut[e] a treatment of MS, much less an established
> treatment of MS.

(Tr., Goodman, 450:12-24).  Given that that the only clinical work with 4-AP described in the

'938 Patent is the work by Davis and Stefoski, Dr. Goodman concluded that the '938 Patent does

not teach treatment of any MS symptoms, much less improving walking.  (PF ¶ 110).  Rather, the

therapeutic benefit addressed in the '938 Patent is the physiologic effect of improving nerve

conduction.  (Id.).[38]

His view is consistent with the Solari Review regarding the use of aminopyridines

for symptomatic treatment of MS patients, which recognized the distinction between achieving

the physiologic effect of improving nerve conduction and the treatment of MS symptoms,

concluding that "[p]otassium blocking drugs ([4-AP and 3, 4 DAP]) may be able to improve

---

[38]     Defendants argue that if Davis and Stefoski do not teach using 4-AP to treat clinical
symptoms of MS (including gait), then the '938 Patent is invalid for lacking enablement
and written description under 35 U.S.C. § 112.  (Defs. Br. at 65-66).  They have not,
however, put forth any argument or evidence that the showing by Davis and Stefoski of
improved nerve conduction is not sufficient to support the Asserted Claims of the '938
Patent.  Their "alternative" § 112 argument therefore is without merit.  In any event,
defendants waived any § 112 argument.  During defendants' opening defendants' counsel
said that the defense would be addressed "if appropriate … in closing argument and post-
trial briefing."  (Tr., 8:8-12).  Counsel did not mention the issue again until his rebuttal
argument at closing.  (Tr.. 800 13-21).  As defendants' counsel acknowledged, the trial
"focus[ed] on issues of obviousness," not § 112.  (Tr., 8:12-13).

nerve function in nerves without enough myelin.  However, the review of trials found there is not enough evidence about the safety of these drugs or whether benefits are certain."  (PTX-0416 at 15; PF ¶ 98).

As set forth above, this Court's claim construction decision also recognized that the "therapeutic effect" that is the subject of the '938 Patent is distinct from the symptom relief that is the subject of the Acorda Patents.  (UF ¶ 43).

The fact that today, in light of Acorda's teaching that the improved nerve conduction caused by 4-AP can, in fact, improve walking in MS patients, someone practicing the Acorda Patent claims would be understood to infringe the '938 Patent claims does not make the inventions of the Acorda Patents selection inventions. The Acorda Patents teach and claim a symptomatic therapy that was not taught by the '938 Patent and would not have been obvious in light of the '938 Patent.  The inventions claimed in the Acorda Patents, all of which are directed to improving a specific MS symptom – walking impairment – are therefore not narrowing selections of the therapeutic effect taught in the '938 Patent.  Thus, the Acorda inventors actually *expanded* upon the teaching of the '938 Patent, extending the known physiologic effect of improving nerve conduction to achieving a clinical benefit not addressed in the '938 Patent and previously unknown in the art.

Moreover, the '938 Patent claims cover any MS treatment achieved by improving nerve conduction using a sustained release formulation of 4-AP of the claims.  They are therefore "so broad as to encompass a very large number of possible distinct" treatments, such that, even if erroneously viewed in terms of the range cases relied on by defendants, they are not sufficiently specific to shift the burden to plaintiffs. *Allergan,* 796 F.3d at 1305 (quoting *Peterson,* 315 F.3d

at 1330 n.1); *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics., Inc.*, 655 F.3d 1291, 1306 (Fed. Cir. 2011).

**(2)     The '938 Patent does not teach fixed/stable dosing.**

Defendants also wrongly characterize the fixed/stable dosing regimen claimed in the Acorda Patents as a narrowing of the '938 Patent.  Again, the coverage of the claims of the '938 Patent is not determinative of the obviousness inquiry.  For purposes of the obviousness analysis, the important point is that the '938 Patent neither discloses nor teaches a fixed/stable dosing regimen and would not afford a POSA a reasonable expectation of success in achieving improved walking using the dosing regimen claimed in the Acorda Patents.

As noted above, the only discussion of dosing in the specification of the '938 Patent (13:65-14:9) teaches an individualized titration dosing scheme, starting with a dose of less than 15 mg/day until a tolerable state is reached and then titrating up by 5 to 15 milligrams a day until a therapeutic dose is reached.  (PF ¶¶ 110, 143).  Although the scope of some of the '938 Patent's claims (including Asserted Claims 3 and 8) are not limited to administration of 4-AP using an individualized titration dosing scheme, the '938 Patent does not disclose any type of administration other than individualized upward titration.  (PF ¶¶ 110, 143).

**b.     Schwid[39]**

**(1)     Schwid does not teach efficacy of sustained release 4-AP to improve walking or increase walking speed.**

Defendants argue that "building on the Elan patent, Schwid narrowed the relevant therapeutic dose of 4-AP to a stable dose of 17.5 mg twice-daily, and also focused a POSA on using that dose to improve walking."  (Defs. Br. at 39).  As Dr. Goodman explained, however, a POSA would not understand the Schwid study to support a reasonable expectation of success that sustained release 4-AP could be used to improve walking at any dose.

---

[39]     Schwid is cited on the face of the '826, '437, '703, and '685 Patents.

Schwid reported on a small 10-patient, methodological study conducted and published in the wake of the failure of Elan's 161-patient study of 4-AP in MS. (PF ¶ 113). Schwid disclosed that the large-scale Elan study of the effect of 4-AP as measured by the EDSS had been "unable to establish clinical efficacy." (JTX-0104 at 817; PF ¶ 100). Notwithstanding that EDSS was a well-established measure that was regularly used in MS trials, Schwid theorized that the "EDSS . . . may have been an inadequate outcome variable for this trial." (JTX-0104 at 817) The Schwid pilot study was thus "planned to assess the effect of 4-AP SR on more sensitive, quantitative measures of function in MS." (*Id.*).

Dr. Goodman, co-author of Schwid, described the Schwid study as "a methodological study to pilot or test different outcome measures." (Tr., Goodman, 469:24-470:1). He testified that the study would not provide the basis for any conclusion regarding efficacy of 4-AP on any of the measures that were tested because "[i]t was an exploration of tests. It was a test of tests to see which tests might be more sensitive and might be useful in future trials in comparison to EDSS, which failed to show an effect." (*Id.*, at 473:3-9; s*ee also*, *id.*, at 499:4-14 (Schwid was a "methodologic[al] study testing the usefulness of the variety of . . . quantitative functional measures that we looked at . . . testing the tests.); *id.*, at 502:7-10 (Schwid, a "test of tests[,] tried to understand whether or not there would be any, any inkling of an efficacy signal at that particular dose."); PF ¶ 113).

Schwid thus tested seven outcome measures that were thought to be more sensitive than EDSS. Schwid found no statistically significant improvement in six of those seven measures. (PF ¶ 114). Schwid did report that one of those outcomes – "timed gait" –

showed improvement on 4-AP as compared to placebo in nine of ten subjects (p=0.02).  (*Id.*).[40] However, that lone positive outcome among many failures would not be relied on by a POSA as a teaching of efficacy.  As noted above, according to Dr. Goodman, the Schwid study's use of multiple outcome measures would impact the statistical interpretation of the study because "if one were considering this an efficacy study, which it was not, . . . then one would need to account for the multiple comparisons" by multiplying the p-value by the number of outcomes.  (Tr., Goodman, 471:24-472:14; PF ¶ 114).  Even with respect to the timed gait measure, the p-value, in light of six failed measures, would be 0.14 (14%), not 0.02 (2%).  (PF ¶ 114).  The Schwid reference called for further studies to establish efficacy of 4-AP: "In addition to establishing efficacy in larger trials, future studies of 4AP SR will need to examine long-term efficacy and tolerability as well as further refine dosing regimens to optimize delivery despite a relatively narrow therapeutic window."  (JTX-0104 at 820; PF ¶ 116).

Defendants incorrectly state that Solari "reported that Schwid showed statistically significant improved walking in MS patients with 17.5 mg 4-AP twice a day over a placebo with a p<0.0001, meaning that the 'odds this is just a random finding as opposed to a real finding is one in 10,000'"  (Defs. Br. at 39 (quoting Tr., Peroutka, 698:20-21; PTX-0416 at 5)).  In fact, the cited passage from Solari states:

> Three studies (54 patients) assessed the efficacy of aminopyridines on ambulation, which was assessed with the Ambulation Index [Bever 1994b, Bever 1996] or with timed gait . . . [Schwid 1997].  *Overall*, 9 patients (17%) improved in ambulation during study treatment versus none during placebo (p<0.0001).

(PTX-0416 at 5) (emphasis added).  Plainly, contrary to defendants' misrepresentation, the passage is addressing the overall result of the three studies (nine out of 54 is 17%), not the nine

---

[40]    Schwid's report of improvement on timed gait contrasted with Bever III, which observed no benefit in ambulation index (AI), a clinical tool which uses a timed walk test to measure ambulation.  (PF ¶ 109).

patients reported as improved in Schwid.  And, significantly, as pointed out above, only two of the three studies included in Solari's p-value calculation for "ambulation" (Bever III, which involved 8 patients, and Schwid, which involved 10 patients) were studies of 4-AP.  The third study (referred to in Solari as "Bever 1996") was a study of 3,4-diaminopyridine – not 4-AP. Thus, of the total of 54 patients included in the statistical analysis that generated the 0.0001 p-value cited by defendants, only 18 received 4-AP.  Moreover, a POSA would have seen Schwid's one positive result standing in sharp contrast to Bever III, similarly a small (eight patient) study testing ambulation using a measure other than EDSS.

### (2) Schwid suggests trying higher doses than the 10 mg twice daily dose claimed in the Acorda Patents.

Schwid, as mentioned above, disclosed administration of 35 mg/day (17.5 mg bid) – a dose that was 75% higher[41] than the 10 mg bid dose claimed in the Acorda Patents -- to just ten patients for a period of only one week (a period significantly shorter than the at least two week period recited in most of the Asserted Claims).  (PF ¶ 113).  Dr. Goodman testified that the design of the study would "specifically not" "permit any conclusion about administering for a period of more than one week."  (Tr., Goodman, 471:3-6).

Moreover, as discussed above, to the extent that one could make inferences from Schwid about efficacy, it "would teach that one needed to target . . . levels higher than 60 nanograms per ml if one were going to be able to detect an efficacy signal using this type of methodology."  (Tr., Goodman, 474:1-7; *see also id.*, at 508:10-16; PF ¶ 115).  Significantly, as Dr. Peroutka admitted, the Hayes III reference on which defendants rely teaches that a dose higher than 25 mg BID – well above the 10 mg BID dose of the Acorda Patent Claims -- would be required to sustain an average serum level of 60 ng/ml.  (PF ¶ 144).  Defendants ignore

---

[41]     Defendants wrongly characterize this 75% difference as "slight."  (Defs. Br. at 6).

Schwid's suggestion to pursue higher doses, although the Federal Circuit has admonished that a reference must be "considered for all it taught," including "disclosures that diverged and taught away from the invention at hand." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 (Fed. Cir.1985).

c.      **The Goodman References**[42]

Defendants mischaracterize the Goodman References as effectively answering the question of whether and how to use 4-AP to improve walking in MS patients.   In particular, defendants assert that the Goodman References show the effectiveness of each (*i.e.,* any/all) of the doses within the range of 20 to 40 mg/day of sustained release 4-AP to increase walking speed.   However, defendants improperly ignore the failures and inconsistent results in the prior art as well as the details of the Goodman References themselves.

A POSA would have viewed the Goodman References in the context of the prior art's history of (i) small exploratory studies, some of which appeared to find evidence of improvement (*e.g*., Schwid) and some of which did not (e.g. Bever III (JTX-0028) which tested ambulation); (ii) the failure of the large Elan study; and (iii) the objective evaluation of the prior art reflected in the Solari Review, which determined that there was insufficient data to conclude that 4-AP could be used to treat walking or other symptoms of MS.   Moreover, in viewing the Goodman References, a POSA would have focused on the totality of the information provided, not only the positive statements as defendants would have it.   A POSA would have understood that the being reported study was not designed to establish efficacy.   Rather, as the Goodman Poster (JTX-0080A) stated, the study was designed as a preliminary dose-ranging study to assess safety and to explore potential outcome measures for use in later trials.   (PF ¶ 125).   The reported

---

[42]      Goodman I and Goodman II are cited on the face of the '826, '437, '703, and '685 Patents.   The Goodman Poster is cited on the face of the '437 and '703 Patents.

finding of a statistically significant improvement in walking speed was obtained only by aggregating the results of a wide range of doses and said nothing about the effect of any particular dose.  In any event, even as to walking speed there was no finding of statistical significance if one took account of the fact that walking speed was just one of multiple endpoints measured in the study.

Furthermore, a POSA would have recognized that the reported data on walking speed was distinct from the dose-response curve regarding timed walk that is depicted on the Goodman Poster.  The dose-response curve included no placebo group data and merely reflected a change in walk time as the dose changed from week to week.  A POSA would have understood that any consideration of efficacy at individual doses would have required consideration of changes occurring in the placebo group.  To the extent there was any teaching about dose, it was to follow the art's standard of escalating to higher doses.

In addition, as mentioned above, the Goodman references underscored the continuing concern about 4-AP potentially causing seizures in MS patients.  As also noted earlier, the study's failure to find improvement as to fatigue further illustrated the inconsistent outcomes of clinical trials of 4-AP in MS patients.

### (1) The MS-F201 study reported in the Goodman references was not designed as an efficacy study.

Acorda's MS-F201 study was not designed to establish efficacy.  (PF ¶¶ 118, 121, 124-125).  It was small, involving twenty-five MS patients[43] who were randomized to receive 4-AP and eleven  who were randomized to receive placebo.  It was primarily a safety study, and to the extent it focused on efficacy, was a methodological study designed to look for some evidence of effect on multiple endpoints which could be used in future trials.  (*Id.*).  As Dr. Goodman

---

[43]     Only 20 patients completed the study.

explained, "it was designed as . . . a methodologic exploration of the sensitivity and usefulness of the outcome measures that we were studying.  It was not an efficacy study."  (Tr., Goodman, 498:21-499:3; PF ¶ 118).[44]

> ### (2) The statistical significance values reported in the Goodman references were not adjusted for the study's use of multiple outcomes.

Recognizing the nature and design of the MS-F201 study as reported in the Goodman References, a POSA would have given little weight to the disclosure in the Goodman References that the "fampridine-SR group showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01)."  (JTX-0061; JTX-0062 at S117; JTX-0080A at Abstract; *see also id.* at Results Summary; PF ¶ 122).  The Goodman References make clear that multiple endpoints were evaluated, yet Dr. Goodman testified that because the MS-F201 study "wasn't an efficacy study, a POSA would not expect to see and there was no mention of corrections for multiple comparisons with . . .  multiple endpoints that were used because it was a methodologic[al] study."  (Tr., Goodman, 477: 5-12, 501:20-502:6; PF ¶ 122).  As Dr. Goodman explained in the context of the Schwid reference, in order to assess efficacy one would need to account for the multiple outcome measures by multiplying the p-value reported for a single measure by the number of different outcome measures that were employed in order to determine the true statistical likelihood that the result could occur by chance alone.  (PF ¶ 114).

A POSA would have known from the Goodman Poster that at least four outcome measures were tested – "[t]imed 25 [f]oot [w]alk . . . , manual muscle testing [LEMMT] . . . ,and

---

[44]    Dr. Goodman also pointed out that the Goodman references do not "have the same weight as a peer review[ed] journal . . . publication" because the abstracts were merely "printed in the meeting announcements and the poster was not an enduring publication, it is an evanescent presentation at a meeting."  (Tr., Goodman, 557:3-13).

patient self-reports of fatigue (using several validated subjective fatigue scales)." (JTX-0080A at Methods; PF ¶ 125).[45]   A POSA would therefore have recognized the need to multiply the reported p=0.04 value for walking speed by at least four, yielding a value of at best p = 0.16. That adjusted p-value would no longer qualify as "statistically significant" because it would no longer represent a less than 5% possibility that the results were a matter of chance.   Thus a POSA reading of the statistical significance reported in the Goodman References would have recognized, as did the Solari Review, the "distinct possibility of false positive findings" in studies that employ multiple outcomes without specifying a primary endpoint at the outset. (PTX-0416 at 5; PF ¶¶ 99, 122, 139).

### (3)   The Goodman references provide no dose-specific information about the performance of sustained release 4-AP versus placebo.

Besides giving little weight to the statistical significance values reported in the Goodman References, a POSA would have recognized from the Goodman References that the study design that MS-F201 provided no dose-specific information regarding the performance of 4-AP versus placebo.   The study used an escalating dose protocol according to which each patient received gradually increasing doses each week, beginning with 10 mg BID during the first week going up to 40 mg BID during the seventh week.   The "significant improvement" for the 4-AP group versus placebo reported in the Goodman References was for the 4-AP treated group, across the entire period of treatment, including all seven doses, ranging from 20 to 80 mg/day (10-40 mg bid per day).   (PF ¶ 127).   The aggregate nature of the reported results versus placebo was reflected  by the Goodman Poster, which indicated that the cited p-values reported in the Results Summary were derived from a repeated measures ANOVA analysis of variance

---

[45]     As detailed earlier, Dr. Cohen testified that "quite a few" outcome measures were used in the MS-F201 study.  (Tr., Cohen, 289:12-22).

based on weeks 1 through 7, implying "an aggregated assessment of all the doses across weeks 1 through 7 and not an assessment as to any one dose in particular." (*Id.*). In other words, the analysis that yielded "statistical significance" combined all seven weekly measurements together; it did not separately consider the patients' performance on individual doses administered each week. It therefore does not suggest statistical significance for any or all of the individual doses. A POSA would therefore have recognized that no conclusion could be drawn about the performance of any particular dose versus placebo.

Defendants rely heavily on the Goodman Poster's statement that there was "[e]vidence of dose response in the 20-40 mg/day range"[46] and on the curve depicted on the Poster entitled "Dose Response 25 ft. Walk." (JTX-0080A at Results, Conclusions). As Dr. Goodman explained, however, the term "dose response" refers to the relative relationship among different doses: A "dose response curve is looking at a series of increasing or decreasing doses, and assessing the effects seen at the different dose levels, one relative to the other to see whether or not there is a pattern of a correlation between, let's say, increasing a dose and increasing a response, or the opposite, increasing and perhaps increasing tolerability. . . [It says] nothing about the particular dose in this situation." (Tr., Goodman, 477:21-478:12).

The dose response curve depicted on the Goodman Poster plots data only for test subjects who received 4-AP; the curve provides no data for the placebo group. No information is provided in the graph or anywhere else in any of the Goodman References about how the "response" at any of the doses tested compared to the placebo group. Absent information about the performance of the placebo group, a POSA, aware of the recognized placebo effect in MS

---

[46]     The poster elsewhere, as in Goodman I and Goodman II, reports "20 to 50 mg" (as opposed to 40 mg) range. (*See* JTX-0061; JTX-0062 at S117; JTX-0080A at Results Summary).

trials generally and in 4-AP trials in particular (as discussed above), would not have understood the dose response curve in the Goodman Poster to teach efficacy at any dose. (PF ¶ 129). A POSA would have appreciated that without placebo control data, the placebo group could have performed as well as or better than the subjects who received 4-AP at any or all individual doses.

The Goodman Poster itself made clear that there was a strong placebo effect in the very trial it was reporting. The placebo group actually performed better than drug treatment group with respect to the effect on fatigue. (PF ¶ 130). The Goodman Poster bar graphs showing change in walking speed also show that "a number of people got better on placebo." (Tr., Goodman, 483:23-484:1). In fact, as mentioned above, Dr. Cohen testified that at week seven of the MS-F201 study the placebo group performed better than the 4-AP group performed at any of the seven weeks of the study and, head-to-head, placebo performed better than the 10 mg 4-AP dose in three of the seven testing visits. (PF ¶ 92). Although this particular information was not published at the time, it illustrates the strong potential for placebo to perform as well or better than 4-AP treatment that was known to a POSA. And a POSA would have read the Goodman References with that understanding.

Defendants misleadingly conflate the data reported in the dose response curve in the Goodman Poster and the mention in the Goodman References of "statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04)[.]" (Defs. Br. at 41 n.5). Defendants would have the Court conclude that the finding of "statistically significant improvement from baseline compared to placebo" relates to the "dose response" observed in the 20-40 mg/day range. As explained above, however, the reported "statistically significant improvement" versus placebo refers to the performance of the 4-AP-treated patients over the entire seven week treatment period – i.e., over

the *entire* dose range of 20-80 mg/day, administered to each patient according to an escalating dosing regimen over the course of the study. The dose response curve, on the other hand, reports data regarding patients' performance on individual doses of 4-AP (i.e., each week), relative to each other, *not* versus placebo group data.

Moreover, the report of "statistically significant improvement" relates to a different measure than the data reported in the dose response curve. The dose response curve plots data regarding "time (secs)" (i.e., the number of seconds a subject took to walk 25 feet), whereas the report of "statistically significant improvement" related to "walking speed," which Dr. Goodman explained is a distinct variable that is derived from the same timed walk test, but behaves differently from a mathematical perspective. (Tr., Goodman, 502:22-503:1; *see also id.*, at 484:2-7 (noting that dose response curve depicts "time in seconds" "not the speed")).[47]

Thus, defendants' suggestions that mentions of statistically significant improvement in the Goodman References were based on the dose response curve are wrong. Defendants' statement, for example, that the Goodman References "conclude that there was '[e]vidence of dose response in [the] 20-40 mg/day range' (i.e., 10-20 mg twice daily) *leading to* a '[s]ignificant benefit on timed walking'" (Defs. Br. at 6-7 (emphasis added)) is unfounded. Likewise, defendants' statement that "Dr. Goodman 'found' evidence of efficacy (i.e., a 'dose response') in the '20-40 mg/day range' for walking but not for fatigue  – *that is* a '[s]ignificant benefit on timed walking' in MS patients" ((*Id.*, at 41 (emphasis added))  is spurious.[48] Defendants' characterization of the dose-response chart as data "underlying" the report in the

---

[47]   Dr. Cohen explained that in the MS-F201 study the results of "timed walk" were "not at all significant," but that a post hoc analysis "according to speed as opposed to time" "showed a statistically significant difference between the drug and placebo group." (Tr., Cohen, 289:23-290:17, 292:2-10; PF ¶ 92).

[48]   Defendants cite "Tr. (Cohen) 304:3-15, 305:25-306:5" as support for this statement (Defs. Br. at 41), but the cited testimony has nothing whatsoever to do with the Goodman references or the underlying MS-F201 study.

Goodman References that "'[t]he fampridine-SR group showed statistically significant improvement from baseline compared to placebo'" is also incorrect.  (*Id.* (emphasis added)).  Similarly, defendants' assertion that Dr. Goodman reported that "'[e]vidence of dose-response in 20-40 mg/day range [which includes 10 mg BID]' *shows* '[s]ignificant benefit on timed walking'" (*id.* (emphasis added)) mischaracterizes the Goodman Poster.  Dr. Goodman's report of "significant benefit on timed walking" is independent of his report of a "dose response in the 20-40 mg/day range."

Defendants also state that "Acorda reported publicly in December 2003 . . . that 4-AP clinical studies by that time 'demonstrated improved walking ability' in MS patients," suggesting that the statement regards Dr. Goodman's findings reported in the Goodman Poster. (Defs. Br. at 51-52).  In fact, the website refers to "six clinical trials for MS" with Fampridine-SR and merely states that "[p]articipants in MS studies demonstrated improved walking ability and lower leg strength."  (DTX-0584 at 1; PF ¶ 137 n.19).  The statement is not linked specifically to the Goodman references; nor does it specify the dosing protocol used in any particular trial in which participants demonstrated improvement or the significance of those improvements.  (PF ¶ 137 n.19).  Contrary to defendants' characterization of the statement as reporting that "clinical studies" (as opposed to individual participants) "demonstrated improved walking," it expressly states that "[as] Fampridine –SR is an experimental drug, safety and efficacy have not been fully determined."  (DTX-0584 at 1).

### (4)    To the extent the Goodman references teach anything about dose, they suggest higher doses are more efficacious than lower doses.

The only information communicated by the dose response curve in the Goodman Poster is that, to the extent an effect was observed in patients administered 4-AP without comparison to placebo group data, the effect appeared to be greater at the higher doses within the

range of 20-40 [or 20-50].  (PF ¶ 129).  Thus, as explained by Dr. Goodman, if one were to infer anything from the "increasing benefit . . . in the 20-50 mg/day range" reported in the Goodman References and depicted in the dose response curve on the Goodman Poster, the implication for future studies could be "that one would either try to titrate upward or target the higher doses, because the dose response implies that you could do better with higher doses."  (Tr., Goodman 478:13-22; PF ¶ 129).  Dr. Goodman warned that in the absence of placebo group data "[o]ne can't get much efficacy inference out of it.  But to the extent one tries to eke out some efficacy inference, . . . the implication of the dose response across a range is in this case that the higher end of the range gets more efficacy than the lower end of the range."  (Tr., Goodman, 533:12-534:1).  Dr. Peroutka admitted that the curve shows that 40 mg/day appeared to yield to more improvement than did 20 mg/day.  (Tr., Peroutka, 136:24-137:7).  Thus, to the extent the "dose response" reported in the Goodman references taught anything regarding specific doses, it suggested using higher doses, consistent with the prior art.

### d.    The Hayes References

Finally, defendants cite Hayes I and III (JTX-0068; JTX-0069) as teaching the pharmacokinetic parameters of the Acorda Patent claims.  (Defs'. Br. at 42-43).

Defendants have made no showing, though, that the pharmacokinetic parameters recited in the Asserted Claims would *necessarily* – and therefore inherently – be met by every sustained release 4-AP formulation administered at 10 mg twice daily.  While plaintiffs do not dispute that the Hayes references disclose that the Elan sustained release formulation used in the spinal cord injury studies reported in those references when dosed at 10 mg BID yielded pharmacokinetic values that fall within the scope of the Acorda Patent claims (or that Ampyra would do so), defendants put forward no evidence that every sustained release formulation administered at 10 mg BID would achieve the claimed pharmacokinetic values.

71

More importantly, as Dr. Goodman testified, the Hayes References provide no link between those pharmacokinetic parameters and improving walking or increasing walking speed as required by every claim in the Acorda Patents.  (PF ¶ 154).  Defendants "conflate the difference between PK data and dose-efficacy results."  *Avanir*, 36 F. Supp 3d at 501.  Hayes I and III provide no basis whatsoever to expect that the pharmacokinetic parameters of the claims would lead to improved walking or increased walking speed in MS patients. (Tr., Goodman, 463:11-465:2).  *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1071 (Fed. Cir. 2012) ("The fact that a skilled artisan could have predicted a particular blood plasma concentration, however, does not mean that such knowledge would have provided a skilled artisan a reasonable expectation of success in calculating a blood plasma concentration that was therapeutically effective.").

In sum, the references relied on by defendants do not support their contention that the Asserted Claims "merely narrow the scope of the Elan patent . . . to treating a particular MS symptom . . . with an optimized dose . . .  that has certain inherent pharmacokinetic results upon administration."  (Defs. Br. at 38).  Defendants have thus failed to establish a *prima facie* case of obviousness and thereby to shift any burden to plaintiffs.

## 2.     Defendants' Obvious To Try Argument Fails

Defendants argue that the treatments claimed in the Acorda Patents were "at least obvious to try, with a reasonable expectation of success."  (Defs. Br. at 44).  Defendants make this argument with respect to the claimed dosage amount of 10 mg twice daily to improve walking, with respect to the limitations requiring a stable dose for more than two weeks, and with respect to the claimed pharmacokinetic values.  As to each of the limitations, when viewed as required in the context of the claims "as a whole," defendants' argument fails. *See Avanir*, 36 F. Supp. 3d at 499.

        a.      **The 10 mg BID stable dose was not obvious to try, with a reasonable expectation of success.**

Defendants "obvious to try theory" is premised on the unsubstantiated proposition that "the prior art – particularly, the Elan patent, Schwid, and the Goodman References – taught that sustained release 4-AP could safely be used to improve walking speed in MS patients when taken in a dose range of 10-20 mg, twice daily." (Defs. Br. at 45). As demonstrated above, none of those references, alone or in combination, taught that a dose range of 10-20 mg sustained release 4-AP administered BID could improve walking in MS patients. Moreover, as also demonstrated above, in view of the complexity of MS, the difficulty of conducting and interpreting studies of MS patients using 4-AP, and the limited and inconsistent study results as of 2004, a POSA would not have had a reasonable expectation of success in improving walking with the dosing regimen claimed in the Acorda Patents. "It is not sufficient to merely assert an 'obvious-to-try theory,' especially where, as here, the relevant art is littered with a history of inconsistent clinical trial results . . . ." *Sanofi v. Glenmark Pharm. Inc., USA*, No. CV 14-264-RGA, 2016 WL 4569680, at *22 (D. Del. Aug. 31, 2016) (in view of decades of erratic results in trials involving antiarrhythmic drugs, POSA may have been motivated to try using claimed drug to reduce cardiovascular hospitalizations and hospitalization for atrial fibrillation but would not have had reasonable expectation of success).

Defendants wrongly assert that "[p]laintiffs' own witnesses agreed that the clinical study results reported in the Goodman References would have motivated a POSA to conduct further testing within the 10-20 mg range." (Defs. Br. at 45). The testimony of Drs. Cohen and Goodman that defendants cite was not about results reported in the Goodman references, but was rather about the complete results of the underlying MS-F201 study itself, with which both Drs. Cohen and Goodman were fully knowledgeable, but which were reported

only partially and in summary fashion in the Goodman references.  (Tr., Goodman, 560:25-561:6

(the report in the abstract and poster was "necessarily a partial highlighted report of the

methodologic study"), *see also* 526:12-20 ("So what is in the abstracts or what is on the poster is

not equivalent to 201.  It's about 201 but it is not equivalent to 201."), 528:18-529:3 ("So you are

going back and forth between what is on . . . the presentation and what is the 201 study. . . .

[T]hese are just summaries.  This is just abstractions.")).

     Furthermore, defendants distort Dr. Goodman's testimony, quoting separate

statements in reverse order without the ellipses necessary to show omitted testimony.   Citing

"(Tr. (Goodman) 529:4-9, 530:5-9.)," defendants quote Dr. Goodman as follows:

> Q:  [I]f there were to be further studies [after the 201 study], what you are
> teaching in the two boxes on DDX-5-5 is that the dose range for future
> studies would be 20 to 40 milligrams per day; right?
>
> A:  As a range, yes.
>
> Q:  Well, just so I'm clear. 20 to 40 milligrams per day in the Goodman
> presentation refers to three doses, 10, 15, and 20 milligrams, of 4-AP
> sustained release taken twice daily; right?
>
> A:  In the dosing scheme that we used in the escalating dosing scheme that
> we used in this study, yes.

Dr. Goodman's actual testimony, however, reads as follows (italicized text omitted by

defendants):

> Q.  Well, just so I'm clear. 20 to 40 milligrams per day in the Goodman
> presentation refers to three doses, 10, 15,and 20 milligrams, of 4-AP
> sustained release taken twice daily; right?
>
> A.  In the dosing scheme that we used in the escalating dosing scheme that
> we used in this study, yes.

\* \* \*

> Q.  *So, in other words, the Goodman presentation teaches that the range
> for further testing would be the 20 to 40 milligram per day range; right?*
>
> A.   *To the extent that it teaches anything. As I have said, this is a
> methodologic study, not an efficacy study, so we're getting hints and
> suggestions, and that is what we get out of this type of study.*
>
> Q.  Okay. But if there were to be further studies, what you are teaching in
> the two boxes on DDX-5-5 is that the dose range for future studies would
> be 20 to 40 milligrams per day; right?

A.  As a range, yes.

(Tr., Goodman, 529:4-530:9).

Defendants also falsely state that Dr. Goodman "conceded (after being impeached

with deposition testimony) that a POSA would have been motivated to conduct further testing,"

quoting the trial transcript at 559:20-25 (Defs. Br. at 46), without providing the context of the

actual testimony, which was as follows (italicized text omitted by defendants):

> Q.  *And a person of ordinary skill in the art in December 2003 would have been motivated based on the 201 study to design a study along the lines of what became the 202 study, right?*
>
> A.  *So, no. Because a person of ordinary skill in the art wouldn't have had the results of the 201 study beyond what was demonstrated in what's called Goodman in this case.*
>
> Q.  *Let's play your deposition 179, lines 17 to 23.*
>
> "Question:  And so would a person of ordinary skill in the art in December 2003 be motivated based on the 201 study to design a study along the lines of what became the 202 study.
>
> "Answer:  Well, I mean, the historical truth is that we did, so yes.
>
> *Was that your testimony, sir?*
>
> A.  *Yeah. So this is my testimony.*
>
> Q.  *That's all I asked. Was this your testimony?*
>
> A.  *Yes, of course.*

(Tr., Goodman, 559:12-560:4).   Plainly, Dr. Goodman "conceded" only that the testimony

quoted by defendants was his testimony at the deposition – *not* that a POSA would have been

motivated to conduct further testing, as asserted by defendants.  Dr. Goodman clarified at trial

that at his deposition he "was talking about what [he] knew about the 201 study in its entirety,

not just what was in the presentation or the abstract[]" based "[o]n [his] personal knowledge

being the lead investigator of that study" and his collaboration "[w]ith the inventors of the

patents in question Cohen and Blight."  (Tr., Goodman, 561:7-23).

Defendants' reliance on the testimony of Drs. Cohen and Goodman therefore runs

afoul of the Supreme Court's admonition that "neither the particular motivation nor the avowed

purpose of the patentee controls."  *KSR*, 550 U.S. at 419; *see also Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.  What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art."); *AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*, No. 10-CV-1835 JAP TJB, 2012 WL 1065458 at *45-46 (D.N.J. Mar. 29, 2012), *aff'd*, 498 F. App'x 999 (Fed. Cir. 2013) ("information regarding the subjective motivations of inventors is not material" to obviousness analysis (citation omitted)).

Moreover, while defendants rely on Dr. Cohen's and Dr. Goodman's personal motivation based on "hints and suggestions" (Tr., Goodman, 529:23-530:4) from the "hypothesis-generating" (Tr., Cohen 312:11-21) MS-F201 study to try doses within the range of 20-40 mg/day in their next study, defendants ignore the results of the next study (MS-F202).  That study actually failed (on all three of the doses tested – 10, 15 and 20 mg BID) when analyzed using the walking speed analysis that had yielded the "statistically significant improvement" reported in the Goodman References.  (PF ¶ 93).  An innovative post hoc "responder analysis" was required to reveal the statistically significant improvement found in the MS-F202 study.  (PF ¶ 94; Tr., Goodman, 515:6-25; *see also* '437 Patent, col. 24:21-28).  The failure of the preplanned analysis of the MS-F202 trial also betrays as classic hindsight defendants' argument that the clinical data in the Ampyra label "confirms data from the Goodman References."  (Defs. Br. at 54).  Now, knowing that the Acorda inventors' post hoc responder analysis demonstrated that the claimed dosing regimen increases walking, defendants merely cherry-pick data from the label that is consistent with data in the Goodman Poster, ignoring the inventors' intervening failure.

76

   b.      There were many options that a POSA could have pursued.

Defendants' obvious to try theory also fails because such a theory can succeed only where "there are a finite number of identified, predictable solutions.'" *KSR*, 550 U.S. at 421; *see also Cyclobenzaprine*, 676 F.3d at 1072 ("Evidence of obviousness, especially when . . . proffered in support of an 'obvious to try' theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention." (quoting *Ortho-McNeil Pharm., Inc.*, 520 F.3d at 1364)).  Defendants posit that there are only four doses to choose from within the 10-20 mg BID (i.e., 20-40 mg/day) range – namely the 10, 15, 17.5 or 20 mg sustained release 4-AP that defendants wrongly contend "demonstrated both safety and efficacy in improving walking in MS patients."  (Defs. Br. at 45).  Dr. Goodman testified on cross-examination, however, that, even within that range, "there were a number of possibilities," including not only the 17.5 mg BID dose tested in Schwid, but also 22.5 or 37.5 or 12.5, "all kinds of doses that could have been chosen by somebody.  It's a range." (Tr., Goodman 551:20-552:7; 557:14-559:4).

Tellingly, when asked "if the person of skill in the art chose to test at least the 10 milligram twice daily dose that would be a reasonable next step; right?"  Dr. Goodman testified: "If you mean reasonable with [a] reasonable expectation of success, I don't think, and I didn't think at the time, that that would have been a smart thing to do."  (Tr., Goodman, 558:23-559:4).  Dr. Goodman explained that the 10 mg twice daily dose was merely "[o]ne among many steps that could have been chosen."  (Tr., Goodman, 558:7-559:11).

Moreover, the many choices facing a POSA were not limited to the dosage amount.  A POSA also had to choose what dosage scheme to use.  Dr. Goodman testified that, including in view of the Goodman references, a "POSA could look at the entirety of the art and

still believe that there was a desire to increase, escalate, titrate doses toward higher levels," noting that he knew of no reason "that a POSA, in 2004, based on all the art, would have come to the conclusion that a stable dose of anything had a reasonable expectation of success or would even be worth testing." (Tr., Goodman 552:14-25).

Thus, this is not a case "[w]here a skilled artisan merely pursues 'known options' from 'a finite number of identified, predictable solutions' . . . ." *Cyclobenzaprine*, 676 F.3d at 1070. Rather, this is a case where "defendant[s] urge[] an obviousness finding by merely throw[ing] metaphorical darts at a board in hopes of arriving at a successful result, but 'the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful,' [in which] courts should reject 'hindsight claims of obviousness.'" *Id.* at 1070-71.

### 3. The Limitations Requiring Stable Dosing for More Than Two Weeks Support the Nonobviousness of the Claims.

No prior art reference cited by defendants shows the administration of any stable dose of 4-AP – much less a stable dose of 10 mg BID – for more than a single week. Nonetheless, defendants wrongly argue, quoting Dr. Peroutka, that "[h]ere, based on the prior art, a POSA would have a reasonable expectation that 10 mg sustained release 4-AP, taken twice daily, would be safe and effective when used for more than two weeks, because 'there is no evidence . . . in the prior art that ever suggested that you couldn't use this drug [4-AP] chronically.'" (Defs. Br. at 47). While defendants acknowledge that "the testing described in Schwid and the Goodman References were for shorter terms" (Defs. Br. at 47), defendants argue that Van Diemen II (PTX-0330), Polman I (JTX-0095) and Murray (JTX-0089) provided a

POSA with a reasonable expectation of success in treating MS patients with a stable dosing regimen of 4-AP that lasted longer than two weeks.[49]

These references, however, do not support defendants' position. First, none of them involved the dosing regimen of the Asserted Claims, none used sustained release formulations, and none administered a stable dose of 10 mg 4-AP BID. Each of the referenced studies used individual titration schemes, titrating up to significantly higher doses than 10 mg BID. Moreover, none of the references suggested that 4-AP at any dose would be effective to improve walking or increase walking speed, and thus none suggested that an improvement in walking or increase in walking speed could be sustained for more than two weeks.

Nor do the references relied on by defendants provide a reasonable expectation of success with respect to the safety of long-term administration of 4-AP given the high risk of seizure in MS patients. As noted above, Polman I reported seizures in one patient after two 5 mg capsules and in another patient at 20 mg/day. (PF ¶¶ 25, 108, 149; Tr., Goodman, 504:15-506:17). Accordingly, in view of Polman I, a POSA in April 2004 would not have had a reasonable expectation of success in administering a 10 mg sustained-release 4-AP BID for at least two weeks to improve walking in MS patients. (PF ¶ 149). In Murray, of the nine subjects in the study, "[o]ne patient had an acute confusional episode, and three patients had seizures . . . ." (JTX-0089 at 270; PF ¶ 101). Murray notes these adverse effects in its conclusion, stating "[t]he central effects of 4-AP, especially seizures, limit its use." (JTX-0089 at 270; PF ¶ 101). Dr. Goodman testified that the concern expressed in Murray with respect to 4-AP would be heightened in MS patients because "one of the hallmarks of MS is brain scarring, predisposing [MS patients] to an increased risk of seizures." (Tr., Goodman, 441:23-442:16; PF ¶ 150).

---

[49]     Van Diemen II, Polman I and Murray are each cited on the face of the '826, '437, '703, and '685 Patents.

Although Murray did not observe seizures under 80 mg, because Murray did not involve patients with MS, the most critical safety concerns related to brain scarring and seizures were not addressed, and Murray would not have given a POSA a reasonable expectation as to the safety of prolonged use of 4-AP in MS patients.  (PF ¶¶ 101, 150).

Defendants cite testimony by Dr. Goodman to support their erroneous contention that "[p]laintiffs do not, and cannot, dispute that the claim limitations requiring a stable dose for at least two weeks are sufficient to survive the obviousness challenge." (Defs. Br. at 47).  Again, defendants bend Dr. Goodman's testimony to serve their argument.  Defendants assert that "Dr. Goodman agreed at trial that the reasonable expectation, after the Goodman study, was to look at the effect of stable 10 mg, 15 mg, and 20 mg 4-AP twice-a-day doses for at least two weeks" and that Dr. Goodman "further agreed that the reason for looking at the effect for more than two weeks was because it was desirable to have a stable, non-titrated dose of 4-AP." (Defs. Br. at 47-48 (citing Tr., Goodman, 552:8-13, 553:1-3, 553:7-9)).  First, Dr. Goodman testified that testing stable 10 mg, 15 mg, and 20 mg 4-AP twice daily doses for longer durations was only one of "a number of possibilities. . . . There are all kinds of doses that could have been chosen by somebody." (Tr., Goodman, 551:20-552:7).  Regarding "the path . . . involv[ing] using the 10, 15, and 20 milligram 4-AP sustained release doses twice daily for longer durations," Dr. Goodman testified:  "[T]his was me with . . . my particular interest in the work and me with my particular knowledge set, which . . . was clearly at the time different than a POSA with respect to 4-AP." (Tr., Goodman, 551:13-19).

Furthermore, contrary to defendants' insinuation, Dr. Goodman did not imply that the *reason* to test for a minimum of two weeks was *because* it was desirable to have a stable, non-titrated dose.  Defendants omit the Q and A, italicized below, that intervened between the

testimony defendants' quote about the desirability of testing for more than two weeks and the desirability of testing a stable dose.

> Q.  Now, follow-up studies to the 201 study needed to test 4-AP doses for longer than two weeks.  Do you agree with that?
>
> A.  Well, you know, I certainly opined at my deposition that one would want to see more than a week . . . that was here.  And two weeks, as a minimum, absolutely.
>
> *Q.  And a person of ordinary skill in the art would also know that a stable 4-AP dose would need to be tested in MS patients for at least two weeks; right?*
>
> *A.  So not necessarily based on, based on what was known in 2004. Again, a POSA could look at the entirety of the art and still believe that there was a desire to increase, escalate, titrate doses towards higher levels.*
>
> *So I don't know that there was a reason that a POSA, in 2004, based on all the art, would have come to the conclusion that a stable dose of anything had a reasonable expectation of success or would even be worth testing.*
>
> Q.  A person of ordinary skill in the art would know that eventually one has to test for stable dose format for 4-AP; right?
>
> \* \* \*
>
> A.  So eventually it would be desirable that one would have some, some dose that one would take, the patient would be prescribed to take on a regular basis.

(Tr., Goodman, 552:8-553:20).  Thus, Dr. Goodman's testimony about the need for prolonged testing was not linked to the desirability of stable doses.  Moreover, Dr. Goodman pointed out that a stable dose and a titrated dose are "not mutually exclusive" because one can titrate based on tolerability and response and then arrive at a stable dose.  (Tr., Goodman 553:21-554:9).[50]

Accordingly, the testimony relied on by defendants in no way undercuts the opinion Dr. Goodman expressed at trial that a POSA would not have had a reasonable expectation of success with respect to administering a stable dose regimen of 10 mg sustained-release 4-AP twice-daily for a period of at least two weeks (or twelve weeks as called for in

---

[50]   Notably, Asserted Claim 7 (and claim 6 from which it depends)saf of the '826 Patent preclude titration at any time prior to or after administration of the stable 10 mg BID dose.

some of the Asserted Claims) to improve walking or increase walking speed in MS patients.  (PF ¶ 147).

### 4.    The "No Titration" Limitations Support the Nonobviousness of the Asserted Claims

Rather than specifying stable dosing for a particular period of time, Asserted Claims 6 and 7 of the '826 Patent preclude adjustment of the dose administered at *any* time (before or after) administration of the claimed 10 mg BID dose by providing that the claimed 10 mg BID dose be administered "without a prior period of 4-aminopyridine titration, and then, maintain[ed]."  The discussion in the preceding section applies equally to these claims.

Furthermore, as discussed above (in Point IV.D.3.), virtually all of the prior art references relied on by defendants used titration dosing schemes.  The prior art did not provide any evidence that 10 mg sustained release 4-AP administered BID without dose titration would safely and efficaciously improve walking in MS patients.  (PF ¶¶ 142-146).  To the extent a POSA would have inferred anything regarding efficacy from the prior art, it suggested, in view of 4-AP's narrow therapeutic window, titrating doses in order to gain maximum efficacy while seeking to avoid adverse effects.  (PF ¶ 142).  Hence claims 6 and 7 of the '826 Patent stand in sharp contrast to the prior art.

### 5.    The claimed pharmacokinetic values support the nonobviousness of the Asserted Claims.

Plaintiffs do not dispute that Drs. Cohen and Blight did no formulation work and used a sustained release formulation of 4-AP that was developed by (and proprietary to) Elan to invent the claimed methods of improving walking or increasing walking in MS patients. Plaintiffs also do not dispute that Hayes I and III disclose pharmacokinetic data for a sustained

release formulation of 4-AP.[51] That, however, does not mean that the pharmacokinetic values achieved by administration of the sustained release formulation of 4-AP used to generate the pharmacokinetic values reported in the Hayes references when administered at a dose of 10 mg BID will *necessarily* be the same as the pharmacokinetic values achieved by *any* (i.e., every) sustained release formulation of 4-AP administered at a dose of 10 mg BID. Indeed, defendants advanced no evidence to the contrary. Defendants have therefore not shown that the pharmacokinetic parameters of the Asserted Claims are inherent properties of the administration of every sustained release formulation of 4-AP administered at 10 mg BID. The claims of the Acorda Patents reciting specific pharmacokinetic values extend, however, to administration of *any* sustained release formulation of 4-AP that achieves those values when administered at 10 mg BID to improve walking/increase walking speed. Thus, defendants have failed to show that the recited pharmacokinetic parameters are inherent to the sustained release formulations of the claims. *See Par Pharm., Inc. v. TWI Pharm.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014) ("A party must . . . meet a high standard in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art."); *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n.1 (Fed. Cir. 2013) (doctrine of inherency not applicable where record did not establish whether any, or only certain, combination formulations inherently produce the claimed result).

Defendants' expert Dr. Kibbe testified that the "claimed PK parameters . . . were a natural result of the [BID] administration of *the* 10 milligrams [4-AP] sustained release product." (Tr., Kibbe, 226:2-24 (emphasis added)). Defendants parrot this testimony – omitting the word

---

[51]    While the pharmacokinetic information reported in Hayes I and Hayes III was in the prior art, neither the formulation itself nor information about its manufacture was public.

"the" – to support their argument that the pharmacokinetic values are inherent. (Defs. Br. at 48-49). Dr. Kibbe's testimony, however, was about the pharmacokinetic parameters reported in Hayes I and III. He did not testify that the values were inherent to administration of *any* 4-AP sustained release product.

Defendants seek to analogize this case to *Santarus, Inc v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012). "Importantly, though, neither party disputed that the blood serum concentrations claimed in *Santarus* were expected in light of the dosages disclosed in the prior art." *Par*, 773 F.3d at 1195 (citing *Santarus*, 639 F.3d at 1070). In contrast here, the record does not establish that the pharmacokinetic parameters recited in the claims are a property that necessarily results from the administration of the dosage of the claims.

Moreover, and most significantly, as noted above, there is nothing in the prior art identifying the pharmacokinetic values recited in the claims as being effective to improve walking or increase walking speed in MS patients. (PF ¶ 153). The Hayes References disclose pharmacokinetic information on administration of sustained release 4-AP in spinal cord injury patients, but contain no teaching or suggestion with respect to the efficacy of any stable dosing regimen of sustained-release 4-AP in improving walking in MS (or in spinal cord) patients. [52] (PF ¶ 154). Nor do the Hayes References address safety concerns specific to MS patients, such as brain related toxicities, encephalopathy and confusion, and seizures. (*Id.*).

There was nothing in the prior art that provided a POSA with a reasonable expectation of success that any dose regimen for sustained-release 4-AP would improve walking in MS patients, let alone identification of specific therapeutic blood levels or pharmacokinetic parameters to achieve doing so. (PF ¶ 155).

---

[52]     In fact, as Dr. Cohen testified, Acorda's spinal cord injury studies failed. (PF ¶ 88).

## V.   SECONDARY CONSIDERATIONS FURTHER SUPPORT THE NONOBVIOUSNESS OF THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT

As explained above (Point I.B and III), secondary considerations or objective indicia of nonobviousness must be considered, in determining whether patent claims were obvious.  *Apple*, 2016 WL 5864573, at *8.  Here, several secondary considerations support the nonobviousness of the inventions claimed in the patents-in-suit:  the commercial success of Ampyra, which is an embodiment of the Asserted Claims; satisfaction of a long-felt but unmet need; failure of others; and surprising and unexpected results.

### A.   The Commercial Success of Ampyra

"Commercial success is an indication of nonobviousness 'because the law presumes an idea would successfully have been brought to the market sooner, in response to market forces, had the idea been obvious to persons skilled in the art.'"  *Avanir*, 36 F. Supp. 3d at 508 (quoting *Merck & Co., Inc. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1376 (Fed. Cir. 2005)).

The "required consideration of commercial success includes a threshold determination of whether the commercial success has the necessary nexus with the claimed invention."  *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012).  The nexus requirement is that the commercial success of a product embodying a patented invention "results from the claimed combination of elements that constitutes the invention," rather than what was "already known in the prior art" or attributable to "unclaimed features."  *Id.*  If a patentee shows that a "successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention."  *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

Here plaintiffs' expert economist Dr. Gregory Bell made clear that Ampyra is a commercial success and that the requisite nexus exists between that success and the claimed invention.  (PF ¶¶ 157-161).[53]  Annual net sales of Ampyra in the U.S. were $133.1 million in 2010, the year that Ampyra was launched; sales reached $436.9 million by 2015; and sales totaled $1.7 billion through 2015.  (PF ¶ 157).  Acorda's net income from those sales was $998.7 million.  (PF ¶ 157).  Sales of Ampyra expanded from eight million tablets in 2010 to 16.6 million tablets in 2015, despite a significant increase in the per tablet price, from $17 to $26, over that period.  (PF ¶ 157).  These figures do not even include sales of dalfampridine outside the U.S., with respect to which Acorda receives milestone and royalty payments from its licensee Biogen.  (PF ¶ 157).  Payments to date from Biogen have totaled approximately $135 million, and Acorda may receive up to an additional $380 million.  (PF ¶ 157).

"[S]ales figures alone are . . . evidence of commercial success."  *Tec Air, Inc. v. Denso Mfg. Michigan Inc.,* 192 F.3d 1353, 1361 (Fed. Cir. 1999); *see also M/A COM Tech. Solutions Holdings, Inc. v. Laird Tech., Inc.,* No. CV 14-181-LPS, 2014 WL 2727198, at *4 (D. Del. June 13, 2014) (Stark, C.J.).  In *UCB,* this Court held that sales of Vimpat®, which increased annually and generated total revenues of $1.67 billion from launch of the product in May 2009 through February 2015, were evidence of commercial success that supported a finding of nonobviousness.  2016 WL 4376346, at *40-*41.

Dr. Bell further opined that Ampyra's commercial success has not been due to aggressive marketing.  (PF ¶ 158).  Acorda's marketing expenditures for Ampyra have decreased while Ampyra revenue has increased.  (PF ¶ 158).  In addition, unit sales of Ampyra increased

---

[53]    Dr. Bell holds both an M.B.A. and a Ph.D. in business economics from Harvard University.  (PF ¶ 64).  He is a Group Vice President at Charles River Associates, a global economics and management consulting firm, where he is the global head of the life sciences practice, and works on, among other things,  new drug strategy, product launches, pricing, and marketing strategy.  (PF ¶ 64).

even as the price of Ampyra increased.  (PF ¶ 158).  This demonstrates that market demand, rather than low prices, has driven sales.  (PF ¶ 158).

Plainly, the commercial success of Ampyra is attributable to the inventions of the patents-in-suit.  (PF ¶ 159).  Ampyra is an embodiment of the inventions of the Asserted Claims of the '938 Patent and the Acorda Patents.  (PF ¶ 159; *see also* Tr., Peroutka, 64:22-65:4).  Ampyra's sustained release formulation and unique indication of treating walking difficulties in MS patients dosed with 10 mg tablets twice-daily are directly related to the product's commercial success.  (PF ¶ 159).  The 10 mg sustained release 4-AP formulation was used to generate walking improvements in the clinical trials based on twice-daily administration.  (PF ¶ 159).  These clinical trials led to Ampyra's approval by the FDA.  (PF ¶ 159).

Dr. Bell pointed to surveys that found that 87% of prescribers and 83% to 87% of patients were moderately to highly satisfied with Ampyra.  (PF ¶ 160).  Furthermore, persistent (continuing) patients on therapy accounted for 78 and 76 percent of revenue for Ampyra in 2012 and 2013.  (PF ¶ 160).  This reflects that Ampyra's success is due to its efficacy at improving walking in patients with MS.  (PF ¶ 160).  Multiple insurance companies have required patients to demonstrate improved walking before Ampyra prescriptions could be renewed.  (PF ¶ 160).  These prior authorization requirements show that patients' continued use of Ampyra and insurers' continued willingness to pay for Ampyra are tied to product benefits claimed by the Ampyra Patents.  (PF ¶ 160).

The sales comparisons cited by defendants' expert Dr. DeForest McDuff do not change the fact that Ampyra has been a commercial success.  (PF ¶ 162).  It is not the level of sales of Ampyra relative to other types of MS drugs that is determinative of commercial success, but rather whether the product presented a commercial opportunity that would have been

exploited sooner had the invention been obvious.  (PF ¶ 162).  Moreover, in terms of market share, Ampyra was the first and remains the only drug specifically approved by the FDA for improving walking in MS patients.  (Tr., Goodman, 512:12-14).

Further, the profitability analysis advanced by Dr. McDuff was predicated on his calculation that the cost of developing Ampyra was equal to the average out-of-pocket costs of pharmaceutical product development multiplied by a factor based on the high rate of research and development failures in the pharmaceutical industry.  (PF ¶ 162).  However, Dr. McDuff cites no authority for his novel approach to evaluating commercial success in the context of an obviousness analysis.  (Tr., McDuff, 671:16-672:5).  The DiMasi-Grabowski articles on which he relies assess generally "the value of the resources expended by industry to discover and develop new drugs and biologics."  (JTX-0044 at 20).  The articles do not address commercial success in the context of an obviousness determination in a patent litigation.  (Tr., McDuff, 668:3-17).[54]  Nor does Dr. McDuff adjust his allocation for drug failures based on the supposed obviousness of the inventions.  (Tr., McDuff, 669:6-10; PF ¶ 162).

Notably, Dr. McDuff does not contend that the out-of-pocket cost of developing Ampyra would have exceeded the net income realized by Acorda without including in the economic cost an allocation for the cost of drug failures.  (Tr., McDuff, 666:13-23, 668:18-669:5, 670:7-21; McDuff, 672:6-14).  The fact that Acorda's success in developing Ampyra may be a relative rarity in the pharmaceutical field only underscores the fact that Ampyra presented a commercial opportunity that someone would have made sooner had the asserted claims been obvious.  (Tr., Bell, 594:6-597:15).

---

[54]   Since receiving his Ph.D. in economics in 2009, Dr. McDuff has repeatedly been engaged by generic pharmaceutical companies to testify various that FDA-approved drugs were not commercially successful provided that one included in their theoretical development costs an allocation for failures in light of the industry-wide approval rate of "about 11 percent."  (Tr., McDuff, 655:5-6, 655:19-657:22, 670:22-671:14).

Dr. McDuff also inappropriately includes in his calculation of the cost of developing Ampyra the full cost of preclinical research and development – even though 4-AP was known for decades before the inventions claimed in the Ampyra Patents.  (PF ¶ 162).  Correcting Dr. McDuff's profitability analysis to exclude his allocation for the cost of failures industry-wide and for preclinical work which did not have to be performed by the developers of Ampyra demonstrates that Ampyra is profitable.  (PF ¶ 162).

Defendants argue that any commercial success enjoyed by Ampyra would not show that the Acorda Patents were nonobvious because the '938 Patent would have blocked others from making and marketing the invention of the Acorda Patents.  Needless to say, defendants' argument has absolutely no bearing on the fact that the commercial success of Ampyra supports the nonobviousness of the '938 Patent.  Moreover, the '938 Patent had no impact on the development of 4-AP before the '938 Patent issued in July 1996 and was never an impediment to the development of an immediate release 4-AP product.  Additionally, defendants point to 4-AP research conducted by scientists in England, Sweden and the Netherlands.  (Defs. Br. at 12-13, 19).  Development of the inventions claimed in the Acorda Patents would not have been blocked outside of the United States.

### B.   Satisfaction of Long-Felt Unmet Need

One of the objective indicia of nonobviousness is a long-felt need for an invention that addresses the problem solved by the patent in suit.  *Graham*, 383 U.S. at17-18.  "Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious."  *Apple*, 2016 WL 5864573, at *15; *see also*, *Procter & Gamble*, 566 F.3d at 998 (finding a long-felt unmet need when osteoporosis was recognized as a serious disease and existing treatments were inadequate); *Bayer Pharma*, 2016 WL 3946916, at *31 (decades of

attempts to create successful treatment supported finding of long-felt need and failure of others);

*In the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp.

1354, 1378 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995) ("The existence of an enduring,

unmet need is strong evidence that the invention is novel, not obvious, and not anticipated.").

The methods of administering sustained-release 4-AP claimed in the Acorda

Patents became the first – and to this day remains the only – FDA-approved therapy to improve

walking in MS patients.  (PF ¶ 167).  This therapy satisfied a long-felt, unmet need to address

one of the most prevalent and most devastating symptoms experienced by MS patients.  As

explained by Dr. Goodman, walking problems are a major issue for people with MS, robbing

them of their independence and having a major impact on their psyche and quality of life.  (PF ¶

165).  Thus, a therapy that can improve walking has a huge impact.  (PF ¶¶164-166).

The FDA's grant of priority review of Acorda's NDA for Ampyra, demonstrating

that the FDA viewed the drug as a potentially important therapy for an important condition (PF ¶

164), is evidence of a long-felt but unmet need.  *See Cadence Pharm., Inc. v. Exela Pharma

Scis., LLC*, No. CV 11-733-LPS, 2013 WL 11083853, at *29 (D. Del. Nov. 14, 2013), *aff'd*, 780

F.3d 1364 (Fed. Cir. 2015); *see also Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed.

Cir. 2013) (FDA approval can be relevant in evaluation the objective indicia of nonobviousness).

Moreover, the FDA's approval of Ampyra in 2010 was the first FDA approval of

4-AP for any purpose and came more than a century after the first disclosure of the chemical 4-

AP (Tr., Peroutka, 73:1-5) and decades after the first investigations by researchers in the UK (Tr.

Peroutka, 75:12-15) and by Davis and Stefoski at the Rush Institute (JTX-0043; JTX-0112)

exploring whether 4-AP could be used for therapy in MS.  The long period of time between

much of the prior art relied on by defendants and Acorda's eventual success in inventing and

90

bringing to market a 4-AP therapy for walking impairment in MS patients "speaks volumes" to the nonobviousness of the Acorda Patents. *See Leo Pharm. Prods.*, 726 F.3d at 1359 ("The length of the intervening time between the publication dates of the prior art and the claimed invention can also qualify as an objective indicator of nonobviousness"); *Warner Chilcott Co., LLC v. Lupin Ltd.*, No. CIV A. 11-5048 JAP, 2014 WL 202659, at *22 (D.N.J. Jan. 17, 2014), *aff'd*, 580 F. App'x 911 (Fed. Cir. 2014) (period of 30 years during which only one low-dose oral contraceptive was FDA approved supported conclusion that patent on second low-dose oral contraceptive was nonobvious).

Defendants attempt to minimize the contribution of the claimed inventions, arguing that it is prescribed to only a low percentage of MS patients, treats only one of many symptoms of MS, and does not stop or slow the progression of disease. (Defs. Br. at 59). However, Dr. Goodman, who, unlike defendants' expert Dr. Peroutka, regularly treats MS patients, testified that while Ampyra does not cure MS and may not permit people who are bedridden to run a marathon, "it improves some people[']s quality of life by being able to walk better" and in that respect it "absolutely yes" did satisfy a long-felt and unmet need. (Tr., Goodman, 537:25-538:12). A patented method of treatment need not "solve the problem for all people" in order to show a long-felt need was met, so long as it proves "effective at [treating] . . . a segment of the population who had previously gone without relief. . . ." *UCB*, 2016 WL 4376346, at *39.[55]

---

[55] Defendants attempt to extend the "blocking patent" argument to negate plaintiffs' showing that Ampyra satisfied a long-felt but unmet need. However, defendants cite no authority for their theory. In any event, as mentioned above, the argument even has only limited applicability even to the secondary consideration of Ampyra's commercial success.

C.    **Failure of Others**

Another of the objective indicia of the nonobviousness of an invention is the failure of others to develop a solution that effectively addresses the problem solved by the patent in suit.  *Graham*, 383 U.S. at 17-18.  Indeed, "there can be little better evidence negating an expectation of success than actual reports of failure."  *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003).  Thus, "[e]vidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry."  *Cyclobenzaprine*, 676 F.3d at 1081.  In fact, failed attempts by others "could be determinative of the issue of obviousness."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000).

As described above, prior to Acorda's successful discovery of a sustained release 4-AP to improve walking, Elan's effort to develop a sustained release 4-AP treatment had failed. The failure of Elan's 161 patient efficacy study had created "a huge amount of skepticism and doubt as to . . . the primary exploratory observations" by researchers such as Davis and Stefoski. (Tr., Goodman, 513:24-514:24; PF ¶ 168).  As Dr. Cohen testified, Acorda undertook the development of 4-AP after Elan's failure, recognizing the "daunting challenges," but concluding that as a startup Acorda "had to take the risk."  (Tr., Cohen, 281:25-282:9; PF ¶ 90).

Drs. Lublin and Goodman also testified regarding Sanofi-Aventis's failure to develop another potassium channel blocker – Nerispirdine– as a therapy to improve walking in MS patients.  (Tr., Lublin, 411:8-413:10; Goodman, 513:2-515:5; PF ¶¶ 169-172).  Sanofi-Aventis applied the same test methodology used by Acorda to establish that 4-AP could improve walking in MS patients – *i.e.*, testing walking speed using a timed 25-foot walk and applying the responder analysis developed by Acorda in an after-the-fact effort to find a positive result following the apparent failure of the MS-F202 study.  (PF ¶¶ 170-171).  Sanofi-Aventis's study,

however, showed no significant difference between Nerispirdine and placebo (in fact, placebo performed a bit better than Nerispirdine), and the company discontinued development of the drug. (PTX-0569; Tr., Lublin, 412:18-25; Goodman, 513:21-23; PF ¶ 171). Both Drs. Lublin and Goodman testified that the failure of Nerispirdine reflected the difficulty of developing an agent that would reliably improve walking in patients with MS and that even when "you're doing the same study with a similar drug it doesn't necessarily come out the way you expect." (Tr., Goodman, 514:25-515:5; Lublin, 413:4-10; PF ¶ 172).

Defendants seeks to dismiss Sanofi-Aventis' failure because Nerispirdine and 4-AP are chemically and pharmacologically distinct. The Federal Circuit, however, has recognized as objective evidence of nonobviousness any "failure of others to find a solution to the problem" and have not limited the analysis to the specific chemical compound that is the subject of the claims at issue. *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004); *Eli Lilly & Co. v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1009 (S.D. Ind. 2010), *aff'd*, 424 F. App'x 892 (Fed. Cir. 2011). Here, Sanofi-Aventis, like Acorda, sought to translate potassium channel-blocking activity into a therapy to improve walking (Tr., Lublin, 411:23-412:16). Their failure (using the very test methods successfully used by Acorda) underscores the unpredictability of the field and thus supports the nonobviousness of Acorda's invention.

### D.   Surprising and Unexpected Results
#### 1.   The efficacy of the 10 mg BID dose was surprising.

A further secondary consideration of nonobviousness is unexpected results, *i.e.*, "that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir.1995); *see also Avanir*, 36 F. Supp. 3d at 510. "The basic principle behind this rule is straightforward—that which would have been surprising to a person of ordinary skill

in a particular art would not have been obvious." *In re Soni*, 54 F.3d at 750.  The patent challenger has the burden of proving that none of the properties were unexpected.  *See Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 8 (Fed. Cir. 1984) ("[Patent holder] is under no compulsion . . . to prove a new and surprising result . . . . Rather, the burden was on [challenger] to establish the lack of new and surprising results or the lack of criticality.").

As discussed above, the prior art as of April 2004 did not teach or suggest that a fixed dose of 10 mg dose of sustained release 4-AP administered twice daily would improve walking or increase walking speed in MS patients.  Dr. Goodman testified that the 10 mg BID dose was "was surprising given the prior art suggesting a need to go to . . . higher doses and higher blood levels."  (Tr., Goodman, 515:6-11; PF ¶ 173).  Dr. Goodman "actually didn't believe the 10 milligrams would be an effective dose."  (Tr., Goodman, 515:24-25; PF ¶ 173).

In fact, as discussed above, the preplanned analysis of Acorda's MS-F202 study testing 10 mg BID, 15 mg BID and 20 mg BID (conducted after the MS-F201 study that was the subject of the Goodman references), which looked at the average change in walking speed versus baseline, failed because the walking speed results did not show statistically significant improvement for any of the three drug doses versus placebo.  (PF ¶ 173).  It was only after a responder analysis was applied to the test results that a subgroup of study participants was found to have meaningfully improved their walking speed.  (PF ¶ 173; *see also* JTX-0003 ('437 Patent) at 24:21-28 ("While pre-planned analyses of the primary efficacy endpoint provided insufficient evidence of treatment benefits for any of the Fampridine-SR doses, subsequent analysis revealed the existence of a subset of subjects who responded to the drug . . . that were consistently better than the fastest walking speeds measured when the subjects were not taking active drug.").

Recognizing the efficacy of the 10 mg BID dose thus required an innovative analysis and would not have been expected by a POSA.

### 2. The fact that the 10 mg BID dose was as effective as higher doses while avoiding adverse effects was surprising.

Even more surprising was the revelation that "there was actually no meaningful difference among the three drug doses, 10 [mg], 15, or 20.  10 was as good as 15 or 20 with respect to the responder analysis."  (Tr., Cohen, 298:21-299:3; PF ¶ 174).  Dr. Cohen testified that "[w]e were extremely surprised" that higher doses did not produce more efficacy.  (Tr., Cohen, 299:4-9; PF ¶ 174).  Dr. Goodman also recalled "being very surprised" that the proportion of people who met the responder analysis criteria was equivalent in the 10 mg, 15 mg and 20 mg dose groups.  (Tr., Goodman, 515:6-25; *see also id.* at 517:7-22 (explaining that Figure 7 of '437 Patent shows "to my surprise, the 10 milligrams appeared to be just as efficacious . . . as the other two higher doses"); PF ¶ 174).

The specifications of the '437 and '703 Patents report the unexpected nature of the finding that the 10 mg dose was as effective as higher doses:  "The data does not appear to support either a number of anecdotal reports or expectations from preclinical pharmacology that doses higher than about 10 to 15 mg b.i.d., and even about 10 mg b.i.d., should be associated with greater efficacy."  (JTX-0003 ('437 Patent) at 27:1-5; JTX-0004 ('703 Patent) at 28:66-29:3).  Table 15 of the '437 and '703 Patents shows that the responders in the 10 mg and 15 mg dose groups performed similarly on five different measures, including the average percent change from baseline in walk speed, the percent change in walk speed by visit, the patients' subjective global impression and average change in the Multiple Sclerosis Walking Scale 12.  (JTX-0003 at 27:6-20; JTX-0004 at 29:5-19; Tr., Goodman, 518:5-519:15).

Importantly, the 10 mg BID dose achieved efficacy similar to that of the higher doses tested while at the same time avoiding serious adverse effects (AE) observed at the higher doses:

> Serious AE's were more frequent in the 15 mg and 20 mg bid groups 10% and 12% rates vs. 0% rate in 10 mg bid and 4% in placebo groups. This may or may not be significant, but the risk of potentially related SAEs, particularly seizures appears to be dose-related from all available data and based on mechanism of action. Based on this data, it would appear that a 10 mg bid does is preferred because of its favorable risk to benefit ratio compared with the 15 and 20 mg doses.

(JTX-0003 at 27:40-46; Tr., Goodman, 519:16-520:4).

As Dr. Goodman explained, the Acorda inventors had identified the 10 mg BID dose as a "sweet spot" that could achieve maximum benefit without individualized titration or maximizing doses in order to gain efficacy with the attendant "peril of coming close to the toxic range." (Tr., Goodman, 520:5-521:3; PF ¶ 174). Similarly, Dr. Cohen testified that having made the surprising discovery that the 10 mg dose was as effective as 15 mg or 20 mg, Acorda determined that there was no need to titrate the patients up from 10 mg. (Tr., Cohen, 299:10-17). This departure from the prior art standard titration scheme is of particular significance when treating a condition like walking impairment, where one wants to get as much improvement as possible. (Tr., Cohen, 294:17-295:6). As Dr. Goodman explained:

> [W]hat's important for these people with MS, they need to get the maximum amount of benefit. It's not a yes or a no. It's a gradation and we want to try to [eke] out as much benefit for each patient as possible. And what was surprising [was] that that could be done with a single dose without having to do what was described . . . in the prior art of titrating or individualizing or maximizing doses in order to gain efficacy with the peril of coming close to the toxic range. Here we have a sweet spot at 10 milligrams with no or minimal at least serious adverse events but still having equivalent efficacy compared to these other doses. So this was an unexpected, surprising and happy discovery.

(Tr., Goodman, 520:5-521:3).

The discovery of the favorable risk/benefit ratio of the 10 mg BID dose, administered as a fixed dose, not as part of an upward titration scheme, was thus an unexpected

96

result that was "different in kind and not merely in degree from the results of the prior art." *Galderma*, 737 F.3d at 739 (citation omitted).  By unexpectedly delivering maximum efficacy while avoiding toxicity, the 10 mg BID dose made possible a different kind of treatment regimen – a stable dose, rather than an upward titration or escalation that characterized the prior art.  *See Allergan,* 796 F.3d at 1307 (unexpected maintenance of efficacy while reducing adverse effects constituted difference in kind, "*viz.*, the difference between an effective and safe drug and one with significant side effects").

## CONCLUSION

Based on the foregoing and the record in this case, this Court should rule that defendants have failed to meet their burden of proving by clear and convincing evidence that any of the asserted claims of the patents-in-suit are invalid on obviousness grounds.  Because defendants have stipulated to infringement, they should be barred from marketing their generic versions of Acorda's Ampyra product until all of the patents-in-suit expire.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Aaron Stiefel
Daniel P. DiNapoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 683-3500

*/s/ Maryellen Noreika*
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
jtigan@mnat.com

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real | Suite 400
Palo Alto, CA 94306
(650) 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 326-5825

*Attorneys for Acorda Therapeutics, Inc.
and Alkermes Pharma Ireland Limited*

October 28, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 28, 2016, upon the following in the manner indicated:

| | |
|---|---|
| John C. Phillips, Jr., Esquire<br>David A. Bilson, Esquire<br>Megan C. Haney, Esquire<br>PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.<br>1200 North Broom Street<br>Wilmington, DE 19806-4204<br>*Attorneys for Alkem Laboratories, Ltd., Accord Healthcare, Inc., Teva Pharmaceuticals USA, Inc., Apotex Corp., Apotex Inc., and Roxane Laboratories, Inc.* | *VIA ELECTRONIC MAIL* |
| James F. Hurst, Esquire<br>George C. Lombardi, Esquire<br>Maureen L. Rurka, Esquire<br>Samuel S. Park, Esquire<br>Reid Smith, Esquire<br>Bryce A. Cooper, Esquire<br>WINSTON & STRAWN LLP<br>35 West Wacker Drive<br>Chicago, IL 60601<br>*Attorneys for Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA, Inc., and Roxane Laboratories, Inc.* | *VIA ELECTRONIC MAIL* |
| Charles B. Klein, Esquire<br>WINSTON & STRAWN LLP<br>1700 K Street, N.W.<br>Washington, DC 20006-3817<br>*Attorneys for Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA, Inc., and Roxane Laboratories, Inc.* | *VIA ELECTRONIC MAIL* |

Imron T. Aly, Esquire                                   *VIA ELECTRONIC MAIL*
Sailesh K. Patel, Esquire
Cindy Ahn, Esquire
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
*Attorneys for Alkem Laboratories, Ltd.*
*and Accord Healthcare, Inc.*

Gina M. Bassi, Esquire                                  *VIA ELECTRONIC MAIL*
SCHIFF HARDIN LLP
666 Fifth Avenue, Suite 1700
New York, NY 10103
*Attorneys for Alkem Laboratories, Ltd.*
*and Accord Healthcare, Inc.*

George Chih-Lun Yu, Esquire                             *VIA ELECTRONIC MAIL*
SCHIFF HARDIN LLP
Spear Street Tower, Suite 3200
San Francisco, CA 94105
*Attorneys for Alkem Laboratories, Ltd.*
*and Accord Healthcare, Inc.*

Mary B. Matterer, Esquire                               *VIA ELECTRONIC MAIL*
Richard K. Herrmann, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
*Attorneys for Mylan Pharmaceuticals Inc.*

Melanie Black Dubris, Esquire                           *VIA ELECTRONIC MAIL*
Catherine R.L. Lawson, Esquire
Christopher M. Thomas, Esquire
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601
*Attorneys for Mylan Pharmaceuticals Inc.*

Robert L. Florence, Esquire                                    *VIA ELECTRONIC MAIL*
Michael L. Binns, Esquire
Karen L. Carroll, Esquire
PARKER POE ADAMS & BERNSTEIN LLP
1180 Peachtree Street, N.E., Suite 1800
Atlanta, GA 30309
*Attorneys for Mylan Pharmaceuticals Inc.*

/s/ Maryellen Noreika
Maryellen Noreika (#3208)

3