IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ACORDA THERAPEUTICS, INC., et al.,

                  Plaintiffs,

    v.

ROXANE LABORATORIES, INC., et al.,

                  Defendants.

)
)
)
)
)
)
)
)
)

C.A. No. 14-882 (LPS)
(CONSOLIDATED)

## DEFENDANTS' POST-TRIAL REPLY BRIEF

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgmhlaw.com
mch@pgmhlaw.com

*and*

WINSTON & STRAWN LLP
George C. Lombardi
Samuel S. Park
Bryce A. Cooper
Reid Smith
35 West Wacker Drive
Chicago, IL 60601

Charles B. Klein
1700 K Street, N.W.
Washington, DC 20006

*Attorneys for Defendants Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA Inc., and Roxane Laboratories, Inc.*

Dated:  November 3, 2016

MORRIS JAMES LLP
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*and*

PARKER POE ADAMS & BERNSTEIN LLP
Robert L. Florence
Karen L. Carroll
Michael L. Binns
1180 Peachtree Street
Suite 1800
Atlanta, GA 30309

Melanie Black Dubis
Catherine R.L. Lawson
Christopher M. Thomas
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601

*Attorneys for Defendant Mylan Pharmaceuticals Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

I.   Defendants Have Proven by Clear and Convincing Evidence That The Asserted
     Elan Patent Claims Are Invalid......................................................................................... 6

     A.  The Asserted Elan Patent Claims Are Obvious. ...........................................................6

          1.  The Prior Art Motivated A POSA, And Provided A Reasonable
              Expectation Of Success, To Use 4-AP To Treat MS Patients. ........................... 6

               a.   Stefoski and Davis Taught That 4-AP Could Be Used to Treat Symptoms
                    Related to Neuromuscular Transmission in MS Patients. .......................... 6

               b.   The Elan Patent Specification Explicitly Acknowledges the Prior Art
                    Research by Stefoski and Davis................................................................. 8

          2.  The Prior Art Also Motivated a POSA, and Provided a Reasonable
              Expectation of Success, To Formulate a 4-AP *Sustained Release* Dosage
              Form to Treat MS Patients.................................................................................. 11

               a.   The State of the Art in 1991 Provided Formulators with Many Sustained
                    Release Options. ..................................................................................... 12

               b.   By 1991, Formulating Sustained Release Dosage Forms was Routine.... 13

               c.   By 1991, the Prior Art Taught the Safety, Efficacy, and Pharmacokinetics
                    of 4-AP................................................................................................... 15

          3.  Secondary Considerations Cannot Overcome The Strong Showing That
              The Elan Patent Is Obvious. .............................................................................. 18

     B.  Alternatively, The Asserted Claims Of The Elan Patent Are Invalid Under §
         112 As Lacking Written Description Or Enablement...................................................19

II.  Defendants Have Proven By Clear And Convincing Evidence That The Asserted
     Claims Of the Acorda Patents Are Invalid As Obvious. .................................................. 23

     A.  The Asserted Acorda Patent Claims Are Presumed Obvious As a Matter of
         Law. 23

     B.  At A Minimum, The Prior Art Rendered The Claimed Invention Obvious To
         Try.  26

1. The Prior Art Encouraged Further Testing Of 10 mg 4-AP Sustained Release, Twice Daily, to Improve Walking in MS Patients. ............................ 27

2. The Claim Limitations Requiring a Stable Dose for More Than Two Weeks Cannot Support the Asserted Claims. ..................................................... 29

3. The Claimed Pharmacokinetic Values Cannot Support the Asserted Claims. .................................................................................................................. 30

C. A POSA Would Have Had a Reasonable Expectation of Success in Using SR 4-AP to Improve Walking or Increase Walking Speed. ................................................31

1. Plaintiffs Overstate The Complexity and Variability Of MS Treatments. ........ 31

2. Plaintiffs Overstate The Risk Of Seizures. ........................................................ 33

3. Plaintiffs Overstate The Relevance Of The "Failed" Elan Study. ...................... 34

4. Plaintiffs Overstate The Relevance Of The Solari Review, Which Supports Defendants' Obviousness Defense. ...................................................... 35

5. Plaintiffs Continue To Rely On Unpublished Data That Is Irrelevant To Obviousness. ....................................................................................................... 36

D. Secondary Considerations Cannot Overcome The Strong Showings Of Obviousness. ..................................................................................................................36

1. Plaintiffs Presented No Credible Evidence of Commercial Success. ................. 36

   a. The Elan "Blocking Patent" Renders Any Evidence Of Commercial Success Legally Irrelevant, At Least For The Acorda Patents. ................ 36

   b. Plaintiffs Failed To Produce Credible Evidence That Ampyra's Sales Establish A "Commercial Success" Relevant To Obviousness. ............... 37

   c. Plaintiffs Failed To Produce Credible Evidence Of A Nexus To The Patents-In-Suit. ......................................................................................... 40

2. Plaintiffs Presented No Credible Evidence That Ampyra Satisfied A Long-Felt But Unmet Need. ............................................................................... 41

3. Plaintiffs Presented No Credible Evidence Of Failure of Others. ..................... 43

4. Plaintiffs Presented No Credible Evidence Of Surprising And Unexpected Results. ........................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014)................................................................22

*Agrizap, Inc. v. Woodstream Corp.*,
  520 F.3d 1337 (Fed. Cir. 2008)...........................................................3, 20

*Allergan, Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013).....................................................3, 11, 16

*Alza Corp. v. Andrx Pharms., LLC*,
  603 F.3d 935 (Fed Cir. 2010).................................................................21

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 2015-1171, 2016 WL 5864573, at *26, *29 (Fed. Cir. Oct. 7, 2016) ............................41

*Aventis Pharm. Deutschland GmbH v. Lupin, Ltd.*,
  499 F.3d 1293 (Fed. Cir. 2007)................................................................19

*Bayer Pharma AG v. Watson Labs, Inc.*,
  F. Supp. 3d, No. CV 12-1726-LPS, 2016 WL 3946916, at *32 (D. Del. July
  18, 2016) .................................................................................24

*Eli Lilly & Co. v. Sicor Pharm., Inc.*,
  705 F. Supp. 2d 971, 1009 (S.D. Ind. 2010), aff'd, 424 F. App'x 892 (Fed.
  Cir. 2011) ..............................................................................44, 45

*Forest Labs. Holding Ltd. v. Mylan Inc.*,
  No. CV 13-1602-SLR, 2016 WL 3677148 (D. Del. July 11, 2016)........................................32

*Galderma Labs., L.P. v. Tolmar*,
  737 F.3d 731 (Fed. Cir. 2013)....................................................... *passim*

*Hoffmann-LaRoche, Inc. v. Apotex* 748 F.3d at 1331 ................................................33

*Iron Grip Barbell Co, Inc. v. USA Sports, Inc.*,
  392 F.3d 1317, 1321 (Fed. Cir. 2004) .................................................48

*Johns Hopkins Univ. v. 454 Life Scis. Corp.*,
  No. CV 13-1853-LPS, 2016 WL 1948818 (D. Del. May 2, 2016).........................................21

*KSR Int'l Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007)................................................................. *passim*

*MagSil Corp. v. Seagate Tech.*,
   764 F. Supp. 2d 674 (D. Del. 2011), *aff'd sub nom. MagSil Corp. v. Hitachi
   Glob. Storage Techs., Inc.*, 687 F.3d 1377 (Fed. Cir. 2012)....................................................21

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
   395 F.3d 1364, 1376-77 (Fed. Cir. 2005) ...........................................................................37

*In re Merck & Co.*,
   800 F.2d 1091 (Fed. Cir. 1986)..........................................................................................33

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*,
   No. CV 13-2088-GMS, 2016 WL 4497054, at *13 (D. Del. Aug. 26, 2016) ......................37

*In re O'Farrell*,
   853 F.2d 894 (Fed. Cir. 1988)............................................................................................27

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007)....................................................................................15, 33

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007)......................................................................................2, 9

*Regent of the Univ. of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997)..........................................................................................20

*Sanofi v. Glenmark Pharm., Inc., USA*,
   No. CV 14-264-RGA, 2016 WL 4569680 (D. Del. Aug. 31, 2016)......................................27

*Sanofi-Synthelabo v. Apotex Inc.*,
   492 F. Supp. 2d 353 (S.D.N.Y. 2007), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008).
   (*See also* Tr. (Becker Closing) 787:19-21.)....................................................................28, 36

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   723 F.3d 1363 (Fed. Cir. 2013)..........................................................................................20

*Tyco Healthcare Group, LP v. Mut. Pharm. Co, Inc.*,
   642 F.3d 1370 (Fed. Cir. 2011)...........................................................................4, 5, 23, 27

*Warner Chilcott Co, LLC. v. Teva Pharm. USA, Inc.*,
   37 F. Supp. 3d 731 (D. Del. 2014), *aff'd*, 594 F. App'x 630 (Fed. Cir. 2014)........................6

**Statutes**

35 U.S.C. § 103, Pub. L. No. 98-622 (1984) (amended 1995) .........................................23, 28, 36

Patent Act § 112.................................................................................................1, 12, 20, 23

**Other Authorities**

FDA Investigational New Drug Application ................................................................12

Fed. R. Evid. 801(d)(1) ..............................................................................................29

*Manual of Patent Examining Procedure* § 2107.03 (8th ed., rev. 6, Sept. 2007).........................11

**INTRODUCTION**

Plaintiffs have failed to rebut Defendants' clear and convincing showing of obviousness for the Elan and Acorda patents. Instead, they repeatedly apply incorrect legal standards and place undue reliance on conclusory and biased testimony from their witnesses who, time and again, distort the prior art. In the end, for the reasons discussed below and in their opening post-trial brief, Defendants request that the Court enter judgment in their favor and against Plaintiffs declaring all asserted claims of the Elan and Acorda patents invalid.

*The Asserted Elan Patent Claims Are Invalid As Obvious Or Under § 112*

The Elan patent claims methods "for the *treatment* of" "multiple sclerosis" with a "sustained release" formulation of 4-AP. (JTX-001 (emphasis added).) As the patent itself makes clear, the prior art disclosed the use of 4-AP "to improve the conduction of nerve impulses, thereby, alleviating symptoms in MS patients," i.e., to address MS symptoms such as impaired walking. (JTX-001 at 1:51-61 (citing prior art studies by Davis and Stefoski; Tr. (Lublin) 409:15-24, 416:19-417:9; Tr. (Goodman) 462:8-12).) The patent further concedes a skilled artisan would have "appreciated that there is a need for an improved dosage form" of 4-AP that "must result in a controlled release of drug," such that it would be "suitable for once- or twice-daily administration to aid patient compliance." (JTX-001 at 2:8-16.) This concession from the specification not only accurately characterizes the prior art, it is "binding on" Plaintiffs for purposes of assessing obviousness. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007).

Plaintiffs cannot run away from these binding concessions. Ignoring the teachings of the prior art as a whole, they argue that, as of 1991, "4-AP was used as a bird toxin," "the prior art showed only that 4-AP warranted further study" in MS patients, and "there were, at best, fragmentary hints that 4-AP might have some clinical usefulness in MS patients[.]" (D.I. 272,

1

Plaintiffs' Answering Brief on Validity and Opening Brief on Secondary Considerations of Nonobviousness (herein after "Pls.' Br.") at 2, 14, 16.)  But try as they might, Plaintiffs cannot rewrite the prior art—which expressly showed 4-AP treating the slowing of nerve impulse transmission and "suggest(s) a safe and effective therapeutic window for orally administered 4-AP for . . . motor deficits in selected MS patients."  (JTX-043 at AMP-DEF-0000071.)

Regardless, to accept Plaintiffs' reading of the prior art would necessarily mean that the Elan patent—which, again, claims a "method for the *treatment* of" "multiple sclerosis"—lacks an adequate patent disclosure.  (JTX-001 at cls. 3, 8 (emphasis added).)  Indeed, the patent relies solely on the prior art when it comes to 4-AP clinical results.  (JTX-001 at 1:51-61, 13:43-45.)  Thus, a skilled artisan as of 1991 would have reasonably expected 4-AP to "alleviat[e] symptoms in MS patients" (JTX-001 at 1:51-61), thus providing motivation to improve the dosage form to improve patient compliance.  Alternatively, to accept Plaintiffs' arguments, a skilled artisan reading the patent specification would not have believed that the inventors were able to treat MS symptoms with 4-AP—meaning that the patent lacked a sufficient written description, or would not be enabled.  Either way, a declaration of invalidity should follow.

Therefore, the sole question for obviousness as to the Elan patent is whether a skilled artisan would have had a reasonable expectation of success in formulating *any* sustained release 4-AP formulation suitable for use in MS patients.  The trial record provides clear and convincing evidence that sustained release technology was well-known at the time (in 1991), and creating a suitable 4-AP formulation merely required routine experimentation.

Plaintiffs place undue reliance on conclusory testimony from their expert and a vague, general statement from a single treatise saying that the "[d]esign of a sustained-release product is normally a very difficult task."  (Pls.' Br. 21.)  Plaintiffs cannot credibly dispute that a skilled

formulator in 1991 could have reasonably expected to develop *at least one* sustained release dosage form suitable for 4-AP. The patent does not claim any specific sustained release formulation, thus giving a skilled artisan many options—including the encapsulated dissolution formulation that Dr. Kibbe testified, without contradiction, would have worked "quite nicely" for 4-AP. (JTX-081; Tr. (Kibbe) 208:18-210:7.) As the Federal Circuit made clear, a patentee cannot point to "general unpredictability of the formulation arts" to support patent validity. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292-93 (Fed. Cir. 2013). This precedent rings true here.

Plaintiffs rely solely on alleged commercial success as a secondary consideration. (Pls.' Br. 26.) As discussed in more depth below, however, Plaintiffs failed to meet their burden of presenting evidence of commercial success—including a nexus to the asserted Elan patent claims. Regardless, any such "objective evidence of nonobviousness simply cannot overcome . . . a strong prima facie case of obviousness." *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).

### The Asserted Acorda Patent Claims Are Invalid As Obvious

The trial record also presents clear and convincing evidence that all asserted claims of the Acorda patents are invalid as obvious. As discussed, these claims merely narrow the Elan patent to a specific stable dose (10 mg twice BID for at least two weeks), for a specific MS treatment (improving walking), with inherent release profiles disclosed in the prior art. Indeed, these patents simply identify the 10 mg BID dose from the preferred prior art range of 10-20 mg BID. Choosing a single dose from a handful of preferred prior art doses was not an invention; it was the obvious result of routine dose optimization.

Although the Acorda patents are *presumed obvious* as a matter of law, Plaintiffs devoted fewer than four pages of their 97-page brief to this critical issue. Plaintiffs cannot change (or gloss

3

past) the law:  "Where there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness."  *Tyco Healthcare Group LP v. Mut. Pharm. Co, Inc*., 642 F.3d 1370, 1372-73 (Fed. Cir. 2011).  Nor can they change the clear and convincing facts:  Schwid taught a stable dose of 17.5 mg BID to improve walking in MS patients, and the Goodman references further taught a "dose-response in 20-40 mg/day range" (i.e., 10-20 mg BID) leading to a "[s]ignificant benefit on timed walking."  (JTX-104; Tr. (Peroutka) 93:8-95:15; JTX-080A; Tr. (Goodman) 528:10-17.)  Applying the law to these facts, "the burden of production falls upon [Plaintiffs] to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations."  *Galderma Labs., L.P. v. Tolmar*, 737 F.3d 731, 738 (Fed. Cir. 2013).

Plaintiffs attempt to distinguish this controlling case law by distorting the prior art.  Indeed, they go so far as to argue that "there was no prior art teaching that *any* dose of 4-AP – any single dose or any range of doses – was safe and effective to improve walking or increase walking speed in MS patients."  (Pls.' Br. 54 (emphasis in original).)  Yet, that is precisely what the prior art did teach.

For example, Schwid taught that "motor function" and, in particular, "[t]imed gait," "improved" with a stable dose of "4AP SR 17.5 mg bid."  (JTX-104; Tr. (Peroutka) 91:17-92:12.)  And while Plaintiffs inexplicitly characterized the MS-F201 study reported in the Goodman references as a "failure" (Pls.' Br. 28), this prior art taught that 10-20 mg 4-AP BID  had a "[s]afety profile consistent with previous experience" and reported "statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04)[.]"  (Tr. (Goodman) 477:4-12; Tr. (Cohen) 307:14-17; JTX-061.)  As Dr.

Goodman reported to his peers, Acorda's secondary objective in the MS-F201 study was to "[o]btain evidence of efficacy and dose response," and he found such "[e]vidence of dose-response in 20-40 mg/day range."  (JTX-080A.)

In short, *Galderma*, *Tyco*, and similar cases control and are dispositive here, and the Acorda patents are presumed obvious as a matter of law.  At a very minimum, given the "finite number of identified, predictable solutions" when assessing an optimized dose for the prior art treatment of MS, the "anticipated success" was "the product not of innovation but of ordinary skill and common sense."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Finally, Plaintiffs presented no persuasive evidence of "secondary considerations" that rebut Defendants' strong showing of obviousness.  Plaintiffs raise no argument for teaching away.  Their purported evidence of commercial success and long-felt but unmet need are legally deficient due to the Elan "blocking patent," and otherwise factually deficient.  *See Warner Chilcott Co, LLC. v. Teva Pharm. USA, Inc.*, 37 F. Supp. 3d 731, 739 (D. Del. 2014), *aff'd*, 594 F. App'x 630 (Fed. Cir. 2014).  They produced no evidence that others tried but failed to practice the claimed invention—indeed, the Schwid and Goodman references reported successes.  And their purported evidence of "unexpected" results were not only expected, but at most suggest legally irrelevant "differences in degree rather than kind."  *Galderma*, 737 F. 3d at 739.

Judgment should be entered for Defendants on all asserted patents.

**ARGUMENT**

I.   **Defendants Have Proven by Clear and Convincing Evidence That The Asserted Elan Patent Claims Are Invalid.**

A.   **The Asserted Elan Patent Claims Are Obvious.**

1.   **The Prior Art Motivated A POSA, And Provided A Reasonable Expectation Of Success, To Use 4-AP To Treat MS Patients.**

Defendants established by clear and convincing evidence that a POSA in 1991 would have been motivated by the prior art to use 4-AP to treat MS patients with a reasonable expectation of success. This factual finding is confirmed by the binding statements the inventors made when characterizing that prior art in the specification. (D.I. 265, Defendants' Opening Post-Trial Brief (herein after "Defs.' Op. Br.") at 13-17.) In an attempt to dismiss the clear import of these references and the admissions in the patent, Plaintiffs argue that (1) the Stefoski and Davis prior art did "little more than suggest the need for further studies" (Pls.' Br. at 16); (2) statements made in the patent specification "have no bearing on whether the claimed inventions of the '938 patent were obvious" (*id.* at 18); and (3) additional "proof of safety and efficacy" is required to render patent claims obvious (*id.* at 19). All three arguments are unpersuasive and should be rejected because they conflate the requirement for FDA approval with the standard for obviousness.

a.   **Stefoski and Davis Taught That 4-AP Could Be Used to Treat Symptoms Related to Neuromuscular Transmission in MS Patients.**

The trial evidence showed that two pivotal human clinical studies by a group of researchers at Rush University in Chicago—led by Drs. Stefoski and Davis—demonstrated in the prior art that 4-AP improves "clinical signs in multiple sclerosis" patients; and that both studies confirmed 4-AP's efficacy using visual evoked potential ("VEP"), a test that eliminates the possibility for a placebo effect and can reveal a nerve conduction response and a therapeutic effect. (Defs.' Op. Br. at 13-15; JTX-112; JTX-043.) In response, Plaintiffs quibble with certain study limitations

(which their experts acknowledge all studies have) and mischaracterize the plain conclusions of these authors.

Plaintiffs attempt to minimize the data reported in the prior art Stefoski and Davis references by referring to 4-AP as a "bird toxin," and the reported information on using the drug in MS patients as "meager."  (Pls.' Br. at 14.)  But Plaintiffs cannot dispute that, to support their patent, the named inventors themselves relied upon these prior art references and, in particular, the reported clinically significant benefits of 4-AP in MS patients.  (JTX-001 at 1:51-60.)

Moreover, Plaintiffs have mischaracterized the prior art.  For example, Plaintiffs argue that Stefoski suggested only that "studies were then under way to assess th[e] *possibility*" of 4-AP's "clinical usefulness," which, "[i]f anything . . . exhibited a lack of confidence in the usefulness of 4-AP."  (JTX-112 at AMP-DEF-0000138; Pls.' Br. at 15) (emphasis in original).  They further argue that a POSA would not make inferences regarding 4-AP's therapeutic effect based on the "limited" findings of the Davis paper.  (Pls.' Br. at 15)  But Drs. Stefoski and Davis did not express the lack of confidence Plaintiffs attribute to them; instead, they titled their articles: "4-Aminopyridine improves clinical signs in multiple sclerosis," and "Orally administered 4-aminopyridine improves clinical signs in multiple sclerosis," respectively.  (JTX-112; JTX-043.)  While Plaintiffs argue that Stefoski and Davis "left open the question of whether the improved nerve conduction caused by 4-AP could have meaningful clinical effects," (Pls.' Br. at 17), Stefoski actually concludes: "we believe that the magnitude of the improvements we observed without serious side effects suggests a clinical usefulness of this agent, administered orally in selected patients."  (JTX-112 at AMP-DEF-0000138.)  And Davis similarly concludes: "orally administered 4-AP produces clinically important improvements in multiple, chronic deficits in MS."  (JTX-043 at AMP-DEF-0000066.)

To support their revisionist interpretation of the prior art, Plaintiffs cherry-pick the reported data and fail to consider its weight as a whole, as a POSA would do.  For example, Plaintiffs argue that Davis conducted "no test of walking speed."  (Pls.' Br. at 16.)  However, Plaintiffs ignore Davis' testing of 4-AP for an effect in gait, which undisputedly is synonymous with walking.  (Tr. (Peroutka) 79:24.)

Plaintiffs' reliance on later articles by Bever in which the authors noted study limitations in the Stefoski and Davis references is unpersuasive.  (Pls.' Br. at 16.)  There is no dispute that any study will have limitations.  And despite the limitations in the studies reported by Stefoski and Davis, Bever still concluded that these studies "suggested benefit" (JTX-027 at AMPFH0021791)—prompting further studies and ultimately "demonstrat[ing] that [4-AP] can improve residual neurological deficits in MS patients" (*id.* at AMPFH0021792).

Plaintiffs also point to this Court's claim construction ruling for the term "therapeutically effective blood levels" as somehow supporting their non-obviousness position, but this argument makes no sense.  (Pls.' Br. at 17.)  This Court's analysis did not minimize or negate the conclusions reported by Davis and Stefoski in the prior art as to the effects of MS on 4-AP.  Nor did this Court change the wording of the patent, which expressly claims a "method for the *treatment* of" multiple sclerosis.  (*See* D.I. 195 at 7; JTX-001 (emphasis added).)

Regardless, to accept Plaintiffs' reading of the prior art, as discussed below, would necessarily mean that the Elan patent—which expressly claims a "method for the *treatment* of" "multiple sclerosis"—lacks an adequate disclosure.  (JTX-001.)

> **b.    The Elan Patent Specification Explicitly Acknowledges the Prior Art Research by Stefoski and Davis.**

Plaintiffs argue that Defendants "attempt to make much" of the Elan patent's specification, which states—referring to the work of Stefoski and Davis—that "4-Aminopyridine (4-AP) has

been found to improve the conduction of nerve impulses, thereby, alleviating symptoms in MS patients." (Pls.' Br. at 17; JTX-001 at 1:51-63.) Indeed, because the inventors' characterizations of the prior art are binding on Plaintiffs (that is, "admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness"), much *should* be made of the inventors' concessions. *PharmaStem*, 491 F.3d at 1362. (Defs.' Op. Br. at 15-17.)

Plaintiffs do not dispute the legal principle from *PharmaStem*. Instead, they argue for the first time, without any evidentiary support, that the specification does not refer to the Davis and Stefoski I references, or to Davis and Stefoski's cumulative published research—but, rather, to the inventors' personal knowledge of unpublished research, or the results of Stefoski II alone (which, as discussed below, is still prior art to the Elan patent). These new arguments are directly contradicted by the plain language of the Elan patent and Plaintiffs' own expert's testimony.

Noting that the specification does not include a citation to Davis and Stefoski's prior research, Plaintiffs offer attorney argument that "the statement in the patent apparently reflects the inventors' personal knowledge about the continuing work by Davis and Stefoski, and is not a representation as to what was in the publicly available prior art." (Pls.' Br. at 17-18.) Putting aside the fact that this discussion appears in a section titled "Background and Prior Art," Plaintiffs are asking this Court to engage in pure speculation as to the inventors' personal knowledge, unsupported by any trial evidence or testimony.

Indeed, Plaintiffs' expert, Dr. Lublin, contradicted this speculation when he agreed that the specification refers to multiple clinical trials undertaken by the Stefoski and Davis research group and reported in the *prior art*:

> Q:   Now, you had also discussed various prior art or disclosure in the '938 patent that talks about previous studies conducted in 4-AP; is that right?
>
> A:   Yes.

9

> Q:     Okay.  And it refers to clinical trials carried out by Davis, FA and Stefoski, D from the Rush Multiple Sclerosis Centre; is that correct?
>
> A:     Yes.
>
> Q:     And I believe that you stated that that was referring to the Rush article that we've been discussing at JTX-43 [1990 Davis reference]?
>
> A:     I think it refers to all of their prior work.

(Tr. (Lublin) 416:19-417:12.)  Dr. Lublin's reading of the Elan patent specification makes sense; each of the publications by Stefoski and Davis taught that 4-AP could be used to treat clinical symptoms related to neuromuscular transmission in MS patients.  (JTX-112 at AMP-DEF-0000138 ("we believe that the magnitude of the improvements we observed without serious side effects suggests a clinical usefulness of this agent, administered orally in selected patients."); JTX-043 at AMP-DEF-0000066 ("orally administered 4-AP produces clinically important improvements in multiple, chronic deficits in MS."); JTX-113 at AMP-DEF-0000145 ("The results with 4-AP in MS clearly indicate efficacy in improving signs and symptoms").)

Next, Plaintiffs argue that even if the Elan patent specification refers to a publication by Stefoski and Davis, it is only to the 1991 Stefoski II reference, which Plaintiffs contend should not be deemed prior art because Defendants somehow "waived" their right to characterize it as such. (Pls.' Br. at 18-19.)  Not so.  Although Plaintiffs could have tried to argue for a November 1990 priority date based on a foreign application, they opted, instead, to assert a priority date of November 1, *1991*.  (Tr. (Fassihi) 324:3-7; *see also id.* 416:19-417:12.)  As a result, Stefoski II, which was published in September 1991, is prior art to the Elan patent.  (JTX-113; D.I. 252, Ex. 1 at 63.)  Defendants never waived their right to argue otherwise.

Stefoski II not only concludes that "4-AP is a promising drug for the symptomatic treatment of MS," but it also references the earlier Davis publication, stating, "In an earlier study, we *demonstrated* efficacy of single oral doses of 4-aminopyridine in improving motor and visual

signs in multiple sclerosis (MS) patients."  (JTX-113 at AMP-DEF-0000142 (emphasis added).)
This is more than enough to provide a reasonable expectation that 4-AP could be used to treat MS
patients.  *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292-93 (Fed. Cir. 2013) ("There is no
requirement that one of ordinary skill have a reasonable expectation of success in developing [the
FDA-approved commercialized product].  Rather, the person of ordinary skill need only have a
reasonable expectation of success of developing the claimed invention.").[1]  Indeed, as discussed
below, Plaintiffs cannot contend otherwise without rendering their patent invalid under § 112.

> **2.**     **The Prior Art Also Motivated a POSA, and Provided a Reasonable
> Expectation of Success, To Formulate a 4-AP *Sustained Release* Dosage
> Form to Treat MS Patients.**

Plaintiffs do not seriously dispute that the prior art would have motivated a POSA in 1991
to reformulate immediate release 4-AP into a sustained release dosage form.  In particular, a skilled
artisan would have recognized from the prior art that:  (1) a sustained release formulation would
address concerns associated with immediate release 4-AP, such as its short half-life, which caused
patient-compliance concerns, and side effects; and (2) 4-AP had qualities that favored a sustained
release dosage form, including effectiveness at relatively small doses, efficient absorption
throughout the gastrointestinal tract, and bioavailability that is unaffected by the first-pass liver
effect.  (Defs.' Op. Br. at 18-26.)

---

[1] Plaintiffs also take issue with Defendants' reference to the utility requirement of the *Manual of Patent Examining Procedure* § 2107.03 (8th ed., rev. 6, Sept. 2007) as one factor in support of a POSA's reasonable expectation of success in this case.  (Pls.' Br. at 19-20.)  But utility means "useful for any particular practical purpose" that would be "considered credible by a person of ordinary skill in the art."  *Manual of Patent Examining Procedure* § 2107 at II(B)(1).  Here, both the *purpose* of the clinical testing undertaken by Drs. Davis and Stefoski and approved through an FDA Investigational New Drug Application ("IND") *and the asserted claims* of the Elan patent relate to a therapeutically effective method of treating MS patients.  Thus, FDA's finding of utility bears directly on whether a POSA would have a reasonable expectation of success that a drug could be useful for the practical purpose of treating MS patients.

Instead, they argue that a POSA in 1991 would not have reasonably expected to *succeed* in formulating a sustained release 4-AP product. In support, they point to the purported "emerging state of the art," "complexity of sustained release formulations," and "dearth of information regarding the safety, efficacy and pharmacokinetics of 4-AP." (Pls.' Br. at 25 n.19.) Again, Plaintiffs' arguments are not persuasive.

### a. The State of the Art in 1991 Provided Formulators with Many Sustained Release Options.

Defendants have provided clear and convincing evidence that many different sustained release platforms were available to formulators, with detailed instructions on how to make them in prior art such as Remington's 1990. (Defs.' Op. Br. 30-31.) In response, Plaintiffs maintain that sustained release technology was nevertheless at a "nascent stage," formulators' knowledge of sustained release was "limited," and the FDA was still in the process of composing guidelines to aid pharmaceutical companies in developing formulations. (Pls.' Br. at 21.) Plaintiffs have understated the ability of a POSA to formulate *at least one* sustained release dosage form of 4-AP that provided therapeutically effective blood levels over a 12- to 24-hour period.

Indeed, Plaintiffs do not dispute that Remington's reported in 1990 at least 39 commercially available sustained release products from 14 different companies using at least five different types of sustained release platforms—all of which were available to a POSA motivated to make a sustained release formulation of 4-AP. (JTX-081 at AMP-DEF-0000175-180.) Indeed, Plaintiffs did not rebut Dr. Kibbe's testimony that the popular "encapsulated dissolution" system disclosed in Remington's—which is the type of formulation used by then-existing over-the-counter medication, Contac—would have worked "quite nicely" for a 4-AP formulation. (JTX-081; Tr. (Kibbe) 208:18-210:7.) To be sure, FDA had not yet issued formal guidelines regarding sustained release formulations. But the agency had "approved a large number of sustained release

dosage forms already, which meant if they didn't have public guidelines, they had internal guidelines."  (Tr. (Kibbe) 234:20-235:3; *see also* D.I. 263 ¶ 91.)  And prior art treatises such as Remington's and Robinson & Lee, which are undisputed "bibles" in the formulation field, had chapters devoted to sustained release technology.  (D.I. 263 ¶¶ 88-90.)

### b. By 1991, Formulating Sustained Release Dosage Forms was Routine.

As set forth in Defendants' opening brief, the evidence clearly and convincingly showed that making a sustained release formulation of a known drug was relatively "straightforward" by 1991, combining the application of a POSA's routine research methods with known sustained release formulation techniques reported in the prior art.  (Defs.' Op. Br. 30-33.)  In response, Plaintiffs argue that Dr. Kibbe provides only a "facile" description of the "complex" process of developing sustained release formulations.  In support, they point to statements by Dr. Robinson, whose writings Plaintiffs argue stand for the proposition that sustained release formulations is "a complex effort," and to Dr. Fassihi, who testified that developing a sustained release formulation of a drug that has not been widely consumed in immediate release form would be "very difficult." (Pls.' Br. at 21, 22, 25 n.19.)  In so doing, Plaintiffs incorrectly characterize Dr. Kibbe's qualifications, take statements in the prior art out of context, and place undue reliance on difficulties in the formulation arts.  Most telling, nowhere have Plaintiffs alleged that making a sustained release formulation is beyond the skill of a POSA.

First, Plaintiffs inappropriately attack Dr. Kibbe's qualifications.  He is a professor, now emeritus, and founder of the Nesbitt School of Pharmacy's Department of Pharmaceutical Sciences at Wilkes University and was accepted as an expert—*without objection*—in "the development and evaluation of pharmaceutical dosage form formulations including both immediate and sustained release formulations" and "pharmacokinetics."  (Tr. 179:25-180:7; DTX-129 at 1.)  Plaintiffs'

13

criticisms—based solely on the number of Dr. Kibbe's academic research publications (Pls.' Br. at 20)—ignore that Wilkes is not a research university, and Dr. Kibbe has spent 22 years training graduate students in developing and formulating pharmaceutical dosage forms, where he routinely makes sustained release formulations. (Tr. 178:14-21; 261:9-13.) Plaintiffs also overlook that Dr. Kibbe served as the Editor in Chief of the Third Edition of the Handbook of Pharmaceutical Excipients—the seminal treatise on the actual materials that are used to create sustained release formulations. (Tr. 176:19-177:2.) In short, Plaintiffs' suggestion that Dr. Kibbe's opinions should be discounted because he "never conducted research on sustained release formulations" and lacks "practical experience" (Pls.' Br. at 20-21) is false.

Second, Plaintiffs erroneously suggest that Dr. Kibbe's testimony "flies in the face" of the work of Dr. Joseph Robinson, who authored some of the prior art. (Pls.' Br. at 21.) To be sure, Dr. Robinson said in his 1978 treatise that formulation tasks can be "difficult," and he left that comment unchanged in later editions. (JTX-079 at AMP-DEF-0000097; PTX-095 at 201.) But normally difficult tasks can still be routine for those of ordinary skill in the art. As Dr. Kibbe testified, a POSA in the pharmaceutical arts would know how to select an appropriate platform and perform routine testing to determine the appropriate excipients and dissolution profiles to prepare a suitable sustained release dosage form for a drug with characteristics like 4-AP. (D.I. 263 ¶¶ 117-120; Tr. (Kibbe) 210:12-211:9.)

Indeed, Dr. Robinson himself authored several chapters in treatises (one dating back to the 1970s) explaining exactly how to do so. In the very chapter Plaintiffs cite, Dr. Robinson reports that "sustained-release products have received a substantial amount of attention in recent years, and several good reviews are available for the interested reader" that "provide not only a description of the available mechanisms and technology for production of these dosage forms, but

14

also information on clinical evaluation and performance." (PTX-095 at 201.) He then details the fabrication steps for multiple different sustained release products. (*Id.* at 199-287.)

At bottom, Plaintiffs' efforts to argue that a POSA would find formulating a sustained release 4-AP dosage form "complex" or "very difficult" achieve nothing—as a matter of law. Federal Circuit precedent holds that "many techniques that require extensive time, money, and effort to carry out may nevertheless be arguably 'routine' to one of ordinary skill in the art." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007). And, more particularly, a patentee cannot point to "general unpredictability of the formulation arts" to support patent validity, "so long as there was a reasonable probability of success." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292-93 (Fed. Cir. 2013).

### c.    By 1991, the Prior Art Taught the Safety, Efficacy, and Pharmacokinetics of 4-AP.

Plaintiffs make much of the fact that an immediate release 4-AP product had not been previously approved. In their view, this must have meant that there was not enough information regarding the safety, efficacy, and pharmacokinetics of 4-AP to provide a POSA with a reasonable expectation of success in formulating a sustained release dosage form of 4-AP that provides therapeutically effective blood levels over a 12-24 hour period. (Pls.' Br. at 22-25, n.19.) Plaintiffs are wrong. They offered no authority suggesting that "copious information" about a drug's safety and efficacy is required before a POSA would have a reasonable expectation of success. (*Id.*) Indeed, as described above and in Defendants' opening brief, the prior art—particularly the Stefoski and Davis references—already offered more than enough data to provide a POSA with a reasonable expectation that 4-AP could be safe and effective in treating MS patients. (*See* D.I. 265 at 13-15; *supra* at 6-7.)

Plaintiffs further argue that "no meaningful pharmacokinetic information was available regarding 4-AP in 1991," and that Dr. Kibbe failed to explain how the pharmacokinetic data in Uges could be used in designing a sustained release ("SR") formulation.  (Pls.' Br. at 23.)  This again contradicts what the evidence at trial showed.  Dr. Kibbe testified that the data disclosed in Uges "gives [a POSA] information that motivates [the POSA] to go forward."  (Tr. (Kibbe) at 203:13-14.)  This information includes that the drug has a "[r]elatively short [half-]life, 3.6 hours. Efficient absorption pattern, [one] hundred percent bioavailability, and relatively small dose, Uges uses 20 milligram dose…."  (*Id*. at 203:23-204:1.)  A POSA would have been able to calculate the inherent known pharmacokinetic values from Uges.  (*Id*. at 218:16-17.)

Further, Dr. Kibbe testified that the half-life disclosed in Uges "is a good half-life to look at in terms of converting [the immediate release formulation] to sustained release...."  (*Id*. at 201:17-18.)  Other pharmacokinetic data disclosed in Uges, according to Dr. Kibbe, would have helped a POSA understand that 4-AP is a good candidate for a SR formulation.  (*Id*. at 201:22-23.) These data included that the "bioavailability of the enteric coated labels is 95 plus or minus 29 percent…which means it is being absorbed more or less informally," as well as data showing that "biotransformation is unlikely…[meaning] that the drug is unchanged in the urine…which means that there is not going to be any first pass effect because there is no metabolism."  (*Id*. at 201:25-202:7.)  While Dr. Kibbe acknowledged that POSAs "always like more data," he opined that as a rule, "everybody wants more data than they have…[b]ut this data tells [a POSA] what [a POSA would] need to know about whether or not this drug is a good candidate for sustained release." (Tr. (Kibbe) at 203:10; 251:10-13.)  A POSA would then "go forward with additional experiments to refine [the POSA's] understanding."  (*Id*. at 251:13-15.)

Plaintiffs argue that the "data disclosed in Uges reflects significant pharmacokinetic variability among the nine test subjects and thus a lack of predictability." (Pls.' Br. at 23.) But this argument is inconsistent with Dr. Kibbe's testimony. Rather, Dr. Kibbe opined that "the calculated [pharmacokinetic] values [] have [] standard deviation numbers within them which reflects the variability." (Tr. (Kibbe) at 248:16-18.) Viewing the data disclosed in Table 2 of Uges, "the standard deviations are less than 10 percent of the mean values. That doesn't make them significant." (*Id*. at 248:23-25.)

Plaintiffs also attempt to warp the significance of the split of the test subjects in Table 1 of Uges such that five subjects were listed in a triexponential pharmacokinetic model and four subjects into a biexponential model. (Pls.' Br. at 23.) But this was simply a decision made by the authors to analyze the data in this manner. (Tr. (Kibbe) at 249:6-19.) The differences shown in the table "reflect[] differences in the model more than the differences in the drug." (*Id*. at 250:19-251:5.) Plaintiffs may dismiss Uges in retrospect, but they fail to recognize that POSAs in the field did not. Stefoski explicitly cites to Uges as evidence of the known pharmacokinetics of 4-AP. (JTX-112 at AMP-DEF-0000138.) And, regardless, a POSA would have had access to 4-AP if more testing and data were warranted. (D.I. 262 at ¶ 53.)

Plaintiffs also suggest that the potential for dose dumping in a sustained release 4-AP formulation was a "real issue" because 4-AP was known to be "toxic." (Pls.' Br. at 24.) But Dr. Fassihi presented no evidence that "dose dumping," while a general concern for sustained release formulations, was an explicit concern with respect to 4-AP that would have dissuaded a POSA from a reasonable expectation of success. Plaintiffs similarly overstate the difficulty in creating a sustained release version of 4-AP because it is water-soluble. (Pls.' Br. at 24.) In addition to similar guidance provided by Remington's 1990, hydroxyl propyl methylcellulose ("HPMC") was

available as a well-known, water-soluble polymer for matrix formulations (indeed, this is the preferred polymer in the patent).  (Tr. (Kibbe) 209:24-210:2; JTX-001 at 4:41-46.)

In the end, Plaintiffs never dispute that the Elan patent claims *any* "sustained release" formulation of 4-AP capable of providing a "controlled absorption" that "achieves therapeutically effective blood levels over a 12-24 hour period when administered on a once- or twice-daily basis." (JTX-001 at 22:16-25.)  This is a critical point.  While Plaintiffs may characterize sustained release technology as "nascent" or "limited," their arguments that a skilled formulator at the time would not have had a reasonable expectation of successfully formulating 4-AP into *any* of multiple available sustained release dosage forms is unsupported by credible evidence in the trial record. Rather, skilled formulators at the time knew how to do precisely this through routine experimentations.  (Tr. (Kibbe) 211:18-23.)   And any such expectation would be sufficient to render the patent obvious.  *See*, *e.g.*, *Aventis Pharm. Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1300 (Fed. Cir. 2007) (finding a genus invalid as obvious because a species within that genus was obvious).

### 3.   Secondary Considerations Cannot Overcome The Strong Showing That The Elan Patent Is Obvious.

Commercial success is the only secondary consideration identified by Plaintiffs in support of their argument that the Elan patent is nonobvious.  (Pls.' Br. at 26.)  While Ampyra cannot be considered a commercial success for any of the patents-in-suit for the reasons discussed below in Section D.1, Plaintiffs have additionally failed to establish a nexus between any sales of Ampyra and the specific contributions of the Elan patent.

Plaintiffs' commercial success expert, Dr. Bell, did not offer any opinions regarding the relative contribution of the Elan patent to Ampyra's commercial success.  (Tr. (Bell) 613:15-18.) Nor did he perform any analysis as to the relative contribution of the prior art 4-AP compound

itself, even though he admitted it was an unpatented feature of Ampyra that is part of what is required for the product to be successful.  (*Id.* at 614:10-24.)

By contrast, Defendants' commercial success expert, Dr. McDuff, opined—without contradiction, and with support from Defendants' expert Dr. Peroutka—that the patented features of the Elan patent "are not nearly in the same magnitude of the 4-AP compound itself" when evaluating the contributions to the overall sales of the commercial product.  (Tr. (McDuff) 653:3-15; Tr. (Peroutka) 707:1-8.)  He thus concluded that the nexus of Ampyra sales to the Elan patent was "weak."  (*Id.* at 654:1-4.)

Based on the commercial success arguments set forth in Section D.1 below and Plaintiffs' complete failure of proof with respect to establishing a nexus between sales of Ampyra and the specific contributions of the Elan patent, the Court should reject commercial success as a secondary consideration in support of the Elan patent's validity.  This is particularly true in light of the "strong prima facie case of obviousness."  *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).

**B.    Alternatively, The Asserted Claims Of The Elan Patent Are Invalid Under § 112 As Lacking Written Description Or Enablement.**

In an effort to defend the Elan patent from an obviousness challenge, Plaintiffs repeatedly contend that, "in 1991, the prior art showed only that 4-AP warranted further study" and that "4-AP was not then 'known' to provide any specific clinical benefit to MS patients."  (*Id.* at 2.)  They further refer to the prior art as providing "meager data" with only "fragmentary hints" that 4-AP might have some clinical usefulness in MS patients.  (*Id.* at 14, 16.)  If true, these are significant admissions under 35 U.S.C. § 112, given that the Elan patent claims methods of "treatment" for MS, and the patent disclosure does not identify any 4-AP testing conducted independently by the inventors.  Indeed, Plaintiffs acknowledge that Davis and Stefoski provide the sole support for the

Elan patent's written description and enablement, confirming that "[w]ith respect to 4-AP, the patent references only the work by Davis and Stefoski, who had already published the 1987 Stefoski and 1990 Davis papers."  (Pls.' Br. at 56.)

To fulfill the written description requirement, a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that "the inventor invented the claimed invention."  *Regent of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997).  Likewise, a specification lacks enablement if it fails to teach one of skill in the art "how to make and use the full scope of the claimed invention without 'undue experimentation.'"  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013). The knowledge of the person of skill in the art cannot substitute for the disclosure of the novel aspects of the invention, particularly in the pharmaceutical arts.  *See Alza Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941-42 (Fed Cir. 2010).

Applying these standards to Plaintiffs' admissions about the patent disclosure, either the prior art taught and enabled using 4-AP to treat MS (and thus provided a motivation to improve the dosage form to aid patient compliance), or the Elan patent lacks a sufficient disclosure to support the breadth of the asserted claims for such treatment.  Either way, the asserted claims of the Elan patent are invalid.[2]

Plaintiffs attempt to save the Elan patent by arguing that the work by Davis and Stefoski enables only improvement of "nerve conduction" and not treatment of MS symptoms.  (Pls.' Br. at 57.)  But the Elan patent is either enabled for the *full* scope of the asserted claims, or it is not

---

[2] Plaintiffs' arguments regarding whether the Elan patent covers a stable dosing regimen similarly either invalidate the patent based on the enabled prior act or insufficient disclosure.  In particular, Plaintiffs argue that "the '938 patent does not disclose administration other than via upward titration," but admit that the claims are "not limited to administration of 4-AP using an individual titration dosing scheme."  (Pls.' Br. at 42.)

enabled at all.  *MagSil Corp. v. Seagate Tech.*, 764 F. Supp. 2d 674, 678 (D. Del. 2011) ("In order to satisfy the enablement requirement of § 112, the specification of a patent must teach those skilled in the art how to make and use the *full scope* of the claimed invention without undue experimentation.") (emphasis added), *aff'd sub nom.*, *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377 (Fed. Cir. 2012).  The *MagSil* court held that the specification of the patent was "insufficient to enable one of ordinary skill in the art to make and use the full scope of asserted claims…[t]hus, these claims are invalid because of lack of enablement."  *MagSil Corp.*, 764 F. Supp. 2d at 683; *see also Johns Hopkins Univ. v. 454 Life Scis. Corp.*, No. CV 13-1853-LPS, 2016 WL 1948818, at *4 (D. Del. May 2, 2016) ("[t]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.")

Likewise, to satisfy the written description requirement, when a patent claims a genus using functional language to define a desired result, "the specification must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014).  The Federal Circuit has held that "a sufficient description of a genus . . . requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Id.*

Contrary to Plaintiffs' suggestion, the Court's claim construction ruling for the term "therapeutically effective blood levels" does not restrict the Elan patent's scope to a method of treatment resulting in improved nerve conduction.  That is merely one possible result of practicing

the asserted claims.  (D.I. 195 at 7.)  Improving MS symptoms (including walking) is clearly

another, as Plaintiffs have listed the Elan patent as covering Ampyra.  (D.I. 262 at ¶226; Tr.

(McDuff) at 648:17-25.)  And while Dr. Goodman may have testified that the work of Davis and

Stefoski did not provide a POSA with a reasonable expectation of success in treating clinical

manifestations of MS (Pls.' Br. at 57), the plain conclusions of Davis and Stefoski say the opposite.

(JTX-112 at AMP-DEF-0000138 ("[W]e believe that the magnitude of the improvements we

observed without serious side effects suggests a clinical usefulness of this agent, administered

orally in selected patients."); JTX-043 at AMP-DEF-0000066 ("[O]rally administered 4-AP

produces clinically important improvements in multiple, chronic deficits in MS."); JTX-113 at

AMP-DEF-0000145 ("The results with 4-AP in MS clearly indicate efficacy in improving signs

and symptoms").)

In short, Plaintiffs cannot have it both ways—simultaneously arguing that the Davis and

Stefoski research referenced in the specification serves as the sole support for its written

description and enablement, while also arguing that this same prior art would not have given a

POSA a reasonable expectation that 4-AP could successfully be used to treat clinical symptoms of

MS.  The asserted Elan patent claims are invalid regardless of how Plaintiffs construe this prior

art—either as obvious under § 103, or as lacking a sufficient disclosure under § 112.[3]

---

[3] Plaintiffs have no basis and cite no authority for arguing that Defendants waived their § 112 arguments related to the Elan patent.  (Pls.' Br. at 57 n.38.)  Based on Plaintiffs' pre-trial submissions, Defendants anticipated Plaintiffs might argue—in an effort to defend the Elan and Acorda patents from obviousness challenges—that the Elan patent lacks a sufficient patent disclosure to support the asserted claims.  For that reason, Defendants expressly raised their § 112 defenses in the pretrial statement.  (*See* Dkt. 252 Ex. 3 ¶¶ 63-70.)  Defense counsel also expressly noted during opening statement they were maintaining a § 112 defense that would be addressed in post-trial briefing, depending on the evidence and Plaintiffs' arguments presented at trial.  (Tr. 8 (Klein Opening) at 8:8-13.)  Counsel again raised this point during closing arguments.  (Tr. (Klein Closing) 799:19-800:21.)

II.     **Defendants Have Proven By Clear And Convincing Evidence That The Asserted Claims Of the Acorda Patents Are Invalid As Obvious.**

A.     **The Asserted Acorda Patent Claims Are Presumed Obvious As a Matter of Law.**

Plaintiffs do not dispute that, under settled law, "[w]here there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of obviousness." *Tyco*, 642 F.3d at 1372-73. Nor do they dispute that, in such a situation, the burden of production "falls upon [the patentee] to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Galderma*, 737 F.3d at 738. Instead, Plaintiffs attempt to distinguish this case law. Plaintiffs' effort, not Defendants' argument, is "futile." (Pls.' Br. at 52.)

For example, Plaintiffs place undue reliance on *Bayer Pharma AG v. Watson Labs, Inc.*, which distinguished *Galderma*. The *Bayer* case involved three phases of dosing that required the skilled artisan "to make at least five decisions to come up with a regimen." In contrast, the Court held, the "invention at issue in *Galderma* was the selection of a dose of one ingredient from a previously-disclosed range of that one ingredient." --- F. Supp. 3d ---, No. CV 12-1726-LPS, 2016 WL 3946916, at *32 (D. Del. July 18, 2016). This case is directly analogous to *Galderma*, not *Bayer*, because it too involves selecting a single dose (10 mg BID) of one ingredient (4-AP) from a previously disclosed range (10-20 mg BID).

Given that *Galderma* is indistinguishable, Plaintiffs distort the prior art beyond recognition, arguing that "there was no prior art teaching that *any* dose of 4-AP – any single dose or any range of doses – was safe and effective to improve walking or increase walking speed in MS patients." (Pls.' Br. at 54 (emphasis in original).) Based on this mischaracterization of the prior art, they conclude: "The Acorda inventors were not seeking to improve upon what was

already a known process, and their invention was not the mere optimization of a known dose range." (*Id.*)  These positions are not credible and contrary to the trial evidence.

First, as Plaintiffs conceded during closing argument, the Elan patent "does subsume" the claimed methods of treating walking in MS patients in the Acorda patents.  (Tr. (Becker Closing) 794:4-795:12.)  While they frantically attempt to draw a distinction between what the patent covers in terms of its "scope" and what it "teaches" a skilled artisan (*see id.*; Pls.' Br. at 56-59), that is not relevant to the *Galderma* inquiry.  There can be no question that the Acorda patents simply narrow the scope of the Elan patent, which preceded by the Acorda patents by almost a decade.

Second, Plaintiffs concede that Schwid, which used an Elan formulation ("fampridine, EL-970"), practiced the Elan patent, and discussed clinical testing with a stable "17.5 mg bid" dose of "4AP SR." (JTX-104; D.I. 262 at ¶ 132.)  Schwid found, for "timed gait," a statistically significant "improvement on 4-AP as compared to placebo on nine of ten subjects (p=0.02)." (Pls.' Br. at 60-61.)  However, Plaintiffs attempt again to twist the problem at hand by focusing on whether 4-AP could be used to treat *any* symptom of MS.  Based on this erroneous analysis, and contrary to the trial record, they argue that a POSA would have not have given Schwid's conclusions weight, because Schwid also showed "six failed measures." (*Id.* at 61.)  But the record clearly establishes that Schwid reviewed various measures—including EDSS, which previously failed—to find the most appropriate measure that would be sensitive enough to determine "symptomatic therapies for MS." (JTX-104 at AMPDEL0166742.)  And Schwid found that appropriate measure, i.e., "timed gait." (*Id.*)  That 4-AP did not meet other measures, such as EDSS, is neither relevant nor probative.  There is no dispute about what Schwid actually taught:  that "[t]imed gait" "improved" with a stable dose of "4AP SR 17.5 mg bid." (JTX-104; Tr. (Peroutka) 91:17-92:12.).

Similarly, Plaintiffs do not dispute that Solari reports that Schwid showed statistically significant improvement in "ambulation" with 4-AP.  (Pls.' Br. at 61.)  Plaintiffs appear to be arguing, however, that Solari's conclusions are not relevant, because, among other things, it was an overview article on both AP (mono-aminopyridine) and DAP (di-aminopyridine).  (Pls.' Br. at 61-62.)  But Plaintiffs are supporting precisely Defendants' broader point about Solari.  Solari, in fact, is not particularly relevant to the issue of obviousness, because it reports on neither original research nor analysis under the appropriate obviousness standard—and, also, does not address the Goodman references at all.  (Tr. (Peroutka) at 696:21-697:9.)  If Solari has any relevance at all, it supports, not detracts from, the obviousness of the Acorda patents because it further points a POSA to using 4-AP to improve walking (ambulation).  (PTX-416; (Tr. (Peroutka) at 699:25-700:19.)

Third, with respect to the Goodman references, they expressly taught that 10-20 mg 4-AP BID had a "[s]afety profile consistent with previous experience" and "statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04)[.]"  (Tr. (Goodman) 477:4-12; Tr. (Cohen) 307:14-17; JTX-061.)  As Dr. Goodman reported to his peers, one of Acorda's objectives in the MS-F201 study was to "[o]btain evidence of efficacy and dose response," and he found such "[e]vidence of dose-response in 20-40 mg/day range."  (JTX-080A.)

Once again, Plaintiffs urge the Court to misread the prior art by characterizing the MS-F201 study reported in the Goodman references as a "failure" for which a POSA "would have given little weight."  (Pls.' Br. at 28, 65.)  This position conflicts with Dr. Goodman's contemporaneous disclosures to the public at the time and, thus, is not credible.  The Goodman references showed not only improvement "at the lowest dose that they use, 20 milligrams, that is 10 milligrams  twice a day," but also that "all the other doses were in the same basic range."  (Tr.

(Peroutka) at 694:1-9.)  Therefore, combined with safety data, the Goodman references directly point a POSA to a narrow range, 10 mg to 20 mg twice a day, that was the most appropriate dose.

Fourth, Plaintiffs have conceded that Hayes III disclosed the precise pharmacokinetic values claimed in the Acorda patents:

> [P]laintiffs do not dispute that the Hayes references disclose that the Elan sustained release formulation used in the spinal cord injury studies reported in those references when dosed at 10 mg BID yielded pharmacokinetic values that fall within the scope of the Acorda Patent claims (or that Ampyra would do so) ….

(Pls.' Br. at 71.)  Nor do Plaintiffs dispute that the values from Hayes in spinal cord injury patients would be the same in MS patients.  (*See id.*)

In sum, the Acorda patents merely took the prior art—which taught that a stable dose of 17.5 mg sustained-release 4-AP, taken BID, improved walking speed in MS patients (Schwid) and a dose range of 10-20 mg BID was safe and had a dose response (Goodman references)—and isolated a particular dose (10 mg BID) from this preferred and narrow dosage range.  As cases like *Galderma* and *Tyco* make clear, such dose optimization is presumed obvious as a matter of law.

**B.    At A Minimum, The Prior Art Rendered The Claimed Invention Obvious To Try.**

As set forth in Defendants' opening brief, the trial evidence showed that the asserted claims of the Acorda patents are, at a minimum, "obvious to try" under *KSR*.  (Defs.' Op. Br. at 44-49.) Plaintiffs respond that *KSR* cannot be applied here because "the relevant art is littered with a history of inconsistent clinical trial results."  (Pls.' Br. at 73, citing *Sanofi v. Glenmark Pharm., Inc., USA*, No. CV 14-264-RGA, 2016 WL 4569680, at *22 (D. Del. Aug. 31, 2016).)  But once again, Plaintiffs have mischaracterized the prior art.

### 1. The Prior Art Encouraged Further Testing Of 10 mg 4-AP Sustained Release, Twice Daily, to Improve Walking in MS Patients.

Defendants established in their opening brief that Plaintiffs' own witnesses agreed that the clinical study results reported in the Goodman References would have motivated a POSA to conduct further testing within the 10-20 mg range, which obviously includes the claimed 10 mg dose.  (Defs.' Op. Br. at 45-46.)  In response, Plaintiffs argue that when Drs. Cohen and Goodman conceded motivation to conduct further testing, they were referring only to their own motivations influenced by full knowledge of the MS-F201 study results and not just those reported in the prior art references.  (Pls.' Br. at 73-76.)  Plaintiffs have pointed to nothing in the public disclosure of the MS-F201 testing that was materially different from the internal reports to support this argument.  And, Dr. Goodman conceded that he did not omit important context when he presented and published on that study in 2002-2003.  (Tr. (Goodman) 525:17-20.)

Indeed, Dr. Goodman acknowledged that the claimed invention of the Acorda patents was obvious to try when asked in his deposition about the motivation of "a person of ordinary skill in the art":

> Q:  And so would *a person of ordinary skill in the art* in December 2003 be motivated based on the 201 study [reported in the Goodman References] to design a study along the lines of what became the 202 study [testing 10 mg BID for 12 weeks]?
>
> A:  Well, I mean, the historical truth is that we did, so yes.

(Tr. (Goodman) 559:20-25) (emphasis added).  Notably, Dr. Goodman was not asked about his own personal motivations in designing the Acorda studies.  Instead, he was asked—as Plaintiffs' primary expert offering opinions on the validity of the Acorda patents—whether "*a person of*

*ordinary skill in the art*" would be motivated to design the study that ultimately supported the Acorda patents.[4]  And he said yes—at least at his deposition.

In their post-trial brief, Plaintiffs make the incredulous assertion that Dr. Goodman's concession is irrelevant, because this "was his testimony at the deposition[.]"  (*See* Pls.' Br. at 75.) To be sure, Dr. Goodman changed his answer from a "yes" to a "no" at trial after defense counsel made it clear that this was a critical concession, and the Court should absolutely consider such impeachment when assessing the credibility of Dr. Goodman, who Defendants showed was a biased witness.  (D.I. 262 at ¶ 64; Tr. (Goodman) at 535:23-537:24.)  More importantly, however, Plaintiffs ignore the Federal Rules of Evidence, which make it clear that Dr. Goodman's deposition testimony is part of the trial record.  *See* Fed. R. Evid. 801(d)(1) (prior inconsistent statements under oath are "not hearsay").  Dr. Goodman got it right the first time.  When he told his peers and the public at large that he found "[e]vidence of dose-response in 20-40 mg/day range," he was motivating those skilled in the art to conduct further testing, with a reasonable expectation of success, within that range.  (JTX-080A.)  Plaintiffs' arguments to the contrary are not credible.

In short, there can be no serious dispute that doses within the 10-20 mg BID range represent "a finite number of identified, predictable solutions" to an obvious question:  what specific, stable dose of sustained-release 4-AP should a skilled artisan use to improve walking speed in MS patients?  *KSR*, 550 U.S. at 421.  All doses within that discrete range, including the 10 mg dose, were at least obvious to try.

---

[4] Plaintiffs argue that defendants "ignore the results" of this next study.  (Pls.' Br. at 76.)  Of course, and it is right to do so.  Such data would not be relevant to an obviousness analysis because it was not publicly available at the relevant time.  35 U.S.C. § 103, Pub. L. No. 98-622 (1984) (amended 1995); *see also Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 394-95 (S.D.N.Y. 2007) ("Sanofi's internal, non-public test data . . . was not material" because "those results were non-public and not part of the prior art"), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008); Tr. (Becker Closing) 785:12-21.

2.  **The Claim Limitations Requiring a Stable Dose for More Than Two Weeks Cannot Support the Asserted Claims.**

Plaintiffs cannot credibly contend that they are entitled to patent protection for discovering that 4-AP could be used to improve walking in MS patients when taken in a *stable dose* for *at least two weeks.*  After all, "the general goal of drug development" is "to provide a stable dosing regimen." (Tr. (Peroutka) 99:9-11.)  Dr. Goodman conceded as much. (Tr. (Goodman) 553:1-20.)

Plaintiffs nonetheless try to make hay out of the fact that Schwid tested a stable dose for only one week, and the Goodman references discussed testing that did not involve a stable dose regimen.  But *combinations* of the prior art with a POSA's knowledge certainly do disclose each of these claim elements.  (Defs.' Op. Br. at 36.)  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. 398, 416 (2007).  Again, stable dosing is the end goal of drug development, which begins with dose-ranging studies for a finite duration.  (Tr. (Peroutka) at 99:5-11; Tr. (Goodman) 553:1-20.)  A POSA can make reasonable inferences from these studies and would have had a reasonable expectation of success in treating patients suffering from MS—a chronic disease with no cure—with a stable dosing regimen of 4-AP that lasted longer than the specifically studied period of one week, e.g., for more than two weeks.  (Defs.' Op. Br. at 47-48.)  To the extent Plaintiffs are trying to argue that the prior art taught that MS patients would have to titrate doses of 4-AP for the rest of their lives, and not settle on a stable dosing regimen, or that patients would take a stable dose for just one week, such positions would be absurd.

Plaintiffs further overstate a POSA's understanding of the "high risk of seizure in MS patients" in an unavailing attempt to establish a lack of expectation in achieving a safe, long-term administration.  (Pls.' Br. at 79.)  As Dr. Goodman reported in the Goodman References, his testing

found a "[s]afety profile consistent with previous experience," and there were "increased AEs [adverse events] at doses *above 50 mg/day*."  (JTX-080; JTX-080A (emphasis added).)  Indeed, there was a wealth of prior art and experience to give comfort to a POSA that dosing within the 10-20 mg range (BID)—particularly the low end of that range—was safe and effective, with seizure risk.  (DDX 2-71; JTX-001; JTX-043; JTX-061; JTX-062; JTX-080; JTX-104; JTX-112; JTX-113.)

### 3.    The Claimed Pharmacokinetic Values Cannot Support the Asserted Claims.

Plaintiffs concede that the listed inventors performed no formulation work and, instead, used a sustained release formulation created by Elan to reach the claimed methods.  They further concede that Hayes I and Hayes III disclose pharmacokinetic data for a 4-AP SR formulation.  (Pls.' Br. at 82-83.)  Plaintiffs nonetheless argue that they are entitled to patent protection based solely on the pharmacokinetic limitations.  This argument has no merits.

There is no dispute that the pharmacokinetic parameters disclosed in the Acorda patents are taken directly from the Hayes prior art references.  (DDX 8-23; JTX-069; JTX-002.)  Indeed, Plaintiffs ignore their concession at closing argument that "[i]t was known in the art that a sustained release formulation of 10 [milligrams] BID could achieve [the claimed] PK."  (Tr. (Becker Closing) 793:23-794:3.)  Dr. Kibbe confirmed as much.[5]

In short, the listed inventors did not invent or otherwise discover any of the pharmacokinetic profiles claimed in the patent.  To grant them patent protection based on the work of others reported in the prior art would turn the patent laws on their head.

---

[5] Plaintiffs argue that Dr. Kibbe limited his testimony on this issue to what was disclosed in Hayes I and III.  (Pls.' Br. at 84.)  Not so.  Dr. Kibbe confirmed at trial—without referencing Hayes in his answer—that "[t]he claimed PK parameters resulting from the administration of 10 milligrams [] BID of 4-AP were known in the art and were the natural result of the administration of the 10 milligrams sustained release product."  (Tr. (Kibbe) at 226:10-13.)

### C.  A POSA Would Have Had a Reasonable Expectation of Success in Using SR 4-AP to Improve Walking or Increase Walking Speed.

Plaintiffs argue that a POSA in 2004 would not have had a reasonable expectation that sustained release 4-AP could be used successfully at *any* dose—much less in accordance with the specific dosing regimen of the Acorda patent claims—to improve walking or increase walking speed in MS patients.  (Pls.' Br. at 31.)  However, Defendants have discussed at length in this brief and in their opening post-trial brief why the prior art provides more than a reasonable expectation of success and address below Plaintiffs' remaining arguments, to the extent not covered elsewhere.

#### 1.  Plaintiffs Overstate The Complexity and Variability Of MS Treatments.

Plaintiffs argue that "the broad range of symptoms caused by MS" complicates selection of the clinical endpoints to be used in MS.  (Pls.' Br. at 33.)  But a chronological review of the prior art timeline shows a consistent march by those skilled in the art towards using 4-AP to improve walking in MS patients:  Stefoski I (1987) showed that 4-AP improved non-motor symptoms (JTX-112); Davis (1990) showed that 4-AP improved motor function (power, coordination, gait) (JTX-043); Stefoski II (1991) showed that 4-AP improves motor functions over several days (JTX-113); Polman I (1994) showed that 4-AP improves ambulation long-term (JTX-095); Bever III (1994) showed that 4-AP improves lower extremity strength (JTX-028); Schwid (1997) showed that 17.5 mg BID sustained release 4-AP improves walking; and the Goodman References (2002-03) showed that 10-20 mg BID sustained release 4-AP increases walking speed (JTX-104, JTX-062, JTX-080).

Plaintiffs diminish the scope of this prior art by arguing that the prior art studies are merely "hypothesis generating," and thus insufficient for a POSA to form a reasonable expectation of success.  (Pls.' Br. at 38, citing *Forest Labs. Holding Ltd. v. Mylan Inc.*, No. CV 13-1602-SLR, 2016 WL 3677148, at *24 (D. Del. July 11, 2016).)  But *Forest Labs.* does not support their

position.  There, the court held that a POSA would not be motivated to combine the closest prior art with a small, open-label, non-placebo controlled trial using a *different drug* that, although in the same class, had the "opposite pharmacology."  2016 WL 3677148 at *22-24.  As a result, the court found this single study would have been interpreted with care by a POSA in light of the different drug, small size of the study, patients with varying prior histories, and the risk of bias.  *Id*.  These concerns are not applicable here, where a series of clinical trials concerning 4-AP by multiple investigators showed consistently promising results and actual, non-placebo induced, beneficial effects.

Plaintiffs further offer only attorney argument that, "[g]iven the nature of the disease, a POSA would not have an expectation of success in using 4-AP to treat any symptom of MS"—despite the favorable results and observed benefits from Stefoski, Davis, Schwid, and the Goodman References—without a "randomized, placebo-controlled clinical study properly designed to assess efficacy." (Pls.' Br. at 38.)  This standard, which is akin to the standard for FDA approval, is not the legal standard, which requires just a reasonable expectation of success. *Hoffmann-LaRoche, Inc. v. Apotex, Inc*., 748 F.3d 1326, 1331 (Fed. Cir. 2014) ("Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success."); Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1364 (Fed. Cir. 2007) (holding that "the expectation of success need only be reasonable, not absolute"); *In re Merck & Co.,* 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Obviousness does not require absolute predictability.").

As the Supreme Court explained, it is error to assume "that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem."  *KSR*, 550 U.S. at 420.  This is because "[c]ommon sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of

ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id*. That is, a "person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id*. The Acorda patents are obvious under this standard.

### 2.      Plaintiffs Overstate The Risk Of Seizures.

Plaintiffs' argument that the risk of seizures using 4-AP "weighed heavily against any reasonable expectation that a safe and efficacious dose could be found" overstates a POSA's understanding of the risk of seizures with 4-AP. (Pls.' Br. at 39.) Defendants addressed this issue in their opening post-trial brief. (Defs.' Op. Br. at 22.)

Plaintiffs continue their mischaracterization of the prior art to argue that "[v]irtually every reference" "taught" upward titration as a means of addressing 4-AP's narrow therapeutic index. (Pls.' Br. at 40-42.) By Plaintiffs' own admission, the prior art studies, such as the one reported in the Goodman references, were dose ranging or dose finding studies designed to "look primarily at a range of doses and safety and tolerability and pharmacokinetics at those doses." (Tr. (Cohen) at 287:13-21.) The goal of almost all dose ranging studies is to find the most efficacious dose without adverse events.  But once an efficacious dose is found, the general goal of drug development is to provide a stable dosing regimen. (Tr. (Peroutka) at 99:5-11.)

Contrary to Plaintiffs' contentions, the prior art did not suggest testing higher doses of 4-AP. (Pls.' Br. at 42-44.) Plaintiffs cannot, on the one hand, warn of the ever-present dangers of seizure risks (at high doses), while also advocating the prior art suggests "as high a dose as possible"—even with the disclaimer "short of precipitating adverse effects"—on the other. Rather, a POSA would know, based on the prior art, that very serious adverse events may occur the higher the dosage strength of 4-AP, and thus attempt to find the lowest effective dose. (Tr. (Peroutka) 104:7-16.)

### 3.      Plaintiffs Overstate The Relevance Of The "Failed" Elan Study.

The evidence shows why the unpublished 1994 Elan study referenced in a single paragraph in Schwid was not a "failed" study, as Plaintiffs repeatedly claimed throughout trial.  (Defs.' Op. Br. at 55-57.)  Plaintiffs ignore this evidence and, instead, continue to argue that this purported "failed" study somehow would have convinced a POSA to take the test results reported by Dr. Goodman in 2002 and 2003 and completely discard them.  Once again, Plaintiffs' arguments are meritless.

To credit Dr. Goodman's testimony, the Court would have to find that a POSA would discount all of the peer-reviewed prior art publications of clinical studies concerning 4-AP and rely, instead, on a passing reference to a 1994 Elan study as informing whether the drug could be reasonably expected to improve walking in MS patients.  Despite Plaintiffs' hyperbolic argument that this purported "failed" study cast "huge shadow on this whole field" (Pls.' Br. at 46), the 1994 Elan research simply moved the ball forward on the use of sustained release 4-AP formulation with MS patients.

As explained in detail in the 1997 Schwid reference dated seven years before the 2004 priority date, Dr. Goodman himself reported the realization from the Elan research that "EDSS . . . may have been an inadequate outcome variable" for this alleged failed trial.  (JTX-104 at AMPDEL0166739; D.I. 263 ¶ 131.)  For this precise reason, Dr. Goodman and others "planned the present pilot study [reported in Schwid]"—namely, "to assess the effect of 4AP SR on more sensitive, quantitative measures of function in MS.  (*Id.*; Tr. (Goodman) 542:19-543:1; Tr. (Peroutka) 703:15-704:18.)  As Dr. Goodman conceded, since the Schwid study reported in 1997, no other published study used EDSS as the sole outcome variable in testing 4-AP.  (Tr. (Goodman) 546:1-4.)  In this sense, as Dr. Peroutka explained, the 1994 Elan study was not a *failed* study.

Instead, it informed investigators how to develop future, successful studies.   (Tr. (Peroutka) 702:22-703:14.)

### 4.   Plaintiffs Overstate The Relevance Of The Solari Review, Which Supports Defendants' Obviousness Defense.

Plaintiffs argue that a POSA would assess the prior art and come to the same conclusions for the purposes of an obviousness analysis as Solari did with respect to her review article assessing the efficacy of 4-AP and DAP.   (Pls.' Br. at 47-50.)   But Plaintiffs' reliance on Solari is misplaced for the reasons previously discussed, as well as for the following reasons.

First, Dr. Goodman describes Cochrane Reviews as "rigorously done evidence-based systematic review[s]" that exclude anything but randomized, controlled clinical trials.   (Pls.' Br. at 48; PTX-416.)   Plaintiffs cite no authority for the proposition that a POSA undertaking an obviousness analysis would only consider randomized, controlled clinical trials.   Indeed, Plaintiffs have conceded that an FDA-approval standard does not apply to an obviousness analysis.   (Pls.' Br. at 38.)

Second, Solari's conclusions are made without the benefit of the teachings of important prior art, such as the Goodman and Hayes references.   (PTX-416.)   Plaintiffs do not dispute that a POSA would have had access to these references as well as those discussed in Solari.

Third, Plaintiffs repeatedly refer to Solari's "overall conclusion" about whether the then-current research on 4-AP and DAP (a compound not at issue here), viewed collectively, allow an unbiased statement about safety or efficacy of aminopyridines for treating all of the MS symptoms considered, which include motor function, eye movements, EDSS, visual function, cognitive function, and fatigue—none of which are at issue here.   (PTX-416.)   However, this is not the relevant analysis.   Indeed, a fair reading of Solari would focus a POSA not on fatigue, cognition,

or visual effects of the drug, but "on the two [aspects] that were highly significant, that is ambulation and motor strength."  (Tr. (Peroutka) 699:25-700:3.)

> **5.      Plaintiffs Continue To Rely On Unpublished Data That Is Irrelevant To Obviousness.**

As Plaintiffs' themselves admit, information that is not "publicly available prior art" has "no bearing" on issues of obviousness.  (Pls.' Br. at 17-18.)  Yet, they continue to argue that "unpublished data confirm the unpredictability in the art as of April 2004."  (Pls.' Br. at 50-51.)  Acorda's unpublished data on failed measures that were not published at the time is irrelevant, because obviousness turns on the knowledge of a hypothetical person of ordinary skill in the art in 2004.  35 U.S.C. § 103, Pub. L. No. 98-622 (1984) (amended 1995); *see also Sanofi-Synthelabo*, 492 F. Supp. 2d at 394-95 ("Sanofi's internal, non-public test data . . . was not material" because "those results were non-public and not part of the prior art").

> **D.      Secondary Considerations Cannot Overcome The Strong Showings Of Obviousness.**

As discussed, "objective evidence of nonobviousness simply cannot overcome . . . a strong prima facie case of obviousness."  *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).  Plaintiffs do not dispute this legal proposition.  They nonetheless attempt to raise a host of "secondary considerations" of nonobviousness.  All of these attempts fail on both legal and factual grounds.

> **1.      Plaintiffs Presented No Credible Evidence of Commercial Success.**

> **a.      The Elan "Blocking Patent" Renders Any Evidence Of Commercial Success Legally Irrelevant, At Least For The Acorda Patents.**

Plaintiffs cannot dispute that the relevance of commercial success to the obviousness inquiry for the Acorda patents is limited, because the Elan patent has served since April 1998 (and continues to serve) as a blocking patent limiting the economic incentives for others to develop a

product like Ampyra at the relevant time—i.e., in 2004. (Defs.' Op. Br. at 61-62.) *See, e.g.*, *Warner Chilcott Co, LLC. v. Teva Pharm. USA, Inc.*, 37 F. Supp. 3d 731, 739 (D. Del. 2014), *aff'd*, 594 F. App'x 630 (Fed. Cir. 2014).

Plaintiffs can only half-heartedly argue that the Elan patent "had no impact on the development of 4-AP before the '938 patent issued in July 1996 and was never an impediment to the development of an *immediate release* 4-AP product." (Pls.' Br. at 89 (emphasis added).) But this is beside the point, because the Acorda patents do not claim immediate release formulations— which, as discussed, would have had limited clinical utility given the short half-life for 4-AP. The fact remains undisputed that the Elan patent barred skilled artisans from July 1996 through the 2004 priority date for the Acorda patents from using a *sustained release* 4-AP product to treat MS. Thus, the existence of this blocking patent—not some purported invention—explains why skilled artisans did not practice the claimed invention before that priority date.

Plaintiffs' expert, Dr. Bell, offered no response. And Plaintiffs presented no evidence that Elan attempted to license its patent to anyone else besides Acorda, which received an exclusive license. (Tr. (McDuff) at 651:18-21.) Nor did Plaintiffs present evidence that Elan was even willing to enter into such a license. (*Id.* at 651:10-17; *see also* 651:22-25.) Because there can be no doubt that "market entry from others was precluded, the inference of non-obviousness of [the Acorda patents], from evidence of commercial success, is weak." *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005).

### b. Plaintiffs Failed To Produce Credible Evidence That Ampyra's Sales Establish A "Commercial Success" Relevant To Obviousness.

Even putting aside the legal deficiencies in Plaintiffs' commercial success theory, Defendants established by clear and convincing evidence that Ampyra's sales and profits do not create an inference that economic incentives in 2004 would have brought the claimed invention to

market sooner.  (Defs.' Op. Br. at 62.)  In response, Plaintiffs tout the gross and net sales numbers for Ampyra as dispositive for a finding of commercial success, relieving them of any further analysis of market share, market opportunity, profitability, or the totality of the rest of the evidence relevant to commercial success.  (Pls.' Br. at 86.)  But contrary to Plaintiffs' suggestion, none of their cited cases hold that nonobviousness of a patent-in-suit is supported by commercial success proven by sales alone.  *Tec Air, Inc. v. Denso Mfg. Michigan*, 192 F.3d 1353, 1361 (Fed. Cir. 1999); *M/A COM Tech Solutions Holding, Inc. v. Laird Tech, Inc.*, No. CV 14-181-LPS, 2014 WL 2727198, at *4 (D. Del. June 13, 2014) (Stark, C.J.); *UCB, Inc. v. Accord Healthcare, Inc.*, No. CV 13-1206-LPS, 2016 WL 4376346, at *29 (D. Del. Aug. 15, 2016) (Stark, C.J.).  For example, this Court's commercial success finding in *UCB* was based not just on sales, but also a contextual analysis of Vimpat's position compared to other drugs in its class—including stiff generic competition.  *Id*.  2016 WL 4376346, at *39-40.

Rather than assess the totality of the evidence, Plaintiffs' expert Dr. Bell hardly looked past Ampyra's sales before rendering his opinions.  Plaintiffs point out that he also relied on the fact Acorda's marketing expenditures for Ampyra have decreased while its revenue has increased, and that unit sales of Ampyra increased even as its price increased.  (Pls.' Br. at 86-87.)  But those patterns are "typical" in the pharmaceutical industry after a drug's launch, and do not provide persuasive evidence of commercial success.  (Tr. (McDuff) 647:9-19.)  Plaintiffs do not dispute that Dr. Bell failed to compare the sales, price, or market share of Ampyra to any other drug; the commercial opportunity presented at the time of the invention; and, most importantly, the economic profitability of the product over its lifecycle.  (Tr. (Bell) 601:24-602:18, 606:25-607:17, 611:8-612:20.)

By contrast, Dr. McDuff's analysis accounted for each of those factors in evaluating Ampyra's commercial success.  While Acorda originally sought to have Ampyra approved for a broader indication, including for treatment of spinal cord injuries and MS (generally), the company failed to obtain such FDA approval, resulting in a significantly diminished market opportunity. (*Id*. at 630:20-25.)  Even within the MS patient population, only 25 to 30 percent of the patients are eligible for Ampyra.  (*Id.*; *see also* JTX-76; DTX-419; DTX-57.)

Put simply, the actual market opportunity from Ampyra never lived up to its original expectations.  And the sales and profits of Ampyra reflect this.  As explained in Defendants' opening brief, such sales and profits are not large enough to have made the market interested in the product back in 2004 when considering commercialization costs.  (*See* Defs.' Op. Br. at 62-63.)

Plaintiffs attempt to undermine Dr. McDuff's calculations of economic profitability by arguing that his estimate of commercialization costs should not include the risk of failure.  (Pls.' Br. at 88.)  But this is undisputedly one cost that pharmaceutical companies consider when assessing whether to pursue a commercial product.  (JTX-144; JTX-088 at AMP-DEF-0009816; JTX-064 at AMP-DEF-0009740; Tr. (McDuff) at 666:24-667:7.)  That is because, for a pharmaceutical product to present a worthwhile marketplace opportunity, its sales must not merely break even with its out-of-pocket costs.  Rather, a product providing sufficient economic incentives for development will make up for the inevitable failures of other drugs in development.  (Tr. (McDuff) 668:22-669:5.)  Here, the parties agree that, when performing a commercial success analysis, the goal is to assess whether there were economic incentives to develop a product back at the time of the alleged invention.  (Tr. (Bell) 599:2-6; (McDuff) at 672:11-14.)  Accordingly,

all of the typical pharmaceutical industry commercialization costs must be taken into account.  (Tr. (McDuff) 630:3-10.)

Plaintiffs also argue that Dr. McDuff has no authority for calculating commercialization costs in the same way the pharmaceutical industry does.  (Pls.' Br. at 88.)  But Plaintiffs ignore that Dr. McDuff's opinions were found persuasive in *Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*, in which Judge Sleet agreed that the patentee failed to rebut a prima facie case of obviousness.  No. CV 13-2088-GMS, 2016 WL 4497054, at *13 (D. Del. Aug. 26, 2016) (Tr. at 657:23-658:6.)  Indeed, the Court found that despite $4.1 billion in global sales, evidence of NuvaRing's commercial success was modest because, among other reasons, "Dr. Rainey [Plaintiffs' expert] did not consider the cost of research and development or the cost of marketing in determining the profitability of NuvaRing."  2016 WL 4497054, at *13.  Thus, while Plaintiffs criticize Dr. McDuff, it is actually Plaintiffs who can cite no authority supporting the methodology—or lack thereof—for Dr. Bell's assessment of commercial success, which results in an *ipse dixit* opinion based on sales figures with no comparison to the costs it took to reap them or to market competitors.[6]

> ### c.   Plaintiffs Failed To Produce Credible Evidence Of A Nexus To The Patents-In-Suit.

Plaintiffs summarily argue that Ampyra sales and profits have a nexus to the Elan and Acorda patents because Ampyra is an embodiment of their asserted claims.  (Pls.' Br. at 87.)  But

---

[6] Plaintiffs also complain that Dr. McDuff inappropriately included the full cost of preclinical research and development for Ampyra, even though 4-AP was known before the inventions claimed in the patents-in-suit.  (Pls.' Br. at 89.)  But Dr. Bell did not calculate, and Plaintiffs do not suggest, what the appropriate amount of preclinical costs for Ampyra *should be*—even though Plaintiffs carry the burden of production.  (Tr. (Bell) 607:13-17.)  And even if Dr. McDuff reduced the preclinical costs borne by Acorda in development Ampyra by *half*, it still would not change his ultimate conclusion regarding Ampyra's economic profitability.  (Tr. (McDuff) 645:22-646:20.)  Nor would including Ampyra sales outside of the U.S. make any material difference to the overall profitability analysis.  (*Id.* at 646:21-647:8.)

the fact a commercial drug product is covered by a patent does not necessarily mean that sales are driven by the patented features.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171, 2016 WL 5864573, at *26, *29 (Fed. Cir. Oct. 7, 2016) ("Apple's evidence of commercial success [of its patented product] does not establish a nexus with the patented feature" because the "evidence does not speak to whether a consumer would be more or less likely to buy a device with the specific combination of features recited in" the patent claim).  Here, Dr. Bell offered no rebuttal to Dr. McDuff's opinions by assessing whether the patented features are driving Ampyra's sales.  Although Plaintiffs carry the burden of production, Dr. Bell performed no analysis of the relative contribution of the Elan patent to Ampyra's sales (Tr. (Bell) 613:15-18); the relative contribution of the Acorda patents to Ampyra's sales (*id.* at 613:19-22); or the relative contribution of the 4-AP compound (an unpatented feature) to Ampyra's sales (*id.* at 614:10-24).  Nor did Plaintiffs offer testimony disputing that a 15 mg or a 20 mg 4-AP sustained release product would be just as clinically effective as a 10 mg product, and sales essentially would be unchanged.  (Tr. (McDuff) 653:19-25; Tr. (Peroutka) 707:9-20.)  Thus, Plaintiffs have failed to meet their burden of producing evidence of a nexus between sales of Ampyra and the Elan patent, or between sales of Ampyra and the Acorda patents.  *See*, *e.g.*, *Galderma*, 737 F.3d at 738 ("the burden of production falls upon the patentee to come forward with evidence" of secondary considerations of nonobviousness).

### 2. Plaintiffs Presented No Credible Evidence That Ampyra Satisfied A Long-Felt But Unmet Need.

Plaintiffs assume that Ampyra satisfies a long-felt but unmet need simply because it is indicated to treat a symptom that is "one of the most prevalent and most devastating symptoms experienced by MS patients." (Pls.' Br. at 90.)  But while there may be a long-felt but unmet need to address symptoms caused by MS, Ampyra indisputably does not satisfy that need.  Rather, Ampyra addresses a single symptom in a subset of MS patients, and it does not work for all MS

patients suffering from this symptom. And, even, then, Ampyra does not reverse the symptom to normal. (Tr. (Peroutka) 701:4-25.)

Plaintiffs argue that a "patented method of treatment need not solve the problem for all people in order to show a long-felt need was met, so long as it proves effective at treating a segment of the population who had previously gone without relief." (Pls.' Br. at 91, citing *UCB, Inc. v. Accord Healthcare, Inc.*, No. CV 13-1206-LPS, 2016 WL 4376346, at *29 (D. Del. Aug. 15, 2016).) However, the drug at issue in *UCB* was shown to *effectively control* seizures in a portion of the population consisting of a "large number of patients" with epilepsy. 2016 WL 4376346, at *6, 39. An equivalent situation is not presented here. For example, Dr. Goodman regularly treats MS patients, but he testified he had never seen someone for whom he has prescribed 4-AP walk entirely normally; and he only prescribed Ampyra to about 10 percent of his MS patients, including only about 15-20 percent of his MS patients who suffer from walking difficulties. (Tr. (Goodman) at 539:13-540:2.) Ampyra also does not stop or slow the progression of MS for any patients, unlike other disease-modifying drugs approved by the FDA. (Tr. (Peroutka) 701:4-22.)

Plaintiffs also argue that the FDA granted "priority review of Acorda's NDA for Ampyra, demonstrating that the FDA viewed the drug as a potentially important therapy for an important condition." (Pls.' Br. at 90.) Again, the cases cited by Plaintiffs are distinguishable. In *Cadence Pharm., Inc. v. Exela Pharma Scis.*, the district court found long-felt unmet need existed in a situation in which the FDA had granted priority review of Plaintiffs' NDA application. No. CV 11-733-LPS, 2013 WL 11083853, at *29 (D. Del. Nov. 14, 2013), *aff'd*, 780 F.3d 1364 (Fed. Cir. 2015). But key to the court's decision was the FDA's public statements that it was "anxious" for such an invention to be created and, later, that the product "fulfilled an unmet need…." *Id.* No such FDA statements are found here. Further, the decision in *Leo Pharm. Prods., Ltd. v. Rea*

simply states that "FDA approval *can* be relevant in evaluating the objective indicia of nonobviousness." 726 F.3d 1346, 1358 (Fed. Cir. 2013) (emphasis added). The decision does not discuss the implications of priority review on the analysis of secondary considerations nor does it say that FDA approval is always relevant. *Id.* In fact, the Court held that "FDA approval is not determinative of nonobviousness." *Id.*

Plaintiffs further suggest that the long period of time between much of the prior art and Acorda's eventual success in bringing the product to market is evidence of the nonobviousness of the Acorda patents. (Pls.' Br. at 90-91.) As discussed in detail in Defendants' opening post-trial brief, the Elan patent served as a blocking patent from 1996 through the priority date for the Acorda patents, legally stopping any POSA who wished to develop the claimed methods. (Defs.' Op. Br. at 59-60); *see also Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 392 (S.D.N.Y. 2007) (because earlier patent precluded anyone else from bringing the compound to market throughout the duration of that patent, "evidence relating to the failure of others [and] a long-felt but unsolved need . . . is undermined by the fact that those phenomena—to the extent they exist in this case— could have been derived from Sanofi's ownership of the [earlier] patent as much as from the nonobviousness of [the compound]"), *aff'd Sanofi-Synthelabo v. Apotex Inc.*, 550 F.3d 1075 (Fed. Cir. 2008).

### 3. Plaintiffs Presented No Credible Evidence Of Failure of Others.

Plaintiffs offer two alleged failures to develop the claimed invention: the unpublished 1994 Elan study and an attempt by Sanofi-Aventis to develop a completely unrelated drug, nerispirdine, as a therapy to improve walking in MS patients. (Pls.' Br. at 92.) Neither of these facts addresses the problem the Acorda patents purport to solve, i.e., an optimized dose for a prior art method. And —and neither can be considered a failure of others to be used as a secondary consideration in an obviousness analysis.

In support of their argument that the unpublished 1994 Elan study was a "failure," Plaintiffs offer nothing more than the self-serving testimony of Drs. Goodman and Cohen describing it as such. (Pls.' Br. at 92.) Again, as Dr. Peroutka explained, because the 1994 Elan study informed investigators how to develop future, successful studies using other measurements, it is not a "failed" study. (Pls.' Br. at 57.) In fact, that is exactly what happened as reported in Schwid and the Goodman references. (JTX-104; JTX-061; JTX-062; JTX-080A.)

In support of their argument that Sanofi's development of nerisperidine was a relevant failure, Plaintiffs suggest that it does not matter that nerispirdine and 4-AP are completely different chemical compounds, because the Federal Circuit has recognized failures of others to find a solution to the problem without limiting the analysis to the specific chemical compound that is the subject of the claims at issue. (Pls.' Br. at 93 (citing *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004); *Eli Lilly & Co. v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1009 (S.D. Ind. 2010), *aff'd*, 424 F. App'x 892 (Fed. Cir. 2011).) That argument misconstrues the holdings of the cited cases.

In *Knoll*, the patent-in-suit was directed to methods and compositions for treating pain by administering a combination of hydrocodone (an opioid) and ibuprofen (a nonsteroidal anti-inflammatory drug), and the district court found that the prior art expressly taught one of ordinary skill to combine an opioid with an NSAID. 367 F.3d at 1382-84. In light of that broad holding, the Federal Circuit found that the district court erred in granting summary judgment for defendant when plaintiff proffered evidence that others had failed to develop other opioid-NSAID compositions. *Id.* at 1385.

In *Eli Lilly*, the patents-in-suit covered a specific nucleoside analog compound and a method of treating tumors with that compound. 705 F. Supp. 2d at 977-78. Because thousands of

nucleoside analogs had been subjected to research and testing and only one had been approved by the FDA for use against solid tumors, the Court found this track record of failure prior to the plaintiff's success with the claimed nucleoside analog as supporting a finding of nonobviousness. *Id.* at 1009.

Here, in contrast, the relationship between nerisperidine and the asserted claims of the Acorda patents are far more tenuous than the above cases.  The supposed failure of the former sheds no light on the nonobviousness of the latter.  First, the Acorda patents are not directed to a chemical compound—they are directed to methods of treatment using an optimized dose for sustained release 4-AP, which was already known to be effective in improving walking in MS patients.  Second, the Acorda patents claim a method of treatment using a sustained release formation of the compound 4-AP, while Nerispirdine was an immediate release drug that did not contain 4-AP.  (Tr. (Peroutka) 705:3-20; Tr. (Lublin) 419:7-24; Tr. (Peroutka) 704:21-705:2.) Third, the Acorda patents claim a specific 10 mg dose of the active drug, b.i.d. for at least two weeks without titration, whereas Plaintiffs presented no evidence of a similar dosing strength or regimen for nerisperidine.  (Pls.' Findings of Fact at ¶¶ 168-172; Pls.' Br. at 92-93.)  And fourth, the Acorda patents claim certain resulting pharmacokinetic levels of the drug after dosing, whereas no information regarding the pharmacokinetics of nerisperidine is provided.  The only similarity between the Acorda patent claims and nerisperidine are that both are directed to improve walking in MS patients.

Plaintiffs attempt to concoct a further tenuous similarity—that both compounds are potassium channel blockers—but that is irrelevant.[7]  The Acorda patents are not directed towards

---

[7] It is also telling that Plaintiffs first define the alleged "invention of the Acorda patents [as] the inventors' identification, for the first time, of a low, stable dose of sustained release 4-AP that could be safely and efficaciously used for a prolonged period to improve walking or increase

potassium channel blockers and, as Dr. Peroutka explained without dispute, "the reality is the potassium channels is not a single entity," and "there is no such thing as a potassium channel," but rather "multiple different subtypes"—as many as more than 80.   (Tr. (Peroutka) 705:3-20.) Sanofi's nerispirdine compound is simply too far removed from the asserted claims of the Acorda patents to provide any persuasive or otherwise relevant evidence as to whether others tried but failed to optimize a 4-AP dose for this purpose.

### 4.   Plaintiffs Presented No Credible Evidence Of Surprising And Unexpected Results.

To support their arguments of surprising and unexpected results, Plaintiffs ignore the contemporaneous statements of Dr. Goodman in the prior art in favor of his litigation-inspired recollections.   (Pls.' Br. at 94 ("Dr. Goodman 'actually didn't believe the 10 milligrams would be an effective dose.'"); *id.* at 95 ("Dr. Goodman also recalled 'being very surprised' that the proportion of people who met the responder analysis criteria was equivalent in the 10 mg, 15 mg and 20 mg dose groups.").)[8]   Try as they might, yet again, Plaintiffs cannot rewrite prior art (including art authored by Dr. Goodman) establishing it was neither surprising that the 10 mg BID dose (1) was efficacious, or (2) was as effective as higher (i.e., 15 and 20 mg) doses.   (D.I. 265 at 53.)

---

walking speed in MS patients." (*Id*. at 54.)   But when discussing failure of others, Plaintiffs alter their definition of the invention to say that it was simply a solution for the problem of translating "potassium channel-blocking activity into a therapy to improve walking." (*Id*. at 93.)

[8] Plaintiffs also incorrectly argue that Defendants have the burden to prove that the results were expected. (Pls.' Br. at 94.) The Federal Circuit has unequivocally held that "where there is a range disclosed in the prior art, and the claimed invention falls within that range, *the burden of production falls upon the patentee* to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Galderma*, 737 F.3d at 738 (emphasis added).

Because the prior art does not support their arguments, Plaintiffs contend that the 10 mg BID dose was unexpectedly effective in light of Acorda's internal MS-F202 study report, which they say originally failed to demonstrate efficacy at 10 mg BID, 15 mg BID, and 20 mg BID, but showed an increase in walking speed after a "responder analysis." (Pls.' Br. at 94.) This does not constitute relevant evidence of unexpected results for at least three reasons. First, the MS-F202 study was not available to a POSA before the 2004 priority date for the Acorda patents and, therefore, sheds no light on what a POSA would have expected at that time. (Tr. (Goodman) at 556:25-557:2; *Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 394-95 (S.D.N.Y. 2007) ("Sanofi's internal, non-public test data . . . was not material" because "those results were non-public and not part of the prior art"), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008)). Second, Plaintiffs admit they expected to find statistically significant improvements in this study, but it purportedly "failed" because they were measuring the wrong outcomes. (Tr. (Cohen) at 298:8-299:3; Tr. (Goodman) at 515:8-25.) Thus, it was Acorda's poor judgment that resulted in "unexpected results," not the allegedly novel features of the patent. Third, Dr. Cohen's "responder analysis" does not create unexpected results for the 10 mg BID dose, specifically. The responder analysis created statistically significant improvements for *all* of the tested dosage strengths. (*Id.*)

Drs. Goodman and Cohen's litigation-inspired testimony that they were surprised to see no meaningful difference between doses of 10, 15, and 20 mg BID is once again contradicted by the contemporaneous statements in the Goodman references. (Tr. (Cohen) 298:25-299:3; Tr. (Goodman) 517:11-25.) Indeed, at trial, Dr. Goodman admitted that the dose response curve in Goodman I did not detect any significant differences among doses within the range of 20-50 mg/day. (Tr. (Goodman) 533:1-4.) Dr. Goodman disclosed that a skilled artisan reading the

Goodman references in 2004 could not expect any dose in the 20 to 50 mg per day range to be more effective than any of the other doses in that same range. (Tr. (Goodman) 533:1-535:4.)

Similarly, the fact that titration was unnecessary was also not unexpected. The Elan patent taught back in 1996 that, in at least some embodiments, "the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached." (JTX-001 at 13:65-14:9.) The dose can then be "increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached." (*Id.*) This teaching would therefore include a dosing regimen in which a therapeutically effective dose is administered at the outset, and thus no titration would be required. Indeed, this is confirmed by Plaintiffs' experts who testified that the Elan patent claims are not limited to a dose titration regimen. (Tr. (Lublin) 415:16-416:10.)

Even if Dr. Goodman's and Dr. Cohen's personal opinions and recollections 12 years after the fact were credible—which they are not—their testimony of surprise constitutes only a change in degree, not kind. "[W]here an unexpected increase in efficacy is measured by a small percentage, as here, and the evidence indicates that skilled artisans were capable of adjusting the percentage, the result constitutes a difference in degree, not kind." *Galderma*, 737 F.3d at 739; *Iron Grip Barbell Co, Inc. v. USA Sports, Inc*., 392 F.3d 1317, 1321 (Fed. Cir. 2004) ("[W]hen the difference between the claimed invention and the prior art is the range or value of a particular variable," then a patent should not issue if "the difference in range or value is minor."). In *Galderma*, the Federal Circuit found no unexpected results when *tripling* the known tolerable dose did not increase side effects as expected. *Id*. By contrast, the *Allergan* case to which Plaintiffs cite found unexpected results when the prior art explicitly taught that 200 ppm BAK would either have no impact on permeability or decrease it, but instead *enhanced* the permeability. 796 F.3d at 1306-07. The result was unexpected because it directly contradicted the teaching of the prior art,

as opposed to the present case, where Plaintiffs literally followed the teachings of the prior art on dosing to achieve results that were well within expectations.

## CONCLUSION

For the reasons presented above and in their opening post-trial brief, Defendants respectfully submit that the Court should enter judgment on their behalf declaring invalid as obvious (or, alternatively, for violating 35 U.S.C. § 112) claims 3 and 8 of the '938 patent; claims 1, 7, 38, and 39 of the '826 patent; claims 3 and 5 of the '685 patent; claims 1, 2, 5, 22, 32, 36, and 37 of the '437 patent; and claims 36, 38, and 45 of the '703 patent.

Dated:  November 3, 2016

PHILLIPS GOLDMAN MCLAUGHLIN & HALL, P.A.

*/s/ John C. Phillips, Jr.*

*Of Counsel:*

WINSTON & STRAWN LLP
George C. Lombardi
Samuel S. Park
Bryce A. Cooper
Reid Smith
35 West Wacker Drive
Chicago, IL 60601

Charles B. Klein
1700 K Street, N.W.
Washington, DC 2006

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE  19806
(302) 655-4200
jcp@pgmhlaw.com
mch@pgmhlaw.com

*Attorneys for Apotex Corp., Apotex Inc., Teva Pharmaceuticals USA, Inc., and Roxane Laboratories, Inc.*

MORRIS JAMES LLP

PARKER POE ADAMS &
BERNSTEIN LLP
Robert L. Florence
Michael L. Binns
Karen L. Carroll
3355 Lenox Road, Suite 750
Atlanta, GA 30326

Melanie Black Dubris
Catherine R.L. Lawson
Christopher M. Thomas
PNC Plaza 301 Fayetteville Street, Suite 1400
Raleigh, NC 27601

*/s/ Mary Matterer*

Richard K. Herrmann (#405)
Mary Matterer (#2696)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6800

*Attorneys for Mylan Pharmaceuticals Inc.*