IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 14-882 (LPS) |
| v. | ) | (CONSOLIDATED) |
| | ) | |
| ROXANE LABORATORIES INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' POST-TRIAL SUR-REPLY BRIEF ON
SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
jtigan@mnat.com

*Attorneys for Acorda Therapeutics, Inc. and
Alkermes Pharma Ireland Limited*

OF COUNSEL:

Aaron Stiefel
Daniel P. DiNapoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 683-3500

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real | Suite 400
Palo Alto, CA 94306
(650) 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 326-5825

*Attorneys for Acorda Therapeutics, Inc.*

November 10, 2016

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 4

I.     THE ASSERTED CLAIMS OF THE ACORDA PATENTS ARE NOT
PRESUMED OBVIOUS ....................................................................................... 4

II.    SECONDARY CONSIDERATIONS SUPPORT THE
NONOBVIOUSNESS OF THE ASSERTED CLAIMS ...................................... 5

    A.    The Surprising and Unexpected Results of the Claimed
Inventions of the Acorda Patents ...................................................................5

        1.    The prior art illustrates the unpredictability that pervades
MS research and made it impossible to predict that the
claimed 10 mg BID dosing regimen would be effective to
safely improve walking. .................................................................. 6

        2.    Schwid .............................................................................................. 8

        3.    The Goodman References ............................................................... 10

        4.    The significance of Acorda's MS-F202 study .............................. 16

        5.    The Acorda Patents disclose that the results of the claimed
dosing regimen were unexpected .................................................. 20

        6.    The unexpected results of the claimed dosing regimen were
different in kind, not merely in degree, from what a POSA
would have expected .................................................................... 20

    B.    Failures by Others Further Support the Nonobviousness of
the Acorda Patents ...................................................................................23

    C.    The Long Felt Need for the Inventions of the Acorda
Patents Further Demonstrates They Were Not Obvious ...........................27

    D.    Ampyra Has Been a Commercial Success Because of the
Inventions of the Patents-in-Suit .............................................................29

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013)............................................................................27

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015)............................................................................23

*Cadence Pharm. Inc. v. Exela Pharmsci Inc.*,
780 F.3d 1364 (Fed. Cir. 2015)............................................................................31

*Eli Lilly & Co. v. Sicor Pharm., Inc.*,
705 F. Supp. 2d 971 (S.D. Ind. 2010), *aff'd*, 424 F. App'x 892 (Fed. Cir.
2011) ......................................................................................................................26

*Eli Lilly and Co. v. Teva Pharm. USA, Inc.*,
No. IP 02-0512-C-B/S, 2004 WL 1724632 (S.D. Ind. July 29, 2004), *aff'd*
2005 WL 163526 (Fed. Cir. July 13, 2005)....................................................29, 30

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1401 (Fed. Cir. 2014).............................................................................28

*Forest Labs. Holdings Ltd. v. Mylan Inc.*,
No. CV 13-1602-SLR, 2016 WL 3677148 (D. Del. July 11, 2016).................11, 12

*Galderma Labs., L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013)...................................................................2, 4, 5, 10

*Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*,
No. Cv. 11-3962-(MLC), 2016 WL 832089 (D.N.J. Mar. 3, 2016) ......................12

*In re May*,
574 F.2d 1082 (C.C.P.A. 1978) ...............................................................................8

*In re Piasecki*,
745 F.2d 1468 (Fed. Cir. 1984)..............................................................................24

*Insite Vision Inc. v. Sandoz, Inc.*,
783 F.3d 853 (Fed. Cir. 2015)................................................................................24

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*,
367 F.3d 1381 (Fed. Cir. 2004)..............................................................................26

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co.*,
No. 13-2088-GMS, 2016 WL 4497054 (D. Del. Aug. 26, 2016)...........................32

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    348 F. Supp. 2d 713 (N.D.W. Va. 2004) *aff'd*, 161 Fed. App'x 944 (Fed. Cir.
    2005) .................................................................................................................................23

*Sanofi-Synthelabo v. Apotex, Inc.*,
    492 F. Supp. 2d 353 (S.D.N.Y. 2007), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008) .......................18

*Sanofi-Synthelabo v. Apotex, Inc.*,
    550 F.3d 1075 (Fed. Cir. 2008).........................................................................................6, 19

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991)..............................................................................................24

*Tyco Healthcare Grp. v. Mut. Pharm. Co.*,
    642 F.3d 1370 (Fed Cir. 2011)................................................................................................5

*Vanda Pharm., Inc. v. Roxane Labs., Inc.*,
    No. Cv 13-1973-GMS, 2016 WL 4490701 (D. Del. Aug. 25, 2016) ..................................8, 28

**Statutes**

21 U.S.C. § 356(b)(1) .......................................................................................................................28

**Rules**

Fed. R. Civ. P. 52(c) ..........................................................................................................................1

## INTRODUCTION

Defendants have stitched together parts of prior art publications and snippets of testimony in a meritless attempt to show – supposedly by clear and convincing evidence – that the inventions claimed in the patents-in-suit would have been obvious to a POSA. Defendants' hindsight rendering fails to come to grips with the totality of the prior art – the positives and the negatives – which, taken together, would not have motivated a POSA as of 1991, with a reasonable expectation of success, to develop a sustained release formulation of 4-AP to improve nerve conduction in MS patients, and would not have motivated a POSA as of 2004, with a reasonable expectation of success, to administer a stable 10 mg dose of sustained release 4-AP twice-daily to improve walking in MS patients.[1] Moreover, a POSA would not reasonably have expected that a 10 mg BID dose of 4-AP would be as effective as doses of 15 mg or 20 mg BID.

Defendants' reply papers do not dispute that POSAs were aware of the unpredictability and variability of MS, of ongoing concerns that 4-AP could cause seizures in MS patients, and of the significant placebo effect which confounded the interpretation of clinical studies of drug candidates in MS patients. Nor do defendants rebut plaintiffs' showing that the

---

[1] As this brief is a sur-reply limited to secondary considerations, plaintiffs address the '938 Patent only with respect to Ampyra's commercial success further supporting the nonobviousness of the patent. The fact that plaintiffs are not otherwise responding to defendants' arguments on reply with respect to the '938 Patent, including the § 112 arguments on which defendants presented zero evidence at trial, should not be taken as an admission of any kind. Plaintiffs note that, after the close of defendants' case, plaintiffs moved for judgment on the § 112 defenses, pursuant to Fed. R. Civ. P. 52(c), on the grounds that defendants' witnesses had avoided any § 112 issues and defendants had submitted no evidence on the subject at trial, notwithstanding that they had the burden of proof. Defendants were thus on notice regarding their lack of proof. (Tr. 272:12-21). The Court denied the motion without prejudice. (Tr. 273:5-7). Defendants chose not to raise the issue again until their rebuttal closing argument. Defendants should be foreclosed from pursuing this position now but, should the Court decide to consider the issue, plaintiffs respectfully request an opportunity to respond to defendants' belated arguments.

Elan study was a failure – except to argue that the Elan study taught the art that 4-AP would not benefit MS patients as measured by the widely accepted EDSS (which included a significant walking component). Defendants also do not challenge plaintiffs' showing that Schwid was a tiny, 10-patient study designed, in the wake of Elan's failure, to test endpoints for use in further studies, that it employed a dose that was 75% higher than the dose in Ampyra, and found statistically significant improvement as to timed gait only because it did not account for the fact that timed gait was merely one of seven endpoints measured in the study, the rest of which failed.

Defendants' reply papers likewise fail to refute plaintiffs' showing that (1) the safety of administering 4-AP to MS patients was a principal concern of the MS-F201 study that was the subject of the Goodman References; (2) the study was designed "as a dose-ranging study to assess safety and to explore potential outcome measures for use in later trials"; (3) the study was an escalating dose study which did not involve stable dosing; (4) the Goodman References reported statistically significant improvement only in the Lower Extremity Manual Muscle Test (LEMMT) and in the (post-hoc) analysis of walking speed and then only when the results of all doses from 20 mg to 80 mg daily were aggregated; and (5) the dose-response curve that appeared in the Goodman Poster did not incorporate the results of the placebo group and did not reflect statistically significant results.

As reiterated below, defendants' contention that this case is governed by *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013), does not square with the facts. Unlike in *Galderma*, the inventions of the Acorda Patents were not limited to selecting a dose amount nor did they involve a drug which had already been established as safe and effective for treatment of any symptom of MS, in particular improved walking.

Plaintiffs previously relied on evidence of secondary considerations in prosecuting the patents-in-suit. As set forth below, defendants' efforts to rebut plaintiffs' evidence at trial of secondary considerations of nonobviousness defy logic.

The fact that the FDA approved Ampyra as the first and only drug for improving walking in MS patients and the fact that patients use Ampyra persistently leaves no doubt that Ampyra filled an unmet need even though it is not a panacea. The failures by Elan and Sanofi-Aventis in developing MS treatments were unquestionably failures by others to address the same need. And Acorda's surprising finding that a 10 mg BID dose of 4-AP was as effective as higher doses, that 4-AP could be administered safely, and that 4-AP could be administered from the outset of the course of treatment in a steady dose without titrating upwards to find the proper balance between safety and efficacy allowed a change in kind, not merely in degree, in the use of 4-AP.

Furthermore, Ampyra is a commercial success that has fueled the growth of Acorda and its ongoing CNS research. It is undisputed that Ampyra is the only drug approved by the FDA to improve walking in MS patients, sales totaled $1.7 billion from launch in 2010 through 2015, and net income from those sales was $998.7 million. Sales of Ampyra in 2016 should approach $500 million. Ampyra is dosed twice daily in 10 mg sustained release tablets of 4-AP to improve walking in MS patients precisely as claimed in the patents-in-suit. Before the claimed inventions, there was no FDA-approved 4-AP product. Hence, as Dr. Bell testified, the commercial success of Ampyra can be attributed to the elements of the Asserted Claims in both the '938 Patent and the Acorda Patents. That is true notwithstanding that Dr. Bell did not purport to undertake the impossible task of apportioning the success of Ampyra among 4-AP itself, the '938 Patent and the Acorda Patents. There would be no Ampyra without all three.

Moreover, defendants' contention that Ampyra has not been a commercial success hinges on the dubious personal theory of their expert Dr. McDuff, who considers essentially all but blockbuster drugs ($1 billion or more in annual sales) to be unsuccessful.  Dr. McDuff has yet to persuade a court that his theory is sound.

Finally, this Court should assess the trial testimony regarding the Acorda Patents in light of the fact that Drs. Cohen and Goodman were there during the development of Ampyra, were immersed in the art at the time, made real world decisions about the course of their research in light of the art, and (in the case of Dr. Goodman) regularly treated MS patients, while the experts hired by defendants had no first-hand knowledge of the facts or the art, admittedly do no research, and (in the case of Dr. Peroutka) have not treated MS patients since 1990.  Plaintiffs submit that the credibility of Drs. Cohen and Goodman as to their thinking and the mindset of a POSA in 2004 is buttressed by defendants' complete inability to challenge their factual and technical testimony and by the tortuous route that Acorda followed in inventing Ampyra   (Defs. Reply Br. at 47).[2]

The Court should conclude that defendants have failed to come forward with the clear and convincing evidence of obviousness that would overcome the statutory presumption that the patents-in-suit are valid.

## **ARGUMENT**

## I.    **THE ASSERTED CLAIMS OF THE ACORDA PATENTS ARE NOT PRESUMED OBVIOUS**

Defendants continue to insist that this case is "indistinguishable" from *Galderma*. (Defs. Reply Br. at 23).  However, to make that argument they have to ignore the multifaceted nature of the Asserted Claims, which are directed not only to the choice of the 10 mg BID dose

---

[2]    Citations to "Defs. Reply Br." refer to Defendants' Post-Trial Reply Brief.

amount, but also to (1) a stated purpose for administering 4-AP, *i.e.*, targeting a selected symptom of MS from among the many symptoms previously studied; (2) an extended period of administration (at least two weeks); (3) the requirement that the dose amount be held constant (*i.e.*, not titrated) during that period or, in the case of claims 6 and 7 of the '826 Patent, that the dose never be titrated; and (4) that certain pharmacokinetic parameters be achieved.  Struggling to analogize this case to *Galderma*, defendants also disregard the fact that, unlike the invention at issue in *Galderma* (and the invention at issue in *Tyco Healthcare Grp. v. Mut. Pharm. Co.*, 642 F.3d 1370 (Fed Cir. 2011)), the inventions claimed in the Acorda Patents did not simply improve upon an already existing FDA-approved, demonstrably safe and effective treatment.  Rather, the inventions at issue here made possible a treatment that had never before been approved by the FDA.  The burden shifting paradigm urged by defendants is therefore not warranted in this case. In any event, plaintiffs have come forward with evidence of secondary considerations sufficient to demonstrate the nonobviousness of the invention.

## II.  SECONDARY CONSIDERATIONS SUPPORT THE NONOBVIOUSNESS OF THE ASSERTED CLAIMS

### A.  The Surprising and Unexpected Results of the Claimed Inventions of the Acorda Patents

As detailed in plaintiffs' Answering Brief,[3] the prior art relied on by defendants would not have afforded a POSA a reasonable expectation that a stable dose of 10 mg BID would be both safe and effective to improve walking in MS patients, and certainly would not have supported an expectation that the 10 mg BID dose would be as effective as higher doses that are associated with an increased risk of serious adverse events.  The evidence presented by plaintiffs regarding the unpredictability of the art and the lack of a reasonable expectation that

---

[3]   Reference is to Plaintiffs' Post-Trial Answering Brief on Validity and Opening Brief on Secondary Considerations of Nonobviousness (Pls. Br.).

the claimed 10 mg BID regimen would yield the positive results discovered by the inventors and reported in the Acorda Patents demonstrates the nonobviousness of the Asserted Claims, even assuming, *arguendo*, that defendants had made a prima facie case of obviousness. *See Sanofi-Synthelabo v. Apotex, Inc.,* 550 F.3d 1075, 1085-90 (Fed. Cir. 2008) (affirming the district court's holding that assumed case of obviousness was rebutted by totality of findings that, in light of prior art, a POSA would not reasonably have expected that the separation of enantiomers would likely produce an isomer that had both favorable activity and tolerability).

> **1.    The prior art illustrates the unpredictability that pervades MS research and made it impossible to predict that the claimed 10 mg BID dosing regimen would be effective to safely improve walking.**

Defendants' hindsight characterization of the art as "a consistent march . . . towards using 4-AP to improve walking in MS patients" (Defs. Reply Br. at 31) flies in the face of the evidence presented at trial.  Both the prior art references relied on by defendants and Acorda's own work demonstrates that the art explored many potential endpoints and yielded inconsistent results.  None of the art, viewed alone or in combination, supported an expectation that the 10 mg BID dosing regimen of the Acorda patent claims would improve walking or increase walking speed.

Stefoski I did not evaluate walking speed or improvement in walking at all and, while it reported improvement in various tests, a POSA reading Stefoski I would not have drawn any meaningful inferences about symptomatic improvement in MS patients from the reported results.  (PF ¶ 102).[4]  Davis also involved an array of tests, and, while it reported improved "motor function," that measure encompassed movement of arms and legs and included "both simple function tests and the performance of complex motor tasks such as gait and repetitive

---

[4]    Citations to "PF" refer to the Plaintiffs' Proposed Findings of Fact, D.I. 262.

movements." (JTX-0043 at 188; PF ¶ 103). Stefoski II similarly tested multiple endpoints, including a variety of motor functions, none of which included walking speed, and would not have been understood by a POSA as supporting a conclusion regarding the safety or efficacy of prolonged administration of 4-AP to MS patients for treatment of any symptom. (PF ¶ 104). Moreover, the Stefoski and Davis studies were criticized by contemporaneous literature as "limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively defined neurological deficits or adjust significance levels to compensate for multiple comparisons." (JTX-0028 (Bever III) at 1058; PF ¶ 106).

Polman I, cited by defendants as showing that 4-AP "improves ambulation long-term" (Defs. Reply Br. at 31), itself pointed out that while "[i]mprovements in fatigue and ambulation were mentioned quite often by the patients as being responsible for the favorable overall effect (Table 1)," "[i]t is important to emphasize the fact that only a small minority of the favorable effects reported by the patients resulted in significant changes in the EDSS" (an important component of which is an assessment of walking). (JTX-0095 at 295; PF ¶ 108). Thus, Polman I itself reported inconsistent results on walking, and, in any event, did not allow a POSA to reasonably infer that 4-AP improves ambulation in MS patients because of its unblinded design. (PF ¶ 108). The eight-patient Bever III study also explored multiple endpoints and reported inconsistent results. (PF ¶ 109). Defendants rely on its showing of improved lower extremity strength. (Defs. Reply Br. at 31). But defendants ignore the fact that Bever III reported no benefit in the EDSS or in the Ambulation Index, which specifically assesses walking speed. (PF ¶ 109).

None of these references support defendants' description of the art as leading toward the use of 4-AP *at any dose* to improve walking. On the contrary, they illustrate the

meandering and unpredictable course of the research seeking to use 4-AP to treat any symptom of MS and thus support the nonobviousness of the Asserted Claims. *See In re May*, 574 F.2d 1082, 1094 (C.C.P.A. 1978) (a patentee may rebut a *prima facie* case of obviousness by "producing sufficient evidence which demonstrates a substantial degree of unpredictability in the pertinent art area"); *Vanda Pharm., Inc. v. Roxane Labs., Inc.*, No. Cv 13-1973-GMS, 2016 WL 4490701, at *9 (D. Del. Aug. 25, 2016) ("the level of clinical testing required and inherent unpredictability in the field [treating schizophrenia] make certain that the invention was not obvious.").

Defendants cite Schwid and the Goodman References as completing the purported "march." (Defs. Reply Br. at 31). However, those references, discussed below, also explored a multiplicity of endpoints and do not support an expectation that the dosing regimen claimed by the Acorda Patents would safely and efficaciously improve walking or increase walking speed.

## 2.   Schwid

Defendants contend that Schwid taught that a stable dose of 17.5 mg of sustained release 4-AP, taken BID, improved walking speed in MS patients. (Defs. Reply Br. at 4). As detailed in plaintiffs' Answering Brief, however, a POSA would not have viewed Schwid (alone or in combination with other prior art) as providing a reasonable expectation that any dose of sustained release 4-AP would safely and effectively improve walking or increase walking speed in accordance with the claims of the Acorda Patents. A POSA would have recognized that the Schwid study was not an efficacy study. (PF ¶¶ 113-114, 116, 132, 137, 139-141). And, to the extent that Schwid provided any guidance about dose, it employed a dose that was 75% higher than the 10 mg BID dose of the Asserted Claims and suggested targeting serum levels of at least 60 nanograms per ml which, as Dr. Peroutka conceded, the prior art taught would require a dose higher than 25 mg BID. (PF ¶¶ 113, 115, 144).

Defendants apparently misconstrue plaintiffs' argument as to why a POSA would discount Schwid's finding that timed gait improved after administration of 17.5 mg of 4-AP BID. (Defs. Reply Br. at 24 (citing Pls. Br. at 61)).  Plaintiffs do not contend "that a POSA would have not have given Schwid's conclusions weight because Schwid also showed 'six failed measures.'" (Defs. Reply Br. at 24 (quoting Pls. Br. at 61)).  Rather, plaintiffs argue that a POSA would have interpreted the results reported in Schwid in view of the fact that the underlying 10-patient study tested seven different outcome measures, yet the statistical significance of the lone positive result with respect to one of the seven measures was not adjusted to reflect that multiple endpoints were tested.  (Pls. Br. at 60-61).  Simply put, as the number of outcome measures increases, so too does the possibility that one will reflect a positive result as a matter of happenstance.  As Dr. Goodman explained (and defendants do not dispute), a statistical correction would be necessary to potentially draw efficacy conclusions from the study.  (PF ¶ 114).

Defendants misrepresent that "Plaintiffs do not dispute that Solari reports that Schwid showed statistically significant improvement in 'ambulation' with 4-AP."  (Defs. Reply Br. at 25 (citing Pls. Br at 61)).  In fact, plaintiffs' Answering Brief clearly called out as an incorrect "misrepresentation" defendants' contention that the Solari Review reported that Schwid reported statistically significant improvement in ambulation.  (Pls. Br. at 61-62).  As plaintiffs previously explained, most of the patients included in Solari's calculation of statistical significance participated in a study that was done with 3,4 diaminopyridine – not 4-AP.  (*See id.* at 49-50, 61-62).  Defendants are therefore wrong in asserting that Solari "further points a POSA to using 4-AP to improve walking (ambulation)."  (Defs. Reply Br. at 25).[5]

---

[5]     Defendants also misrepresent Solari's "overall conclusion" as being "about whether the then-current research on 4-AP and DAP . . . viewed collectively, allow an unbiased statement about safety or efficacy of aminopyridines for treating all of the MS symptoms

### 3.     The Goodman References

In their effort to shoehorn the facts of this case to fit *Galderma*, defendants mischaracterize the Goodman References as teaching that every dose within the range of 20-40 mg/day (i.e., 10-20 mg BID) is safe and effective to improve walking in MS patients.  As explained in plaintiffs' Answering Brief, the Goodman References (alone or in combination with other prior art ) would not have provided a POSA with a reasonable expectation of success that *any* dose of sustained release 4-AP would safely and effectively improve walking or increase walking speed in accordance with the claims of the Acorda Patents.  (*See* Pls. Br. at 63-71).  A POSA would have recognized from the study's objectives and design, as reported in the Goodman References, that the MS-F201 study underlying the Goodman References was a small, methodologic exploratory study, not designed to establish the efficacy of sustained release 4-AP, much less to select an individual, stable dose.  (PF ¶¶ 118, 121, 124-125; Tr., Goodman, 544:25-545:1).  The Goodman Poster disclosed that multiple endpoints were measured.  (PF ¶ 125).  A POSA would also have understood that (as in Schwid) the statistical significance values reported in the Goodman References with respect to particular outcome measures were not adjusted to account for the study's use of multiple outcomes.  (PF ¶¶ 122, 125, 139).

---

considered, which include motor function, eye movements, EDSS, visual function, cognitive function, and fatigue . . ." (Defs. Reply Br. at 35).  In fact, Solari's overall conclusion was that "[c]urrently available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms" period.  (PTX-0416 at 1)  Plainly, that conclusion expressed uncertainty with respect to the ability of aminopyridines to treat any MS symptoms.  As Solari explained: "Potassium blocking drugs [4-AP and 3,4-DAP] may be able to improve nerve function in nerves without enough myelin.  However, the review of trials found there is not enough evidence about the safety of these drugs or whether benefits are certain."  (*Id*. at 15).  Contrary to defendants' argument, Solari's assessment does not exclude ambulation and motor strength.

Defendants err (Defs. Reply Br. 32) in asserting that plaintiffs "offer only attorney argument" to support their position that a POSA would not have had a reasonable expectation of success that 4-AP would treat a symptom of MS absent a "randomized, placebo-controlled clinical study properly designed to assess efficacy."  In fact, Dr. Goodman testified that a POSA would not have had a reasonable expectation of success because the prior art contained "small exploratory and/or methodologic studies not adequately designed to show efficacy."  (Tr., Goodman, 495:11-496:1).[6]  Dr. Goodman further stated that a POSA "fully aware of . . . the variability in MS patients, the . . . propensity for placebo effect, and fully aware of the need to have for those reasons, among others, . . . a more rigorous approach to assessing efficacy," would realize that "randomized and controlled . . . versus placebo" trials would be "just the sort of standards one would need in order to make meaningful inferences about efficacy or safety."  (Tr., Goodman, 489:9-490:2).    Furthermore, in describing "the art of doing clinical trials," Dr. Goodman explained that a POSA "who is analytic . . . realizes" that a positive signal of effect is "not enough to go on until you do further testing to actually see whether or not what you thought was a signal is in fact a real signal . . . that there's a real pharmacologic effect."  (Tr., Goodman, 563:12-564:13).  Thus, plaintiffs are, in fact, relying on expert testimony as to what information would afford a POSA a reasonable expectation of success.[7]  *See Forest Labs. Holdings Ltd. v. Mylan Inc.*, No. CV 13-1602-SLR, 2016 WL 3677148, at *24 (D. Del. July 11, 2016) (holding, in the context of obviousness, that references discussing the results of "small, open-label, non-placebo controlled trials" are generally ineffective at establishing a reasonable

---

[6]     Citations to "Tr." refer to the trial transcript in this case.

[7]     Defendants argue that the standard articulated by Dr. Goodman is "akin to the standard for FDA approval."  (Defs. Reply Br. 32).  However, defendants say nothing about what that standard is.  In any event, what the FDA standard may be is wholly beside the point here.

expectation of success because they "would not be accepted by persons of ordinary skill in the art as establishing the efficacy of a drug for the treatment of [a particular condition] for many reasons, including the introduction of patient and doctor bias, false positives due to a placebo response, and lack of sufficient patients.")[8]; *see also Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, No. Cv. 11-3962-(MLC), 2016 WL 832089, at *60, *64 (D.N.J. Mar. 3, 2016) (Phase II data which expert described as "an exploratory dose-ranging study . . . to evaluate the safety [of graded doses] and to identify a possible signal of benefit" was found by the court to "have been wholly insufficient at that time to support any valid scientific knowledge of efficacy as claimed").

Defendants continue to deceptively conflate the Goodman References' report of a "dose response in the 20-40 mg/day range" (shown in a graph) and the report in the Goodman Poster of a "[s]ignificant benefit on timed walking." (Defs. Reply Br. at 4). Defendants imply that the finding of a "significant benefit on timed walking" relates to the "dose response" observed in the 20-40 mg/day range. In fact, as described in plaintiffs' Answering Brief and as explained further below, the Goodman References' report of "significant benefit on timed walking" was independent of the Goodman References' report of a "dose response in the 20-40 mg/day range." (Pls. Br. at 70)

A POSA would have appreciated that the statistically "significant benefit" versus placebo reported in the Goodman References refers to the performance, as measured by walking

---

[8]     Defendants seek to distinguish *Forest Labs.* because the study at issue there was for a different drug (venlafaxine) with a different pharmacology than the claimed drug (milnacipran). (Defs. Reply Br. at 31-32). The court, however, expressly found, based on expert testimony, that "*[a]side* from the fact that venlafaxine and milnacipran are pharmacologically different," POSAs would not accept "small, open-label, non-placebo controlled trials . . . as establishing efficacy of a drug for treatment of fibromyalgia . . . ." *Forest Labs.*, 2016 WL 3677148, at *24 (emphasis added). The case is therefore directly analogous in view of Dr. Goodman's testimony.

speed, of the 4-AP-treated patients over the entire seven week treatment period of the study. (PF ¶¶ 120, 127). The patients each received the entire dose range of 20-80 mg/day, administered pursuant to an escalating dosing regimen that increased by 10 mg/day each week. (PF ¶ 120). Thus, the only "significant benefit" reported in the Poster was based on aggregated measurements obtained over the entire course of the study during which patients received *all* of the tested doses, ranging from 20-80 mg daily (10-40 mg BID). (PF ¶ 127). The patients who received all seven escalating doses of 4-AP showed statistically significant improvement over the patients that received placebo during the seven week study. The Goodman References provided no dose-specific information about the performance of sustained release 4-AP versus placebo. (*Id*.) Consequently, the References provided no statistically significant data on the effect of any particular dose amount. (*Id*).

The reported "dose response in the 20-40 mg/day range" on the other hand, simply reflects how the patients performed, as measured by timed walk, on individual escalating weekly doses of 4-AP, not versus the results of the placebo group. (JTX-0080A at Conclusions; PF ¶ 129). Specifically, the reported "[e]vidence of dose-response in the 20-40 mg/day range" refers to the finding (depicted in the dose response curve in the Goodman Poster) that within the range of 20-40 mg/day, higher doses appeared to respond better than lower doses. (JTX-0080A at Conclusions, Results; PF ¶ 129). The dose-response results were not shown to be statistically significant relative to the placebo group. (PF ¶¶ 123, 127-129). Thus, if anything, the Goodman References, like the rest of the prior art, taught to escalate to higher doses in an effort to maximize the effect.[9]

---

[9] A POSA would have been aware of the prominent placebo effect seen in other MS trials of 4-AP and even in the very study underlying the Goodman References, which reported that placebo performed *better* than drug treatment on fatigue and showed that the walking

Defendants rely on the "dose response" reported in the Goodman References −
which was not reported relative to placebo group data and was not reported as statistically
significant − to support not only their erroneous contention that Goodman showed improvement
at the 10 mg BID dose, but also to argue that Goodman showed that "all the other doses were in
the same basic range."  (Defs. Reply Br. at 25 (quoting Tr., Peroutka, 694:1-9)).  But they simply
ignore the statement in each of the three Goodman References that "[d]ose response curves
showed *increasing benefit* in both [timed 25 walking speed and manual muscle testing] in the 20-
50 mg/day range."  (JTX-0062 at S117; JTX-0061 at A167; JTX-0080A at Abstract (emphasis
added); PF ¶¶ 123-124, 129).   That *increasing* dose response is depicted in the dose response
curve in the Goodman Poster, which, as Dr. Peroutka conceded, reflects a bigger improvement at
40 mg/day compared to 20 mg/day.  (Tr., Peroutka, 136:24-137:7; PF ¶ 129).

Defendants attempt to buttress their argument that the Goodman References
would support an expectation that all doses in the 20 to 50 mg/day range would be equally
effective with Dr. Goodman's testimony at trial that the dose response curve referenced in
Goodman I "did not detect any significant differences among doses within the range of 20-50
mg/day."  (Defs. Reply Br. at 47-48).   However, Dr. Goodman's testimony immediately
following the "admission" relied on by defendants, contradicts their position.  Dr. Goodman
stated that the reason a POSA could not infer from the dose response curve that any one dose
would be more effective than any other dose was because "[o]ne can't get much efficacy
inference" at all, about any dose, from the underlying methodological study.  (Tr., Goodman,
533:12-534:1).  "But, to the extent one tries to eke out some efficacy inference," Dr. Goodman
explained, "the implication of the dose response across a range is in this case that the higher end

---

speed of "a number of people . . . got better on placebo."  (Tr., Goodman, 483:23-484:1;
PF ¶¶ 130, 132).

of the range gets more efficacy than the lower end of the range as much as one can infer efficacy, one relative to the other, but not in comparison to placebo which one would want in an efficacy study." (*Id.*; *see also* Tr., Goodman, 534:7-16 ("I would say that the higher doses . . . up to 40 or 50 depending on how you would read the curve . . . without placebo control, was showing a . . . shorter walking time.").

Thus, Dr. Goodman's testimony shows that, to the extent the "increasing dose response" reported in the Goodman References teaches anything about the efficacy of individual doses, the teaching is consistent with other prior art reports in, for example, Schwid and Van Diemen II (PTX-0330), that "higher dosages and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP." (PTX-0330 at 203; PF ¶ 107). Accordingly, the Goodman References do not, as defendants posit (Defs. Reply Br.at 47), "contradict[]" the testimony of Dr. Goodman and Dr. Cohen that they were surprised to see no meaningful difference between doses of 10, 15, and 20 mg BID.

Contrary to defendants' contention (*see* Defs. Reply Br. at 33), the prior art's suggestion to test as high a dose as possible short of precipitating adverse effects is not at all inconsistent with the prior art's recognition of the risk that 4-AP would cause serious side effects (including seizures) in MS patients. Given that walking impairment is a continuum, not a yes/no type of outcome, it is important to provide maximum benefit so that patients achieve a state that is as close to normal as possible. (PF ¶ 135). Recognizing this objective as well as the need to avoid intolerable adverse effects, the prior art used individualized titration schemes designed to start low and increase doses gradually in an effort to reach a dose that would provide maximum benefit without dangerous side effects. (PF ¶¶ 101, 107-110, 142-144). Plainly, Dr. Peroutka's

assertion that a POSA would simply seek the lowest effective dose without attempting to maximize efficacy would not make sense in treating MS patients to improve walking.

Defendants are also disingenuous in arguing that the Goodman References do not distinguish the efficacy of individual doses.  (Defs. Reply Br. at 47-48).  For that purpose, defendants embrace Dr. Goodman's testimony that "one can't get much efficacy inference" from the dose response information provided in the Goodman References.  Yet, defendants disregard the very same statement by Dr. Goodman in asserting that the Goodman References show the efficacy of the entire 20-40 mg/day range.  (Defs. Reply Br. at 4, 5, 25, 28).

Thus, reading the Goodman References as Dr. Goodman testified a POSA would, the references do not contradict his testimony that he "actually didn't believe the 10 milligrams would be an effective dose."  (Tr., Goodman, 515:6-25).  The Goodman Reference also are not inconsistent with the testimony of Drs. Cohen and Goodman that they were surprised to find no meaningful difference among doses of 10, 15, and 20 mg BID.  Defendants' impugning the testimony by Drs. Goodman and Cohen as being not credible and "litigation-inspired" (Defs. Reply Br. at 47) is wholly unjustified.

### 4.     The significance of Acorda's MS-F202 study

The historical course of Acorda's research following the MS-F201 study that was the subject of the Goodman References reinforces the testimony by Drs. Goodman and Cohen regarding their surprise that the 10 mg BID dose proved as efficacious as the 15 and 20 mg BID doses and reflects the unpredictability of the work in this area.  Employing the post-hoc walking speed analysis which, in the MS-F201 study, had shown significant improvement in the aggregated results of the escalating dosing scheme of 10 to 40 mg BID (20-80 mg/day). Acorda's next study, MS-F202, failed to show statistically significant improvement in any of the three doses tested (10 mg, 15 mg, and 20 mg BID).  (PF ¶ 93).  As reported in the Acorda

Patents, the Acorda inventors devised an innovative post hoc "responder analysis" which revealed a statistically significant improvement in walking speed in a subset of the patients studied.  (PF ¶ 94).

Defendants misrepresent that "Plaintiffs admit they expected to find statistically significant improvements in [the MS-F202] study, but it purportedly 'failed' because they were measuring the wrong outcomes."  (Defs. Reply Br. at 47 (citing Tr., Cohen, 298:8-299:3; Tr., Goodman, 515:8-25)).  The testimony that defendants cite to support this alleged "admission" in no way suggests any prior expectation of finding statistically significant results.  The cited testimony of Dr. Cohen, for example, merely confirms that the inventors applied a responder analysis and were "extremely surprised" to find that "10 was as good as 15 or 20."  (Tr., Cohen, 298:8-299:3).  Likewise, Dr. Goodman's cited testimony explains his surprise at the findings of the responder analysis:

> So the 10 milligram twice daily sustained release as the, in essence, preferred dosage, was surprising given the prior art suggesting a need to go to higher, higher doses and higher blood levels.  And Ron Cohen talked yesterday about, about the responder analysis that was developed after what he called, was called the 202 study, that in essence failed in its primary endpoint. But then the responder analysis filtered the noise, is one way to think about it, or through a particular lens of the math, basically . . . it clarified what the . . . apparent failure was about.  And that was . . . that was that there was a subgroup of people who met the criteria for responder analysis and hugely surprising was that the proportion of people who met that response analysis threshold was equivalent in the 10 milligram, 15 milligram and 20 milligram dose.  And I particularly remember being very surprised by that, because I actually didn't believe the 10 milligrams would be an effective dose.

(Tr., Goodman, 515:6-25).  The referenced testimony thus does not "admit" that the MS-F202 study was expected to yield statistically significant improvement, particularly at the 10 mg dose. The testimony directly contradicts defendants' contention that the results of the MS-F202 reported in the Acorda Patents were not surprising and unexpected.

- 17 -

Defendants' position is at odds with their assertion that the need for the responder analysis shows that "it was Acorda's poor judgment that resulted in 'unexpected results,' not the allegedly novel features of the patent." (Defs. Reply Br. at 47). Apparently, defendants maintain, on the one hand, that the Goodman References (regarding a study expertly designed by the Acorda team) would lead a person of skill to test, with a reasonable expectation of success, each dose within the range of 20-40 mg/day, but contend, on the other hand, that Acorda's failed test of three selected doses from within that range, using the same analysis that yielded the positive results reported in the Goodman References, was the result of "poor judgment."

Also unavailing is defendants' argument that Acorda's internal MS-F202 study analysis does not constitute relevant evidence of unexpected results, as a matter of law, because the study was not available to a POSA before the 2004 priority date and therefore sheds no light on what a POSA would have expected at the time. Plaintiffs are not relying on Acorda's internal testing (including but not limited to the MS-F202 study) as information of which a POSA would be aware. Acorda's testing is simply another illustration of the extreme unpredictability of the field of which a POSA would have been aware based on the art.

The decision in *Sanofi-Synthelabo v. Apotex, Inc.*, 492 F. Supp. 2d 353 (S.D.N.Y. 2007), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008), which defendants cite, actually demonstrates the relevance of internal testing to the obviousness analysis. There, the court assumed that defendant Apotex had made a *prima facie* case of obviousness of the claimed enantiomer. Consequently, the court "proceed[ed] directly to whether the specific properties exhibited by [the claimed compound] – the invention as a whole – would have been unexpected to a person of skill in the art." *Id.* at 390. In conducting its analysis, the court found that "[e]vidence of . . . Sanofi's research prior to securing the [patent-in-suit] also weigh[ed] in favor of the conclusion that

separating the enantiomers of PCR 4099 would not have been obvious to a person of ordinary skill in the art at the relevant time." *Id.* The court pointed out:

> Sanofi spent four years and "tens of millions" developing and extensively testing the racemate PCR 4099 before deciding to try separating the enantiomers of the racemic mixture. . . . The superiority of [the claimed enantiomer] to PCR 4099 – which was only confirmed later – was clearly not obvious to the chemists at Sanofi. Apotex has not made a persuasive case to provide an explanation as to why the skilled chemists at Sanofi, furthermore, would have acted – as Apotex contends – so contrary to the hypothetical person of ordinary skill in the art.

*Id.* at 390-91 (internal citations omitted). Based, *inter alia*, on its findings regarding the course of Sanofi's own research, the court concluded that Sanofi had "effectively rebutted a prima facie case of obviousness by demonstrating that the [claimed enantiomer] – as a whole – possesses unexpected properties that could not have reasonably been viewed as a likely outcome of preparing the invention," even if "obvious to try." *Id.* at 392.

The Federal Circuit's affirmance of the district court's decision specifically noted the district court's reliance on evidence regarding the Sanofi research team's belief that separation of enantiomers was unlikely to be productive, the fact that Sanofi's success came only after several failures, and Sanofi's expenditure of tens of millions of dollars for several years of development of the racemate before separating the enantiomers, as evidence weighing against obviousness. *Sanofi-Synthelabo*, 550 F.3d at 1087-88. The Federal Circuit stated that the district court's extensive findings concerning the difficulty and unpredictability of the separation of the enantiomers "undermine[d] Apotex's argument . . . that the separation of the enantiomers would have been obvious," and that "[o]nly with hindsight knowledge that the [claimed] enantiomer has highly desirable properties, can Apotex argue that it would have been obvious to select this particular racemate and undertake its arduous separation." *Id.* at 1088. The court admonished: "The application of hindsight is inappropriate where the prior art does not suggest that [the

claimed enantiomer] could reasonably be expected to manifest the properties and advantages that were found" for the claimed enantiomer.  *Id.*  Similarly, here, the researchers saw no obvious path forward.  The fact that Acorda took a leap of faith and persevered in the face of discouraging results cannot transform the prior art into a roadmap to obvious success.

### 5. The Acorda Patents disclose that the results of the claimed dosing regimen were unexpected.

Defendants' effort to malign the testimony by Drs. Goodman and Cohen regarding their surprise that the 10 mg BID dose was as efficacious as the higher, more dangerous 15 mg and 20 mg BID doses, disregards the fact that the Acorda Patents themselves report the unexpected nature of the finding that the 10 mg dose was as effective as higher doses: "The data does not appear to support either a number of anecdotal reports or expectations from preclinical pharmacology that doses higher than about 10 to 15 mg b.i.d. and even about 10 mg b.i.d. should be associated with greater efficacy."  (JTX-0003 ('437 Patent) at 27:1-5; JTX-0004 ('703 Patent) at 28:66-29:3).  As noted above, prior reports, as in Schwid and Van Diemen II (PTX-0330), would have led to an expectation that "higher dosages and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP."  (PTX-0330 at 203; PF ¶107).

### 6. The unexpected results of the claimed dosing regimen were different in kind, not merely in degree, from what a POSA would have expected.

The revelation that the 10 mg BID dose of sustained release 4-AP was as efficacious as the 15 mg and 20 mg BID doses, while at the same time avoiding the higher incidence of serious adverse effects observed at the higher doses, was momentous.  It allowed a departure from the prior art's standard method of using individualized titration schemes, designed to start low and only gradually increase the dose so as to balance the concern about

intolerable adverse effects against the desire to achieve maximum therapeutic benefit.

Dr. Goodman explained:

> [W]hat's important for these people with MS, they need to get the maximum amount of benefit. It's not a yes or a no. It's a gradation and we want to try to [eke] out as much benefit for each patient as possible. And what was surprising [was] . . . that that could be done with a single dose without having to do what was described . . . in the prior art of titrating or individualizing or maximizing doses in order to gain efficacy with the peril of coming close to the toxic range. Here we have a sweet spot at 10 milligrams with no or minimal at least serious adverse events but still having equivalent efficacy compared to these other doses. So this was an unexpected, surprising and happy discovery.

(Tr., Goodman, 520:5-521:3). The new dosing regimen of the Asserted Claims of the Acorda Patents was different in kind, not in degree, from how 4-AP had been used in the prior art.

Defendants rely on the '938 Patent in arguing that "the fact that titration was unnecessary was . . . not unexpected." (Defs. Reply Br. at 48). Defendants quote selectively from the passage in the '938 Patent addressing dosing, which reads (italicized text omitted by defendants):

> *In one embodiment, the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of active agent at selected intervals of time until a therapeutic dose is achieved.*
>
> *In this embodiment of the invention at the commencement of treatment* the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. *Suitably when said tolerable state is reached, the dose administered is* increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached.

(JTX-0001, 13:65-14:9). Ignoring the first paragraph and replacing the patent's statement that "the dose administered *is* increased" with their own words − "the dose *can* then be increased" − defendants suggest that this passage does not require an increase in dose and "would therefore include a dosing regimen in which a therapeutically effective dose is administered at the outset,

- 21 -

and thus no titration would be required." (Defs. Reply Br. at 48). In fact, the '938 Patent clearly contemplates an increase in dose after a tolerable dose is reached. Drs. Lublin and Goodman both testified that the '938 Patent taught only an individualized titration regimen. (Tr., Lublin, 409:25-410:17; Tr., Goodman, 462:19-463:10; PF ¶ 143).

Defendants erroneously argue that plaintiffs' experts "testified that the Elan patent claims are not limited to a dose titration regimen." (Defs. Reply Br. at 48). In support, defendants cite no testimony by Dr. Goodman and cite testimony by Dr. Lublin that merely confirms that independent claim 1 of the '938 Patent is "silent as to dose titration," that dependent claim 5 requires titration, and that asserted claims 3 and 8 do not depend from claim 5. (Tr., Lublin, 415:16-416:10). However, that testimony by Dr. Lublin (a non-lawyer) regarding the legal scope and dependencies of various claims, does not change the '938 Patent specification's sole teaching regarding dosing, which is directed to an individualized titration scheme – not the stable dosing regimen of the Acorda Patent claims.

Defendants try to minimize the importance of the Acorda Patent claim limitations requiring no titration for specified periods of time, or (in the case of claims 6 and 7 of the '826 Patent) precluding titration altogether. Defendants reason that it "would be absurd" "to argue that the prior art taught that MS patients would have to titrate doses of 4-AP for the rest of their lives, and not settle on a stable dosing regimen, or that patients would take a stable dose for just one week." (Defs. Reply Br. at 29). Plaintiffs, though, make no such argument. Indeed, defendants apparently misapprehend the concept of titration.

Plaintiffs acknowledge that as to each particular patient, the ultimate objective of even the individualized titration dosing schemes taught by the prior art was to arrive at a maximally efficacious dose that could be safely tolerated by that patient over time. The patient

would then receive that individualized dose going forward.  The beauty of the dosing regimen claimed in the Acorda Patents is that there is no need to employ a titration process, starting low so as to acclimate patients to the drug and ensure tolerability, while gradually increasing the doses in an effort to maximize therapeutic benefit, in order to arrive at an optimal dose for each individual patient.  Acorda's surprising discovery that the 10 mg BID dose achieved maximum therapeutic benefit eliminated the need to titrate up to higher, more dangerous doses, in an effort to achieve greater benefit with the attendant "peril of coming close to the toxic range."  (Tr., Goodman, 520:5-521:3; PF ¶ 174).  The unexpected ability of the claimed dosing regimen to provide and maintain maximum efficacy while reducing the risk of adverse effects, thus constituted a difference in kind that made possible the use of a stable dose without individualized titration, meaning an appropriate risk balance of safety and effectiveness could finally be achieved.  *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1306-07 (Fed. Cir. 2015) ("unexpected maintenance of efficacy while reducing adverse effects constituted difference in kind, "viz., the difference between an effective and safe drug and one with significant side effects"); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 755 (N.D.W. Va. 2004) *aff'd*, 161 Fed. App'x 944 (Fed. Cir. 2005) (claimed compound's combination of higher activity and lower toxicity would have been unexpected because "increased therapeutic activity is normally accompanied by increased toxicity" posing "major impediment to successful drug design").

### B.  Failures by Others Further Support the Nonobviousness of the Acorda Patents

Defendants seek to dodge the import of Elan's failure to develop a therapy for improving walking using sustained release 4-AP and Sanofi-Aventis's failure to develop a therapy for improving walking using a different potassium channel blocker by narrowly defining

the problem the Acorda Patents sought to solve as "an optimized dose for a prior art method." (Defs. Reply Br. at 43). Defendants thereby run afoul of the Federal Circuit's admonition that an "overly narrow statement of the problem" can represent a "prohibited reliance on hindsight." *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015). As discussed both above and in plaintiffs' Answering Brief, the work underlying the Acorda Patent claims was not merely dose optimization. In fact, the problem addressed by the Acorda inventors was the need for a safe and effective therapy to improve walking in MS patients. The inventors sought to develop such a therapy by using a compound, the potassium channel blocking capabilities of which had been shown to improve nerve conduction but had not been shown to improve walking (or any clinical manifestation of MS). Their efforts resulted in the identification for the first time, of a low, stable dose of sustained release 4-AP that could be used safely and effectively for a prolonged period to improve walking in MS patients.[10]

   The Acorda inventors were not the first to attempt to translate the potassium channel blocking capacity of 4-AP into a symptomatic therapy that would improve walking in MS patients. Elan, which had previously developed and patented a sustained release formulation

---

[10]   Contrary to defendants' contention (Defs. Reply Br. at 45, n. 7), it is not inconsistent to characterize the problem solved by the invention of the Acorda claims as "translating potassium channel blocking activity into a therapy to improve walking" and to define the invention of the Acorda patents as the "identification for the first time, of a low, stable dose of sustained release 4-AP that could be safely and efficaciously used for a prolonged period to improve walking in MS patients." The claims define the inventors' solution to the problem, they do not define the problem. Defendants' mistake on this issue is also reflected by their incorrect suggestion that plaintiffs' task is to produce evidence that "others tried but failed to practice the claimed invention." (Defs. Reply Br. at 5). Rather, "[n]onobviousness is suggested by the failure of others to '*find a solution to the problem* which the patent[s] in question purport[ ] to solve.'" *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) (citation omitted) (emphasis added); *see also In re Piasecki*, 745 F.2d 1468, 1474 (Fed. Cir. 1984) (holding that "a failure of others to provide a feasible solution to [a] long-standing problem" is the relevant inquiry for nonobviousness).

of 4-AP, had conducted its large-scale, 161-patient, six-week, multicenter, double-blind, placebo controlled, parallel groups study using sustained release 4-AP.  The study evaluated the ability of sustained release 4-AP to improve MS patient performance as measured by the widely accepted EDSS, a large component of which is an assessment of walking ability.   Unlike the small, exploratory and/or methodological prior art studies relied on by defendants, the Elan study was specifically designed and powered to assess efficacy.   (Tr., Goodman, 468:1-24; PF ¶ 89).  However, as disclosed by the Schwid reference, the Elan study "was unable to establish clinical efficacy"; 22% of patients improved on placebo and 22% improved on 4-AP.  (JTX-0104 at 817; Tr., Goodman, 468:25-469:17).

Notwithstanding that the Elan study did not find that 4-AP yielded improvement in MS patients, defendants implausibly try to cast Elan's study as a success, because it "informed investigators how to develop future, successful studies using other measurements."  (Defs. Reply Br. at 44).  As is clear from the scale and design of the study, however, it was not intended merely to inform the development of future studies.  Elan clearly aimed – but failed – to establish clinical efficacy on its primary endpoint, which was a widely-used MS assessment tool that emphasizes walking ability.   Plainly, the primary takeaway was that 4-AP did not improve walking in MS patients.

Defendants' characterization of the Elan study as simply having used the wrong endpoint and thus advancing the field by prompting the search for alternatives is pure hindsight.  The only reason one knows that EDSS was the wrong endpoint is that the endpoint failed and that another endpoint ultimately succeeded.   It was the failure of the study – not its "success" – that stimulated later methodological studies searching for other endpoints to salvage Elan's fruitless effort to develop a clinical therapy for MS patients.   Indeed, the fact that Elan followed

its 161-patient study with its 10 patient Schwid study that measured seven endpoints reflects that researchers were befuddled by the large-scale failure.  And after the Schwid study Elan licensed the '938 Patent to Acorda.  (PF ¶¶ 39, 88-89).  As Dr. Goodman testified, the failure of the Elan study had "cast a huge shadow on [the] whole field."  (Tr., Goodman, 513:24-514:24).

Defendants' refusal to acknowledge Sanofi-Aventis' effort to develop the compound Nerispirdine as a therapy to improve walking in MS patients as a failure to accomplish precisely what the Acorda inventors accomplished misses the point.[11]  The Sanofi-Aventis researchers attempted to emulate what the Acorda inventors did, using the same endpoint (timed 25 foot walk) and the exact statistical analysis developed and applied by Acorda (the "responder analysis" based on consistency rather than magnitude of improvement) to show that a different potassium channel blocking compound could provide a safe and effective therapy to improve walking in MS patients.  (PF ¶¶ 169-171).  Unlike the Acorda inventors, however, the Sanofi-Aventis researchers failed, and Ampyra remains the only therapy available to improve walking in MS patients.  Sanofi-Aventis' failure clearly reflects the unpredictability of the field and further supports the nonobviousness of the therapy claimed in the Acorda Patents.

---

[11]     Defendants do not dispute that this Court may consider compounds other than 4-AP when analyzing the failure of others to find a solution to the problem.  (*See* Pls. Br. at 93 (citing *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004); *Eli Lilly & Co. v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1009 (S.D. Ind. 2010), *aff'd*, 424 F. App'x 892 (Fed. Cir. 2011))).  Defendants' conclusory assertion that the relationship between the Acorda Patents and Nerispirdine is "far more tenuous" than in *Knoll* and *Eli Lilly* (Defs. Reply Br. at 45) is unfounded; those cases do not speak to all the differences between the patented claims and the other failed drugs.  In *Knoll*, the Federal Circuit simply stated that the district court's analysis failed to properly consider the failure of two opioid/NSAID combinations that were different from the patented opioid/NSAID combination.  *Knoll*, 367 F.3d at 1385.  In *Eli Lilly*, the court considered the failure of other nucleoside analogs as evidence of nonobviousness even though "[s]light structural modification[s] can drastically alter the biological activity of nucleoside analogs" and the field was considered "very unpredictable."  *Eli Lilly*, 705 F. Supp. 2d at 980, 1009.

Defendants attempt to obscure this fundamental reality by pointing to irrelevant differences between the work by Acorda and the work by Sanofi-Aventis, which defendants themselves elsewhere characterize as immaterial to the contribution of the Acorda inventors. Defendants note, for example, that Sanofi-Aventis used an immediate release rather than a sustained release formulation (Defs. Reply Br. at 45), while elsewhere emphasizing that the sustained release formulations of the Acorda patent claims were not Acorda's invention. (Defs. Reply Br. at 30). Similarly, defendants decry the lack of information about Nerispirdine's pharmacokinetics (Defs. Reply Br at 45), while contending that the Acorda inventors "did not invent or otherwise discover any of the pharmacokinetic profiles claimed in the patent." (Defs. Reply Br. at 30).[12]

### C.     The Long Felt Need for the Inventions of the Acorda Patents Further Demonstrates They Were Not Obvious

Defendants try to but cannot escape the fact that the FDA's grant of priority review for Ampyra demonstrates that there was a long-felt and unmet need for treatment of

---

[12]     While defendants argue that the claimed pharmacokinetic values cannot support the Asserted Claims (Defs. Reply Br. at 30), they put forward no prior art that associated the recited pharmacokinetic parameters with safely and efficaciously improving walking or increasing walking speed. The Hayes references relied on by defendants merely report that one particular sustained release formulation of 4-AP when administered at 10 mg BID achieve the recited pharmacokinetic parameters. The Hayes references say nothing about the efficacy of those pharmacokinetic parameters for improving walking or increasing walking speed in MS patients and do not establish the safety of those pharmacokinetic parameters in MS patients. (PF ¶¶ 111-112; Tr., Goodman, 509:18-510:13). Nor have defendants shown that the recited pharmacokinetic parameters are inherent in every 10 mg BID administration of sustained release 4-AP (i.e., that every sustained release formulation of 4-AP administered at 10 mg BID will necessarily achieve the recited pharmacokinetic parameters). Neither Dr. Kibbe's testimony, nor plaintiffs' "concession" at closing argument that "[i]t was known in the art that a sustained release formulation 10 [milligrams] BID *could* achieve [the claimed] PK" (Defs. Reply Br. at 30 (emphasis added)) establishes the inherency of the recited pharmacokinetic parameters. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 n.1 (Fed. Cir. 2013).

impaired walking.  *See Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1407 (Fed. Cir.

2014) (FDA's grant of "fast track" review under 21 U.S.C. § 356(b)(1) recognized long-felt and

unmet need for treatment of menorrhagia that avoided adverse events).

Defendants seek to trivialize the contribution of the Acorda inventors,

acknowledging that "there may be a long-felt but unmet need to address symptoms caused by

MS," but asserting that Ampyra falls short of satisfying that need because it fails to address

every MS symptom in every MS patient and fails to restore to "normal" even the symptom it

addresses.  (Defs. Reply Br. at 41-42).  The Court's analysis, however, "must consider whether

the claimed invention represents an improvement from the prior art at the time, not whether the

problem has been totally eliminated."  *See Vanda Pharm.*, 2016 WL 4490701 at *10 (rejecting

argument that claimed method of treating schizophrenia did not satisfy long-felt need because

schizophrenia continues to be difficult to treat)

The fact is that walking impairment is one of the most prevalent and most

devastating symptoms experienced by MS patients and Ampyra was the first – and remains the

only – therapy available to MS patients to address that symptom.  Ampyra thereby helps improve

independence, employment opportunity, and ultimately quality of life.  (PF ¶¶ 165-66).  It is

unfortunate that Ampyra works only in a subset (approximately one third) of patients, but

defendants do not (and cannot) demonstrate that efficacy in only a portion of a patient population

is unusual for a pharmaceutical.  Ampyra does significantly improve the lives of those patients

who respond to 4-AP.  (Tr., Goodman, 517:7-22, 538:13-17).  In this respect, Ampyra

"absolutely" does satisfy a long-felt and unmet need.  (Tr., Goodman, 537:25-538:12).

Defendants also denigrate Ampyra because, unlike disease-modifying drugs, it

does not stop or slow the progression of MS.  (Defs. Reply Br. at 42).  But those drugs, unlike

Ampyra, do not relieve the functional problems caused by the disease, such as impaired walking, and thus fail to offer the quality of life benefit provided by Ampyra.

The fact that Ampyra meets patients' need for a therapy that addresses walking impairment is reflected in the high level of satisfaction reported by prescribers and patients and by the fact that the majority of Ampyra's revenues are accounted for by persistent (continuing) patients on therapy.  (PF ¶ 160).

Defendants assert that the '938 Patent diminishes the significance of the long period between 4-AP's discovery a century ago and its approval for any therapeutic use.  (Defs. Reply Br. at 43).  The '938 Patent, however, did not issue until 1996, and research prior to that date had not made the compound available as a therapy for any clinical manifestation of MS. Defendants also fail to address the fact that the '938 patent did not impede development of an immediate release form to 4-AP and did not "block" the development of 4-AP outside the U.S.

Finally, defendants' efforts to obtain FDA-approval of their generic versions of Ampyra are further proof that the product is effective and desirable.

### D.  Ampyra Has Been a Commercial Success Because of the Inventions of the Patents-in-Suit

Dr. Bell's testimony that 4-AP sales in the U.S. alone totaled $1.7 billion from launch in 2010 through the end of 2015, that Acorda's net income therefrom was $998.7 million, that sales to repeat users on persistent therapy account for most sales of Ampyra, and that sales of Ampyra are attributable to market demand rather than aggressive marketing or low prices stands unrefuted.  (PF ¶¶ 157-161).  Dr. Cohen added that 2016 sales of Ampyra were projected to be close to $500 million.  (Tr., Cohen, 301:12-14).  *See Eli Lilly and Co. v. Teva Pharm. USA, Inc.*, No. IP 02-0512-C-B/S, 2004 WL 1724632, at *36 (S.D. Ind. July 29, 2004), *aff'd* 2005 WL 163526 (Fed. Cir. July 13, 2005) ("Lilly has satisfied its burden by offering evidence that

Sarafem, its product covered by . . . the . . . patent, had sales of $176.2 million from August 2000 to December 2002 and was the most prescribed product for the treatment of severe PMS during that time.")

It is also self-evident that, as Dr. Bell explained, Ampyra owes its success to the inventions of the patents-in-suit. (PF ¶ 159). It is undisputed that Ampyra is an embodiment of the Asserted Claims and that the sustained release formulation and 10 mg BID dosing regimen to improve walking in MS patients, which is reflected both in the Asserted Claims and in Ampyra's FDA-approved label, are directly responsible for Ampyra's commercial success. (*Id.*). Indeed, 4-AP was long-known, but was never approved by the FDA in any dose for any purpose before the claimed inventions.

Dr. McDuff's testimony (Tr., McDuff, 631:23-634:2, 665:7-21) that the sales of Ampyra were average for a pharmaceutical product and were lower than the sales of drugs which, unlike Ampyra, are disease modifying treatments for MS, rather than treatments to improve walking, do not change the fact that Ampyra was successful enough to present an economic opportunity that would have motivated pharmaceutical companies to develop the inventions of the Asserted Claims if they were obvious as defendants maintain. (Tr., Bell, 593:2-594:5). [13]

Defendants' mention of the fact that Acorda had originally hoped to develop 4-AP as a treatment for spinal cord injuries and for MS generally (Defs. Reply Br. at 39), merely highlights the unpredictability and complexity of treating CNS disorders and the difficulty of establishing the efficacy and safety of 4-AP. Moreover, those potential uses for 4-AP would have been outside the scope of the Asserted Claims which are limited to the FDA-approved use

---

[13]     Evidently, the prospect of average sales regularly motivates pharmaceutical companies to develop products.

of Ampyra to treat walking in MS patients when dosed twice daily in 10 mg sustained release tablets. [14]

As a practical matter, defendants' argument depends entirely on Dr. McDuff's novel theory that in order for a pharmaceutical product to be a commercial success for purposes of a secondary considerations analysis, the return on the product must exceed the hypothetical "economic cost" of product development that includes an outsized allocation for the failures generally of many potential pharmaceutical products during development. (PF ¶ 162). Based on published data regarding the average cost of clinical trials ($172.7 million) and the low success rate of products during development (about 11%), Dr. McDuff estimated that the total economic cost of developing Ampyra would have been $2.564 billion. (Tr., McDuff, 640:22-641:7, 669:11-671:14, 676:4-677:20). Dr. McDuff arrived at that number by multiplying the approximate average out-of-pocket clinical trial costs for a drug candidate by a factor reflecting the industry-wide likelihood of failure. (Tr., McDuff, 676:4-677:20). Dr. McDuff posited that Ampyra was not a commercial success because it would have to bear a share of the costs of the 88% of failures that the industry experiences; however, its revenues are below that amount. (Tr., McDuff, 642:12-18, 677:15-20; PF ¶ 162). Dr. McDuff relies, though, on publications that address the industry-wide cost of drug development, not the commercial success of particular products in the context of nonobviousness. (*See, e.g.*, JTX-0044). Clearly, while companies use revenues from marketed products to pay for development of other products, the commercial success or failure of a particular product is judged against its own costs, not those of the rest of the pipeline.

---

[14]   The fact that Acorda licensed the '938 Patent "is also evidence of a belief that the . . . patent was valid." *Cadence Pharm. Inc. v. Exela Pharmsci Inc.*, 780 F.3d 1364, 1376 (Fed. Cir. 2015).

Defendants cite no case law that supports Dr. McDuff's theory.  Their citation to

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co.,* No. 13-2088-GMS, 2016 WL 4497054 (D.

Del. Aug. 26, 2016), is mystifying.  There, the court made no mention of Dr. McDuff's theory

that the NuvaRing product at issue was not a commercial success in light of the industry-wide

costs of failures unrelated to NuvaRing.  (*See* Tr., McDuff, 657:7-10).  The *Merck* court "did not

find [the patentee's expert's] testimony reliable" and cited Dr. McDuff only with respect to

NuvaRing being "not the top pharmaceutical contraceptive, but the fifth."  *Merck*, 2016 WL

4497054, at *13.  On that basis, the court found that Merck had "established at most a modest

level of commercial success for NuvaRing."  *Id.*  Here, by contrast, Ampyra is the first and only

drug approved to improve walking in MS patients.

The nexus between the inventions of the Asserted Claims and the commercial

success of Ampyra is undeniable.  4-AP was known for a century but was not approved by the

FDA for any purpose until the inventions of the patents-in-suit.  Contrary to defendants' empty

assertion of a "complete failure of proof" as to the nexus (Defs. Reply Br. at 19), Dr. Bell

testified that Ampyra embodies the 10 mg BID administration of sustained release 4-AP that is

the subject of the Asserted Claims of the patents-in-suit; that the claimed dosing regimen was the

predicate for the clinical trials which achieved FDA approval; that the claimed dosing regimen is

the FDA-approved regimen that appears in the Ampyra labeling; and that Acorda advertises

Ampyra based on the patented attribute of improving walking.  (Tr., Bell, 577:25-578:13,

584:10-585:8; 588:10-589:10; PF ¶ 159).  Simply put, Ampyra and the Asserted Claims are

essentially indistinguishable.

There is manifestly no merit to defendants' argument that 15 mg or 20 mg tablets

of sustained release 4-AP "would be just as clinically effective as a 10 mg product, and sales

essentially would be unchanged." (Defs. Reply Br. at 41). Given the recognized toxicity of 4-AP, patients would not be well advised to take doses of 4-AP that are 50% to 100% higher but offer no increased benefit. As shown in plaintiffs' Answering Brief, the Ampyra label discloses that in open label extension trials the incidence of seizures in patients dosed with 15 mg of 4-AP BID "was over 4 times higher" than in patients dosed with 10 mg BID. (JTX-0076 at AMPDEL0170808; Pls. Br. at 40, n.27). Indeed, the label expressly warns patients not to take even a single extra dose of Ampyra.

Dr. Peroutka's attribution of "50 to 80 percent" of Ampyra's commercial success to 4-AP (Tr., Peroutka, 707:1-8) is meaningless. Dr. Peroutka simply plucks the numbers out of thin air. While it is self-evident that the compound 4-AP is important to the success of Ampyra, the fact is that 4-AP was known for a century before Acorda made Ampyra. It was the inventions of the patents-in-suit that, in combination, turned 4-AP into an FDA-approved product. Accordingly, the inventions and 4-AP all contribute to the success of Ampyra.

Defendants' argument that the '938 Patent was a blocking patent vis-a-vis the Acorda Patents has no bearing on the fact that Ampyra's commercial success supports the nonobviousness of the '938 Patent itself. Nor do defendants counter plaintiffs' argument that the '938 Patent was not an obstacle to the development work that was being conducted abroad before the failure of the large Elan efficacy study, yet the record is devoid of such work continuing after that study. In any event, even as to the Acorda Patents, the alleged blocking effect of the '938 Patent at most weakens the inference from the commercial success of Ampyra that the Acorda Patents were not obvious. (*See* Defs. Reply Br. at 37).

## CONCLUSION

Based on the foregoing and the record in this case, this Court should rule that defendants have failed to meet their burden of proving by clear and convincing evidence that any

of the Asserted Claims of the patents-in-suit are invalid on obviousness grounds.   The Court should, therefore, enter judgment in favor of plaintiffs.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
jtigan@mnat.com

OF COUNSEL:

Aaron Stiefel
Daniel P. DiNapoli
Jeffrey Martin
David Harris
Philip Smithback
Stephanie M. Piper
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000

Sylvia M. Becker
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 683-3500

Soumitra Deka
KAYE SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real | Suite 400
Palo Alto, CA 94306
(650) 319-4500

Jane Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 326-5825

*Attorneys for Acorda Therapeutics, Inc.*

November 10, 2016

*Attorneys for Acorda Therapeutics, Inc. and Alkermes Pharma Ireland Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2016, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

November 10, 2016 upon the following in the manner indicated:

John C. Phillips, Jr., Esquire                                          *VIA ELECTRONIC MAIL*
David A. Bilson, Esquire
Megan C. Haney, Esquire
PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806-4204
*Attorneys for Alkem Laboratories, Ltd., Accord*
*Healthcare, Inc., Teva Pharmaceuticals USA,*
*Inc., Apotex Corp., Apotex Inc., and Roxane*
*Laboratories Inc.*

James F. Hurst, Esquire                                                 *VIA ELECTRONIC MAIL*
George C. Lombardi, Esquire
Maureen L. Rurka, Esquire
Samuel S. Park, Esquire
Reid Smith, Esquire
Bryce A. Cooper, Esquire
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
*Attorneys for Apotex Corp., Apotex Inc.*
*Teva Pharmaceuticals USA, Inc., and*
*Roxane Laboratories, Inc.*

Charles B. Klein, Esquire                                               *VIA ELECTRONIC MAIL*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006-3817
*Attorneys for Apotex Corp., Apotex Inc.*
*Teva Pharmaceuticals USA, Inc., and*
*Roxane Laboratories, Inc.*

Mary B. Matterer, Esquire                                    *VIA ELECTRONIC MAIL*
Richard K. Herrmann, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
*Attorneys for Mylan Pharmaceuticals Inc.*

Melanie Black Dubris, Esquire                                *VIA ELECTRONIC MAIL*
Catherine R.L. Lawson, Esquire
Christopher M. Thomas, Esquire
PARKER POE ADAMS & BERNSTEIN LLP
PNC Plaza
301 Fayetteville Street, Suite 1400
Raleigh, NC 27601
*Attorneys for Mylan Pharmaceuticals Inc.*

Robert L. Florence, Esquire                                  *VIA ELECTRONIC MAIL*
Michael L. Binns, Esquire
Karen L. Carroll, Esquire
PARKER POE ADAMS & BERNSTEIN LLP
1180 Peachtree Street, N.E., Suite 1800
Atlanta, GA 30309
*Attorneys for Mylan Pharmaceuticals Inc.*

*/s/ Maryellen Noreika*
Maryellen Noreika (#3208)